UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>v.<br><br>BIOPURE CORPORATION,<br>THOMAS MOORE, HOWARD RICHMAN<br>and JANE KOBER,<br><br>         Defendants. | CIVIL ACTION NO.<br>05-CA-11853-PBS<br><br><br><br><br>December 21, 2005 |

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Preliminary Statement**

Mindful of the Court's advice that although a party is free to file any Rule 56 motion at any time, a succinct submission stands a better chance of judicial review during the agreed upon accelerated pre-trial schedule in this case, defendants' motion attacks only one key contention in the SEC's case. Like the remainder of the case, this overreaching claim should never have been brought. Furthermore, admitted and undisputed facts readily reveal this claim's lack of merit, even at this early stage.

One of the oddest allegations in this fraud complaint is the SEC's contention that Biopure and its executives misled investors by issuing a press release *that used the same words that the FDA used to update Biopure* as to the status of Biopure's Biological License Application ("BLA") at the *FDA*. Surely, nowhere in the annals of securities law has this government (through one agency, the SEC) sued an issuer and its senior officers for issuing a press release

publicly using the *same words* that this same government (through another agency, the FDA) used to advise the issuer. If the government (SEC) had any problem with the government's (FDA's) chosen words, surely the better path would have been for the SEC and FDA to sort out for future reference (not via a baseless enforcement action) those disclosure key words that they respectively agree matter.

Although the concept of estoppel jumps to mind when one learns of this unheard of, inappropriate catch-22, defendants move here for partial summary judgment on the merits, based on the undisputed identity of the press release content with that of the substance of the FDA's own advisory letter. Specifically, defendants seek partial summary judgment as to all claims that the August 1 press release is misleading about the status of the BLA because the press release effectively said what the letter said. Partial summary judgment will narrow the issues involved in this litigation and shorten the trial.

## Summary of Argument

Biopure received a letter from the FDA on July 30, 2003 responding to Biopure's previously filed Biological License Application (the "BLA Letter").[1]  *See* Transmittal Affidavit of Robert A. Buhlman ("Trans. Aff.") Ex. E. Biopure promptly issued a press release on August 1, accurately summarizing what the BLA Letter stated about the status of the BLA.[2] Trans. Aff. Ex. A. In sum:

---

[1] The remainder of the SEC complaint challenges the alleged failure of Biopure to disclose a safety hold on a protocol seeking to test its product in a completely different indication than the indication applied for in the BLA. The BLA sought marketing approval to treat anemic orthopedic surgery patients while the proposed protocol sought to conduct a test using a new-high dosage of Hemopure in trauma patients, in the hospital. The facts relating to that proposed test in a new indication, including the FDA's July 30, 2003 letter as to it (a second July 30 letter, not the BLA Letter) are not material to this narrow motion.

[2] For brevity, the pertinent undisputed facts, set forth in defendants' Rule 56.1 Statement, will not be repeated here.

1. Biopure's August 1, 2003 press release accurately reported all material information concerning both the status and content of the FDA's July 30, 2003 BLA Letter.

    - <u>Status</u>:  In all material respects, the press release said what the FDA's BLA Letter said: "[T]he U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) . . . With 30 days remaining in the original BLA review cycle, the issuance of the letter has suspended the FDA review clock [those are the exact words of the BLA Letter] until Biopure submits a complete response."  The press release accurately quoted and paraphrased the BLA Letter, conveying the status of the BLA review.

    - <u>Content</u>:   The press release accurately stated that FDA "request[ed] additional information.  The letter focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling.  It does not request additional clinical trials."  The Company was not required to delve into the scientific detail of FDA's questions stated in the BLA Letter.  Indeed, as the FDA stated no conclusions regarding Hemopure in the BLA Letter, a disclosure speculating about the issues that remained "up in the air" would have been premature and irresponsible.

