UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. |
| ) | |
| v. ) | 05-CA-11853-PBS |
| ) | |
| BIOPURE CORPORATION, ) | |
| THOMAS MOORE, HOWARD RICHMAN ) | |
| and JANE KOBER, ) | |
| ) | |
| Defendant. ) | December 21, 2005 |
| ) | |
| ) | |

**APPENDIX OF CITATIONS TO DEFENDANTS' MEMORANDUM OF
LAW IN SUPPORT OF JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

| **Document** | **Exhibit** |
| --- | --- |
| FDA's Manual of Standard Operating Procedures and Policies, SOPP 8405 | 1 |
| PDUFA III Five-Year Plan, Department of Health and Human Services FDA, Office of Management and Systems July 2003 | 2 |
| Proposed Rules Department Of Health And Human Services: FDA 21 CFR Parts 312, 314, 600, and 601 July 20, 2004 69 FR 43351-01, 2004 WL 1599720 | 3 |
| *Gross v. Summa Four, Inc.*, No. Civ. C-94-364-B 1995 WL 806823 (D.N.H. Nov. 8, 1995) | 4 |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the above document was served by hand upon the attorney(s) of record for each party on December 21, 2005.


/s/ Robert A. Buhlman
Robert A. Buhlman

Case 1:05-cv-11853-PBS    Document 48-2    Filed 12/21/2005    Page 1 of 4

 

## U.S. Food and Drug Administration

### CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

Department of Health and Human Services

FDA Home Page | CBER A-Z Index | CBER Search | Contact CBER | CBER Home Page

Blood | Vaccines | Cellular/Gene Therapy | Tissue | Devices

Products | Industry | Healthcare | Reading Room | Meetings | What's New

# Manual of Standard Operating Procedures and Policies

# Regulatory - License Applications

# Complete Review and Issuance of Action Letters

**SOPP 8405**          **Version #4**          **Date: Sep. 20, 2004**

## 1. Purpose

The purpose of this document is to describe the policies and procedures that the Center for Biologics Evaluation and Research (CBER) staff will follow to perform complete reviews of applications and supplements and communicate deficiencies to applicants.

## 2. History

This version updates signature authorities and references to PDUFA and eliminates the definition of backlog.

## 3. Definitions

### Complete Biologics License Application

A biologics license application will be considered complete for filing purposes if it contains all of the data and critical review elements necessary for initiating a meaningful review process. In considering the completeness of an application, CBER staff should determine whether the application contains the elements described in the Guidance for Industry on the Chemistry Manufacturing and Controls and Establishment Description Information appropriate for the product, in addition to the applicable requirements outlined in Title 21, Code of Federal Regulations (21 CFR) Sections 601.2 and 601.3 and the elements described in the CBER "Refusal To File" (RTF) SOPP 8404.

### Information Requests

Communications asking for data or information needed to complete the review of an application or supplement are information requests. They are not considered to be Action Letters because they do not represent a complete review of the submission and therefore do not stop the review clock. Information Requests can include letters, facsimiles, documented telecons, etc.

### Priority Applications

The product, if approved by CBER or the Center for Drug Evaluation and Research (CDER), would be a significant improvement in the safety or effectiveness of the treatment, diagnosis or prevention of a serious or life-threatening disease. In addition, for drug products under CDER's jurisdiction, the product, if approved, would be a significant improvement in the treatment, diagnosis or prevention of a non-serious disease. Examples include:

- documented improvement in patient compliance
- elimination or significant reduction of a treatment-limiting drug reaction
- demonstration of safety or effectiveness in a new subpopulation of patients with the disease.

**Standard Applications**

All non-priority applications will be considered "standard" applications.

**Action Letters**

The following letter types constitute complete Agency actions (for performance goal and review clock purposes) in response to the application or supplement review process. Action letters are the result of complete Agency review of applications or supplements and stop the review clock.

- **Complete Response Letter** - This letter will be issued when the complete review indicates that there are deficiencies remaining that preclude the approval of the application or supplement at that time. The Complete Response Letter will:

  - Summarize all of the deficiencies remaining, and
  - Where appropriate, describe actions necessary to place the application/supplement in a condition for approval.

- **Approval Letter** - Following completion of all aspects of the review process, including testing of submitted product lots, pre-licensing inspection and evaluation of final printed labeling or a suitable alternative, an approval letter will constitute the final action.

# 4. Background

CBER will utilize Action Letters (i.e., complete response and approval) following each complete review cycle for biologics license applications (BLAs) and supplements. FDA committed to meeting various performance goals in support of the user fee program established by the Prescription Drug User Fee Act of 1992 (PDUFA). CBER intends to perform an initial, complete review of an application or supplement subject to user fees within the time frames contained in the FDA's June 4, 2002 letter to Congress setting out the performance goals regarding the Food and Drug Administration Modernization Act of 1997 (FDAMA), in which PDUFA (PDUFA 3) was reauthorized. CBER staff should conduct a complete review of a manufacturer's complete response to a previously issued action letter (resubmission) according to the procedures set out in SOPP 8405.1.

# 5. Policy

The Secretary's letter to Congress sets out the performance goals regarding PDUFA 3. CBER staff should review all priority and standard license applications and amendments subject to PDUFA 3 within established time frames. The results of each complete review will be communicated to the applicant via the appropriate Action Letter. The signature authorities for Action Letters issued by the various offices are contained in the Appendix of this SOPP. Additionally, as agreed during the 1993 senior management go-away, the same procedure for complete review and issuance of action letters will apply to products not subject to user fees, with the exception that strict adherence to the time lines will be recommended as resources permit but

not required.

# 6. Responsibilities and Procedures

**User Fee Applications**

Follow the general guidance specified below for all applications and supplements subject to user fees (on or after September 1, 1992, and not specifically exempted by the legislation).

- Designate the status of the application (i.e., priority or standard) at the time of the pre-BLA meeting or as soon as possible after receipt.
- Verify the status of all fees owed by the applicant. The User Fee Act provides that an application will not be accepted for filing unless the applicant has paid all fees due. Information regarding payment of fees will be provided to CBER in reports issued by the Office of Financial Management (OFM), FDA.
- Assign the submission tracking number when the application is received in the application division of each office and correlate the receipt of payment with the submitted application.
- Use an administrative screening procedure as an initial step to document that the submission contains all of the required filing elements (this is not an in-depth review as to the quality of the submitted data).
- Form the review committee and meet in accordance with guidance established and issued by each office.
- Make a refusal to file decision by the time of the 45-day meeting. Notify the applicant of the decision in accordance with the CBER refusal to file guidance document.
- If the application/supplement is accepted for filing, information requests may be utilized up to the time that a complete action is taken.
- The application/supplement should be acted on within the appropriate time frame. Such action consists of a complete review followed by issuance of an action letter (complete response, or approval). If information requests were utilized, the dates and status of the applicant's response to such requests should be acknowledged in the action letter.
- Other actions that may be taken include withdrawal or denial.

**Applications/Supplements not Subject To User Fees**

- Designate the status of the application as either priority or standard.
- Assign the submission tracking number when the application is received in the application division of each office.
- Use an administrative screening procedure as an initial step to document that the submission contains all of the required filing elements (this is not an in-depth review as to the quality of the submitted data). Each office will define and issue a procedure for administrative screening.
- Form the review committee and meet in accordance with guidance established and issued by each office.
- Make an RTF decision by the time of the 45-day meeting as resources permit.
- The application/supplement should be acted on within the appropriate time frame as resources permit. Such action consists of a complete review followed by issuance of an action letter (complete response or approval). If information requests were utilized, the dates and status of the applicant's response to such requests should be acknowledged in the action letter.
- Other actions that may be taken include withdrawal or denial.

# 7. Appendices

Appendix 1: Signature Authority for Action Letters

# 8. Effective Date

September 20, 2004

Updated September 27, 2004

---

CBER Home Page | CBER A-Z Index | CBER Search | Contact CBER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA / Center for Biologics Evaluation and Research



# PDUFA III

# Five-Year Plan

### 2003 - 2004 - 2005 - 2006 - 2007

### Department of Health and Human Services
### FOOD AND DRUG ADMINISTRATION
#### Office of Management and Systems

July 2003

## Executive Summary

The Prescription Drug User Fee Act (PDUFA) provides authority for FDA to collect additional resources (fees from industry) that enable FDA to accelerate its drug evaluation process without compromising review quality. The Prescription Drug User Fee Amendments of 2002 extended PDUFA through September 30, 2007 (PDUFA III). Under PDUFA III, FDA is committed to meeting demanding performance goals documented in a June 4, 2002 letter from the Secretary of Health and Human Services to the Chairmen and Ranking Minority Members of the House Committee on Energy and Commerce and the Senate Committee on Health, Education, Labor and Pensions.

In July 1998, FDA completed the first PDUFA II Five-Year Plan. It was FDA's blueprint for investing the resources expected under PDUFA II. That plan was revised and updated periodically. Following that tradition, this initial PDUFA III Five-Year Plan similarly sets out FDA's plans for investing the resources expected under PDUFA III, by organization component and major performance goals.

The planned fee collections and spending over the 5-year period from FY 2003 through FY 2007 total a little over $1.25 billion. This plan provides background information on PDUFA, documents the assumptions upon which the plan is based, and describes the efforts and anticipated costs to meet the performance goals associated with PDUFA III.

By spending category, 64 percent of the fee revenues will be allocated for employee salary and benefit costs, 15 percent for center and ORA operating funds, 11 percent for IT investments, 4 percent for rental payments to GSA, and 5 percent central accounts. By organization, CDER will spend 58 percent, CBER will spend 11 percent, ORA will spend 2 percent, and OC overhead will spend 8 percent, centrally funded items will use 5%, and rent payments to GSA will use 4%.

Spending at this level will not only sustain the 1088 staff years paid from fees by the end of FY 2002, but will also enable the agency to add an additional 376 staff years for the drug review process by FY 2007. Planned increases from 2002 staffing levels by component are:

- CDER-a net increase of 293 staff years by the end of 5 years
- CBER-a net increase of 59 staff years by the end of 5 years
- ORA-level staffing by the end of 5 years

- OC-a net increase of 24 staff years by the end of 5 years

Operating at these levels should enable the agency to meet PDUFA III goals through FY 2003.

---

# Contents

Purpose

Background
    PDUFA I
    PDUFA II
    PDUFA III
    PDUFA Goals

Assumptions

1. Inflation and Inflation Adjustments
2. Workload and Workload Adjustments
3. Revenue Levels and Adjustments
4. Anticipated Collections
5. Support of PDUFA II Fee Base Levels
6. All Statutory Triggers Will Be Met
7. Human Resources May Be Acquired By Either Hiring Or Contracting
8. Resources For The Human Drug Application Review Process Will Increase By About 16 Percent By The End Of PDUFA III
9. The Resources Are Allocated To Assure That The Performance Goals Are Met
10. The Plan Will Be Reassessed And Updated Annually

Planning Process

CDER Plan Summary

CDER Plan Summary Tables

CBER Plan Summary

CBER Plan Summary Tables

ORA Plan Summary

ORA Plan Summary Tables

OC Plan Summary

OC Plan Summary Tables

Information Technology, Rent and Central Accounts

Information Technology, Rent and Central Account Summary Tables

FDA Plan Summary

FDA Plan Summary Tables

Annual Reassessments

Appendix A - PDUFA III Information Technology Five-Year Plan

---

## Purpose

This document is a blueprint for investing the substantial resources the agency expects to collect under the recently reauthorized Prescription Drug User Fee Act, referred to as PDUFA III. It provides FDA's initial estimates of the revenues and expenditures anticipated over the five-year period of the most recent PDUFA reauthorization, fiscal years 2003 through 2007.

The plan seeks to ensure that fee revenues would be effectively used to meet the challenging goals associated with PDUFA III. It proposes an initial allocation of the resources expected each year among the FDA components responsible for achieving PDUFA goals. The plan keeps faith with the agreements made prior to the recent reauthorization of PDUFA by planning expenditures in the same nine categories that were used during discussions that preceded reauthorization. Those categories are:

- Meeting PDUFA II goals - the PDUFA II Additive Base
- Enhanced Training and Staffing
- Risk Management
- Electronic Submissions
- Continuous Marketing Applications
- Efficacy Supplement Resubmissions
- First Cycle Reviews
- Expert Outside Consultants
- Performance Management

In the discussions that preceded the enactment of PDUFA III, the first two bulleted items above were collectively referred to as "Sound Financial Footing" for the drug review program. FDA stressed that resources for these items were necessary to assure the agency's ability to continue to meet the old PDUFA II goals in future years. The remaining bulleted items represent distinct new or enhanced goals under PDUFA III.

FDA will update the plan annually to reflect changes in workload and replace revenue and expenditure estimates with amounts actually received and spent. Updates will also respond to any unanticipated contingencies that may occur. As was done over the past five years, FDA will make the plan, and subsequent updates, publicly available for anyone to review and comment on.

---

## Background

### PDUFA I

The Prescription Drug User Fee Act of 1992 provided FDA with increasing levels of resources for the review of human drug applications. Fees that FDA collected from drug and biologic firms from 1993 through 1997 were used to reduce the evaluation time for certain human drug applications without compromising review quality. Letters from the Secretary of Health and Human Services to Congressional Committee Chairmen detailed goals for the program. By 1997, fees provided FDA with an additional $87.5 million a year for the drug evaluation process.

FDA primarily spent these new resources to hire additional personnel to review human drug applications and to update the information technology (IT) infrastructure supporting the human drug review process. FDA staff dedicated to these reviews in the Center for Drug Evaluation and Research (CDER), the Center for Biologics Evaluation and Research (CBER), the Office of Regulatory Affairs (ORA), and the Office of the Commissioner (OC) increased 56 percent during this period--from 1,277 staff-years in 1992 before PDUFA was enacted to 1,990 staff-years by 1997.

FDA's success in making the drug approval process more predictable, accountable, and scientifically sound, while making safe and effective drugs available to the public more quickly, was recognized in late 1997 when FDA received the prestigious Innovations in American Government Award, jointly sponsored by the Ford Foundation and the Harvard University's John F. Kennedy School of Government.

PDUFA contained a "sunset" provision for automatic expiration on September 30, 1997. Without further legislation, FDA would have been unable to continue to collect and spend PDUFA fees essential to maintain review process improvements.

## PDUFA II

As a result of this success, PDUFA was reauthorized and extended through September 30, 2002. This extension authorized FDA to collect and spend fee revenue to accomplish increasingly challenging goals over this five-year span. These new goals were set forth in letters from the Secretary of Health and Human Services to Congressional Committee Chairmen on November 12, 1997. PDUFA, amended and extended and with its new goals, was referred to as PDUFA II, and its predecessor as PDUFA I. By 2002, PDUFA fees permitted FDA to spend an additional $161.8 million a year for the drug evaluation process.

FDA continued to spend these new resources primarily to hire additional personnel to review human drug applications and to update the IT infrastructure supporting the human drug review process. FDA staff dedicated to these reviews in the CDER, CBER, ORA, and OC increased over 85 percent during the 10 years since PDUFA was enacted--from 1,277 staff years in 1992 before PDUFA was enacted to 2,365 staff years by 2002.

## PDUFA III

Because of the continued success of this program, PDUFA was again reauthorized for another five years. That reauthorization was contained in the Prescription Drug User Fee Amendments of 2002 (Title 5 of the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002), signed by the President on June 12, 2002. This reauthorization covers fiscal years 2003 through 2007, and is known as PDUFA III.

PDUFA III corrects some of the flaws in PDUFA II and should provide for more stable fee revenues over the next five years. It should provide sufficient resources for FDA to continue to be able to meet the challenging PDUFA III goals and undertake pilot programs and new initiatives. Fee revenues should be sufficient to sustain the 1,088 staff years supported by fees in FY 2002, and to add at least an additional 376 staff years. PDUFA III also permits fee revenues to be used for some post-approval risk management activities for the first time. The goals for PDUFA III were set forth in letters from the Secretary of Health and Human Services to Congressional Committee Chairmen on June 4, 2002.

## PDUFA Goals

The goals for PDUFA III are challenging, diverse, and resource intensive. Many of the goals require the development of guidance documents and databases to track performance. The development of infrastructure and tools necessary to enhance electronic application receipt and review is also required. The following table provides an overview and comparison of the major goals by the end of PDUFA I, PDUFA II, and PDUFA III. Some of the goals are

phased in gradually over time, but only the goal for the final year, FY 2007, is reflected in this summary table. For more detail on the actual goals and FDA's performance, see FDA's latest Performance Report on the Internet at http://www.fda.gov/oc/pdufa/reports.html. In addition to the summarized goals described below, over the five-year PDUFA III period, FDA is to also undertake a pilot project in a new type of application review process designated "continuous marketing application," to study ways to complete more reviews in the first review cycle, and to undertake some initiatives aimed at improving review performance.

**Summary Comparison of Goals at the End of PDUFA I, II, and III**

| Goal | PDUFA I | PDUFA II | PDUFA III |
|---|---|---|---|
| Complete review of priority original new drug and biologic applications and efficacy supplements | 90% in 6 months | | |
| Complete review of standard original new drug and biologic applications and efficacy supplements | 90% in 12 months | 90% in 10 months | |
| Complete review of manufacturing supplements | 90% in 6 months | 90% in 4 months if prior approval needed, 6 months otherwise | |
| Complete review of resubmitted new drug and biologic applications | 90% in 6 months | 90% of class 1 in 2 months and 90% of class 2 in 6 months | |
| Complete review of resubmitted efficacy supplements | No Goal | 90% in 6 months | 90% of class 1 in 2 months and 90% of class 2 in 6 months * |
| Discipline review letters for pre-submitted "Reviewable Units" of new drug and biologic applications | No Goal | | 90% in 6 months * |
| Report of substantive deficiencies (or lack thereof) | No Goal | | 90% within 14 days of filing date * |
| Respond to industry requests for meetings | No Goal | 90% within 14 days | |
| Meet with industry within set times | No Goal | 90% within 30, 60, or 75 days, depending on type of meeting | |
| Provide industry with meeting minutes | No Goal | 90% within 30 days | |
| Communicate results of review of complete industry responses to FDA clinical holds | No Goal | 90% within 30 days | |
| Resolve major disputes appealed by industry | No Goal | 90% within 30 days | |

| Complete review of special protocols | No Goal | 90% within 45 days | |
|---|---|---|---|
| Electronic application receipt and review | No Goal | In place by the end of FY 2002 | Enhanced by the end of FY 2007 |

\* Items noted with an asterisk are phased in gradually over time. Only the goal for the final year, FY 2007, is shown here.

---

## Assumptions

Throughout this plan there are a number of tables. The numbers in the tables may not always add due to rounding.

The plan to utilize the PDUFA III additional revenues to meet the challenging PDUFA III goals is based on ten major assumptions. A discussion of each of these assumptions follows.

### 1. Inflation and Inflation Adjustments

The statute provides for annual adjustment of revenues for the costs of inflation after FY 2003. This is identical to the inflation adjustments that have been in place since 1998. The inflation adjustment is the greater of the total percentage change that occurred in either the Consumer Price Index (CPI) for all urban consumers for the 12 month period ending June 30 preceding the beginning of the fiscal year for which fees are being established, or the total percentage change for the previous fiscal year in pay for Federal employees stationed in the Washington DC metropolitan area. The adjustment made each fiscal year by this subsection will be added on a compounded basis to the sum of all adjustments made each fiscal year after fiscal year 2003.

For FY 2004, the adjustment factor specified for Federal pay is 4.27 percent—the rate of increase for employees in the Washington DC area that took place in January 2003. This was greater than the CPI change for the 12-month period ending June 30, 2003—which was 2.225 percent. As a result this plan will use 4.27 percent as the estimated inflation adjuster to apply to FY 2004. For this unique workload adjuster defined in PDUFA, the plan will use the average annual increase in pay for Federal employees in the Washington DC area for the past five years as the basis for estimating future inflation adjustments. That average for the most recent five-year period is 4.08 percent. Future plans will replace this estimate with the actual inflation adjustment as it becomes available.

#### Inflation Adjustment Estimates

| Inflation Adjustment | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan |
|---|---|---|---|---|---|
| Annual Inflation Estimate | | 4.27% | 4.08% | 4.08% | 4.08% |
| Cumulative Inflation Estimate | | 4.27% | 8.52% | 12.95% | 17.56% |
| Estimated Inflation Adjustor | | 4.27% | 8.52% | 12.95% | 17.56% |

### 2. Workload and Workload Adjustments

The statute also provides for annual adjustment of revenues each year after FY 2003 for increases in workload for the process of the review of human drug applications. This

adjustment is new with PDUFA III and will be implemented for the first time when fees for FY 2004 are set in August of 2003.

The workload adjuster will use as its base the average number of various types of applications received for the five-year period from FY 1998 through FY 2002. It will compare those to the average number of applications of each type for the most recent five-year period, and assign a weighting factor to represent the portion of drug review workload represented by each type of application. If the workload for the most recent five years is higher than the five-year average for the base period, then revenues will be increased proportionately. The statute directs that the adjustment may not result in fee revenues for a fiscal year that are less than the inflation adjusted fee revenues for the fiscal year.

For the purpose of this initial five-year plan, FDA is assuming that workload over the course of PDUFA III will be stable. This assumption will change in future plans if, over time, our analyses reflect an increase in workload that causes us to adjust fee revenues.

## 3. Revenue Levels and Adjustments

The statute sets revenue levels for the five years of PDUFA III. They are:

### Statutory PDUFA III Revenue Levels

|  | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Product Fees** | $74,300,000 | $77,000,000 | $84,000,000 | $86,434,000 | $86,434,000 |
| **Establishment Fees** | $74,300,000 | $77,000,000 | $84,000,000 | $86,433,000 | $86,433,000 |
| **Application Fees** | $74,300,000 | $77,000,000 | $84,000,000 | $86,433,000 | $86,433,000 |
| **Total** | $222,900,000 | $231,000,000 | $252,000,000 | $259,300,000 | $259,300,000 |

These statutory revenue levels are to be adjusted for inflation. When the inflation assumptions described in Assumption 1 are applied to the statutory revenue levels above, the inflation adjusted revenue levels that result are set forth in the table below:

### Inflation Adjusted PDUFA III Revenue Levels

|  | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Product Fees** | $74,300,000 | $80,287,900 | $91,160,341 | $97,628,935 | $101,612,196 |
| **Establishment Fees** | $74,300,000 | $80,287,900 | $91,160,341 | $97,627,806 | $101,611,020 |
| **Application Fees** | $74,300,000 | $80,287,900 | $91,160,341 | $97,627,806 | $101,611,020 |
| **Total** | $222,900,000 | $240,863,700 | $273,481,024 | $292,884,546 | $304,834,236 |

The inflation adjusted revenue levels are to be adjusted again for workload. As stated in Assumption 2, above, no workload adjustment is being made in the initial PDUFA III Five-year Plan. However, in future years there may be a further adjustment to these revenue levels for workload in future revisions of this plan.

## 4. Anticipated Collections

Experience has taught FDA that the two-thirds of PDUFA fee revenues that come from establishment and product fees are relatively stable, and can be counted on each year. However, the remaining one-third of revenues that comes from applications has proven fairly volatile and can fluctuate widely from year to year. In two of the five years of PDUFA II, fee revenues fell below anticipated collections. Because of this volatility, it is not prudent for FDA to plan for the allocation of 100% of the application fees each year.

Therefore, in developing plans for the future, FDA will routinely count on getting 100% of the establishment and product fee revenues each year, but only 80% of the application fee revenues, as depicted in the table below:

### Anticipated PDUFA III Collections

| Fiscal Year | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Product Fees | $74,300,000 | $80,287,900 | $91,160,341 | $97,628,935 | $101,612,196 |
| Establishment Fees | $74,300,000 | $80,287,900 | $91,160,341 | $97,627,806 | $101,611,020 |
| Application Fees | $59,440,000 | $64,230,320 | $72,928,273 | $78,102,245 | $81,288,816 |
| Total | $208,040,000 | $224,806,120 | $255,248,956 | $273,358,985 | $284,512,032 |

Revenues at this reduced level will be planned and allocated. If more than 80% of the application fee revenues are collected, and the agency assumes that will be increasingly the case in future years, the revenues will increase FDA's carryover balances, and may support increased levels of planned expenditures in future years. This plan results in minimal carryover balances each year.

It should be noted that at the time of agreement on the substantive provisions of PDUFA III FDA envisioned sufficient resources to add about 450 additional staff years of effort over the five years of PDUFA III. However, the assumption above (that we may prudently plan on only 80% of application fee revenues each year) reduces the level of resources we may plan on, making this current plan reduce expectations to 376 additional staff years.

