UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 05-CA-11853-PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN and JANE KOBER, | ) ) ) ) | |
| Defendant. | ) ) ) ) | December 21, 2005 |

## TRANSMITTAL AFFIDAVIT OF ROBERT A. BUHLMAN

I, Robert A. Buhlman being sworn, depose and state:

1.       My name is Robert A. Buhlman.  I am a partner in the law firm Bingham McCutchen LLP.  I represent Biopure Corporation ("Biopure") in the captioned case.  I make this affidavit based on personal knowledge.

2.       I submit that the following attached documents are true and accurate copies.

3.       Attached hereto as Exhibit A is Biopure's August 1, 2003 press release.

4.       Attached hereto as Exhibit B is Biopure's July 31, 2002 press release.

5.       Attached hereto as Exhibit C is Biopure's October 1, 2002 press release.

6.       Attached hereto as Exhibit D is the Letter to Dr. Howard P. Richman ("Dr. Richman") from Dr. Basil Golding ("Dr. Golding") of the U.S. Food and Drug Administration ("FDA") re: BLA Amendment 7, May 30, 2003.

7.       Attached hereto as Exhibit E is the Letter to Dr. Richman from Dr. Golding of FDA re: BLA, July 30, 2003.

8.       Attached hereto as Exhibit F are the FDA Official Meeting Minutes dated March 15, 2004 of January 6, 2004 Meeting.

Signed under the pains and penalties of perjury this 21st day of December , 2005.

/s/ Robert A. Buhlman
Robert A. Buhlman


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above pleading was served by hand upon the attorney(s) of record for all parties on December 21, 2005.

/s/ Robert A. Buhlman
Robert A. Buhlman

2

# EXHIBIT A

Biopure Corporation (ticker: BPUR, exchange: NASDAQ) News Release - 8/1/2003

## Biopure Receives FDA Response to Hemopure(R) Marketing Application

CAMBRIDGE, Mass., Aug. 1 /PRNewswire-FirstCall/ -- Biopure Corporation (Nasdaq: BPUR) announced today that the U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) for Hemopure(R) [hemoglobin glutamer - 250 (bovine)] and issued a letter requesting additional information. The letter focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling. It does not request additional clinical trials. Biopure has applied to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients.

With 30 days remaining in the original BLA review cycle, the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response.

"We're encouraged that the FDA has finished its review and provided comprehensive feedback in advance of the formal action due date. By maintaining thirty days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible," said Biopure President and CEO Thomas A. Moore. "We'll work with the Agency to address the remaining questions and will provide our answers as expeditiously as possible."

Anemia is a shortage of RBCs in the body that can create an oxygen deficit and lead to cell damage, organ dysfunction or, in severe cases, death. Acute anemia, usually caused by blood loss, is the primary indication for a RBC transfusion. In 1999, approximately 1.4 million RBC units were transfused in 500,000 high blood loss orthopedic surgical procedures.* These statistics are expected to increase as the population ages.

Hemopure is an oxygen therapeutic, or drug, consisting of chemically stabilized bovine hemoglobin formulated in a balanced salt solution. This stabilized, acellular hemoglobin circulates directly in plasma (the fluid part of blood) when administered intravenously, increasing oxygen delivery and diffusion. The product is compatible with all blood types, is stable for three years at room temperature (2 degrees to 30 degrees Celsius), and is purified through patented and proprietary techniques that are validated to remove potential contaminants.

Biopure Corporation

Biopure Corporation, headquartered in Cambridge, Mass., is the leading manufacturer and marketer of oxygen therapeutics, a new class of drugs that are intravenously administered to deliver oxygen to the body's tissues for the treatment of acute surgical anemia and other potential medical applications. Hemopure(R) [hemoglobin glutamer - 200 (bovine)] is approved in South Africa for the treatment of acutely anemic surgical patients and for eliminating, delaying or reducing the need for red blood cell transfusion in these patients. The company's veterinary product, Oxyglobin(R) [hemoglobin glutamer - (200 bovine)], is a similar oxygen therapeutic approved in the United States and European Union for the treatment of anemia in dogs.

Statements in this press release that are not strictly historical may be forward-looking statements. There can be no assurance that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained, that anticipated milestones will be met in the expected timetable, that any clinical trials will be successful, or that any approved product will find market acceptance and be sold in the quantities anticipated. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, and uncertainties and possible delays related to clinical trials, regulatory approvals, possible healthcare reform, manufacturing capacity, marketing, market acceptance, competition and the availability of sufficient financing to support operations. The company undertakes no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date hereof. A full discussion of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found on the company's Web site at www.biopure.com/corporate/legal/home_legal.htm and in the company's filings with the U.S. Securities and Exchange Commission, which can be accessed in the EDGAR database at the SEC Web site, www.sec.gov, or through the Investor section of Biopure's Web site, www.biopure.com.

BP 01100

* Theta Reports study entitled "Synthetic Blood Products Worldwide" and the National Center for Health Statistics' 1999 National Hospital Discharge Survey.

Contact:
Douglas Sayles Biopure Corporation
(617) 234-6826
PR@biopure.com Lee Stern (investors)
The Trout Group
(212) 477-9007 x22
lstern@troutgroup.com

SOURCE Biopure Corporation

BP 01101

# EXHIBIT B

Biopure Corporation (ticker: BPUR, exchange: NASDAQ) News Release - 7/31/2002

## Biopure Submits Hemopure(R) Marketing Application to the U.S. FDA

CAMBRIDGE, Mass., Jul 31, 2002 /PRNewswire-FirstCall via COMTEX/ -- Biopure Corporation (Nasdaq: BPUR) today announced that it has submitted an electronic Biologic License Application (BLA) to the U.S. Food and Drug Administration (FDA) for its oxygen therapeutic Hemopure(R) [hemoglobin glutamer - 250 (bovine), or HBOC-201]. The company is seeking regulatory approval to market this pharmaceutical product in the United States for the treatment of the signs and symptoms of acute anemia in adult patients undergoing orthopedic surgery, and for the purpose of eliminating, delaying or reducing the need for red blood cells in these patients.

"This BLA is supported by two red blood cell controlled Phase III studies, which is a first in the field of oxygen therapeutics," said Biopure's CEO and President Thomas A. Moore. "We look forward to the FDA's review of our application and to filing additional applications in Europe and other markets."

The clinical section of the BLA includes data from a Phase III orthopedic surgery trial conducted at 46 centers in the United States, South Africa, Europe and Canada, and from a non-U.S. Phase III general non-cardiac surgery trial conducted at 21 centers in South Africa and Europe. It also contains an integrated database of all 22 Hemopure clinical trials conducted to date, including data for more than 1400 total subjects of which more than 800 received Hemopure.

The FDA has 60 business days from the submission date of a BLA to determine its acceptability for review.

Surgical Anemia

Anemia is a shortage of red blood cells caused by blood loss, disease or insufficient red blood cell production, which can compromise the body's oxygen-carrying capacity and in severe cases lead to cell damage, organ dysfunction or death. According to a Theta Reports study entitled Synthetic Blood Products Worldwide and the National Center for Health Statistics' 1999 National Hospital Discharge Survey, an estimated 8.54 million total red blood cell units were transfused in the United States in 2.63 million high blood loss surgical procedures. Of these procedures, approximately 1.35 million red blood cell units were transfused in 500,000 high blood loss orthopedic surgery procedures.

"Oxygen therapeutics represent a new treatment approach for managing patients' oxygen requirements," said company Vice Chairman and Chief Technology Officer Carl W. Rausch. "Because of its physiological and clinical characteristics, we believe Hemopure may help address many of the logistical and medical issues associated with the availability and administration of donated blood."

"This regulatory filing is the culmination of 18 years of research and development at Biopure," added company co-founder David N. Judelson.

Hemopure is an intravenously administered pharmaceutical consisting of chemically stabilized bovine hemoglobin (the protein that carries oxygen) formulated in a balanced salt solution. This stabilized, acellular hemoglobin circulates directly in plasma (the fluid part of blood) when infused and has lower viscosity and releases oxygen to tissues more efficiently than red blood cells. Hemopure is compatible with all blood types, stable both refrigerated and at room temperature (2 to 30 degrees Celsius) for up to three years, and is purified through patented and proprietary techniques that are validated to remove potential contaminants, including infectious agents such as bacteria, viruses and transmissible spongiform encephalopathy (TSE) agents.

Biopure Corporation

Biopure Corporation, headquartered in Cambridge, Mass., is a leading developer, manufacturer and marketer of oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's tissues. Hemopure(R) [hemoglobin glutamer - 250 (bovine), or HBOC-201] is commercially available in the Republic of South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating, delaying or reducing the need for allogenic red blood cell transfusion in these patients. The company has

Confidential Treatment Requested by Biopure

BP 00386

submitted an application to the FDA to market Hemopure in the United States for a similar indication in orthopedic surgical patients, and it plans to file applications in Europe and other markets. Hemopure is in earlier stages of development for use in trauma, cancer and ischemic events such as heart attack and stroke. Biopure's veterinary product Oxyglobin(R) [hemoglobin glutamer - 200 (bovine), or HBOC- 301], the only oxygen therapeutic approved by the FDA and the European Commission, is commercially available for the treatment of anemia in dogs.

Statements in this press release that are not strictly historical are forward-looking statements. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, uncertainties and possible delays related to the filing and acceptance of applications to the FDA and foreign regulatory authorities, the uncertainties of clinical trials, possible healthcare reform, manufacturing capacity, marketing, market acceptance, competition and the availability of sufficient financing to support operations. Discussions of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found on the company's Web site at www.biopure.com/corporate/legal/home_legal.htm and in the company's filings with the U.S. Securities and Exchange Commission, which can be accessed in the EDGAR database at the SEC Web site, www.sec.gov, or through the Investor section of Biopure's Web site, www.biopure.com.

Contact:

Douglas Sayles
Director
Corporate Communications
Biopure Corporation
(617) 234-6826
IR@biopure.com

Jonathan Fassberg (investors)
The Trout Group
(212) 477-9007 x16

Brad Miles (media)
BMC Communications
(212) 477-9007 x17

SOURCE Biopure Corporation

COMTEX
News Network

News provided by COMTEX. User agreement applies

Confidential Treatment
Requested by Biopure

BP 00387

# EXHIBIT C

Biopure Corporation (ticker: BPUR, exchange: NASDAQ) News Release - 10/1/2002

## Biopure's Marketing Application for Hemopure(R) Accepted by the FDA for Review

CAMBRIDGE, Mass., Oct 1, 2002 /PRNewswire-FirstCall via COMTEX/ -- Biopure Corporation (Nasdaq: BPUR) today announced that its Biologic License Application (BLA) for Hemopure(R) [hemoglobin glutamer - 250 (bovine)] has been accepted for review by the U.S. Food and Drug Administration (FDA). The acceptance is based on the agency's determination that the BLA is adequate to permit a substantive and meaningful review.

On July 31, 2002, Biopure submitted an electronic BLA to the FDA seeking regulatory clearance to market Hemopure in the United States for the treatment of acute anemia in adult patients undergoing orthopedic surgery, and for eliminating or reducing the need for red blood cells in these patients. The application was based on two Phase III clinical trials and an integrated database of all 22 Hemopure clinical trials, including data for more than 1400 total subjects of which more than 800 received Hemopure.

"This is the fourth regulatory milestone for our technology we've passed that no competitor has achieved," said Biopure's President and CEO Thomas A. Moore. "Approvals for our veterinary product in the United States and European Union, the approval of Hemopure in South Africa for human use and now FDA acceptance of our BLA for review in the United States."

"While the FDA will decide whether our application is approvable, this acceptance is further affirmation of the substantive clinical data we've amassed. This latest 'first' for Biopure should help support our efforts to establish new business relationships and product indications. We will continue to work closely with the FDA on this review while also preparing other international filings," added Moore.

Hemopure

Hemopure is an intravenously administered pharmaceutical consisting of chemically stabilized bovine hemoglobin (the protein that carries oxygen) formulated in a balanced salt solution. This stabilized, acellular hemoglobin circulates directly in plasma (the fluid part of blood) when infused and has lower viscosity and releases oxygen to tissues more efficiently than red blood cells. Hemopure is compatible with all blood types, stable both refrigerated and at room temperature (2 degrees to 30 degrees C) for up to three years, and is purified through patented and proprietary techniques that are validated to remove potential contaminants, including infectious agents such as bacteria, viruses and transmissible spongiform encephalopathy (TSE) agents.

Biopure Corporation

Biopure Corporation, headquartered in Cambridge, Mass., is a leading developer, manufacturer and marketer of oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's tissues. Hemopure(R) [hemoglobin glutamer - 250 (bovine), or HBOC-201] is commercially available in the Republic of South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating, delaying or reducing the need for allogenic red blood cell transfusion in these patients. The company has submitted an application to the FDA to market Hemopure in the United States for a similar indication in orthopedic surgical patients, and it plans to file applications in Europe and other markets. Hemopure is in earlier stages of clinical development for use in cancer and in preclinical development for trauma and ischemic events such as heart attack and stroke. Biopure's veterinary product Oxyglobin(R) [hemoglobin glutamer - 200 (bovine), or HBOC- 301], the only oxygen therapeutic approved by the FDA and the European Commission, is indicated for the treatment of anemia in dogs.

Statements in this press release that are not strictly historical are forward-looking statements. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, uncertainties and possible delays related to the filing and acceptance of applications to the FDA and foreign regulatory authorities or related to regulatory clearances for new or revalidated manufacturing facilities, the uncertainties of clinical trials, possible healthcare reform, manufacturing capacity, marketing, market acceptance, competition and the availability of sufficient financing to

Confidential Treatment Requested by Biopure

BP 00380

support operations. Discussions of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found on the company's Web site at http://www.biopure.com/corporate/legal/home_legal.htm and in the company's filings with the U.S. Securities and Exchange Commission, which can be accessed in the EDGAR database at the SEC Web site, http://www.sec.gov, or through the Investor section of Biopure's Web site, http://www.biopure.com.