    - <u>Future Implications</u>:  The Company did not *speculate* about future timetables regarding its response to the FDA or the time it might take FDA to respond once the Company answered the BLA Letter.  While the SEC faults the Company on a theory that the BLA Letter somehow controlled the time frame for these future events (*even the SEC must concede the letter was silent on them*), no 10b-5 action may proceed on that theory.  The Company is not required to disclose such projections, and given the information available at the time, could not have made such disclosure.

2. The SEC faults defendants for not <u>*adding*</u> to the press release a label not used by the FDA itself, namely, that the BLA Letter was purportedly a "complete response letter" ("CRL").  Including a CRL label would have been neither additive nor material, and the SEC's attempt to predicate a securities fraud claim on this ground would elevate form over substance to the exclusion of accuracy.

    - <u>Including a CRL label would not have been material</u>.  The label (or lack of one) on the BLA Letter did not change its content and significance for the approval of Hemopure.  As Biopure's public disclosure accurately reported the status of the BLA approval process and content of the BLA Letter, the defendants cannot be held liable for securities fraud for failing to call the letter a CRL when the FDA itself did not.

    - <u>With the benefit of hindsight, a CRL label could have been materially misleading.</u>  Under FDA's own operating procedures, a CRL lists "all" deficiencies.  The BLA Letter requested no additional studies and the Company accurately reported that fact.  Later, FDA did raise safety questions and ask for trials in connection with the BLA that were *not* in the July 30 BLA Letter.  FDA's later conduct confirms the July 30 BLA Letter did not amount to an orthodox, definitive CRL, and a disclosure labeling it as such might have been misleading.  The Company cannot be sued for fraud for not saying it was.

3

LITDOCS/624457.3

# ARGUMENT

## I. THE AUGUST 1, 2003 PRESS RELEASE ACCURATELY DISCLOSED THE JULY 30 BLA LETTER.

The securities laws do not impose liability for accurate statements of historical fact or statements that had a reasonable basis at the time made. *See In re Boston Technology, Inc. Securities Litigation*, 8 F. Supp. 2d 43, 59 (D. Mass. 1998) ("accurate reports of past results or events are not actionable. Nor are forward-looking statements in required SEC filings actionable, as long they are made in good faith and with a reasonable basis.") Here, Biopure's disclosures concerning the July 30 BLA Letter were accurate and had a reasonable basis.

On July 30, 2003, Biopure received the FDA's BLA Letter, thirty days ahead of the scheduled date.[3] Trans. Aff. Ex. E. The BLA Letter did not identify itself as a CRL, and stated that the review clock had been "suspended," rather than "stopped." (By contrast, the FDA's Manual of Standard Operating Procedures and Policies, SOPP 8405, attached as Appendix Exhibit 1 ("App. Ex."), describing CRL's says they "stop" the review clock.)

The August 1 Press Release was based on the wording of the July 30 BLA Letter as this side by side comparison shows:

| The July 30 BLA Letter | The August 1 Press Release |
|---|---|
| • "(CBER) has *completed the review* of all submissions made relating to your Biologics License Application." | • "(FDA) has *completed its review* of the company's biologics license application . . ." |
| • The letter asks for information about clinical and preclinical data and has some comments on labeling. | • "The FDA has issued a letter requesting additional information."… "The letter focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling." |
| • "Please note our review clock has been suspended with the issuance of this | • "With 30 days remaining in the original BLA review cycle, the issuance of the letter |

---

[3] It is undisputed that FDA notified Biopure in writing on May 30, 2003 that FDA would "have *completed our review* and will take action on your [BLA]" by August 29, 2003. *See* May 30, 2003 Letter, Trans. Aff. Ex. D.

4

| | |
|---|---|
| letter." The letter was sent on July 30, 2003 but the deadline was August 29, 2003, thirty days later. The letter stated the review clock "will [not] be reactivated until all deficiencies have been addressed." | has suspended the FDA review clock until Biopure submits a complete response." |
| • The letter does not request additional clinical trials. | • "It does not request additional clinical trials." |

*See* Trans. Aff. Exs. E and A.