This strategy of planning and allocating only 80 percent of the anticipated application fee revenues each year replaces the strategy of planning a contingency reserve for each year that was used in the previous PDUFA II five-year plans.

### 5. Support of PDUFA II Fee Base Levels

The fees collected during PDUFA II funded activities that became an integral part of FDA's resources for reviewing human drug applications are referred to as the PDUFA II Fee Base. In FY 2002, over two-thirds of these funds were spent on pay and benefits for an additional 1088 staff years in CDER, CBER, ORA, and OC. These were above the staffing level FDA had been devoting to the review of human drug and biologic applications in FY 1992, the year before PDUFA was enacted. The remaining one-third of the funds was used to provide operating support, IT support, centrally funded support (for indirect costs such as utilities and telecommunications), rent, and overhead costs. The continuation of these 1088 staff years of effort each year is crucial to FDA's ability to review drug and biologic applications efficiently and effectively. These resources are the foundation upon which the improvements mandated by PDUFA III are built.

The PDUFA II Fee Base staff years are allocated as follows:

### PDUFA II Fee Base Staff Year Levels with Adjustments for Therapeutics Transfer

| Fiscal Year | CDER | CBER | ORA | OC | Total |
|---|---|---|---|---|---|
| 2003 | 678 | 246 | 41 | 123 | 1088 |
| 2004 and Beyond | 762 | 162 | 41 | 123 | 1088 |

The difference of 84 staff years from CBER to CDER in FY 2004 and later years reflects the reorganization of the therapeutics products from CBER to CDER in FY 2004. In addition to these PDUFA fee-funded resources, appropriated funds and staff years were also reassigned from CBER to CDER as part of this reorganization.

The five-year estimated costs associated with the PDUFA II Fee Base are detailed in the table below and reflect:

- Annual pay and benefit cost increases of these 1088 staff years
- Operating and support costs for these staff years
- Office of the Commissioner overhead costs is calculated as a percent of center/ORA pay and benefits. (Overhead calculations are discussed beginning on page 22.)
- Information Technology, Central Account and Rent estimates are based on base year costs. (Information Technology, Central Account and Rent estimates are discussed beginning on page 26.)

### PDUFA II Additive Base Fund Estimates ($000)[1]

| Item\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total |
|---|---|---|---|---|---|---|
| Pay and Benefits for Centers/ORA | $107,696 | $112,295 | $116,877 | $121,645 | $126,608 | $585,121 |
| Base Operating Funds--Centers/ORA | $22,598 | $23,563 | $24,524 | $25,525 | $26,566 | $122,776 |
| OC--Salaries and Operating/Contract $ | $13,445 | $14,019 | $14,591 | $15,186 | $15,805 | $73,045 |
| Information Technology | $18,750 | $19,551 | $20,348 | $21,179 | $22,043 | $101,870 |
| Rent | $7,813 | $8,147 | $8,479 | $8,825 | $9,185 | $42,451 |
| Central Accounts | $9,197 | $9,590 | $9,981 | $10,388 | $10,812 | $49,969 |
| Total--PDUFA II Additive Base | $179,499 | $187,164 | $194,800 | $202,748 | $211,020 | $975,232 |

[1]Numbers may not add due to rounding.

### 6. All Statutory Triggers Will Be Met

The law allows FDA to collect and spend PDUFA III revenues each year only if three specific conditions are met. This plan assumes that each of the three statutory conditions will be met each year:

- Total FDA appropriations each year (exclusive of user fees and rent payments to GSA) must total at least as much as FDA received in FY 1997, adjusted for inflation at the rate

of change in the Consumer Price index since FY 1997. For FY 2005 and later, the chart below assumes that this will be a change of 2.5 percent each year. The assumed rates will be updated in future revisions of this plan. The estimates are as follows:

| Fiscal Year | 1997 Amount ($ Millions) Less Rent and User Fees | Est. Adjustment Factor (Actual factors through FY 2004, estimated for later years) | Minimum Appropriation ($ Millions) | Actual Appropriation ($ Millions) Less Rent and Fees |
|---|---|---|---|---|
| 2003 | $820 | 1.1224 | $920 | $1,275 |
| 2004 | $820 | 1.1473 | $941 | |
| 2005 | $820 | 1.1760 | $964 | |
| 2006 | $820 | 1.2054 | $988 | |
| 2007 | $820 | 1.2355 | $1,013 | |

FDA meets this trigger consistently, even though for most years since FY 1997 FDA did not receive increases to cover the cost of pay increases and inflation for its core programs-which was the original intent of this trigger. FDA meets this trigger primarily because FDA has received appropriation increases earmarked for specific initiatives since FY 1997 (e.g., food safety, tobacco, counter-terrorism).

- Each year FDA must actually spend at least as much from appropriations on the human drug review process as it spent from appropriations on this process in FY 1997, adjusted for inflation at the rate of change in the Consumer Price index since FY 1997. For FY 2005 and later, the chart below assumes that this will be a change of 2.5 percent each year. The assumed rates will be updated in future revisions of this plan. The estimates are in the table below:

| Fiscal Year | 1997 Amount Spent on Drug Review from Appropriations ($ Millions) | Adjustment Factor (Actual factors through FY 2004, estimated for later years) | Minimum Drug Review Spending from Appropriations ($ Millions) | Actual Drug Review Spending from Appropriations ($ Millions) |
|---|---|---|---|---|
| 2003 | $148 | 1.1224 | $166 | |
| 2004 | $148 | 1.1473 | $170 | |
| 2005 | $148 | 1.1760 | $174 | |
| 2006 | $148 | 1.2054 | $178 | |
| 2007 | $148 | 1.2355 | $183 | |

If FDA spending from appropriations on the drug review process is less than 5 percent of the specified minimum above, no fees may legally be collected or spent for the year. FDA will not know exactly how much it has spent from appropriations until after the end of the year when final accounting reports are prepared. FDA plans to spend this minimum from appropriations each year. In years when FDA programs do not receive appropriations to cover costs of inflation and mandatory pay increases, core FDA programs other than drug review may have to be further reduced to assure that

appropriated spending for drug review meets the requirements of this trigger.

- PDUFA fee revenues may be collected and spent only to the extent provided each year in FDA's appropriation. If collections exceed appropriations, the surplus can be kept by FDA and used to reduce anticipated collections in a future year.

| Fiscal Year | PDUFA Fees Provided in Appropriations ($ Millions)[1] | PDUFA Fees Actually Collected ($ Millions) as of 9/30/2002 | Overage, if Any ($ Millions) |
|---|---|---|---|
| 2003 | $222.9 | | |
| 2004 | | | |
| 2005 | | | |
| 2006 | | | |
| 2007 | | | |

[1]Actual amount shown for 2003. In updates of the plan, amounts appropriated in subsequent years and amounts actually collected each year will be added to this table.

## 7. Human Resources May Be Acquired By Either Hiring Or Contracting

To develop cost estimates, it was assumed that human resources would be acquired by hiring additional employees. The centers and ORA are not constrained in how necessary additional human resources are acquired. They are encouraged to utilize contract support any time it is more practical or cost effective than hiring.

## 8. Resources For The Human Drug Application Review Process Will Increase By About 16 Percent By The End Of PDUFA III

Over the five years covered by PDUFA III, spending on the process for the review of human drug applications is expected to increase to about $467 million, as reflected in the table below. This is an increase of about 34 percent, or $119 million, compared with $348 million spent in FY 2002, the last year of PDUFA II. This increase by itself may seem large. However, the impact of pay increases over the five years is about 18 percent—or a little over half of the increase. This means that, after accounting for inflation, and excluding the impact of any workload changes, the total resources available for drug review will increase by 16 percent by the end of PDUFA III—an increase of about $50 million. This is expected to add at least 376 more staff years to the drug review process than were spent by the end of PDUFA II—an increase of about 15 percent over the human resources available in FY 2002.

### Projection of Total Spending for the Human Drug Review Process ($000)

| Source of Funds | FY 2003 Estimate | FY 2004 Estimate | FY 2005 Estimate | FY 2006 Estimate | FY 2007 Estimate |
|---|---|---|---|---|---|
| S&E Appropriations | $166,062 | $169,756 | $174,000 | $178,350 | $182,809 |
| Fees from Industry | $208,040 | $224,806 | $255,249 | $273,359 | $284,512 |
| Total Funds | $374,102 | $394,562 | $429,249 | $451,709 | $467,321 |

## 9. The Resources Are Allocated To Assure That The Performance Goals Are Met

These resources are available to FDA to assure that the agency has the additional

resources it needs to meet the performance goals negotiated for PDUFA III. The resources are being allocated in performance goal categories, with the expectation that all of the performance goals that were agreed to when PDUFA III was reauthorized will be met.

**10. The Plan Will Be Reassessed And Updated Annually**

All allocations in the plan are subject to review and reassessment each fiscal year as figures for workload and revenue for the previous year are available and better estimates for the next year's revenues are made. Of course, adjustments will have to be made based on these assessments. The plan will continue to have value as the baseline from which future changes will be made. This annual reassessment process is discussed further on page 34.

---

## Planning Process

The planning process for meeting new PDUFA III goals began during discussions with stakeholders in the last year of PDUFA II. The ability to continue to meet PDUFA II goals was contingent on getting enough resources to maintain the PDUFA II additive base and the resources needed to enhance training and staffing. As new goals were proposed, resource implications were also estimated and discussed. These ongoing discussions over many months resulted in the PDUFA III goal letters of June 4, 2002. The PDUFA III resource levels and adjusters to achieve these goals were enacted in the PDUFA III statute.

This PDUFA III Five-Year Plan is patterned after the five-year plan for PDUFA II and its annual updates. The plan reflects the resources anticipated and FDA plans for investing those resources. The plan is intended to be a living and dynamic document, and will be updated annually.

In developing this plan, the Office of Management and Systems (OMS) worked with CDER, CBER, and ORA to integrate their plans into an overall FDA plan. The primary focus of this effort was to ensure sound plans supporting PDUFA III goals. CDER, CBER and ORA were each asked to reassess essential needs in order to ensure that they meet the PDUFA III goals.

The complete PDUFA III Information Technology (IT) Five-Year Plan is included in this plan (Appendix A). It is summarized in the following pages as a single overall plan for FDA, rather than in the narratives and estimates of each component, as was the case in the PDUFA II IT plans.

The overall PDUFA III Five-Year Plan resulting from this process provides a sound blueprint for the investments needed to ensure FDA success with PDUFA III. The following pages summarize the planned distribution of PDUFA III funds to each component (CDER, CBER, and ORA, and OC) over the five years of the plan and a summary section on IT, Rent and Central Accounts. At the end there are FDA Plan Summary Tables. The two largest demands continue to be: (1) additional human resources to meet the PDUFA III goals and (2) IT investments both to enhance paperless application receipt and review and to consolidate IT resources to assure their efficient use.

---

## CDER Plan Summary

CDER plans for FY 2003 and the subsequent fiscal years authorized in PDUFA III are summarized below, using the PDUFA III goal categories.

### Enhanced Staffing & Training

In FY 2003, CDER plans to increase review staffing in support of the Sound Financial Footing initiative. An additional 34 FTEs are planned for this category. The estimated increase is $4.5 million with 83%, $3.7 million, of the total for pay and benefits. The goal of this increase is to achieve a sufficient level of staffing to allow reviewers time to maintain their review workloads and engage in professional development and training opportunities. Under PDUFA II staffing levels did not keep up with increases in workload and therefore reviewers were required to forego some training and professional development activities. This precluded reviewers from pursuing development activities (e.g., training in new technology) that are considered to be essential to support the attainment of PDUFA III goals.

Additional funds will be used to provide training related to PDUFA III activities, including the implementation of new guidance (e.g., Good Review Management Principles and Continuous Marketing Application Pilot Programs). Other training will cover topics such as counter-terrorism efforts, current good manufacturing initiatives, and pediatric labeling information.

## Risk Management

The Commissioner has established Efficient Risk Management as one of FDA's five strategic goals. The goal includes both the new drug review process and oversight after approval. When a drug product is approved, it is impossible to know everything about its safety. Therefore, it is important that we increase the surveillance of the safety of medicines during their first two years on the market (or first three years for drugs with potentially serious safety concerns identified at the time of approval). This increased focus on detection of adverse events and monitoring of risk management programs during the pre-approval period will allow improved safe use of newly approved drugs.

The FY 2003 estimated increase for Risk Management is $5.7 million. CDER plans to hire and support an additional 10 FTEs, an increase of $1.2 million for pay and benefits. The personnel will enforce regulations on postmarketing adverse event reporting to ensure that submitted reports are accurate, timely and complete. Plans also include the development of regulatory strategies and final guidance documents; and inspections to ensure industry compliance with the regulations. The largest portion of the increase, $4.5 million will be utilized for the Adverse Event Reporting System (AERS). Upgrading the reporting format from paper to electronic will expedite the reporting process as well as reduce the cost of receiving and processing a report ($31 per report) by at least half for those submitted electronically.
Efficacy Supplement Resubmissions

CDER plans to hire an additional five FTEs in FY 2003 for Resubmitted Efficacy Supplements. The total estimated increase is $590,000. The additional personnel will be used to achieve the Center's expedited performance goals.

## Continuous Marketing Application

FDA recognizes the importance of providing safe, effective, and high quality drugs to the American public that treat serious and life-threatening diseases as soon as possible. The Continuous Marketing Application (CMA) goal is a new performance goal comprised of two pilot programs that will test whether early review of selected applications and additional feedback and advice to sponsors during drug development will further shorten drug development and review times.

CDER is in the process of developing guidance with CBER on how the pilot program will be implemented. The Center estimates $982,000 will be required to fund the salaries and support of 8 additional Staff years. Personnel will complete the initial phase of the guidance development by the end of FY 2003. The guidance will describe the principles, processes, and procedures of the pilot program as well as other required technical and scientific information.

### Independent Expert Consultants

CDER plans to retain independent expert consultants to assist in review of clinical protocols expected to serve as the basis for approval for new biotechnology drugs. CDER will engage these consultants on an ad hoc basis in response to requests from applicants. CDER has developed draft guidance on how this program will be implemented and will work to finalize the guidance. The estimate for FY 2003 is $56,000.

### First Cycle Review Performance

FDA plans to develop a joint CDER/CBER guidance on Good Review Management Principles (GRMPs) and publish a guidance by the end of FY 2003 that will address critical principles for the efficient management of the review of new marketing applications. The plan also includes the development and implementation of a training program for all review personnel on the GRMPs. An independent expert consultant will subsequently evaluate issues that pertain to the first cycle reviews. The study will evaluate current performance and changes that occur after the GRMPs guidance is published; an assessment of the first cycle review history of all NDA's for NME's during PDUFA III; and the effectiveness of the training program. CDER plans to hire an additional 2 FTEs in FY 2003, a total increase of $295,000.

### CDER Plan Summary Tables--PDUFA III
### Plan for Funds from PDUFA Fee Revenues ($000)

Note: Numbers Are Rounded and May Not Add

**Inflation Adjustment Estimate**

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Annual Inflation Estimate | | 4.27% | 4.08% | 4.08% | 4.08% | |
| Cumulative Inflation Estimate | | 4.27% | 8.52% | 12.95% | 17.56% | |
| Estimated Inflation Adjustor | | 104.27% | 108.52% | 112.95% | 117.56% | |

**PDUFA II Additive Base**

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| PDUFA II Additive Base Staff Years | 678 | 762 | 762 | 762 | 762 | |
| Payroll for PDUFA II Staff Years | $78,239 | $90,717 | $94,418 | $98,271 | $102,280 | $463,925 |
| Operating Support for | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| PDUFA II Base | $18,330 | $20,212 | $21,036 | $21,895 | $22,788 | $104,261 |
| Subtotal--To Maintain PDUFA II Levels | $96,569 | $110,929 | $115,455 | $120,165 | $125,068 | $568,186 |

**PDUFA III Enhancements Over PDUFA II**

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| **Enhanced Training and Staffing** | **$4,466** | **$11,583** | **$19,573** | **$23,965** | **$26,410** | **$85,996** |
| Additional Staff Years | 34 | 85 | 138 | 162 | 172 | |
| Payroll for Additional Staff Years | $3,723 | $9,720 | $16,425 | $20,115 | $22,168 | $72,151 |
| Operating Support | $742 | $1,863 | $3,147 | $3,849 | $4,242 | $13,844 |
| **Risk Management** | **$5,757** | **$8,122** | **$12,020** | **$13,957** | **$16,281** | **$56,137** |
| Additional Staff Years | 10 | 23 | 43 | 68 | 78 | |
| Payroll for Additional Staff Years | $1,152 | $2,659 | $5,182 | $8,429 | $10,101 | $27,523 |
| Operating Support | $125 | $291 | $565 | $919 | $1,102 | $3,002 |
| Contract Support[1] | $4,480 | $5,172 | $6,273 | $4,608 | $5,079 | $25,612 |
| **Continuous Marketing Applications** | **$982** | **$1,830** | **$2,809** | **$3,314** | **$3,652** | **$12,588** |
| Additional Staff Years | 8 | 14 | 21 | 24 | 26 | |
| Payroll for Additional Staff Years | $886 | $1,650 | $2,532 | $2,987 | $3,292 | $11,347 |
| Operating Support | $96 | $181 | $277 | $327 | $361 | $1,242 |
| **Efficacy Supplement Resubmissions** | **$589** | **$1,152** | **$1,536** | **$1,716** | **$1,891** | **$6,884** |
| Additional Staff Years | 5 | 9 | 12 | 12 | 13 | |
| Payroll for | | | | | | |

| Category | | | | | | |
|---|---|---|---|---|---|---|
| Additional Staff Years | $532 | $1,038 | $1,384 | $1,547 | $1,705 | $6,205 |
| Operating Support | $58 | $114 | $152 | $169 | $187 | $679 |
| **First Cycle Reviews** | **$295** | **$339** | **$375** | **$390** | **$430** | **$1,830** |
| Additional Staff Years | 2 | 3 | 3 | 3 | 3 | |
| Payroll for Additional Staff Years | $266 | $306 | $338 | $352 | $388 | $1,649 |
| Operating Support | $29 | $33 | $37 | $38 | $42 | $180 |
| **Expert Outside Consultants** | **$56** | **$95** | **$107** | **$112** | **$122** | **$492** |
| Additional Staff Years | 0 | 1 | 1 | 1 | 1 | |
| Payroll for Additional Staff Years | $44 | $75 | $83 | $86 | $95 | $382 |
| Operating Support | $12 | $20 | $25 | $26 | $27 | $110 |
| Subtotal of PDUFA III Additional Staff Years | 60 | 135 | 218 | 270 | 293 | |
| **Subtotal PDUFA III Enhancements** | **$12,145** | **$23,121** | **$36,420** | **$43,454** | **$48,787** | **$163,927** |

**Totals**

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Funds--CDER | $108,715 | $134,050 | $151,875 | $163,619 | $173,855 | $732,113 |
| Total PDUFA Additive Staff Years--CDER | 738 | 897 | 980 | 1,032 | 1,054 | |

[1] Risk Management Contract support includes funds for both CDER and CBER, but funds for both centers are being managed by CDER.
[2] Estimates for 2004 and beyond include transfer of 34% of CBER's PDUFA resources along with the transfer of CBER therapeutic product review functions to CDER.

## CBER Plan Summary

CBER's overall plan for the five years of PDUFA III totals $139.3 million. A year-by-year resource summary of CBER's plan is on page 19. It has 6 principal components (1) enhanced training and staffing (2) risk management (3) continuous marketing applications (4) efficacy supplement resubmissions (5) first cycle reviews (6) expert outside consultants.

CBER's plan shows a total increase of 59 FTEs. This number is offset by the reductions as a result of the transfer of the CBER therapeutic product review functions to CDER in FY 2004. CBER actually transferred 84 PDUFA additive positions and 82 appropriated base positions dedicated to the drug review process, and 42 positions not part of the drug review process. CBER's appropriated base for human drug review is now reduced to 210 and PDUFA additive staff year number increases to 221, for a total of 414 PDUFA staff years by FY 2007.

In CBER's plan the additional FTEs needed each year were arrayed with the specific PDUFA III goals.

### Enhanced Training and Staffing

The largest portion of the CBER plan, $16.2 million over five years, will be dedicated to keeping the staff abreast of the latest advances in technology. The staff will be trained in new processes intended to facilitate the drug development process. It will be necessary to increase the current staff to handle new tracking and review requirements stemming from CMA and first cycle review commitments.

### Risk Management

Risk Management is an important part of the goals under PDUFA III. CBER plans $4.7 million over five years for this purpose. These resources will be used to develop guidance on appropriate risk management programs for new products, evaluate industry risk management programs, and carry out specific pre-approval surveillance activities.

### Continuous Marketing Applications

Additional resources are included under Continuous Marketing Applications (CMA) to develop guidance documents on the fundamentals of the two CMA pilot programs. The funding will enable the Center to revise the Managed Review process and tracking systems to accommodate the CMA. In addition the Center will be able to provide more intensive interactions with Industry.

### Efficacy Supplement Resubmissions

The Center will use increased funding to revise tracking systems to accommodate the revisions in processes dealing with Efficacy Supplements.

### First Cycle Reviews

CBER will work with CDER to develop guidance on Good Review Management Practices (GRMP). Additional staffing and funding will be used to revise review processes to enhance interactions with industry. CBER will also develop and implement training for staff on GRMPs.

### Expert Outside Consultants

The final component of CBER's plan is funding for expert outside consultants. CBER plans to use this increase to enhance staff to deal with requests for engagement of expert independent consultants, identify and clear consultants as special government employees and provide background and other necessary information to consultants.

The table on the following page summarizes CBER's revised plans to invest the additional funds made available under PDUFA III.

## CBER Plan Summary Tables--PDUFA III
## Plan for Funds from PDUFA Fee Revenues ($000)

Note: Numbers Are Rounded and May Not Add

### Inflation Adjustment Estimate

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Annual Inflation Estimate | | 4.27% | 4.08% | 4.08% | 4.08% | |
| Cumulative Inflation Estimate | | 4.27% | 8.52% | 12.95% | 17.56% | |
| Estimated Inflation Adjustor | | 104.27% | 108.52% | 112.95% | 117.56% | |

### PDUFA II Additive Base

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| PDUFA II Additive Base Staff Years | 246 | 162 | 162 | 162 | 162 | |
| Payroll for PDUFA II Staff Years | $25,774 | $17,737 | $18,461 | $19,214 | $19,998 | $101,183 |
| Operating Support for PDUFA II Base | $3,100 | $2,133 | $2,220 | $2,311 | $2,405 | $12,168 |
| Subtotal--To Maintain PDUFA II Levels | $28,873 | $19,870 | $20,681 | $21,525 | $22,403 | $113,352 |

### PDUFA III Enhancements Over PDUFA II

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Enhanced Training and Staffing | $1,348 | $2,040 | $3,487 | $4,412 | $4,862 | $16,150 |
| Additional Staff Years | 12 | 17 | 29 | 35 | 37 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Payroll for Additional Staff Years | $1,204 | $1,822 | $3,115 | $3,941 | $4,343 | $14,424 |
| Operating Support | $144 | $218 | $373 | $471 | $520 | $1,726 |
| **Risk Management** | **$539** | **$556** | **$820** | **$1,210** | **$1,568** | **$4,694** |
| Additional Staff Years | 5 | 5 | 7 | 10 | 12 | |
| Payroll for Additional Staff Years | $481 | $497 | $733 | $1,081 | $1,401 | $4,193 |
| Operating Support | $58 | $59 | $88 | $129 | $168 | $502 |
| Contract Support[1] | $0 | $0 | $0 | $0 | $0 | $0 |
| **Continuous Marketing Applications** | **$359** | **$371** | **$615** | **$712** | **$784** | **$2,842** |
| Additional Staff Years | 3 | 3 | 5 | 6 | 6 | |
| Payroll for Additional Staff Years | $321 | $331 | $550 | $636 | $700 | $2,538 |
| Operating Support | $38 | $40 | $66 | $76 | $84 | $304 |
| **Efficacy Supplement Resubmissions** | **$180** | **$247** | **$342** | **$356** | **$392** | **$1,517** |
| Additional Staff Years | 2 | 2 | 3 | 3 | 3 | |
| Payroll for Additional Staff Years | $160 | $221 | $305 | $318 | $350 | $1,355 |
| Operating Support | $19 | $26 | $37 | $38 | $42 | $162 |
| **First Cycle Reviews** | **$90** | **$62** | **$68** | **$71** | **$78** | **$370** |
| Additional Staff Years | 1 | 1 | 1 | 1 | 1 | |
| Payroll for Additional Staff Years | $80 | $55 | $61 | $64 | $70 | $330 |
| Operating Support | $10 | $7 | $7 | $8 | $8 | $39 |
| **Expert Outside Consultants** | **$103** | **$71** | **$80** | **$83** | **$91** | **$428** |
| Additional Staff Years | 0.8 | 0.528 | 0.561 | 0.561 | 0.594 | |
| Payroll for Additional Staff Years | $80 | $55 | $61 | $64 | $70 | $330 |
| Operating Support | $23 | $16 | $19 | $20 | $21 | $98 |
| Subtotal of PDUFA III Additional Staff Years | 23 | 29 | 44 | 54 | 59 | |
| **Subtotal PDUFA III Enhancements** | **$2,619** | **$3,348** | **$5,413** | **$6,844** | **$7,777** | **$26,000** |

**Totals**

| Category | 2003 Plan | 2004 Plan[2] | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Funds--CBER | $31,492 | $23,218 | $26,094 | $28,368 | $30,179 | $139,352 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Staff Years--CBER | 269 | 191 | 207 | 216 | 221 | |

[1] Risk Management Contract support includes funds for both CDER and CBER, but funds for both centers are being managed by CDER.