SOURCE Biopure Corporation

CONTACT: Douglas Sayles, Director Corporate Communications of Biopure Corporation, +1-617-234-6826, PR@biopure.com; or Jonathan Fassberg (investors) of The Trout Group, +1-212-477-9007 ext. 16; or Brad Miles (media) of BMC Communications, +1-212-477-9007 ext. 17

COMTEX
News Network·

News provided by COMTEX. User agreement applies

Confidential Treatment
Requested by Biopure

BP 00381

# EXHIBIT D



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration

1401 Rockville Pike
Rockville MD 20852-1448

Our STN: BL 125066/0

MAY 3 0 2003

Howard Richman, D.P.M.
Biopure Corporation
11 Hurley Street
Cambridge, MA 02141

Dear Dr. Richman:

We acknowledge receipt on May 13, 2003 of your May 12, 2003 amendment to your Biologics License Application for Hemoglobin Glutamer-250 (Bovine). We further acknowledge that the information in this amendment was submitted in your complete response to our April 25, 2003 clinical hold letter under BB- IND 10962.

As discussed in the telephone conversation of May 27, 2003 between representatives of FDA and Dr. Howard Richman of Biopure, Corporation, because this amendment contains significant new analyses of clinical data and new information regarding the SEEC committee, we consider this submission a major amendment. CBER intends to review this submission within the current review cycle. Since this is a major amendment submitted within the last 90 days of the review cycle we are extending the action due date. We will have completed our review and will take action on your application by August 29, 2003.

If you have any questions, please contact Mr. Franklin T. Stephenson, at (301) 827-3524.

Sincerely yours,

Basil Golding, M.D.
Acting Director
Division of Hematology
Office of Blood Research and Review
Center for Biologics
    Evaluation and Research

Confidential Treatment
Requested by Biopure

BP 00816

# EXHIBIT E

DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448

**JUL 3 0 2003**

Our Reference STN: 125066/0

Howard P. Richman, D.P.M.
Biopure Corporation
11 Hurley Street
Cambridge, Massachusetts 02141

Dear Dr. Richman:

This letter is in regard to your Biologics License Application (BLA) for Hemoglobin Glutamer-250 (Bovine), also known as HBOC-201 submitted under section 351 of the Public Health Service Act.

The Center for Biologics Evaluation and Research (CBER) has completed the review of all submissions made relating to your Biologics License Application. Our review finds that the information and data submitted are inadequate for final approval action at this time based on the deficiencies outlined below.

The deficiencies may be summarized as follows:

### Monitoring of study HEM-0115

**Bioresearch Monitoring Inspections:**

1.  FDA inspections of fourteen clinical investigator sites at which subjects had been enrolled and treated under the HEM-0115 clinical study revealed that in addition to internal monitors, Biopure had engaged the services of several contract research organizations (CROs) and private consultants who conducted multiple monitoring visits at these clinical sites. It was also noted that these CROs and private consultants were monitoring the same sites during the same study period concurrently with internal Biopure monitors.

    Please provide a detailed list of:

    a.  All CROs and private consultants used to monitor the HEM-0115 study.

    b.  The site(s) and time period(s) during which the internal Biopure monitors, CROs and private consultants performed specific monitoring activities.

    c.  The specific obligations and responsibilities for the monitoring of clinical investigators performed by internal Biopure monitors, each CRO, and each private

Confidential Treatment
Requested by Biopure

BP 00144

STN: 125066/0, Page 2

consultant including, but not limited to: completing and making changes to the case report forms (CRFs), the handling of data clarification requests, and the reporting of serious adverse events (SAEs) and adverse events (AEs).

2.  FDA's November 1999 inspection of Biopure revealed there was no documentation to substantiate that the firm's internal monitors, CROs, and private consultants were trained as required by Biopure SOP CN-0029.  The external contract monitors' training documentation forms (QA-0078) were found to be incomplete, and did not identify the SOPs reviewed or the trainer.  There was also no documentation to ensure that external contract monitors were knowledgeable and proficient in current Biopure SOPs.

    a.  Please provide a detailed explanation as to how Biopure ensured the consistency of the monitoring activities performed by the internal Biopure monitors, the CROs and the private consultants who were monitoring the study at the various sites, especially at sites that had multiple monitors during the course of the study.

    b.  Please provide a detailed description of how Biopure instructed the internal monitors, each of the CROs and private consultants to report the results of their monitoring activities, such as the frequency and content of reports. For example (but not limited to this example), did Biopure expect the monitors to submit reports for each monitoring visit, or to submit  integrated reports explaining findings during a defined time period?

3.  Review of monitoring reports during FDA's November 1999 inspection of Biopure revealed the following:

    a.  Eight of ten pre-study monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

    b.  Five of eight initiation monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

    c.  Four of 28 monitoring reports covering six clinical sites were not finalized per SOPs; the date that each report was finalized was unknown for 22 out of 28 monitoring reports, and zero of 28 monitoring reports were reviewed in accordance with Biopure's SOPs.

    d.  FDA's November 2002 inspection of Biopure revealed that the internal Biopure monitors, the CROs, and the private consultants were still not submitting monitoring reports within the specified time frames, and Biopure was still not reviewing the monitoring reports in accordance with their own SOPs.

Please provide a detailed explanation or answer for the following:

    i.  How Biopure ensured that the clinical investigators were conducting the HEM-0115 clinical study in accordance with the protocol requirements when

Confidential Treatment
Requested by Biopure

BP 00145

STN: 125066/0, Page 3

the internal Biopure monitors, the CROs, and the private consultants were not submitting the monitoring reports as required, and Biopure was not reviewing the monitoring reports in accordance with their own SOPs.

ii. Why BioPure failed to initiate appropriate corrective action after the November 1999 inspection to ensure that all monitoring reports were submitted and reviewed within the specified time frames.

4.  Please provide a detailed explanation of the activities of GloboMax of Hanover, Maryland, in regards to data management and statistical analysis on the HEM-0115 study.

## Clinical investigator issues

The FDA inspections of fourteen clinical investigator sites revealed significant deficiencies to include, but not limited to the following: (1) many SAEs and AEs not reported; (2) ineligible subjects enrolled, including subjects with known excludable medical risks; (3) not all subjects properly consented; and (4) numerous protocol required assessments either not performed or not performed within the timeframes specified by the protocol, including vital signs, hematology tests, clinical chemistry tests, urinalysis, ECGs, neurologic assessments, and physical examinations.  Questions 7, 8 and 10 are examples of the significant deficiencies noted during the FDA inspections.

5.  The samples for laboratory assessments for hematocrit, hemoglobin, and plasma hemoglobin were either not drawn, or were not consistently drawn immediately prior to subsequent transfusions.  This deficiency was observed at numerous sites.

Please explain how Biopure can assure, without these required assessments, that additional transfusions were based on the individual needs of the subject.

6.  During the inspections, a review of CRFs revealed that at least seven subjects presented with abnormal ECGs during the perioperative period.  There was no record in their CRFs to document they were evaluated just prior to randomization/infusion to confirm that their abnormal ECGs did not meet the definition of acute life-treating or significant destabilizing event.

Please explain how Biopure can ensure that these subjects were qualified or remained qualified to participate in the study without documentation of evaluation by a cardiologist that the abnormal ECG s were not clinically significant, and the subjects were cleared to participate in the study.

7.  Please describe in detail how Biopure trained each of the clinical investigator sites, including the principal investigator, all sub-investigators, and study coordinators, before the sites began enrolling subjects and using the investigational product to ensure that the principal investigators, sub-investigators, and study coordinators fully understood the HEM-0115 protocol and all study requirements.

Confidential Treatment
Requested by Biopure

BP 00146

STN: 125066/0, Page 4

8.   The FDA inspections, and monitoring reports submitted by the internal Biopure monitors,
     CROs, and private consultants revealed: (1) missing source documents, (2) incomplete
     CRFs, (3) unsupported changes to data on the CRFs, and (4) discrepancies between the
     CRFs, hospital blood bank records, and drug accountability records regarding the date,
     number of units and volume of the investigational product that was dispensed, transfused,
     and returned, and (5) discrepancies regarding the date, volume, type and number of units
     of the control product (red blood cells, packed cells, whole blood, etc.) that was
     dispensed and transfused.

     Please provide a detailed explanation as to how Biopure can ensure that the data in
     the BLA submission, in regards to the use of the investigational and/or control
     product, is accurate and reliable in light of the noted discrepancies.

9.   As described above, FDA inspections of the clinical sites revealed significant deficiencies
     throughout the course of the study. Several sites had patterns of protocol violations that
     continued unabated despite repeated monitoring visits that disclosed the on-going
     problems.

     a.  Who was responsible for correcting problems and resolving the issues that were
         observed by the internal Biopure monitors, CROs, and consultants during the
         monitoring visits at the various clinical sites?

     b.  In response to the problems observed by the internal Biopure monitors, CROs, and
         consultants, were any of the principal investigators, sub-investigators and study
         coordinators re-trained? If so, what type of training was given? Who was responsible
         for the re-training?

     c.  Please explain in detail why Biopure failed to initiate appropriate corrective action,
         such as suspending enrollment of subjects at sites where serious deficiencies were
         noted, or terminating the study at sites where continued non-compliance to the
         protocol was observed during the multiple monitoring visits by the internal Biopure
         monitors, CROs, and private consultants.

10.  Please provide a detailed explanation as to how Biopure can ensure that the safety and
     efficacy endpoints were met in light of the many protocol deficiencies including, but not
     limited to the examples described above, which were noted during the FDA inspections
     of these fourteen clinical sites.

     How can BioPure ensure that the remaining thirty-two sites that were not inspected
     do not have the same types of deficiencies, and the data from these sites are reliable
     and accurate?

Confidential Treatment
Requested by Biopure

BP 00147

STN: 125066/0, Page 5

**Study Conduct:**

In the various submissions from Biopure related to BLA 125066 for HBOC-201, Biopure has used the term "softlock" to denote a number of different data management actions. In the BLA itself, submitted July 31, 2002, the term "softlock" appears in section 16.1.14 and in the description of the historical chain of events for the SEEC process. Similarly, the term "CEVA" (Clinical Event Validation and Adjudication) appears to have been used to denote different groups of people or different activities by a Data Coordinating Group.

Under section 16.1.14, on page 12 of the SEEC charter, "softlock" is described as the "resolution of all site queries for certain critical fields." This activity was supposed to occur before patient records were submitted to the SEEC for adjudication for the primary safety endpoint. CEVA Data Coordination Services were to be provided by Quintiles, Inc. The CEVA Team was to be responsible for collecting and evaluating patient safety documentation provided by investigative sites. CEVA was to be responsible for assembling safety assessment patient dossiers for all patients from all regions and for proofing each file for completeness prior to submission to the SEEC.

In the Historical Chain of Events: SEEC Process, there is an entry dated June 26, 2000 stating, "Softlock Criteria Approved (J. Burke)."

The letter dated September 24, 2002, contains following statements about "softlocking" databases and about CEVA and the Quintiles Data Management group:

- "The adjudication forms for each AE were prepared by CEVA based on the AEs in the *softlocked* AE database managed by the Quintiles Data Management group."

- "The first *softlock* of the database was completed on 22 February 2001 and the last 1ˢᵗ level patient dossier was submitted to adjudicators on 30 March 2001."

- "Data Management activities continued after the first database *softlock* and patients with changes in the database that would require resubmission of the dossiers to the SEEC were identified."

- "The final *softlock* of the database was completed on 29 June 2001 and the last 1ˢᵗ level patient dossier was resubmitted to adjudicators at that time."

- "This [final database as of June 29, 2001] *softlocked* database was also transferred to RRS."

1.  Please answer the following questions:

    a.  What is meant by the phrase, "softlocked database?"

    b.  The abbreviation "CEVA" appears to be used in several different ways in the various submissions. What activities were encompassed by the term CEVA?

Confidential Treatment
Requested by Biopure

BP 00148

STN: 125066/0, Page 6

   c.  What was the relationship between the CEVA Data Coordinating Center and the Quintiles Data Management group? Did the Quintiles Data Management group provide the services collectively called CEVA?

   d.  Who performed the evaluation of the source documents that were provided to the SEEC?

   e.  What adjudication forms were prepared by CEVA based on the AEs in the softlocked AE database managed by Quintiles Data Management group?

   f.  What were the "softlock" criteria that were approved by J. Burke on June 26, 2000?

   g.  For each individual patient, what critical fields were to be resolved prior to "softlock" of the file and submission to SEEC?

   h.  What role did Quintiles Data Management group play in managing the various softlocked databases and softlocked patient data?

   i.  What data management activities continued after the first database softlock? Why were these activities not completed before submitting the first patient dossiers to the SEEC in November 2000?

   j.  Please explain what is meant by "All post-softlock changes identified" for the June 8, 2001 entry in the historical chain of events timeline.

   k.  Please explain the role and training of CEVA in collecting, assembling, and proofing patient safety documentation provided by investigative sites given that these functions had already been performed beginning in July, 2000 by a "new monitoring team."

   l.  Please identify the members of the "new monitoring team" and their affiliations.

       i.  What was re-monitored by this team?

       ii.  How were the findings by this team reconciled with the later work performed by CEVA?

       iii.  How long did the re-monitoring by the new team take and when were these activities completed?

   m.  What or who is AACT? What was the role of AACT?

   n.  Please describe in detail the SAS listing that was approved by M. Gawryl on October 6, 2000.

Confidential Treatment
Requested by Biopure

BP 00149

STN: 125066/0, Page 7

o. Please explain how patient listings that were blinded for patient identifiers and certain information related to investigator determination of severity, seriousness, and drug-relatedness of adverse events were transferred to Red River Statistics for analysis. What analyses were performed on such listings that lacked any investigator information about adverse event severity or seriousness?

p. Please provide a flow diagram and the names of all individuals who handled source documents from the time they were completed by the investigative site to the time they were reviewed by the SEEC for the final adjudication.

q. Please document all transactions, including all involved personnel with their affiliations, which occurred after the review process was reopened in February 2001. The flow diagram provided in the SEEC charter does not appear to document this process completely.