### A. The Press Release Accurately Reported The Status Of The BLA Approval Process

Biopure's disclosure concerning the BLA Letter accurately reported the status of the BLA review in light of the BLA Letter. In all material respects, the Company's press release said what the FDA's BLA Letter said:

- "[T]he U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) . . . ." Indeed, the FDA had communicated that it had "completed its review."

- "With 30 days remaining in the original BLA review cycle" -- as a matter of chronological fact, the July 30 BLA Letter arrived with 30 days remaining in the FDA's stated review cycle to end on August 29, 2003.

- "[T]he issuance of the letter has suspended the FDA review clock until Biopure submits a complete response." The FDA communicated that the review clock was "suspended" until Biopure submitted a "complete response."

The Company cannot be faulted through a 10b-5 action for conveying to the public what the FDA conveyed to it -- that FDA had completed its review ahead of schedule and had suspended the review clock. The Company's disclosure regarding the status of the BLA review was accurate because it was based on the BLA Letter.

### B. The Press Release Accurately Reported The Content Of The BLA Letter

The Company's August 1, 2003 disclosure accurately stated that FDA "request[ed] additional information. The letter focuses primarily on clarification of clinical and preclinical

data and includes some comments on labeling. It does not request additional clinical trials." The SEC does not take issue with these statements, literally read, but rather, contends that the press release was misleading because the July 30 BLA Letter was thirty-four pages long and asked many questions. The SEC apparently reads the length of the letter and number of questions to be *per se* negative, requiring some negative-sounding disclosure. *See* Compl. ¶ 73C ("length, detail and substance" a "major setback"). The SEC's theory cannot be sustained.

As stated above, the letter states that FDA has "completed the review" of all submissions relating to the BLA. The review found the information and data submitted "inadequate for final approval action *at this time*." It states "You may request a meeting with CBER to discuss the above *steps for approval*." Further, the letter requests *no additional clinical trials*. These phrases and the absence of a request for additional trials are *not* on their face or by implication a "major setback." On the contrary, it is indisputable that no request for additional trials is a positive.

In thirty-four pages, the July 30 BLA Letter asks questions. It reads:
- "Please comment" -- 26 times
- "Please explain" -- 36 times
- "Please clarify" -- 8 times
- "Please describe" -- 5 times

It requests seven lists, seven spreadsheets and four flow diagrams.

There can be no dispute that the BLA Letter did not provide any final, negative *conclusions* concerning Hemopure. Indeed, by indicating the "steps for approval," no such conclusion could be reasonably inferred. Accordingly, the SEC is left to argue that the length of the letter and number of questions somehow required the Company to make an inference that the letter was truly bad news. But the mere fact that the FDA had communicated thirty-four pages of questions -- regarding a BLA numbering over one million pages, making the BLA Letter .000034% as long as the BLA -- is not so negative that the Company was required to make that

inference and publicly disclose that the FDA had reached negative conclusions when the FDA did not communicate as much.

  The SEC also apparently takes issue with the fact that the BLA Letter used the term "deficiencies" and stated that the BLA was "inadequate for final approval action at this time." *See* Compl.¶ 69. The claim is a red herring. The disclosed fact that Hemopure was not approved - standing alone without any other description -- conveyed to the public that the BLA was "inadequate" and "deficient." By definition, a failure to achieve approval means that the BLA is inadequate and deficient. The Company cannot be held liable for securities fraud for failing to disclose the obvious or to use pejorative adjectives in its disclosure. *See, e.g., In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 375, 377 (3d Cir. 1993) (securities laws are concerned with disclosure of facts, not with the failure to characterize facts with pejorative adjectives; holding also "[t]he federal securities laws, in a word, do not compel the [issuer] to state the obvious"); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980) ("It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market."); *Krim v. Coastal Physician Group, Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998) ("Because Defendants informed investors of the backlogs and problems in Coastal's billing system that caused the company to incur expenses that contributed to its financial decline, the more detailed description of the problems in the billing system which Plaintiff argues should have been disclosed is therefore immaterial as a matter of law."); *Brogren v. Pohlad*, 960 F. Supp. 1401, 1408 (D. Minn. 1997) (holding "no duty to point out a decline in sales which was already reflected in diminished profitability"); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory"); *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 837 (E.D. Va. 1993) ("Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry. The focus of the securities laws is on the disclosure of facts; characterizations of