[2] Estimates for 2004 and beyond include transfer of 34% of CBER's PDUFA resources along with the transfer of CBER therapeutic product review functions to CDER.

---

### ORA Plan Summary

At this time ORA has no increases planned as a part of implementing PDUFA III. ORA expects to expend a total of 147 staff years on the drug review process in each year of the plan (41 staff years paid from PDUFA fees and 106 Staff years paid from appropriations). This is 33 fewer staff years paid from fees than were spent in most of the PDUFA II years.

This reduction in staff years reflects the fact that fewer pre-approval inspections are being ordered each year. This is occurring because, if recent inspections have been performed and reflect that the production facility is in compliance, then a pre-approval inspection is waived as part of the application approval process. It is also due to the fact that fewer applications were submitted over the past two years. The table on the next page reflects the cost of the 41 ORA staff years to be paid from fees for each of the next five years.

---

### ORA Plan Summary Tables--PDUFA III
### Plan for Funds from PDUFA Fee Revenues ($000)

Note: Numbers Are Rounded and May Not Add

#### Inflation Adjustment Estimate

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Annual Inflation Estimate | | 4.27% | 4.08% | 4.08% | 4.08% | |
| Cumulative Inflation Estimate | | 4.27% | 8.52% | 12.95% | 17.56% | |
| Estimated Inflation Adjustor | | 104.27% | 108.52% | 112.95% | 117.56% | |

#### PDUFA II Additive Base

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| PDUFA II Additive Base Staff Years | 41 | 41 | 41 | 41 | 41 | |
| Payroll for PDUFA II Staff Years | $3,683 | $3,841 | $3,997 | $4,161 | $4,330 | $20,012 |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Operating Support for PDUFA II Base | $1,168 | $1,218 | $1,268 | $1,320 | $1,373 | $6,347 |
| **Subtotal--To Maintain PDUFA II Levels** | **$4,852** | **$5,059** | **$5,265** | **$5,480** | **$5,704** | **$26,359** |

### PDUFA III Enhancements Over PDUFA II

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| **Enhanced Training and Staffing** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Risk Management** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| Contract Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Continuous Marketing Applications** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Efficacy Supplement Resubmissions** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **First Cycle Reviews** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Expert Outside Consultants** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| Subtotal of PDUFA III Additional Staff Years | - | - | - | - | - | |
| **Subtotal PDUFA III Enhancements** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

### Totals

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Funds--ORA | $4,852 | $5,059 | $5,265 | $5,480 | $5,704 | $26,359 |
| Total PDUFA Additive Staff Years--ORA | 41 | 41 | 41 | 41 | 41 | |

## OC Plan Summary

The Office of the Commissioner provides support to the process for the review of human drug applications in a variety of ways. It collects and manages the fee revenue, hires additional staff, coordinates the acquisition and management of the additional space, provides IT support, and reports to Congress on the financial aspects of the program each year. It is also responsible for the annual PDUFA performance report to Congress and for assisting with other management responsibilities including the PDUFA III goal for improved Performance Management and the various contracts associated with this goal.

OC personnel necessary to support the drug review process are paid for under the overhead calculation described below. The management of contract funds necessary for the Performance Management goals is then discussed.

### Overhead Calculation

As FDA developed PDUFA baseline costs in 1993, the Office of the Assistant Secretary for Finance prescribed the formula FDA uses to determine OC overhead costs. For this discussion, OC is used in its larger sense to encompass the several management and staff offices that report to the Commissioner. That formula conforms with generally accepted accounting principles and was found reasonable by Arthur Andersen consultants in subsequent annual audits. The formula is:

Total Costs of OC ÷ (Salary Costs of All of FDA - OC Salary Costs) = Overhead Rate

The salary costs used in this formula do not include the costs of any benefits. At the end of each fiscal year, the Office of Financial Management recalculates this overhead rate. To determine overhead costs attributable to the drug review process activities, this rate is multiplied by the total drug review process salary costs (excluding benefits) for CDER, CBER, and ORA. In FY 2002, FDA spent a total of $347.6 million on the drug review process as defined in PDUFA, and the FY 2002 PDUFA overhead costs were $28.6 million, or about 8.2 percent. This is down from 10.4 percent in 1998 and 11.1 percent in 1993, due in large part to the reorganizations and reductions in the Office of the Commissioner. This plan assumes a continuation of the 2002 rate—8.2 percent of total PDUFA spending for each year of PDUFA III. The FY 2003 overhead for the drug review process is estimated to be about $30.6 million.

As with all drug review process costs, this overhead has two components: (1) a portion paid from traditional appropriations and (2) a portion paid from fees collected from industry. Under PDUFA I, the portion that must be paid from appropriations was the overhead amount FDA actually spent on this process in 1992, adjusted for cost increases since then. Under PDUFA II, the portion that must be paid from appropriations was the overhead amount FDA actually spent on this process in 1997, adjusted for cost increases since then. The adjusted amount that must come from appropriations in FY 2003 is $14.1 million.

The difference between the total estimated overhead costs of $30.6 million in FY 2003 and the $14.1 million that must be paid from appropriated funds is $16.5 million. This $16.5 million is the amount of FDA's estimated overhead costs to be paid from fees in FY 2003.

Estimates of overhead costs by fund source over the five years of PDUFA III are provided in the chart that follows.

**Projected Drug Review Process Overhead Costs and Source ($000)**

| Source | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate |
|---|---|---|---|---|---|
| S&E Appropriations | $14,084 | $14,822 | $16,747 | $17,836 | $18,087 |
| PDUFA Fees[1] | $16,593 | $17,532 | $18451 | $19,204 | $20,233 |
| Total Overhead | $30,676 | $32,354 | $35,198 | $37,040 | $38,320 |

[1]The amount on this line is the same as the amount in the last line of the tables on page 25. This amount does not include the cost of the performance management contracts discussed below, since they are a separate and unique requirement or PDUFA-an expense that otherwise would not be incurred.

All overhead costs paid from PDUFA fees are now treated as indirect costs. The fees allocated to overhead are used to pay for the same percent of the costs of all components of the Office of the Commissioner. For FY 2003, approximately $16,593,000 in fees from PDUFA will pay for about 13 percent of total OC overhead costs. Since OC will utilize about 800 Staff years in FY 2003, PDUFA fees will pay for 13 percent of these FTE, or about 150 FTE. This is an increase of 22 staff years over the level spend from fees in FY 2002. The OC Summary plan table on page 24 estimates the allocation of these additional staff years by PDUFA III goals.

## Performance Management Contracts

The PDUFA III goals letter includes a new area of goals for improved Performance Management, and specifies that resources for this purpose are to be managed by the Office of the Commissioner. These resources in the Office of the Commissioner are in addition to estimated overhead costs.

PDUFA III performance management resources are to be used to enhance the new drug review process by improving the efficiency and effectiveness of the review process, improving communications between FDA and applicants, and improving harmonization and consistency of the review process. The first two initiatives under performance management are an evaluation of first cycle review performance and a process review and analysis of the drug review process focused on implementing a quality management system. FDA plans to award a contract in early FY 2004 to a firm with the expertise to conduct evaluations and analyses of the new drug review process. The first task will include a retrospective evaluation of the first cycle review process and an evaluation of the first cycle initiatives under PDUFA III. FDA expects that this contract could also be used for the evaluation of the CMA pilots and other PDUFA related performance management initiatives.

The process review and analysis initiative will focus on implementing a continuous improvement/quality management system for new drug review. Review of new drugs is a challenging and constantly changing task: the relevant technologies are changing rapidly, new innovations are occurring in statistical methods and in data systems to support product evaluations, and in many respects the information surrounding effective use is becoming more complex. To help reviewers keep up with the latest relevant developments in biomedical, statistical, and risk assessment sciences, to continue to improve efficiency in its operations, and to attract and retain the best possible scientific talent, FDA is committed to implementing a continuous learning quality systems approach to new drug review. FDA plans to award one or more tasks in FY 2003 (e.g., under an existing contract or with a

purchase order) for training about quality systems before developing a request and soliciting a contract for implementation of a quality system. The quality system implementation contract is expected to be awarded in FY 2004.

The OC Summary plan table on page 25 estimates the allocation of these additional contract funds in the Performance Management line near the bottom of the chart, and in the contract support line for CMA and first cycle reviews.

---

### OC Plan Summary Tables--PDUFA III
### Plan for Funds from PDUFA Fee Revenues ($000)

Note: Numbers Are Rounded and May Not Add

**Inflation Adjustment Estimate**

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Estimated Inflation Adjustor | | 104.27% | 108.52% | 112.95% | 117.56% | |

**PDUFA II Additive Base**

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| PDUFA II Additive Base Staff Years | 123 | 123 | 123 | 123 | 123 | |
| Payroll for PDUFA II Staff Years | $11,895 | $12,403 | $12,909 | $13,435 | $13,983 | $64,625 |
| Operating Support for PDUFA II Base | $1,550 | $1,616 | $1,682 | $1,751 | $1,822 | $8,420 |
| Subtotal--To Maintain PDUFA II Levels | $13,445 | $14,019 | $14,591 | $15,186 | $15,805 | $73,045 |

**PDUFA III Enhancements Over PDUFA II**

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Enhanced Training and Staffing | $1,739 | $1,451 | $1,604 | $1,670 | $1,840 | $8,305 |
| Additional Staff Years | 16 | 12.8 | 13.6 | 13.6 | 14.4 | |
| Payroll for Additional Staff Years | $1,547 | $1,291 | $1,427 | $1,486 | $1,637 | $7,388 |
| Operating Support | $192 | $160 | $177 | $184 | $203 | $917 |
| Risk Management | $435 | $635 | $702 | $731 | $805 | $3,307 |
| Additional Staff Years | 4 | 5.6 | 5.95 | 5.95 | 6.3 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Payroll for Additional Staff Years | $387 | $565 | $624 | $650 | $716 | $2,942 |
| Operating Support | $48 | $70 | $77 | $81 | $89 | $365 |
| Contract Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Continuous Marketing Applications** | **$574** | **$898** | **$993** | **$1,033** | **$1,139** | **$4,636** |
| Additional Staff Years | 2 | 2.4 | 2.55 | 2.55 | 2.7 | |
| Payroll for Additional Staff Years | $155 | $242 | $268 | $279 | $307 | $1,250 |
| Operating Support | $19 | $30 | $33 | $35 | $38 | |
| Contract (Study) Support | $400 | $626 | $692 | $720 | $794 | $3,231 |
| **Efficacy Supplement Resubmissions** | **$0** | **$113** | **$100** | **$104** | **$115** | **$433** |
| Additional Staff Years | 0 | 1 | 0.85 | 0.85 | 0.9 | |
| Payroll for Additional Staff Years | $0 | $101 | $89 | $93 | $102 | $385 |
| Operating Support | $0 | $13 | $11 | $12 | $13 | $48 |
| **First Cycle Reviews** | **$400** | **$417** | **$461** | **$480** | **$529** | **$2,287** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| Contract (Study) Support | $400 | $417 | $461 | $480 | $529 | $2,287 |
| **Expert Outside Consultants** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |
| Additional Staff Years | 0 | 0 | 0 | 0 | 0 | |
| Payroll for Additional Staff Years | $0 | $0 | $0 | $0 | $0 | $0 |
| Operating Support | $0 | $0 | $0 | $0 | $0 | $0 |
| **Performance Management** | **$500** | **$2,502** | **$1,302** | **$1,017** | **$940** | **$6,262** |
| Contract (Study) Support | $500 | $2,502 | $1,302 | $1,017 | $940 | $6,262 |
| Subtotal of PDUFA III Additional Staff Years | 22 | 22 | 23 | 23 | 24 | |
| **Subtotal PDUFA III Enhancements** | **$3,648** | **$6,016** | **$5,163** | **$5,035** | **$5,368** | **$25,230** |

**Totals**

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Funds-- OC | $17,093 | $20,035 | $19,753 | $20,220 | $21,174 | $98,275 |
| Total Without Perf. | | | | | | |

| Mgmt. Contract | $16,593 | 17,532 | $18,451 | $19,204 | $20,233 | $92,013 |
| Total PDUFA Additive Staff Years--OC | 145 | 145 | 146 | 146 | 147 | |

## Information Technology, Rent and Central Accounts

The funds in three important areas are centrally managed in PDUFA III. These areas are Information Technology, Rent, and Central Accounts. This section provides a summary of each one, and ends with a chart summarizing the year by year planned spending in each area.

### Information Technology

The complete PDUFA III Five Year Information Technology Plan is included as Appendix A to this document. Only a high level summary of that plan is included here.

The first year of PDUFA III is a period of considerable transition. Many near-term fundamental activities and strategic issues must be resolved by the Agency as a foundation for long-range systems development plans for the out years of PDUFA III. For example FDA is conducting studies to determine a strategy for consolidating IT infrastructure and services. Similarly, FDA is working to shift its IT decision-making and governance to an Agency-wide, less de-centralized model. Further, FDA must resolve security issues with standard, Agency-wide solutions for secure submissions, secure e-mail, and electronic signatures. In the first year to 18 months of PDUFA III, FDA will focus on completing these efforts to ensure that they are developed, published, and widely understood. Once this is done, FDA will be able to expand planning of specific systems development and infrastructure projects into the out-years.

This plan represents only a portion of the overall IT work to be accomplished at FDA, but it is imperative that these PDUFA activities map clearly to overall Agency business and IT strategic planning. Several of the strategies must be accomplished not only to meet PDUFA III IT goals, but also Agency and DHHS goals. Therefore, the strategies presented here must be applied consistently across the Agency to achieve the maximum benefit of the efforts.

Many levels of planning efforts are underway within the Department of Health and Human Services, the FDA, the Centers and Offices, and within the PDUFA Program. The strategies outlined in the plan are presented to show their alignment with overall Department, Agency, and Program goals and objectives. One strategy that supports goals and objectives at all levels is the establishment of a formal IT governance process at FDA. Within this governance process, FDA will centralize accountability and funding for all PDUFA IT initiatives/activities for CBER, CDER, ORA and OC under the leadership of the Chief Information Officer (CIO). The FDA CIO is responsible for ensuring IT investments support the Agency's common IT goals, fit into a common computing environment, and follow IT industry standard management practices and capability maturity model principles. Establishing a formal PDUFA IT investment governance process that incorporates the oversight and approval by both the Agency CIO and Agency management is critical to the success of PDUFA IT investments.

The strategies FDA is pursuing within the PDUFA III IT Program are aligned and presented in plan according to the CIO's PDUFA Program goals:

- Provide a governance framework, management, and oversight of IT decision-making
- Review the efforts within the Electronic Regulatory and Submission Review (ERSR)

Program and move the Program forward; and

- Increase the efficiency of IT programs and services to better support all of its customers.

A table at the end of the Executive Summary in Appendix A summarizes the strategies the FDA will pursue in FY 2003-2004 and shows a mapping of those strategies to PDUFA III, Center/Office, Agency, and Departmental goals.

The summary IT/Rent/Central Plan Summary Tables reflect the five-year IT costs in three places. The first is in the top portion of the chart that reflects the PDUFA II Additive Base Costs—starting with $18.8 million in FY 2003. The second place is the Electronic Submissions line, which reflects anticipated expenditures on IT enhancements each year. The last place is near the bottom of the chart where two IT subtotals are given. The IT subtotal for FY 2003 is $23.7 million, increasing to $30.3 million by FY 2007.

## Rent

The General Services Administration charges rent to FDA for the Federal buildings that FDA occupies. This rent is charged at different rates depending on the type and location of the space provided. Since rent is an essential support cost for the process for human drug review, part of those charges are paid from appropriations and part from PDUFA fees. The amount of rent FDA pays is directly related to the number of employees that must be housed. Under PDUFA III the agency will be hiring additional employees, and the cost of acquiring and maintaining space for those additional employees is reflected in the rent estimates.

The summary IT/Rent/Central Plan Summary Tables reflect the five year Rent estimates in three places. The first is in the top portion of the chart that reflects the PDUFA II Additive Base Costs—starting with $7.8 million in FY 2003. The second place is a separate rent line in each of the goal areas. In each goal area, the first line shows the cumulative additional staff years associated with the goal area for each year—additional staff years to be hired during PDUFA III. The number of additional staff years that must be housed each year drives the amount of increased rent each year. The last place is near the bottom of the chart where two rent subtotals are given. The rent subtotal for FY 2003 is $8.8 million, increasing to $13.0 million by FY 2007.

## Central Accounts

The Central Account pays for shared agency-wide services such as telecommunications, training, printing, mail and document management, IT systems including maintenance, employee health units, and other support and miscellaneous services. Also included in this account are recurring costs that FDA pays directly to non-Federal sources under the delegation of direct lease and service authority. These services include rental of space, and all recurring services for building operations such as overtime utilities, janitorial, guard, and ground maintenance. Like rent, the amount of central account support FDA pays is directly related to the number of employees that must be serviced. PDUFA provides the increased resources for these costs for the additional staff associated with the implementation of PDUFA.

The summary IT/Rent/Central Plan Summary Tables reflect the five-year Central Account estimates in three places. The first is in the top portion of the chart that reflects the PDUFA II Additive Base Costs—starting with $9.2 million in FY 2003. The second place is a separate central account line in each of the goal areas. In each goal area, the first line shows the cumulative additional staff years associated with the goal area for each year—additional staff years hired during PDUFA III. The number of additional staff years that must be supported each year drives the amount of increased central account costs each year. The last place is near the bottom of the chart where two central account subtotals are given. The central account subtotal for FY 2003 is $10.5 million, increasing to $16.4 million in FY 2007.

## IT/Rent/Central Plan Summary Tables--PDUFA III
## Plan for Funds from PDUFA Fee Revenues ($000)

Note: Numbers Are Rounded and May Not Add

### Inflation Adjustment Estimate

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Estimated Inflation Adjustor | | 104.27% | 108.52% | 112.95% | 117.56% | |

### PDUFA II Additive Base

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| IT | 1088 | 1088 | 1088 | 1088 | 1088 | |
| Rent | $18,750 | $19,551 | $20,348 | $21,179 | $22,043 | $101,870 |
| Central Accounts | $9,197 | $9,590 | $9,981 | $10,388 | $10,812 | $49,969 |
| Subtotal--To Maintain PDUFA II Levels | $35,761 | $37,288 | $38,809 | $40,392 | $42,040 | $194,290 |

### PDUFA III Enhancements Over PDUFA II

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Enhanced Training and Staffing | $1,348 | $2,577 | $4,180 | $5,094 | $5,613 | $18,813 |
| Additional Staff Years | 62 | 115.2 | 180.2 | 210.8 | 223.2 | |
| IT | $0 | $0 | $0 | $0 | $0 | $0 |
| Rent | $611 | $1,083 | $1,720 | $2,075 | $2,287 | $7,776 |
| Central Accounts | $737 | $1,495 | $2,461 | $3,018 | $3,326 | $11,037 |
| Risk Management | $423 | $757 | $1,285 | $1,967 | $2,374 | $6,805 |
| Additional Staff Years | 19 | 33.6 | 56.1 | 83.3 | 96.3 | |
| IT | $0 | $0 | $0 | $0 | $0 | $0 |
| Rent | $183 | $328 | $551 | $835 | $998 | $2,895 |
| Central Accounts | $240 | $429 | $734 | $1,132 | $1,375 | $3,910 |
| Electronic Submissions | $4,906 | $5,465 | $6,870 | $7,518 | $8,286 | $33,045 |

| | | | | | | |
|---|---|---|---|---|---|---|
| IT | $4,906 | $5,465 | $6,870 | $7,518 | $8,286 | $33,045 |
| **Continuous Marketing Applications** | **$161** | **$261** | **$400** | **$466** | **$513** | **$1,802** |
| Additional Staff Years | 13 | 20 | 28.9 | 32.3 | 34.2 | |
| IT | $0 | $0 | $0 | $0 | $0 | $0 |
| Rent | $116 | $189 | $277 | $320 | $353 | |
| Central Accounts | $161 | $261 | $400 | $466 | $513 | $1,802 |
| **Efficacy Supplement Resubmissions** | **$135** | **$274** | **$358** | **$391** | **$431** | **$1,589** |
| Additional Staff Years | 6 | 12.2 | 15.3 | 16.15 | 17.1 | |
| Rent | $53 | $112 | $143 | $157 | $173 | $639 |
| Central Accounts | $82 | $162 | $215 | $234 | $257 | $949 |
| **First Cycle Reviews** | **$68** | **$70** | **$78** | **$81** | **$89** | **$386** |
| Additional FTE's | 3 | 3.2 | 3.4 | 3.4 | 3.6 | |
| Rent | $27 | $28 | $31 | $32 | $35 | $153 |
| Central Accounts | $41 | $43 | $47 | $49 | $54 | $234 |
| **Expert Outside Consultants** | **$29** | **$30** | **$33** | **$34** | **$38** | **$164** |
| Additional Staff Years | 1.2 | 1.2 | 1.275 | 1.275 | 1.35 | |
| Rent | $9 | $10 | $11 | $11 | $12 | $53 |
| Central Accounts | $19 | $20 | $22 | $23 | $26 | $111 |
| Subtotal of PDUFA III Additional Staff Years | 104 | 185 | 285 | 347 | 376 | |
| **Subtotal PDUFA III Enhancements** | **$7,069** | **$9,435** | **$13,204** | **$15,551** | **$17,344** | **$62,603** |
| Enhancement Subtotal IT | $4,906 | $5,465 | $6,870 | $7,518 | $8,286 | $33,045 |
| Enhancement Subtotal Rent | $1,000 | $1,749 | $2,733 | $3,431 | $3,859 | $12,771 |
| Enhancement Subtotal Central Accounts | $1,280 | $2,410 | $3,879 | $4,922 | $5,552 | $18,043 |
| | | | | | | |
| Subtotal IT | $23,656 | $25,016 | $27,218 | $28,697 | $30,328 | $134,915 |
| Subtotal Rent | $8,813 | $9,896 | $11,212 | $12,256 | $13,045 | $55,221 |
| Subtotal Central Accounts | $10,477 | $12,000 | $13,861 | $15,310 | $16,365 | $68,013 |

**Totals**

| Category | 2003 Plan | 2004 Plan | 2005 Plan | 2006 Plan | 2007 Plan | 5-Year Total |
|---|---|---|---|---|---|---|
| Total PDUFA Additive Funds-- IT - Rent - Central | $42,830 | $46,723 | $52,013 | $55,943 | $59,384 | $256,894 |
| Total PDUFA Additive Staff Years--IT - Rent - Central | 1,192 | 1,273 | 1,373 | 1,435 | 1,464 | |

---

### FDA Plan Summary

The Agency plan for PDUFA III is a composite of the plans developed by CDER, CBER, ORA, and OC components. Tables 1-7 on pages 32 and 33 summarize the overall FDA plan. The discussion below summarizes information in each of these tables.

- Table 1 (page 32) shows the $975 million set aside over five years to maintain and support the additional staff hired by the end of PDUFA II (referred to as the PDUFA II Additive Base) discussed in Assumption 5. It also shows the total fee revenues projected annually, the reserve set aside for application shortfalls, and the amounts still available for enhancements after the PDUFA II Additive Base funds have been subtracted from the total estimated fees available--a total of about $271 million over the five years.

- Table 2 (page 32) shows the allocation of $279 million over five years, by component, planned to meet PDUFA III goals. The yearly amounts and totals for CDER, CBER, ORA, and OC on the first four lines are from their individual plans. The next three lines show the amounts for: (1) information technology, (2) rent, and (3) central accounts. These are necessary to meet PDUFA III goals and to accommodate the additional staff hired by the centers. The total line allocates all the PDUFA funds, above the PDUFA II Additive Base, that FDA expects to spend through FY 2007.