2. In the letter of September 24, 2002, you stated that: "the documents upon which the Biopure medical review was based were the same as those provided to the SEEC." You also stated that "at no time did Biopure have access to, nor responsibility for maintaining the database." In the BLA submission, under section 16.1.14, however, you stated, "Quintiles will ensure that the following data is (sic) blinded to the SEEC, prior to submission of each dossier." This list included patient identifiers, and certain aspects of patient treatment to include hematocrit, total and plasma hemoglobin, methemoglobin levels, etc.

a. Please clarify who performed the "Biopure medical review" and whether the Biopure medical review referred to was for the safety endpoint.

b. Please clarify whether the safety data provided for the "BioPure medical review" was also cleared of the same entries and that the documents provided for the "Biopure medical review" were identical to the documents provided to the SEEC.

c. Please also clarify whether the documents submitted for the Biopure medical review corresponded to the first patient dossiers submitted to SEEC or to the second set of files.

3. Please explain why CEVA was instructed by M. Hensley to stop collection of source documents for the week between February 13-20, 2001.

4. Please explain why Biopure requested re-copying of all source documents from dossier files (via J. Cermak) on February 23, 2001. For what purpose were these files recopied? What files were recopied? To whom were the files provided?

5. Please explain why the SEEC was asked to re-review patient records for a new adjudication for the primary safety endpoint. What "postsoftlock" changes were reviewed by the SEEC during the second review cycle?

Confidential Treatment
Requested by Biopure

BP 00150

STN: 125066/0, Page 8

6.   When 506 files were re-reviewed, did the original reviewers perform the second review? If not, why not?

7.   Please explain who attended the adjudication meetings documented in the historical chain of events document and what was the purpose of the meetings.

8.   In the chronology of major project developments for SEEC, you state that the first three submissions for 1st level SEEC review were submitted to SEEC before CEVA initiated site contacts for collection of source documents (November-December, 2000). The role of CEVA was to provide case report form and source documentation, which was "accurate, focused, and relevant." CEVA was also charged with resolving all site queries for certain critical fields BEFORE submission of any documents to SEEC. Please explain how the first three submissions were provided to SEEC before CEVA had contacted any sites.

9.   How was the toxicity grading scale used by the investigator? Was the toxicity grading scale used during any remonitoring of the clinical data or the clinical sites?

10.  Between February 26, 2001 and April 16, 2001, Biopure reviewed all source documents from the dossier file and submitted new AEs (N=1443) to CEVA for review by the SEEC. However, in the September 24, 2002 letter, you stated that Biopure did not have a direct role in providing information to the SEEC. Please explain the relationship and provide the identities of the clinical personnel contracted by Biopure to review and provide new source documents to the SEEC adjudicators for re-review. Were these personnel completely independent of Biopure? Why was this function not performed directly by CEVA, to whom this function was assigned by SEEC charter?

   a.  Please provide a detailed summary of the contractual obligations assumed by Quintiles and other data management services with regard to the "cleaning" of data for study HEM-0115.

   b.  Was the February 26, 2001 to April 16, 2001 review of all source documents the result of the July, 2000 remonitoring effort undertaken by the "new monitoring team?"

   c.  Were these adverse events also incorporated into the documentation upon which the Biopure medical review was based?

11.  In the historical chain of events, three transfers of the SEEC database to Biopure are documented. The last transfer occurred on August 9, 2001, and the notation "complete data, locked" is recorded. On September 24, 2002, you stated that, "at no time did Biopure have access to nor responsibility for maintaining the database." However, in the text of the original BLA submitted July 31, 2002, on page 65 of the report of study HEM-0115, you stated that, "The database was subsequently transferred to Red River Statistics (RRS), Shreveport, LA. RRS and Biopure jointly completed data cleaning activities."

Confidential Treatment
Requested by Biopure

BP 00151

These statements would appear to be contradictory. Please clarify and answer the following questions.

a.  Who prepared the database from the output of the SEEC deliberations?

b.  Did Biopure have access to the databases constructed from the SAF-1 and SAF-2 forms?

c.  Who provided the analysis datasets to Red River Statistics?

d.  You stated that Quintiles completed data management activities for and hardlocked the CEVA database on 8/9/01 and that the hardlocked CEVA database was transferred to both Red River Statistics and Biopure on August 9, 2001. However, the historical chronology provided in the BLA indicates that two transfers of incomplete data from the SEEC database to Biopure occurred on July 12 and July 20, 2001. How were these databases used by Biopure?

e.  In the September 17, 2002 letter submitted from Red River Statistics, it is noted that changes to an interim dataset dated June 29, 2001 were made by Red River Statistics and that these changes are memorialized in a SAS program module named ERRATA.SAS. This file contains additional raw data for adverse events and concomitant medications received after the June 29, 2001 cutoff date. Please clarify whether the second SEEC review contained the information that is contained in ERRATA.SAS.

12.  In the letter of May 12, 2003, you stated that "it was always Biopure's intention to derive the secondary safety endpoints for the HEM-0115 study from the Investigator Database, not the internal scoring of the SEEC." Please note that it was always FDA's intent that all of the analyses, including the secondary analyses, be performed using the database constructed from the blinded review by the SEEC. Please note that the FDA letter to you, dated September 15, 1999, explicitly stated that:

"The review of data by the Independent Data Monitoring Committee (N.B. later renamed the SEEC) at these various time points (including at the conclusion of the study) was to have been blinded to treatment allocation. The determination of severity and seriousness of adverse events by unblinded investigators on-site was to be masked from the Independent Data Monitoring Committee. The Independent Data Monitoring Committee was to evaluate all adverse events and make an independent determination of intensity and seriousness of the adverse events, all in blinded fashion."

That letter went on to state that all serious adverse events, as determined in blinded fashion by the IDMC, would be categorized and evaluated according to the proposed statistical analysis plan. This statement did not distinguish between the primary safety analysis and the secondary safety endpoints, and the FDA letter of December 10, 1999 simply summarized the secondary safety endpoints that would be evaluated. In the September 15 and December 10, 1999 letters, FDA provided adequate documentation of

Confidential Treatment
Requested by Biopure

BP 00152

what was expected for a regulatory submission. Omission of the recommended design features did not constitute grounds for imposing a clinical hold. On March 27, 2000 and July 7, 2000, you received letters from FDA that stated, "The statistical plan described notwithstanding, ultimate approval of your product depends on the totality of the evidence submitted from appropriately designed and conducted clinical studies including satisfactory risk: benefit outcomes." Biopure acknowledged these statements.

Since Biopure did not perform the secondary safety analyses as expected and in the manner recommended by FDA, please clarify the following points:

a. Who performed the medical evaluation of the secondary safety endpoints for the purpose of reporting in the BLA?

b. Who generated the safety database for the secondary endpoints of study HEM-0115?

c. Who audited the safety database against source records and who monitored and reconciled the data. When was the database audited and when were the data reconciled?

d. What is the nature of affiliation and financial relationship to Biopure if the medical reviewers were not Biopure personnel?

e. Were the medical reviewers blinded to treatment assignment?

13. It is FDA's understanding that site-identified adverse events and source documents were provided to SEEC for determination of seriousness, intensity, and causality of the events, and that these, together with additional adverse events identified by each SEEC reviewer, were used to generate the SAF-1 dossier for each patient. This SAF-1 dossier was then used by each SEEC reviewer to assign a medical risk score that was recorded on SAF-2. Further, the SEEC charter stated that,

"SEEC identified adverse events: The SEEC is not charged with the task of identifying all potentially un-reported adverse events; however, if during the course of reviewing a case for adjudication, a SEEC reviewer notes an unreported adverse event, this data (sic) should be captured." The charter further states that the CEVA Data Coordinating Center will review all completed adjudication CRFs for potential adjudication data discrepancies. If discrepancies are identified, a query will be issued to the reviewer who supplied the data."

"In order to proactively prevent the need to issue queries, the CEVA Data Coordinating Center has prepared a guideline for the completion of the adjudication CRFs which will be utilized by the SEEC." (This guideline included information about both the SAF-1 and SAF-2 forms.)

If it is the case that the SEEC reviewers used adverse events recorded on the SAF-1 forms in order to generate the adjudication recorded on the SAF-2 forms, and that the

Confidential Treatment
Requested by Biopure

BP 00153

adverse events recorded on the SAF-1 forms could originate either from the on-site investigator or the SEEC reviewer, and it is also the case that the SAF-1 entries were not completely monitored and/or reconciled against source documents, then it may be concluded that the medical assessment of risk was based on a data set that did not conform with cGCPs. Your letter of May 12, 2003 in response to the clinical hold imposed on IND 10792 and also submitted to the BLA states that, "SEEC AE/SAE database was not designed or chartered to be consistent with Good Clinical Practice (GCP)". Please clarify how a database that was generated for the purpose of at least the primary safety analysis was not designed or chartered to be consistent with Good Clinical Practice.

   a. If SEEC members found additional adverse events over and above those reported from the clinical sites, how was the validity of the findings by the SEEC members determined, and were the additional, valid adverse events added to the database upon which the Biopure medical assessment was made?

14. In the May 12, 2003 letter, you stated that the SEEC AE/SAE database was not audited against source documents nor was (sic) data monitored or reconciled. Based on these statements, it would appear that the information reviewed for the secondary safety endpoints may have differed substantially from the data reviewed by the SEEC. Please clarify. Please explain why the SEEC AE/SAE database was not audited against source material.

15. In the May 12, 2003 letter, you stated that SEEC reviewers were not responsible for assessing intensity and causality of adverse events classified as non-serious. Please note that the December 10, 1999 letter from FDA clearly stated that it was FDA's intent that the IDMC evaluate all adverse events, not only those deemed serious by the on-site investigators. The specific language states, "The role of IDMC-2 is to review all adverse events in blinded fashion for each individual subject and to perform a separate determination of intensity and seriousness of the adverse events. The IDMC was to be blinded to investigator determination of intensity and seriousness when making this determination." Further, Biopure itself stated that the function of the IDMC-2 was "at the conclusion of the study, in blinded fashion, to review listings of all adverse events, whether serious or not, by individual subject, for all subjects enrolled in the study." Please comment.

16. In the letter of September 24, 2002, you stated that:

   "In July of 2000, it was learned by Biopure Regulatory Management that clinical sites had inconsistently interpreted the type of adverse events that were to be recorded in the CRFs. In order to ensure the accuracy of the data, it would be necessary to re-monitor all clinical data submitted by the Investigators."

   "In December of 2001, after a review of the data listings, it was discovered that not all of the Investigators had consistently applied the SAE definitions when recording data. A specially designated Biopure team conducted a complete Medical Review of all Serious

Confidential Treatment
Requested by Biopure

BP 00154

STN: 125066/0, Page 12

Adverse Event (SAE) listings against the original CRFs and source documents submitted to Biopure to assure consistent classification, processing, and reporting of Serious Adverse Events….As a result of the audits, DCFs were written and signed by the Investigators to correct any data discrepancies discovered."

In the letter of May 12, 2003, you stated that:

"SEEC reviewers did not always apply serious criteria consistently and tended to classify known side effects of HBOCs (e.g., elevated liver function tests, jaundice) more seriously and conservatively. This is particularly true for the serious criteria pertaining to persistent/significant disability/incapacity and important medical events…

There was a high degree of disparity among individual SEEC reviewers: e.g., the difference in the number of SAEs for any one subject was frequently between 10 and 20."

A number of comments pertain:

a.  These various statements, taken together, suggest that the data recorded may at best be incomplete and at worst not constitute an adequate basis upon which to make a determination of safety or efficacy of HBOC-201.

b.  What criteria were applied to the remonitoring efforts that occurred after July, 2000? Please provide the Monitoring Guidelines that were used for this effort.

c.  Why did the remonitoring actions that occurred after July, 2000 not capture the inconsistencies in the classifications of SAEs?

d.  Please provide the names and affiliations of all members of all monitoring and re-monitoring teams that visited the clinical sites.

e.  The comments suggest that corrections, changes, additions, or subtractions may have been made to the databases after the so-called hardlock of August 9, 2001. Specifically, the letter of September 24, 2002 documents re-review of source documents in December 2001, and corrections that were signed by the on-site investigators. Please comment.

f.  Why did the remonitoring that occurred not clarify all the adverse events that were to be reviewed by the SEEC? Were any of the adverse events recorded by the SEEC, but not recorded by the on-site investigators, valid? If so, please explain why these adverse events were not also captured by the investigators and/or the monitoring teams sent by Biopure.

Please provide a fully detailed flow diagram and narrative description of the handling of all source documents, including but not limited to case report forms, patient chart records, etc. from the time of completion at the investigative site to the generation of the databases ultimately submitted to the BLA. (see item 1 above)

Confidential Treatment
Requested by Biopure

BP 00155

Please provide a fully detailed flow diagram and narrative description of the generation of each database that was developed, to include, but not limited to, additions, subtractions, corrections, etc.

Please provide a fully detailed flow diagram and narrative description of all of the remonitoring efforts that occurred between the conclusion of the study and the submission of the BLA.

Please provide a detailed list of all the individuals, including affiliation and financial relationship to Biopure, who were involved in data management and database management activities for HEM-0115.

FDA reserves the right to re-evaluate the output of the SEEC adjudication and the determination that the primary safety endpoint was in fact met in HEM-0115 pending receipt of your answers to the above questions regarding study conduct and integrity of the data.