or conclusions drawn from those facts are matters that are left to the judgment of investors."); *Vosgerichian v. Commodore Int'l*, 862 F. Supp. 1371 (E.D. Pa. 1994) (finding no actionable fraud in failing to report a price decrease where the defendant accurately reported both its large drop in earnings and its much smaller drop in sales).

  The Company's disclosure summarized what the BLA Letter did -- requested additional information and sought clarification. The Company was not required to speculate publicly about the significance of either the number or nature the FDA's questions. *In re PLC Systems, Inc. Securities Litigation*, 41 F. Supp. 2d 106, 119 (D. Mass. 1999) (omissions of details concerning FDA trials, as opposed to fact that endpoint had not been met, was "more quibble than material" because, while these details "might interest a medical researcher, [they] would not be an influential factor in making an investment decision"); *Oran v. Stafford*, 34 F. Supp. 2d 906, 913 n.9 (D.N.J. 1999) (holding "failing to disclose various details concerning the FDA approval process" was "not materially misleading."); *Anderson v. Abbott Laboratories,* 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001) ("omitting smaller details, even if investors might care about them, is not necessarily misleading").

  Indeed, while in a slightly different context, this Court has adhered to the common sense proposition that disclosure of FDA questions during the review process is not only not required, it may be irresponsible. In *In re Biogen Securities Litigation*, 179 F.R.D. 25, 37 (D. Mass. 1997) this Court rejected the assertion that a pharmaceutical company was required to disclose concerns about the efficacy of the drug expressed by the director of the responsible FDA division. The reasoning underlying that holding is fully applicable here. Quoting *In re Medimmune, Inc. Securities Litigation*, 873 F. Supp. 953, 966 (D. Md.1995) this Court explained the danger of "requiring ongoing disclosure of FDA's questions" -- "it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again." *Id.* at 966. Those same concerns control here -- the Company was not required to, and in fact should not have, disclosed what it did not know about the FDA's

state of mind in asking the questions.

### C. The Press Release Appropriately Declined To Comment On Future FDA Timetables

In its August 1, 2003 press release, the Company did not speculate about the specific timing of its response to the FDA or the time it might take FDA to respond thereafter.[4] The SEC faults the Company on a theory that the BLA Letter somehow controlled the time frame for these future events. At the same time, the SEC must concede that the July 30 BLA Letter was *silent* on FDA future review periods. The SEC's fraud claims based on failure to speculate about future review periods are at odds with both longstanding legal principles and indisputable facts.

The BLA Letter did not dictate the timing of any future events. Even if the BLA Letter bore a CRL label and conveyed standard form language (and it did not) typical of a CRL, the FDA's issuance of a CRL imposes *no regulatory requirement* regarding the timing of future FDA action. The PDUFA time commitments are aspiratory -- they are not mandatory. *See* PDUFA III Five-Year Plan, Department of Health and Human Services FDA, Office of Management and Systems July 2003 ("PDUFA III"), attached as App. Ex. 2, (setting forth PDUFA "performance goals" for completing review of certain percentages of (not all) applications within specified time-frame).

But here, the BLA Letter did not state that it was a CRL, and contained language that was not typical of a CRL. In particular with respect to timing issues, the letter stated that the review clock had been "suspended" -- not "stopped" as a CRL would provide. *See* SOPP 8405 (Complete Response Letters "*stop* the review clock"). In addition, detracting from any view that the FDA was adhering to any rigid timetables with respect to Hemopure, the BLA Letter was received thirty days prior to the PDUFA aspiratory deadline.

---

[4] The press release said the Company would provide answers "as expeditiously as possible." "Expeditiously" means "characterized by or acting promptly and efficiently."