- Table 3 (page 32) shows the allocation of this $279 million by PDUFA III goal category. About $129 million (46% of the increases) will be spent for enhanced training and staffing to meet the goals. About $71 million (25% of the increases) is planned for risk management activities. About $33 million (12% of the increases ) is planned for IT/electronic submission enhancements. About 23 million (8% of the increases) is planned for implementing the pilot program for continuous marketing applications. The remaining $23 million (8% of the increase) is planned for enhancements in the remaining 4 goal areas-efficacy supplement resubmissions, first cycle reviews, expert outside consultants, and performance management.

- A summary of the additional staff years planned each year, over and above the PDUFA II base levels shown on page 8, are shown below.

### PDUFA III Program Staff Year Changes from PDUFA II Additive Base

| Organization | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate |
|---|---|---|---|---|---|
| CDER | +60 | +135 | +218 | +270 | +293 |
| CBER | +23 | +29 | +44 | +54 | +59 |
| | | | | | |

| OC | +21 | +21 | +23 | +23 | +24 |
| Total | +104 | +185 | +285 | +347 | +376 |

- Table 4 (page 33) shows the difference between the projected fee revenues and expenditures each year and the estimated PDUFA carryover balances at the beginning and end of each year. In FY 2003, FDA will spend about $2.9 million less than it expects to collect and in FY 2004 about $4.5 million more. FDA can do this because FY 2003 began with about $22.7 million in PDUFA carryover funds. The plan shows that these carryover balances will be spent down to about $14 million in the last year of the program. However, FDA's assumptions about application fee collections reflected in Table 1 may prove too pessimistic, and cause these carry over balances to be higher than the plan shows.

- Tables 5 and 6 (page 33) summarize the allocation of the $1,254,248,000 total fee revenue that FDA plans to spend over the five years of PDUFA III (PDUFA II additive base plus PDUFA III increases) by component (Table 5) and by expense category (Table 6). The last column in both tables shows the percent of total PDUFA funds planned over the next five years. By component, CDER will be allocated 58 percent, CBER 11 percent, ORA 2 percent, overhead 8 percent, information technology 11 percent, central accounts 5 percent, and rental payments to GSA 4 percent. By other expense categories, 64 percent of the total PDUFA III revenues will be dedicated to pay and benefits for staff (same as in the original plan), 15 percent for operating costs, 11 percent for IT.

- Table 7 (page 33) summarizes the total PDUFA staff years planned each year, showing the number of staff years paid from the salary and expense appropriations, the number of staff years paid from fees and considered the PDUFA II additive base, and the number of staff years added over the course of PDUFA III under this plan.

### FDA Plan Summary Tables--PDUFA III ($000)

Note: Numbers Are Rounded and May Not Add

**Table 1: PDUFA II Additive Base, and Estimated Funds Available**

| Item\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total | Five-Year Percen |
|---|---|---|---|---|---|---|---|
| Pay and Benefits for Centers/ORA | $107,696 | $112,295 | $116,877 | $121,645 | $126,608 | $585,121 | 60% |
| Base Operating Funds--Centers/ORA | $22,598 | $23,563 | $24,524 | $25,525 | $26,566 | $122,776 | 13% |
| OC--Salaries and Operating/Contract $ | $13,445 | $14,019 | $14,591 | $15,186 | $15,805 | $73,045 | 7% |
| Information Technology | $18,750 | $19,551 | $20,348 | $21,179 | $22,043 | $101,870 | 10% |
| Rent | $7,813 | $8,147 | $8,479 | $8,825 | $9,185 | $42,451 | 4% |
| Central Accounts | $9,197 | $9,590 | $9,981 | $10,388 | $10,812 | $49,969 | 5% |
| Total--PDUFA II | | | | | | | |

| Additive Base | $179,499 | $187,164 | $194,800 | $202,748 | $211,020 | $975,232 | 100% |
|---|---|---|---|---|---|---|---|
| Estimated Fee Receipts | $222,900 | $240,864 | $273,481 | $292,885 | $304,834 | $1,334,964 | |
| Reserve for Application Fee Shortfalls | $14,860 | $16,058 | $18,232 | $19,526 | $20,322 | $88,998 | |
| Available for Enhancements | $28,541 | $37,642 | $60,449 | $70,611 | $73,492 | $270,734 | |

Table 2: Funds Planned for Enhancements--by Organization or Cost Component

| Component\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total | Five-Year Percent |
|---|---|---|---|---|---|---|---|
| CDER | $12,145 | $23,121 | $36,420 | $43,454 | $48,787 | $163,927 | 59% |
| CBER | $2,619 | $3,348 | $5,413 | $6,844 | $7,777 | $26,000 | 9% |
| ORA | $0 | $0 | $0 | $0 | $0 | $0 | 0% |
| OC--Salaries and Operating/Contract $ | $3,648 | $6,016 | $5,163 | $5,035 | $5,368 | $25,230 | 9% |
| Information Technology | $4,906 | $5,465 | $6,870 | $7,518 | $8,286 | $33,045 | 12% |
| Rental Payments to GSA | $1,000 | $1,749 | $2,733 | $3,431 | $3,859 | $12,771 | 5% |
| Central Accounts | $1,280 | $2,410 | $3,879 | $4,922 | $5,552 | $18,043 | 6% |
| Total | $25,597 | $42,109 | $60,477 | $71,204 | $79,629 | $279,015 | 100% |

Table 3: Funds Planned for Enhancements--by Enhancement Category

| Expense Category\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total | Five-Year Percent |
|---|---|---|---|---|---|---|---|
| Enhanced Training and Staffing | $8,900 | $17,652 | $28,845 | $35,140 | $38,726 | $129,263 | 46% |
| Risk Management | $7,154 | $10,070 | $14,827 | $17,864 | $21,029 | $70,943 | 25% |
| Electronic Submissions | $4,906 | $5,465 | $6,870 | $7,518 | $8,286 | $33,045 | 12% |
| Continuous Marketing Applications | $2,193 | $3,549 | $5,095 | $5,845 | $6,441 | $23,123 | 8% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Efficacy Supplement Resubmissions | $904 | $1,787 | $2,335 | $2,567 | $2,829 | $10,423 | 4% |
| First Cycle Reviews | $852 | $889 | $983 | $1,023 | $1,127 | $4,873 | 2% |
| Expert Outside Consultants | $188 | $196 | $221 | $230 | $251 | $1,085 | 0% |
| Performance Management | $500 | $2,502 | $1,302 | $1,017 | $940 | $6,262 | 2% |
| Total | $25,597 | $42,109 | $60,477 | $71,204 | $79,629 | $279,015 | 100% |

**Table 4: Difference Between Plans & Available Funds, with Year-end Carry-Over Balances**

| Category\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total |
|---|---|---|---|---|---|---|
| Difference Between Plan & Available | $2,944 | ($4,467) | ($29) | ($593) | ($6,137) | |
| Est. Carry-Over Balance-Year Beginning | $22,683 | $25,627 | $21,160 | $21,131 | $20,538 | |
| Est. Carry-Over Balance-Year End | $25,627 | $21,160 | $21,131 | $20,538 | $14,401 | |

**Table 5: FDA Summary of all PDUFA Additive Resources--by Organization or Cost Component**

| Component\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total | Five-Year Percent |
|---|---|---|---|---|---|---|---|
| CDER | $108,715 | $134,050 | $151,875 | $163,619 | $173,855 | $732,113 | 58% |
| CBER | $31,492 | $23,218 | $26,094 | $28,368 | $30,179 | $139,352 | 11% |
| ORA | $4,852 | $5,059 | $5,265 | $5,480 | $5,704 | $26,359 | 2% |
| Overhead | $17,093 | $20,035 | $19,753 | $20,220 | $21,174 | $98,275 | 8% |
| Information Technology | $23,656 | $25,016 | $27,218 | $28,697 | $30,328 | $134,915 | 11% |
| Rental Payments to GSA | $8,813 | $9,896 | $11,212 | $12,256 | $13,045 | $55,221 | 4% |
| Central Accounts | $10,477 | $12,000 | $13,861 | $15,310 | $16,365 | $68,013 | 5% |
| Total | $205,096 | $229,273 | $255,278 | $273,952 | $290,649 | $1,254,248 | 100% |

**Table 6: FDA Summary of all PDUFA Additive Resources--by Expense Category**

| Expense Category\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate | Five-Year Total | Five-Year Percent |
|---|---|---|---|---|---|---|---|
| Pay and Benefits | $130,611 | $145,325 | $162,962 | $177,205 | $188,036 | $804,139 | 64% |
| Operating Expenses | $31,540 | $37,037 | $40,026 | $40,483 | $42,876 | $191,961 | 15% |
| Information Technology | $23,656 | $25,016 | $27,218 | $28,697 | $30,328 | $134,915 | 11% |
| Rental Payments to GSA | $8,813 | $9,896 | $11,212 | $12,256 | $13,045 | $55,221 | 4% |
| Central Accounts | $10,477 | $12,000 | $13,861 | $15,310 | $16,365 | $68,013 | 5% |
| Total | $205,096 | $229,273 | $255,278 | $273,952 | $290,649 | $1,254,248 | 100% |

**Table 7: FDA Summary of all PDUFA Staff Years for CDER, CBER, ORA, and OC**

| FTE Category\Year | 2003 Estimate | 2004 Estimate | 2005 Estimate | 2006 Estimate | 2007 Estimate |
|---|---|---|---|---|---|
| Base Staff Years Paid from Appropriations | 1,277 | 1,277 | 1,277 | 1,277 | 1,277 |
| PDUFA II Base Staff Years | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 |
| Staff Years Added for PDUFA III | 104 | 185 | 285 | 347 | 376 |
| Total | 2,469 | 2,550 | 2,650 | 2,712 | 2,741 |

## Annual Reassessments

This plan will be revised each year based on the latest information available. This information facilitates the resource allocation and planning for center work required to meet the PDUFA III goals. Actual workload and revenues will continue to be monitored closely.

The plan is a dynamic framework for the investments FDA must make. It will be updated again in the second quarter of FY 2004. That update will take into account the actual accomplishments, workload, revenues, and expenses of the previous fiscal years and the planned accomplishments, workload, revenues and fees to be charged over the remaining period of PDUFA III. Workload and revenue estimates are always based on the information set forth in the latest *Federal Register* notice setting fees, published in August of each year.

If reassessments of center/ORA PDUFA workload indicate that PDUFA workload is not in line with the distribution of resources in this plan, then adjustments may be made.

Because FDA plans to spend all funds it expects to collect, adjustments needed by the centers and ORA each year will generally be within the total amounts already planned for the fiscal year. For example, if an unplanned IT item becomes a high priority, then cutbacks

will have to be made in other components of that organization's plan (such as other IT items, hiring, or operating support) in order to fund that need.

Printable version of plan (PDF 396 KB)

Appendix A

_____

PDUFA Home Page
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Website Management Staff

Westlaw.

69 FR 43351-01                                                    Page 1

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

PROPOSED RULES

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

21 CFR Parts 312, 314, 600, and 601

[Docket No. 2004N-0267]

Applications for Approval to Market a New Drug; Complete Response Letter;
Amendments to Unapproved Applications

Tuesday, July 20, 2004

**\*43351**  AGENCY: Food and Drug Administration, HHS.

ACTION: Proposed rule.

SUMMARY: The Food and Drug Administration (FDA) is proposing to amend our
regulations on new drug applications (NDAs) and abbreviated new drug applications
(ANDAs) for approval to market new drugs and generic drugs.  We propose to
discontinue the use of approvable letters and not approvable letters when taking
action on marketing applications.  Instead, we intend to use complete response
letters to indicate that the review cycle is complete and that the application is
not ready for approval.  We also are proposing to revise the regulations on
extending the review cycle due to the submission of an amendment to an unapproved
application and starting a new cycle after a resubmission following receipt of a
complete response letter.  In addition, we are proposing to add to the regulations
on biologics license applications (BLAs) a provision on the issuance of complete
response letters to BLA applicants.  We are taking these actions to implement the
user fee performance goals referenced in the Prescription Drug User Fee Amendments
of 2002 that address procedures and establish target timeframes for reviewing
human drug applications.

DATES: Submit written or electronic comments by October 18, 2004.  See section
VIII of this document for the proposed effective date of a final rule based on
this document.

ADDRESSES: You may submit comments, identified by [Docket No. 2004N-0267], by any
of the following methods:

  . Federal eRulemaking Portal: http://www.regulations.gov.  Follow the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 2

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

instructions for submitting comments.

   . Agency Web Site: http://www.fda.gov/dockets/ecomments.  Follow the
instructions for submitting comments on the agency Web site.

   . E-mail: fdadockets@oc.fda.gov.        Include [Docket No. 2004N-0267] in the
subject line of your e-mail message.

   . Fax: 301-827-6870.

   . Mail/Hand delivery/Courier [For paper, disk, or CD-ROM submissions]: Division
of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane,
rm.  1061, Rockville, MD 20852.

   Instructions: All submissions received must include the agency name and  [Docket
No. 2004N-0267] for this rulemaking.  All comments received will be posted without
change to http://www.fda.gov/dockets/ecomments, including any personal information
provided.  For detailed instructions on submitting comments and additional
information on the rulemaking process, see the "Request for Comments" heading in
the SUPPLEMENTARY INFORMATION section of this document.

   Docket: For access to the docket to read background documents or comments
received, go to http://www.fda.gov/dockets/ecomments and/or the Division of
Dockets Management, 5630 Fishers Lane, rm.  1061, Rockville, MD 20852.

   The Office of Management and Budget (OMB) is still experiencing significant
delays in the regular mail, including first class and express mail, and messenger
deliveries are not being accepted.  To ensure that comments on the information
collection are received, OMB recommends that written comments be faxed to the
Office of Information and Regulatory Affairs, OMB, Attn: Fumie Yokota, Desk
Officer for FDA, FAX: 202-395-6974.

FOR FURTHER INFORMATION CONTACT: Brian L. Pendleton, Center for Drug Evaluation
and Research (HFD-7), Food and Drug Administration, 5600 Fishers Lane, Rockville,
MD 20857, 301-443-5523.

SUPPLEMENTARY INFORMATION:

I. Background

A. User Fee Performance Goals and Complete Response Letters

   In conjunction with the Prescription Drug User Fee Act of 1992 (PDUFA) (  Public
Law 102-571), we committed to meet certain goals for reviewing and acting on human
drug applications, as defined in section 735(1) of the Federal Food, Drug, and
Cosmetic Act (the act) (21 U.S.C. 379g(1)).  For example, we promised that by
September 30, 1997, we would review and act on at least 90 percent of standard
NDAs within 12 months after the submission date (H. Rep. No. 895, 102d Cong., 2d.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                              Page 3

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

sess. 32 (1992) (letter from David A. Kessler, M.D., Commissioner of Food and
Drugs, to Representatives John Dingell and Norman Lent, House Committee on Energy
and Commerce (September 14, 1992))).

 FDA's drug application review performance goals were revised with the enactment
of the Food and Drug Administration Modernization Act of 1997 (Public Law 105-115)
(the user fee provisions of this act are known as "PDUFA II").  The goals were
further revised in conjunction with the enactment of the Prescription Drug User
Fee Amendments of 2002 (PDUFA III), set forth in title V, subtitle A, of the
Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (
Public Law 107-188).  Section 502 of PDUFA III states that user fees will be
dedicated to expediting the drug development process and the process for the
review of human drug applications in accordance with the new performance goals,
which are set forth in an enclosure to letters from Tommy Thompson, Secretary of
Health and Human Services, to the Chairman of the House Committee on Energy and
Commerce and the Ranking Member of the Senate Committee on Health, Education,
Labor and Pensions (June 4, 2002) (Goals Letter).

 Under the user fee performance goals, the term "review and act on" is defined as
the issuance of a complete action letter after the complete review of a complete
application that we have accepted for filing (Goals Letter at 15).  An action
letter, if not an approval, states the specific deficiencies of the application,
and where appropriate, the actions necessary to place the application in condition
for approval (id.).

 As part of the user fee performance goals (first in PDUFA II and again in PDUFA
III), FDA's Center for Drug Evaluation and Research (CDER) and **43352** Center for
Biologics Evaluation and Research (CBER) agreed to revise their regulations and
procedures to provide for the issuance of either an approval or a "complete
response" action letter at the completion of the review cycle for an application
(Goals Letter at 15).  We are now proposing to revise our regulations on human
drugs in part 314 (21 CFR part 314) to replace two types of action letters
currently used, approvable letters (§ 314.110) and not approvable letters (§
314.120), with complete response letters.  Because there are no provisions on
action letters in the biological product regulations in parts 600 through 680 (21
CFR parts 600 through 680), CBER had only to change their standard operating
procedures to incorporate the use of a complete response letter at the end of a
review cycle for a biological product. Although CBER has already done this, we are
now proposing to add a regulation (proposed § 601.3) on the issuance of complete
response letters concerning BLAs and BLA supplements.

 In replacing approvable and not approvable letters with complete response
letters, our intent is to adopt a consistent and more neutral mechanism to convey
that we cannot approve a drug marketing application in its current form.
Historically, FDA issued a not approvable letter when deficiencies were major
(e.g., no adequate and well-controlled studies, failure to demonstrate
effectiveness, and a major safety concern).  However, the distinction between
approvable and not approvable letters became somewhat blurred.  For example, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                                    Page 4

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

some cases, the absence of a second study supporting the effectiveness of a
proposed drug product for a particular indication might have led to a not
approvable letter; in other cases, FDA might have issued an approvable letter
stating the need for additional evidence.  Thus, issuance of an approvable letter
might mean that an application needed only minor changes, such as a revision of
labeling, or much more substantial changes.  In addition, we subsequently approved
many applications for which we had first issued a not approvable letter.  Issuance
of complete response letters will ensure a consistent approach to informing
sponsors of needed changes before we can approve an application, with no
implication as to the ultimate approvability of the application.

We also intend to incorporate into the regulations for NDAs the terminology based
on the user fee performance goals regarding Class 1 and Class 2 resubmissions.  A
"Class 1 resubmission" is defined for performance goal purposes as an application
resubmitted after receipt of an approvable or not approvable letter that includes
only certain items such as draft or final printed labeling, safety or stability
updates, or other minor clarifying information.  A "Class 2 resubmission" is one
that addresses any other items, including any item that would require presentation
to an advisory committee.  A Class 1 resubmission has a performance goal of 2
months and a Class 2 resubmission has a performance goal of 6 months.  In
accordance with the user fee goals, we are proposing to apply this terminology to
original NDAs as well as to efficacy supplements (supplements to approved
applications to make certain significant changes to product labeling).  As a
result, efficacy supplements would be treated like original NDAs with regard to
resubmissions. We are proposing to apply different rules to resubmissions of other
types of NDA supplements.

B. ANDAs

Although the user fee performance goals do not apply to ANDAs, the current
regulations regarding approvable and not approvable letters in §§ 314.110 and
314.120 apply to both NDAs and ANDAs (with a few exceptions).  As a result, any
proposed change to the regulations for NDAs must take into account the impact on
ANDAs.  Because we intend to change the regulations for NDAs and we believe that
these changes make sense for other applications, we have decided to propose
similar changes for ANDAs.

C. Amendments to Unapproved Applications

The PDUFA performance goals also state that a major amendment to an unapproved
application submitted within 3 months of the goal date (i.e., the end of the
initial review cycle) extends the goal date by 3 months.  We are proposing to
incorporate this provision into our regulations by revising § 314.60 on amendments
to unapproved applications.  In accordance with the user fee goals, we are
proposing to apply this provision to efficacy supplements and resubmissions of
applications and efficacy supplements as well, but not to ANDAs.

II. Highlights of the Proposed Rule

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                      Page 5

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


A. Complete Response Letters

 In accordance with the PDUFA performance goals and in response to the concerns
previously discussed, we are proposing to substitute complete response letters for
approvable and not approvable letters at the completion of the review cycle for an
NDA or ANDA.  Under proposed § 314.110, we will send a complete response letter if
we determine that we will not approve an application or abbreviated application in
its present form.  The complete response letter usually would describe all of the
specific deficiencies in the application or abbreviated application.  If we
determine, after an application is filed or an abbreviated application is
received, that the data submitted are inadequate to support approval, we might
issue a complete response letter without first conducting required inspections
and/or reviewing proposed product labeling.

 Table 1 of this document summarizes the changes that we propose to make in
substituting complete response letters for approvable and not approvable letters:


|     Table 1.--Summary of Proposed Changes Regarding Substitution of Complete Response Letter for Approvable and Not Approvable Letters | |
| --- | --- |
| Current Regulations | Proposed Regulations |
| Approvable Letter for NDA .................... Complete Response Letter | |
| . States that NDA is basically approvable if certain issues are resolved................. | . States that FDA will not approve NDA or ANDA in its present form. |
| . Indicates that NDA substantially meets requirements of part 314 (21 CFR part 314) and FDA can approve it if applicant submits additional information or agrees to specific conditions (e.g., labeling changes)..................................... | . Describes all specific deficiencies, except when issued without conducting required inspections or labeling review because data found to be inadequate to support approval. |
| Approvable Letter for ANDA .................... ................................... | |
| . Indicates that ANDA substantially meets requirements of part 314 and is approvable if minor deficiencies are corrected......... | . Reflects complete review of data in NDA or ANDA as well as |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                      Page 6

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

|  |  |
|---|---|
|  | amendments for which review cycle was extended. |
| . Describes deficiencies and states when applicant must respond..................... | . Where appropriate, describes actions necessary to place NDA or ANDA in condition for approval. |

```
------------------------------------------------------------------
Not Approvable Letter for NDA or ANDA ........ ................................
------------------------------------------------------------------
```

. States that NDA cannot be approved for one
  of reasons in § 314.125 or ANDA cannot be
  approved for one of reasons in § 314.127....  ................................
. Describes deficiencies in NDA or ANDA.......  ................................

```
------------------------------------------------------------------
```

  **\*43353** For products for which approval of a BLA is required for marketing, we
are proposing to adopt a new regulation, § 601.3, stating that FDA will send a BLA
a complete response letter if we determine that we will not approve the BLA or BLA
supplement in its present form.

B. Resubmissions

  We also propose to revise the current provisions in §§ 314.110 and 314.120 on
extension of the review period due to resubmission of an NDA or ANDA after receipt
of an approvable or not approvable letter (to be replaced by a complete response
letter). We propose that a Class 2 resubmission of an NDA following receipt of a
complete response letter would start a new 6-month review cycle, as is the case
with an "amendment" following receipt of a not approvable letter under current §
314.120(a)(1). A Class 1 resubmission of an NDA following receipt of a complete
response letter would start a new 2-month review cycle.

  The proposed rules on Class 1 and Class 2 resubmissions would also apply to
efficacy supplements to NDAs, in accordance with the user fee performance goals.
We believe that this is appropriate because efficacy supplements, like original
applications, contain varying amounts of data. Where extensive data requiring
significant agency resources for review are provided, the current 6- month review
cycle should apply. But as with some NDA resubmissions, it would be appropriate
to consider some smaller resubmissions of efficacy supplements as Class 1
resubmissions. We propose to apply different rules and terminology to other types
of NDA supplements, including supplements dealing with chemistry, manufacturing,
and controls (CMC) and labeling supplements for which no clinical data are needed.
 For NDA supplements other than efficacy supplements, a resubmission would start a
new 6-month review cycle.

  A "major" resubmission of an ANDA following receipt of a complete response letter
would start a new 6-month review cycle, as is the case with an "amendment"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 7

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


following receipt of a not approvable letter under current § 314.120(a)(1). A
"minor" resubmission of an ANDA would start a new review cycle of an unspecified
length; the period might last from 30 days to a few months, depending on the
issues involved. Under the relevant current CDER guidance document, entitled
"Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications"
(December 2001), a minor resubmission usually would start a new review cycle of
between 30 to 60 days.

 The proposed changes to our regulations on applicants' responses to action
letters are summarized in the following table 2.