## Clinical Trials

### HEM-0115 (Efficacy):

1.  The case report forms provided and the case tabulations and patient summaries contain numerous discrepancies, cross-outs, and unexplained deletions with regard to allogeneic transfusions given. It will be necessary for you to reconcile the case report form information against blood bank records and the patient charts in order to ensure the accuracy of these data that contribute to the assessment of the efficacy endpoints of the trial.

    a.  Please provide blood bank records, physician orders, and patient chart data to confirm all transfusions and infusions given.

    b.  Please cross-check these source documents and provide an accounting of all transfusion requests, transfusions administered, used and unused bags returned to the blood bank, etc. to ensure the accuracy of the data entered into the case tabulations and the case report forms.

    c.  Please provide complete and accurate summary data for all transfusions administered including, but not limited to the type and volume of product administered etc.

    FDA reserves the right to re-evaluate the efficacy data pending receipt of this information. 

2.  Please provide the efficacy data for test and control groups in tabular format with each row of the table devoted to each individual patient. Each patient should have data entered on a single row and each row should contain all the information related to transfusion

decisions and transfusion outcomes (relationship to prior trauma event, volume of blood lost, volume of fluids administered, volume of autologous blood collected and administered, time of randomization, baseline hemoglobin and hematocrit, etc.). The database should be constructed such that chronological events related to the efficacy endpoints can be read from left to right across the table. Each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be accomplished readily. The column headings should include, but are not limited to, date and type of surgery, time of surgery start and stop, total hemoglobin and hematocrit at randomization, reticulocyte counts at various time points, etc. The table should be constructed such that running time analyses may be performed. The data points entered into the table should refer to the source laboratory document, and the laboratory site (central, local, point of care) should be documented in the table.

FDA reserves the right to re-evaluate the efficacy data pending receipt of a table constructed in this manner.

3.     Please provide all missing data for pre- and post-infusion total hemoglobin so that incremental increase in total hemoglobin due to administration of the product may be calculated. Significant numbers of data points appear to be missing from the case report forms. Based on the available data, the median increase in total hemoglobin following the loading dose of 60 g HBOC-201 would appear to be 0.3 g/dL rather than the expected 1.0 g/dL. Subsequent doses of 30 g HBOC-201 also appear to have increased the total hemoglobin concentration by approximately 0.2 to 0.3 g/dL. Please comment.

4.     The BLA text states that dosing of HBOC-201 by 30 g dose intervals was intended to maintain plasma hemoglobin levels at safe and physiologically appropriate ranges. The clinical trial, however, did not specify what the target plasma hemoglobin level should be, and dosing decisions were based on the total hemoglobin concentration rather than a combination of RBC hemoglobin levels plus plasma hemoglobin levels or the plasma hemoglobin levels alone. Of the 317 patients treated with less than the full 300 g dose of HBOC-201, approximately 30% ultimately were transfused with allogeneic red blood cells. Most of these patients were transfused because clinicians did not appear to be able to manage their patients based on assessment of total hemoglobin levels, because the total hemoglobin levels did not increase as expected.

The dosing recommendations provided in Table 1 of the proposed package insert are not supported by clinical data from HEM-0115 or HEM-0114. Any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial. In turn, support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data to suggest that dosing based on such a measure is safe and likely to be efficacious. Please comment.

Given the information from the clinical trial, it is not possible to write adequate and safe dosing guidelines, and the utility of the dosing guidelines in Table 1 (using plasma hemoglobin levels) of the proposed package insert cannot be confirmed. Please comment.

Confidential Treatment
Requested by Biopure

BP 00157

STN: 125066/0, Page 15

5.  Many transfusions in the control red blood cell group were given back-to-back. This is
    particularly true for those patients who received only two units of blood. It is not clear
    whether this phenomenon also occurred for patients randomized to HBOC-201 who also
    received allogeneic red blood cells.

    a.  Please provide the records for each hospital transfusion oversight committee together
        with the records for each site for transfusion practices for the specific surgical
        procedures performed. What measures are in place at each of the study sites for
        control of transfusion decisions?

    b.  Please include information on allogeneic transfusion from each site for patients
        treated for the one year prior to initiation of the study and for concurrent patients who
        were not enrolled in the clinical trial. The report should include information about
        patients who underwent the specified orthopedic procedures and who did not
        predonate autologous red blood cells or use erythropoietin.

6.  It would appear that transfusion avoidance for study HEM-0115 was largely driven by
    avoidance of allogeneic transfusion among those subjects who received only 60-90 g of
    HBOC-201. In this group, the median time to transfusion was 2.5 days. At 91-180 g of
    product, only 50% of subjects avoided transfusion and the median time from
    randomization to transfusion was approximately 4.5 days. Between 181 and 270 g of
    product, only 32% of subjects avoided transfusion, and the median time to transfusion
    was 3.3 days. At 300 g of product, 75% of patients received allogeneic red blood cells.
    The median time to transfusion was approximately 3 days. Patients who received
    HBOC-201 in any dose and who also received allogeneic red blood cells, received a
    median dose of 2 units (mean approximately 3 units) of red blood cells. This dose of red
    blood cells was comparable to or slightly higher than the dose received by patients
    randomized to the control group. Thus, at doses above 90 g of HBOC-201, not only were
    many patients exposed to the dose of HBOC-201, they also were also exposed to
    allogeneic blood in the amounts received by the control group. Please comment.

7.  Patients in the test arm had, on average, approximately 1 g/dL lower total hemoglobin
    levels than did patients in the control arm for treatment days 2-6. At discharge, patients
    treated with HBOC-201 had hematocrits of 28 as compared to patients treated with
    allogeneic red blood cells who had discharge hematocrits of 31. Thus, patients treated
    with HBOC-201 were discharged from the hospital significantly more anemic than
    patients in the control group. Please comment.

    Please re-analyze your efficacy database that FDA has asked you to construct and report
    your conclusions in your response to this letter. Your analyses might include, but should
    not be limited to, comparison of incremental increase in total hemoglobin levels as a
    result of administration of each unit of product or control, comparison of total
    hemoglobin levels on treatment days 2 through 6 for each group, a comparison of
    discharge hematocrits, review of changes in reticulocyte levels and other measures of
    oxygen delivery by the product, and an analysis of transfusions administered at each dose
    cohort of HBOC-201.

Confidential Treatment
Requested by Biopure

BP 00158

STN: 125066/0, Page 16

**HEM-0115 (Safety):**

1.  Many of the CRF Adverse Experience pages have cross-outs, deletions, additions, missing dates and/or times, or are marked "re-monitored". It will be necessary to reconcile the CRF information against hospital records in order to ensure the accuracy of data that contribute to the safety profile.

    a.  Please provide copies of source documents to substantiate all CRF Adverse Experience changes as enumerated above.

    b.  Please provide the names and affiliations of all individuals who entered or modified data entries on a CRF-by-CRF basis, and the dates and times when these changes were made.

FDA reserves the right to re-evaluate the safety data pending receipt of this information.

2.  Please provide the safety data for test and control groups in tabular format. Each row should contain all the information related to the adverse event (please request a sample copy from FDA). The database should be constructed in such a way that the chronology of the adverse event can be read from left to right and that can be readily analyzed using statistical software. The column headings should include, but are not limited to, age, gender, CTM dose, time of surgery, time of treatment-emergent AE, time of first CTM infusion, time of last CTM infusion, time from 1st CTM infusion to time of treatment-emergent AE, time from last CTM infusion to time of treatment-emergent AE, total amount of CTM administered at time of treatment-emergent AE, official time/date of premature discontinuation of CTM, official reason for premature discontinuation of CTM, and time/date of 1st non-CTM transfusion.

    FDA reserves the right to re-evaluate the safety data pending receipt of tables constructed in this manner.

3.  The incidence of acute myocardial infarction is different between the SEEC and FDA (based on entries by investigators in the Adverse Events pages of the CRF) databases.

    a.  Please provide FDA with copies of all source documents supplied to the SEEC regarding this issue.

    b.  Please provide copies of all source documents for all subjects with respect to troponin and CK-MB values.

    c.  Please supply tables for all CK-MB and troponin values, as outlined in question 2 (above). Note that each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be readily accomplished using statistical software.

Confidential Treatment
Requested by Biopure

BP 00159

STN: 125066/0, Page 17

    d. There are numerous instances where datasets for the same subject report identical values on the same CRF page for both troponin I and T. Please explain how this occurred, which value/parameter is correct, and supply the correct CRF page for each value reported in these datasets.

    e. Subjects 0915 and 1113 had troponin values entered by hand on the CRF page, yet the data printout with troponin values for this day is missing. Please explain the origin of these troponin values.

4. The incidence of acute renal failure (pre-specified as dialysis-dependency) is different between the SEEC (7 vs. 2) and FDA (3 vs. 1) databases.

    Please provide FDA with all source documents provided to the SEEC regarding this issue and explain why there is a discrepancy between the investigator information and SEEC adjudication of the same events.

5. Laboratory measurements of amylase, AST, and ALT are deleted (or missing) for many HBOC-201 subjects.

    a. Please explain why these values are missing or deleted, provide raw data for these missing data, identify the particular analyzer used to make the measurement, and the methodology used to obtain corrected values that reflect the presence of HBOC-201 at each corresponding study site.

    b. Please explain why the amount of missing data for AST and ALT at treatment days 2 and 3 is much greater in the HBOC-201 arm than in the control arm during the perioperative period.

6. Progress notes for subject 2513 mention the possible necessity for renal dialysis, but omit entries on or around 9/16/1999.

    a. Please provide source documents for all consultations and all progress, nursing, and (if applicable) dialysis nursing notes for this subject.

    b. Similar requests pertain to subjects 4201, 4820, and 5405.

7. In your table, "Summary of Data Changes Concerning Serious Adverse Events Generated from the HEM-0115 Medical Review", which was sent to FDA after BLA submission, you list changes in adjudication and/or severity made by Biopure to the SAEs. Please provide copies of all source documents to substantiate each change.

8. Regarding product immunogenicity, please provide details of the antibody assay methodologies, including the definition of the IgG antibody unit, and the sensitivity and specificity used for positive and negative controls.

Confidential Treatment
Requested by Biopure

BP 00160

STN: 125066/0, Page 18

9.  Please evaluate the cross reactivity of these antibodies to human hemoglobin and describe a plan to assess the risks to patients who develop antibodies to HBOC-201 of repeat exposure to the drug.

10. Please provide an analysis of drug-drug interactions including interactions of HBOC-201 with anti-hypertensives, vasodilators, diuretics, cardiac glycosides, and colloid solutions, etc.

11. Please provide a list of, and analyze the data from, patients who received product near the end of the expiration period.

**HEM-0114:**

1.  Please provide analyses on safety and efficacy data for patients who underwent orthopedic surgery in HEM-0114.

2.  Please clarify what sponsor responsibilities were transferred to CRO(s) for HEM-0114.

3.  The clinical protocol for HEM-0114 states that there is an Appendix G, "Clinical Safety Data Management: Definitions and Standards for Expedited Reporting; ICH E2A, March 1995", but only Appendices A and B are present in the BLA. Please include *all* appendices for this protocol in your submission.

4.  Here were patients in the red blood cell treatment group who had neither completed six CTM infusions, nor reached the time limit for receiving CTM, but were transfused with allogeneic red blood cells considered as non-CTM. Please provide the reasons these transfusions were considered non-CTM.

5.  Please provide explanations for withholding CTM infusion(s) when such infusions are "permitted".

6.  Please detail the information on the patients not discharged from hospital, including their ultimate disposition.

7.  Please address the issue of interference of laboratory tests in HEM-0114 (see below, clinical laboratory).

8.  In the BLA, the normal ranges of the chemistry laboratory tests are given in a distinct tabulation. As the normal ranges might vary widely depending on the testing laboratory, the data in the listings for chemistry laboratory tests become incomprehensible in the absence of the normal range for each listing. Please provide the normal values for each laboratory test in the patient data listings adjacent to the test results. If central laboratory results are available, please provide this information as well.

Confidential Treatment
Requested by Biopure

BP 00161

STN: 125066/0, Page 19

9.     Please provide *all* post-baseline clinical hematology and chemistry data listings; including CPK, CK-MB and troponin, regardless of whether such data were from the treatment period or not.

10.     Please provide complete information on the assays for antibodies to HBOC-201 and the data obtained.

11.     Please provide an analysis of drug-drug interactions, including interactions of anti-hypertensives, vasodilators, diuretics, cardiac glycosides and colloid solutions with your product in HEM-0114.

12.     Please provide <u>all</u> CRFs for HEM-0114, including laboratory printouts. In addition, please also provide:

    a.   Copies of source documents to substantiate <u>all</u> CRF Adverse Experience changes as enumerated elaborated in question 1 a (above) under HEM-0115 (Safety).

    b.   Names and affiliations of <u>all</u> individuals who entered or modified data entries on a CRF-by-CRF basis, and the dates and times when these changes were made.

13.     Please provide tables for <u>all</u> treatment-emergent adverse events, as outlined in question 2 (above) under HEM-0115 (Safety).

14.     Please provide a list of the subjects who were administered product near the end of the expiration period of the lot.

15.     Please provide a copy of all training materials supplied to investigators, a check-off list to verify their attendance at all training sessions, and results of tests you administered to verify their understanding of GCP.

### Other Clinical Studies

**General Comments about the phase 2 studies:**

1.     Please provide all case report forms, individual patient data, laboratory printouts, and source documents to support claims of safety and efficacy for all phase 2 studies.

2.     The case report forms that were provided for the phase II studies contain numerous discrepancies, cross-outs and unexplained alterations with regard to transfusions given. Accordingly, please provide explanations for missing and crossed-out data in the case reports a.) originally submitted with the phase 2 studies in this BLA and b.) all additional requested case report forms for the phase 2 studies.

3.     Please provide the anesthesia records for all surgical patients in all of the phase 2 studies.

Confidential Treatment
Requested by Biopure

BP 00162

STN: 125066/0, Page 20

4.  For all phase 2 studies in which hemodynamic monitoring was performed using a PA catheter, please present a table that includes individual patient data listings for the following calculated hemodynamic parameters: systemic vascular resistance, oxygen delivery, oxygen consumption, and oxygen extraction ratio.