At most then, the Company would have been required to speculate[5] to reach the conclusion that the BLA Letter signified the "stop" (instead of suspension) of the review clock and a 2 month or 6 month aspiratory response time by FDA under PDUFA, following the Company's response.  The August 1 press release does not so speculate, stating only that "the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response" -- a statement that is literally and indisputably true.  To require further disclosure concerning the future of the BLA would amount to a requirement that the Company publicly speculate about future events.  It is axiomatic, however, that "[t]he federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data." *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996).  Based on the content of the letter and surrounding circumstances, the Company did not publicly speculate about future projected timetables, and it was not required to do so as a matter of law.

The SEC seems to take issue with the press release using the word "suspend," because "suspend" implies that the clock will *resume* with 30 days left in the original review cycle.  To the extent that the SEC finds that implication misleading, it comes from the word "suspend" *used by the FDA*.  It is simply inconceivable that the SEC can pursue a misrepresentation claim alleging that the press release used a word that implied the original review cycle would resume, when the FDA's own July 30 BLA Letter stated that the FDA's review had been <u>suspended</u> and the press release used that <u>same word</u>, "suspended," in the same context as the FDA's BLA Letter.

*   *   *

---

[5] That the SEC has instituted a *fraud* action for failure to disclose that the BLA Letter was a CRL when, even after the fact, the unusually worded BLA Letter does not appear to be a CRL, is to say the least, overreaching.

In sum, the Company's August 1, 2003 press release was accurate regarding the status and content of the BLA Letter and is not actionable with respect to nondisclosure of estimates concerning future FDA actions.

## II. THE ABSENCE OF THE TERM "COMPLETE RESPONSE LETTER" IN THE PRESS RELEASE IS NOT AN ACTIONABLE OMISSION

### A. The CRL Label Is Not Material

The SEC alleges that the August 1, 2003 press release was materially misleading because it did not disclose that the BLA Letter was a CRL. Apart from the fact that the BLA Letter does not identify itself as a CRL (thus undermining any contention that the press release contained an omission) the label in and of itself is not material, because the press release, like the BLA Letter, stated that the FDA had "completed its review."

Preliminarily, the SEC's implicit contention that a sponsor's receipt of a CRL is inherently bad news is simply incorrect. In the words of the FDA, "*[i]ssuance of complete response letters . . . [carry] no implication as to the ultimate approvability of the application.*" *See* Proposed Rules Department Of Health And Human Services: FDA 21 CFR Parts 312, 314, 600, and 601 Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications Tuesday, July 20, 2004 69 FR 43351-01, 2004 WL 1599720 ("Proposed Rules"), attached as App. Ex. 3, (comments on proposed regulation defining complete response letters) (emphasis added).

Moreover, there is no statute or regulation imposing any binding requirements concerning the implications of receiving a CRL insofar as future timing of FDA actions is concerned regarding a BLA.[6] As explained above, there are PDUFA guidelines that set forth "performance goals" for when the FDA will respond to a sponsor's "complete response" to a CRL, but the guidelines are aspiratory -- not mandatory. *See* PDUFA III. Nor are there any regulations

---

[6] There are regulations imposing such requirements in other contexts, such as FDA's review of New Drug Applications ("NDA's"). Moreover, the FDA had proposed regulations that would place some binding requirements upon sponsor's following receipt of a CRL. *See* Proposed Rules. Those regulations have not been adopted even today. They were *not* in effect on July 30, 2003.

imposing requirements on sponsors or the FDA concerning other post-receipt events associated with CRL's. At most, CBER has adopted SOPP 8405, part of its "Manual of Standard Operating Procedures and Policies," which states that Complete Response Letters are issued "when the complete review indicates that there are deficiencies remaining that preclude the approval of the application or supplement at that time" and the issuance of the letter will "stop the review clock." SOPP 8405.