Table 2.--Summary of Proposed Changes to Regulations Regarding Applicant's
         Response to Agency Action Letter (Resubmissions)

| Current Regulations | Proposed Regulations |
|---|---|
| Applicant's Response to Approvable Letter or Not Approvable Letter for NDA (or NDA Supplement) ............................ | NDA or ANDA Applicant's Response to Complete Response Letter |
| Within 10 days of date of letter, NDA applicant must do one of following: ...... | Review period is extended until applicant takes one of following actions: |
| . Amend application or notify FDA of intent to file amendment........................ | . Resubmit NDA or ANDA, addressing identified deficiencies. |
| . Withdraw application...................... | --Class 1 resubmission of NDA or efficacy supplement starts new, 2-month cycle |
| . Request opportunity for hearing.......... | --Class 2 resubmission of NDA or efficacy supplement starts new, 6-month cycle |
| . Agree to extend review period to decide which of above actions to take........... | --Resubmission of NDA supplement other than efficacy supplement starts new, 6-month cycle |
| Response to Approvable Letter for ANDA (or ANDA Supplement) ....................... | ................................. |
| . Correct deficiencies by specified date or FDA will refuse to approve ANDA or ANDA supplement............................... | --Major resubmission of ANDA or ANDA supplement starts new, 6-month cycle |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 8

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

| . Request opportunity for hearing within 10 days........................................ | --Minor resubmission of ANDA or ANDA supplement starts new cycle of variable length |
|---|---|
| Response to Not Approvable Letter for ANDA (or ANDA Supplement) ................... | ................................. |
| . Same as for NDAs except that 10-day period does not apply (with exception of request for opportunity for hearing)...... | . Withdraw NDA or ANDA. |
| . FDA may regard failure to respond within 180 days as request to withdraw........... | . Request opportunity for hearing. |

**\*43354** These proposed changes with respect to NDAs are consistent with our user fee performance goals for resubmissions of human drug applications following receipt of an action letter. The proposed provisions for ANDAs are similar, although not identical, to those for NDAs.

C. Amendments to Unapproved Applications

In accordance with our user fee goals, we are proposing to revise our regulations on extending the review cycle following the submission of an amendment to an unapproved NDA. Under current § 314.60, the submission of a major amendment to an unapproved NDA (such as one that contains significant new data from a previously unreported study or detailed new analyses of earlier data) may extend the review period by up to 180 days. Under the user fee goals, a major amendment to an original NDA submitted within 3 months of the goal date extends the goal date by 3 months (Goals Letter at 15). Therefore, we propose to revise § 314.60 to state that submission of a major amendment to an original NDA within 3 months of the end of the initial review cycle constitutes an agreement to extend the review cycle by 3 months. The proposed regulation states that FDA may instead defer review of such an amendment until the subsequent review cycle.

Under the proposal, the submission of a major amendment to an NDA more than 3 months before the close of the initial review cycle, or the submission of a minor amendment during the initial review cycle, would not extend the review cycle. FDA might, at its discretion, review such an amendment during the initial review cycle or defer review until the subsequent review cycle. This proposed change to § 314.60 would codify for all NDAs our current policy on extending the review cycle for amendments to unapproved NDAs that are subject to user fees.

Also in accordance with the user fee goals, we are proposing to revise the regulations to provide that submission of a major amendment to an efficacy supplement to an approved application within 3 months of the end of the initial review cycle constitutes an agreement to extend the review cycle for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

supplement by 3 months (although we could defer review to the subsequent cycle).
It is appropriate to treat major amendments to efficacy supplements the same way
as major amendments to original applications because their review requires
significant agency resources.  Amendments to other types of NDA supplements,
however, will not extend the review cycle.

 An additional change that is consistent with the user fee goals would provide
that the submission of a major amendment to a resubmission of an application or
efficacy supplement within 3 months of the end of the initial review cycle
constitutes an agreement to extend the review cycle by 3 months (again, we could
elect to defer review).  Because major amendments to these resubmissions generally
require the review of substantial data, it is appropriate to treat them the same
way as major amendments to original applications or efficacy supplements.

We propose to make only minor revisions to the regulations on submitting
amendments to unapproved ANDAs in § 314.96.  The proposed rule would clarify that
an amendment to an ANDA submitted before the end of the initial review cycle that
contains significant data or information could extend the initial review cycle by
as many as 180 days.

 Table 3 of this document summarizes the proposed changes to our regulations on
amendments submitted before an action letter:

Table 3.--Summary of Proposed Changes to Regulations on Amendments Submitted
                       Prior to Action Letter

| Current Regulations | Proposed Regulations |
| --- | --- |
| Amendments to Unapproved NDAs and NDA Supplements .. | Amendments to Unapproved NDAs and Efficacy Supplements |
| . Submission of major amendment constitutes agreement to extend deadline for FDA decision.. | . Submission of major amendment within 3 months of end of initial review cycle constitutes agreement to extend cycle by 3 months; FDA may instead defer review to subsequent cycle. |
| . FDA may not extend review period more than 180 days.. | . Initial review cycle may be extended only once for major amendment. |
| . Submission of nonmajor amendment will not extend review period.............. | . Submission of major amendment more than 3 months before end of initial review cycle will not extend cycle. |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                          Page 10

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

---

| Amendments to Unapproved ANDAs and ANDA Supplements | . Submission of minor amendment will not extend review cycle. |
|---|---|
| . Submission of amendment containing significant data or information constitutes agreement to extend review period up to 180 days................. . Same for amendments to unapproved ANDA supplements............... | ..................................................... ..................................................... |

| | Amendments to Unapproved NDA Supplements Other Than Efficacy Supplements |
|---|---|
| | . Submission of any amendment will not extend the initial review cycle. |

| | Amendments to Resubmissions of Applications and Efficacy Supplements |
|---|---|
| | . Submission of major amendment within 3 months of end of initial review cycle constitutes agreement to extend cycle by 3 months; FDA may instead defer review to subsequent cycle. |

| | Amendments to Unapproved ANDAs and ANDA Supplements |
|---|---|
| | . Unchanged |

---

**\*43355 III.  Description of the Proposed Rule**

The proposed rule would make the following five types of revisions and additions to the regulations: (1) Revisions to remove the use of approvable and not approvable letters for NDAs and ANDAs and to incorporate the use of complete response letters and use of the term "review cycle", (2) addition of provisions on the issuance of complete response letters concerning BLAs and BLA supplements, (3) revisions related to resubmissions of NDAs and ANDAs after receipt of complete response letters, (4) miscellaneous technical revisions related to the use of complete response letters for NDAs and ANDAs, and (5) revisions related to amendments to unapproved NDAs and ANDAs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


A. The Complete Response Letter and the Review Cycle for NDAs and ANDAs

1. Definitions (Proposed § 314.3)

 Current § 314.3(b) defines "approvable letter" and "not approvable letter." We
propose to revise § 314.3(b) by removing these definitions and adding a definition
of "complete response letter." A complete response letter would be defined as a
written communication to an applicant from FDA usually identifying all of the
deficiencies in an application or abbreviated application that must be
satisfactorily addressed before it can be approved. (Under current § 314.3,
"application" refers to an NDA and "abbreviated application" refers to an ANDA.)

 We also propose to revise § 314.3(b) by adding a definition of "original
application." An original application would be defined as a pending application
for which we have never issued a complete response letter or approval letter or an
application that was submitted again after we had refused to file it or after it
was withdrawn without being approved.

 We also propose to add definitions of "Class 1 resubmission" and "Class 2
resubmission" for resubmissions of NDAs.  A "Class 1 resubmission" would be
defined as the resubmission of an application (i.e., an NDA), following receipt of
a complete response letter, that contains final printed labeling, draft labeling,
certain safety updates, stability updates to support provisional or final dating
periods, commitments to perform Phase 4 studies (including proposals for such
studies), assay validation data, final release testing on the last lots used to
support approval, minor reanalyses of previously submitted data, and other
comparatively minor information. [FN1] A "Class 2 resubmission" would be defined
as the resubmission of an application, following receipt of a complete response
letter, that includes any item not specified in the definition of "Class 1
resubmission," including any item that would require presentation to an advisory
committee.  These definitions of Class 1 and Class 2 resubmissions of NDAs reflect
those stated in the Goals Letter and will not be applied to ANDAs.

 FN1 This definition of Class 1 resubmission matches the definition stated in the
user fee Goals Letter, except that the latter refers to "other minor clarifying
information" and states that "[o]ther specific items may be added later as the
Agency gains experience with the scheme and will be communicated via guidance
documents to industry" (Goals Letter at 16).  The proposed definition would allow
resubmissions that contain unspecified information of a comparatively minor nature
to be treated as Class 1 resubmissions.  FDA might address specific types of such
resubmissions in agency guidance.

 In addition, we propose to revise § 314.3(b) to add a definition of  "efficacy
supplement." An "efficacy supplement" would be defined as a supplement to an
approved NDA to make one or more of the following changes to product labeling: (1)
Add or modify an indication for use, (2) revise the dose or dose regimen, (3)
provide for a new route of administration, (4) make a comparative efficacy claim
naming another drug product, (5) significantly alter the intended patient

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

population, (6) change the marketing status from prescription to over-the-counter
use, (7) complete the traditional approval of a product originally approved under
subpart H of part 314, or (8) incorporate other information based on at least one
adequate and well-controlled clinical study.

2. Timeframes for Review (Proposed § 314.100)

 Current § 314.100 addresses the timeframes for reviewing applications and
abbreviated applications.  Section 314.100(a) states that within 180 days of
receipt of an application for a new drug under section 505(b) of the act (21
U.S.C. 355(b)) or of an abbreviated application for a new drug under section
505(j) of the act, FDA will review it and send the applicant either an approval
letter under § 314.105, an approvable letter under § 314.110, or a not approvable
letter under § 314.120.  This 180-day period is called the review clock.

 We propose to revise § 314.100(a) by creating two separate provisions reflecting
different review cycles for applications that are subject to user fees and those
that are not subject to such fees.  Proposed § 314.100(a)(1) states that, except
as provided in **43356 § 314.100(a)(2), within 180 days of receipt of an
application for a new drug under section 505(b) of the act or of an abbreviated
application for a new drug under section 505(j) of the act, FDA will review it and
send the applicant either an approval letter under § 314.105 or a complete
response letter under § 314.110.  We propose to rename this 180-day period the
"initial review cycle" to be consistent with the term we currently use.

 Proposed § 314.100(a)(2) states that, for applications that are human drug
applications, as defined in section 735(1)(A) and (B) of the act (NDAs), or
supplements to such applications, as defined in section 735(2) of the act, the
initial review cycle will be adjusted to be consistent with our user fee
performance goals for reviewing such applications and supplements.  We are making
this change to reflect that, under the user fee performance goals, we are not
expected to review and act on all applications that are subject to user fees
within 180 days of receipt of such applications.  Rather, we have committed to
take action on certain percentages of applications within different time periods,
depending on the type of application (e.g., standard, priority, supplement,
resubmission) and the relevant fiscal year (see Goals Letter at 1, 2, and 3).  In
some cases, such as CMC supplements that require prior approval, we have committed
to taking action in less than 180 days. Consequently, proposed § 314.100(a)(2)
reflects that the initial review cycle for human drug applications and supplements
to such applications may in some cases be shorter or longer than 180 days.

 Current § 314.100(b) states that, during the review period, an applicant may
withdraw an application under § 314.65 or an abbreviated application under §
314.99 and later resubmit it.  We will treat the subsequent submission as a new
original application or abbreviated application.  Current § 314.100(b) uses the
term "review period" rather than "review clock" because it is intended to address
withdrawals made at any time while an application or abbreviated application is
pending before the agency (i.e., filed but not yet approved), not simply

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                          Page 13

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


withdrawals made while the review clock is running. (Although not defined in the regulations, the "review period" means the period from filing of an NDA or receipt of an ANDA to the ultimate disposition of the application, either by approval, refusal to approve the NDA under § 314.125 or the ANDA under § 314.127, or withdrawal of the application.) Rather than use the term "review period" or "review clock," we propose to clarify § 314.100(b) by stating that, at any time before approval, an applicant may withdraw an application under § 314.65 or an abbreviated application under § 314.99 and later submit it again for consideration. We propose to substitute the phrase "submit it again" for "resubmit it" because we want to limit the terms "resubmit" and "resubmission" in part 314 to resubmissions after receipt of a complete response letter.

Current § 314.100(c) states that the review clock may be extended by mutual agreement between FDA and an applicant or as provided in §§ 314.60 or 314.96, as the result of a major amendment. To be consistent with proposed § 314.100(a)(1), we propose to revise this provision by substituting "initial review cycle" for "review clock."

3. Filing an NDA and Receiving an ANDA (Proposed § 314.101)

Current § 314.101(f)(1) states that within 180 days after the date of filing of an NDA, plus the period of time the review period was extended (if any), FDA will either approve the application or issue a notice of opportunity for hearing if the applicant asked FDA to provide it an opportunity for a hearing on an application in response to an approvable letter or a not approvable letter.

Consistent with our proposed revision of § 314.100(a), we are proposing to add a new § 314.101(f)(2) (redesignating current § 314.101(f)(2) and (f)(3) as § 314.101(f)(3) and (f)(4), respectively). The new section states that for applications that are human drug applications, as defined in section 735(1)(A) and (B) of the act, and supplements to such applications, as defined in section 735(2) of the act, the 180-day period specified in § 314.101(f)(1) will be adjusted to be consistent with the agency's user fee performance goals for reviewing such applications and supplements. We also propose to replace references in current § 314.101(f) to approvable and/or not approvable letters with references to complete response letters.

4. Approvable and Not Approvable Letters (Proposed §§ 314.110 and 314.120)

Current § 314.110 sets forth provisions on the issuance of and response to approvable letters. Section 314.110(a) states that it may be appropriate for FDA to issue an approvable letter at the end of a review period to inform an applicant that its application or abbreviated application is basically approvable if the applicant resolves certain issues. It also states that an approvable letter signifies that we believe that we can approve the application or abbreviated application if the applicant submits specific additional information or material or agrees to specific conditions (e.g., changes in labeling). Section 314.110(a) further states that as a practical matter, an approvable letter in most instances

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

serves as a mechanism for resolving outstanding issues on drugs that are about to be approved and marketed.

Current § 314.120 addresses the agency's issuance of not approvable letters to applicants and applicants' responses to such letters. Section 314.120(a) states that we will send an applicant a not approvable letter if we believe that the application may not be approved for one of the reasons given in § 314.125, or that an abbreviated application may not be approved for one of the reasons given in § 314.127.

We propose to revise § 314.110 (and to remove and reserve § 314.120) by replacing references to approvable letters and not approvable letters with references to complete response letters.

a. Issuance of complete response letters. Proposed § 314.110 is entitled "Complete response letter to the applicant." Proposed § 314.110(a) states that we will send the applicant a complete response letter if we determine that we will not approve the application or abbreviated application in its present form for one or more of the reasons given in § 314.125 or § 314.127, respectively.

Proposed § 314.110(a)(1) states that a complete response letter will describe all of the specific deficiencies in the application or abbreviated application, except as stated in proposed § 314.110(a)(3). (Under current procedures, we might also notify the applicant of deficiencies in certain parts of the application or abbreviated application before issuance of a complete response letter.)

Following issuance of a complete response letter, we would not expect to identify any additional deficiencies in an NDA or ANDA. However, it is possible that we might find additional deficiencies in an application following review of: (1) Data submitted in an amendment not reviewed before issuance of the complete response letter, (2) a resubmission containing new data or analyses, or (3) additional safety data obtained from any source. These additional deficiencies might be based wholly on the newly submitted data or might reflect new analyses of previous data prompted by the new data. Finally, it is also possible that we might find **43357** additional deficiencies in previously reviewed data on the basis of advice from an advisory committee.

Proposed § 314.110(a)(2) states that the complete response letter reflects FDA's complete review of the data submitted in an original application or abbreviated application (or, where appropriate, a resubmission) and any amendments for which the review cycle was extended. It adds that the complete response letter will identify any amendments for which the review cycle was not extended that we have not yet reviewed.

Proposed § 314.110(a)(3) states that if we determine, after an application is filed or an abbreviated application is received, that the data submitted are inadequate to support approval, we might issue a complete response letter without first conducting required inspections and/or reviewing proposed product labeling.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                              Page 15

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

Proposed § 314.110(a)(4) states that, where appropriate, a complete response
letter will describe the actions necessary to place the application or abbreviated
application in condition for approval.

b.  Responses to complete response letters.  Current § 314.110(a) states that
within 10 days after the date of an approvable letter, the sponsor of an NDA must
respond in one of the following several ways: (1) Amend the application (or notify
us of an intent to do so), (2) withdraw the application (failure to respond within
10 days to an approvable letter is regarded as a request to withdraw the
application), (3) ask us to provide the applicant with an opportunity for a
hearing on whether there are grounds for denying the approval of the application
under section 505(d) of the act, or (4) notify us that the applicant agrees to
extend the review period under section 505(c) of the act so that the applicant can
determine whether to take one of the previously listed actions.

Current § 314.110(b) addresses the issuance of approvable letters to ANDA
applicants.  Under § 314.110(b), we will send an ANDA applicant an approvable
letter only if the abbreviated application substantially meets the requirements of
part 314 and we believe that we can approve it if minor deficiencies (e.g.,
regarding labeling) are corrected.  The approvable letter describes the
deficiencies in the ANDA and states a date by which the applicant must respond.
Unless the applicant corrects the deficiencies within the specified period, FDA
will refuse to approve the ANDA.  Within 10 days of the date of the approvable
letter, the applicant may request an opportunity for a hearing.

In proposed § 314.110(b), we direct both NDA and ANDA applicants to take one of
three actions following receipt of a complete response letter, eliminating (except
with respect to resubmissions) the separate provisions for ANDAs in current §
314.110(b).  We also propose to delete the requirement that NDA applicants take
action within 10 days.

The first option for the recipient of a complete response letter, stated in
proposed § 314.110(b)(1), is to resubmit the application or abbreviated
application, addressing all deficiencies identified in the letter.  For purposes
of § 314.110, a resubmission would mean the submission by an applicant of all
materials needed to fully address all deficiencies identified in the complete
response letter.

Under proposed § 314.110(b)(1)(i), a resubmission of an NDA or an efficacy
supplement that we classify as a Class 1 resubmission would constitute an
agreement by the applicant to start a new 2-month review cycle beginning on the
date we receive the resubmission.  Under proposed § 314.110(b)(1)(ii), a
resubmission of an NDA or an efficacy supplement that we classify as a Class 2
resubmission would constitute an agreement by the applicant to start a new 6-
month review cycle beginning on the date we receive the resubmission.

For NDA supplements other than efficacy supplements, such as a supplement for a
change in CMC or a labeling supplement that does not require clinical data, we

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

propose to retain the current practice of not applying the Class 1 and Class 2 terminology and review cycle lengths. Thus, under proposed § 314.110(b)(1)(iii), a resubmission of an NDA supplement other than an efficacy supplement would constitute an agreement by the applicant to start a new 6-month review cycle beginning on the date we receive the resubmission.

For resubmissions of ANDAs, we propose to continue the current practice of categorizing them as "major" or "minor." Under proposed § 314.110(b)(1)(iv), a major resubmission of an ANDA would constitute an agreement by the applicant to start a new 6-month review cycle beginning on the date we receive the resubmission. Under proposed § 314.110(b)(1)(v), a minor resubmission of an ANDA would constitute an agreement to start a new review cycle (length unspecified) beginning on the date we receive the resubmission. The actual length of the cycle would depend on the contents of the resubmission. As noted in section II.C of this document, CDER's guidance on "Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications" provides guidance on how the agency handles these resubmissions. The guidance states that CDER attempts to review most minor amendments within 30 to 60 days, and we intend to apply this to minor resubmissions of ANDAs. Under the proposed rule, resubmissions of supplements to approved ANDAs would continue to be treated the same as ANDA resubmissions in accordance with § 314.97.

The second option for the recipient of a complete response letter, stated in proposed § 314.110(b)(2), is to withdraw the application or abbreviated application. A decision to withdraw an application or abbreviated application would be without prejudice to a subsequent submission.

The third option for the recipient of a complete response letter, stated in proposed § 314.110(b)(3), is to ask us to provide the applicant an opportunity for a hearing on the question of whether there are grounds for denying approval of the application or abbreviated application under section 505(d) or (j)(4) of the act, respectively. Within 60 days of the date of a request for an opportunity for a hearing, or within a different time period to which we and the applicant agree, we would take either of the following actions: (1) Approve the application or abbreviated application under § 314.105 or (2) refuse to approve the NDA under § 314.125 or the ANDA under § 314.127 and give the applicant written notice of an opportunity for a hearing under § 314.200 and section 505(c)(1)(B) or (j)(5)(C) of the act on the question of whether there are grounds for denying approval of the application.

Under proposed § 314.110(c), an applicant agrees to extend the review period under section 505(c)(1) of the act until it takes any of the actions listed in proposed § 314.110(b). Section 505(c)(1) of the act directs FDA, within 180 days after the filing of an application under section 505(b) of the act or an additional period agreed upon by the applicant and the agency, to either approve the application (if we find that none of the grounds for denying approval stated in section 505(d) of the act applies) or give the applicant an opportunity for a hearing under section 505(d) on the question of whether such application is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

approvable. Thus, the addition of the provision on agreement to extend the review period in proposed § 314.110(c) would ensure that, if we do not approve an application, the applicant is provided a notice of opportunity for a hearing within the time specified by section 505(c)(1) of the act. **\*43358**

 Proposed § 314.110(c) further states that we may consider an NDA applicant's failure to take any of the actions listed in § 314.110(b) within 1 year after receiving a complete response letter to be a request by the applicant to withdraw the application. However, regarding ANDAs, proposed § 314.110(c) states that we may consider an applicant's failure to take any of the listed actions within 6 months after receiving a complete response letter to be a request by the applicant to withdraw the abbreviated application. We believe that the shorter time period for ANDAs is appropriate because an ANDA resubmission is not likely to involve generation of clinical data and deficiencies normally could be addressed within 6 months.

 Because we propose to revise current § 314.110 to state the provisions on complete response letters, we propose to delete current § 314.120 on not approvable letters and to reserve this section for future use.

B. Complete Response Letter for BLAs

 To incorporate into the biologics regulations the use of complete response letters for BLAs, we are proposing to add a definition of "complete response letter" to § 600.3 and to add § 601.3 on complete response letters.

1. Definition (Proposed § 600.3)

 We propose to add to current § 600.3, paragraph (jj) to define a complete response letter. Under proposed § 600.3(jj), a complete response letter would be defined as a written communication to an applicant from FDA usually identifying all of the deficiencies in a biologics license application or supplement that must be satisfactorily addressed before it can be approved. (Current § 600.3(gg) defines a "supplement" as a request to the Director, Center for Biologics Evaluation and Research, to approve a change in an approved license application.)

2. Complete Response Letter to the Applicant (Proposed § 601.3)

 To incorporate current CBER policy into the regulations, we are proposing to establish a new § 601.3 on complete response letters. Under proposed § 601.3(a), FDA will send the biologics license applicant or supplement applicant a complete response letter if we determine that we will not approve the biologics license application or supplement in its present form.

 Under proposed § 601.3(b), a biologics license applicant or supplement applicant must take one of two actions after receiving a complete response letter. Under proposed § 601.3(b)(1), the license or supplement applicant may resubmit the application or supplement, addressing all deficiencies identified in the complete

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 18

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

response letter.  Under proposed § 601.3(b)(2), the license or supplement
applicant may withdraw the application or supplement; a decision to withdraw would
be without prejudice to a subsequent submission.

 Finally, under proposed § 601.3(c), FDA may consider a biologics license
applicant or supplement applicant's failure to either resubmit or withdraw the
application or supplement within 1 year after receiving a complete response letter
to be a request by the applicant to withdraw the application or supplement.

C. Miscellaneous Revisions Related to Adoption of Complete Response Letters for
NDAs and ANDAs

 To reflect FDA's use of complete response letters for NDAs and ANDAs, the agency
proposes to make the following additional revisions to its regulations:

1. Content and Format of Applications (Proposed § 314.50)

 Current § 314.50 specifies the content and format of NDAs.  Section 314.50(d)
describes the technical sections required in each application.  Section
314.50(d)(5)(vi)(b) states that an applicant periodically must update its pending
application with new safety information that might affect the statement of
contraindications, warnings, precautions, and adverse reactions in the draft
labeling.  The applicant must file these safety update reports 4 months after the
initial submission, after receiving an approvable letter, and when otherwise
requested by FDA.

 We propose to revise § 314.50(d)(5)(vi)(b) by replacing the requirement to submit
a safety update report following receipt of an approvable letter with a
requirement to submit a safety update report in a resubmission following receipt
of a complete response letter.  This would ensure that we have more extensive
safety information than was available at the time of the original submission.  In
addition, we could, if appropriate, require submission of a safety update report
immediately before issuing an approval letter under the current provision that
allows us to require submission of a report "at other times as requested by FDA."

2. Withdrawal by the Applicant of an Unapproved Application (Proposed § 314.65)

 Current § 314.65 states that an applicant may at any time withdraw an application
that is not yet approved by notifying us in writing.  It further states that we
will consider an applicant's failure to respond within 10 days to an approvable
letter under § 314.110 or a not approvable letter under § 314.120 to be a request
by the applicant to withdraw the application.

 We propose to revise § 314.65 to delete the reference to responding within 10
days to an approvable or not approvable letter, consistent with proposed §
314.110.  In addition, we propose to add a statement that if, by the time we
receive a notice of withdrawal, we have identified any deficiencies in the
application, we will list those deficiencies in the letter we send the applicant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 19

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

acknowledging the withdrawal.