5.  Please provide final study reports for all phase 2 studies conducted to support claims of efficacy and safety for your product.

6.  Please provide the efficacy data for the test and control groups for all phase 2 studies in a tabular format with each row of the table devoted to each individual patient. Each patient should have data entered on a single row and each row should contain all the information related to transfusion decisions and transfusion outcomes (relationship to prior event, volume of blood lost volume of fluids administered, volume of autologous blood collected and administered, time of randomization, baseline hemoglobin and hematocrit, etc.) The database should be constructed such that chronological events related to the efficacy endpoints can be read from left to right across the table. Each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be accomplished readily. The column headings should include, but are not limited to, date and type of surgery, time of surgery, total hemoglobin at baseline and then at randomization, etc. The data points entered into the table should refer to the source laboratory document, and the laboratory site (local or central) should be documented in the table.

7.  Please address the issue of laboratory interferences on laboratory tests in the phase 2 clinical trials.

**Study M9990-0075:**

8.  Please provide the reasons for CTM transfusion and the data to support the decision to transfuse for each patient and each transfusion in this clinical trial.

9.  You state the following conclusion for the above referenced study:

    " In summary, in the present study, HBOC-201 was used to treat post-operative anemia in cardiovascular surgery patients in the intensive care unit. We found that: HBOC –201 eliminated the need for postoperative allogeneic transfusion." (Page 106). The statement is misleading. Only 34% of the patients who were randomized to the HBOC-201 group required no postoperative allogeneic RBC's. Please provide information on the number of patients who avoided allogeneic transfusion port operatively but who had been transfused intraoperatively..

10. The conclusions on page 106 also state that HBOC-201 was safe and well tolerated; however, the following adverse events were seen in this clinical trial:

    a.  Serious adverse events in HBOC-201 group had more SAE's than the RBC group: 19 vs. 4. Of the HBOC-201 SAE's, 11/19 were cardiovascular events such as ventricular

Confidential Treatment
Requested by Biopure

BP 00163

STN: 125066/0, Page 21

tachycardia, atrial fibrillation, arterial desaturation, pericardial effusions, CHF, respiratory distress and dysrhythmias. In the RBC group, the SAE's consisted primarily of infections/ cellulitis (3/4) and small bowel obstruction (1/4). Please comment.

11.   FDA notes that the only death in this study, patient 310, was infused with CTM#2 without having met the post- operative transfusion trigger criterion. According to protocol, the patient could be transfused with CTM if the hemoglobin was between 6.5 and 9 g/dl. In the case of patient 310, the pre-CTM #2 hemoglobin level was 9.5. Please provide an explanation for why this patient was given additional CTM for a low hemoglobin, when in fact the patient's recorded hemoglobin was above the level required for CTM infusion.

12.   FDA notes that for subjects who discontinued CTM (section 12.2), most were stopped due to investigator concerns about safety (cardiorespiratory or neurological deterioration) and subjects experiencing adverse events. Please comment.

**Study BR-0049-0144:**

13.   Study BR-0049-0144 references the following publication: "The Effects of Increased Doses of Bovine Hemoglobin on Hemodynamics and Oxygen Transport in Patients Undergoing Preoperative Hemodilution for Elective Abdominal Aortic Surgery", Kasper, et al. *Anesth Analg* 1998; 87: 284-291. The author of the publication concludes that Bovine hemoglobin in doses ranging between 55 and 97 grams of hemoglobin increased vascular resistance and decreased cardiac output in anesthetized surgical patients. Furthermore, he states that hemodilution with bovine hemoglobin in those doses ranges provided no apparent benefit over hemodilution with hydroxyethyl starch. Given the data that you provided for this study, please comment on the validity of the above statements.

14.   In addition to intraoperative anesthesia records, please provide individual patient data listings for the following hemodynamic parameters: oxygen extraction ratio, systemic vascular resistance, oxygen consumption and oxygen delivery.

15.   Please provide the DSMB members and charter for this study.

FDA reserves the right to review the clinical data of all phase 2 studies pending the receipt of all requested information.

**General Comments on Clinical Studies**

1.   Please provide hospital records for <u>all</u> patients who received HBOC-201 on the basis of compassionate use.

2.   Please provide data, which show that HBOC-201 can be administered safely at clinically relevant rates in the setting of uncontrolled surgical bleeding.

Confidential Treatment
Requested by Biopure

BP 00164

STN: 125066/0, Page 22

3.  Please submit Full Study Reports for studies where there are only abstracts and/or manuscripts in the BLA.

## Statistics

1.  It is not clear why the sample size was amended shortly before completion of study HEM-0115. Please explain whether the sample size was amended because of observations about the data collected to the point of sample size increase, if not, please explain why the sample size was increased.

2.  An annual report was submitted on June 6, 2002 under BB-IND 2935 for the reporting period from February 1, 2000 through January 31, 2001. Study HEM-0115 was completed two and a half months before the end of the reporting period. However, the numbers of deaths reported in the annual report in the HBOC and RBC arms were 6 and 1 respectively, compared with 10 and 6, respectively, in the BLA submissions. Please explain the discrepancy in reporting and account for the under-reporting of deaths, considered to be serious adverse events, in the annual report.

3.  In the HBOC-201 group, 5 deaths occurred among 31 patients who were older than 80 years compared to 1 death out of 26 in the RBC group. The difference is marginally significant (p = 0.074; one-sided Fisher's exact test). Please comment.

4.  Although there is no significant difference between the two arms (10/350 vs 6/338; p = 0.45), the number of deaths observed in the study seems a little too high in consideration that these are elective surgeries (16/688 = 2.3%; 95% confidence interval is (1.3%, 3.7%)). Please comment on this observation in light of the mortality rate of a similar patient population with similar types of surgery from historical data.

5.  Please provide the randomization code with detailed description of the randomization scheme and patient ID. Please also identify those who died.

6.  Table 14.5.1 of BLA Amendment 2 also shows that there is a highly significant difference between the two arms (HBOC vs RBC: 81/350 vs 46/338; p < 0.001) in proportions of patients experiencing at least one SAE that resulted in death or persistent disability. Furthermore, there are 23.7% (83/350) of patients in the HBOC group who prematurely discontinued from CTM compared with 2.4% (8/338) in the RBC group.

    a.  Please justify the benefit of avoidance of allogeneic blood transfusion by administration of HBOC in light of higher proportions of patients experiencing at least one SAE that resulted in death or persistent disability and higher rate of prematurely discontinuation from CTM.

    b.  In connection with (a) above, please provide a 2 by 2 table defined by avoidance and SAE that resulted in death or persistent disability for the HBOC group.

Confidential Treatment
Requested by Biopure

BP 00165

STN: 125066/0, Page 23

## Clinical Laboratory Measurements

1. Although the BLA text states that in situations where the central laboratory(ies) was or were used, data management rules dictated use of the central laboratory data; however, it is not clear from the BLA text, the case report forms, the case tabulations, or the individual patient summaries which clinical laboratory results, i.., local, central laboratory, or point-of-care, were captured in the clinical database. In addition, the hypertext links from the patient summaries take the reader to one of several different reportings of individual patient laboratory results. In some instances, the link takes the reader to the central laboratory result. In other instances, the link takes the reader to the case report forms. Some case report forms are associated with clinical laboratory printouts while many others are not. Thus, it is not possible to be sure whether the data reported in the case report forms represent local laboratory results or central laboratory results.

   a. Please provide clear documentation for each clinical laboratory result for each site about what laboratory results have been submitted to the BLA for review.

   b. The BLA text states that three different central laboratories, one each in the United States, Europe, and South Africa, were used for reporting of the clinical laboratory data. Since the data from these various sources are to be combined for study HEM-0115, please provide information about the clinical laboratory reference ranges, documentation of your efforts to assure that clinical data reported from each of the central laboratories were comparable such that the data could be combined for reporting purposes, the results of such studies, and a description of the instrumentation used for each laboratory assay at each of the three central laboratory sites.

2. Each hospital's laboratory was supposed to have been evaluated, and an assay limitation sheet listing all parameters available for patient management and for the study, was to have been provided to the hospital's laboratory and the investigator. In regard to these preconditions, please provide the following:

   a. Documentation that this evaluation was performed at each site and that each investigator and each hospital laboratory was provided with the appropriate assay limitation sheet.

   b. The assay limitation sheet for each site listing all parameters available for patient management.

   c. The data from each clinical site and for each central laboratory regarding colorimetric and other potential interferences in assay results due to the presence of HBOC-201 in the plasma or serum samples.

Confidential Treatment
Requested by Biopure

BP 00166

STN: 125066/0, Page 24

d. The information about what backup facilities were available to ensure that parameters required for patient management and study conduct were available, and the results of studies to evaluate these back-up sites.

e. The information about the training of and the specific procedures followed by both local laboratory and central laboratory personnel for the conduct of the various clinical studies reported in the BLA.

f. The information about the training, the specific procedures used, and quality control methods used for all assays performed on point-of-care instruments used in the clinical studies.

g. Clarify if clinical results reported in the BLA were corrected for assay interference by HBOC-201. Absent such information, it is not possible to review clinical laboratory data sufficiently to make accurate conclusions about the effect of the drug on patient care or patient safety.

In the tabulations and case report forms, you report that various clinical chemistry and other laboratory data have been deleted. Why were these data deleted?

3. The BLA contains articles and abstracts summarizing data regarding potential interference by HBOC-201 in clinical laboratory assays but does not contain any raw data documenting the interferences for commonly used laboratory assays, commonly used laboratory instrumentation, and commonly used point-of-care instrumentation.

a. Please provide for review the data from studies to assess the degree of interference by HBOC-201 for commonly used clinical assays. These studies should provide information about interferences over the full range of concentrations of HBOC-201 to which patients will be exposed and should assess interference over the full range of likely analyte concentrations.

If HBOC-201 interferes with clinical measurements, please provide information characterizing the direction and magnitude of the bias associated with varying drug levels.

b. Please provide information about point-of-care assays (including the name of the test system), which you have tested.

c. Please provide a list of all analytes, by instrument used, for which
   ii.   there is no interference
   iii.  interfernce can be corrected
   iv.   no results can be obtained while HBOC-201 is still present in the circulation, above a specified threshold.

Confidential Treatment
Requested by Biopure

BP 00167

STN: 125066/0, Page 25

d. Please provide validation data supporting the use of commonly used clinical laboratory and point-of-care instruments for analyzing patient samples containing HBOC-201.

e. Additional interference studies should be ongoing with samples drawn from study patients. The purpose of these studies is to validate other methods and analytes using real patients samples by using established methods as comparators. Patient samples should be banked for future use. Please comment.

**Pharmacology/toxicology**

**Study (NC101):**

1. Based on results from NC101 it appears that HBOC-201 delivers excessive amounts of oxygen to the tissue evaluated (left quadriceps muscle) and results in equally excessive global oxygenation and tissue oxygen extraction. Conversely, both stored and fresh blood normalizes tissue oxygenation parameters relative to pre-hemodilution values.

   Please comment on the performance of stored and fresh whole blood in this model and provide a rationale for why apparent tissue over oxygenation by HBOC-201 is appropriate.

2. Under conditions of hypoxia, excess oxygen delivery inevitably will lead to oxidative cascades and tissue injury.

   a. Please comment on the potential longer-term effects of excessive oxygen delivery apparently mediated by HBOC-201.

   b. Please comment on the study duration and why a short-term evaluation was chosen to address a pivotal question (i.e. does HBOC-201 provide optimal tissue oxygenation?) most appropriately determined over a minimum of 24 hours. .

   c. Please provide metHb concentrations for at least 24 hours following the final infusion of HBOC-201, tissue oxygenation parameters for at least 24 hours following the final infusion of HBOC-201 and an assessment of any tissue oxidative damage.

3. Study NC101 models a severe situation of isovolemic anemia and is intended to mimic the expected scenario for HBOC-201 utilization in clinical situations of surgical anemia related to blood loss. However, an important clinical parameter is volume status and patients generally don't require blood unless Hb falls below 6-7 g/dL. In study NC101 HES maintains the intra-vascular volume of swine.

   Please comment on and provide evidence that clinically relevant HBOC-201 administration volumes provide adequate volume expansion in a clinically relevant large animal model.

Confidential Treatment
Requested by Biopure

BP 00168

STN: 125066/0, Page 26

4.  Measurements of tissue oxygen debt such as arterial acid base balance are progressively worsened in all groups following transfusion. This has been associated with poor prognosis in clinical cases of hemorrhagic shock and is difficult to explain in this model given the improvements in other parameters of oxygenation.

    Please provide an explanation for this paradox.

5.  The model presented in study NC101 and other subsequent canine models presented in the submission involves anesthetized animals. Inclusion of a conscious animal model would have been useful to assess oxygenation parameters in the absence of mechanical ventilation and anesthetic agents.

    Please comment on why a conscious animal model was not used in any evaluation of tissue/global oxygenation.

## Study (NC093):

6.  The fact that continuous infusion of pentobarbital was used as the anesthetic may present a problem. Typically if an anesthetic is to be used in a study assessing hemodynamics one would specifically avoid pentobarbital. Pentobarbital may blunt the vasoreactivity caused by infusion of HBOC-201. Without a positive hypertensive control it would be difficult to assess the effects of the anesthetic.

    a.  Please comment on why pentobarbital was used and any effect the choice of anesthetic may have had on the study outcome as related to hemodynamics and tissue oxygenation. Previous publications by your group (e.g. Lee, et al., J. Appl. Physiol. 79(1): 236-242, 1995.) demonstrate hypertension following Oxyglobin (earlier version of HBOC-1) administration.

    b.  While, it is understood that Oxyglobin and HBOC-201 different it is unclear from the data provided how HBOC-201 affects hemodynamics in a conscious animal model. Subsequently HBOC-201 may alter hemodynamic parameters (i.e. vasoconstriction) in conscious animals, which may go on to negatively influence tissue oxygenation. Please provide evidence from a conscious large animal model that vasoconstriction does not adversely influence tissue oxygenation following infusion of clinically relevant volumes of HBOC-201.

    c.  Also, please comment on the relevance of reporting oxygen delivery determined from cardiac output without knowing organ blood flow. Can you please confirm that the distribution of cardiac output or blood flow is optimal to specific organs following HBOC-201 infusion? If not, oxygen delivery and the values of oxygenation calculated from it become less meaningful.