Accordingly, in the BLA context, the CRL label means little more than that (i) the FDA completed its review and the BLA is not approved at that time, (ii) the review clock is stopped, and (iii) the FDA will aspire to respond to any resubmission in 2 months or 6 months following the sponsor's response. The August 1 press release discloses that the FDA completed its review, that the FDA requested more information, and that the review clock had been suspended (FDA's word). The only possible additional "fact" that could have been conveyed to investors by including a CRL label in the press release would concern FDA's projected timetable for responding to any response Biopure submitted at some unspecified date in the future. As explained above, the Company has no duty to disclose projections of future events, let alone projections of events over which it has no control, concerning when in the future the *FDA* would *aspire* to act on the Company's future response, which was itself to be submitted by the Company at some *indefinite time in the future*. Indeed, given the extremely indeterminate time frames -- again, the Company made no estimate of when it would respond to the FDA -- such information could not be deemed material as a matter of law. A purported omission of such a vague and open ended projection could not be the basis for a 10b-5 action. *See In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 516 (9th Cir. 1991) (no duty to disclose uncertain projections); *Walker v. Action Industries, Inc.*, 802 F.2d 703, 709-10 (4th Cir. 1986) (no duty to disclose financial projections that were uncertain and misleading in nature); *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243-44 (D. Utah 1999) ("when defendants voluntarily disclose information, they have a duty only to make the disclosure at the time 'complete and accurate'" but "[t]his obligation, however, carries with it no duty to make

projections about the future.")

Missing the point, the SEC alleges that an FDA staffer, Franklin Stephenson, told one Biopure executive on or about that July 31, 2003, that the BLA Letter was a "complete response letter." That is nothing more than an allegation of immaterial fact: There is no material difference between stating, as both the BLA Letter and the press release did, that the FDA had "completed its review" and stating that the BLA Letter was a "complete response letter." Given that both the BLA Letter and the press release also stated that the FDA review clock was "suspended" by the Letter, the BLA timing implication of the Letter was also addressed in the press release *using the FDA's own words*. Characterization of the Letter was not required and could have been misleading in light of subsequent events. (*See* Section B).

> B.  **With Hindsight, Under FDA Guidelines And As A Matter Of Undisputed Fact, It Could Have Been Materially Misleading To Label The BLA Letter A CRL**

In addition to the implications for CRL's mentioned above, SOPP 8405, "Complete Review and Issuance of Action Letters," provides:

> "The Complete Response Letter *will*:
>
> - Summarize *all* of the *deficiencies* remaining, and
> - Where appropriate, *describe actions necessary* to place the application/supplement in a condition for approval."[7]

So, for instance, if FDA required studies or had safety questions based on adverse events data for the BLA, under its own guidelines, FDA was required to say so *in the July 30 BLA Letter*, if the July 30 BLA Letter were a Complete Response Letter.

In this case, FDA did not state in the July 30 BLA letter that *any* additional clinical or preclinical trials were necessary to place the BLA in a condition for approval and it did not ask *any* safety data comparison questions. The Court can read the July 30 BLA letter and see that no

---

[7] Following the events giving rise to this litigation, on July 9, 2004 the FDA proposed a new definition of "complete response letter" for the Code of Federal Regulations. Significantly, that definition would provide only that the FDA's written communication would "*usually* identify[] all of the deficiencies in a biologics license application or supplement that must be satisfactorily addressed before it can be approved." *See* Federal Register/Vol. 69, No. 138/Tuesday, July 20, 2004/Proposed Rules.

clinical or preclinical trials were identified as necessary and that there were no safety data comparison questions. Biopure accurately disclosed that the FDA did not request additional clinical trials.

Months later, at Biopure's first in face meeting with FDA representatives to review the BLA Letter, on January 6, 2004, FDA informed the Company *for the first time* that conscious swine studies would be required in connection with the BLA review and asked safety data comparison questions for the BLA. The FDA's Official Meeting Minutes of the January 6, 2004 meeting between the FDA and Biopure regarding the BLA state: "[a]dditional animal studies are *necessary* to resolve safety concerns before proceeding to clinical trials" and "the path forward was for Biopure to perform the requested *animal studies*." Trans. Aff. Ex. F.