3. Communications Between FDA and Applicants (Proposed § 314.102)

Current § 314.102 addresses communications between FDA and applicants. Section 314.102(b) states that FDA reviewers shall make every reasonable effort to communicate promptly to applicants easily correctable deficiencies found in an application or an abbreviated application when those deficiencies are discovered, particularly deficiencies concerning CMC issues. This early communication is intended to permit applicants to correct readily identified deficiencies relatively early in the review process and to submit an amendment before the review period has elapsed. Section 314.102(b) further states that such early communication would not ordinarily apply to major scientific issues; instead, major scientific issues will ordinarily be addressed in an action letter.

We propose to revise § 314.102(b) to clarify that major scientific issues will ordinarily be addressed in a complete response letter, even though they may have been addressed earlier in a discipline review letter in accordance with user fee performance goals.

Current § 314.102(d) discusses end-of-review conferences. It states that at the conclusion of our review of an application or abbreviated application as designated by the issuance of an approvable or not approvable letter, we will provide applicants with an opportunity to meet with agency reviewing officials. The purpose of the meeting will be to discuss what further steps need to be taken by the applicant *43359 before the application or abbreviated application can be approved. Section 314.102(d) further states that this meeting will be available on all applications or abbreviated applications, with priority given to applications for new chemical entities and major new indications for marketed drugs and for the first duplicates for such drugs. Requests for such meetings must be directed to the director of the division responsible for reviewing the application or abbreviated application.

We propose to revise § 314.102(d) by replacing "an approvable or not approvable letter" with "a complete response letter." In addition, we propose to delete the references to abbreviated applications because the Office of Generic Drugs, which reviews such applications, does not routinely provide end-of-review conferences for ANDAs. Finally, because we virtually always agree to requests for end-of-review conferences for NDAs and do not prioritize the scheduling of such conferences for particular types of NDAs, we propose to remove the reference to priority status for certain types of NDAs.

4. Approval (Proposed § 314.105)

Current § 314.105(b), concerning approval of applications and abbreviated applications, states that FDA will approve an application and issue the applicant an approval letter (rather than an approvable letter under § 314.110) on the basis of draft labeling if only minor labeling deficiencies remain. We propose to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

delete the reference to approvable letters.  Substituting a reference to complete
response letters would not be appropriate because issuance of such a letter would
not necessarily signify that we believe that an application is basically
approvable provided that certain issues are resolved or that the application
substantially meets the requirements of part 314, as is the case with approvable
letters issued under current § 314.110.

5. Public Disclosure of Existence of Applications (Proposed § 314.430)

Current § 314.430(b) states that we will not publicly disclose the existence of
an application or abbreviated application before we send an approvable letter to
the applicant unless the existence of the application or abbreviated application
has been previously publicly disclosed or acknowledged.  The provision further
states that CDER will maintain and make available for public disclosure a list of
applications or abbreviated applications for which we have sent an approvable
letter to the applicant.

We propose to revise § 314.430(b) to allow for FDA disclosure of the existence of
an NDA or ANDA after issuance of an approval letter or tentative approval letter.
Proposed § 314.430 (b) states that we will not publicly disclose the existence of
an application or abbreviated application before we send the applicant an approval
letter under § 314.105 or a tentative approval letter under § 314.107, unless the
existence of the application or abbreviated application has been previously
publicly disclosed or acknowledged.  We do not believe that it is necessary to
include a provision stating that the agency will maintain and make available for
public disclosure a list of approved applications and abbreviated applications
because we already make this information available by routinely announcing the
approval of NDAs and ANDAs within days of their approval and publishing an annual
list (with monthly supplements) of "Approved Drug Products With Therapeutic
Equivalence Evaluations" (known as the "Orange Book").

We issue a tentative approval letter when an application meets the scientific and
technical requirements for approval under section 505(b) or (j) of the act but
marketing exclusivity (e.g., pediatric exclusivity, orphan drug exclusivity) or
patent rights prevent final approval of the drug product.  As stated in §
314.107(b)(3)(v), tentative approval of an application does not constitute an
approval of an application and cannot, absent a final approval letter from the
agency, result in an effective approval of an application. However, because we
only issue tentative approval letters when an application has met the scientific
and technical approval requirements, tentative approval letters do not present the
same disclosure concerns as correspondence regarding other unapproved
applications.  Therefore, we intend to follow our past practice of acknowledging
the existence of applications that have received tentative approval letters and
making those letters publicly available.

Because current § 314.107(b)(3) does not explicitly refer to our practice of
issuing a letter notifying an applicant of a tentative approval, we propose to
revise § 314.107(b)(3)(v) to state that we will issue a tentative approval letter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                               Page 21

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

when tentative approval is appropriate in accordance with § 314.107 (b)(3).

The changes that we are proposing to the disclosure provisions would mean that FDA disclosure of the existence of an NDA or ANDA might result in later disclosure than sometimes occurs under the current regulation (i.e., with respect to those applications for which FDA now issues approvable letters). However, we believe that this effect would be limited because most applicants (at least for NDAs) publicly reveal the existence of their applications before agency issuance of an approval letter. Moreover, the proposed change would be consistent with the agency's long-standing presumption that, before approval (and absent evidence to the contrary), the existence of an application is confidential commercial information under 21 CFR 20.61. For example, under § 601.51, FDA will not disclose the existence of a biological product file before a BLA has been approved unless it has previously been publicly disclosed or acknowledged.

However, we specifically invite comment on whether it would be appropriate for FDA to disclose the existence of an NDA or ANDA following issuance of a complete response letter and if so, what conditions, if any, should be placed on such disclosure. For example, one alternative to the proposed approach would be that FDA would publicly disclose the existence of an NDA or ANDA following issuance of a complete response letter unless the applicant notified the agency (by some specified deadline) that the applicant had not publicly disclosed or acknowledged the existence of the application or abbreviated application. This approach would allow applicants to prevent agency disclosure of the existence of an application despite the issuance of a complete response letter. However, it also would create the potential for inadvertent disclosure and necessitate the establishment of a system to record and track applicants' positions regarding disclosure. This could be burdensome to applicants and the agency.

6. Other Technical Revisions (Proposed §§ 312.84, 314.103, 314.125, and 314.440)

We are proposing to revise other sections of the regulations to replace references to approvable and/or not approvable letters with references to complete response letters. These revisions would be made to § 312.84 (Risk-benefit analysis in review of marketing applications for drugs to treat life-threatening and severely-debilitating illnesses), § 314.103 (Dispute resolution), § 314.125 (Refusal to approve an application), and § 314.440 (Addresses for applications and abbreviated applications). (The proposed rule also revises this section by providing the current address to *43360 which an NDA must be submitted and the address for applications regarding certain products reviewed by CBER.)

D. Amendments to Unapproved NDAs, ANDAs, and Unapproved Supplements to Approved NDAs

The other principal purpose of this proposed rule, besides the adoption of complete response letters and related changes to resubmissions, is to revise the regulations in §§ 314.60 and 314.96 on amendments to unapproved NDAs and ANDAs, respectively.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

1. Amendments to Unapproved NDAs, Supplements, and Resubmissions (Proposed §
314.60)

Amendments to unapproved NDAs are addressed in § 314.60.  Current § 314.60(a)
states that except as provided in § 314.60 (b), the applicant may submit an
amendment to an application that is filed under § 314.100, but not yet approved.
(The reference to § 314.100 is in error; § 314.101 not § 314.100 addresses the
filing of applications.) Section 314.60(a) further states that the submission of a
major amendment (e.g., one that contains significant new data from a previously
unreported study or detailed new analyses of earlier data) constitutes an
agreement by the applicant under section 505(c) of the act to extend the date by
which we are required to decide on the application.  The section adds that we
ordinarily will extend the review period but only for the time needed to review
the new information, and we may not extend the period for more than 180 days.  If
we extend the review period for the application, the director of the division
responsible for reviewing the application will notify the applicant of the length
of the extension.  The submission of an amendment that is not a major amendment
will not extend the review period.

We propose to revise § 314.60(a) to state that we generally assume that when an
original application (i.e., original NDA) supplement to an approved application or
resubmission of an application or supplement is submitted to the agency for
review, the applicant believes that we can approve the application, supplement, or
resubmission as submitted.  However, the applicant may submit an amendment to an
application or supplement that has been filed under § 314.101 but is not yet
approved.

In place of the provisions in current § 314.60(a), we propose to add new §
314.60(b).  Under proposed § 314.60(b)(1), submission of a major amendment to an
original application, efficacy supplement, or resubmission of an application or
efficacy supplement within 3 months of the end of the initial review cycle
constitutes an agreement by the applicant under section 505(c) of the act to
extend the review cycle by 3 months.  However, the proposed regulation states that
we may instead defer review of such an amendment until the subsequent review
cycle.  The subsequent review cycle would run from the resubmission of the
application, efficacy supplement, or resubmission following receipt of the
complete response letter to the issuance of either a second complete response
letter or an approval letter.  Under proposed § 314.60(b)(1), if we extend the
initial review cycle for an original application, efficacy supplement, or
resubmission of an application or efficacy supplement under this paragraph (b)(1),
the division responsible for reviewing the application, supplement, or
resubmission will notify the applicant of the extension.  Proposed § 314.60(b)(1)
further states that the initial review cycle for an original application, efficacy
supplement, or resubmission of an application or efficacy supplement may be
extended only once due to submission of a major amendment.  Finally, proposed §
314.60(b)(1) states that we may, at our discretion, review any subsequent major
amendment during the initial review cycle (as extended) or defer review until the
subsequent review cycle.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


Under proposed § 314.60(b)(2), submission of a major amendment to an original application, efficacy supplement, or resubmission of an application or efficacy supplement more than 3 months before the end of the initial review cycle will not extend the cycle. We may, at our discretion, review such an amendment during the initial review cycle or defer review until the subsequent review cycle.

Under proposed § 314.60(b)(3), submission of a minor amendment to an original application, efficacy supplement, or resubmission of an application or efficacy supplement will not extend the initial review cycle. We may, at our discretion, review such an amendment during the initial review cycle or defer review until the subsequent review cycle.

Under proposed § 314.60(b)(4), submission of an amendment to a supplement other than an efficacy supplement will not extend the initial review cycle. We may, at our discretion, review such an amendment during the initial review cycle or defer review until the subsequent review cycle.

Proposed § 314.60 (b)(5) specifies that a major amendment may not include data to support an indication for a use that was not included in the original application, supplement, or resubmission.

These proposed regulations would codify for all NDAs, efficacy supplements, and resubmissions of NDAs and efficacy supplements, our current policy on extending the review period for human drug applications when a major amendment is submitted before FDA issuance of an action letter. As stated in the previous paragraphs, we believe that it is appropriate to treat amendments to unapproved efficacy supplements and amendments to resubmissions of applications and efficacy supplements, the same as amendments to unapproved NDAs. Amendments to ANDAs submitted before FDA issuance of an action letter are addressed in § 314.96, discussed in section III.D.3 of this document.

2. Procedures for Submission of a Supplement to an Approved Application (Proposed § 314.71)

The references to different types of supplemental applications in proposed §§ 314.60 and 314.110 necessitate a change to § 314.71, which addresses procedures for submission of supplements to approved applications. Current § 314.71(c) states that all procedures and actions that apply to applications under part 314, including actions by applicants and the agency, also apply to supplements. Under proposed §§ 314.60 and 314.110, a certain type of NDA supplement (i.e., efficacy supplements) will be treated the same as an NDA, while other types will be treated differently. To reflect this different treatment of certain supplements, we propose to revise § 314.71(c) to clarify that all procedures and actions that apply to applications under part 314 also apply to supplements "except as specified otherwise in this part."

3. Amendments to Unapproved ANDAs (Proposed § 314.96)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

Our regulations on submitting amendments to unapproved abbreviated applications are set forth in § 314.96. Current § 314.96(a)(2) states that submission of an amendment containing significant data or information constitutes an agreement to extend the review period only for the time necessary to review the information and for no more than 180 days. Under § 314.96(a)(3), the submission of an amendment containing significant data or information to resolve deficiencies specified in a not approvable letter will extend the date by which we must reach a decision on the abbreviated *43361 application only for the time necessary to review the information and for no more than 180 days.

We propose to revise § 314.96(a)(2) to substitute the term "initial review cycle" for "review period." Our proposed revision would also clarify that an amendment to an ANDA submitted before the end of the initial review cycle that contains significant data or information could extend the initial review cycle for as many as 180 days. Thus, we are proposing to retain the Office of Generic Drugs' current approach to amendments to ANDAs.

We propose to delete § 314.96(a)(3) because the submission of an amendment to an abbreviated application following receipt of a complete response letter (i.e., a resubmission of an abbreviated application) is addressed in proposed § 314.110.

IV. Analysis of Economic Impacts

FDA has examined the impacts of the proposed rule under Executive Order 12866 and the Regulatory Flexibility Act (5 U.S.C. 601-612), and the Unfunded Mandates Reform Act (Public Law 104-4). Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). The agency believes that this proposed rule is not a significant regulatory action as defined by the Executive order.

The Regulatory Flexibility Act requires agencies to prepare a Regulatory Flexibility Analysis for each rule unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

Section 202(a) of the Unfunded Mandates Reform Act of 1995 requires that agencies prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing "any rule includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.

We believe that this proposed rule is consistent with the regulatory philosophy and principles identified in Executive Order 12866. Because the proposed rule does not impose mandates on State, local, or tribal governments, or the private sector, that would result in an expenditure in any one year of $100,000,000 or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 25

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

more, we are not required to perform a cost-benefit analysis under the Unfunded
Mandates Reform Act of 1995.

 With respect to the Regulatory Flexibility Act, we do not believe that this
proposed rule would have a significant economic impact on a substantial number of
small entities.  We are taking this action to amend our regulations governing
applications for approval to market new drugs, generic drugs, and biological
products.  This action is necessary to meet a user fee performance goal to replace
approvable and not approvable letters with complete response letters.  The
proposed rule also would revise regulations governing amendments to unapproved
applications and codify terminology used in user fee performance goals affecting
resubmissions of applications.  As discussed in greater detail in the following
paragraphs, the economic impact of these regulatory changes is not expected to be
significant for any affected entity.

A. Impact of the Proposed Rule

 As described in detail in sections II and III of this document, the proposed rule
would do the following: (1) For NDAs and ANDAs, replace the two types of action
letters currently used (approvable and not approvable letters) with complete
response letters; (2) for BLAs, incorporate into the regulations an existing
policy on complete response letters; (3) incorporate into regulations the
terminology and procedures used in the user fee performance goals regarding NDA
resubmissions; and (4) revise regulations governing extension of the initial
review cycle in response to major amendments to unapproved applications,
supplements, and resubmissions.  For NDAs (with respect to resubmissions and
amendments) and BLAs, the proposed rule largely would codify current agency
practices.  For ANDAs, the proposed rule would revise regulations to be consistent
with current practice or, where appropriate, with the provisions governing NDAs.
The most significant impact of the proposed rule would be on efficacy supplements
to approved NDAs and on resubmissions of applications and efficacy supplements.
The impact of specific provisions of this proposed rule on NDAs, ANDAs, efficacy
supplements, and resubmissions is described in greater detail in the following
paragraphs.

1. Complete Response Letter

 We are proposing regulatory changes that would replace approvable and not
approvable letters with complete response letters.  Both approvable and not
approvable letters indicate that an NDA or ANDA is not approvable in its current
form, and that changes are necessary or that we require additional information.  A
complete response letter would describe the deficiencies in an NDA or ANDA and,
where appropriate, the actions necessary to place the application in condition for
approval.  In the past, some drug manufacturers have expressed concern that a not
approvable letter sends an unintended message that a marketing application will
never be approved, which could adversely affect a company's ability to raise
capital.  Thus, in addition to allowing us to meet our commitments under the user
fee performance goals, this regulatory change addresses industry comments by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

adopting a more neutral mechanism to convey that an NDA or ANDA cannot be approved in its current form. (We have already adopted a policy of issuing complete response letters for BLAs, and the proposed rule would simply codify this policy.) Because this regulatory change is primarily administrative in nature and is being made in response to the user fee performance goals, it is expected to have little or no economic impact.

2. Resubmissions

We also are proposing regulatory changes to implement the user fee performance goals and to codify new terminology associated with the resubmission of drug marketing applications. A Class 2 resubmission (incorporating major changes or a significant amount of additional data) would start a new 6-month review cycle, whereas a Class 1 resubmission (incorporating minor changes or a limited amount of additional data) would begin a new 2-month review cycle. These changes would codify agency practices regarding NDA resubmissions in place since 1998.

We are proposing to apply the Class 1 and Class 2 provisions to resubmissions of efficacy supplements as well. We agreed to make this policy change in PDUFA III because efficacy supplements, like original NDAs, contain varying amounts of data requiring different review times. We began to implement this change in October 2002. The proposed application of the Class 1 and Class 2 provisions to resubmissions of efficacy supplements would represent a regulatory change because under PDUFA II, all resubmissions of efficacy supplements would start a new 6-month review cycle. Under the proposed rule, a Class 1 resubmission of an efficacy supplement would extend the review *43362 cycle by only 2 months, rather than 6 months, as occurred under PDUFA II. Review times for Class 2 efficacy supplement resubmissions would be largely unaffected by the proposed change. Based on data from 1996 to 2000 (the most recent 5-year period for which complete data were available), an average of 16 efficacy supplements (approximately 40 percent) resubmitted annually would be reviewed in 2 months rather than the current 6 months. The proposed rule generally would maintain current agency practice (review within 6 months) with respect to the review of other types of NDA supplements, i.e., for CMC or labeling changes (although under PDUFA III, our goal is to review within 4 months resubmissions of certain CMC supplements for which prior approval is required). For ANDA resubmissions, the proposal would codify the current practice of 6-month review.

3. Amendments to Unapproved Drug Marketing Applications

We also are proposing to revise our regulations on extending the initial review cycle following the submission of an amendment to an unapproved drug marketing application. Current regulations state, for unapproved NDAs and efficacy supplements, that submission of a major amendment extends the review cycle for the amount of time necessary to review the new information but not by more than 180 days. The proposed rule generally would extend the review cycle by 3 months if a major amendment to an application, efficacy supplement, or resubmission of an application or efficacy supplement were submitted within 3 months of the end of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


the initial review cycle.  (The proposed rule states that we may defer review
until a subsequent review cycle.) If a major amendment were submitted more than 3
months before the end of the initial review cycle, the review cycle would not be
extended.  These changes would codify the practice for NDAs that has been in place
since 1998.  However, we have recently begun to apply this policy to efficacy
supplements.  Before October 2002, under the user fee performance goals, we did
not extend the review cycle for a major amendment to an efficacy supplement.
Therefore, as with the proposed change regarding resubmissions of efficacy
supplements, we believe that it is appropriate to treat the proposed change
regarding amendments to unapproved efficacy supplements as a regulatory change for
purposes of this analysis.

 These provisions of the proposed rule might slightly increase review times for
efficacy supplements for which at least one major amendment was received during
the initial review cycle.  Based on data from 1996 to 2000, these regulatory
changes could affect as many as 11 percent of all efficacy supplements filed or an
average of 15 per year.  The effect of this change is dependent on the timing of
future filings and the number of instances in which we might exercise our review
discretion.

 With respect to amendments to ANDAs, the proposed changes to regulations would
codify FDA's current approach.

B. Summary of Impacts

 Based on the preceding analysis, the proposed changes to provisions governing
resubmissions could result in reduced review times for up to 40 percent of
efficacy supplements resubmitted annually.  However, the proposed provisions
governing major amendments could slightly increase review times for up to 11
percent of efficacy supplements (for which at least one major amendment was
received during the initial review cycle) filed annually.  The full impact of this
rule would be affected by the number of future submissions and the extent to which
we might exercise our discretion to defer review until the next cycle.  ANDAs will
not be significantly affected by the proposed changes to regulations.

 Because this proposed rule generally amends current regulations governing
applications for approval to market new drugs and generic drugs to reflect user
fee terminology and performance goals that have already been incorporated into FDA
policies (except with respect to complete response letters, as previously noted),
we certify that the proposed rule will not have a significant economic impact on a
substantial number of small entities.  Therefore, no further analysis is required
under the Regulatory Flexibility Act.

V. Environmental Impact

 We have determined under 21 CFR 25.30(h) that this action is of a class of
actions that do not individually or cumulatively have a significant effect on the
human environment.  Therefore, neither an environmental assessment nor an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                                                     Page 28

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

environmental impact statement is required.

VI. Paperwork Reduction Act of 1995

 This proposed rule does not contain new information collection provisions that
are subject to review by the Office of Management and Budget (OMB) under the
Paperwork Reduction Act of 1995 (the PRA) (44 U.S.C. 3501-3520).  The proposed
rule would substitute complete response letters for approvable and not approvable
letters (in current §§ 314.110 and 314.120, respectively) when we take action on
marketing applications.  The proposed rule would retain the provisions requiring
the recipient of the action letter (a complete response letter under the proposed
rule) to either amend the application (resubmit it), withdraw it, or ask us to
provide an opportunity for a hearing on whether there are grounds for denying
approval of the application.  The proposed rule also would revise the regulations (
§§ 314.60, 314.96, 314.110, and 314.120) on extending the review cycle due to the
submission of amendments before we issue an action letter and due to
resubmissions, but would not change the information required in such amendments
and resubmissions.  OMB has approved the information collection previously
discussed concerning responses to action letters under OMB control number
0910-0001, which expires on March 31, 2005.

 The proposed rule would also establish regulations on the issuance of complete
response letters to biologics license applicants and supplement applicants. The
proposed rule would codify current agency practice on the issuance of complete
response letters to these applicants and on applicant actions in response to these
letters (resubmission or withdrawal of the application or supplement).  OMB has
already approved the information collection concerning responses to complete
response letters for BLAs and BLA supplements under OMB control number 0910-0338,
which expires on August 31, 2005.

 FDA tentatively concludes that this proposed rule contains no new collection of
information.  Therefore, OMB clearance under the PRA is not required.

VII. Federalism

 We have analyzed this proposed rule in accordance with the principles set forth
in Executive Order 13132.  We have determined that the rule does not contain
policies that have substantial direct effects on the States, on the relationship
between the National Government and the States, or on the distribution of power
and responsibilities among the various levels of government.  Accordingly, we have
concluded that the rule does not contain policies that have federalism
implications as defined in the order and, consequently, a federalism summary
impact statement is not required.  **\*43363**

VIII. Proposed Effective Date

 We propose that any final rule that may issue based on this proposal become
effective 30 days after the date of its publication in the Federal Register.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 29

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


IX. Request for Comments

 Interested persons may submit to the Division of Dockets Management (see
ADDRESSES) written or electronic comments on this proposal. Submit a single copy
of electronic comments or two paper copies of any mailed comments, except that
individuals may submit one paper copy. Comments are to be identified with the
docket number found in brackets in the heading of this document. Received
comments may be seen in the Division of Dockets Management between 9 a.m. and 4
p.m., Monday through Friday.

List of Subjects

21 CFR Part 312

 Drugs, Exports, Imports, Investigations, Labeling, Medical research, Reporting
and recordkeeping requirements, Safety.


21 CFR Part 314

 Administrative practice and procedure, Confidential business information, Drugs,
Reporting and recordkeeping requirements.


21 CFR Part 600

 Biologics, Reporting and recordkeeping requirements.


21 CFR Part 601

 Administrative practice and procedure, Biologics, Confidential business
information.

 Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority
delegated to the Commissioner of Food and Drugs, it is proposed that 21 CFR parts
312, 314, 600, and 601 be amended as follows:

PART 312--INVESTIGATIONAL NEW DRUG APPLICATION

 1. The authority citation for 21 CFR part 312 continues to read as follows:

 Authority: 21 U.S.C. 321, 331, 351, 352, 353, 355, 371; 42 U.S.C. 262.

 2. Section 312.84 is amended in paragraph (c) by revising the first sentence to
read as follows:

§ 312.84 Risk-benefit analysis in review of marketing applications for drugs to
treat life-threatening and severely-debilitating illnesses.


* * * * *

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


(c) If FDA concludes that the data presented are not sufficient for marketing approval, FDA will issue a complete response letter under § 314.110 of this chapter (for a drug) or § 601.3 of this chapter (for a biologic).  * * *


* * * * *

PART 314--APPLICATIONS FOR FDA APPROVAL TO MARKET A NEW DRUG

3.  The authority citation for 21 CFR part 314 continues to read as follows:

Authority: 21 U.S.C. 321, 331, 351, 352, 353, 355, 355a,  356, 356a, 356b, 356c, 371, 374, 379e.