Confidential Treatment
Requested by Biopure

BP 00169

**Tumor oxygenation studies:**

All studies provided addressing tumor oxygenation by HBOC-201 are not relevant to the application and should not be considered in support of the concept of adequate tissue oxygen delivery in anemia. Please comment on tumor vascular similarities to that of essentially normal tissue, which would allow for a correlation of oxygen delivery within a tumor to that of normal tissue.

**Population pharmacokinetic analyses**

Under the pharmacokinetics portion of the label, you indicated that a weight-based dosing approach would yield a more consistent systemic exposure to HBOC-201. This approach may be anticipated to yield safer and equally efficacious clinical outcomes. However, your proposed dosing regimen is not weight-based. In your population pharmacokinetics analysis, clearance was found to increase with increasing body weight, which varied over the range of 23.4 kg to 170.1 kg (age: 8-90 years). HBOC-201 clearance as predicted by the model was 81% higher over the weight range of patients studied. Since the impact of body weight on HBOC-201 clearance may be different between pediatric and adult populations, please perform a separate analysis using pharmacokinetic data in adult population to examine the effect of body weight on HBOC-201 clearance. Furthermore, please determine whether weight-based dosing for HBOC-201 should be adopted. These determinations notwithstanding, as noted in question 4 under HEM-0115 (Efficacy), any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial. In turn, support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data to suggest that dosing based on such a measure is safe and likely to be efficacious. Please comment.

1.  Your phase I studies indicated the dependence of elimination half-life of HBOC-201 on dose, but your population PK analysis did not include dose as a covariate.

    Please include dose as a covariate in your population PK model to investigate the effect of dose on HBOC-201 clearance.

2.  Your population pharmacokinetic analysis report is incomplete. It did not include the final model equation and examples of its application.

    Please submit the complete study report with the results of the newly requested analyses.

**Phase I pharmacokinetics studies:**

1.  You claim that the plasma concentration of and plasma exposure to HBOC-201 (hemoglobin) are approximately proportional to dose, but no formal proportionality analysis has been done on your pharmacokinetics data.

    Please perform such an analysis using AUC vs. Dose and $C_{max}$ vs. Dose.

Confidential Treatment
Requested by Biopure

BP 00170

07/30/03 WED 16:32 FAX 8 301 827 3524 CBER/OBRR/DBA ☑005
Case 1:03-cv-11853-PBS Document 50-6 Filed 12/21/2005 Page 29 of 35

STN: 125066/0, Page 28

**Dosing in patients with hepatic and renal impairment:**

1.  Your proposed indication for HBOC-201 is for the treatment of the signs and symptoms of acute anemia in adult patients undergoing orthopedic surgery. This patient population includes patients with hepatic and/or renal impairment. Elevations of serum creatinine and blood urea nitrogen were observed in patients administered HBOC-201. However, the impact of renal and hepatic impairment on HBOC-201 clearance has not been studied and the routes and mechanisms for clearance of HBOC-201 are not clearly described.

    Please address these issues.

**Repeat dose pharmacokinetics:**

*We have this, occuly to Bruce*

1.  You have not conducted repeated dose pharmacokinetic studies using HBOC-201. Your population pharmacokinetic analysis indicated that patients who received HBOC-201 pre-operatively had, on average, a 61% lower clearance and 29% lower volume than those who did not receive HBOC-201 pre-operatively. These findings indicate that HBOC-201 involves a saturable elimination process. However, your proposed dosing regimen for HBOC-201 is up to 5 doses in 6 days, and has not characterized for its pharmacokinetics as repeated dose may lead to unanticipated accumulation of HBOC-201, it is necessary to characterize repeated dose pharmacokinetics by conducting a multiple dose pharmacokinetic study.

    *Another trial?*

    Please submit study protocol for our comments.

**Change in mean plasma hemoglobin following infusion of HBOC-201:**

1.  You have provided a table with change in mean plasma hemoglobin following infusion of HBOC-201.

    Please also provide median with range for change in plasma hemoglobin following infusion of HBOC-201.

**Other Pharmacology/Toxicology studies**

1.  The first section of your proposed label (Section 2, Dosage and Administration) describes human dosing in the context of both preclinical and clinical pharmacokinetic studies. In Section 2.2, "Additional Dose," the sentence in lines 35-37 reads that an initial dose of 60 grams of HBOC-201 will result in a plasma hemoglobin concentration of approximately 1.4 g/dL, based on data from pharmacokinetic studies in animals and humans." Please delete the word "preclinical" from this language since human dosing guidance in product labeling is not predicated on animal pharmacokinetic data. Language regarding plasma

Confidential Treatment
Requested by Biopure

BP 00171

STN: 125066/0, Page 29

hemoglobin levels achieved after administration of 60 g of HBOC-201 must be based on clinical data. (Please see question 4 in the review of efficacy of Study HEM-0115).

2. In Section 2.2 of the label, Table 1 entitled, "Extrapolated Dosage Guideline" is not informative because human dosing and administration needs to be based solely on human clinical data. As noted in question 4 under HEM-0115 (Efficacy), any dosing guidelines based on plasma hemoglobin levels require confirmation in an adequately sized and adequately powered phase 3 clinical trial. Human dosing based on plasma hemoglobin levels requires phase 2 data demonstrating that this approach is safe and efficacious. Please comment.

3. The language of lines 236-263 of the proposed package insert imply that the rat reproductive toxicity studies are less informative than the dog reproductive toxicity studies for predicting human developmental toxicities because of the lack of an inverted yolk sac structure in the human fetus and a longer time interval of histiotrophic nutrition in the rat compared to the dog. Although humans do not have an inverted yolk sac, and depend quite early in development on hemotrophic nutrition compared to other species, the histiotrophic process may supply the fetus with nutrients throughout gestation. Thus, FDA recommends that lines 257-263 of the proposed label be deleted and that more details are provided on the teratogenicity findings in the rat model. We also recommend that the rat teratogenicity results precede the language describing the dog reproductive toxicity studies in the label.

4. Instead of Pregnancy Category "C," FDA recommends that the product be labeled as Pregnancy Category "X" because:

   a. The product is teratogenic in the rat

   b. FDA does not envision a situation where use of HBOC-201 is less of a risk to a pregnant woman than red blood cells. Accordingly, please change the language of this section of the label to that stated in 21 CFR 201.57 for drugs with a pregnancy category of "X." Please comment.

5. Please refer to lines 416-421 of the proposed label. Your contention that preclinical studies suggest that Hemopure transports oxygen more effectively than red blood cells is not supported by the preclinical studies you submitted because most of the preclinical studies do not directly compare HBOC-201 treatment(s) with autologous or homologous red blood cell treatment(s). Please comment.

6. Preclinical studies with HBOC-201 in the cynomolgus model provide evidence of cardiotoxicity. The pathologic review of the studies noted that there was "a fairly strong association of HBOC-201 with heart lesions consisting of interstitial fibrosis accompanied by myocyte hypertrophy." The findings of cardiac toxicity in the Cynomolgus monkey studies should be described in detail in the HBOC- label. Please comment.



Confidential Treatment
Requested by Biopure

BP 00172

STN: 125066/0, Page 30

## Chemistry, Manufacturing and Controls

**Herd Management Program:**

1.  Please explain how Animal husbandry practices (vaccines used, vaccination schedules, anthelminthic treatments, veterinary evaluation, and quarantine of new or sick animals and effective housing facilities) are being ensured and documented in the housing facilities that are providing the source herds for your product.

2.  Please describe the health-screening program of source herds, including a list of agents that are screened, the frequency of testing, the proximity of test date to the slaughter date and the methodologies used for testing including positive and negative controls. In your response, please indicate whether necropsies are performed on animals that die unexpectedly at source herd farms. If so, how are results of these necropsies included in herd health assessment?

3.  Please provide a description of the method for the assessment of "fallen stock" as well as for any other clinical signs of disease in animals that are presented at the abattoir for blood collection. Please explain any exception with regard to the exclusion of "fallen stock" and animals with clinical signs of diseases as source animals.

**Blood Collection:**

1.  Please provide information on the type of dissection equipment that is used to isolate the jugular, its method of sanitization, and whether such equipment is single use or shared use among animals. Furthermore, please describe procedures used in dealing with accidental contamination by brain matter during the captive bolt process, and accidental contamination by the contents of the rumen following the hoisting of the animal.

2.  For general guidance, we have previously provided you with a list of Core Cattle Diseases that the Agency uses as species-specific agents of concern when bovine-derived materials are used for human biologicals production.

**Transmissible spongiform encephalopthies (TSE):**

1.  The performance of your TSE clearance studies provides some assurance of safety, however if TSE agents were discovered in source cattle for this product, these studies would not necessarily support release of the product. Additional studies may be requested by FDA in the future, as improved models for blood TSE infectivity are defined, when more is known about blood infectivity in bovines, and as assays are improved. Any safety claim with regard to TSE's in the package insert, must note the limitations inherent in the current validation studies including potential differences between TSE infectivity in blood of an infected animal and that of brain homogenates. Please comment.

Confidential Treatment
Requested by Biopure

BP 00173

STN: 125066/0, Page 31

**Process Validation:**

1.   Please explain the discrepancies with regard to the concentration of IgG after ultrafiltration stage I and II and that of post-final filtration (Tables 2.5.4.1.2.6 and 2.5.4.1.2.7, Page 3150) of C-500 intermediate. The data show an increased concentration of IgG after second filtration, whereas a decrease in the concentration is expected

2.   Please explain the rationale for the change in IgG specification for C-800 from <15.6 ng/ml in 1997 to ≤25 ng/ml in 2002 (Page 3153) as an indicator or parameter for purification.

3.   Please explain how the deviation with regard to elevated OxyHb was resolved in C-800 PQ studies (Table 2.5.4.1.4.5, and Table 2.5.4.1.4.6, Page 3161-2). Please provide complete deviation investigation reports with supporting data. It appears that increase in the % oxyHb has been a frequent occurrence, as demonstrated in the course of process validation. Please explain.

4.   Please explain how the deviation with regard to low total Hb concentration was resolved (Table 2.5.4.1.4.11, Page 3164).

5.   Please note that specification level for Boron concentration indicated for diafiltration step (DFA), as *"post-diafiltration less than pre-diafiltration result"* is unacceptable, considering that the limit of this compound may range from 600 ppm to 2.9 ppm. Please specify a numerical value for an upper acceptable limit of Boron, following diafiltration, and explain the rationale for choosing the specified limit.

6.   Following diafiltration against DFC and concentration of hemoglobin, you have specified the pH of the final solution as ≤ 9.0 at 20°C (Table 2.5.4.1.4.12, Page 3165). Please explain what would be the acceptable lower limit for pH at this stage. In your response, please provide data supporting your rationale for the specification.

7.   You have indicated that the bands that are detected between 66 and 22kD in SDS-PAGE analysis of Hemopure are likely to be stabilized hemoglobin subunits and not plasma protein impurities. Please provide characterization data to support your conclusion regarding the identity of these bands.

8.   Your viral validation studies of the ultrafiltration step used in purification of C-500 compound was performed prior to recent changes in your process. Please provide validation data to establish the relevancy of the scaled-down model, used in this validation, to the current purification conditions indicated for this step. In addition, you have indicated that you could not successfully produce three batches of C-500 for the validation of the scaled-down ultrafiltration step. In your response please provide completed validation data for this step.

Confidential Treatment
Requested by Biopure

BP 00174

STN: 125066/0, Page 32

9.    Please provide validation data demonstrating that the of the 100kD Fractionation Ultrafilter from Pall Filtron Centrasette open channel filter to Pall Filtron Maxisette Filter, would not alter viral clearance capacity of the filtration step. In your evaluation please consider the following parameters: changes in flow rate, filter conditioning step and change from constant diafiltration volume process to constant retentate hemoglobin concentration process.

**Product Characterization:**

1.    Your current measurements of oxygen dissociation equilibrium (i.e., $P_{50}$ values) of the final product, using the Hemox-Analyzer are not based on complete oxygen saturation of hemoglobin, but rather are derived at approximately 80% saturation. Therefore these values do not reflect the actual $P_{50}$ of the test article. Please provide corrected $P_{50}$ values, taking into account the level of oxygen saturation in the test article. Both the corrected value of $P_{50}$ as well as the calculated oxygen binding cooperativity (Hill coefficient) should be included in the final product specifications.

    Please note that we reserve comments on "mechanism of action" of this product as described in your label until these issues are resolved.

2.    The functional assays, used for the characterization of your product, are limited to measuring oxygen dissociation equilibrium parameters mentioned above. Please expand on these functional characteristics of HBOC-201 by determining the dependence of oxygen binding on pH (Bohr effect), chloride (Cl⁻) and temperature.

3.    Since HBOC-201 is composed of several molecular weight species, some understanding of the contributions of individual molecular species to the overall oxygen affinity ($P_{50}$) and cooperativity of the product should be established. Accordingly, please evaluate the contributions of individual molecular species to the overall oxygen affinity and cooperativity of the product and report these results to the BLA.

4.    Your data indicated that Lot H6C014 had low total hemoglobin concentration and high $P_{50}$ value. Please explain these results, and comment on a possible relationship between $P_{50}$ measurement and hemoglobin concentration, including the effect of total hemoglobin and hemoglobin species such as methemoglobin (MetHb).