The Court need not rely on this January 2004 meeting to enter summary judgment, because it can do so on the basis of the arguments set forth in Section I.

Nevertheless, this January 2004 undisputed evidence confirms why the CRL label might have not even been appropriate, let alone required.

### III.  THE CORPORATE OPTIMISM CONTAINED IN THE PRESS RELEASE IS NOT ACTIONABLE AS A MATTER OF LAW

Other than the accurate phrases and descriptions lifted from the July 30 BLA Letter, the August 1 press release contains a quote from Mr. Moore.

The quote reads as follows:

> We're encouraged that the FDA has finished its review and provided comprehensive feedback in advance of the formal action due date. By maintaining 30 days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible," said Biopure president and CEO Thomas A. Moore. "We'll work with the Agency to address the remaining questions and will provide our answers as expeditiously as possible."

This is a soft statement of corporate optimism (*i.e.,* "we're encouraged") and future intent. As courts have aptly recognized, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be

expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2nd Cir. 1994) *superceded by statute on other grounds as recognized in In re Paracelsus*, 61 F. Supp.2d 591 (S.D. Tex. 1998). Accordingly, such statements are not actionable as a matter of law. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) *superceded by statute on other grounds as recognized in Greebel v. FTP Software, Inc.,* 194 F. 3d 185 (1st Cir. 1999) ("Courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available"); *Gross v. Summa Four, Inc.*, No. Civ. C-94-364-B 1995 WL 806823, *11 (D.N.H. Nov. 8, 1995) ("Statements, however, that are general, vague, or lack specificity, or are not guarantees, even if made without a reasonable basis, are not actionable because a reasonable investor would not rely on them."); *See* App. Ex. 4; *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 209 (D. Mass. 1994) (statements such as "we are optimistic about the future" are "too general for a reasonable investor to have considered them to be important ").

**Conclusion**

We submit that most modern Americans (those not cynical) would do a double-take upon hearing that their government sued an issuer and executives for fraud for issuing a press release repeating what the FDA stated, namely that the FDA had completed its review of a BLA. This is not a close call.

| | |
|---|---|
| **JANE KOBER,** | **BIOPURE CORPORATION,** |
| By her attorneys, | By its attorneys, |
| /s/ Thomas J. Dougherty<br>Thomas J. Dougherty BBO #132300<br>Justin J. Daniels BBO #656118<br>Scott T. Lashway BBO #655268<br>Skadden, Arps, Slate,<br>  Meagher & Flom LLP<br>One Beacon Street<br>Boston, MA 02108<br>(617) 573-4800 | /s/ Robert A. Buhlman<br>Robert A. Buhlman, BBO #554393<br>Donald J. Savery, BBO #564975<br>Michael D. Blanchard, BBO #636860<br>Bingham McCutchen LLP<br>150 Federal Street<br>Boston, MA 02110-1726<br>(617) 951-8000 |
| **HOWARD RICHMAN,** | **THOMAS MOORE,** |
| By his attorneys, | By his attorneys, |
| /s/John D. Hughes<br>John D. Hughes BBO #243660<br>Cathy A. Fleming (*pro hac vice*)<br>Mary P. Cormier BBO #635756<br>Edwards & Angell, LLP<br>101 Federal Street<br>Boston, MA 02110<br>617-951-2225 | /s/Edward P. Leibensperger<br>Edward P. Leibensperger BBO # 292620<br>Jeffrey S. Huang BBO #651854<br>McDermott, Will & Emery LLP<br>28 State Street<br>Boston, MA 02109<br>617-535-4046 |

## **CERTIFICATE OF SERVICE**

    I hereby certify that a true copy of the above pleading was served by hand upon the attorney(s) of record for all parties on December 21, 2005.

                                    /s/ Robert A. Buhlman
                                    Robert A. Buhlman