4.  Section 314.3 is amended in paragraph (b) by removing the definitions for "Approvable letter" and "Not approvable letter" and by adding the following definitions in alphabetical order:

§ 314.3 Definitions.

* * * * *
 (b) * * *

Class 1 resubmission means the resubmission of an application, following receipt of a complete response letter, that contains final printed labeling, draft labeling, certain safety updates, stability updates to support provisional or final dating periods, commitments to perform Phase 4 studies (including proposals for such studies), assay validation data, final release testing on the last lots used to support approval, minor reanalyses of previously submitted data, and other comparatively minor information.

Class 2 resubmission means the resubmission of an application, following receipt of a complete response letter, that includes any item not specified in the definition of "Class 1 resubmission," including any item that would require presentation to an advisory committee.

Complete response letter means a written communication to an applicant from FDA usually identifying all of the deficiencies in an application or abbreviated application that must be satisfactorily addressed before it can be approved.

* * * * *
 Efficacy supplement means a supplement to an approved application to make one or more of the following changes to product labeling:

(1) Add or modify an indication for use;

(2) Revise the dose or dose regimen;

(3) Provide for a new route of administration;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

   (4) Make a comparative efficacy claim naming another drug product;

   (5) Significantly alter the intended patient population;

   (6) Change the marketing status from prescription to over-the-counter use;

   (7) Complete the traditional approval of a product originally approved under subpart H of this part or;

   (8) Incorporate other information based on at least one adequate and well-controlled clinical study.

* * * * *
 Original application means a pending application for which FDA has never issued a complete response letter or approval letter, or an application that was submitted again after FDA had refused to file it or after it was withdrawn without being approved.

* * * * *

§ 314.50 [Amended]

   5.  Section 314.50 is amended in paragraph (d)(5)(vi)(b) in the fourth sentence by removing the phrase "following receipt of an approvable letter" and by adding in its place the phrase "in a resubmission following receipt of a complete response letter".

   6.  Section 314.60 is amended as follows:

   a.  By revising the section heading;

   b.  By revising paragraph (a);

   c.  By redesignating paragraphs (b) and (c) as paragraphs (c) and (d), respectively;

   d.  By adding new paragraph (b); and

   e.  By revising newly redesignated paragraphs (c)(1)(iii) and (c)(1)(iv), and the first sentence of paragraph (c)(2) to read as follows:

§ 314.60 Amendments to an unapproved application, supplement, or resubmission.

   (a) FDA generally assumes that when an original application, supplement to an approved application, or resubmission of an application or supplement is submitted to the agency for review, the applicant believes that the agency can approve the application, supplement, or resubmission as submitted.  However, the applicant may submit an amendment to an application that has been filed under § 314.101 but is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

not yet approved.

  (b)(1) Submission of a major amendment to an original application, efficacy
supplement, or resubmission of an application or efficacy supplement within 3
months of the end of the initial review cycle constitutes an agreement by the
applicant under section 505(c) of the act to extend the initial review cycle by 3
months.  FDA may instead defer review of the amendment until the subsequent review
cycle.  If the agency extends the initial review cycle for an original
application, efficacy supplement, or resubmission under this paragraph, the
division responsible for reviewing the application, supplement, **43364** or
resubmission will notify the applicant of the extension.  The initial review cycle
for an original application, efficacy supplement, or resubmission of an
application or efficacy supplement may be extended only once due to submission of
a major amendment.  FDA may, at its discretion, review any subsequent major
amendment during the initial review cycle (as extended) or defer review until the
subsequent review cycle.

  (2) Submission of a major amendment to an original application, efficacy
supplement, or resubmission of an application or efficacy supplement more than 3
months before the end of the initial review cycle will not extend the cycle.  FDA,
may, at its discretion, review such an amendment during the initial review cycle
or defer review until the subsequent review cycle.

  (3) Submission of an amendment to an original application, efficacy supplement,
or resubmission of an application or efficacy supplement that is not a major
amendment will not extend the initial review cycle.  FDA may, at its discretion,
review such an amendment during the initial review cycle or defer review until the
subsequent review cycle.

  (4) Submission of an amendment to a supplement other than an efficacy supplement
will not extend the initial review cycle.  FDA may, at its discretion, review such
an amendment during the initial review cycle or defer review until the subsequent
review cycle.

  (5) A major amendment may not include data to support an indication for a use
that was not included in the original application, supplement, or resubmission.

  (c)(1) * * *

  (iii) The applicant has not obtained a right of reference to the investigation
described in paragraph (c)(1)(ii) of this section; and

  (iv) The report of the investigation described in paragraph (c)(1)(ii) of this
section would be essential to the approval of the unapproved application.

  (2) The submission of an amendment described in paragraph (c)(1) of this section
will cause the unapproved application to be deemed to be withdrawn by the
applicant under § 314.65 on the date of receipt by FDA of the amendment.* * *

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

\* \* \* \* \*

7.  Section 314.65 is amended by revising the second sentence to read as follows:

§ 314.65 Withdrawal by the applicant of an unapproved application.

 \* \* \* If, by the time it receives such notice, the agency has identified any deficiencies in the application, we will list such deficiencies in the letter we send the applicant acknowledging the withdrawal.\* \* \*

§ 314.71 [Amended]

8.  Section 314.71 is amended in paragraph (c) by adding the phrase "except as specified otherwise in this part" at the end of the sentence.

§ 314.96 [Amended]

9.  Section 314.96 is amended by revising paragraph (a)(2) and by removing paragraph (a)(3) to read as follows:

§ 314.96 Amendments to an unapproved abbreviated application.

 (a) \* \* \*

 (2) Submission of an amendment containing significant data or information before the end of the initial review cycle constitutes an agreement between FDA and the applicant to extend the initial review cycle only for the time necessary to review the significant data or information and for no more than 180 days.

\* \* \* \* \*

10. Section 314.100 is revised to read as follows:

§ 314.100 Timeframes for reviewing applications and abbreviated applications.

 (a)(1) Except as provided in paragraph (a)(2) of this section, within 180 days of receipt of an application for a new drug under section 505(b) of the act or an abbreviated application for a new drug under section 505(j) of the act, FDA will review it and send the applicant either an approval letter under § 314.105 or a complete response letter under § 314.110.  This 180-day period is called the "initial review cycle."

 (2) For applications that are human drug applications, as defined in section 735(1)(A) and (B) of the act, or supplements to such applications, as defined in section 735(2) of the act, the initial review cycle will be adjusted to be consistent with the agency's user fee performance goals for reviewing such applications and supplements.

 (b) At any time before approval, an applicant may withdraw an application under § 314.65 or an abbreviated application under § 314.99 and later submit it again for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 34

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**


consideration.

(c) The review cycle may be extended by mutual agreement between FDA and an applicant or as provided in §§ 314.60 and 314.96, as the result of a major amendment.

11. Section 314.101 is amended as follows:

a. By revising paragraph (f)(1)(ii);

b. By redesignating paragraphs (f)(2) and (f)(3) as paragraphs (f)(3) and (f)(4), respectively;

c. By adding new paragraph (f)(2); and

d. By revising the second sentence of newly redesignated paragraph (f)(3) to read as follows:

§ 314.101 Filing an application and receiving an abbreviated new drug application.

* * * * *
(f)(1) * * *

(ii) Issue a notice of opportunity for hearing if the applicant asked FDA to provide it an opportunity for a hearing on an application in response to a complete response letter.

(2) For applications that are human drug applications, as defined in section 735(1)(A) and (B) of the act, or supplements to such applications, as defined in section 735(2) of the act, the 180-day period specified in paragraph (f)(1) of this section will be adjusted to be consistent with the agency's user fee performance goals for reviewing such applications and supplements.

(3) * * * If FDA disapproves the abbreviated new drug application, FDA will issue a notice of opportunity for hearing if the applicant asked FDA to provide it an opportunity for a hearing on an abbreviated new drug application in response to a complete response letter.

* * * * *
12. Section 314.102 is amended in the last sentence in paragraph (b) by removing the phrase "an action" and adding in its place the phrase "a complete response" and by revising paragraph (d) to read as follows:

§ 314.102 Communications between FDA and applicants.

* * * * *
(d) End-of-review conference. At the conclusion of FDA's review of an NDA as designated by the issuance of a complete response letter, FDA will provide the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

applicant with an opportunity to meet with agency reviewing officials. The
purpose of the meeting will be to discuss what further steps need to be taken by
the applicant before the application can be approved. Requests for such meetings
must be directed to the director of the division responsible for reviewing the
application.

* * * * *

§ 314.103 [Amended]

13. Section 314.103 is amended in paragraph (c)(1) in the first sentence by
removing the phrase "an approvable or not approvable" and adding in its place the
phrase "a complete response" and **\*43365** by removing the phrase "or § 314.120,
respectively".

§ 314.105 [Amended]

14. Section 314.105 is amended in paragraph (b) in the first sentence by removing
the phrase "(rather than an approvable letter under § 314.110)".

15. Section 314.107 is amended by adding a new sentence at the beginning of
paragraph (b)(3)(v) to read as follows:

§ 314.107 Effective date of approval of a 505(b)(2) application or abbreviated new
drug application under section 505(j) of the act.

* * * * *
  (b) * * *

  (3) * * *

  (v) FDA will issue a tentative approval letter when tentative approval is
appropriate in accordance with paragraph (b)(3) of this section.* * *

* * * * *
16. Section 314.110 is revised to read as follows:

§ 314.110 Complete response letter to the applicant.

  (a) Complete response letter.  FDA will send the applicant a complete response
letter if the agency determines that we will not approve the application or
abbreviated application in its present form for one or more of the reasons given
in § 314.125 or § 314.127, respectively.

  (1) Description of specific deficiencies.  A complete response letter will
describe all of the specific deficiencies in an application or abbreviated
application, except as stated in paragraph (a)(3) of this section.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

(2) Complete review of data. A complete response letter reflects FDA's complete review of the data submitted in an original application or abbreviated application (or, where appropriate, a resubmission) and any amendments for which the review cycle was extended. The complete response letter will identify any amendments for which the review cycle was not extended that FDA has not yet reviewed.

(3) Inadequate data. If FDA determines, after an application is filed or an abbreviated application is received, that the data submitted are inadequate to support approval, the agency might issue a complete response letter without first conducting required inspections and/or reviewing proposed product labeling.

(4) Description of actions necessary for approval. Where appropriate, a complete response letter will describe the actions necessary to place the application or abbreviated application in condition for approval.

(b) Applicant actions. After receiving a complete response letter, the applicant must take one of following actions:

(1) Resubmission. Resubmit the application or abbreviated application, addressing all deficiencies identified in the complete response letter. For purposes of this section, a resubmission means submission by the applicant of all materials needed to fully address all deficiencies identified in the complete response letter.

(i) A resubmission of an application or efficacy supplement that FDA classifies as a Class 1 resubmission constitutes an agreement by the applicant to start a new 2-month review cycle beginning on the date FDA receives the resubmission.

(ii) A resubmission of an application or efficacy supplement that FDA classifies as a Class 2 resubmission constitutes an agreement by the applicant to start a new 6-month review cycle beginning on the date FDA receives the resubmission.

(iii) A resubmission of an NDA supplement other than an efficacy supplement constitutes an agreement by the applicant to start a new 6-month review cycle beginning on the date FDA receives the resubmission.

(iv) A major resubmission of an abbreviated application constitutes an agreement by the applicant to start a new 6-month review cycle beginning on the date FDA receives the resubmission.

(v) A minor resubmission of an abbreviated application constitutes an agreement by the applicant to start a new review cycle beginning on the date FDA receives the resubmission.

(2) Withdrawal. Withdraw the application or abbreviated application. A decision to withdraw an application or abbreviated application is without prejudice to a subsequent submission.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

(3) Request opportunity for hearing. Ask the agency to provide the applicant an opportunity for a hearing on the question of whether there are grounds for denying approval of the application or abbreviated application under section 505(d) or (j)(4) of the act, respectively. The applicant must submit the request to the Associate Director for Policy, Center for Drug Evaluation and Research (HFD-5), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857. Within 60 days of the date of the request for an opportunity for a hearing, or within a different time period to which FDA and the applicant agree, the agency will either approve the application or abbreviated application under § 314.105, or refuse to approve the application under § 314.125 or abbreviated application under § 314.127 and give the applicant written notice of an opportunity for a hearing under § 314.200 and section 505(c)(1)(B) or (j)(5)(c) of the act on the question of whether there are grounds for denying approval of the application under section 505(d) or (j)(4) of the act.

(c) Failure to take action. An applicant agrees to extend the review period under section 505(c)(1) of the act until it takes any of the actions listed in paragraph (b) of this section. For an application, FDA may consider an applicant's failure to take any of such actions within 1 year after receiving a complete response letter to be a request by the applicant to withdraw the application. For an abbreviated application, FDA may consider an applicant's failure to take any of the actions listed in paragraph (b) of this section within 6 months after receiving a complete response letter to be a request by the applicant to withdraw the abbreviated application.

§ 314.120 [Removed and Reserved]

17. Section 314.120 is removed and reserved.

§ 314.125 [Amended]

18. Section 314.125 is amended in paragraph (a)(1) by removing the phrase "an approvable or a not approvable" and adding in its place the phrase "a complete response"; and by removing the phrase "or § 314.120".

§ 314.430 [Amended]

19. Section 314.430 is amended by in paragraph (b) in the first sentence by removing the phrase "approvable letter is sent to the applicant under § 314.110" and adding in its place the phrase "approval letter is sent to the applicant under § 314.105 or tentative approval letter is sent to the applicant under § 314.107"; and by removing the last sentence.

20. Section 314.440 is amended in paragraph (a)(1) by removing the phrase "Document and Records Section, 5901-B Ammendale Rd., Beltsville, MD 20705-1266" and by adding in its place the phrase "Central Document Room, 12229 Wilkins Ave., Rockville, MD 20852-1833"; in paragraph (a)(3) by removing the phrase "or § 314.120"; and by revising the introductory text of paragraph (b) to read as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

follows:

§ 314.440 Addresses for applications and abbreviated applications.

* * * * *
  (b) Applicants must send applications and other correspondence relating to
matters covered by this part for the drug products listed below to the Center for
Biologics Evaluation and Research (HFM-99), Food and Drug **\*43366** Administration,
1401 Rockville Pike, Rockville, MD 20852, except applicants must send a request
for an opportunity for a hearing under § 314.110 on the question of whether there
are grounds for denying approval of an application to the Director, Center for
Biologics Evaluation and Research (HFM-1), at the same address.

* * * * *

PART 600--BIOLOGICAL PRODUCTS: GENERAL

  21. The authority citation for 21 CFR part 600 continues to read as follows:

Authority: 21 U.S.C. 321, 351, 352, 353, 355, 360, 360i,  371, 374; 42 U.S.C. 216
, 262, 263, 263a, 264, 300aa-25.

  22. Section 600.3 is amended by revising paragraph (jj) to read as follows:

§ 600.3 Definitions.

* * * * *
  (jj) Complete response letter means a written communication to an applicant from
FDA usually identifying all of the deficiencies in a biologics license application
or supplement that must be satisfactorily addressed before it can be approved.

* * * * *

PART 601--LICENSING

  23. The authority for 21 CFR part 601 continues to read as follows:

Authority: 15 U.S.C. 1451-1561; 21 U.S.C. 321, 351, 352,  353, 355, 356b, 360,
360c-360f, 360h-360j, 371, 374, 379e, 381; 42 U.S.C. 216, 241, 262, 263, 264; sec
122, Pub. L. 105-115, 111 Stat. 2322 (21 U.S.C. 355 note).

  24. Section 601.3 is added to subpart A to read as follows:

§ 601.3 Complete response letter to the applicant.

  (a) Complete response letter.  The Food and Drug Administration will send the
biologics license applicant or supplement applicant a complete response letter if
the agency determines that it will not approve the biologics license application

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 43351-01                                                    Page 39

69 FR 43351-01, 2004 WL 1599720 (F.R.)

**(Cite as: 69 FR 43351)**

or supplement in its present form.

(b) Applicant actions.  After receiving a complete response letter, the biologics
license applicant or supplement applicant must take either of the following
actions:

(1) Resubmission.  Resubmit the application or supplement, addressing all
deficiencies identified in the complete response letter.

(2) Withdrawal.  Withdraw the application or supplement.  A decision to withdraw
the application or supplement is without prejudice to a subsequent submission.

(c) Failure to take action.  FDA may consider a biologics license applicant or
supplement applicant's failure to either resubmit or withdraw the application or
supplement within 1 year after receiving a complete response letter to be a
request by the applicant to withdraw the application or supplement.

Dated: July 9, 2004.

Jeffrey Shuren,

Assistant Commissioner for Policy.

[FR Doc. 04-16476 Filed 7-19-04; 8:45 am]

BILLING CODE 4160-01-S

69 FR 43351-01, 2004 WL 1599720 (F.R.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, D. New Hampshire.
GROSS
v.
SUMMA FOUR, INC., et al.
**Civil No. C-94-364-B.**

Nov. 8, 1995.

MEMORANDUM AND ORDER

BARBADORO, District Judge.
**\*1** This is a securities class action brought by David Gross as representative of an uncertified class, against Summa Four, Inc., and certain of its officers and directors [FN1] ("the Defendants"), for claims arising under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78t(a) (West 1981), Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (1994), and related common law. Gross alleges, on behalf of all persons who purchased the common stock of Summa Four from January 18, 1994 through July 5, 1994 ("the Class Period"), that the Defendants perpetrated a fraud-on-the-market. Specifically, he claims the Defendants falsely and recklessly mislead the investing public through statements and omissions made during the Class Period which artificially inflated the market price of the company's common stock. The Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), after plaintiff filed his first amended complaint. For the following reasons, I grant Defendants' Motion to Dismiss.

I. FACTUAL BACKGROUND

Because this case is before me on the Defendants' motion to dismiss, I recite the extensive factual background in the light most favorable to the plaintiff. *Berniger v. Meadow Green-Wildcat Corp.*, 945 F.2d 4, 6 (1st Cir.1991) (court must accept all facts in complaint as true, drawing all reasonable inferences in plaintiff's favor).

A. *Summa Four*

Summa Four is a Delaware corporation with its principle executive offices located in Manchester, New Hampshire. It develops, distributes, and services, both domestically and internationally, switching systems and advanced signaling solutions for telephone companies. ¶¶ 12, 34, 35. [FN2] Sales of its products are directly to end-users of these systems as well as through telecommunications systems integrators, including IBM and Digital Equipment Corporation. ¶ 35. The SDS series of distributed switching systems and the Portico SS-7 internetworking product are its leading products. ¶ 36.

On September 23, 1990, Summa Four completed its initial public offering ("IPO") and provided a prospectus in which it portrayed the company as expanding and "poised for rapid growth." ¶ 38. The individual defendants sold a portion of their common shares into the IPO, but retained a substantial quantity of those shares. ¶ 39. As provided in a "lock-up" agreement, these retained shares could not be sold until 180 days after the date of the IPO prospectus. ¶ 39.

In late 1993, the company, through its officers as well as press releases, touted the progress and prospects of the company. ¶¶ 40-41. Summa Four had regular, extensive, and non-public contact with various stock market professionals, analysts, and money managers, including analysts from Montgomery Securities and Cruttenden & Co. ¶ 42. At least with respect to the analysts from Cruttenden & Co., Summa Four conveyed detailed information regarding its business and operations not available to the public. ¶ 42. As a result of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

these contacts, the analysts released "extremely positive" reports. Newspapers, including the *Manchester Union Leader,* quoted these statements in articles printed during October 1993. ¶ 43.

**\*2** On November 15, 1993, Summa Four issued a press release indicating that it had entered into a world wide cooperative agreement with IBM, with initial orders over $1 million. ¶ 44. In December, the company issued another press release announcing expansion of its European operations and also highlighting the rapidly growing market share and opportunities of Summa Four. ¶ ¶ 45-46.

### B. *The Class Period*

During the Class Period, the Defendants, as well as market analysts, made numerous positive statements concerning the company's financial position, market potential, and sales. ¶ ¶ 48-60. Contemporaneously, Summa Four was actually experiencing downward trends evidenced by facts and events not disclosed to the public. ¶ ¶ 61-98. During the Class Period, on May 27, 1994, Gross purchased 200 shares of Summa Four Common Stock at $27.5625 per share. ¶ 11.

### 1. *Statements by the Defendants*

On the first day of the Class Period, January 18, 1994, Summa Four issued a press release containing several statements. ¶ ¶ 48-50. The press release announced the company's results for the end of its third fiscal quarter, stating that its revenues were $7,277,000 and its net income was $1,852,000. In addition, the president of Summa Four stated: "We are also *seeing increased demand* for our SDS distributed switch in a number of international markets." (emphasis added). He continued, "[t]he SDS distributed switch *is becoming* the platform of choice." (emphasis added). Finally, the release noted that Summa Four had received orders from Unisys, Sprint, IBM, DEC, Pacific Bell, US West and AT & T.

The Defendants made several statements in the

Spring of 1994. ¶ ¶ 52-55. On April 25, 1994, they introduced a new product, stating that it was a revolutionary product and would put "carriers in a position to win back [lost] customers by providing flexible cost-effective access to overlay network services." Shortly thereafter, the Defendants reported their fourth quarter, year-end operating results for fiscal 1994, reporting revenues of $8,344,000 and net income of $1,675,000 for the quarter, and revenues of $27,257,000 and net income of $5,287,000 for the year.

In a press release issued the same day, the Defendants stated: "We see the current market continuing to expand over the next several years.... We continue to be enthusiastic about our opportunities to grow over the next several years." ¶ 54. Furthermore, the Defendants stated they had received "significant orders" for "new and existing applications, domestically and internationally," from AT & T, McCaw, Sprint, GTE, Unisys and IBM. ¶ 55.

Finally, the Defendants made statements in the 10-k form submitted to the Securities and Exchange Commission ("SEC") and in a letter to shareholders accompanying the 1994 Annual Report issued June 29, 1994. ¶ ¶ 59-60. In the 10K form, filed two weeks before the end of the quarter, the Defendants described the company in an optimistic light, stating more than once that it "anticipated growth." Likewise, in its letter to shareholders the tone was optimistic: "We have a ... strong financial position" ; "We continue to be enthusiastic about our opportunity to grow over the next several years"; " Our major goal in Fiscal Year 1995 is to continue to further leverage our market leadership position as the telecommunications industry continues to expand worldwide."

### 2. *Statements by analysts*

**\*3** Montgomery Securities issued three favorable analyst reports regarding Summa Four, dated January 19, 1994, May 4, 1994, and May 31, 1994, based in large part on the Defendants' public statements and private communications between the individual defendants and analysts at Montgomery.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

¶¶ 51, 56, 57. The January report included the following statements: "SUMA [sic] business is very strong"; "We have increased our revenue and EPS estimates"; "For FY:1995 we have increased our revenue and EPS forecasts"; "The company is performing well with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:95 forecast."

The May 4th report expressed similar optimism, stating: "SUMA [sic] business remains strong"; " We have increased our revenue estimates ... and we have also increased our fiscal 1995 revenue estimate "; "The company is performing well, with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:1995 forecast."

Finally, Montgomery issued a report on May 31st stating: "The Company's intermediate to long-term prospects have never looked brighter"; "The VCO [product] is an important product and should result in a greater than doubling of SUMA's [sic] addressable market to more than $300 million." In addition, the report cited a deal with AT & T which Montgomery believed had potential to Summa Four of "perhaps greater than $10 million over an 18-24 month period."

### 3. *Undisclosed, adverse facts*

Plaintiff delineates several facts, relying primarily on internal budgetary reports, which allegedly indicate that the true state of affairs experienced by Summa Four during the Class Period belied the positive statements and optimistic predictions disseminated by the Defendants and analysts. ¶¶ 61-98. Specifically, the company was unable to meet internally budgeted results of operations, the Defendants employed, or authorized, the use of undisclosed or unauthorized accounting procedures which created a false and misleading impression of its growth and prosperity and the company's international operations were "in a state of disarray and ... had a materially negative effect upon the Company's results during the Class Period." ¶ 61.

### (a) Summa Four was consistently off-budget during the Class Period

In December 1993, the company made an adjustment for income tax which "enabled the Company to meet or exceed analysts' predictions with regard to the Company's operating results." According to the company's internal reports, dated January 20, 1994, December 1993 revenues were $68,000 below projections, general and administrative expenses were $11,000 over budget, and research and development expenses were $37,000 over budget. Similar results were reported for the quarter ending December 31, 1993. In addition, the report indicated that for the previous nine months the company had experienced " significant cost overruns," totalling $746,000 over budget.