5.    Carbonic anhydrase (CA) is the only impurity found in the C-500 and C-800 intermediates as detected by SDS-PAGE, immunoblotting and isoelectric focusing techniques. Other possible impurities, specifically red cell enzymes (i.e., superoxide dismutase and catalase) or their fractions should be detected by more sensitive methods. Accordingly, please present data about impurities from more sensitive assays such as, but not limited to immunoaffinity chromatography (see for example, Privalle et al., *Free Rradic Biol Med* 28:1507, 2000)

Confidential Treatment
Requested by Biopure

BP 00175

STN: 125066/0, Page 33

**Stability:**

1. Final product stability data indicate an apparent temperature-dependent increase in the high molecular weight fraction over time (>500 kD). As a case in point, it appears that at the 25 °C storage condition the high molecular weight fraction (>500 kD) will exceed its specification limit (≤15%) *prior* to the proposed 3-yr expiration (Page 6697-6705, Lots H01C03 – H01C11).

   a. Please explain the apparent temperature-dependent increase in the high molecular weight fraction (>500 kD) over time, and its potential impact on your proposed shelf life for the product at 25 °C.

   b. Please provide updated stability data for final product lots manufactured in 2002 and 2001.

2. You have indicated that a two-column high performance size exclusion chromatography (HP-SEC) system (YMC-S, QT-0541) will be used to determine the molecular weight size distribution of final product instead of the one-column system (BioRad BioSil, QT-0394). Used in previous analysis.

   a. Please provide complete validation studies for the newly developed HP-SEC method, and explain the rationale for implementing this new methodology.

   b. You have indicated that the high molecular weight species (>500 kD) are not resolved using the newly developed two-column HP-SEC system (YMC-S). Please explain how the high molecular weight species will be measured in the final product.

   c. Please provide data to demonstrate the comparability of molecular size determinations obtained using the one-column HP-SEC system (BioRad BioSil, QT-0394) with those obtained using the two-column HP-SEC system (YMC-S, QT-0541). In your response please indicate how the use of two different systems, over time, will effect the interpretation of the stability data with regard to the molecular size determination.

3. The final product release specification for N-acetylcysteine (0.13 – 0.22%) differs from its specification for the stability of the final product (0.02 – 0.22%). Please explain why is stability specification lower than release specification for -N-acetylcysteine.

4. Please measure the degree of autoxidation (i.e., methemoglobin formation) of final product at different temperatures (i.e., 5, 25, and 37°C) once it is removed from the inner pouch. For a given lot of the product, please compare these measurements at the beginning and at the end of the product shelf life.

Confidential Treatment
Requested by Biopure

BP 00176

07/30/03 WED 16:35 FAX 9 301 827 3524     CBER/OBRR/DBA     @011
Case 1:05-cv-11853-PBS     Document 50-6     Filed 12/21/2005     Page 35 of 35

STN: 125066/0, Page 34

5.  Please include the measurement of free iron/chelatable iron in the final product as an additional product release specification and as a stability-indicating test, to assess and monitor potential product degradation.

6.  In- process testing of phospholipid content was conducted in the manufacturing of C-500 qualification lots. However, this measurement was discontinued in lots that have been manufactured subsequently. Pease note that phospholipid content is considered a critical measure of purity for this intermediate, and therefore its determination should be included as a final release test for the C-500 intermediate

**Package Inserts:**

We reserve comments on the labeling issues for the package insert until the BLA is otherwise acceptable.

*no issue*
*Age*
*Contraind.*
*Ind:*

**Preapproval Inspection:**

1.  Inspectional issues from the February 3 through 7, 2003 and March 17 through 27, 2003 pre-approval inspection have not been resolved.

*no new clericale at this time prior to approved.*

You may request a meeting with CBER to discuss the above steps for approval. Please request the meeting at least 15 days prior to the proposed meeting date. Alternatively, you may choose to discuss this matter via a telephone call. Should you wish this meeting or a telephone discussion please call Mr. Franklin T. Stephenson in the Division of Blood Applications at 301-827-3524.

*Request mtg*

Within 10 days after the date of this letter, you are requested to take one of the following actions: (1) amend the application; (2) notify us of your intent to file an amendment or a new submission; (3) withdraw the application; or (4) request an opportunity for a hearing on the question of whether there are grounds for denying approval of the application. In the absence of any of the above responses, CBER may initiate action to deny the application.

Please note our review clock has been suspended with the issuance of this letter. Note also that any amendment should respond to all deficiencies listed and that a partial reply will not be considered for review nor will the review clock be reactivated until all deficiencies have been addressed.

*Electronically*

Sincerely yours,

Basil Golding, M.D.
Director,
Division of Hematology
Office of Blood Research and Review
Center for Biologics
    Evaluation and Research

Confidential Treatment
Requested by Biopure

BP 00177

# EXHIBIT F

FOOD AND DRUG ADMINISTRATION
CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

MEMORANDUM

**Date:**        15-Mar-2004
**From:**        Franklin Stephenson,  CBER/OBRR/DBA/RPMB, HFM-380
**To:**          File
**Subject:**     Revised Official Meeting Minutes (CRMTS#3896)

**Meeting Date:**     6-Jan-2004        **Time:** 1:00 -3:00 PM EST
**Location:**  Woodmont Office Center I, Conf.# 1
**Meeting Requestor / Sponsor: Biopure**

**Type of Meeting: Type B  (Face-to-face)**
**Product: HBOC-1**

**CBER Meeting Leader: Dr. Laurence Landow**
**Recorder: Mr. Franklin Stephenson and Ms. Cheryl Campbell**

**Biopure Attendees:**
Mr. Jo Fladger
Dr. Maria Gawryl
Dr. Douglas Hansell
Mr. Thomas Moore
Dr. Martha Reitman
Mr. Frank Sasinowski
Ms. Josephine Torrente
Mr. David Zuchero

**FDA Attendees:**
Dr. Paul Aebersold
Dr. Abdu Alayash
Dr. Paul Buehler
Ms.Cheryl Campbell
Dr. Jay Epstein
Mr. Jeffrey Francer
Dr. Basil Golding
Ms. Patricia Holobaugh
Dr. Laurence Landow
Dr. Kimberly Lindsey
Dr. Tie Hua Ng
Dr. Toby Silverman

**K- 063**

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

1

Mr. Franklin Stephenson
Mr. Robert Wesley
Ms. Denise Zavagno

**Purpose:** To discuss the progress in responding to the Complete Response letter under STN: 125066/0 dated July 30, 2003, review to the HBOC-201 indication statement and review of overall HBOC-201 clinical development plan.

**Discussion points/ agreements:**

After introductions, Mr. Frank Sasinowski, regulatory counsel, made remarks on behalf of Biopure. He stated that Biopure has carefully considered FDA's comments captured in the July 30, 2003 Complete Response letter and will respond in due time. However, for the current meeting, Biopure was asking that its product, HBOC-201, be "radically repositioned" for a limited indication where blood is not available during surgery (rather than as an alternative to blood in surgery). Biopure sought FDA's concurrence to assemble and present a BLA for HBOC-201 only for patients for whom blood is not available during surgery. Mr. Sasinowski stated that there are various examples of restrictive licensing that FDA has permitted without the need for new clinical studies. Mr. Sasinowski stated that such second line use of a product is common for cancer drugs and it is common to place such drugs in a niche where a product is needed and where a product can meet a currently unmet need. He stated that there were examples of drugs other than cancer drugs that have also been handled in a similar fashion. For example, Mr. Sasinowski stated that there have been adjustments to indications for use after safety findings in studies for primary use indicated that the drug lacked an adequate safety profile for primary use but where use as a second line drug might be appropriate. Mr. Sasinowski stated that Biopure has vetted such a concept with Drs. Fratantoni (formerly of FDA) and Conry-Cantilena (of NIH transfusion medicine service), who were said to agree with the possibility of a "second line" limited indication for HBOC-201. Mr. Sasinowski stated that Biopure is asking if FDA concurs with a plan to reassemble the BLA for this more limited use. In addition, Biopure will ask for another meeting to discuss separately the good clinical practice (GCP) issues and the preclinical issues as well as a phase 4 program. Mr. Sasinowski stated that Biopure must have a path forward for resubmission to the BLA.

Dr. Hansell presented overheads of the Biopure presentation (included). Biopure believes that the company has a very exciting technology with the potential to impact health care on a very broad level. However, Dr. Hansell stated that the product has side effects. Biopure hopes to continue to work with this product and the company is trying to listen carefully to FDA. Dr. Hansell stated that Biopure understands that FDA has questions about the conduct of the study, about the interpretability of the data, and about the safety of the product in general. Biopure has also heard general concerns about the drug as a broad replacement for red blood cells. Dr. Hansell stated that Biopure wishes to shift its focus to try to

K- 064

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

2

mitigate those concerns. Biopure is looking for a path forward to broader use of the product and is hoping to understand a pathway for use of the product in the United States.

Dr. Hansell reviewed Biopure's requested new indication. Specifically, Biopure seeks the following indication:

"HBOC-201 is indicated for the treatment of anemia associated with surgery. HBOC-201 should only be used when red blood cell transfusion is not an option."

Dr. Hansell then reviewed the clinical situations to which this indication statement might apply and claimed that these were situations where there was an unmet medical need:

1.    Red blood cell alloimmunization: 1-2% of patients requiring type and cross in teaching hospitals
2.    Rare blood type where blood is needed before suitably matched blood can be obtained
3.    Hemolytic anemia (which Dr. Hansell stated is a medical indication)
4.    Patients who refuse blood, including those who refuse because of religious objections (more than 1 million with religious objections)

Dr. Hansell reviewed the situation of alloimmunization to red blood cells. Dr. Hansell stated that the majority of such patients are either sickle cell disease patients or have a thlassemic condition. There are approximately 150,000 sickle cell disease patients in the United States, of whom approximately 20-40% are alloimmunized. Dr. Hansell stated that other causes for alloimmunization include aplastic anemia following multiple transfusion, and multiparous females. He also stated that the incidence of thalassemia outside the United States is greater than in the United States, but increasing immigration has increased the prevalence in the United States.

Dr. Hansell reviewed data from Carson et al., published in Lancet in 1996 and reanalyzed by Carson in 2002. Dr. Hansell stated that in this retrospective study of 2083 patients, there were 1958 surgical patients over the age of 18 who were not undergoing cardiac surgery and who refused blood transfusion. The analysis of the data was based on preoperative total hemoglobin level and the primary endpoint was day 30 postoperative mortality. Dr. Hansell stated that the study demonstrated that mortality increased with decreasing preoperative total hemoglobin. Biopure has re-evaluated the deaths in the HEM-0115 study. Dr. Hansell stated that there were 4 deaths in the RBC control group and 10 deaths in the HBOC-201 treated group. Dr. Hansell stated that there was no particular pattern to the distribution of deaths in either group, but overall, the number of deaths was significantly lower than in the Carson study at each level of preoperative total hemoglobin. Dr. Hansell claimed that study HEM-0115 demonstrated avoidance of allogeneic red blood cells and that the test group

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

appears to have a favorable risk/benefit outcome when compared with the data from the Carson study. Dr. Hansell stated that when looking at the demographics of the Carson patients, it was apparent that cardiovascular history and operative blood loss were important variables in overall mortality.

Dr. Hansell presented Biopure's position that HBOC-201 addresses an unmet medical need in patients with a surgically associated anemia in whom blood transfusion is not an option. He claimed that HBOC-201 has an acceptable safety profile from over 1000 patients treated with product. Biopure believes that the existing data indicate that HBOC-201 has a favorable safety profile for use where blood is not an option during surgery. Dr. Hansell stated that other sources of support for the new indication include additional experience in over 200 patients in South Africa and from 33 compassionate use cases where HBOC-201 was used as an extreme rescue.

Biopure proposes to extend the existing experience with HBOC-201 in a phase 4 program, particularly in the setting when blood is not an option in a surgical setting. The objectives of such a phase 4 program would be to evaluate repeat dosing of the product using plasma hemoglobin as a guide to dosing, expanded safety monitoring and study in special risk populations, and evaluation of use of the product in combination with erythropoietin. Biopure seeks to understand better the use of the product in special risk populations. Finally, Biopure proposes to put in place an initial risk management program to direct the use of the product to the approved indication. Such a program would be accomplished by labeling, physician education, and post marketing surveillance of use.

Dr. Hansell summarized Biopure's position as follows:

1. HBOC-201's efficacy and safety for this indication can be determined by existing data;
2. HBOC-201's risk benefit profile is favorable when blood is not an option;
3. Biopure will conduct appropriate post marketing clinical trials and a disciplined risk management program.

Questions:

1. **Does the Agency agree that it is appropriate to consider the revised indication statement, "HBOC-201 is indicated for the treatment of anemia associated with surgery. HBOC-201 should only be used when red blood cell transfusion is not an option," for first approval of HBOC-201?**

Dr. Epstein turned the discussion over to Dr. Landow. Dr. Landow stated that the Carson data published in 1996 and cited by Biopure are not as strong as presented by Biopure. He noted that in 2002, Carson et al. published a follow-up paper in which the authors retreated from the conclusions about the association between preoperative total hemoglobin and mortality. Dr.

**K- 066**

4

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

Landow made the following comments about the data published by Carson and their applicability to the proposed indication:

a.  The Carson data were collected from 1981 to 1994, yet management of patients who refuse allogeneic blood has changed over the past 10-20 years, e.g., introduction of Epogen, the explosion in "bloodless surgery" centers, autologous donation, etc.

b.  Potential futility of HBOC-201 administration: Overall, the leading cause of death by day 30 among Carson's patients was cancer (35% of 63 patients who died). It is possible that in some cancer patients, no amount of HBOC could have reduced the mortality rate had HBOC been available and used.

c.  There are apparent inconsistencies in Carson's data: Carson et al. hypothesized (and found) that coronary artery disease was a significant covariate for mortality. However, even though there was an 11.3% prevalence of angina, MI, CHF, or peripheral vascular disease in the population, the incidence of acute MI in this anemic population was very small (0.4%), an issue not addressed by the authors.

d.  Imprecision of the estimates: only 36/1958 (2%) of patients had a total hemoglobin less than or equal to 6 g/dL. Thus, the 95% confidence intervals for mortality rate in this subgroup were 18.6%, 51.0%.

e.  Cause of death: In their 1996 article, Carson et al stated, "Anemia was assigned as the underlying cause of death when patients died from sequelae of severe anemia without another apparent cause of death." In their subsequent 2002 article, Carson et al stated, "We chose not to try to classify the cause of death in this study population because it may be inaccurate. There are several case reports since 1993 of medical and surgical patients surviving with Hb levels of 2.0 to 5.0 g per dL, ..."