*4 Both Summa Four's Monthly Operating Report and its Revised Flash Report for January 1994, indicated that revenue, gross margin, and net income fell below the forecasted budget. A similar assessment was made of the company's situation in February 1994. The company's president acknowledged to the Board that several major orders were delayed and that he would have to adjust downward the quarterly bookings forecast. ¶ 70. By March 1, 1994, Summa Four was $2,019,000, or 43.66%, behind budgeted revenues for the fourth fiscal quarter. Gross margin as well as research and development expenses were below budget by similar percentages. The February Flash Report stated that projected operating profit for the fiscal year ending March 31, 1994, was $532,000, or 13.51%, under budget. Net income reflected similar shortfalls. These trends continued through March and April of 1994.

### (b) Improper recognition of revenue during the Class Period

According to GAAP and FASB, a company must wait in most cases until goods are shipped in order to recognize revenue for accounting purposes. ¶¶ 110-111. In conformance with these principles, Summa Four's 10K form for fiscal 1994 states that " [r]evenue from product sales is recognized

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                           Page 4

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

generally on shipment." Nevertheless, plaintiff contends that Summa Four improperly recognized revenue as soon as orders were received. As a result, plaintiff contends that Summa Four materially overstated its revenues during the class period. It supports this assertion with allegations that minutes for Summa Four's June 20, 1994, board meeting state that a draft revenue recognition policy had been prepared for review which "is a more formalized and somewhat more restrictive policy than was previously in place." Plaintiff also cites to a statement allegedly made by defendant Fiedler at a June 19, 1995 board meeting in which Fiedler claimed that Summa Four might be able to generate up to $4.7 million in revenues in two weeks from " orders" which had not yet been received. Since the complaint alleges that Summa Four does not ship goods until long after orders are received, plaintiff contends that this statement is evidence of Summa Four's overstatement of revenues.

(c) International operations in disarray

In its Monthly Operating Report dated January 20, 1994, the company commented that "overall international sales and marketing efforts are currently under review and will be revised." In the February 25, 1994 Operating Report, the company stated that it planned "a major reorganization of sales responsibilities ..." in March. The refocusing of sales and marketing efforts in their international subsidiary was confirmed in the company's March Operating Report. In addition, Summa Four fired its Managing Director of European Operations that month as well as two other management team members. The company appointed a new managing director that same month.

In addition, there were indications of slow-downs with respect to certain international customers as of January 1994. In June 1994, the Board dispatched one individual "to check one more time to see if all international opportunities are abandoned at this time."

4. *The July 5, 1994 Announcement*

*5 As of the June 6, 1994 "Watch Meeting," Summa Four had only shipped $4,298,720 in products, although the quarter was two thirds complete and the predicted revenues were $8.7 million by analysts and $9.025 million by the company for that quarter. The company revised its expectations for the quarter setting an additional $3.6 million in shipments as its goal for the remainder of the quarter.

On June 14, 1994, the Board convened by phone to address the issue again. It was determined at this point in the quarter that revenues would reach only $7.7 to 7.8 million which fell 11.49% and 14.68% behind analysts and company estimates respectively. The below budget prospects were attributed to internal disruptions experienced by regular customers as well as international orders being received at a slower rate than expected.

The Board determined that any insider trading at this point would be inappropriate and further discussed this issue at a meeting on June 20, 1994. At that meeting the Board also discussed the prospect of making an announcement concerning financial performance and guidelines for such announcements. No decision was reached at that meeting, but further review was undertaken in the subsequent weeks.

In its July 5th announcement the Defendants stated that they anticipated net revenues for the first fiscal quarter 1995 of between $7,400,000 to $7,600,000, and net earnings of $875,000 to $1,000,000. These projected results contrasted with analysts' projections which placed revenue estimates at $8.7 million for that quarter.

Following the announcement, the company's stock experienced a rapid sell-off resulting in a single-day decline of 46.6% in Summa Four's market price.

C. *The Aftermath*

The company reported its earning for the first quarter 1995 on July 19, 1994, which confirmed its announcement made earlier that month. Summa Four replaced its president that month and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                            Page 5

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

attributed its failure to attain projections for that quarter on "longer than anticipated negotiation and procurement processes" of certain major customers. This assessment was echoed by analysts' reports later that month which also contained revised estimates of the company's future prospects. These revisions, even taking into account the delays, showed a 23.91% decrease in estimated projected earnings per share from previous estimates. Estimates of revenue generating EPS were also adjusted downward representing an 8.97% and a 13.79% decrease in revenues and earnings per share respectively.

According to Montgomery Securities, two of the six contracts needed to be closed in order for Summa Four to meet the original projections for that quarter. In contrast, Summa Four closed only one of the six contracts.

Summa Four also attributed its poor first quarter of 1995 to decreased unit shipments of its SDS-1000 product in its Form 10-Q filed with the SEC on August 11, 1994. This statement is in contrast to its statements in December 1993 and March 1994 attributing increased revenues to the sale of its SDS products.

## II. STANDARDS OF REVIEW AND ELEMENTS OF THE CLAIM

*6 Defendants argue that the complaint should be dismissed pursuant to Rule 12(b)(6) because it fails to state a claim and pursuant to Rule 9 because it fails to plead fraud with particularity.

### A. *Federal Rules of Civil Procedure 12(b)(6) and 9(b)*

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to review the allegations of the complaint in the light most favorable to the plaintiff, accepting all material allegations as true, with dismissal granted only if no set of facts entitles plaintiff to relief. *E.g., Berniger,* 945 F.2d at 6; *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

In the context of a motion to dismiss a claim of fraud or misrepresentation, however, the claim must also meet the special pleading requirements of Fed.R.Civ.P. 9(b). *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991); *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). While the term "fraud" need not appear in the complaint, Rule 9 requires that the circumstances indicating fraud be stated with particularity. *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 439 (1st Cir.1985) (although plaintiffs did not use word fraud, complaint stated with sufficient particularity circumstances entitling them to relief on a theory of fraud).

The purpose of Rule 9(b)'s particularity requirement is "to apprise the defendant of fraudulent claims *and of the acts* that form the basis for the claim [sic]." *Hayduk,* 775 F.2d at 443 (emphasis added). Specifically in the context of securities fraud cases, "Rule 9 operates to diminish the possibility that a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], ... [without] a reasonably founded hope that the process will reveal relevant evidence." *Wayne Inv., Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984) (internal quotations and citations omitted). In order for this purpose to be adequately fulfilled, the rule requires "specification of the time, place, and content of an alleged false representation." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980); *accord Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994) (general averments of defendant's knowledge of material falsity insufficient); *Hayduk,* 775 F.2d at 444 (conclusory allegations of fraud insufficient even if repeated several times). Further, the complaint must "set forth specific facts that make it reasonable to believe that defendants knew that a statement was materially false or misleading" when made. *Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 174 (1st Cir.1994) (quoting *Serabian,* 24 F.3d at 361); *accord Romani,* 929 F.2d at 878 (time,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

place, and content specificity insufficient where no factual support for inference of fraud). This requirement is not relaxed even though the bases and specific supporting facts relate " 'to matters peculiarly within the knowledge of the opposing party.' " *Hayduk,* 775 F.2d at 444 (quoting *Wayne,* 739 F.2d at 14); *see also Romani,* 929 F.2d at 878. Allegations of fraud by hindsight are insufficient to meet these requirements. *Serabian,* 24 F.3d at 367 (claim cannot assume defendants knew severity of problems earlier because conditions became bad later); *accord Berliner v. Lotus Dev. Corp.,* 783 F.Supp. 708, 710, 711 (D.Mass.1992).

### B. Elements of Claim under 10(b)

*7 Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder, prohibit any person from, directly or indirectly, committing fraud in connection with the purchase or sale of securities. 15 U.S.C.A. § 78j(b); [FN3] 17 C.F.R. § 240.10b.5 (1994); [FN4] *Rand v. Cullinet Software, Inc.,* 847 F.Supp. 200, 204 (D.Mass.1994). "In order to prevail on a rule 10b-5 claim, a plaintiff must show: (1) a material misstatement or omission by the defendant; (2) scienter; [FN5] (3) reliance; [FN6] and (4) due care by the plaintiff." *Rand,* 847 F.Supp. at 204-05 (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730 (1975)). " [M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic,* 485 U.S. at 240; *accord Rand,* 847 F.Supp. at 205; *Colby,* 817 F.Supp. at 209. If a reasonable investor would view the misrepresented or omitted fact as "having significantly altered the total mix of information made available," then the materiality requirement is satisfied. *Basic,* 485 U.S. at 232 (internal quotations and citations omitted). Therefore, in pleading a claim under Rule 10b-5 in conformity with the requirements of Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) *explain why the statements were fraudulent.* " *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (emphasis added) (internal quotations and citations omitted); *accord Suna v.*

*Baily Corp.,* No. 94-273-M, slip op. at 8 (D.N.H. Nov. 10, 1994). With these principles in mind, I address the sufficiency of the plaintiff's complaint.

### III. THE COMPLAINT

The challenged statements at issue fall into three categories: (1) allegedly false statements of current facts; (2) allegedly false forward-looking statements; and (3) current or forward-looking statements that were literally true, but misleading because the speaker withheld other material information on the same subject. [FN7] I address each category in turn.

### A. *Statements of Current Fact*

"[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." *Serabian,* 24 F.3d at 361. "[I]f defendants reported correctly, without more, 'This is our eighth consecutive quarter in which our gross has increased,' there [is] no duty to add, for the benefit of market buyers, 'We are concerned about the next one.' " *Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 8 (1st Cir.1991). If the plaintiff alleges the statements were false when made, then the complaint must contain facts which would support a reasonable inference that the defendants deliberately or recklessly disregarded known adverse facts at the time they made the statements. *Steiner v. Unitrode Corp.,* 834 F.Supp. 40, 43 (D.Mass.1993); *Berliner,* 783 F.Supp. at 710, 711 (plaintiff's claim amounted to fraud by hindsight because disclosure seven months after alleged misrepresentation not sufficient to show defendant's knew it was false when made). Absent a showing that the statements were false or misleading at the time they were made, such statements are not actionable under Rule 10b-5.

*8 For the following reasons I find that the plaintiff's allegations that defendants fraudulently misstated current fact cannot meet the particularity requirement of Rule 9. Therefore, I dismiss this portion of the complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 7

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

#### 1. *Statements of current fact other than revenue statements*

Plaintiff claims that certain statements in the January 18th press release ("we are also seeing increased demand for our SDS distributed switch.... [T]he SDS distributed switch is becoming the platform of choice...."), the May 3rd press release (Summa Four had received "significant orders" from AT & T, Sprint, GTE, Unysis, and IBM), and a letter accompanying the 1994 Annual Report (Summa Four is in a "strong financial position") misstated current facts. ¶¶ 49-50, 55, 60. Defendants argue that plaintiff has failed to satisfy his Rule 9(b) burden of pleading with particularity the facts which form the basis of his claim that these statements were false when they were made.

The only pleaded facts that even arguably support plaintiff's contention that the cited statements were false when made are allegations in the complaint that Summa Four's own documents establish that (1) the company's revenues, gross margin, and net income during the Class Period were below internal budget projections; (2) March bookings were lower than expected; and (3) the company's internal operations were in a state of disarray. ¶¶ 69-72, 74, 92-98, 121(b). However, these allegations are insufficient to satisfy plaintiff's burden under Rule 9(b) to identify specific facts that make it reasonable to believe that the statements were false. A reasonable person could not infer from the pleaded facts that demand for the SDS switch was no longer growing, that significant orders had not been received from major corporations, or that the company was not in a "strong financial position" simply because it did not meet its short-term budget projections, its orders for one month were lower than expected, and its international operations were in a state of disarray. Accordingly, this portion of the complaint must be dismissed.

#### 2. *Current Revenue Statements*

Plaintiff alleges that defendants materially overstated Summa Four's revenues. Specifically, he contends that Summa Four stated in its public filings that it complied with GAAP and FASB but

nevertheless violated these standards by recognizing revenue as soon as an order was placed rather than when goods were shipped. As a result, plaintiff claims that Summa Four's revenue statements were false and misleading.

The First Circuit recognizes that "a general allegation that the practices at issue resulted in a false report of company earning is not a sufficiently particular claim of misrepresentation to satisfy the requirements of Rule 9(b). *Serabian*, 24 F.3d at 362 n. 5. Plaintiff seeks to satisfy this requirement by pointing to the minutes of the June 20, 1994 board meeting (noting that the board's review of a draft revenue recognition policy which was more conservative than the policy then in effect) and the June 14, 1994 board meeting (noting Fiedler's statement that Summa Four might be able to generate up to $4.7 million in revenue in two weeks from "orders" which had not yet been received). However, these records, simply will not support a reasonable inference that Summa Four was materially overstating its revenues during the period in question. Thus, this portion of the complaint must be dismissed as well.

#### B. *Forward-looking Statements*

#### 1. *Analyst statements*

**\*9** Plaintiff seeks to attribute to the defendants three statements by Montgomery Securities during the Class Period, claiming that these statements regarding anticipated growth and increasing revenues, were false and misleading, and lacking in a reasonable basis. ¶ 121(a). Further, he alleges that the defendants failed to correct these statements during the Class Period when the statements were or became materially false and misleading. ¶ 122. This part of the complaint is attacked by the Defendants on grounds that it lacks the requisite specificity necessary to justify the inference that the Defendants so entangled themselves that the statements may be treated as their own.

In order to base a claim of fraud on statements by third parties, the plaintiff must demonstrate that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

those statements may be fairly attributed to the defendants. *Raab v. General Physics Corp.,* 4 F.3d 286, 288-89 (4th Cir.1993). Where defendants have so entangled themselves "with the analysts' forecasts such that they assumed a duty to disclose the analysts' errors," the statements by analysts may be attributed to the defendant. *Colby,* 817 F.Supp. at 210. "[S]ince the allegation of entanglement is central to the overall allegation of securities fraud, plaintiffs seeking to hold a corporate insider liable for an analyst's forecasts should plead entanglement with the degree of specificity required under [Rule 9 ]." *In re Caere Corporate Sec. Litig.,* 837 F.Supp. 1054, 1059 (N.D.Cal.1993) (limning three requirements to meet this hurdle). Rule 9(b) imposes the burden on the plaintiffs in this context to allege facts from which it can be inferred that company exercised sufficient control over an analyst such that company may be held liable for the analyst's statements. *Raab,* 4 F.3d at 288-89; *Elkind,* 635 F.2d at 163 (where company so involves itself in preparation or reports and projections of analysts it may have duty to correct material errors); *In re Caere,* 837 F.Supp. at 1059 (advocating strict construction of entanglement requirement because analysts make forecasts about publicly traded companies frequently).

Where company officers are directly quoted, other courts have sustained such allegations against Rule 9 challenges. *Colby,* 817 F.Supp. at 215 n. 10 (collecting cases). The analysts cited by the plaintiff here, however, do not directly quote the defendants or make reference to information provided by the defendants. *See id.* at 213 (analysts' statements not attributable to company where no direct quoting and no reference to misleading information provided by company). All three reports "were presented as independent opinions and [none] referred to any role of [Summa Four] or its officers in the preparation, approval, or editing of the" reports. *Id.* at 213-14; *accord Raab,* 4 F.3d at 288 (failed to meet Rule 9 specificity requirement where no allegations of who supplied information, how it was supplied or how company controlled contents, especially where report did not directly quote company). The amended complaint only states that some defendants had private communications with representatives from

Montgomery Securities and Cruttenden & Company. It does not allege facts which would support a reasonable inference that the statements in question were based on false or misleading information obtained directly from the defendants. While it is unclear whether this circuit would require that the reports quote the defendants in order to impute the former to the latter, because there is no other basis alleged which would establish any, let alone a significant, connection between the defendants and the analysts, I find that the analyst's statements fail to meet the Rule 9(b) requirement. Therefore, claims based on these statements should also be dismissed.

### 2. *Defendants' Statements*

**\*10** Plaintiff cites several statements which he characterizes as forward-looking statements that are actionable under Rule 10b-5 because they lacked a reasonable basis when made. These statements are found in the May 3rd press release ("We see the current market continuing to expand over the next several years.... We continue to be enthusiastic about our opportunity to grow over the next several years"), Summa Four's 10K Form filed with the SEC ("anticipated growth"), and its letter to shareholders accompanying its Annual Report ("We continue to be enthusiastic about our opportunity to grow"; "Our major goal in Fiscal Year 1995 is to continue to further leverage our market leadership position"). ¶ 54, 59 and 60.

"Although 'predictions are inherently uncertain, they are not exempt from the anti-fraud provisions of the federal securities laws ... materially misleading predictions made with the scienter are actionable.' " *Rand,* 847 F.Supp. at 207 (citations omitted); *accord In re Apple Computer,* 886 F.2d at 1113. Because predictions imply a factual basis, they come within the purview of Rule 10b-5's prohibitions. *See Virginia Bankshares v. Sandberg,* 111 S.Ct. 2749, 2758 (1991) (statements of belief or opinion are factual statements actionable under securities laws); *In re Apple Computer,* 886 F.2d at 1113 (listing three factual assertions implied in predictions). Therefore, if a reasonable investor would rely on the predictive statement in making a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

decision to buy or sell securities, then the prediction, if false or misleading, is actionable. *See Basic,* 485 U.S. at 248. Statements, however, that are general, vague, or lack specificity, or are not guarantees, even if made without a reasonable basis, are not actionable because a reasonable investor would not rely on them. *Capri Optics,* 950 F.2d at 10; *Rand,* 847 F.Supp. at 208; *Colby,* 817 F.Supp. at 210-11 ("prospects for long term growth" not actionable because no projection of earnings or sales statistics and no temporal reference point); *Elkind,* 635 F.2d at 164 ("we expect another good year in 1972," not actionable). Furthermore, absent a showing of intentional deception, " optimistic predictions about the future that prove to be off the mark likewise are immunized...." *Serabian,* 24 F.3d at 361; *accord Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 282 (3d Cir.), *cert. denied,* 113 S.Ct. 365 (1992); *Dileo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941 (1990).

The statements cited by the plaintiff although predictive, lack any specificity as to projected earnings, lack any time frame, and lack any guarantees. *Compare Colby,* 817 F.Supp. at 210, 211 (statement that "prospects for long term growth are bright" not actionable because vague and no specific projections) *with Cosmas v. Hassett,* 886 F.2d 8, 12 (2d Cir.1989) (statement predicting EPS of $.90 to 1.15 for next fiscal year actionable). No reasonable investor would rely on such vague expressions of optimism in deciding whether to purchase Summa Four's securities. Nor could such statements be considered so significant as to alter the total mix of information available to the reasonable investor. *Colby,* 817 F.Supp. at 211. Thus, these statements fail to meet the materiality requirement necessary to state a claim under Rule 10b-5. Therefore, this portion of the complaint is dismissed. See Fed.R.Civ.P. 12(b)(6).

### C. Omissions

*11 Finally, plaintiff asserts that many of the statements cited, while technically true, were in fact misleading because of defendants' failure to disclose the whole truth. The challenged statements include portions of the January 18th press release (¶ 50), the May 3d press release (¶ 55), and the April 25th announcement of their new product (¶ 52). Plaintiff points to several omitted facts that he claims should have been disclosed in order to cure the misleading nature of the public statements, including: numerous reports during the Class Period indicating that Summa Four was not meeting budget targets; a June 6, 1994 report indicating that two-thirds through the first quarter of 1994 Summa Four had only shipped 50% of what analysts had predicted and even less than its own predictions ¶ 84; a June 14th report indicating that revenue would only be $7.7 million, approximately 30% below projections (¶ 87); and an acknowledgment on June 14th that lower revenues were due to delays in the approval of contracts (¶ 88).

Where the plaintiff alleges that a defendant's silence precipitated the fraud, the complaint must allege that the omitted facts were not only material, but also that the defendant had a duty to disclose those facts. *Basic,* 485 U.S. at 239 n. 16; *Dirks v. SEC,* 463 U.S. 646, 657-58 (1983); *Backman,* 910 F.2d at 12. Nondisclosure in the context of fraud on the market deals with reliance by investors on misleading statements, i.e., misleading because prior disclosures were inaccurate or incomplete. *Backman,* 910 F.2d at 13; *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir.1987). Thus, where " a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate." *Lucia,* 36 F.3d at 175. (internal quotations and citations omitted).

There is no duty, however, that companies make full disclosure of all material information. *Backman,* 910 F.2d at 12, 16 (duty to disclose does not arise from mere possession of nonpublic information nor from disclosure of one fact about a product) (quoting *Chiarella v. United States,* 445 U.S. 222, 235 (1980)). "Management cannot be expected to disclose information that some may find distasteful but that does not alter the total mix of information made available to the investor." *Roeder,* 814 F.2d at 26 (internal quotations and citations omitted); *accord Colby,* 817 F.Supp. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

213 (duty to disclose does not arise merely because investors may be interested in the information).

Although the "adverse" facts cited by the plaintiff present a picture of a company concerned about its ability to meet its own projections, nothing in these facts indicates that the challenged statements were misleading for failure to include these facts. *See Backman,* 910 F.2d at 16 (disclosed facts cannot be so incomplete as to mislead). Although the omitted facts might have been important to the reasonable investor, absent a sufficient showing that the disclosed information was so incomplete as to be misleading, defendants were under no duty to disclose this information. Absent something more, this portion of the complaint amounts to nothing more than "fraud by hindsight," not actionable under the securities laws. Thus, this portion of the complaint is dismissed. *See* Fed.R.Civ.P. 9(b).

### IV. LEAVE TO AMEND

**\*12** At oral argument, Plaintiff requested that in the event that I dismissed his complaint, or portions of it, he be granted leave to amend. Ordinarily leave to amend should be grated liberally. In this case, however, Plaintiff has had the benefit of Defendants' first motion to dismiss as well as limited discovery to prepare the present complaint. Thus, he had "ample opportunity to allege any facts . .. from which liability may flow." *Tapogna v. Egan,* 141 F.R.D. 370, 373 (D.Mass.1992). In light of these circumstances, I deny Plaintiff's request for leave to amend.

### V. OTHER ISSUES

Because Count I of the complaint is dismissed with prejudice, the Plaintiff cannot assert a claim under 15 U.S.C.A. § 78t(a) (West 1981). Therefore, that claim is also dismissed with prejudice. Finally, I decline to exercise supplemental jurisdiction over the pendent state law claims. *See* 28 U.S.C.A. § 1367(c)(3) (West 1993) Therefore, these claims are dismissed without prejudice.

### VI. CONCLUSION

For the foregoing reasons I grant Defendants' Motion to Dismiss (document no. 17).

SO ORDERED.

FN1. The individual defendants are Barry Gorsun, current president, CEO and Chairman of the Board; James J. Fiedler, president and director from July 1993 through July 1994; John A. Shane, director since 1976; William M. Scranton, director since 1976; and Robert A. Degan, director since 1984.

FN2. All paragraph references are to the plaintiffs' First Amended Complaint.

FN3. Section 10(b) of the Act states in pertinent part: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C.A. § 78kj(b).

FN4. Rule 10b-5 states in pertinent part: " It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b.5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

FN5. The scienter element is "... satisfied if plaintiffs 'prove an intent to deceive, manipulate, or defraud.' " *Rand,* 847 F.Supp. at 205. In this circuit, " recklessness amounting to indifference is an acceptable substitute." *Id.* (citing *Hoffman v. Easterbrook & Co.,* 587 F.2d 509, 516 (1st Cir.1978)). Under Rule 9(b) , a plaintiff's complaint must support an inference that the defendant's knew, or should have known, that the statements were false or misleading. *Romani,* 929 F.2d at 878.

FN6. Reliance is presumed in a fraud on the market case. *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 209 n. 7 (D.Mass.1993) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 246-47 (1988)); *accord In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113-14 (9th Cir.1989), *cert. denied,* 496 U.S. 943 (1990).

FN7. Plaintiffs allege that not only were many statements misleading when made because of the omission of material facts necessary to make the statement complete, but that the Defendants had a duty to correct statements that became misleading only after the statements were made. ¶ 122. The First Circuit has definitively held that no duty to correct exists if the statements were true and not misleading when made. *Backman,* 910 F.2d at 17. Because I conclude plaintiff failed to adequately show that the statements at issue were false or misleading when they were made, I dismiss this portion of the complaint. *See* Fed.R.Civ.P. 12(b)(6). The complaint is also based in part on statements by analysts. There is no duty to correct statements by third parties unless the defendant has significantly entangled itself with the third party's production of the statement. *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163-64 (2d Cir.1980). As discussed below, the plaintiff failed to plead with sufficient specificity any entanglement between the defendants and

Montgomery Securities. Thus, this portion of the complaint is also dismissed. *See* Fed.R.Civ.P. 9(b).

D.N.H.,1995.
Gross v. Summa Four, Inc.
Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999

Briefs and Other Related Documents (Back to top)

• 1:94cv00364 (Docket) (Jul. 12, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.