Dr. Landow stated that safety of HBOC-201 was not demonstrated in study HEM-0115, particularly when blood was available, and therefore use in other surgical settings is not justified by the existing data. FDA cannot judge how patients would have fared without either red blood cells or HBOC-201; therefore the Agency cannot know if patients treated with HBOC-201 would have done better or worse than patients receiving standard of care without red blood cells.

Dr. Epstein summarized the FDA position. He stated that Biopure had failed to demonstrate safety and efficacy of the product compared to blood. He stated that the historical data are not adequate and that FDA does not have clinical equipoise about use of the product under the conditions proposed by Biopure. FDA cannot "grandfather" the indication, cannot extrapolate from the historical control data, and cannot use the historical control data because they are confounded by the period effect. Dr. Epstein stated that an indication for use of a product when red blood cells are not available is a valid and credible indication; however the

K- 067

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

5

validity of the indication is separable from whether or not the dataset is adequate to support Biopure's proposed indication. Dr. Epstein raised the following issues:

a. How should the indication of use where blood is not available or cannot be used be validated?

b. The existing data from the BLA are not sufficient to support the proposed indication.

c. The comparison of data from the HBOC-201 arm of study HEM-0115 to data from the Carson study is confounded because patient demographics are not the same and the standard of care is better now.

2. **Does the Agency agree that efficacy data from the original BLA, along with the data from Biopure's compassionate use program, could be sufficient to assess the efficacy of HBOC-201 for this indication?**

3. **Does FDA agree that a comparison of the BLA safety data to historical data on surgical outcomes when blood is not available could be sufficient to assess the safety profile of HBOC-201 in this limited population?**

4. **Does the Agency have additional comments on Biopure's development plan for HBOC-201?**

FDA indicated that the Agency has concerns about the safety of HBOC-201 based upon the data submitted in the BLA. Dr. Epstein stated that in order for Biopure to pursue its new proposed indication, FDA will want to see data from additional, well-controlled preclinical studies before any additional clinical trials may be performed. Biopure and FDA will also need to discuss the clinical development plan for the new proposed indication.

Dr. Landow discussed the safety issues discovered during review of the BLA application. Dr. Landow stated that the review raised serious concerns about safety. FDA reviewers had evaluated all case report forms in their entirety, with emphasis on investigator-described serious adverse events, questions raised by the CROs concerning such events, and answers given by investigators in response to these questions. Dr. Landow stated that there were a number of very serious adverse events. Specifically, he noted that there were statistically significant differences in morbidity between the HBOC-201 group and control groups with respect to the following types of adverse events:

    CHF/pulmonary edema
    Myocardial infarction
    Diagnosed by elevated CK-MB
    Diagnosed by elevated troponin
    Hypertension
    Hypoxemia/desaturation/cyanosis
    Pneumonia/respiratory failure

K- 068

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

6

Hypovolemia
Oliguria
Confusion

Dr. Landow stated that these findings raised red flags about the safety of the product.

Mr. Sasinowski claimed that Biopure had not seen the safety analyses described by Dr. Landow and that the numbers discussed were not in the CR letter.

Dr. Silverman stated that Biopure had seen similar information that had been provided in one of the clinical hold letters for IND 10962.

Dr. Silverman summarized the efficacy findings for study HEM-0115. Dr. Silverman stated that while the study had met the primary endpoint for avoidance of allogeneic transfusion, it appeared that patients in the control red blood cell arm had been transfused inappropriately. Dr. Silverman noted that patients in the control group were discharged from hospital with an average hematocrit of 31 whereas patients in the test group were discharged with a hematocrit of 28, on average. This difference in hematocrit amounts to the approximate equivalent of a unit of blood transfusion. Performing a thought experiment -- giving an extra unit of blood to the test patients – essentially eliminates the benefit of avoidance of allogeneic red blood cell transfusion.

Dr. Epstein summarized, stating that there are unresolved issues related to both efficacy and safety of the product. He stated that the safety issues are troubling and require additional animal studies for resolution.

Mr. Sasinowski stated that Biopure was aware of these issues from the CR letter. He asked whether FDA could reconsider the data for a different indication or whether the issues raised by FDA could be resolved for the new indication as a review issue.

Dr. Golding replied that FDA has raised a fundamental issue of efficacy, not just safety, and that FDA has asked for new animal studies.

Mr. Sasinowski agreed that the product had to be efficacious as well as safe.

Dr. Hansell addressed some of the efficacy analyses. He stated that the discharge hematocrit for the HBOC-201 group was different from that for the control group. However, Biopure views the product as a bridge; Biopure expected a difference in hematocrit. Further, a hematocrit of 28% is generally acceptable and is not clinically different from 31%. He also noted that some patients receiving 2 units back-to-back were being treated at sites above 5000 feet elevation. Finally, the primary endpoint of avoidance was met in HEM-0115.

**K- 069**

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

7

Dr. Silverman noted that overall efficacy of the product was demonstrated predominantly among patients receiving either the loading dose of the product or the loading dose plus one or two more units of the product Patients eligible to receive another unit of HBOC-201 often did not receive the next dose because physicians either noted adverse events or felt that they could not monitor patient status adequately. Only 30 or so patients had received the full 10 units of HBOC-201 that they were eligible to receive. Dr. Silverman and Dr. Aebersold noted that patients in the clinical trial were not comparable to the patients in the Carson study. Two points follow: in protocol HEM-0115, product or blood had been administered at transfusion triggers that included higher total hemoglobin levels. Dr. Aebersold noted that study HEM-0115 does not support extrapolation to the situation where surgical patients who cannot get blood might reach lower hematocrits and receive more units of HBOC-201. Second, since patients who refuse blood are generally not likely to reach the low total hemoglobin levels that are associated with higher mortality rates, it is conceivable that use of the product might not be as safe as current standard of care without red blood cells.

Mr. Sasinowski stated that if FDA concurred, Biopure would start to reassemble the BLA.

Dr. Landow replied that the pathway forward was for Biopure to perform the requested *animal studies*.

Mr. Sasinowski replied that he had not heard FDA state definitively that the safety profile of the product was not acceptable for patients who cannot get blood. He noted that being safe compared to blood is a high standard, but that Biopure is asking for a comparison to not getting blood.

Dr. Landow responded that animal data are needed before considering new clinical trials in order to move forward with the new indication.

Dr. Epstein stated that if non-inferiority of the product had been demonstrated against red blood cells, then the product might have been indicated for use where blood is not available. However, FDA now has additional concerns about safety and efficacy that need to be resolved before Biopure can move forward with additional clinical studies and potential approval.

Dr. Epstein summarized the FDA position as follows:

    a.    Can the safety issues be resolved? Additional animal studies are necessary to resolve safety concerns before proceeding to clinical trials, even for the "narrow" indication. If these issues cannot be addressed satisfactorily, then additional human studies may not be possible.

**K- 070**

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

b.  If the safety issues are resolved (as noted above), then clinical trials for the "narrow" indication can be contemplated.

c.  FDA cannot extrapolate safety and efficacy from subjects in HEM-0115 to subjects who are unable to receive blood cell transfusions.

d.  Historical data from the Carson paper cannot be used because the standard of care has changed significantly since that time.

Dr. Epstein further stated that the way to move forward is for Biopure to conduct the three preclinical studies outlined in the clinical hold letters for IND 10962 and, if the product can attain suitable clinical equipoise, to design and conduct a clinical study for the new use.

Dr. Gawryl asked whether FDA wanted to see more animal studies than had been outlined in the clinical hold letters for IND 10962. She stated that Biopure wants to do the requested studies, but there are many studies that have been performed that were submitted in the BLA.

Dr. Silverman indicated that Biopure had received extensive comments on the preclinical program presented in the BLA.

Dr. Gawryl noted that there had been no comments on any of the "complete blood volume replacement" studies.

Dr. Golding stated that Biopure should evaluate the safety and efficacy of the product from the clinical trials, look at the FDA comments, and consider what has already done in animal models. With respect to safety, it may not be possible to extrapolate from animals to humans. He also noted that the efficacy issues of adequacy of oxygen delivery might present as safety issues clinically.

Dr. Gawryl asked whether Biopure would need to perform another clinical study if the preclinical data addressed the concerns.

Dr. Landow stressed that the IND 10962 clinical hold letter had stated that at least 3 preclinical studies would be required. Since HBOC-201 was vasoactive and could result in clot disruption and increased bleeding, an uncontrolled hemorrhagic shock + resuscitation model would also be required.

Dr. Silverman noted that it appeared that in requesting a new indication, Biopure was conceding FDA's assessment about the safety of the product relative to the safety of blood and about the relative efficacy of the product. Representatives of Biopure stated that they disagreed with FDA's comments relating to the safety and efficacy data of HBOC-201 as well as any implication that Biopure's discussion of a more limited indication conceded such comments.

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

9

Mr. Sasinowski stated that Biopure is looking for a faster way to license the product and fully intends to address directly the issues raised by the CR letter for the use in orthopedic surgery. Thus, Mr. Sasinowski stated that Biopure had not come to the meeting prepared to challenge the FDA evaluation of the product. Rather, Biopure seeks to license HBOC-201 for a narrow, "almost orphan" indication.

Dr. Silverman disagreed with Mr. Sasinowski about the narrowness of the indication. She stated that if patients fear blood as much as media reports indicate that they do, then the indication was really very broad.

Dr. Hansell briefly reviewed the safety information. He stated that Biopure had noted that certain underlying medical conditions had predisposed patients randomized to the test group to experience more adverse events. Biopure is conducting exploratory analyses in order to understand predisposing factors better.

Dr. Aebersold and Dr. Silverman noted that exploratory analyses do not resolve the safety issues; rather, they suggest parameters to be incorporated into a new study protocol. Exploratory analyses are hypothesis generating.

Dr. Epstein stated that data reanalysis is not likely to resolve the outstanding issues with respect to Biopure's BLA given the startling findings in the clinical trial. If Biopure reanalyzes its datasets and submits them to FDA, then FDA will review the submission. Dr. Epstein stated that the safety issues are not mitigated by the new "narrow" indication.

Dr. Epstein suggested that the remainder of the meeting be used to start the discussion about the three animal studies suggested by FDA. Since Biopure has indicated a willingness to perform the requested studies, FDA would be willing to arrange another meeting to discuss the design of the protocols. Dr. Epstein stated that one way forward for Biopure would be as follows:

    a.    design and conduct the suggested animal studies

    b.    pending outcome of the three animal studies and a study in an animal model of uncontrolled hemorrhagic shock + resuscitation, design and conduct suitably controlled studies in humans

Mr. Sasinowski stated that representatives of Biopure were listening very carefully to what FDA is saying. He noted "for the lawyers at the table" that Biopure is having difficulty raising money and that the company is a going concern. Mr. Sasinowski stated that there might be a need for Biopure to make a resubmission in order to keep the company going. Thus Mr. Sasinowski stated that Biopure may nevertheless proceed with their resubmission.

K- 072

10

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

Dr. Epstein replied that FDA will review a resubmission, but that FDA had told Biopure as strongly as FDA could that such a review is not likely to be "dispositive." Dr. Epstein stated that he was pessimistic that the concerns raised by FDA could be completely resolved by a resubmission to the BLA. He suggested that if Biopure does make a resubmission, perhaps Biopure would include both the data from the new animal studies as well as a re-analysis of the clinical data in order to further long-range understanding of the toxicities.

FDA and Biopure agreed to follow up meetings (by telephone or face to face) to discuss the animal studies. Dr. Buehler noted that Biopure will need to conduct an additional preclinical study of uncontrolled hemorrhage, as noted by Dr. Landow.

5. **Would the appropriate Agency individuals be willing to participate in a meeting to discuss and provide input on a detailed plan for reconstructing the clinical databases and associated issues so that Biopure can move forward in its response to the BLA comments?**

This question was not directly addressed at the meeting.

Summary:

1.    Question 5 was not addressed directly at the meeting

2.    After examination of Biopure's BLA and consideration of its presentation, FDA concluded:

   a.   Additional animal studies are necessary to address efficacy and safety concerns before proceeding to further clinical trials, even for the "narrow" indication. The existing data from the BLA are not sufficient to support the new proposed indication of use when blood cannot be used in surgery.

   b.   FDA and Biopure will meet to discuss the design of these preclinical studies.

   c.   If FDA's concerns regarding safety and efficacy cannot be resolved by animal studies, then human studies for use where blood cannot be used or where blood is not available in surgery may not be possible.

   d.   If FDA's concerns are addressed (as noted above), then clinical trials for the "narrow" indication may be contemplated.

Historical data such as the Carson paper cannot be compared with data from HEM-0115 in support of a new, limited indication because patient demographics

**K- 073**

11    PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

are not the same and because standard of care has changed since the time of the Carson study.

Biopure intends to address both the GCP and the clinical trial data issues identified in the complete review letter. FDA recommends that Biopure's response include results of the requested animal studies.

K- 074

PRODUCTION RE: BIOPURE CORP., SEC No. B-01987
CONFIDENTIAL TREATMENT REQUESTED BY
THOMAS J. DOUGHERTY, SKADDEN, ARPS, BOSTON,
617-573-4800; FOIA EXEMPTION CLAIMED
PRIOR NOTIFICATION REQUESTED BEFORE ANY
DISCLOSURE

12