UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action ) No. 05-11853-PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER, | ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RULE 16 CONFERENCE

Robert A. Buhlman
Donald J. Savery
Machael D. Blanchard
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, Massachusetts 02110
(617) 951-8000

Counsel for Defendant Biopure Corporation

John. D. Hughes
Cathy A. Fleming
Mary-Pat Cormier
Joey H. Lee
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, Massachusetts 02199
(617) 239-0100

Counsel for Defendant Howard Richman

Thomas J. Dougherty
Justin J. Daniels
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendant Jane Kober

Edward P. Leibensperger
Bobby R. Burchfield
Jason A. Levine
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, Massachusetts 02109
(617) 535-4046

Counsel for Defendant Thomas Moore

Pursuant to Federal Rule of Civil Procedure 16(a), Defendants Biopure Corporation ("Biopure"), Thomas Moore, Howard Richman, and Jane Kober (collectively "Defendants") respectfully submit this memorandum of law. Defendants seek a conference or hearing with the Court on February 10, 2006, or as soon as practicable, for the purpose of ordering the Government – a party in this action – to cause the immediate production of documents and personnel requested from the Food and Drug Administration ("FDA").

## I. INTRODUCTION

Defendants seek resolution of a fundamental trial preparation problem that goes to the heart of Defendants' ability to try their case. The problem is acute because the trial is scheduled to commence on May 8, 2006 – a date to which Defendants are committed.[1] This request is consistent with the Court's instruction, during the November 22, 2005 Scheduling Conference, that the parties promptly bring forward any issues that require its attention.

The Government is affirmatively preventing Defendants' access to critical discovery that is central to their defense. Specifically, the FDA – with the support of the Securities and Exchange Commission ("SEC") – refuses to comply with Defendants' discovery requests for documents and depositions of FDA witnesses citing regulations, notwithstanding that the FDA apparently voluntarily and expeditiously responded to informal SEC off-the record requests for information. This prosecutorial gamesmanship potentially has grave consequences for Defendants, impacts their entire case strategy, obliterates the Court's schedule and violates both

---

[1] See Defendants Memorandum of Law in Support of Joint Motion to Shorten Response Time to Request for Admission and to Expedite Summary Judgment Hearing, filed October 31, 2005, and Defendants Memorandum of Law in Support of Their Pre-Trial Plan, filed November 17, 2005. In those filings and before this Court the Defendants have pointed out that a prompt resolution of this matter is necessary due to the pressures placed on them by the pendency of this action, and the extended time period with which they have already had to endure these pressures given that the SEC's investigation began over 2 ½ years ago.

the fundamental fairness that underlies the spirit and purpose of the discovery rules and Defendants' constitutional rights to due process under the Fifth Amendment.

On February 1, 2006, this Court denied Defendants' Motion to Preclude FDA Evidence From the Trial of This Matter ("Defendants' Motion to Preclude"). Although the issues raised in this Memorandum are related to the issues raised in the Defendants' Motion to Preclude, the events of the past two weeks, described more fully below, compel the Defendants to ask the Court to exercise its authority to order the Government to appear. See Fed. R. Civ. P. 1, 16, 26, 37; In re Atlantic Pipe Corp., 304 F.3d 135, 143 (1st Cir. 2002) (citing Court's inherent authority to manage and control the disposition of cases on its docket).[2] Our position is simply this: The Government should comply with proper discovery requests in this Court which are essential to the Defendants' case or suffer appropriate sanctions, including dismissal. This Court has the power to require the Government to choose between these results.

## II. BACKGROUND

### A. Pertinent Procedural History

After a 2 ½ year investigation, the SEC filed this action on September 14, 2005. During the preceding 2 ½ year period – while investigating Biopure, its employees and former employees, counsel, and Board members – the SEC worked closely with the FDA and apparently had unfettered access to the FDA's employees, documents, and files. The document and information sharing between the two agencies was a manifestation of their ongoing joint efforts,

---

[2]   The Court also has the inherent power to fashion other remedies for a party's failure to provide crucial discovery. For example, Federal Rule of Civil Procedure 37(b) outlines specific sanctions for failure to comply with discovery orders: that certain matters be taken as established, refusing to allow disobedient parties to support or designate certain claims or defenses, prohibiting disobedient parties from introducing certain matters into evidence, striking out pleadings or various parts thereof, dismissing the action, rendering a judgment by default against the disobedient party, holding disobedient parties in contempt, or order monetary sanctions. Fed. R. Civ. P 37(b). The Court may also issue a trial subpoena pursuant to Rule 45 with a return date well in advance of the trial.

as publicized in a February 2004 press release.  <u>See</u> http://www.fda.gov/bbs/topics/news/2004/new01019.html, attached as Exhibit A.

Indeed, the entire investigation of Biopure was instigated by an August 8, 2003 communication from the FDA to the SEC.  <u>See</u> Exhibit B.  This included the SEC's "extensive" informal "off the record" access as early as October 2003 to key FDA personnel involved in Biopure's applications.  <u>See</u> Exhibit C.  The SEC went out of its way to thank the FDA for its unquestionably invaluable assistance:  "Thank you very much for your assistance with this request and for the extensive time and effort you and Dr. Silverman (a key FDA witness) have offered to this office in connection with our investigation."  <u>Id.</u>

## B. <u>Defendants' Consistent and Unavailing  Attempts to Obtain Discovery</u>

As early as October 2004, long before the SEC filed its complaint, certain of the parties who were later named as defendants in this action filed Freedom of Information Act ("FOIA") requests with the FDA for the production of certain documents related to Biopure.  <u>See</u> Exhibits D and E, attached.  The FDA responded on October 19, 2004 and July 15, 2005 but gave no time frame for production:  "We will respond as soon as possible."  <u>See</u> Exhibits F and G, attached. No further response has arrived.  Following the filing of the Complaint on September 14, 2005, Biopure served subpoenas on the FDA and one of its divisions, the Center for Biologics Evaluation and Review ("CBER") on November 2, 2005.  Two subpoenas sought the production of business records and the depositions of the FDA and CBER recordkeepers.  A third subpoena sought the deposition of Lawrence Landow, an employee of CBER.  <u>See</u> Exhibits H through J. Two additional subpoenas were served on two other crucial FDA witnesses for the case, Franklin Stephenson and Toby Silverman, on or about January 17, 2006.  <u>See</u> Exhibits K and L, attached.

On November 15, 2005, the FDA objected to Biopure's November 2, 2005 subpoenas and refused to produce anything or anyone in response.  <u>See</u> Exhibit M, attached.  Seven days later, the SEC appeared at the November 22 Scheduling Conference before this Court.  It <u>agreed</u> to the April 14, 2006 fact discovery and expert discovery deadlines.  It <u>agreed</u> to the May 8, 2006 trial date – a date that ensured the Defendants that this case would be decided without prolonged delay, which would only cause them further harm.  The SEC did not advise the Court that it intended to oppose Defendants' then-pending subpoenas to the FDA.

The FDA's position in its November 15 letter is, in essence, that "the FDA cannot be compelled to testify or produce records in response to a subpoena issued [under] the Federal Rules of Civil Procedure," but that requests for information could be placed in the "Freedom of Information Act queue."  <u>See</u> Exhibit M, attached.  This failure to provide documents and testimony created a serious impediment to the Defendants' case.  On December 9, 2005 Biopure filed its Motion to Compel FDA Compliance with Federal Subpoenas ("Motion to Compel") in the U.S. District Court for the District of Columbia ("D.C. Court").  The SEC filed its Response to Biopure's Motion to Compel on December 23, 2005, supporting the position of the FDA in avoiding compliance.  On December 23, 2005, the FDA also filed a consolidated Opposition to the Motion to Compel and a Motion to Quash.

On January 24, 2006, the FDA sent a three-page letter to Biopure objecting to the January subpoenas to the FDA employees, Mr. Stephenson and Dr. Silverman on the same grounds as its objections in the November 15, 2005 letter.  <u>See</u> Exhibit N, attached.  The FDA also offered again to discuss the FOIA avenue for obtaining information from the FDA.  According to the FDA, it would take "<u>over a year</u> to search for, identify and copy responsive documents.  Redaction of responsive documents would require an additional six months to a year."  <u>Id.</u> at 3

_522435_2/

(emphasis added).  This means, of course, that this case would be on hold for up to two years. The FDA also restates the SEC's argument, namely, that the SEC has those documents that the Government deems necessary for the case, and that Defendants accordingly are not entitled to, and do not require, anything else.

On January 20, 2006, a Magistrate Judge of the D.C. Court denied Biopure's Motion to Compel and granted the FDA's Motion to Quash.  See the D.C. Court's Memorandum Opinion and Order ("D.C. Court Order"), filed with this Court on January 23, 2006, a copy of which is also attached hereto at Exhibit O.  Defendants have filed a motion for reconsideration of this portion of the ruling with the D.C. Court.  At the FDA's suggestion in its underlying paper, the D.C. Court further ordered the parties "to confer for the purpose of narrowing the scope of Biopure's requests and allowing the FDA a reasonable amount of time to respond . . . the parties are directed to meet and confer at a mutually convenient place and time, to make a good faith effort to effect a resolution of this dispute."  See Exhibit O, attached.  Defendants did not move for reconsideration of that portion of the Order.

On January 23, 2006, Biopure faxed and sent a letter to the FDA suggesting dates between January 27 and February 8 to confer as per the D.C. Court Order, including a request for the earliest available meeting date, emphasizing that "time is of the essence".  See Exhibit P, attached.  On January 26, 2006, the FDA scheduled a meeting on Monday, February 6, 2006, for two hours at the FDA's Rockville, Maryland offices.  See Exhibit Q, attached.  Defendants remain committed to complying with the D.C. Court Order to meet and confer with the FDA.

On February 1, 2006, in an effort to obtain FDA cooperation and to facilitate the FDA's compliance with the D.C. Court's Order, Defendants sent to the FDA a list of requested documents and employee depositions, narrower and more specific than previously demanded.

See Exhibit R, attached.  On February 2, 2006, in direct violation of the D.C. Court Order requiring the parties to meet and confer in good faith, and notwithstanding the scheduled time by agreement between the FDA and Defendants to do just that in Rockville, Maryland on the following Monday, the FDA sent a letter to Defendants unilaterally canceling the February 6, 2006 meeting.  See Exhibit S.  The FDA stated that, in light of Defendants' motion in the D.C. Court of Appeals to reconsider the ruling of the D.C. Court, and in accordance with a (new and inexplicable) position taken by the FDA that the D.C. Court Order requiring good faith negotiations was inconsistent with that Order's underlying holding, it was "in the interests of all to await the [D.C. Court's] ruling."  Id.  This despite the fact that it was the FDA itself that had suggested to the D.C. Court that it order parties to meet and confer in order to effect a good faith resolution.

In response to this latest attempt to block discovery, Defendants immediately issued a letter to the FDA, that same day, stating that Defendants' preservation of its rights by way of motion for reconsideration in the D.C. Court  in no way affected the obligation of the FDA to meet and confer in compliance with the D.C. Court Order.    See Exhibit T.  The letter emphasized Defendants' commitment to negotiating a good faith resolution to the discovery dispute, and informed the FDA that Defendants would arrive at the Monday, February 6, 2006 meeting as planned.

On February 3, 2006, after a telephone conference between counsel for Biopure, and the FDA during which Biopure repeated Defendants' objection to the FDA's unilateral and unjustified cancellation of the February 6, 2006 meeting, Defendants sent the FDA a letter containing the following proposal:  Defendants would withdraw the motion for reconsideration of the D.C. Order if the FDA produced all documents in Defendants' narrowed February 1, 2006

_522435_2/

letter before February 27, 2006, and committed to making available for depositions on mutually agreed upon dates all employees requested in that letter before February 27, 2006. <u>See</u> Exhibit U. Defendants asked that the FDA respond before the close of business on February 6, 2006. Defendants have received no response to that letter. Instead, the FDA had previously moved for reconsideration on February 3, 2006 in the D.C. Court of the D.C. Court's Order requiring the parties to meet and confer.

The SEC and the FDA – which are, after all, agencies of the same government – are attempting to circumvent the authority of this Court by hiding behind government regulations to avoid providing discovery to Defendants. The FDA voluntarily and expeditiously provided documents and witnesses for interviews to the SEC. Indeed, in at least one instance, the SEC received documents only 10 days after requesting them from the FDA. Defendants' requests, in contrast, will take up to 2 years to produce according to the FDA. Compare Binkley Decl. ¶ 35, attached at Exhibit V with Oct. 31, 2003 Letter, attached at Exhibit W. This Court should not countenance such gamesmanship, particularly since it interferes with the Defendants' right to a fair trial and due process of law.

Meanwhile, as the Defendants are unable to obtain critical source documents in this case, the SEC shows no signs of arresting its own discovery. It has served subpoenas on third-party witnesses, Frank Sasinowski, Josephine Torrente, and Roger Thiess, all regulatory counsel to Biopure at the law firm of Hyman Phelps & McNamara. The pretrial schedule also continues. An SEC-initiated deposition of a Biopure employee, Douglas Sayles, is going forward on February 9, 2006. This leaves the Defendants in the impossible and fundamentally unfair position of preparing for depositions and expert discovery without access to the SEC's witnesses or FDA documents that are essential to their defense.

_522435_2/

The SEC improperly asserts in this case that Biopure should have disclosed an immaterial trauma study protocol because of its implications for Biopure's pending BLA in a different indication, for a different patient population with a different dosage. Yet, when the SEC took ex parte testimony from the FDA's Toby Silverman, the head of the FDA review team for Hemopure, she contradicted the SEC's own assertion.[3]

That ex parte testimony was taken long before the SEC filed its complaint that contained the allegations which were contrary to Dr. Silverman's testimony. This claim is specious, as are others that are belied by FDA testimony, which Defendants have now had the opportunity to read. (Prior to permitting Biopure to read the testimony, through its leading questions, the SEC misled Biopure's witnesses by implying that the FDA had testified to the effect set forth in the complaint. All the while, Biopure's witnesses were testifying consistent with the FDA's witnesses.) We could not rely on any plaintiff to select a defendant's evidence but especially not when the plaintiff – the SEC, here – has shown that it will ignore testimony favorable to its opponents in order to state a preconceived claim.

### III. ARGUMENT

The Defendants request an immediate conference with the Court and the SEC. The Defendants ask this Court to exercise its inherent authority to address the unfairness of the FDA and SEC's position by ordering the Government to facilitate the immediate production of the properly requested FDA documents and personnel.

It defies law, logic, common sense, and, especially, fairness, that the SEC was able to obtain documents from the FDA in merely 10 days and work off-the-record with the key FDA

---

[3] Defendants have deleted all transcript references from this Memorandum since the SEC declined to consent to the filing under seal of motions or memoranda containing SEC investigative testimony that the FDA has not designated as confidential. If the court would like the actual transcript quotations referenced in this Memorandum, Defendants will provide copies to the Court.

witnesses, while the Defendants must either try a case without access to information essential to their litigation strategy or languish for years while the FDA determines whether it will respond to Biopure's subpoenas and, if so, what it will "redact" from its response.  For the reasons stated below, the Court in this case is in a unique position to preserve the integrity and fairness of the judicial process by ordering the FDA – through the SEC – to cooperate.

A.  **This Court has the Inherent Power to Rectify Fundamental Unfairness and Grant the Remedy Requested**

The First Circuit has repeatedly recognized the inherent power of every court to manage and control the disposition of cases on its docket in furtherance of "the enhancement of the court's processes." In re Atlantic Pipe Corp., 304 F.3d at 143.  Such power is essential to what one court has called the court's fundamental role as "a guarantor of fairness".  Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 525 (1st Cir. 1991).  As noted in a criminal case applying sanctions, "[t]he court under its inherent supervisory power may formulate procedural rules not specifically required by the Constitution or Congress when such rules are needed to implement a remedy for violation of recognized rights or to deter illegal conduct."  U.S. v. Horn, 811 F. Supp. 739, 753 (D.N.H. 1992) rev'd in part, aff'd in part, 29 F.3d 754 (1st Cir. 1994), citing U.S. v. Hasting, 461 U.S. 499, 505, 103 S. Ct. 1974, 1978 (1983).[4]

The relief requested by the Defendants falls squarely within the Court's authority to act as "guarantor of fairness".  Simply put, it is wrong for one arm of the government to block Defendants' access to another arm's (the FDA's) witnesses and documents after benefiting from

---

[4]  Additional authority for the Court to act in these circumstances may also be found in the All Writs Act, 28 U.S.C. 1651(a):  "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. 1651(a). The Act is "a residual source of authority to issue writs that are not otherwise covered by statute." Carlisle v. U.S., 517 U.S. 416, 429 (1996).  Here, Defendants suggest there are statutory procedures which specifically address the particular issue at hand (i.e. Rules 1, 16, 26, and 37).  See Aetna Cas. & Ins. Co. v. Markarian, 114 F.3d 346, 350 (1st Cir. 1997), citing Pennsylvania Bureau of Correction v. United States Marshals Serv., 474 U.S. 34, 43, 106 S. Ct. 355, 361 (1985).  We cite the All Writs Act as alternative authority for the court's ability to compel a fair proceeding here.

that other arm's willing and eager assistance. We cannot overstate the importance of the documents and depositions that are the subject of the FDA subpoenas. Mr. Stephenson and Drs. Silverman and Landow are central to the SEC's case and are essential to the defense of this action. The SEC obviously appreciates their importance to its case, because they were all previously interviewed on the record by the SEC – Dr. Silverman over the course of two days. Although the transcripts of their testimony were provided to the Defendants as part of discovery, none of the Defense counsel were permitted to be present at those interviews. Only the questions deemed pertinent by the SEC – who of course had informal access to those same Government employees prior to their testimony – were asked on the record.

Moreover, documents that are critical to the Defendants' case are being withheld. For instance, during the course of Mr. Stephenson's interview with the SEC, he read from his own notes of certain pivotal conference calls with the Defendants.[5] But those notes were never produced to the Defendants. This is a blatant example of why Defendants cannot rely on the SEC's selection of important documents as sufficient to make their case

Examples of this unfair, unprincipled approach abound. The FDA has not produced contemporaneous notes of any of the calls that it had during the relevant time period with Biopure. It has refused to provide records or notes regarding critical conference calls with Biopure, such as the April 9, and September 16, 2003 conference calls. The FDA has even taken the position that it will not allow its personnel to testify to routine procedures. See Exhibit M and N.

In several instances during the ex parte testimony of the FDA witnesses taken by the SEC, (not limited to Mr. Stephenson) it was clear that the witnesses had in their possession files

---

[5] See supra note 3.

_522435_2/

and handwritten notes concerning conversations with Biopure.  The SEC never asked for these files or notes, and instead let the FDA provide it with an "official" version later on.

Perhaps the single most important document in the case – the FDA's letter of July 30, 2003 concerning Biopure's BLA – was never produced by the FDA in final form.  This includes the fact that there was no formal "concurrence" sheet attached (showing who "signed off" on it).  It is also important to note that the SEC did not identify that it would support quashing the FDA subpoenas until <u>after</u> the November 22 Scheduling Conference.  At that conference, the SEC represented to the Court that the April 14, 2006 discovery deadlines were achievable and agreed to the May 8, 2006 trial date.  <u>After</u> that conference, however, the SEC sought only to frustrate the agreed-to discovery and trial schedule by supporting its sister agency's roadblocks to the Defendants' access to the same kind of information and FDA personnel of which it had the benefit.  The goal of the Court's discovery schedule is to promote fairness in both the discovery process and at trial.  <u>See</u> <u>Macaulay v. Anas</u>, 321 F.3d 45, 50 (1st Cir. 2003).  The SEC's support for the FDA in connection with FDA subpoenas after the November 22 Scheduling Conference threatens to make a mockery of that schedule.

**B.  <u>The Government's Actions Violate the Rules Of Discovery and Defendants' Due Process Rights.</u>**

The decisions of the SEC and the FDA to hamper the Defendants' ability to discover evidence fundamental to their defense is in clear violation of the spirit and express purpose of the discovery rules.  As noted by the First Circuit, "[w]henever a litigant decides to enter the court system to seek justice, he must play by the rules."  <u>Kale v. Combined Ins. Co. of America</u>, 924 F.2d 1161, 1168 (1st Cir. 1991).  The three FDA witnesses sought to be deposed by Defendants are all on the SEC's list of disclosures of persons with knowledge.  The SEC has supported the FDA in preventing defendants from discovering the evidence of key FDA witnesses, the very

_522435_2/

evidence upon which the SEC itself relies in building its case against Defendants. Such conduct is entirely contrary to the fundamental fairness that the discovery rules are designed to ensure. U.S. v. Candelaria-Silva, 162 F.3d 698, 702 (1st Cir. 1998). "The federal courts' supervision of the discovery process, and the courts' concomitant authority to upbraid those who do not play by the rules, is rooted in the need for maintaining the integrity of the trial process." Thibeault v. Square D Co., 960 F.2d 239, 245 (1st Cir. 1992). Here, the Court must act to ensure protection of the integrity of the trial process by ordering the Government to cooperate.

In addition, denial of access to discovery crucial to a litigant's core claims or defenses is a violation of that litigant's constitutional right to due process under the Fifth Amendment. See Columbus-America Discovery Group v. Atlantic Mut. Ins. Co., 974 F.2d 450, 470 (4th Cir. 1992) (district court's denial of intervener's opportunity for discovery amounted to a violation of intervener's due process rights). "Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the *critical and decisive allegations* which go to the *core* of the parties' claim or defense and to present evidence on the contested facts." Id., quoting Complaint of Bankers Trust Co., 752 F.2d 874, 890 (3d Cir. 1984) (emphasis in original). Without an opportunity for appropriate discovery, compliance with this mandate is impossible. This Court should not permit the SEC to continue to aid the FDA's roadblocks to Defendants' requests for information and individuals that are essential to the defense. To do so would deny Defendants' fundamental constitutional right to have an opportunity to be heard on the critical elements of their argument and to present important evidence necessary to their defense.

The FDA's failure to cooperate must be viewed against the backdrop of the cozy sister relationship between the FDA and the SEC – the very relationship on which the SEC relied in the years leading up to its commencement of suit against Defendants. During that time frame,

the SEC enjoyed unfettered access to the very people and documents that the Defendants are barred from examining. Surely, this is the height of unfairness: to ask Defendants to defend a case without access to the very documents and witnesses used to build that case against them.

**C. The SEC and the FDA Must Act as Unified Government Parties, and Cannot Hide Behind Internal FDA Regulations to Assist the FDA in Avoiding Its Obligations to Provide Information in Furtherance of the Public Interest.**

The FDA cannot hide behind its internal regulations to avoid its obligation to participate fairly and without bias in the SEC's enforcement action. Specifically, the FDA should not be allowed to rely on a refusal by the FDA Commissioner to respond to Defendants' discovery requests under 21 C.F.R. § 20.1. That regulation was "promulgated by the FDA for its own benefit," and "does not supercede the Federal Rules of Civil Procedure." Metrex Research Corp. v. U.S., 151 F.R.D. 122, 124 (D. Colo. 1993). Crucially, "when discovery of FDA personnel is relevant in civil litigation, it can be ordered despite the regulation." Id. at 124.

Defendants ask the Court to consider In re U.S. Bioscience Securities Litigation, 150 F.R.D. 80 (E.D. Pa. 1993), which involved a class action claim for securities violations based on misrepresentations about prospects for FDA approval of the defendant's product. In response to a motion by the non-party FDA, pursuant to its internal regulations, to quash subpoenas served on three of its employees, the court focused on 21 C.F.R. §20.1(c)'s explanation that if "testimony will be in the public interest and will promote the objectives of the act and the agency," the FDA Commissioner may allow employees to testify. The court observed that private securities actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Securities and Exchange Commission action." Id. at 82 (quoting Bateman, Eichler, Hill, Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985)). Rejecting the FDA's reliance on its regulations, the court further noted that:

> While it is certainly true that these actions involve claims by shareholders of U.S. Biosicence, all private citizens, for the large losses they incurred, it is also true that the interests they seek to vindicate are those that Congress has regarded as very much in the federal public interest. Put another way, the "public interest" does not exist in a vacuum, isolated at the FDA's offices in Rockville, Maryland. The "public interest" also includes the Congressionally-mandated assurance of the integrity of the public's securities markets that are so crucial to the nation's economic well-being. That issue is most assuredly involved here.

Id.

The similarities between U.S. Bioscience and the matter in this case are striking, but the public interest in resolving the SEC's enforcement action allegations are even more serious here, since the litigation to which the FDA's participation is requested is brought not by private plaintiffs, but by the Government itself. In order to fulfill its obligation to further the public interest in assuring the integrity of this nation's securities markets through resolution of actions initiated by the SEC, the FDA must comply with Defendants' requests for discovery. The FDA cannot rely on a refusal of the FDA Commissioner, based on the self-interested aim of minimizing expenditure of FDA resources under 21 C.F.R. §20.1, when the broader public interest in resolving Government-initiated securities actions necessitates FDA involvement.

## IV. CONCLUSION

The Government should not be allowed to engage in this gamesmanship. Defendants have tried repeatedly to obtain valid, proper discovery. No other litigant or witness would be allowed to play the games being exhibited here. Defendants request that the Court use its inherent authority to require that the plaintiff Government make a choice: Provide expeditiously the discovery requested by Defendants or have the court impose an appropriate sanction, including dismissal. Defendants suggest that the SEC could cause the FDA to respond to such an order with the same cooperation and responsiveness to Defendants, which the FDA so

_522435_2/

willingly and expeditiously provided to the SEC.  Defendants request a conference or hearing at

the Court's earliest opportunity to resolve this matter.

Dated February 8, 2006

Boston, Massachusetts

                                        Respectfully submitted,


/s/_____          /s/_____
Robert A. Buhlman (BBO #554393)     John. D. Hughes (BBO #243660)
Donald J. Savery (BBO #564975)      Cathy A. Fleming (*pro hac vice*)
Machael D. Blanchard (BBO #636860)  Mary-Pat Cormier (BBO #635756)
BINGHAM MCCUTCHEN LLP               Joey H. Lee (BBO #663803)
150 Federal Street                  EDWARDS ANGELL PALMER &
Boston, Massachusetts 02110            DODGE LLP
(617) 951-8000                      111 Huntington Avenue
                                    Boston, Massachusetts 02199
Counsel for Defendant Biopure Corporation  (617) 239-0100

                                    Counsel for Defendant Howard Richman


/s/_____          /s/_____
Thomas J. Dougherty (BBO #132300)   Edward P. Leibensperger (BBO #292620)
Justin J. Daniels (BBO #656118)     Bobby R. Burchfield (*pro hac vice*)
SKADDEN, ARPS, SLATE,               Jason A. Levine (*pro hac vice*)
   MEAGHER & FLOM LLP               MCDERMOTT, WILL & EMERY LLP
One Beacon Street                   28 State Street
Boston, Massachusetts 02108         Boston, Massachusetts 02109
(617) 573-4800                      (617) 535-4046

Counsel for Defendant Jane Kober    Counsel for Defendant Thomas Moore

_522435_2/

EXHIBIT A

# U.S. Food and Drug Administration
Department of Health and Human Services

# *FDA News*

FOR IMMEDIATE RELEASE
P04-15
February 5, 2004

Media Inquiries: 301-827-6242
Consumer Inquiries: 888-INFO-FDA

## FDA and SEC Work to Enhance Public's Protection from False and Misleading Statements

The Food and Drug Administration (FDA) is announcing new measures designed to improve the manner by which FDA assists the Securities and Exchange Commission (SEC), whose primary mission is to protect the investing public and maintain the integrity of the securities market. In addition to implementing administrative improvements to make FDA technical and scientific support of the SEC and its staff more efficient, FDA is for the first time establishing a centralized procedure for FDA personnel to use in referring to the SEC statements by FDA-regulated firms that may be false or misleading.

"The SEC and its staff have primary responsibility for enforcing the rules requiring truth in the securities market, which is essential for its proper functioning," said Commissioner of Food and Drugs Mark B. McClellan, M.D., Ph.D. "Unfortunately, companies sometimes violate the public trust by issuing false or misleading statements about FDA-related issues, such as the progress of FDA's premarket review. When we identify suspected misstatements, we have a new process to bring them to the attention of the SEC staff as quickly and efficiently as possible."

Under the new referral procedure, any FDA employee who believes a publicly held, FDA-regulated firm has made a false or misleading statement to the investment public concerning a matter within FDA's authority can initiate a process for referring the matter to the SEC Division of Enforcement. FDA's mission is to promote and protect the public health, and FDA employees will not be expected routinely to police statements by publicly held, FDA-regulated companies. However, FDA can be in a position to identify statements that may be of interest to the SEC and its staff, and FDA employees will now have a centralized procedure to make SEC referrals if, in the normal course of their activities, they come to believe that a company may have made a false or misleading statement to the investing public.

In addition to establishing this new referral procedure, the FDA is implementing the following administrative measures to improve the assistance it provides to the SEC and its staff:

1. **FDA Contacts.** FDA has identified a liaison officer as well as specific contacts within the agency's principal operational components for the SEC and its staff to use in requesting information from FDA.
2. **Training.** FDA is working with the SEC and its staff to identify opportunities for the two agencies to engage in training in areas of mutual interest.
3. **Electronic Communication.** FDA will use electronic media when possible, e.g., to provide information or technical support to the SEC or its staff, receive requests from the SEC for non-public information, and review statements in annual reports and other SEC filings made by FDA-regulated firms.
4. **Non-Public Records/Information.** FDA will provide specified FDA employees a

"blanket" authorization to enable them to share non-public information with the SEC or its staff, rather than executing such authorizations on a case-by-case basis. FDA and SEC staff have agreed to continue identifying additional measures that might be implemented to improve the process by which FDA shares non-public information with the SEC and its staff in accordance with FDA's laws and procedures.

The FDA has been providing support to the SEC and its staff for many years. FDA assists SEC staff by assessing the accuracy of statements in SEC filings relating to FDA issues. FDA officials routinely provide technical and scientific information and expert advice to the SEC to assist in their investigations of possible violations of federal securities laws. FDA's new initiative aims to strengthen this cooperation, and make it more effective and efficient.

####

Letter from FDA
Letter from SEC
SEC Press Release

---

EXHIBIT B

DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Food and Drug Administration

Center for Biologics Evaluation and
Research
1401 Rockville Pike
Rockville MD 20852-1448

August 8, 2003

Laurie Stegman
Special Counsel to the Director
Division of Enforcement
Securities and Exchange Commission
450 Fifth Street NW
Washington, DC  20549

Re:    Biopure Corporation                    Certified Mail Return Receipt
       11 Hurley Street
       Cambridge, MA  02141

Dear Ms. Stegman:

This letter is in follow-up to a recent phone conversation between you and
Ms. Coleen Klasmeier of the Office of the Chief Counsel of the Food and
Drug Administration (FDA). It has come to the attention of the FDA that
information in a press release dated 8/1/2003 and posted by Biopure
Corporation on its internet website, http://www.biopure.com, may not be a fair
and accurate disclosure of information to public investors. The press release
may not accurately reflect the magnitude of concerns expressed by FDA's
Center for Biologics Evaluation and Research (CBER) about deficiencies in
the biologics license application (BLA) for the firm's investigational product
"Hemopure." We enclose a copy of CBER's July 30, 2003 letter (redacted to
remove trade secret information that, under 21 USC 331(j), we are not
permitted to release outside of the Department of Health and Human
Services) to Biopure Corporation, so that the SEC can determine whether or
not the press release complies with the registrant's statutory requirements for
disclosure to public investors.

For your information, the SEC's letter of February 5, 2003 (Jeffrey P. Riedler,
Assistant Director, Division of Corporation Finance) asked CBER to review
the S-3 registration filed by Biopure Corporation on 1/29/03 and the annual
report on form 10-K for the fiscal year ending 10/31/02, SEC file #333-
102786. We replied (letter of 3/26/2003) "The information in the registration
statement is accurate as it pertains to Hemopure [hemoglogin glutamer-250

Case 1:05-cv-11853-PBS     Document 58     Filed 01/10/2006     Page 3 of 4

L. Stegman, p.2

(bovine), or HBOC-201] for human use." The records enclosed with this letter
to you provide facts or additional information to supplement our previous
communication concerning Biopure Corporation.

Please note that under the SEC's existing agreement with FDA, the
information provided is not publicly disclosable without written permission
from FDA. If you have any questions, please call me at 301-827-6220.

Sincerely,

Elaine Knowles Cole
Director, Division of Inspections
and Surveillance (HFM-650)
Office of Compliance and Biologics
Quality

Enclosure: as stated

Cc: C. Klasmeier GCF-1

SEC LIT 000326

L. Stegman, p.3

Bcc:
Reference- STN 125066/0
HFM-1 Goodman
HFM-4 Elengold
HFM-600 Masiello
HFM-600 Cohen
HFM-650 Cole
HFM-650 J.Davis
HFM-664 R.Wesley
HFM-664 P. Holobaugh
HFM-340 Golding
HFM- 300 J. Epstein
HFM-44 J.Binkley
HFC-200 D.Elder
HFC-230 S.Sheehan
HF-1 S.Gottlieb
Redactions reviewed by OCTMA (Binkley/Brockner Ryan) 8/8/2003
EKCole:ekc:8/8/2003

SEC LIT 000327

EXHIBIT C



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
BOSTON DISTRICT OFFICE
6TH FLOOR
73 TREMONT STREET
BOSTON, MASSACHUSETTS 02108

IN REPLYING PLEASE QUOTE

TELEPHONE: (617) 424-5900
FACSIMILE: (617) 424-5940

ELLEN E. BOBER
(617) 424-5900 ext. 608

October 22, 2003

**VIA FACSIMILE (301) 827-6748**
**AND FIRST CLASS MAIL**

Elaine Knowles Cole
Director, Division of Inspections
  and Surveillance (HFM-650)
Office of Compliance and Biologics Quality
Center for Biologics Evaluation and Research
Food and Drug Administration
1401 Rockville Pike
Rockville, MD 20852-1448

Re:    In re: Biopure Corporation (MB-01987)

Dear Ms. Cole:

As we discussed earlier this afternoon, the staff of the U.S. Securities and Exchange Commission ("Commission") requests that your office send us copies of certain materials in connection with our investigation of the above-referenced matter. Specifically, the staff requests that you voluntarily produce the following documents relating to the Food and Drug Administration's ("FDA's") communications with Biopure Corporation ("Biopure") regarding Biopure's applications for approval of its hemoglobin-based oxygen therapeutics:

1)    The FDA's April 25, 2003 letter to Biopure notifying the company that, due to safety concerns, the FDA was placing on clinical hold Biopure's HEM-0125 protocol submitted to its Investigative New Drug Application ("IND" 10962) for the use of its hemoglobin product, HBOC-201, for a trauma application;

2)    The FDA's July 30, 2003 letter to Biopure regarding IND 10962;

SEC LIT 000402

Ms. Elaine Cole
October 22, 2003
Page 2

3) Other correspondence, notes or other memorializations of all conversations between FDA officials and employees, officers or agents of Biopure regarding IND 10962 for the period April 1, 2003 to the present; and

4) Notes of all conversations between FDA officials and employees, officers or agents of Biopure regarding Biopure's biologics license application ("BLA") for the company's investigational "Hemopure" product for the period April 1, 2003 through the present.

Please forward the information to my attention at your earliest convenience at the following address:

U.S. Securities and Exchange Commission
Boston District Office
73 Tremont Street, 6th Floor
Boston, MA 02108
fax: (617) 424-5940

This inquiry is confidential and should not be construed as an indication by the Commission or its staff that any violations of law have occurred, nor should it be construed as an adverse reflection upon any person, entity or security. For your information, I have enclosed a copy of the Commission's Supplemental Information for Persons Requested to Supply Information Voluntarily ("Form 1662"). Please also note that the staff is not requesting production of any materials not permitted by the Commission's existing agreement with the FDA.

Thank you very much for your assistance with this request and for the extensive time and effort you and Dr. Silverman have offered to this office in connection with our investigation. If you have any questions, please contact me at (617) 424-5900, extension 608, or Celia D. Moore, Deputy Assistant District Administrator, at extension 650.

Very truly yours,

Ellen E. Bober
Senior Enforcement Counsel

Enclosure

**EXHIBIT D**



# Edwards *&* Angell LLP

101 Federal Street   Boston, MA 02110   617.439.4444   *fax* 617.439.4170

John D. Hughes

617.951.3373
*fax* 888.325.9109
jhughes@EdwardsAngell.com

July 13, 2005

**VIA FACSIMILE (301) 443-1726**
**AND FIRST CLASS MAIL**

Food and Drug Administration
Office of Management Programs
Division of Freedom of Information (HFI-35)
5600 Fishers Lane
Rockville, MD 20857

*Re:    Freedom of Information Act Request to the Food and Drug Administration ("FDA")*

To Whom It May Concern:

Pursuant to the Freedom of Information Act, 5 USCA 552 ("FOIA"), we are writing to request the following information and documents, including but not limited to, all e-mail, notes, memoranda (both internal and external), and recordings, summaries, logs, or transcriptions of any telephone conversations ("Communications")[1] pursuant to the Freedom of Information Act. Please provide copies of the following:

- All Communications from July 1, 2002 to the present between FDA, Center for Biologics Evaluation and Research ("CBER"), or any of its agents or representatives regarding the **Biologics License Application, Submission Tracking Number 1651-1, for Hemopure®, hemoglobin-glutamer 250 (bovine); Hemoglobin Based Oxygen Carrier-201 (HBOC)-201), Polymerized Bovine Hemoglobin BB-IND 2935 to be used in orthopedic surgery indications ("Hemopure® BLA")**, filed by Biopure Corporation ("Biopure") with the FDA on or about July 31, 2002.

- All Communications from July 1, 2002 to the present between FDA, Center for Biologics Evaluation and Research ("CBER"), or any of its agents or representatives regarding the **Investigational New Drug Application (IND 10962) "A Multi-Center Study to Evaluate the Safety and Tolerability of Hemoglobin-based Oxygen Carrier-201 (HBOC-201) in Trauma Subjects,"** filed by Biopure Corporation ("Biopure") with the FDA on or about March 7, 2003.

---

[1] This request does not purport to request documents subject to any FOIA exemptions, including but not limited to Exemption 4 that protects trade secrets and confidential commercial or financial information.

Edwards *&* Angell LLP

July 13, 2005
Page 2

- All Communications from July 1, 2002 to the present either to, from or copied to Franklin Stephenson of the FDA regarding Hemopure® BLA, the FDA application associated with it, or the application and approval process for Hemopure® BLA.

- Communications from July 1, 2002 through October 31, 2003 between Howard Richman of Biopure Corporation ("Biopure") and Dr. Toby Silverman affiliated with the FDA and/or CBER;

- Communications from July 1, 2002 through October 31, 2003 between Howard Richman of Biopure and any representative of the CBER;

- Communications from July 1, 2002 through October 31, 2003 between Howard Richman of Biopure and Franklin Stephenson of the FDA;

- Communications from July 1, 2002 through October 31, 2003 between Howard Richman of Biopure and any other representative of the FDA, other than Franklin Stephenson or Dr. Toby Silverman.

We understand this request may require us to pay fees. We are willing to pay all fees incurred in processing this request, but please advise us as to the costs or fees associated with such processing.

If you decline to provide any of the information identified in this letter, we ask that you identify the basis for that decision, including any confidential basis or claim to privilege in connection with the information that is withheld.

All information should be sent to:

**John D. Hughes**
**Edwards & Angell LLP**
**101 Federal St.**
**Boston, MA 02110**

Thank you for your kind assistance in this matter.

Sincerely,

John D. Hughes

c.c.    Howard Richman
        Robert Buhlman

- 2 -

EXHIBIT E

- 1 -

# CAPITOL DISTRICT INFORMATION

471 H St., NW, Lower Level, Washington, DC 20001 • (202) 265-1516 • Fax (202) 265-5006

October 18, 2004

## FREEDOM OF INFORMATION ACT REQUEST

FOOD AND DRUG ADMINISTRATION
Office of Management Programs
Division of Freedom of Information (HFI-35)
5600 Fishers Lane
Rockville, MD 20857

VIA FAX to  (301) 443-1726

Dear Sir/Madam:

This is a request under the Freedom of Information Act.  I request that a copy of the following documents be provided to me:

All records discussing, considering or otherwise relating to the following amendments to SOPP 8405 of the Manual Of Standard Operating Procedures And Policies for the Center For Biologics Evaluation And Research ("CBER"):

1. The elimination of the definition of "backlog" used in Version #3 (Aug. 8, 2003) from SOPP 8405 Version #4 (Sept. 20, 2004).

2. The substitution of the phrase "asking for data or information needed to complete the review of an application or supplement are information requests" in SOPP 8405 Version #4 (Sept. 20, 2004) for the phrase "that convey deficiencies in applications or supplements" from Version #3 (Aug. 8, 2003).

3. The deletion of the phrase "for both the product and establishment license application" used in Version #3 (Aug. 8, 2003) from SOPP 8405 Version #4 (Sept. 20, 2004).

4. All records discussing, considering or otherwise relating to the following amendment to the form language previously used by CBER in its "Complete Response Letter" ("CRL") but subsequently changed:The modification and/or deletion of the phrase in the closing paragraph of the previous form of CRL stating "our review clock has been suspended."

- 2 -

We request that the FDA produce responsive documents in their entirety, including all attachments, enclosures, and exhibits to any and all responsive documents. In the event you determine that a document contains material or information which falls within the statutory exemptions to mandatory disclosure, we request that such material or information be reviewed for possible discretionary disclosure. Similarly, in the event you determine that a document contains material or information which falls within the statutory exemptions to mandatory disclosure, we request that, in accordance with the provisions of 5 U.S.C. § 552(b), any and all reasonably segregable portions of such document be produced.

This letter constitutes notice of request for production of the above-described documents for purposes of copying. If for any reason you determine that any document or portion thereof will not be made available, prompt notice of any action taken is solicited. We request that such notice identify clearly the documents withheld and provide a thorough explanation of all legal and factual bases for any determination to deny disclosure. Because we have an urgent need for the documents identified herein, we request that you adhere to the time limitations for responding set forth at 5 U.S.C. § 552(a)(6)(A).

I am willing to pay fees up to $300.00. If you expect the fees will exceed this, please contact me before proceeding.

If you need to discuss this request, I can be reached at 202-265-1516. Thank you for your consideration of this request.

Sincerely,

Ron Barrett

Capitol District Information

**EXHIBIT F**

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Rockville MD 20857


EDWARDS & ANGELL                    07/15/05
ATTN: J HUGHES
101 FEDERAL ST                      In reply refer to:
BOSTON, MA 02110                    05009356


Dear Requester:

The Food and Drug Administration (FDA) has received your
Freedom of Information Act (FOIA) request for records
regarding:

        HEMOPURE, HEMOGLOBIN-GLUTAMER 250,
        HEMOGLOBIN BASED OXYGEN CARRIER-201, ETC
        COMM 7/02 TO PRESENT

We will respond as soon as possible and may charge you a
fee for processing your request. If you have any questions
about your request, please call Christopher E. Cunningham,
Information Technician, at 301-827-6551 or write to us at:

        Food and Drug Administration
        Division of Freedom of Information
        5600 Fishers Lane, HFI-35
        Rockville, MD 20857

If you call or write, use the reference number above
which will help us to answer your questions more quickly.

EXHIBIT G

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Public Health Service

---

Food and Drug Administration
Rockville MD 20857

CAPITOL DISTRICT INFORMATION          10/19/04
ATTN: R BARRETT
471 H ST NW                           In reply refer to:
WASHINGTON, DC 20001                  04015817

Dear Requester:

The Food and Drug Administration (FDA) has received your
Freedom of Information Act (FOIA) request for records
regarding:

    MANUAL OF STANDARD OPERATING PROCEDURES
    & POLICIES - SOPP 8405 VERSIONS 3 & 4
    AMDTS

We will respond as soon as possible and may charge you a
fee for processing your request. If you have any questions
about your request, please call Christopher E. Cunningham,
Information Technician, at 301-827-6551 or write to us at:

       Food and Drug Administration
       Division of Freedom of Information
       5600 Fishers Lane, HFI-35
       Rockville, MD 20857

If you call or write, use the reference number above
which will help us to answer your questions more quickly.

EXHIBIT H

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF  Columbia

| | |
|---|---|
| Securities and Exchange Commission<br>V.<br>Biopure Corporation, Thomas Moore, Howard Richman,<br>and Jane Kober | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1] 05-11853-PBS<br>(Pending in USDC, D. Mass.) |

TO: Keeper of Records
    U.S. Food and Drug Administration
    5600 Fishers Lane, Rockville, Maryland 20857

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | 11/16/05 - 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

    See Schedule A attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | 11/16/05 - 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Defendant, Biopure Corporation | DATE<br>11/2/05 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert A. Buhlman / Bingham McCutchen LLP / 150 Federal Street, Boston, MA 02110 / Phone (617) 951-8717

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.<br>www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | |
|---|---|
| DATE | PLACE |
| **SERVED:** | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the

www.USCourtForms.com

provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

**SCHEDULE A:**

**DOCUMENTS TO BE PRODUCED**

1.      All documents[1] concerning Biopure Corporation ("Biopure")'s biologics license application ("BLA") for Hemoglobin Glutamer-250 (bovine), also known as Hemopure (hereinafter, "Hemopure"), including:[2]

   (a)      all documents concerning, constituting or reflecting any communications between the FDA[3] and any other party;

   (b)      all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the Securities and Exchange Commission ("SEC");

   (c)      all documents generated by the FDA concerning, discussing or relating to Biopure's BLA for Hemopure;

   (d)      all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies regarding Hemopure;

   (e)      all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure;

   (f)      all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure; and

   (g)      all documents concerning, constituting or reflecting any internal communications within FDA.

----

[1] Note that the term "documents" specifically includes electronic files, including electronic mail. *See* Definitions and Instructions hereto.

[2] Note that the word "include" or "including" means including without limitation. *See* Definitions and Instructions hereto.

[3] Note that the term "FDA" specifically includes CBER and CDER. *See* Definitions and Instructions hereto.

2.   All documents concerning Biopure's investigational new drug application ("IND") 10962, including:

    (a)    all documents concerning, constituting or reflecting any communications between the FDA and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the SEC;

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's IND 10962;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies relating to IND 10962;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure; and

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure.

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

3.   All documents concerning Biopure, Jane Kober, Thomas Moore or Howard Richman, individually, jointly or in any combination, (the "Biopure Defendants") including:

    (a)    all documents in any electronic form relating to the Biopure Defendants, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

    (b)    all documents describing, analyzing or discussing the Biopure Defendants;

    (c)    all documents relating to any studies or trials (actual or otherwise) by or on behalf of Biopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial by or on behalf of Biopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports by or on behalf of Biopure;

(f)     all documents relating to any BLA, IND, or any other regulatory submission by or on behalf of Biopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to the Biopure Defendants;

(h)     all communications between the FDA and the SEC relating to the Biopure Defendants;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to the Biopure Defendants;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to the Biopure Defendants;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), relating to the Biopure Defendants;

(l)     all documents relating to the Biopure Defendants that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)     all documents relating to the Biopure Defendants in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)     any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to the Biopure Defendants not already requested in ¶¶ 2 (a)-(n), above.

4.    All documents concerning Hemopure, including:

(a)    all documents in any electronic form relating to Hemopure, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

(b)    all documents describing, analyzing or discussing Hemopure;

(c)    all documents relating to any studies or trials (actual or otherwise) for Hemopure;

(d)    all documents relating to any endpoints (actual or otherwise) relating to any study or trial for Hemopure;

(e)    all documents relating to any protocols, statistical analysis plans or clinical study reports relating to Hemopure;

(f)    all documents relating to any Biologics License Application, Investigational New Drug, or any other regulatory submission for Hemopure;

(g)    all communications between the FDA any other governmental agency, body, or entity, relating to Hemopure;

(h)    all communications between the FDA and the SEC relating to Hemopure;

(i)    all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to Hemopure;

(j)    all documents issued, distributed, published, circulated or otherwise made available to the public relating to Hemopure;

(k)    all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States relating to Hemopure;

(l)    all documents relating to Hemopure that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)    all documents relating to Hemopure in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)    any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to Hemopure not already requested in ¶¶ 1(a)-(n), above.

5.    All documents concerning, constituting or reflecting any communications between the FDA and the SEC about Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

6.    All documents concerning this lawsuit and any other lawsuit involving the Biopure Defendants or Hemopure, whether concluded, pending, or contemplated.

7.    All complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time.

8.    All complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time.

9.    All documents concerning, constituting or reflecting any communications within FDA about changing wording of complete response letters during the period July 1, 2002 through the present.

10.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #2.

11.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #3.

12. All documents issued, distributed, published, circulated or otherwise made available to the public by the FDA concerning Biopure's BLA for Hemopure.

13. All documents concerning Biopure's clinical studies regarding Hemopure, including comments concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, and internal memoranda concerning Biopure's clinical studies regarding Hemopure.

14. All documents concerning the FDA's consideration of Biopure's clinical studies regarding Hemopure, including communications concerning that issue with the FDA.

15. All documents concerning communications with the FDA about proposed revisions to Biopure's clinical studies regarding Hemopure.

16. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), concerning Hemopure.

17. All standard record retention schedules maintained pursuant to which existing FDA records are subject to routine destruction as described in 20 C.F.R. 20.23(c).

18. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to the dissolution of, or potential dissolution of CBER.

19. Any proposed or final guidelines, protocols, FAQ's or other advisories for the information or assistance of those making public disclosures of the status of a drug biologics application approval or denial by the FDA.

20. All documents relating to the joint FDA/SEC effort to increase the public's protection from false and misleading statements by enhancing inter-agency cooperation.

21. Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Lawrence Landow.

22.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Franklin Stephenson.

23.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Toby Silverman.

## DEFINITIONS AND INSTRUCTIONS

Defendant incorporates by reference the Uniform Definitions In Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5.

Additionally, the following definitions and instructions shall apply:

(A)    "Biopure Corporation" and "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, its business (past, present and future whether actual, or contemplated), its officers, directors, employees, representatives, agents, and all other persons or entities action on its behalf.

(B)    The "Center for Biologics Evaluation and Research" and "CBER" include the Center for Biologics Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(C)    The "Center for Drug Evaluation and Research" and "CDER" include the Center for Drug Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(D)    The "Food and Drug Administration" and "FDA" includes the Food and Drug Administration, CBER, CDER, and each of their respective officers, employees, gents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its request or on its behalf.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, the following items, whether typed, printed, recorded, written out by hand, photographed, microfilmed, microfiched, or reproduced by any other mechanical or electronic process, including any information maintained on computer memory disk or electronic or magnetic media, whether or not printed out, and any information to which you have access by reason of

any computer, including, without limitation: agreements; contracts; communications, including intra-company communications; correspondence; e-mails; envelopes; telegrams; telecopies; telefacsimilies; memoranda; agenda; books; summaries of records of personal or telephone conversations or interviews; telephone logs, diaries; articles; newspapers; circulars; brochures; pamphlets; forecasts; statistical statements; accountants; work papers; graphs; charts; slides; drawings; diagrams; films; video tapes; visual aids; audio tapes; compact discs or CD-ROMs; accounts; analytical records; worksheets; worksheet files; spreadsheets; word processor files; minutes or records of meetings or conferences; reports or summaries of interviews; reports or summaries of investigations; opinions or reports of consultants; appraisals' records; reports or summaries of negotiations; trade letters; press releases; notes; projections; drafts of any documents; working papers; securities ledgers; checks, front and back; check stubs or receipts; including any other document or writings of whatever description.

(F)    The term "communication" is used in the broadest sense and means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether written or oral, and includes without limitation all forms of electronic mail, voice mail or other recorded forms of communication.    It includes, but it not limited to, documents, meetings, and conversations. To the extent the communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation, and (b) state the nature and substance of the meeting or conversation. The term "communications" means yes transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(G)    The term "person" includes natural persons, or any business, legal, or governmental entity or association.

(H)    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "include" or "including" means including without limitation.

(I)    Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

(J)    If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following

information with respect to any such document withheld: date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed and the paragraph of this Subpoena to which such document relates.

(K)    In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without limitation, the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

(L)    If you have any objections to this Subpoena, a written statement containing those objections is to be furnished at the time specified herein for the production of documents.

(M)    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production if the FDA or the Center for Biologics Evaluation and Research obtains or discovers additional documents between the time of initial production and the time of hearing or trial.

(N)    All documents are to be produced as they are kept in the usual course of business so that Biopure can ascertain the file in which they are located, their relative order in such files and how such files were maintained.

**EXHIBIT I**

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF  Columbia

| | |
|---|---|
| Securities and Exchange Commission<br>V.<br>Biopure Corporation, Thomas Moore, Howard Richman,<br>and Jane Kober | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1] 05-11853-PBS<br>(Pending in USDC, D. Mass) |

TO: Keeper of Records
    Center for Biologics Evaluation and Research (CBER)
    U.S. Food and Drug Administration
    1401 Rockville Pike, Rockville, Maryland 20852-1448

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | DATE AND TIME<br>11/17/05 - 10:00 a.m. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE<br>Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | DATE AND TIME<br>11/17/05 - 10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Defendant, Biopure Corporation | DATE<br>11/2/05 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert A. Buhlman / Bingham McCutchen LLP
150 Federal Street, Boston, MA 02110 / Phone (617) 951-8717

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | |
|---|---|
| DATE<br>   SERVED: | PLACE |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

   I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

**SCHEDULE A:**

**DOCUMENTS TO BE PRODUCED**

1.    All documents[1] concerning Biopure Corporation ("Biopure")'s biologics license application ("BLA") for Hemoglobin Glutamer-250 (bovine), also known as Hemopure (hereinafter, "Hemopure"), including:[2]

    (a)    all documents concerning, constituting or reflecting any communications between the FDA[3] and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the Securities and Exchange Commission ("SEC");

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's BLA for Hemopure;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies regarding Hemopure;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure;

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure; and

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

---

[1] Note that the term "documents" specifically includes electronic files, including electronic mail. *See* Definitions and Instructions hereto.

[2] Note that the word "include" or "including" means including without limitation. *See* Definitions and Instructions hereto.

[3] Note that the term "FDA" specifically includes CBER and CDER. *See* Definitions and Instructions hereto.

2. All documents concerning Biopure's investigational new drug application ("IND") 10962, including:

    (a)    all documents concerning, constituting or reflecting any communications between the FDA and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the SEC;

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's IND 10962;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies relating to IND 10962;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure; and

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure.

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

3. All documents concerning Biopure, Jane Kober, Thomas Moore or Howard Richman, individually, jointly or in any combination, (the "Biopure Defendants") including:

    (a)    all documents in any electronic form relating to the Biopure Defendants, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

    (b)    all documents describing, analyzing or discussing the Biopure Defendants;

    (c)    all documents relating to any studies or trials (actual or otherwise) by or on behalf of Biopure;

(d)    all documents relating to any endpoints (actual or otherwise) relating to any study or trial by or on behalf of Biopure;

(e)    all documents relating to any protocols, statistical analysis plans or clinical study reports by or on behalf of Biopure;

(f)    all documents relating to any BLA, IND, or any other regulatory submission by or on behalf of Biopure;

(g)    all communications between the FDA any other governmental agency, body, or entity, relating to the Biopure Defendants;

(h)    all communications between the FDA and the SEC relating to the Biopure Defendants;

(i)    all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to the Biopure Defendants;

(j)    all documents issued, distributed, published, circulated or otherwise made available to the public relating to the Biopure Defendants;

(k)    all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), relating to the Biopure Defendants;

(l)    all documents relating to the Biopure Defendants that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)    all documents relating to the Biopure Defendants in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)    any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)     all other documents relating to the Biopure Defendants not already requested in ¶¶ 2 (a)-(n), above.

4.     All documents concerning Hemopure, including:

(a)     all documents in any electronic form relating to Hemopure, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

(b)     all documents describing, analyzing or discussing Hemopure;

(c)     all documents relating to any studies or trials (actual or otherwise) for Hemopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial for Hemopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports relating to Hemopure;

(f)     all documents relating to any Biologics License Application, Investigational New Drug, or any other regulatory submission for Hemopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to Hemopure;

(h)     all communications between the FDA and the SEC relating to Hemopure;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to Hemopure;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to Hemopure;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States relating to Hemopure;

(l)     all documents relating to Hemopure that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)    all documents relating to Hemopure in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)    any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to Hemopure not already requested in ¶¶ 1(a)-(n), above.

5.    All documents concerning, constituting or reflecting any communications between the FDA and the SEC about Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

6.    All documents concerning this lawsuit and any other lawsuit involving the Biopure Defendants or Hemopure, whether concluded, pending, or contemplated.

7.    All complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time.

8.    All complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time.

9.    All documents concerning, constituting or reflecting any communications within FDA about changing wording of complete response letters during the period July 1, 2002 through the present.

10.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #2.

11.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #3.

12.   All documents issued, distributed, published, circulated or otherwise made available to the public by the FDA concerning Biopure's BLA for Hemopure.

13.   All documents concerning Biopure's clinical studies regarding Hemopure, including comments concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, and internal memoranda concerning Biopure's clinical studies regarding Hemopure.

14.   All documents concerning the FDA's consideration of Biopure's clinical studies regarding Hemopure, including communications concerning that issue with the FDA.

15.   All documents concerning communications with the FDA about proposed revisions to Biopure's clinical studies regarding Hemopure.

16.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), concerning Hemopure.

17.   All standard record retention schedules maintained pursuant to which existing FDA records are subject to routine destruction as described in 20 C.F.R. 20.23(c).

18.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to the dissolution of, or potential dissolution of CBER.

19.   Any proposed or final guidelines, protocols, FAQ's or other advisories for the information or assistance of those making public disclosures of the status of a drug biologics application approval or denial by the FDA.

20.   All documents relating to the joint FDA/SEC effort to increase the public's protection from false and misleading statements by enhancing inter-agency cooperation.

21.   Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Lawrence Landow.

22.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Franklin Stephenson.

23.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Toby Silverman.

### DEFINITIONS AND INSTRUCTIONS

Defendant incorporates by reference the Uniform Definitions In Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5.

Additionally, the following definitions and instructions shall apply:

(A)    "Biopure Corporation" and "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, its business (past, present and future whether actual, or contemplated), its officers, directors, employees, representatives, agents, and all other persons or entities action on its behalf.

(B)    The "Center for Biologics Evaluation and Research" and "CBER" include the Center for Biologics Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(C)    The "Center for Drug Evaluation and Research" and "CDER" include the Center for Drug Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(D)    The "Food and Drug Administration" and "FDA" includes the Food and Drug Administration, CBER, CDER, and each of their respective officers, employees, gents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its request or on its behalf.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, the following items, whether typed, printed, recorded, written out by hand, photographed, microfilmed, microfiched, or reproduced by any other mechanical or electronic process, including any information maintained on computer memory disk or electronic or magnetic media, whether or not printed out, and any information to which you have access by reason of

any computer, including, without limitation: agreements; contracts; communications, including intra-company communications; correspondence; e-mails; envelopes; telegrams; telecopies; telefacsimilies; memoranda; agenda; books; summaries of records of personal or telephone conversations or interviews; telephone logs, diaries; articles; newspapers; circulars; brochures; pamphlets; forecasts; statistical statements; accountants; work papers; graphs; charts; slides; drawings; diagrams; films; video tapes; visual aids; audio tapes; compact discs or CD-ROMs; accounts; analytical records; worksheets; worksheet files; spreadsheets; word processor files; minutes or records of meetings or conferences; reports or summaries of interviews; reports or summaries of investigations; opinions or reports of consultants; appraisals' records; reports or summaries of negotiations; trade letters; press releases; notes; projections; drafts of any documents; working papers; securities ledgers; checks, front and back; check stubs or receipts; including any other document or writings of whatever description.

(F)    The term "communication" is used in the broadest sense and means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether written or oral, and includes without limitation all forms of electronic mail, voice mail or other recorded forms of communication.    It includes, but it not limited to, documents, meetings, and conversations. To the extent the communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation, and (b) state the nature and substance of the meeting or conversation. The term "communications" means yes transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(G)    The term "person" includes natural persons, or any business, legal, or governmental entity or association.

(H)    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "include" or "including" means including without limitation.

(I)    Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

(J)    If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following

information with respect to any such document withheld: date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed and the paragraph of this Subpoena to which such document relates.

(K)     In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without limitation, the following information:  date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

(L)     If you have any objections to this Subpoena, a written statement containing those objections is to be furnished at the time specified herein for the production of documents.

(M)     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production if the FDA or the Center for Biologics Evaluation and Research obtains or discovers additional documents between the time of initial production and the time of hearing or trial.

(N)     All documents are to be produced as they are kept in the usual course of business so that Biopure can ascertain the file in which they are located, their relative order in such files and how such files were maintained.

EXHIBIT J

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF  Columbia

Securities and Exchange Commission

V.

Biopure Corporation, Thomas Moore, Howard Richman, and Jane Kober

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-11853-PBS

(Pending in USDC, D. Mass.)

TO:  Laurence Landow
Center for Biologics Evaluation and Research (CBER)
U.S. Food and Drug Administration
1401 Rockville Pike, Rockville, Maryland 20852-1448

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | 11/18/05 - 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St., N.W., Suite 800 / Washington, DC 20036 | 11/18/05 - 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant, Biopure Corporation | 11/2/05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert A. Buhlman / Bingham McCutchen LLP
150 Federal Street, Boston, MA 02110 / Phone (617) 951-8717

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| SERVED: | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a persons who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

## SCHEDULE A:

## **DOCUMENTS TO BE PRODUCED**

1.    All documents[1] concerning Biopure Corporation ("Biopure")'s biologics license application ("BLA") for Hemoglobin Glutamer-250 (bovine), also known as Hemopure (hereinafter, "Hemopure"), including:[2]

    (a)    all documents concerning, constituting or reflecting any communications between the FDA[3] and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the Securities and Exchange Commission ("SEC");

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's BLA for Hemopure;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies regarding Hemopure;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure;

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure; and

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

---

[1] Note that the term "documents" specifically includes electronic files, including electronic mail. *See* Definitions and Instructions hereto.

[2] Note that the word "include" or "including" means including without limitation. *See* Definitions and Instructions hereto.

[3] Note that the term "FDA" specifically includes CBER and CDER. *See* Definitions and Instructions hereto.

2.    All documents concerning Biopure's investigational new drug application ("IND") 10962, including:

    (a)    all documents concerning, constituting or reflecting any communications between the FDA and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the SEC;

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's IND 10962;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies relating to IND 10962;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure; and

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure.

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

3.    All documents concerning Biopure, Jane Kober, Thomas Moore or Howard Richman, individually, jointly or in any combination, (the "Biopure Defendants") including:

    (a)    all documents in any electronic form relating to the Biopure Defendants, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

    (b)    all documents describing, analyzing or discussing the Biopure Defendants;

    (c)    all documents relating to any studies or trials (actual or otherwise) by or on behalf of Biopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial by or on behalf of Biopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports by or on behalf of Biopure;

(f)     all documents relating to any BLA, IND, or any other regulatory submission by or on behalf of Biopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to the Biopure Defendants;

(h)     all communications between the FDA and the SEC relating to the Biopure Defendants;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to the Biopure Defendants;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to the Biopure Defendants;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), relating to the Biopure Defendants;

(l)     all documents relating to the Biopure Defendants that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)     all documents relating to the Biopure Defendants in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)     any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to the Biopure Defendants not already requested in ¶¶ 2 (a)-(n), above.

4.    All documents concerning Hemopure, including:

(a)    all documents in any electronic form relating to Hemopure, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

(b)    all documents describing, analyzing or discussing Hemopure;

(c)    all documents relating to any studies or trials (actual or otherwise) for Hemopure;

(d)    all documents relating to any endpoints (actual or otherwise) relating to any study or trial for Hemopure;

(e)    all documents relating to any protocols, statistical analysis plans or clinical study reports relating to Hemopure;

(f)    all documents relating to any Biologics License Application, Investigational New Drug, or any other regulatory submission for Hemopure;

(g)    all communications between the FDA any other governmental agency, body, or entity, relating to Hemopure;

(h)    all communications between the FDA and the SEC relating to Hemopure;

(i)    all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to Hemopure;

(j)    all documents issued, distributed, published, circulated or otherwise made available to the public relating to Hemopure;

(k)    all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States relating to Hemopure;

(l)    all documents relating to Hemopure that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)    all documents relating to Hemopure in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)    any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to Hemopure not already requested in ¶¶ 1(a)-(n), above.

5.    All documents concerning, constituting or reflecting any communications between the FDA and the SEC about Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

6.    All documents concerning this lawsuit and any other lawsuit involving the Biopure Defendants or Hemopure, whether concluded, pending, or contemplated.

7.    All complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time.

8.    All complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time.

9.    All documents concerning, constituting or reflecting any communications within FDA about changing wording of complete response letters during the period July 1, 2002 through the present.

10.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #2.

11.    All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #3.

12.   All documents issued, distributed, published, circulated or otherwise made available to the public by the FDA concerning Biopure's BLA for Hemopure.

13.   All documents concerning Biopure's clinical studies regarding Hemopure, including comments concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, and internal memoranda concerning Biopure's clinical studies regarding Hemopure.

14.   All documents concerning the FDA's consideration of Biopure's clinical studies regarding Hemopure, including communications concerning that issue with the FDA.

15.   All documents concerning communications with the FDA about proposed revisions to Biopure's clinical studies regarding Hemopure.

16.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), concerning Hemopure.

17.   All standard record retention schedules maintained pursuant to which existing FDA records are subject to routine destruction as described in 20 C.F.R. 20.23(c).

18.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to the dissolution of, or potential dissolution of CBER.

19.   Any proposed or final guidelines, protocols, FAQ's or other advisories for the information or assistance of those making public disclosures of the status of a drug biologics application approval or denial by the FDA.

20.   All documents relating to the joint FDA/SEC effort to increase the public's protection from false and misleading statements by enhancing inter-agency cooperation.

21.   Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Lawrence Landow.

22.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Franklin Stephenson.

23.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Toby Silverman.

## DEFINITIONS AND INSTRUCTIONS

Defendant incorporates by reference the Uniform Definitions In Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5.

Additionally, the following definitions and instructions shall apply:

(A)    "Biopure Corporation" and "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, its business (past, present and future whether actual, or contemplated), its officers, directors, employees, representatives, agents, and all other persons or entities action on its behalf.

(B)    The "Center for Biologics Evaluation and Research" and "CBER" include the Center for Biologics Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(C)    The "Center for Drug Evaluation and Research" and "CDER" include the Center for Drug Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(D)    The "Food and Drug Administration" and "FDA" includes the Food and Drug Administration, CBER, CDER, and each of their respective officers, employees, gents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its request or on its behalf.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, the following items, whether typed, printed, recorded, written out by hand, photographed, microfilmed, microfiched, or reproduced by any other mechanical or electronic process, including any information maintained on computer memory disk or electronic or magnetic media, whether or not printed out, and any information to which you have access by reason of

any computer, including, without limitation: agreements; contracts; communications, including intra-company communications; correspondence; e-mails; envelopes; telegrams; telecopies; telefacsimilies; memoranda; agenda; books; summaries of records of personal or telephone conversations or interviews; telephone logs, diaries; articles; newspapers; circulars; brochures; pamphlets; forecasts; statistical statements; accountants; work papers; graphs; charts; slides; drawings; diagrams; films; video tapes; visual aids; audio tapes; compact discs or CD-ROMs; accounts; analytical records; worksheets; worksheet files; spreadsheets; word processor files; minutes or records of meetings or conferences; reports or summaries of interviews; reports or summaries of investigations; opinions or reports of consultants; appraisals' records; reports or summaries of negotiations; trade letters; press releases; notes; projections; drafts of any documents; working papers; securities ledgers; checks, front and back; check stubs or receipts; including any other document or writings of whatever description.

(F)     The term "communication" is used in the broadest sense and means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether written or oral, and includes without limitation all forms of electronic mail, voice mail or other recorded forms of communication.    It includes, but it not limited to, documents, meetings, and conversations. To the extent the communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation, and (b) state the nature and substance of the meeting or conversation. The term "communications" means yes transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(G)     The term "person" includes natural persons, or any business, legal, or governmental entity or association.

(H)     The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "include" or "including" means including without limitation.

(I)     Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

(J)     If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following

information with respect to any such document withheld: date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed and the paragraph of this Subpoena to which such document relates.

(K)     In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without limitation, the following information:  date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

(L)     If you have any objections to this Subpoena, a written statement containing those objections is to be furnished at the time specified herein for the production of documents.

(M)     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production if the FDA or the Center for Biologics Evaluation and Research obtains or discovers additional documents between the time of initial production and the time of hearing or trial.

(N)     All documents are to be produced as they are kept in the usual course of business so that Biopure can ascertain the file in which they are located, their relative order in such files and how such files were maintained.

EXHIBIT K

CAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF    COLUMBIA

Securities and Exchange Commission
V.
Biopure Corporation, Thomas Moore, Howard Richman,
and Jane Kober

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-11853 -PBS
(Pending in USDC, D. Mass.)

TO: Franklin Stephenson
U.S. Food and Drug Administration
1401 Rockville Pike
Rockville, MD  20852

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St. N.W., Suite 800 / Washington, DC  20036 | 2/2/06 - 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St. N.W., Suite 800 / Washington, DC  20036 | 2/2/06 - 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant, Biopure Corporation | 1/11/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Donald J. Savery / Bingham McCutchen LLP / 150 Federal Street, Boston MA 02110 / Phone (617) 951-8709

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | | PLACE |
|---|---|---|
| SERVED: | 01/17/06<br>at 1:06 pm | Office of General Counsel<br>200 Independence Avenue, SW<br>Washington, DC 20024 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Matt Mellon, Legal Assistant | Authorized to accept |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Ambiko Guice | Private Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____    01/18/06

SIGNATURE OF SERVER

**Capitol Process Services, Inc.**
1827 18th Street, NW
Washington, DC 20009
ADDRESS OF SERVER        (202) 667-0050

American LegalNet, Inc.<br>www.USCourtForms.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION ) N0. 05-11853 - PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER | ) ) ) ) |
| Defendants. | ) ) ) |

## BIOPURE CORPORATION'S NOTICE OF
## DEPOSITION OF FRANKLIN STEPHENSON

PLEASE TAKE NOTICE THAT, pursuant to Rules 30 and 45 of the Federal Rules of Civil Procedure, Defendant Biopure Corporation will take the deposition upon oral examination of Franklin Stephenson, U.S. Food and Drug Administration on February 2, 2006 at 10:00 a.m., at the offices of Bingham McCutchen LLP, 1120 20th St., NW, Suite 800, Washington, D.C. 20036, before a notary public or other officer authorized by law to administer oaths. The deposition will be recorded by sound-and-visual means and will continue from day to day until completed.

Franklin Stephenson, U.S. Food and Drug Administration, will be served with a subpoena and will be required to produce the documents specified in Schedule A attached hereto.

You are invited to attend and cross-examine.

Dated:   January 12, 2006

BIOPURE CORPORATION,

By its attorneys,

Robert A. Buhlman (BBO #554393)
Donald J. Savery (BBO #564975)
Michael Blanchard, (BBO #636860)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1276
(617) 951-8000

Counsel for Defendant Biopure
Corporation

## CERTIFICATE OF SERVICE

I, Jennifer L. Holden, hereby certify that on January 12, 2006, I caused a true copy of the foregoing Defendant's Notice of Deposition of Franklin Stephenson to be served by hand delivery upon Ian D. Roffman, United States Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts 02108, and by hand on counsel for each of the three individual defendants.

Dated:  January 12, 2006

Jennifer L. Holden

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF   COLUMBIA

| | |
|---|---|
| Securities and Exchange Commission | |
| V. | **SUBPOENA IN A CIVIL CASE** |
| Biopure Corporation, Thomas Moore, Howard Richman, and Jane Kober | |
| | Case Number:[1] 05-11853 -PBS |
| | (Pending in USDC, D. Mass.) |

TO: Franklin Stephenson
U.S. Food and Drug Administration
1401 Rockville Pike
Rockville, MD   20852

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St. N.W., Suite 800 / Washington, DC  20036 | 2/2/06 - 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th St. N.W., Suite 800 / Washington, DC  20036 | 2/2/06 - 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant, Biopure Corporation | 1/11/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Donald J. Savery / Bingham McCutchen LLP / 150 Federal Street, Boston MA 02110 / Phone (617) 951-8709

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
| SERVED: | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

**SCHEDULE A:**

**DOCUMENTS TO BE PRODUCED**

1.     All documents[1] concerning Biopure Corporation ("Biopure")'s biologics license application ("BLA") for Hemoglobin Glutamer-250 (bovine), also known as Hemopure (hereinafter, "Hemopure"), including:[2]

    (a)     all documents concerning, constituting or reflecting any communications between the FDA[3] and any other party;

    (b)     all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the Securities and Exchange Commission ("SEC");

    (c)     all documents generated by the FDA concerning, discussing or relating to Biopure's BLA for Hemopure;

    (d)     all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies regarding Hemopure;

    (e)     all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure;

    (f)     all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure; and

    (g)     all documents concerning, constituting or reflecting any internal communications within FDA.

---

[1] Note that the term "documents" specifically includes electronic files, including electronic mail. *See* Definitions and Instructions hereto.

[2] Note that the word "include" or "including" means including without limitation. *See* Definitions and Instructions hereto.

[3] Note that the term "FDA" specifically includes CBER and CDER. *See* Definitions and Instructions hereto.

2.   All documents concerning Biopure's investigational new drug application ("IND") 10962, including:

    (a)   all documents concerning, constituting or reflecting any communications between the FDA and any other party;

    (b)   all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the SEC;

    (c)   all documents generated by the FDA concerning, discussing or relating to Biopure's IND 10962;

    (d)   all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies relating to IND 10962;

    (e)   all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure; and

    (f)   all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure.

    (g)   all documents concerning, constituting or reflecting any internal communications within FDA.

3.   All documents concerning Biopure, Jane Kober, Thomas Moore or Howard Richman, individually, jointly or in any combination, (the "Biopure Defendants") including:

    (a)   all documents in any electronic form relating to the Biopure Defendants, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

    (b)   all documents describing, analyzing or discussing the Biopure Defendants;

    (c)   all documents relating to any studies or trials (actual or otherwise) by or on behalf of Biopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial by or on behalf of Biopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports by or on behalf of Biopure;

(f)     all documents relating to any BLA, IND, or any other regulatory submission by or on behalf of Biopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to the Biopure Defendants;

(h)     all communications between the FDA and the SEC relating to the Biopure Defendants;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to the Biopure Defendants;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to the Biopure Defendants;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), relating to the Biopure Defendants;

(l)     all documents relating to the Biopure Defendants that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)     all documents relating to the Biopure Defendants in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)     any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to the Biopure Defendants not already requested in ¶¶ 2 (a)-(n), above.

4.    All documents concerning Hemopure, including:

(a)    all documents in any electronic form relating to Hemopure, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

(b)    all documents describing, analyzing or discussing Hemopure;

(c)    all documents relating to any studies or trials (actual or otherwise) for Hemopure;

(d)    all documents relating to any endpoints (actual or otherwise) relating to any study or trial for Hemopure;

(e)    all documents relating to any protocols, statistical analysis plans or clinical study reports relating to Hemopure;

(f)    all documents relating to any Biologics License Application, Investigational New Drug, or any other regulatory submission for Hemopure;

(g)    all communications between the FDA any other governmental agency, body, or entity, relating to Hemopure;

(h)    all communications between the FDA and the SEC relating to Hemopure;

(i)    all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to Hemopure;

(j)    all documents issued, distributed, published, circulated or otherwise made available to the public relating to Hemopure;

(k)    all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States relating to Hemopure;

(l)    all documents relating to Hemopure that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)    all documents relating to Hemopure in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)    any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)    all other documents relating to Hemopure not already requested in ¶¶ 1(a)-(n), above.

5.    All documents concerning, constituting or reflecting any communications between the FDA and the SEC about Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

6.    All calendar entries, diary entries, travel records, expense receipts and reports, agendas, notes, communications, and other documents relating to any meetings between the FDA and the SEC concerning, in whole or in part, Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

7.    All documents concerning this lawsuit and any other lawsuit involving the Biopure Defendants or Hemopure, whether concluded, pending, or contemplated.

8.    All complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time.

9.    All complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time.

10.   All documents concerning, constituting or reflecting any communications within FDA about changing wording of complete response letters during the period July 1, 2002 through the present.

11.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #2.

12. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #3.

13. All documents issued, distributed, published, circulated or otherwise made available to the public by the FDA concerning Biopure's BLA for Hemopure.

14. All documents concerning Biopure's clinical studies regarding Hemopure, including comments concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, and internal memoranda concerning Biopure's clinical studies regarding Hemopure.

15. All documents concerning the FDA's consideration of Biopure's clinical studies regarding Hemopure, including communications concerning that issue with the FDA.

16. All documents concerning communications with the FDA about proposed revisions to Biopure's clinical studies regarding Hemopure.

17. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), concerning Hemopure.

18. All standard record retention schedules maintained pursuant to which existing FDA records are subject to routine destruction as described in 20 C.F.R. 20.23(c).

19. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to the dissolution of, or potential dissolution of CBER.

20. Any proposed or final guidelines, protocols, FAQ's or other advisories for the information or assistance of those making public disclosures of the status of a drug biologics application approval or denial by the FDA.

21. All documents relating to the joint FDA/SEC effort to increase the public's protection from false and misleading statements by enhancing inter-agency cooperation.

22. Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Lawrence Landow.

23. Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Franklin Stephenson.

24. Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Toby Silverman.

## DEFINITIONS AND INSTRUCTIONS

Defendant incorporates by reference the Uniform Definitions In Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5.

Additionally, the following definitions and instructions shall apply:

(A)    "Biopure Corporation" and "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, its business (past, present and future whether actual, or contemplated), its officers, directors, employees, representatives, agents, and all other persons or entities action on its behalf.

(B)    The "Center for Biologics Evaluation and Research" and "CBER" include the Center for Biologics Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(C)    The "Center for Drug Evaluation and Research" and "CDER" include the Center for Drug Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(D)    The "Food and Drug Administration" and "FDA" includes the Food and Drug Administration, CBER, CDER, and each of their respective officers, employees, gents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its request or on its behalf.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, the following items, whether typed, printed, recorded, written out by hand, photographed,

microfilmed, microfiched, or reproduced by any other mechanical or electronic process, including any information maintained on computer memory disk or electronic or magnetic media, whether or not printed out, and any information to which you have access by reason of any computer, including, without limitation: agreements; contracts; communications, including intra-company communications; correspondence; e-mails; envelopes; telegrams; telecopies; telefacsimilies; memoranda; agenda; books; summaries of records of personal or telephone conversations or interviews; telephone logs, diaries; articles; newspapers; circulars; brochures; pamphlets; forecasts; statistical statements; accountants; work papers; graphs; charts; slides; drawings; diagrams; films; video tapes; visual aids; audio tapes; compact discs or CD-ROMs; accounts; analytical records; worksheets; worksheet files; spreadsheets; word processor files; minutes or records of meetings or conferences; reports or summaries of interviews; reports or summaries of investigations; opinions or reports of consultants; appraisals' records; reports or summaries of negotiations; trade letters; press releases; notes; projections; drafts of any documents; working papers; securities ledgers; checks, front and back; check stubs or receipts; including any other document or writings of whatever description.

(F)    The term "communication" is used in the broadest sense and means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether written or oral, and includes without limitation all forms of electronic mail, voice mail or other recorded forms of communication.    It includes, but it not limited to, documents, meetings, and conversations. To the extent the communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation, and (b) state the nature and substance of the meeting or conversation. The term "communications" means yes transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(G)    The term "person" includes natural persons, or any business, legal, or governmental entity or association.

(H)    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "include" or "including" means including without limitation.

(I)    Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto,

(J)    If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following information with respect to any such document withheld: date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed and the paragraph of this Subpoena to which such document relates.

(K)    In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without limitation, the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

(L)    If you have any objections to this Subpoena, a written statement containing those objections is to be furnished at the time specified herein for the production of documents.

(M)    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production if the FDA or the Center for Biologics Evaluation and Research obtains or discovers additional documents between the time of initial production and the time of hearing or trial.

(N)    All documents are to be produced as they are kept in the usual course of business so that Biopure can ascertain the file in which they are located, their relative order in such files and how such files were maintained.

**EXHIBIT L**

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF   COLUMBIA

| | |
|---|---|
| Securities and ExchangeCommission<br>V.<br>Biopure Corporation, Thomas Moore, Howard Richman,<br>and Jane Kober | **SUBPOENA IN A CIVIL CASE**<br><br>Case Number:[1] 05-11853-PBS<br>(Pending in USDC, D. Mass.) |

TO:  Toby Silverman
     U.S. Food and Drug Administration
     1401 Rockville Pike
     Rockville, MD  20852

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Bingham McCutchen LLP<br>1120 20th Street, N.W. - Suite 800<br>Washington, DC  20036 | DATE AND TIME<br>2/1/06 - 10:00 a.m. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE<br>Bingham McCutchen LLP / 1120 20th Street, N.W. - Suite 800 / Washington, DC 20036 | DATE AND TIME<br>2/1/06 - 10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

  Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Defendant, Biopure Corporation | DATE<br>1/11/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Donald J. Savery / Bingham McCutchen LLP / 150 Federal Street / Boston, MA 02110 / (617) 951-8709

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
| SERVED: 01/17/06 at 1:06 pm | Office of General Counsel 200 Independence Avenue, SW Washington, DC 20024 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Matt Mellon, Legal Assistant | Authorized to accept |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Ambiko Guice | Private Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____   01/18/06

SIGNATURE OF SERVER

**Capitol Process Services, Inc.**
1827 18th Street, NW
Washington, DC 20009
ADDRESS OF SERVER   (202) 667-0050

American LegalNet, Inc.
www.USCourtForms.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER | ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION
N0. 05-11853 - PBS

## BIOPURE CORPORATION'S NOTICE OF
## DEPOSITION OF TOBY SILVERMAN

PLEASE TAKE NOTICE THAT, pursuant to Rules 30 and 45 of the Federal Rules of Civil

Procedure, Defendant Biopure Corporation will take the deposition upon oral examination of Toby

Silverman, U.S. Food and Drug Administration on February 1, 2006 at 10:00 a.m., at the offices of

Bingham McCutchen LLP, 1120 20th St., NW, Suite 800, Washington, D.C. 20036, before a notary

public or other officer authorized by law to administer oaths. The deposition will be recorded by

sound-and-visual means and will continue from day to day until completed.

Toby Silverman, U.S. Food and Drug Administration, will be served with a subpoena and

will be required to produce the documents specified in Schedule A attached hereto.

You are invited to attend and cross-examine.

Dated:  January 12, 2006

BIOPURE CORPORATION,

By its attorneys,

Robert A. Buhlman (BBO #554393)
Donald J. Savery (BBO #564975)
Michael Blanchard, (BBO #636860)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1276
(617) 951-8000

Counsel for Defendant Biopure
Corporation

## CERTIFICATE OF SERVICE

I, Jennifer L. Holden, hereby certify that on January 12, 2006, I caused a true copy of the foregoing Defendant's Notice of Deposition of Toby Silverman to be served by hand delivery upon Ian D. Roffman, United States Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts 02108, and by hand on counsel for each of the three individual defendants.

Dated:  January 12, 2006

Jennifer L. Holden

OAO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

Securities and ExchangeCommission
V.
Biopure Corporation, Thomas Moore, Howard Richman,
and Jane Kober

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-11853-PBS
(Pending in USDC, D. Mass.)

TO: Toby Silverman
    U.S. Food and Drug Administration
    1401 Rockville Pike
    Rockville, MD  20852

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP | 2/1/06 - 10:00 a.m. |
| 1120 20th Street, N.W. - Suite 800 | |
| Washington, DC  20036 | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Bingham McCutchen LLP / 1120 20th Street, N.W. - Suite 800 / Washington, DC 20036 | 2/1/06 - 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant, Biopure Corporation | 1/11/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Donald J. Savery / Bingham McCutchen LLP / 150 Federal Street / Boston, MA 02110 / (617) 951-8709

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| SERVED: | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

SIGNATURE OF SERVER

ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

**SCHEDULE A:**

**DOCUMENTS TO BE PRODUCED**

1.    All documents[1] concerning Biopure Corporation ("Biopure")'s biologics license
application ("BLA") for Hemoglobin Glutamer-250 (bovine), also known as Hemopure
(hereinafter, "Hemopure"), including:[2]

    (a)    all documents concerning, constituting or reflecting any communications between
the FDA[3] and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between
the FDA and any other federal government agency, body or entity, including the
Securities and Exchange Commission ("SEC");

    (c)    all documents generated by the FDA concerning, discussing or relating to
Biopure's BLA for Hemopure;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's
interpretation, analysis, or discussion of Biopure's clinical studies regarding
Hemopure;

    (e)    all documents concerning, constituting or reflecting any communications between
the FDA and any agent or employee of Biopure;

    (f)    all documents concerning, constituting or reflecting any communications between
the FDA and any attorney representing Biopure; and

    (g)    all documents concerning, constituting or reflecting any internal communications
within FDA.

---

[1] Note that the term "documents" specifically includes electronic files, including electronic mail. *See* Definitions and Instructions hereto.

[2] Note that the word "include" or "including" means including without limitation. *See* Definitions and Instructions hereto.

[3] Note that the term "FDA" specifically includes CBER and CDER. *See* Definitions and Instructions hereto.

LITDOCS/620532.1

2.    All documents concerning Biopure's investigational new drug application ("IND") 10962, including:

    (a)    all documents concerning, constituting or reflecting any communications between the FDA and any other party;

    (b)    all documents concerning, constituting or reflecting any communications between the FDA and any other federal government agency, body or entity, including the SEC;

    (c)    all documents generated by the FDA concerning, discussing or relating to Biopure's IND 10962;

    (d)    all documents concerning, describing, evidencing, or constituting the FDA's interpretation, analysis, or discussion of Biopure's clinical studies relating to IND 10962;

    (e)    all documents concerning, constituting or reflecting any communications between the FDA and any agent or employee of Biopure; and

    (f)    all documents concerning, constituting or reflecting any communications between the FDA and any attorney representing Biopure.

    (g)    all documents concerning, constituting or reflecting any internal communications within FDA.

3.    All documents concerning Biopure, Jane Kober, Thomas Moore or Howard Richman, individually, jointly or in any combination, (the "Biopure Defendants") including:

    (a)    all documents in any electronic form relating to the Biopure Defendants, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

    (b)    all documents describing, analyzing or discussing the Biopure Defendants;

    (c)    all documents relating to any studies or trials (actual or otherwise) by or on behalf of Biopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial by or on behalf of Biopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports by or on behalf of Biopure;

(f)     all documents relating to any BLA, IND, or any other regulatory submission by or on behalf of Biopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to the Biopure Defendants;

(h)     all communications between the FDA and the SEC relating to the Biopure Defendants;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to the Biopure Defendants;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to the Biopure Defendants;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), relating to the Biopure Defendants;

(l)     all documents relating to the Biopure Defendants that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)     all documents relating to the Biopure Defendants in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)     any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)     all other documents relating to the Biopure Defendants not already requested in ¶¶ 2 (a)-(n), above.

4.     All documents concerning Hemopure, including:

(a)     all documents in any electronic form relating to Hemopure, including all email, computer hard drives, documents on any form of network, deleted electronic documents, DVDs, CDs, tape or other backup, storage or archive systems;

(b)     all documents describing, analyzing or discussing Hemopure;

(c)     all documents relating to any studies or trials (actual or otherwise) for Hemopure;

(d)     all documents relating to any endpoints (actual or otherwise) relating to any study or trial for Hemopure;

(e)     all documents relating to any protocols, statistical analysis plans or clinical study reports relating to Hemopure;

(f)     all documents relating to any Biologics License Application, Investigational New Drug, or any other regulatory submission for Hemopure;

(g)     all communications between the FDA any other governmental agency, body, or entity, relating to Hemopure;

(h)     all communications between the FDA and the SEC relating to Hemopure;

(i)     all communications between the FDA and any individual or entity not employed by or part of a governmental agency, body or entity, relating to Hemopure;

(j)     all documents issued, distributed, published, circulated or otherwise made available to the public relating to Hemopure;

(k)     all documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States relating to Hemopure;

(l)     all documents relating to Hemopure that are not physically located at the FDA but which the FDA has possession, custody or control;

(m)   all documents relating to Hemopure in the possession, custody or control (or at any time previously in the possession, custody or control) of Lawrence Landow, Toby Silverman, Franklin Stephenson or Basil Golding;

(n)   any reports, presentations, memoranda, notes, drafts, diagrams, memoranda, minutes, communications, correspondence, discussions, briefings, agendas, or analyses relating to any of the above, and

(o)   all other documents relating to Hemopure not already requested in ¶¶ 1(a)-(n), above.

5.   All documents concerning, constituting or reflecting any communications between the FDA and the SEC about Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

6.   All calendar entries, diary entries, travel records, expense receipts and reports, agendas, notes, communications, and other documents relating to any meetings between the FDA and the SEC concerning, in whole or in part, Biopure, the Biopure Defendants, Hemopure, Biopure's public disclosures or Biopure's communications with the FDA.

7.   All documents concerning this lawsuit and any other lawsuit involving the Biopure Defendants or Hemopure, whether concluded, pending, or contemplated.

8.   All complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time.

9.   All complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time.

10.   All documents concerning, constituting or reflecting any communications within FDA about changing wording of complete response letters during the period July 1, 2002 through the present.

11.   All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #2.

12. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams, files, communications and e-mails, concerning any revisions (whether contemplated, considered, proposed or implemented) to CBER's Standard Operating Procedures and Policies 8405, Version #3.

13. All documents issued, distributed, published, circulated or otherwise made available to the public by the FDA concerning Biopure's BLA for Hemopure.

14. All documents concerning Biopure's clinical studies regarding Hemopure, including comments concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, communications concerning Biopure's clinical studies regarding Hemopure, and internal memoranda concerning Biopure's clinical studies regarding Hemopure.

15. All documents concerning the FDA's consideration of Biopure's clinical studies regarding Hemopure, including communications concerning that issue with the FDA.

16. All documents concerning communications with the FDA about proposed revisions to Biopure's clinical studies regarding Hemopure.

17. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to any research projects, studies, or cost analysis conducted, initiated or funded by the United States (including the FDA), concerning Hemopure.

18. All standard record retention schedules maintained pursuant to which existing FDA records are subject to routine destruction as described in 20 C.F.R. 20.23(c).

19. All documents, including any correspondence, reports, presentations, memoranda, notes, drafts, diagrams and e-mails, relating to the dissolution of, or potential dissolution of CBER.

20. Any proposed or final guidelines, protocols, FAQ's or other advisories for the information or assistance of those making public disclosures of the status of a drug biologics application approval or denial by the FDA.

21. All documents relating to the joint FDA/SEC effort to increase the public's protection from false and misleading statements by enhancing inter-agency cooperation.

22.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Lawrence Landow.

23.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Franklin Stephenson.

24.    Personnel file, job description and performance reviews during the period January 1, 2002 through January 1, 2005 of Toby Silverman.

## DEFINITIONS AND INSTRUCTIONS

Defendant incorporates by reference the Uniform Definitions In Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5.

Additionally, the following definitions and instructions shall apply:

(A)    "Biopure Corporation" and "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, its business (past, present and future whether actual, or contemplated), its officers, directors, employees, representatives, agents, and all other persons or entities action on its behalf.

(B)    The "Center for Biologics Evaluation and Research" and "CBER" include the Center for Biologics Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(C)    The "Center for Drug Evaluation and Research" and "CDER" include the Center for Drug Evaluation and Research and each of its officers, employees, agents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its/his request or on its behalf.

(D)    The "Food and Drug Administration" and "FDA" includes the Food and Drug Administration, CBER, CDER, and each of their respective officers, employees, gents, representatives, attorneys, and/or any other individual or entity presently or formerly acting at its request or on its behalf.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, the following items, whether typed, printed, recorded, written out by hand, photographed,

microfilmed, microfiched, or reproduced by any other mechanical or electronic process, including any information maintained on computer memory disk or electronic or magnetic media, whether or not printed out, and any information to which you have access by reason of any computer, including, without limitation: agreements; contracts; communications, including intra-company communications; correspondence; e-mails; envelopes; telegrams; telecopies; telefacsimilies; memoranda; agenda; books; summaries of records of personal or telephone conversations or interviews; telephone logs, diaries; articles; newspapers; circulars; brochures; pamphlets; forecasts; statistical statements; accountants; work papers; graphs; charts; slides; drawings; diagrams; films; video tapes; visual aids; audio tapes; compact discs or CD-ROMs; accounts; analytical records; worksheets; worksheet files; spreadsheets; word processor files; minutes or records of meetings or conferences; reports or summaries of interviews; reports or summaries of investigations; opinions or reports of consultants; appraisals' records; reports or summaries of negotiations; trade letters; press releases; notes; projections; drafts of any documents; working papers; securities ledgers; checks, front and back; check stubs or receipts; including any other document or writings of whatever description.

(F)     The term "communication" is used in the broadest sense and means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether written or oral, and includes without limitation all forms of electronic mail, voice mail or other recorded forms of communication.    It includes, but it not limited to, documents, meetings, and conversations. To the extent the communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation, and (b) state the nature and substance of the meeting or conversation. The term "communications" means yes transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(G)     The term "person" includes natural persons, or any business, legal, or governmental entity or association.

(H)     The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; the word "include" or "including" means including without limitation.

(I)     Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

(J)    If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following information with respect to any such document withheld:  date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed and the paragraph of this Subpoena to which such document relates.

(K)    In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without limitation, the following information:  date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

(L)    If you have any objections to this Subpoena, a written statement containing those objections is to be furnished at the time specified herein for the production of documents.

(M)    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production if the FDA or the Center for Biologics Evaluation and Research obtains or discovers additional documents between the time of initial production and the time of hearing or trial.

(N)    All documents are to be produced as they are kept in the usual course of business so that Biopure can ascertain the file in which they are located, their relative order in such files and how such files were maintained.

**EXHIBIT M**

NOV-15-2005  16:05     CHIEF COUNSEL/FDA                301 443 0739    P.01



CC *(handwritten notes)* Kobel, Dougherty, Premity, Lehmany[?] Blended[?]

**U.S. Department of Health and Human Services**
**Office of the General Counsel**
**Food and Drug Division**
**Food and Drug Administration**
**Office of the Chief Counsel**
**Mailcode GCF-1**
**5600 Fishers Lane**
**Rockville, Maryland 20857**

## FAX TRANSMISSION COVER SHEET

**DATE: November 15, 2005**

**TO:**   Robert A. Buhlman
          Bingham McCutchen LLP
          150 Federal Street
          Boston, MA 02110

     **FAX: (617) 951-8736**          **PHONE:**     **(617) 951-8717**

**FROM: Michael Shane**

     **FAX: (301) 827-7876**          **PHONE:**     **(301) 827-2802**

**PAGES (INCLUDING THIS COVER SHEET): 3**

**Subject:**     SEC v. Biopure Corp., et al.

**MESSAGE:**     Please see the attached letter.

**NOTE:**  IF YOU DO NOT RECEIVE A LEGIBLE DOCUMENT OR ALL OF THE PAGES, PLEASE TELEPHONE US.

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE ADDRESSEE, OR A PERSON AUTHORIZED TO DELIVER THE DOCUMENT TO THE ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISCLOSURE, DISSEMINATION, COPYING, OR OTHER ACTION BASED ON THE CONTENT OF THIS COMMUNICATION IS NOT AUTHORIZED. IF YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN IT TO US BY MAIL.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the General Counsel

Office of the Chief Counsel
Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD 20857

November 15, 2005

**VIA FACSIMILE AND U.S. MAIL**
**617-951-8736**

Robert A. Buhlman
Bingham McCutchen LLP
150 Federal Street
Boston MA 02110

> Re:    Securities and Exchange Commission v. Biopure Corp., et al.,
>        Civil Action No. 05-11853-PBS

Dear Mr. Buhlman:

I write on behalf of the United States Food and Drug Administration ("FDA") in response to the three November 2, 2005 subpoenas for testimony and documents directed to: (1) Keeper of Records of FDA, (2) Keeper of Records of the FDA Center for Biologics Evaluation and Research ("CBER"), and (3) Lawrence Landrow, CBER. For the reasons discussed below, FDA, a non-party in the above-referenced action, objects to the subpoenas and requests that they be withdrawn.

First, FDA cannot be compelled to testify or produce records in response to a subpoena issued pursuant to Rule 45 of the Federal Rules of Civil Procedure. Rule 45 provides, in part, that "[e]very subpoena shall . . . command each person to whom it is directed to attend and give testimony or to produce and permit inspection and copying of designated . . . documents." Fed. R. Civ. P. 45(a)(1)(C). The Supreme Court has consistently held that, as a matter of plain meaning, "the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude [the government]." Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989) (first two alterations in original) (citation omitted); see also Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 780-81 (2000). Lower courts have therefore held that a subpoena issued pursuant to Rule 45 may not be used to seek discovery from an agency of the federal government because the term "person" as used in that Rule does not include the federal government. See Yousuf v. Samantar, No. 05-110, 2005 U.S. Dist. LEXIS 8488, at *14 (D.D.C. May 3, 2005) (holding that Rule 45 cannot be used to compel a federal agency to produce documents when it is not a party to the case); United States ex rel. Taylor v. Gabelli, No. 04-534, 2005 U.S. Dist. LEXIS 8489, at *7 (D.D.C. May 2, 2005) (stating that "the term 'person' in Rule 45, in the absence of a satisfactory basis to override this interpretive presumption [that 'person' excludes the sovereign], does not include the federal government"); Lerner v. District of Columbia, No. 00-1590, 2005 U.S. Dist. LEXIS 10154, at *17 (D.D.C. Jan.

7, 2005) (finding that the court lacked jurisdiction to subpoena the federal government because "the 'requisite affirmative indications' that the term 'person' in Rule 45 includes the federal government are absent"); see also Al-Fayed v. CIA, 229 F.3d 272, 276-77 (D.C. Cir. 2000) (affirming the district court's quashing of a subpoena issued under 28 U.S.C. § 1782 because there was no "affirmative evidence to disturb the presumption that 'person' excludes the sovereign").

Second, the subpoenas do not comply with the criteria set forth in FDA's regulations, 21 C.F.R. part 20, governing requests for the testimony of FDA employees. These regulations describe the procedures that must be followed when litigants request testimony from an officer or employee of FDA. The regulations specifically prohibit officers and employees of FDA from testifying about FDA functions or information acquired in the discharge of their official duties. 21 C.F.R. § 20.1(a). Any person who desires testimony from an FDA employee must submit a written request to the Commissioner in accordance with the procedures set forth in 21 C.F.R. § 20.1(c). Both the Supreme Court and the United States Court of Appeals for the Fourth Circuit have held that, under the principles of sovereign immunity, an administrative agency may promulgate regulations that limit the extent to which demands for the testimony of agency employees and documents will be honored in civil litigation in which the agency is not a party. See United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951); COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 278 (4th Cir. 1999); Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir. 1989).

Third, even if FDA could properly be compelled to give testimony or produce records in response to subpoenas issued pursuant to Rule 45, the agency objects to the subpoenas on the following additional grounds:

     (1)    The subpoenas may require disclosure of information that is or contains proprietary, trade secret, confidential commercial, personal privacy, investigatory, pre-decisional, and/or agency deliberative process information that is protected from disclosure under the applicable laws, regulations, or privileges;

     (2)    The subpoenas, which request twenty-three broad categories of documents, several of which contain up to fifteen additional subcategories, are unduly burdensome and over broad, particularly in that they request documents and correspondence (relating to Biopure and Hemopure) that are decades old. In order to fully respond to the subpoenas, the agency would need to search for and obtain documents from federal records storage areas and archives. Therefore, compliance with the subpoenas would require an unreasonable commitment of agency resources;

     (3)    The subpoenas are unduly burdensome in that they request documents that may be maintained by agencies other than the FDA;

     (4)    The subpoenas are unduly burdensome in that they request documents, many of which are already in defendant's possession;

2

(5)    The subpoenas are unduly burdensome in that they request "complete response" letters sent to entities other than Biopure, including all complete response letters "sent out by FDA at any time." Even assuming that the requests were limited to complete response letters issued by CBER, in order to respond to this request, FDA would be required to conduct a search of thousands of documents relating to virtually every BLA application and supplement received by CBER from any BLA applicant. Responding to this broadly-drafted request would require extensive resources, significantly affecting the agency's ability to pursue its public health mission. Furthermore, these documents would require significant redaction because they contain trade secret and other confidential commercial and otherwise protected information that may not be disclosed; and

(6)    The subpoenas fail to allow reasonable time for the agency to comply. The subpoenas were served on the Department of Health and Human Services on November 4, 2005, and I did not receive a copy of them until November 10, 2005. Given the breath of the subpoenas, it is simply impossible for the FDA to obtain, review, and redact the requested documents within the short window provided in the subpoenas. Upon preliminary review of the subpoenas, CBER's Division of Disclosure and Oversight Management estimates that, given CBER's limited resources, current queue of requests, and public health priorities, it would take over a year to search for, identify, and copy responsive documents. Redaction of responsive documents would require an additional six months to a year.

Without waiving any of the objections above, I am available to discuss with you other avenues for obtaining information from the agency, including, if you wish, placing your requests for documents in CBER's Freedom of Information Act queue. Moreover, it is my understanding that the Securities and Exchange Commission ("SEC") has asked the FDA for permission to release all FDA documents that were provided to SEC by FDA, as well as transcripts of investigative testimony provided by FDA employees. FDA has begun the process of reviewing those materials, and plans to respond to SEC's request as soon as that review is completed. Please feel free to contact me at (301) 827-2802 if you would like to discuss this matter further.

Sincerely,

Michael Shane
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration

cc:    Anne P. Smith, Testimony Specialist, FDA

3

EXHIBIT N

JAN-24-2006  15:26          CHIEF COUNSEL/FDA                    301 443 0739    P.01



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
OFFICE OF THE GENERAL COUNSEL, FOOD AND DRUG DIVISION
FOOD AND DRUG ADMINISTRATION
OFFICE OF THE CHIEF COUNSEL
MAILCODE GCF-1
5600 FISHERS LANE
ROCKVILLE, MARYLAND 20857

## FAX TRANSMISSION COVER SHEET

**DATE:**          January 24, 2006

**TO:**            Donald J. Savery            **FAX:** 617-951-8736    **VOICE:**

**FROM:**          Michael Shane              **FAX:** 301-827-7876    **VOICE:** 301-827-2802

**Transmitted by:** Terri Andersen @ 301-827-1187

**PAGES (INCLUDING THIS COVER SHEET): 5**

*MESSAGE:*

*SEC v Biopure subpoenas*

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE ADDRESSEE, OR A PERSON AUTHORIZED TO DELIVER THIS DOCUMENT TO THE ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISCLOSURE, DISSEMINATION, COPYING, OR OTHER ACTION BASED ON THE CONTENT OF THIS COMMUNICATION IS NOT AUTHORIZED. IF YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN IT TO US BY MAIL.

JAN-24-2006  15:26          CHIEF COUNSEL/FDA                    301 443 0739    P.02



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Office of the General Counsel

                                                    Office of the Chief Counsel
                                                    Food and Drug Administration
                                                    5600 Fishers Lane, GCF-1
                                                    Rockville, MD 20857

                              January 24, 2006

**VIA FACSIMILE AND U.S. MAIL (617-951-8736)**

Donald J. Savery
Bingham McCutchen LLP
150 Federal Street
Boston MA 02110

          Re:    Securities and Exchange Commission v. Biopure Corp., et al.,
                 Civil Action No. 05-11853-PBS

Dear Mr. Savary:

I write on behalf of the United States Food and Drug Administration ("FDA") in response to the
subpoenas for testimony and documents directed to FDA employees Toby Silverman and
Franklin Stephenson that were served on the Department of Health and Human Services on
January 17, 2006. As you are aware, the subpoenas directed to Drs. Silverman and Stephenson
are nearly identical to three subpoenas that your firm directed to other FDA employees on
November 2, 2005. As you are also aware, on January 20, 2006, United States Magistrate Judge
Alan Kay granted the FDA's motion to quash Biopure's November 2 third-party subpoenas and
denied Biopure's motion to compel discovery in case number 1:05-mc-00506-RWR-AK (the
"January 20 Order"). For the reasons discussed below, those stated in our correspondence and
pleadings concerning your three previous subpoenas, as well as those stated in the January 20
Order, FDA, a non-party in the above-referenced action, objects to Biopure's January 17
subpoenas and requests that they be withdrawn.

First, as explained in Magistrate Kay's January 20 Order, FDA cannot be compelled to testify or
produce records in response to subpoenas issued pursuant to Rule 45 of the Federal Rules of
Civil Procedure. Rule 45 provides, in part, that "[e]very subpoena shall . . . command each
person to whom it is directed to attend and give testimony or to produce and permit inspection
and copying of designated . . . documents." Fed. R. Civ. P. 45(a)(1)(C). The Supreme Court has
consistently held that, as a matter of plain meaning, "the term 'person' does not include the
sovereign, [and] statutes employing the [word] are ordinarily construed to exclude [the
government]." Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989) (first two alterations
in original) (citation omitted); see also Vt. Agency of Natural Res. v. United States ex rel.
Stevens, 529 U.S. 765, 780-81 (2000). Lower courts have therefore held that a subpoena issued
pursuant to Rule 45 may not be used to seek discovery from an agency of the federal government
because the term "person" as used in that Rule does not include the federal government. See
Yousuf v. Samantar, No. 05-110, 2005 U.S. Dist. LEXIS 8488, at *14 (D.D.C. May 3, 2005)
(holding that Rule 45 cannot be used to compel a federal agency to produce documents when it is
not a party to the case); United States ex rel. Taylor v. Gabelli, No. 04-534, 2005 U.S. Dist.

LEXIS 8489, at *7 (D.D.C. May 2, 2005) (stating that "the term 'person' in Rule 45, in the absence of a satisfactory basis to override this interpretive presumption [that 'person' excludes the sovereign], does not include the federal government"); Lerner v. District of Columbia, No. 00-1590, 2005 U.S. Dist. LEXIS 10154, at *17 (D.D.C. Jan. 7, 2005) (finding that the court lacked jurisdiction to subpoena the federal government because "the 'requisite affirmative indications' that the term 'person' in Rule 45 includes the federal government are absent"); see also Al-Fayed v. CIA, 229 F.3d 272, 276-77 (D.C. Cir. 2000) (affirming the district court's quashing of a subpoena issued under 28 U.S.C. § 1782 because there was no "affirmative evidence to disturb the presumption that 'person' excludes the sovereign").

Second, as recognized in the January 20 Order, the subpoenas do not comply with the criteria set forth in FDA's regulations, 21 C.F.R. part 20, governing requests for the testimony of FDA employees. These regulations describe the procedures that must be followed when litigants request testimony from an officer or employee of FDA. The regulations specifically prohibit officers and employees of FDA from testifying about FDA functions or information acquired in the discharge of their official duties. 21 C.F.R. § 20.1(a). Any person who desires testimony from an FDA employee must submit a written request to the Commissioner in accordance with the procedures set forth in 21 C.F.R. § 20.1(c). Both the Supreme Court and the United States Court of Appeals for the Fourth Circuit have held that, under the principles of sovereign immunity, an administrative agency may promulgate regulations that limit the extent to which demands for the testimony of agency employees and documents will be honored in civil litigation in which the agency is not a party. See United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951); COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 278 (4th Cir. 1999); Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir. 1989).

Third, even if FDA could properly be compelled to give testimony or produce records in response to subpoenas issued pursuant to Rule 45, the agency objects to the subpoenas directed to Drs. Silverman and Stephenson on the following additional grounds:

(1)    The subpoenas may require disclosure of information that is or contains proprietary, trade secret, confidential commercial, personal privacy, investigatory, pre-decisional, and/or agency deliberative process information that is protected from disclosure under the applicable laws, regulations, or privileges;

(2)    The subpoenas, which request twenty-four broad categories of documents, several of which contain up to fifteen additional subcategories, are unduly burdensome and over broad, particularly in that they requests documents and correspondence (relating to Biopure and Hemopure) that are decades old. In order to fully respond to the subpoenas, the agency would need to search for and obtain documents from federal records storage areas and archives. Therefore, compliance with the subpoenas would require an unreasonable commitment of agency resources;

2

(3)     The subpoenas are unduly burdensome in that they request documents that may be maintained by agencies other than the FDA;

(4)     The subpoenas are unduly burdensome in that they request documents, many of which are already in defendant's possession;

(5)     The subpoenas are unduly burdensome in that they request "complete response" letters sent to entities other than Biopure, including all complete response letters "sent out by FDA at any time." Even assuming that the requests are limited to complete response letters issued by CBER, in order to respond to these requests, FDA would be required to conduct a search of thousands of documents relating to virtually every BLA application and supplement received by CBER from any BLA applicant. Responding to these broadly-drafted requests would require extensive resources, significantly affecting the agency's ability to pursue its public health mission. Furthermore, these documents would require significant redaction because they contain trade secret and other confidential commercial and otherwise protected information that may not be disclosed; and

(6)     The subpoenas fail to allow reasonable time for the agency to comply. The subpoenas were served on the Department of Health and Human Services on January 17, 2006. Given the breath of the subpoenas, it is simply impossible for the FDA to obtain, review, and redact the requested documents within the short window provided in the subpoenas. Upon preliminary review of the subpoenas, CBER's Division of Disclosure and Oversight Management estimates that, given CBER's limited resources, current queue of requests, and public health priorities, it would take over a year to search for, identify, and copy responsive documents. Redaction of responsive documents would require an additional six months to a year.

Without waiving any of the objections above, I am available to discuss with you other avenues for obtaining information from the agency, including, if you wish, placing your request for documents in CBER's Freedom of Information Act queue. Moreover, it is my understanding that the Securities and Exchange Commission ("SEC") has released to your client all FDA documents that were provided to SEC by FDA, as well as transcripts of investigative testimony provided by FDA employees. Finally, I am returning two checks (numbers 5912 and 5913), each for $45.00, that were attached to your subpoenas. Please feel free to contact me at (301) 827-2802 if you would like to discuss this matter further.

Sincerely,

Michael Shane
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration

cc:     Anne P. Smith, Testimony Specialist, FDA

3

JAN-24-2006  15:27          CHIEF COUNSEL/FDA                    301 443 0739      P.05

**CAPITOL PROCESS SERVICES, INC.**
PH. 202-667-0050
1827 18TH STREET, NW
WASHINGTON, DC  20009

Date Jan. 12, 2006

Pay to the order of _Toby Silverman_                              $ 45.00

_Forty- five and_  no/100                                    Dollars

WACHOVIA BANK, N.A.
WACHOVIA.COM

For _Witness fee_                         angela H. Croson

⑈000059¡2⑈ ⑆051400549⑊ 2000007613¡7⑈

---

**CAPITOL PROCESS SERVICES, INC.**                              5913
PH. 202-667-0050
1827 18TH STREET, NW
WASHINGTON, DC  20009

Date Jan. 12, 2006

Pay to the order of _Franklin Stephenson_                        $ 45.00

_Forty- five and_  no/100                                    Dollars

WACHOVIA BANK, N.A.
WACHOVIA.COM

For _Witness fee_                         angela H. Croson

⑈0000591 3⑈ ⑆051400549⑊ 2000007613¡7⑈

TOTAL P.05

EXHIBIT O

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE          )
COMMISSION,                      )
        Plaintiff,        )
                                 )       Miscellaneous 05-00506 (RWR/AK)
        v.                )
                                 )
BIOPURE CORPORATION, *et al.*,   )
        Defendants.       )
_____)

## ORDER

     Upon consideration of Defendant Biopure Corporation's Motion to Compel FDA

Compliance with Federal Subpoenas ("Motion to Compel") [1], and Non-Party Respondent

United States Food and Drug Administration's [consolidated] Motion to Quash Subpoenas Duces

Tecum and Opposition to Motion to Compel ("Motion to Quash") [5/6], and the documents

associated with both motions, in support and in opposition thereto, for the reasons set forth in

detail in the accompanying Memorandum Opinion, it is this 20th day of January, 2006,

     ORDERED that Biopure's Motion to Compel [1] is DENIED, and it is further,

     ORDERED that the FDA's Motion to Quash [5/6] is GRANTED, and it is further

     ORDERED that pursuant to the FDA's suggestion that the Court enter an order directing

the parties to confer for the purpose of narrowing the scope of Biopure's requests and allowing

the FDA a reasonable amount of time to respond, and directing the Biopure shall assume the

costs associated with the requests, the parties are directed to meet and confer at a mutually

convenient place and time, to make a good faith effort to effect a resolution of this dispute.


                              _____
                              ALAN KAY
                              UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) | |
| | ) | Miscellaneous 05-00506 (RWR/AK) |
| v. | ) ) | |
| BIOPURE CORPORATION, *et al.*, | ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Biopure Corporation's Motion to Compel FDA

Compliance with Federal Subpoenas ("Motion to Compel") [1]; Plaintiff Securities and

Exchange Commission's ("SEC") Response thereto ("Response")[4]; Non-Party Respondent

United States Food and Drug Administration's (hereinafter "Respondent" or "FDA")

[consolidated] Motion to Quash Subpoenas Duces Tecum and Opposition to Motion to Compel

("Motion to Quash") [5/6]; Defendant Biopure Corporation's Reply Memorandum of Law in

Further Support of the Motion to Compel and in Opposition to the Motion to Quash

("Opposition") [7/8]; the SEC's Surreply [no docket number assigned]; and the Reply by the

Food and Drug Administration ("Reply") [11].[1] Defendant Biopure Corporation ("Defendant" or

---

[1]Biopure Corporation contests the Securities and Exchange Commission's standing to challenge the Motion to Compel or enforcement of the subpoenas, on grounds that the SEC "claims no interest or privilege in the FDA documents at issue . . . ." Motion to Compel at 16 (emphasis in original). *See Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C. 2005)("A party generally lacks standing to challenge a subpoena issued to a third-party absent a claim of privilege, proprietary interests, or personal interest in the subpoenaed matter.") (citations omitted). The Court notes that this dispute centers around the arguments made by Biopure Corporation in its Motion to Compel and by the FDA in it Motion to Quash. The arguments in the SEC's Response and its Surreply are encompassed within the FDA's pleadings and thus, the Court permitted the filing of

"Biopure") moves to compel the FDA to comply with three subpoenas served on the FDA by

Biopure. *See* Motion to Compel Exhibits A-C (copies of the three subpoenas).  The subpoenaed

discovery is sought in connection with Biopure's defense in a federal, civil enforcement action

pending in the United States District Court for the District of Massachusetts.[2]  For the reasons

set forth herein, Defendant's Motion to Compel is denied and Respondent FDA's Motion to

Quash is granted.  An appropriate Order accompanies this Memorandum Opinion.

## I. Background

_____On November 4, 2005, Biopure served upon the FDA and one of its divisions, the Center

for Biologics Evaluation and Review ("CBER"), three subpoenas seeking the production of

business records and the depositions of the FDA and CBER record-keepers, as well as the

deposition of Lawrence Landow, an employee of CBER.  By Letter dated November 15, 2005,

counsel for the FDA objected to the Biopure subpoenas on grounds that the subpoenas:

(1) could not be used to obtain discovery from FDA because the United States is not a person
within the meaning of Rule 45 and cannot be served with a third- party subpoena; (2) did not
comply with the FDA's *Touhy* regulations governing requests for FDA testimony; (3) requested
documents containing "proprietary, trade secret, . . . and/or agency deliberative process
information" that is not subject to release; (4) were unduly burdensome, over[ly] broad, and
would require an unreasonable commitment of agency resources; (5) were unduly burdensome
in that they requested documents that may be maintained by agencies other than the FDA; (6)
were unduly burdensome in that they requested documents that were already in Biopure's
possession; (7) were unduly burdensome in that they requested "completed response letters"
sent to entities other than Biopure, . . . ; and (8) did not give the FDA a reasonable time to
respond.

*See* November 15, 2005 Letter attached as Motion to Compel Exhibit E.  FDA's counsel

---

such documents without specifically addressing the SEC's standing to object.

[2]Biopure indicates that trial in that matter is set to commence on May 8, 2006.  Motion to
Compel at 3.

indicated that Plaintiff Securities and Exchange Commission ("SEC") had requested permission

to release to Biopure documents that were obtained from the FDA by the SEC. The SEC has

now confirmed that "transcripts of [deposition] testimony [by FDA witnesses] and copies of all

documents released to the SEC by FDA have already been provided by the SEC to Biopure and

the other defendants." Response at 1-2.

On December 9, 2005, Biopure filed the instant Motion to Compel. On December 23,

2005, the SEC filed its response and non-party FDA responded by filing a consolidated

opposition and motion to quash (together referred to as the "Motion to Quash"). The Motion to

Compel and Motion to Quash have now been fully briefed and are ripe for determination by this

Court.[3]

## II. The FDA Challenges the Subpoenas
## A. Applicability of Fed. R. Civ. P. 45

Respondent FDA's foremost challenge to enforcement of the subpoenas is based on its

argument that Fed. R. Civ. P. 45 does not authorize subpoenas, or subpoena enforcement

proceedings, against non-party federal agencies or employees because under Rule 45, a

subpoena may only be directed to a "person" and that term does not include federal agencies or

its employees.[4] *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ( "[T]he term

'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily

---

[3]Biopure requested an expedited oral hearing on the Motion to Compel but the Court determined that a hearing is unnecessary.

[4]Rule 45 provides, in relevant part, that: "Every subpoena shall . . . command each person to whom it is directed to attend and give testimony or produce and permit inspection and copying of designated books, documents or tangible things in the possession, custody or control of that person, . . . ." Fed. R. Civ. P. 45(a)(1)(C).

-3-

construed to exclude [the government].") (internal quotations omitted). *See also Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) ("[W]e must apply . . . our longstanding interpretive presumption that 'person' does not include the sovereign.")

Defendant Biopure challenges the FDA's assertion that Rule 45 does not authorize subpoenas against federal agencies, relying heavily on *Houston Bus. Journal, Inc. v. Office of the Comptroller, Dep't of Treasury*, 86 F.3d 1208, 1212 (D.C. Cir. 1996), wherein the Court of Appeals for the D.C. Circuit stated that: "A federal-court litigant . . . can seek to obtain the production of documents from a federal agency by means of a federal subpoena." The Court of Appeals further noted that to the extent that a federal agency's regulation "may be to the contrary, it conflicts with Federal Rule of Civil Procedure 45 and exceeds the [agency's] authority under the Housekeeping Statute [also referred to as *Touhy* regulations]."[5] *Id.*

In *Houston Bus. Journal*, a private company sought to compel the Office of the Comptroller to comply with subpoenas issued in connection with a state court libel action in which the company was a defendant. The Comptroller refused to comply with the subpoenas, citing its regulations governing the testimony of agency employees enacted under "*Touhy* regulations," codified at 5 U.S.C. §301. The D.C. Circuit affirmed the District Court's denial of the motion to compel, holding that because the underlying litigation was in state court, the district court did not have jurisdiction to issue the subpoena. It is that context in which the Court of Appeals engaged in its discourse on the [differences between procedures available to

_____

[5]*See Touhy v. Ragen*, 340 U.S. 462, 467 (1951) (holding that federal agencies, in the interest of internal administration, may promulgate regulations governing an agency's procedures for producing documents and testimony under certain circumstances.)

-4-

state court and] federal court litigants seeking documents from a non-party government agency.

The FDA notes that the *Houston Business Journal* case did "not involve the questions of whether Rule 45's reference to 'person' included the government, so the Court's statement about that issue was dicta." Reply at 8. Respondent further alleges that the dicta from *Houston Bus. Journal* cited by Biopure is superceded by the holdings in *Vermont Agency of Natural Resources, supra.* at 781 (courts should presume that "person" excludes the government absent an "affirmative showing of statutory intent to the contrary") and *Al Fayed v. CIA*, 229 F.3d 272, 312-13 (D.C. Cir. 2000) (where the D.C. Circuit affirmed the district court's order quashing a subpoena issued under a statute similar in effect to Rule 45 because there was no "affirmative evidence to disturb the presumption that 'person' excludes the sovereign.")

*See also Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001) ("Although our past decisions have assumed that 'person' in Rule 45 included the federal government, we have never expressly so held and our assumption may need to be reexamined in light of *Al Fayed*) and *AlohaCare, Inc. v. Haw. Dep't of Human Servs. (In re: Subpoena Duces Tecum to Tommy G. Thompson)*, Misc. No. 04-498 (D.D.C. June 28, 2005) (an unreported case in which the Honorable Colleen Kollar-Kotelly noted that, in *Linder, id.* at 180, the D.C. Circuit "dropped significant hints that the federal government [is] outside the purview of Rule 45[,]" and she thus concluded [Memorandum Opinion at 9] that the term "person" in Rule 45 does not include the federal government.) Biopure's reliance on dicta from *Houston Business Journal* is not persuasive in light of the D.C. Circuit's language in *Al Fayed* and *Linder*, and the *AlohaCare* case.

Biopure also cites Fed. R. Civ. P. 30(b)(6) in support of its contention that a

-5-

governmental agency is subject to a subpoena. That contention was discussed and dismissed in

*AlohaCare, id.*, where that Court held that [t]here is a clear distinction between Rule 30 and
Rule 45 that Aloha Care has ignored; Rule 30 and Rule 45, drafted over three decades apart,
serve vastly different purposes. Rule 45 deals with subpoenas exclusively, while Rule 30 deals
with subpoenas in the limited context of their application to oral depositions. * * * Rule
30(b)(6) simply establishes a discrete procedure for a narrow circumstance in which a party
seeks testimony from an organizational entity, and obliges that party to identify the natural
person who will testify. The Rule applies to both a party ("notice") and to non-party
("subpoena") depositions. . . . If the Government is a party, Rule 30(b)(6) certainly applies to it;
however, when it is not a party, the availability of a subpoena is governed by Rule 45. If Rule
45 was intended to extend to the federal government, the Judicial Conference and Congress had
ample opportunity to amend the Rule in conformity with the language of Rule 30. Given both
the lack of clear expression of such an intent and the governing rules of statutory construction,
the Court rejects AlohaCare's request for it to judicially amend the Federal Rules of Civil
Procedure and instead emphasizes the clear distinction between the scope of the twin Rules.

In addition to United States District Court Judge Kollar-Kotelly's decision in

*AlohaCare*, several other judges from this Court have recently addressed whether, as a matter of

interpretation, the word "person" in Fed. R. Civ. P. 45 includes the federal government, and all

have concluded that it does not. *See Yousuf. v. Samantar*, Misc. No. 05-110, 2005 U.S. Dist.

LEXIS 8488, at *14 (D.D.C. May 3, 2005) (where the Honorable Reggie Walton found that "a

federal government agency is not a 'person' within the meaning of Rule 45 and thus [a court]

cannot enforce a Rule 45 subpoena served on such an agency.")[6] *See also United States ex rel.*

*Taylor v. Gabelli*, Misc. No. 04-534, 2005 U.S. Dist. LEXIS 8489, at *7 (D.D.C. May 2, 2005)

(wherein the Honorable Richard Leon held that "the term 'person' in Rule 45, in the absence of

a satisfactory basis to override this interpretive presumption [that 'person' excludes the

sovereign], does not include the federal government"); *Lerner v. District of Columbia*, Civil

---

[6]This decision has been appealed. *See* 2005 U.S. App. LEXIS 21043 (D.C. Cir. Sept. 26,
2005).

Action No. 00-1590, 2005 U.S. Dist. LEXIS 10154, at \*17 (D.D.C. Jan. 7, 2005) (where the Honorable Gladys Kessler found that the Court lacked jurisdiction to subpoena two federal agencies because "the 'requisite affirmative indications' that the term 'person' in Rule 45 includes the federal government [we]re absent"); and *Truex v. Allstate Ins. Co.*, Misc. No. 05-439, 2006 U.S. Dist. LEXIS 424, at \*11 (D.D.C. Jan. 1, 2006) ("In response to *Al Fayed* and *Linder*, the District Court has re-examined the assumption that Rule 45 applies to the federal government and held that 'person' as used in Rule 45 does not include the federal agencies.") *See generally Chen v. Ho*, 368 F. Supp.2d 97,98 (D.D.C. 2005) ("[W]hen a federal agency, pursuant to so-called *Touhy* regulations, prohibits its employees from responding to a *subpoena ad testificandum* without agency approval and declines to grant that approval . . . , the requesting party must then proceed under the APA, and a federal court will review the agency's decision . . ..") (citation omitted).

In footnote 5 of its Opposition, Biopure cites two cases from this District Court, which allegedly counter the impact of the aforementioned recent decisions. *See Providian Financial Corp. Securities Litigation*, 222 F.R.D. 22 (D.D.C. 2004), and *Ho v. United States*, 374 F. Supp.2d 82 (D.D.C. 2005). It does not appear however that the governmental parties in these two cases raised the argument that they were not persons within the meaning of Rule 45. *See Providian, supra.*(summarizing relevancy and privilege based objections made by the Comptroller of the Currency) and *Ho v. United States*, 374 F. Supp.2d 82, (D.D.C. 2005) (accepting the Department of Homeland Security's argument that it could not be compelled to respond to the plaintiff's Rule 45 subpoena because the agency had enacted valid *Touhy* regulations).

-7-

Biopure attempts to distinguish the recent decisions from this Court, cited by FDA, by noting that "in contrast to the litigation here, in none of these cases was the federal government the plaintiff." Motion to Compel at 6. Biopure does not cite any cases to support this proposition; instead, it asserts that the FDA has provided "active assistance" to the SEC, and accordingly, "under the particular circumstances of this case, any claim that the FDA should not be required to comply with a federal subpoena, issued out of court whose jurisdiction was invoked <u>by</u> the federal government with the <u>cooperation</u> of the FDA, is frivolous and should be rejected." Motion to Compel at 9. The FDA argues that Biopure's suggestion that, in cases brought by one federal agency, the entire federal government and all of its agencies are to be treated as parties to the litigation for purposes of discovery, is unsupported by any authority.[7]

Following the Court of Appeals' reasoning in *Al Fayed, supra.* and the recent cases from this Court determining that the Government is not a party subject to the subpoena power of Rule 45, and finding no support for Biopure's proposition that because the SEC [Government] is a party, then other branches of the Government such as the FDA should also be treated as a party, the Court finds that the word "person" in Rule 45 does not apply to the FDA, and accordingly Biopure's subpoenas are not enforceable against the FDA.

---

[7]The FDA proffers that it has located one case from this district holding that different agencies should be subject to discovery in a case brought by a single agency. *See United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978). FDA explains that the *AT&T* case is inapposite because it involved "unique" circumstances and "peculiar facts, which involve[d] massive and wide-ranging allegations, and . . . many departments and their evidence," such that the government could not "claim to be merely the Department of Justice." *Id.* at 1334. The court in *AT&T* cautioned that its holding should be limited to that particular case because if not so confined, it "might encourage other litigants in other cases to rummage through the files of the entire government, and so paralyze both the work of numerous agencies and that of the court." *Id.* The FDA contends that because this case deals with issues within the purview of the SEC, an independent agency, it should not be subjected to discovery which would paralyze the FDA and keep it from performing its functions.

## B. *Touhy* Regulations

Even assuming *arguendo* that the FDA is treated as a "person" under Rule 45, Biopure

has not complied with the FDA's *Touhy* regulations in crafting its subpoena requests. The FDA

asserts that "[c]ounsel for Biopure was informed that Biopure's third-party subpoenas did not

constitute a proper request for testimony pursuant to the FDA's Touhy's regulations." Motion

to Quash at 6; *see* 21 C.F.R. §20.1. "In order to obtain the testimony of the FDA records

custodians, Biopure must submit a written request to the Commissioner of Food and Drugs."

*Id.* There is no evidence in the record before this Court that Biopure has complied with the

FDA's *Touhy* regulations in its efforts to obtain the testimony of FDA employees. The FDA

further asserts that "[e]ven if Biopure's subpoenas could be construed as a valid request for

FDA documents, . . ., it will be approximately three years before FDA will be able to begin its

search for responsive documents . . . ." Motion to Quash at 7; *see* Declaration of Joanne

Binkley, ¶35, attached as Exhibit 1. The FDA has suggested that Biopure "convert its subpoenas

into a request for documents pursuant to FOIA," with the understanding that a narrowing of the

request will "expedite production of the documents." Motion to Quash at 6-7; Binkley Decl. at

¶36.[8]    Biopure alleges that the FDA's refusal to provide testimony is particularly unfair in light

of the FDA's providing documents and testimony to the SEC pursuant to a "blanket

authorization" enabling FDA employees to share information with the SEC. Reply at 18. The

---

[8]Biopure states that "[p]ursuant to FDA regulations, service of the subpoenas automatically
triggers the FOIA process." Opposition at 5 n.8, citing 21 C.F.R. §20.2(a). The FDA suggests that
as an alternative to granting the Motion to Quash, the Court should enter an order directing the
parties to confer for the purpose of narrowing the scope of Biopure's request and allowing the FDA
a reasonable amount of time to respond, and requiring Biopure to pay the costs associated with
document production. FDA Reply at 21.

FDA contradicts this allegation, noting that it provided documents to the SEC through its

"regulations permitting the inter-agency disclosure of documents, 21 C.F.R. §20.85" and

furthermore, "unlike Biopure, the SEC complied with FDA's <u>Touhy</u> regulations in order to

obtain testimony from FDA employees." Motion to Quash at 16.   Moreover, the documents

that were given to the SEC by the FDA have also been provided to Biopure.  There is no

indication that Biopure has complied with the FDA's *Touhy* regulations in an effort to obtain

discovery and accordingly, Biopure's Motion to Compel should also be denied on those grounds

and the FDA's Motion to Quash should be granted.


DATED: January 20, 2006          _____
                                 ALAN KAY
                                 UNITED STATES MAGISTRATE JUDGE


-10-

**EXHIBIT P**

**BINGHAM McCUTCHEN**

Robert A. Buhlman
Direct Phone: (617) 951-8717
Direct Fax:    (617) 951-8736
robert.buhlman@bingham.com

January 23, 2006

### BY FACSIMILE AND REGULAR MAIL

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Paula M. Stannard, Acting General Counsel
Sheldon T. Bradshaw, Associate General Counsel
Erick M. Blumberg, Deputy Chief Counsel, Litigation
Michael Shane, Associate Chief Counsel
U.S. Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD  20857-0001

> Re:    *Securities and Exchange Commission v. Biopure Corporation, et al., United States District Court, District of Columbia, Misc. Action No. 05-00506 (RWR/AK)*

Dear Counsel:

In accordance with the Magistrate Judge's Order directing the parties to meet and confer for the purpose of narrowing the scope of Biopure's requests and allowing the FDA a reasonable amount of time to respond, Biopure would like to meet with you on any one of the following dates:  January 27, 30 or 31 (9:00 am through 11:00 am only on this date), 2006 or February 3, 6, 7 or 8, 2006.  Please let me know the earliest of those dates that you can meet with us.  Time is of the essence.

We will come to Washington D.C. to meet you.

Best regards.

Yours truly,

Robert A. Buhlman

RAB/pmd

**EXHIBIT Q**

JAN-26-2006  18:17    CHIEF COUNSEL/FDA

301 443 0739    P.01



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
OFFICE OF THE GENERAL COUNSEL, FOOD AND DRUG DIVISION
FOOD AND DRUG ADMINISTRATION
OFFICE OF THE CHIEF COUNSEL
MAILCODE GCF-1
5600 FISHERS LANE
ROCKVILLE, MARYLAND 20857

## FAX TRANSMISSION COVER SHEET

DATE:        January 26, 2006

TO:          Robert Buhlman            FAX: 617-951-8736    VOICE:

FROM:        Michael Shane             FAX: 301-827-7876    VOICE:  301-827-2802

Transmitted by:  Terri Andersen @ 301-827-1187

PAGES (INCLUDING THIS COVER SHEET):  2

MESSAGE:

*Meeting scheduled for Monday, February 6 @ 1:00-3:00pm.  I apologize for sending the wrong letter. Here is the correct one, promise*

*Terri ( Mike's secretary )*

THIS DOCUMENT IS INTENDED ONLY FOR THE USE ON THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.  IF YOU ARE NOT THE ADDRESSEE, OR A PERSON AUTHORIZED TO DELIVER THE DOCUMENT TO THE ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISCLOSURE, DISSEMINATION, COPYING, OR OTHER ACTION BASED ON THE CONTENT OF THIS COMMUNICATION IS NOT AUTHORIZED.  IF YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN IT TO US BY MAIL.

JAN-26-2006  18:17    CHIEF COUNSEL/FDA

301 443 0739    P.02

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the General Counsel

Office of the Chief Counsel
Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD 20857

January 26, 2006

**VIA FACSIMILE AND
U.S. MAIL (617-951-8736)**

Robert A. Buhlman
Bingham McCutchen LLP
150 Federal Street
Boston MA 02110

Re:    Securities and Exchange Commission v. Biopure Corp., et al.,
       Civil Action No. 05-11853-PBS

Dear Mr. Buhlman:

Pursuant to Magistrate Judge Kay's Order of January 20, 2006, and in response to your letter of
January 23, 2006, I have confirmed that the Food and Drug Administration and the Department
of Justice will be available to meet with Biopure as follows:

Date:       February 6, 2006
Time:       1:00 to 3:00 p.m.
Location:   Food and Drug Administration
            Parklawn Building
            5600 Fishers Lane
            Rockville, MD 20857
Room:       6-21

Upon entering the Parklawn Building, participants will be asked to provide identification and
will be issued visitor badges. My secretary, Terri Anderson, will be available to escort visitors to
Room 6-21. Her telephone number is (301) 827-1187.

Please feel free to contact me at (301) 827-2802 if you have any questions or would like to
discuss this matter further.

Sincerely,

Michael Shane
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration

cc:    AUSA Claire Whitaker

EXHIBIT R

**BINGHAM McCUTCHEN**

## FOIA CONFIDENTIAL TREATMENT REQUESTED
## FOR DISPUTE RESOLUTION PURPOSES ONLY

Donald J. Savery
Direct Phone: (617) 951-8709
Direct Fax:     (617) 951-8736
don.savery@bingham.com

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

February 1, 2006

**BY FAX & FEDERAL EXPRESS**

Michael Shane, Esq.
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD  20857-0001

*Re:*     ***SEC v. Biopure Corporation***
         ***Civil Action No. 05-11853-PBS (D. Mass.)***

Dear Mr. Shane:

We write to confirm our meeting at your offices scheduled for Monday, February 6, 2006, at 1:00 P.M.  We expect to attend with representatives of each of the defendants in the above-referenced litigation.

In anticipation of the meeting and in the interest of expediting production, we have reviewed the outstanding subpoenas and have narrowed the categories of documents we presently seek for purposes of our court-ordered meeting as follows:

A.     **Immediate Production Requested**

      1.     Notes, call reports and minutes made by the following individuals relating to or reflecting conversations with Biopure or any of its agents or attorneys:  Abdu Alayash, Lawrence Landow, Franklin Stephenson and Toby Silverman.  See Subpoena Request Nos. 1-4.

      2.     Notes, call reports and minutes made by the following individuals relating to or reflecting conversations with those other than Biopure (including any staff of the Securities and Exchange Commission) about Biopure or Hemopure:  Abdu Alayash, Lawrence Landow,

FOIA CONFIDENTIAL TREATMENT REQUESTED

**MICHAEL SHANE, ESQ.**
**February 1, 2006**
Page 2

Franklin Stephenson and Toby Silverman.  <u>See</u> Subpoena Reqeust Nos. 1-5.

3.  Other notes or personal files of the following individuals relating to Biopure or Hemopure:  Abdu Alayash, Lawrence Landow, Franklin Stephenson and Toby Silverman.  <u>See</u> Subpoena Request Nos. 1-5.

4.  The final July 30, 2003 letter relating to Biopure's BLA, including any FDA "concurrence" sheets.  <u>See</u> Subpoena Request No. 1.

**B.    Expedited Production Requested (20 days)**

1.  Electronic mail (in native format) for the period January 1, 2003 to April 30, 2004, relating to Biopure or Hemopure for which one or more of the following individuals are shown as authors, recipients or copyees:  Abdu Alayash, Lawrence Landow, Toby Silverman and Franklin Stephenson.

2.  All drafts and electronic copies (including metadata) of the following attached documents:

> a.  4/25/03 Golding letter to Richman regarding Biopure's IND application (FDA Reference:  BB-IND 10962);
>
> b.  5/30/03 Golding letter to Richman regarding Biopure's IND application (FDA Reference:  BB-IND 10962);
>
> c.  7/30/03 Golding letter to Richman regarding Biopure's IND application (FDA Reference:  BB-IND 10962);
>
> d.  7/30/03 Golding letter to Richman regarding Biopure's Hemopure BLA (FDA Reference STN: 125066/0);
>
> e.  "Telcon with Biopure" memoranda by Franklin Stephenson dated 7/31/03, 8/5/03, 8/15/03, 8/26/03, and 9/16/03;
>
> f.  "Record of Telephone Conversation" memoranda concerning telephone contact with Howard Richman on the following dates and times:   3/13/03 at

Bingham McCutchen LLP
bingham.com

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**MICHAEL SHANE, ESQ.**
**February 1, 2006**
Page 3

16:00:30; 3/13/03 at 17:05:59; and 4/9/03 at 16:05:48; and

g.    purported transcription of Howard Richman 9/10/03 voicemail to Franklin Stephenson.

Bingham McCutchen LLP
bingham.com

3.    Personnel files of the following individuals: Lawrence Landow, Toby Silverman and Franklin Stephenson. See Subpoena Request Nos. 21-23.

4.    All communications between the FDA and the SEC (and any notes or memoranda reflecting such communications) concerning the defendants in this lawsuit – Biopure Corporation, Thomas A. Moore, Howard Richman, and Jane Kober.

5.    All documents describing or concerning the policy of inter-agency cooperation between the FDA and the SEC to increase the public's protection from false and misleading statements, including communications between the FDA and the SEC.

6.    All documents describing or concerning proposed or actual revisions to CBER's Standard Operating Procedures and Policies 8405, versions #2 and #3.

7.    All "complete response letters" issued by the FDA between the dates January 1, 2003 and December 31, 2003.

In addition, we request that the following individuals be made available for deposition on the following dates:

1.    Abdu Alayash, February 28, 2006

2.    Lawrence Landow, March 1, 2006

3.    Toby Silverman, March 2, 2006

4.    Franklin Stephenson, March 3, 2006

The foregoing is provided to facilitate expeditious production of the listed documents prior to the scheduled trial in the Massachusetts litigation and should not be construed as an admission relative to the remaining documents sought in the

FOIA CONFIDENTIAL TREATMENT REQUESTED

MICHAEL SHANE, ESQ.
February 1, 2006
Page 4

subpoenas of the FDA, CBER, and FDA personnel. Biopure reserves all rights relative to those subpoenas.

Bingham McCutchen LLP
bingham.com

This document is submitted as <u>CONFIDENTIAL</u>. Exemption from disclosure of this document and copies of it is claimed under all applicable statutes, rules and regulations, including but not limited to exemptions under the Freedom of Information Act ("FOIA"). It is requested that <u>before</u> any disclosure is permitted of this document, or any part or copies of it, timely notice be given to the undersigned. Regarding FOIA in particular, it is our position that *this document is not an "agency record" within the meaning of FOIA, 5 U.S.C. § 552, as amended, or under the relevant rules of the U.S. Food and Drug Administration (the "FDA"), and may not be disclosed to third persons, including another governmental agency such as the Securities and Exchange Commission, without the prior written consent of Donald J. Savery, Esq. on behalf of Biopure Corporation.* In the event that this letter or the enclosed documents become "agency records" within the meaning of FOIA pursuant to any action of the FDA or otherwise or are judicially determined to be such "agency records," we request confidential treatment for such materials pursuant to FOIA and the applicable rules of the FDA thereunder.

Thank you. We look forward to meeting with you on Monday.

Very truly yours,

Donald J. Savery

/caw
Enclosure
cc:     Thomas J. Dougherty, Esq.
        Edward P. Leibensperger, Esq.
        John D. Hughes, Esq.

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**



Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448

**APR 25 2003**

Our Reference: BB-IND 10962

BioPure Corporation
Howard P. Richman. D.P.M.
Senior Vice President of Regulatory Affairs
11 Hurley Street
Cambridge, MA 02141

Dear Dr. Richman,

Subsequent to our review of your **Investigational New Drug Application (IND 10962)**, "A *Multi-center, Study to Evaluate the Safety and Tolerability of Hemoglobin-based Oxygen Carrier-201 (HBOC-201) in Trauma Subjects,*" and as discussed during the telephone conversation between you and Dr. Landow of this office on April 9, 2003, your proposed study under this IND has been placed on clinical hold.

Your IND is on clinical hold because subjects would be exposed to an unreasonable and significant risk of injury [CFR 312.42(b)(1) (iv)]. Specifically, we have the following comments:

1. Subsequent to review of your BLA and especially pivotal trial HEM-0115 (N=693), we conclude that compared to allogeneic blood, HBOC-201 administration is associated with a higher incidence of life-threatening SAEs. In your pivotal trial, between-group asymmetry was remarkably consistent:

   a. Death: 10 vs 6, HBOC-201 vs control, respectively
   b. Cardiac arrest: 9 vs 2; p=0.04
   c. Acute renal failure requiring dialysis: 3 vs 0
   d. Congestive heart failure/pulmonary edema: 19 vs 3; p=0.0005
   e. Atrial fibrillation/flutter: 11 vs 2; p=0.01
   f. CVA/TIA/RIND: 5 vs 1.

2. Moreover, systemic hypertension, which is believed to result in increased blood loss during uncontrolled hemorrhage, e.g., trauma, was observed much more frequently in HBOC-201 subjects than control (63 vs 21; p<0.0001). Since the proposed clinical trial is to be conducted in the same setting as HEM-0115, i.e., in-hospital where blood is available, HBOC-201 subjects in IND 10962 would be exposed to unreasonable and significant risk of injury.

3. Our safety concerns are supported by the results of the independent, blinded Data Monitoring Board, which found between-group differences in the incidence of SAEs that were highly statistically significant against HBOC-201:

Confidential Treatment
Requested By Biopure
Corporation
BP 07438

Page 2 - BB-IND 10962

    a. Patients experiencing ≥ 1 SAE that resulted in permanent disability:
       76 vs 41 (p<0.001)
    b. Patients experiencing ≥ 1 SAE that resulted in death or permanent
       disability: 81 vs 46 (p= 0.001)
    c. Patients experiencing ≥ moderate to severe SAE: 206 vs 144 (p <0.001)
    d. Patients experiencing ≥ 1 SAE associated with CTM or ≥ 1 SAE
       with unknown association to CTM: 281 vs 205 (p <0.001)
    e. Patients experiencing ≥ 1 SAE associated with CTM: 83 vs 36 (p<0.001).

**You may not initiate clinical trials under this IND** until your response to the above
deficiencies has been received and reviewed by FDA, and you are informed that the response is
satisfactory. When you respond to all of the above issues, please identify your response as a
"CLINICAL HOLD COMPLETE RESPONSE" and submit this information in triplicate to the
IND. In addition, FAX a copy of the Form 1571, cover letter, and delivery tracking number to
name at 301-827-3535. For additional information, please refer to the FDA Guidance:
Submitting and Reviewing Complete Responses to Clinical Holds – 5/14/98
(http://www.fda.gov/cber/gdlns/clinhold.pdf).

If you have any questions, please contact Franklin Stephenson at (301) 827- 3524.

Sincerely yours,

acting
for

Basil Golding, M.D.
Acting Director
Division of Hematology
Office of Blood Research and Review
Center for Biologics
   Evaluation and Research

Confidential Treatment
Requested By Biopure
Corporation
BP 07439



DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Public Health Service

Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448

MAY 3 0 2003

Our Reference: BB-IND 10962

Howard Richman, D.P.M.
Biopure Corporation
11 Hurley Street
Cambridge, MA 02141

Dear Dr. Richman:

We have reviewed your Clinical Hold Complete Response letter dated May 12, 2003.
The response to the clinical hold letter is incomplete and your IND will remain on
clinical hold. Specifically, resolution of contradictory statements (see below) is necessary
in order to assess your responses to safety concerns raised in our clinical hold letter of
April 9, 2003.

1. You state that, "It was always Biopure's intention to derive the secondary safety
   endpoints for the HEM-0115 study from the Investigator Database, not the
   internal scoring of the SEEC. Unlike the HEM-0115 Investigator Database, the
   SEEC AE/SAE database was not designed or chartered to be consistent with
   Good Clinical Practice (GCP)." Yet according to a letter dated 24 September
   2002, you stated that, "Biopure has followed cGCPs to ensure that the HEM-0115
   trial is compliant" and "The HEM-0115 database used for the Final Study Report
   accurately reflects the true safety profile experienced by patients in the trial"
   (letter from Biopure to FDA dated 24 September 2002).

   Since the SEEC review was considered to be an integral part of HEM-0115 and
   was the basis for the primary safety endpoint, we are confused by this apparent
   contradiction. Please clarify.

2. You also state that, "SEEC reviewers were not responsible for assessing intensity
   and causality of adverse events classified as non-serious". Yet according to a
   letter dated 10 December 1999, FDA stated that the role of the IDMC-2 [i.e.,
   SEEC] was to "review all adverse events in blinded fashion for each individual
   subject and to perform a separate determination of intensity and seriousness of the
   adverse events".

   Please clarify this apparent contradiction.

Confidential Treatment
Requested By Biopure
Corporation
BP 07440

Page 2 – Biopure Corporation

3.  With reference to adverse events in HEM-0115, you state that, "When stratified
    by age and pre-existing co-morbid conditions, the trends in SAEs seen between
    HBOC patients and RBC patients are mitigated or no longer apparent. None reach
    [sic] statistical significance in patients up to age 75."
    HEM-0115 was a randomized trial with inclusion and exclusion criteria. To
    stratify the population *post hoc* introduces selection bias, subverts the
    randomization process, and invalidates conclusions about product safety and
    efficacy. Our conclusions about product safety remain unchanged.

4.  IND 10962 calls for up to 15 units of HBOC-201 administration in trauma
    patients. Based on the safety findings in HEM-0115 and other clinical trials, FDA
    is concerned that in this setting, vasoconstriction associated with high volume
    administration of the product will reduce tissue perfusion and jeopardize tissue
    oxygenation. At least three additional studies in conscious swine will be required
    to address tissue perfusion, tissue oxygenation, and volume hemodynamics
    following stepwise 20% exchange transfusions with HBOC-201. ·

    a.  Tissue perfusion: study 1 will capture individual organ blood flow (using
        microspheres) measured after each 20% exchange transfusion (separated
        by 1-2 hours). Blood flow determinations should be made approximately
        20 minutes after completion of each exchange. The final blood flow
        measurement should be made at least 2 hours after the end of the final 20%
        exchange.

    b.  Tissue oxygenation: study 2 will capture liver and muscle tissue $PO_2$.
        Measurement of the oxygen equilibrium curve of HBOC-201 in plasma
        over time should also be made in order to understand potential structural
        changes in the product and the effect on oxygen carrying capability.
        Timing of measurement of $tPO_2$ should mimic times of blood flow
        measurements in study 1. At the end of this study, organs should be
        evaluated for histopathology. Nitrotyrosine staining techniques should be
        used to assess potential oxidative injury mediated by peroxynitrite.

    c.  Volume hemodynamics: study 3 will capture hemodynamic and blood
        volume measurements using the Evens Blue dye dilution technique.

Each of these studies should be conducted over at least a 24-hour period to
capture late effects related to product administration.

Confidential Treatment
Requested By Biopure
Corporation
BP 07441

Page 3 – Biopure Corporation

It is strongly recommended that you discuss the design of these studies with FDA prior to their initiation.

You may not initiate clinical trials under this IND.

If you have any questions, please contact Mr. Franklin Stephenson at (301) 827-6165

Sincerely yours,

Basil Golding, M.D.
Acting Director
Division of Hematology
Office of Blood Research and Review
Center for Biologics
  Evaluation and Research

Confidential Treatment
Requested By Biopure
Corporation
BP 07442



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448
**JUL 3 0 2003**

Our Reference: BB-IND 10962

BioPure Corporation
Howard P. Richman. D.P.M.
Senior Vice President of Regulatory Affairs
11 Hurley Street
Cambridge, MA 02141

Dear Dr. Richman,

Subsequent to our review of your **Investigational New Drug Application (IND 10962)**, "A Multi-center, Study to Evaluate the Safety and Tolerability of Hemoglobin-based Oxygen Carrier-201 (HBOC-201) in Trauma Subjects," and as discussed during the telephone conversation between you and Dr. Landow of this office on July 16, 2003, your proposed studies under this IND have been placed on clinical hold.

Your IND remains on clinical hold because human subjects are or would be exposed to an unreasonable and significant risk of illness or injury [21 CFR 312.42(b)(1)(i)].

Your answers to questions 1 and 2 do not clarify fully the differences between the safety dataset based on investigator assessments and the safety dataset based on SEEC evaluation of safety information. It will be necessary for you to clarify what constituted the data set for the Biopure medical review and the dataset that constituted the basis for the SEEC assessment of medical risk (data constructed from SAF-1). It will further be necessary for you to identify and reconcile all differences between these two data sets.

1. Specifically, we have the following comments and questions with regard to the conduct and monitoring of study HEM-115:

   A. **Bioresearch Monitoring Inspections:**

      1. FDA inspections of fourteen clinical investigator sites at which subjects had been enrolled and treated under the HEM-0115 clinical study revealed that in addition to internal monitors, Biopure had engaged the services of several contract research organizations (CROs) and private consultants who conducted multiple monitoring visits at these clinical sites. It was also noted that these CROs and private consultants were monitoring the same sites during the same study period concurrently with internal Biopure monitors.

EXHIBIT

26 B-1987
KLS 12/3/03

Confidential Treatment
Requested By Biopure
Corporation
BP 07443

SEC-Biopure
00165

Page 2 - BB-IND 10962

Please provide a detailed list of:

a.   All CROs and private consultants used to monitor the HEM-0115 study.

b.   The site(s) and time period(s) during which the internal Biopure monitors, CROs and private consultants performed specific monitoring activities.

c.   The specific obligations and responsibilities for the monitoring of clinical investigators performed by internal Biopure monitors, each CRO, and each private consultant including, but not limited to: completing and making changes to the case report forms (CRFs), the handling of data clarification requests, and the reporting of serious adverse events (SAEs) and adverse events (AEs).

2.   FDA's November 1999 inspection of Biopure revealed there was no documentation to substantiate that the firm's internal monitors, CROs, and private consultants were trained as required by Biopure SOP CN-0029. The external contract monitors' training documentation forms (QA-0078) were found to be incomplete, and did not identify the SOPs reviewed or the trainer. There was also no documentation to ensure that external contract monitors were knowledgeable and proficient in current Biopure SOPs.

a.   Please provide a detailed explanation as to how Biopure ensured the consistency of the monitoring activities performed by the internal Biopure monitors, the CROs and the private consultants who were monitoring the study at the various sites, especially at sites that had multiple monitors during the course of the study.

b.   Please provide a detailed description of how Biopure instructed the internal monitors, each of the CROs and private consultants to report the results of their monitoring activities, such as the frequency and content of reports. For example (but not limited to this example), did Biopure expect the monitors to submit reports for each monitoring visit, or to submit integrated reports explaining findings during a defined time period?

3.   Review of monitoring reports during FDA's November 1999 inspection of Biopure revealed the following:

a.   Eight of ten pre-study monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

b.   Five of eight initiation monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

c.   Four of 28 monitoring reports covering six clinical sites were not finalized per SOPs; the dates that each report was finalized was unknown for 22 out

Confidential Treatment Requested By Biopure Corporation BP 07444

Page 3 - BB-IND 10962

of 28 monitoring reports, and zero of 28 monitoring reports were reviewed in accordance with Biopure's SOPs.

d. FDA's November 2002 inspection of Biopure revealed that the internal Biopure monitors, the CROs, and the private consultants were still not submitting monitoring reports within the specified time frames, and Biopure was still not reviewing the monitoring reports in accordance with their own SOPs.

Please provide a detailed explanation or answer for the following:

i. How Biopure ensured that the clinical investigators were conducting the HEM-0115 clinical study in accordance with the protocol requirements when the internal Biopure monitors, the CROs, and the private consultants were not submitting the monitoring reports as required, and Biopure was not reviewing the monitoring reports in accordance with their own SOPs.

ii. Why BioPure failed to initiate appropriate corrective action after the November 1999 inspection to ensure that all monitoring reports were submitted and reviewed within the specified time frames.

4. Please provide a detailed explanation of the activities of GloboMax of Hanover, Maryland, in regards to data management and statistical analysis on the HEM-0115 study.

## B. Clinical Investigator Issues

The FDA inspections of fourteen clinical investigator sites revealed significant deficiencies to include, but not limited to the following: (1) many SAEs and AEs not reported; (2) ineligible subjects enrolled, including subjects with known excludable medical risks; (3) not all subjects properly consented; and (4) numerous protocol required assessments either not performed or not performed within the timeframes specified by the protocol, including vital signs, hematology tests, clinical chemistry tests, urinalysis, ECGs, neurologic assessments, and physical examinations. Questions 7, 8 and 10 are examples of the significant deficiencies noted during the FDA inspections.

5. The samples for laboratory assessments for hematocrit, hemoglobin, and plasma hemoglobin were either not drawn, or were not consistently drawn immediately prior to subsequent transfusions. This deficiency was observed at numerous sites.

Please explain how Biopure can assure, without these required assessments, that additional transfusions were based on the individual needs of the subject.

Confidential Treatment
Requested By Biopure
Corporation
BP 07445

Page 4 - BB-IND 10962

6. During the inspections, a review of CRFs revealed that at least seven subjects presented with abnormal ECGs during the perioperative period. There was no record in their CRFs to document they were evaluated just prior to randomization/infusion to confirm that their abnormal ECGs did not meet the definition of acute life-treating or significant destabilizing event.

Please explain how Biopure can ensure that these subjects were qualified or remained qualified to participate in the study without documentation of evaluation by a cardiologist that the abnormal ECG s were not clinically significant, and the subjects were cleared to participate in the study.

7. Please describe in detail how Biopure trained each of the clinical investigator sites, including the principal investigator, all sub-investigators, and study coordinators, before the sites began enrolling subjects and using the investigational product to ensure that the principal investigators, sub-investigators, and study coordinators fully understood the HEM-0115 protocol and all study requirements.

8. The FDA inspections, and monitoring reports submitted by the internal Biopure monitors, CROs, and private consultants revealed: (1) missing source documents, (2) incomplete CRFs, (3) unsupported changes to data on the CRFs, and (4) discrepancies between the CRFs, hospital blood bank records, and drug accountability records regarding the date, number of units and volume of the investigational product that was dispensed, transfused, and returned, and (5) discrepancies regarding the date, volume, type and number of units of the control product (red blood cells, packed cells, whole blood, etc.) that was dispensed and transfused.

Please provide a detailed explanation as to how Biopure can ensure that the data in the BLA submission, in regards to the use of the investigational and/or control product, is accurate and reliable in light of the noted discrepancies.

9. As described above, FDA inspections of the clinical sites revealed significant deficiencies throughout the course of the study. Several sites had patterns of protocol violations that continued unabated despite repeated monitoring visits that disclosed the on-going problems.

a. Who was responsible for correcting problems and resolving the issues that were observed by the internal Biopure monitors, CROs, and consultants during the monitoring visits at the various clinical sites?

b. In response to the problems observed by the internal Biopure monitors, CROs, and consultants, were any of the principal investigators, sub-investigators and study coordinators re-trained? If so, what type of training was given? Who was responsible for the re-training?

Confidential Treatment
Requested By Biopure
Corporation
BP 37446

Page 5 - BB-IND 10962

    c.  Please explain in detail why Biopure failed to initiate appropriate corrective action, such as suspending enrollment of subjects at sites where serious deficiencies were noted, or terminating the study at sites where continued non-compliance to the protocol was observed during the multiple monitoring visits by the internal Biopure monitors, CROs, and private consultants.

10. Please provide a detailed explanation as to how Biopure can ensure that the safety and efficacy endpoints were met in light of the many protocol deficiencies including, but not limited to the examples described above, which were noted during the FDA inspections of these fourteen clinical sites.

How can BioPure ensure that the remaining thirty-two sites that were not inspected do not have the same types of deficiencies, and the data from these sites are reliable and accurate?

## C. Study Conduct:

In the various submissions from Biopure related to BLA 125066 for HBOC-201, Biopure has used the term "softlock" to denote a number of different data management actions. In the BLA itself, submitted July 31, 2002, the term "softlock" appears in section 16.1.14 and in the description of the historical chain of events for the SBEC process. Similarly, the term "CEVA" (Clinical Event Validation and Adjudication) appears to have been used to denote different groups of people or different activities by a Data Coordinating Group.

Under section 16.1.14, on page 12 of the SBEC charter, "softlock" is described as the "resolution of all site queries for certain critical fields." This activity was supposed to occur before patient records were submitted to the SBEC for adjudication for the primary safety endpoint. CEVA Data Coordination Services were to be provided by Quintiles, Inc. The CEVA Team was to be responsible for collecting and evaluating patient safety documentation provided by investigative sites. CEVA was to be responsible for assembling safety assessment patient dossiers for all patients from all regions and for proofing each file for completeness prior to submission to the SBEC.

In the Historical Chain of Events: SBEC Process, there is an entry dated June 26, 2000 stating, "Softlock Criteria Approved (J. Burke)."

The letter dated September 24, 2002, contains following statements about "softlocking" databases and about CEVA and the Quintiles Data Management group:

●  "The adjudication forms for each AE were prepared by CEVA based on the AEs in the *softlocked* AE database managed by the Quintiles Data Management group."

Confidential Treatment
Requested By Biopure
Corporation
BP 07447

Page 6 - BB-IND 10962

- "The first *softlock* of the database was completed on 22 February 2001 and the last 1st level patient dossier was submitted to adjudicators on 30 March 2001."

- "Data Management activities continued after the first database *softlock* and patients with changes in the database that would require resubmission of the dossiers to the SEEC were identified."

- "The final *softlock* of the database was completed on 29 June 2001 and the last 1st level patient dossier was resubmitted to adjudicators at that time."

- "This [final database as of June 29, 2001] *softlocked* database was also transferred to RRS."

1. Please answer the following questions:

   a. What is meant by the phrase, "softlocked database?"

   b. The abbreviation "CEVA" appears to be used in several different ways in the various submissions. What activities were encompassed by the term CEVA?

   c. What was the relationship between the CEVA Data Coordinating Center and the Quintiles Data Management group? Did the Quintiles Data Management group provide the services collectively called CEVA?

   d. Who performed the evaluation of the source documents that were provided to the SEEC?

   e. What adjudication forms were prepared by CEVA based on the AEs in the softlocked AE database managed by Quintiles Data Management group?

   f. What were the "softlock" criteria that were approved by J. Burke on June 26, 2000?

   g. For each individual patient, what critical fields were to be resolved prior to "softlock" of the file and submission to SEEC?

   h. What role did Quintiles Data Management group play in managing the various softlocked databases and softlocked patient data?

   i. What data management activities continued after the first database softlock? Why were these activities not completed before submitting the first patient dossiers to the SEEC in November 2000?

   j. Please explain what is meant by "All post-softlock changes identified" for the June 8, 2001 entry in the historical chain of events timeline.

Confidential Treatment
Requested By Biopure
Corporation
BP 07448

SEC-Biopure
00170

Page 7 - BB-IND 10962

    k. Please explain the role and training of CBVA in collecting, assembling, and proofing patient safety documentation provided by investigative sites given that these functions had already been performed beginning in July, 2000 by a "new monitoring team."

    l. Please identify the members of the "new monitoring team" and their affiliations.

        i.    What was re-monitored by this team?

        ii.   How were the findings by this team reconciled with the later work performed by CBVA?

        iii.  How long did the re-monitoring by the new team take and when were these activities completed?

    m. What or who is AACT? What was the role of AACT?

    n. Please describe in detail the SAS listing that was approved by M. Gawryl on October 6, 2000.

    o. Please explain how patient listings that were blinded for patient identifiers and certain information related to investigator determination of severity, seriousness, and drug-relatedness of adverse events were transferred to Red River Statistics for analysis. What analyses were performed on such listings that lacked any investigator information about adverse event severity or seriousness?

    p. Please provide a flow diagram and the names of all individuals who handled source documents from the time they were completed by the investigative site to the time they were reviewed by the SEEC for the final adjudication.

    q. Please document all transactions, including all involved personnel with their affiliations, which occurred after the review process was reopened in February 2001. The flow diagram provided in the SEEC charter does not appear to document this process completely.

2. In the letter of September 24, 2002, you stated that: "the documents upon which the Biopure medical review was based were the same as those provided to the SEEC." You also stated that "at no time did Biopure have access to, nor responsibility for maintaining the database." In the BLA submission, under section 16.1.14, however, you stated, "Quintiles will ensure that the following data is (sic) blinded to the SEEC, prior to submission of each dossier." This list included patient identifiers, and certain aspects of patient

Confidential Treatment
Requested By Biopure
Corporation
BP 07449

Page 8 - BB-IND 10962

treatment to include hematocrit, total and plasma hemoglobin, methemoglobin levels, etc.

   a. Please clarify who performed the "Biopure medical review" and whether the Biopure medical review referred to was for the safety endpoint.

   b. Please clarify whether the safety data provided for the "BioPure medical review" was also cleared of the same entries and that the documents provided for the "Biopure medical review" were identical to the documents provided to the SEEC.

   c. Please also clarify whether the documents submitted for the Biopure medical review corresponded to the first patient dossiers submitted to SEEC or to the second set of files.

3. Please explain why CEVA was instructed by M. Hensley to stop collection of source documents for the week between February 13-20, 2001.

4. Please explain why Biopure requested re-copying of all source documents from dossier files (via J. Cermak) on February 23, 2001. For what purpose were these files recopied? What files were recopied? To whom were the files provided?

5. Please explain why the SEEC was asked to re-review patient records for a new adjudication for the primary safety endpoint. What "postsoftlock" changes were reviewed by the SEEC during the second review cycle?

6. When 506 files were re-reviewed, did the original reviewers perform the second review? If not, why not?

7. Please explain who attended the adjudication meetings documented in the historical chain of events document and what was the purpose of the meetings.

8. In the chronology of major project developments for SEEC, you state that the first three submissions for 1st level SEEC review were submitted to SEEC before CEVA initiated site contacts for collection of source documents (November-December, 2000). The role of CEVA was to provide case report form and source documentation, which was "accurate, focused, and relevant." CEVA was also charged with resolving all site queries for certain critical fields BEFORE submission of any documents to SEEC. Please explain how the first three submissions were provided to SEEC before CEVA had contacted any sites.

9. How was the toxicity grading scale used by the investigator? Was the toxicity grading scale used during any remonitoring of the clinical data or the clinical sites?

Confidential Treatment
Requested By Biopure
Corporation
BP 67450

SEC-Biopure
00172

Page 9 - BB-IND 10962

10. Between February 26, 2001 and April 16, 2001, Biopure reviewed all source documents from the dossier file and submitted new AEs (N=1443) to CEVA for review by the SEEC. However, in the September 24, 2002 letter, you stated that Biopure did not have a direct role in providing information to the SEEC. Please explain the relationship and provide the identities of the clinical personnel contracted by Biopure to review and provide new source documents to the SEEC adjudicators for re-review. Were these personnel completely independent of Biopure? Why was this function not performed directly by CEVA, to whom this function was assigned by SEEC charter?

    a. Please provide a detailed summary of the contractual obligations assumed by Quintiles and other data management services with regard to the "cleaning" of data for study HEM-0115.

    b. Was the February 26, 2001 to April 16, 2001 review of all source documents the result of the July, 2000 remonitoring effort undertaken by the "new monitoring team?"

    c. Were these adverse events also incorporated into the documentation upon which the Biopure medical review was based?

11. In the historical chain of events, three transfers of the SEEC database to Biopure are documented. The last transfer occurred on August 9, 2001, and the notation "complete data, locked" is recorded. On September 24, 2002, you stated that, "at no time did Biopure have access to nor responsibility for maintaining the database." However, in the text of the original BLA submitted July 31, 2002, on page 65 of the report of study HEM-0115, you stated that, "The database was subsequently transferred to Red River Statistics (RRS), Shreveport, LA. RRS and Biopure jointly completed data cleaning activities." These statements would appear to be contradictory. Please clarify and answer the following questions.

    a. Who prepared the database from the output of the SEEC deliberations?

    b. Did Biopure have access to the databases constructed from the SAF-1 and SAF-2 forms?

    c. Who provided the analysis datasets to Red River Statistics?

    d. You stated that Quintiles completed data management activities for and hardlocked the CEVA database on 8/9/01 and that the hardlocked CEVA database was transferred to both Red River Statistics and Biopure on August 9, 2001. However, the historical chronology provided in the BLA indicates that two transfers of incomplete data from the SEEC database to Biopure occurred on July 12 and July 20, 2001. How were these databases used by Biopure?

Confidential Treatment
Requested By Biopure
Corporation
BP 07451

Page 10 - BB-IND 10962

    e. In the September 17, 2002 letter submitted from Red River Statistics, it is noted that changes to an interim dataset dated June 29, 2001 were made by Red River Statistics and that these changes are memorialized in a SAS program module named ERRATA.SAS. This file contains additional raw data for adverse events and concomitant medications received after the June 29, 2001 cutoff date. Please clarify whether the second SEEC review contained the information that is contained in ERRATA.SAS.

12. In the letter of May 12, 2003, you stated that "it was always Biopure's intention to derive the secondary safety endpoints for the HBM-0115 study from the Investigator Database, not the internal scoring of the SEEC." Please note that it was always FDA's intent that all of the analyses, including the secondary analyses, be performed using the database constructed from the blinded review by the SEEC. Please note that the FDA letter to you, dated September 15, 1999, explicitly stated that:

"The review of data by the Independent Data Monitoring Committee (N.B. later renamed the SEEC) at these various time points (including at the conclusion of the study) was to have been blinded to treatment allocation. The determination of severity and seriousness of adverse events by unblinded investigators on-site was to be masked from the Independent Data Monitoring Committee. The Independent Data Monitoring Committee was to evaluate all adverse events and make an independent determination of intensity and seriousness of the adverse events, all in blinded fashion."

That letter went on to state that all serious adverse events, as determined in blinded fashion by the IDMC, would be categorized and evaluated according to the proposed statistical analysis plan. This statement did not distinguish between the primary safety analysis and the secondary safety endpoints, and the FDA letter of December 10, 1999 simply summarized the secondary safety endpoints that would be evaluated. In the September 15 and December 10, 1999 letters, FDA provided adequate documentation of what was expected for a regulatory submission. Omission of the recommended design features did not constitute grounds for imposing a clinical hold. On March 27, 2000 and July 7, 2000, you received letters from FDA that stated, "The statistical plan described notwithstanding, ultimate approval of your product depends on the totality of the evidence submitted from appropriately designed and conducted clinical studies including satisfactory risk: benefit outcomes." Biopure acknowledged these statements.

Since Biopure did not perform the secondary safety analyses as expected and in the manner recommended by FDA, please clarify the following points:

    a. Who performed the medical evaluation of the secondary safety endpoints for the purpose of reporting in the BLA?

Confidential Treatment
Requested By Biopure
Corporation
BP 07452

b. Who generated the safety database for the secondary endpoints of study HEM-0115?

c. Who audited the safety database against source records and who monitored and reconciled the data. When was the database audited and when were the data reconciled?

d. What is the nature of affiliation and financial relationship to Biopure if the medical reviewers were not Biopure personnel?

e. Were the medical reviewers blinded to treatment assignment?

13. It is FDA's understanding that site-identified adverse events and source documents were provided to SEEC for determination of seriousness, intensity, and causality of the events, and that these, together with additional adverse events identified by each SEEC reviewer, were used to generate the SAF-1 dossier for each patient. This SAF-1 dossier was then used by each SEEC reviewer to assign a medical risk score that was recorded on SAF-2. Further, the SEEC charter stated that,

"SEEC identified adverse events: The SEEC is not charged with the task of identifying all potentially un-reported adverse events; however, if during the course of reviewing a case for adjudication, a SEEC reviewer notes an unreported adverse event, this data (sic) should be captured." The charter further states that the CEVA Data Coordinating Center will review all completed adjudication CRFs for potential adjudication data discrepancies. If discrepancies are identified, a query will be issued to the reviewer who supplied the data."

"In order to proactively prevent the need to issue queries, the CEVA Data Coordinating Center has prepared a guideline for the completion of the adjudication CRFs which will be utilized by the SEEC." (This guideline included information about both the SAF-1 and SAF-2 forms.)

If it is the case that the SEEC reviewers used adverse events recorded on the SAF-1 forms in order to generate the adjudication recorded on the SAF-2 forms, and that the adverse events recorded on the SAF-1 forms could originate either from the on-site investigator or the SEEC reviewer, and it is also the case that the SAF-1 entries were not completely monitored and/or reconciled against source documents, then it may be concluded that the medical assessment of risk was based on a data set that did not conform with cGCPs. Your letter of May 12, 2003 in response to the clinical hold imposed on IND 10792 and also submitted to the BLA states that, "SEEC AE/SAE database was not designed or chartered to be consistent with Good Clinical Practice (GCP)". Please clarify how a database that was generated for the

Confidential Treatment
Requested By Biopure
Corporation
BP 07453

SEC-Biopure
00175

Page 12 - BB-IND 10962

purpose of at least the primary safety analysis was not designed or chartered to be consistent with Good Clinical Practice.

If SEEC members found additional adverse events over and above those reported from the clinical sites, how was the validity of the findings by the SEEC members determined, and were the additional, valid adverse events added to the database upon which the Biopure medical assessment was made?

14. In the May 12, 2003 letter, you stated that the SEEC AE/SAE database was not audited against source documents nor was (sic) data monitored or reconciled. Based on these statements, it would appear that the information reviewed for the secondary safety endpoints may have differed substantially from the data reviewed by the SEEC. Please clarify. Please explain why the SEEC AE/SAE database was not audited against source material.

15. In the May 12, 2003 letter, you stated that SEEC reviewers were not responsible for assessing intensity and causality of adverse events classified as non-serious. Please note that the December 10, 1999 letter from FDA clearly stated that it was FDA's intent that the IDMC evaluate all adverse events, not only those deemed serious by the on-site investigators. The specific language states, "The role of IDMC-2 is to review all adverse events in blinded fashion for each individual subject and to perform a separate determination of intensity and seriousness of the adverse events. The IDMC was to be blinded to investigator determination of intensity and seriousness when making this determination." Further, Biopure itself stated that the function of the IDMC-2 was "at the conclusion of the study, in blinded fashion, to review listings of all adverse events, whether serious or not, by individual subject, for all subjects enrolled in the study." Please comment.

16. In the letter of September 24, 2002, you stated that:

"In July of 2000, it was learned by Biopure Regulatory Management that clinical sites had inconsistently interpreted the type of adverse events that were to be recorded in the CRFs. In order to ensure the accuracy of the data, it would be necessary to re-monitor all clinical data submitted by the Investigators."

"In December of 2001, after a review of the data listings, it was discovered that not all of the Investigators had consistently applied the SAE definitions when recording data. A specially designated Biopure team conducted a complete Medical Review of all Serious Adverse Event (SAE) listings against the original CRFs and source documents submitted to Biopure to assure consistent classification, processing, and reporting of Serious Adverse Events....As a result of the audits, DCFs were written and signed by the Investigators to correct any data discrepancies discovered."

Confidential Treatment
Requested By Biopure
Corporation
BP 07454

Page 13 - BB-IND 10962

In the letter of May 12, 2003, you stated that:

"SEEC reviewers did not always apply serious criteria consistently and tended to classify known side effects of HBOCs (e.g., elevated liver function tests, jaundice) more seriously and conservatively. This is particularly true for the serious criteria pertaining to persistent/significant disability/incapacity and important medical events...

There was a high degree of disparity among individual SEEC reviewers: e.g., the difference in the number of SAEs for any one subject was frequently between 10 and 20."

A number of comments pertain:

a. These various statements, taken together, suggest that the data recorded may at best be incomplete and at worst not constitute an adequate basis upon which to make a determination of safety or efficacy of HBOC-201.

b. What criteria were applied to the remonitoring efforts that occurred after July, 2000? Please provide the Monitoring Guidelines that were used for this effort.

c. Why did the remonitoring actions that occurred after July, 2000 not capture the inconsistencies in the classifications of SAEs?

d. Please provide the names and affiliations of all members of all monitoring and re-monitoring teams that visited the clinical sites.

e. The comments suggest that corrections, changes, additions, or subtractions may have been made to the databases after the so-called hardlock of August 9, 2001. Specifically, the letter of September 24, 2002 documents re-review of source documents in December 2001, and corrections that were signed by the on-site investigators. Please comment.

f. Why did the remonitoring that occurred not clarify all the adverse events that were to be reviewed by the SEEC? Were any of the adverse events recorded by the SEEC, but not recorded by the on-site investigators, valid? If so, please explain why these adverse events were not also captured by the investigators and/or the monitoring teams sent by Biopure.

Please provide a fully detailed flow diagram and narrative description of the handling of all source documents, including but not limited to case report forms, patient chart records, etc. from the time of completion at the investigative site to the generation of the databases ultimately submitted to the BLA. (see item 1 above)

Confidential Treatment
Requested By Biopure
Corporation
BP 07455

Page 14 - BB-IND 10962

> Please provide a fully detailed flow diagram and narrative description of the generation of each database that was developed, to include, but not limited to, additions, subtractions, corrections, etc.
>
> Please provide a fully detailed flow diagram and narrative description of all of the remonitoring efforts that occurred between the conclusion of the study and the submission of the BLA.
>
> Please provide a detailed list of all the individuals, including affiliation and financial relationship to Biopure, who were involved in data management and database management activities for HEM-0115.
>
> FDA reserves the right to re-evaluate the output of the SEBC adjudication and the determination that the primary safety endpoint was in fact met in HEM-0115 pending receipt of your answers to the above questions regarding study conduct and integrity of the data.

2. HEM-0115 did not pre-specify a subgroup analysis for subjects 75 years and older. Selecting this particular subgroup to analyze *post hoc* can be used to generate hypotheses to test in future studies but it cannot be used to "mitigate" outcome differences in the aggregate study population. If Biopure had expected an effect specific to age or co-morbid conditions, it should have specified this in the protocol and stratum-specific randomization should have been employed.

3. The submission contains summaries of published and in-press reports, and meeting abstracts of pre-clinical studies performed by you and other investigators. The information contained in these reports is not sufficient to assess the adequacy of the studies to support use of the product at any dose in the proposed patient population or to substitute for the preclinical assessments proposed in our letter of May 12, 2003.

Please submit the final study report for each study or abstract cited in your response to the clinical hold letter of May 12, 2003.

We note your request to meet with FDA to discuss any preclinical studies that may be required to address the clinical hold.

Confidential Treatment
Requested By Biopure
Corporation
BP 07456

SEC-Biopure
00178

Page 15 - BB-IND 10962

<u>You may not initiate clinical trials under this IND</u> until your response to the above deficiency has been received and reviewed by FDA, and you are informed that the response is satisfactory. When you respond to all of the above issues, please identify your response as a "CLINICAL HOLD COMPLETE RESPONSE" and submit this information in triplicate to the IND. In addition, FAX a copy of the Form 1571, cover letter, and delivery tracking number to name at 301-827-3535. For additional information, please refer to the FDA Guidance; Submitting and Reviewing Complete Responses to Clinical Holds – 5/14/98 (http://www.fda.gov/cber/gdlns/clinhold.pdf).

If you have any questions, please contact Mr. Franklin T. Stephenson at (301) 827- 3524.

Sincerely yours,

Basil Golding, M.D.
Director
Division of Hematology
Office of Blood Research and Review
Center for Biologics
Evaluation and Research

Confidential Treatment
Requested By Biopure
Corporation
BP 07457

SEC-Biopure
00179

SBC-Biopure
00180

Telephone Records

07/30/03  WED 16:31 FAX 9 301 827 3524    CBER/OBRR/DBA                    Ø001



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
1401 Rockville Pike
Rockville MD 20852-1448

**JUL 3 0 2003**

Our Reference STN: 125066/0

Howard P. Richman, D.P.M.
Biopure Corporation
11 Hurley Street
Cambridge, Massachusetts 02141

Dear Dr. Richman:

This letter is in regard to your Biologics License Application (BLA) for Hemoglobin Glutamer-250 (Bovine), also known as HBOC-201 submitted under section 351 of the Public Health Service Act.

The Center for Biologics Evaluation and Research (CBER) has completed the review of all submissions made relating to your Biologics License Application. Our review finds that the information and data submitted are inadequate for final approval action at this time based on the deficiencies outlined below.

The deficiencies may be summarized as follows:

**Monitoring of study HEM-0115**

**Bioresearch Monitoring Inspections:**

1.   FDA inspections of fourteen clinical investigator sites at which subjects had been enrolled and treated under the HEM-0115 clinical study revealed that in addition to internal monitors, Biopure had engaged the services of several contract research organizations (CROs) and private consultants who conducted multiple monitoring visits at these clinical sites. It was also noted that these CROs and private consultants were monitoring the same sites during the same study period concurrently with internal Biopure monitors.

     Please provide a detailed list of:

     a.   All CROs and private consultants used to monitor the HEM-0115 study.

     b.   The site(s) and time period(s) during which the internal Biopure monitors, CROs and private consultants performed specific monitoring activities.

     c.   The specific obligations and responsibilities for the monitoring of clinical investigators performed by internal Biopure monitors, each CRO, and each private

EXHIBIT

3  B -1987

12/3/03   ᴋᴜ

Confidential Treatment
Requested by Biopure

BP 00144

STN: 125066/0, Page 2

consultant including, but not limited to: completing and making changes to the case report forms (CRFs), the handling of data clarification requests, and the reporting of serious adverse events (SAEs) and adverse events (AEs).

2.   FDA's November 1999 inspection of Biopure revealed there was no documentation to substantiate that the firm's internal monitors, CROs, and private consultants were trained as required by Biopure SOP CN-0029. The external contract monitors' training documentation forms (QA-0078) were found to be incomplete, and did not identify the SOPs reviewed or the trainer. There was also no documentation to ensure that external contract monitors were knowledgeable and proficient in current Biopure SOPs.

   a.   Please provide a detailed explanation as to how Biopure ensured the consistency of the monitoring activities performed by the internal Biopure monitors, the CROs and the private consultants who were monitoring the study at the various sites, especially at sites that had multiple monitors during the course of the study.

   b.   Please provide a detailed description of how Biopure instructed the internal monitors, each of the CROs and private consultants to report the results of their monitoring activities, such as the frequency and content of reports. For example (but not limited to this example), did Biopure expect the monitors to submit reports for each monitoring visit, or to submit integrated reports explaining findings during a defined time period?

3.   Review of monitoring reports during FDA's November 1999 inspection of Biopure revealed the following:

   a.   Eight of ten pre-study monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

   b.   Five of eight initiation monitoring reports covering six sites were not finalized and reviewed in accordance with Biopure's SOPs.

   c.   Four of 28 monitoring reports covering six clinical sites were not finalized per SOPs; the date that each report was finalized was unknown for 22 out of 28 monitoring reports, and zero of 28 monitoring reports were reviewed in accordance with Biopure's SOPs.

   d.   FDA's November 2002 inspection of Biopure revealed that the internal Biopure monitors, the CROs, and the private consultants were still not submitting monitoring reports within the specified time frames, and Biopure was still not reviewing the monitoring reports in accordance with their own SOPs.

   Please provide a detailed explanation or answer for the following:

      i.   How Biopure ensured that the clinical investigators were conducting the HEM-0115 clinical study in accordance with the protocol requirements when

Confidential Treatment
Requested by Biopure

BP 00145

STN: 125066/0, Page 3

the internal Biopure monitors, the CROs, and the private consultants were not submitting the monitoring reports as required, and Biopure was not reviewing the monitoring reports in accordance with their own SOPs.

    ii.  Why BioPure failed to initiate appropriate corrective action after the November 1999 inspection to ensure that all monitoring reports were submitted and reviewed within the specified time frames.

4.    Please provide a detailed explanation of the activities of GloboMax of Hanover, Maryland, in regards to data management and statistical analysis on the HEM-0115 study.

**Clinical Investigator issues**

The FDA inspections of fourteen clinical investigator sites revealed significant deficiencies to include, but not limited to the following: (1) many SAEs and AEs not reported; (2) ineligible subjects enrolled, including subjects with known excludable medical risks; (3) not all subjects properly consented; and (4) numerous protocol required assessments either not performed or not performed within the timeframes specified by the protocol, including vital signs, hematology tests, clinical chemistry tests, urinalysis, ECGs, neurologic assessments, and physical examinations. Questions 7, 8 and 10 are examples of the significant deficiencies noted during the FDA inspections.

5.    The samples for laboratory assessments for hematocrit, hemoglobin, and plasma hemoglobin were either not drawn, or were not consistently drawn immediately prior to subsequent transfusions. This deficiency was observed at numerous sites.

    Please explain how Biopure can assure, without these required assessments, that additional transfusions were based on the individual needs of the subject.

6.    During the inspections, a review of CRFs revealed that at least seven subjects presented with abnormal ECGs during the perioperative period. There was no record in their CRFs to document they were evaluated just prior to randomization/infusion to confirm that their abnormal ECGs did not meet the definition of acute life-treating or significant destabilizing event.

    Please explain how Biopure can ensure that these subjects were qualified or remained qualified to participate in the study without documentation of evaluation by a cardiologist that the abnormal ECG s were not clinically significant, and the subjects were cleared to participate in the study.

7.    Please describe in detail how Biopure trained each of the clinical investigator sites, including the principal investigator, all sub-investigators, and study coordinators, before the sites began enrolling subjects and using the investigational product to ensure that the principal investigators, sub-investigators, and study coordinators fully understood the HEM-0115 protocol and all study requirements.

Confidential Treatment
Requested by Biopure

BP 00146

07/30/03  WED 16:22 FAX 9 301 827 3524        CBER/OBRR/DBA                      @005

STN: 125066/0, Page 4

8.   The FDA inspections, and monitoring reports submitted by the internal Biopure monitors,
     CROs, and private consultants revealed: (1) missing source documents, (2) incomplete
     CRFs, (3) unsupported changes to data on the CRFs, and (4) discrepancies between the
     CRFs, hospital blood bank records, and drug accountability records regarding the date,
     number of units and volume of the investigational product that was dispensed, transfused,
     and returned, and (5) discrepancies regarding the date, volume, type and number of units
     of the control product (red blood cells, packed cells, whole blood, etc.) that was
     dispensed and transfused.

          Please provide a detailed explanation as to how Biopure can ensure that the data in
          the BLA submission, in regards to the use of the investigational and/or control
          product, is accurate and reliable in light of the noted discrepancies.

9.   As described above, FDA inspections of the clinical sites revealed significant deficiencies
     throughout the course of the study. Several sites had patterns of protocol violations that
     continued unabated despite repeated monitoring visits that disclosed the on-going
     problems.

     a.  Who was responsible for correcting problems and resolving the issues that were
         observed by the internal Biopure monitors, CROs, and consultants during the
         monitoring visits at the various clinical sites?

     b.  In response to the problems observed by the internal Biopure monitors, CROs, and
         consultants, were any of the principal investigators, sub-investigators and study
         coordinators re-trained?  If so, what type of training was given? Who was responsible
         for the re-training?

     c.  Please explain in detail why Biopure failed to initiate appropriate corrective action,
         such as suspending enrollment of subjects at sites where serious deficiencies were
         noted, or terminating the study at sites where continued non-compliance to the
         protocol was observed during the multiple monitoring visits by the internal Biopure
         monitors, CROs, and private consultants.

10.  Please provide a detailed explanation as to how Biopure can ensure that the safety and
     efficacy endpoints were met in light of the many protocol deficiencies including, but not
     limited to the examples described above, which were noted during the FDA inspections
     of these fourteen clinical sites.

          How can BioPure ensure that the remaining thirty-two sites that were not inspected
          do not have the same types of deficiencies, and the data from these sites are reliable
          and accurate?

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 5

**Study Conduct:**

In the various submissions from Biopure related to BLA 125066 for HBOC-201, Biopure has used the term "softlock" to denote a number of different data management actions. In the BLA itself, submitted July 31, 2002, the term "softlock" appears in section 16.1.14 and in the description of the historical chain of events for the SEEC process. Similarly, the term "CEVA" (Clinical Event Validation and Adjudication) appears to have been used to denote different groups of people or different activities by a Data Coordinating Group.

Under section 16.1.14, on page 12 of the SEEC charter, "softlock" is described as the "resolution of all site queries for certain critical fields." This activity was supposed to occur before patient records were submitted to the SEEC for adjudication for the primary safety endpoint. CEVA Data Coordination Services were to be provided by Quintiles, Inc. The CEVA Team was to be responsible for collecting and evaluating patient safety documentation provided by investigative sites. CEVA was to be responsible for assembling safety assessment patient dossiers for all patients from all regions and for proofing each file for completeness prior to submission to the SEEC.

In the Historical Chain of Events: SEEC Process, there is an entry dated June 26, 2000 stating, "Softlock Criteria Approved (J. Burke)."

The letter dated September 24, 2002, contains following statements about "softlocking" databases and about CEVA and the Quintiles Data Management group:

- "The adjudication forms for each AE were prepared by CEVA based on the AEs in the *softlocked* AE database managed by the Quintiles Data Management group."

- "The first *softlock* of the database was completed on 22 February 2001 and the last 1st level patient dossier was submitted to adjudicators on 30 March 2001."

- "Data Management activities continued after the first database *softlock* and patients with changes in the database that would require resubmission of the dossiers to the SEEC were identified."

- "The final *softlock* of the database was completed on 29 June 2001 and the last 1st level patient dossier was resubmitted to adjudicators at that time."

- "This [final database as of June 29, 2001] *softlocked* database was also transferred to RRS."

1.    Please answer the following questions:

   a.  What is meant by the phrase, "softlocked database?"

   b.  The abbreviation "CEVA" appears to be used in several different ways in the various submissions. What activities were encompassed by the term CEVA?

Confidential Treatment
Requested by Biopure

BP 00148

STN: 125066/0, Page 6

c.  What was the relationship between the CEVA Data Coordinating Center and the Quintiles Data Management group? Did the Quintiles Data Management group provide the services collectively called CEVA?

d.  Who performed the evaluation of the source documents that were provided to the SEEC?

e.  What adjudication forms were prepared by CEVA based on the AEs in the softlocked AE database managed by Quintiles Data Management group?

f.  What were the "softlock" criteria that were approved by J. Burke on June 26, 2000?

g.  For each individual patient, what critical fields were to be resolved prior to "softlock" of the file and submission to SEEC?

h.  What role did Quintiles Data Management group play in managing the various softlocked databases and softlocked patient data?

i.  What data management activities continued after the first database softlock? Why were these activities not completed before submitting the first patient dossiers to the SEEC in November 2000?

j.  Please explain what is meant by "All post-softlock changes identified" for the June 8, 2001 entry in the historical chain of events timeline.

k.  Please explain the role and training of CEVA in collecting, assembling, and proofing patient safety documentation provided by investigative sites given that these functions had already been performed beginning in July, 2000 by a "new monitoring team."

l.  Please identify the members of the "new monitoring team" and their affiliations.

  i.   What was re-monitored by this team?

  ii.  How were the findings by this team reconciled with the later work performed by CEVA?

  iii. How long did the re-monitoring by the new team take and when were these activities completed?

m.  What or who is AACT? What was the role of AACT?

n.  Please describe in detail the SAS listing that was approved by M. Gawryl on October 6, 2000.

Confidential Treatment
Requested by Biopure

SEC-Biopure
00014

BP 00149

STN: 125066/0, Page 7

    o.  Please explain how patient listings that were blinded for patient identifiers and certain information related to investigator determination of severity, seriousness, and drug-relatedness of adverse events were transferred to Red River Statistics for analysis. What analyses were performed on such listings that lacked any investigator information about adverse event severity or seriousness?

    p.  Please provide a flow diagram and the names of all individuals who handled source documents from the time they were completed by the investigative site to the time they were reviewed by the SEEC for the final adjudication.

    q.  Please document all transactions, including all involved personnel with their affiliations, which occurred after the review process was reopened in February 2001. The flow diagram provided in the SEEC charter does not appear to document this process completely.

2.    In the letter of September 24, 2002, you stated that: "the documents upon which the Biopure medical review was based were the same as those provided to the SEEC." You also stated that "at no time did Biopure have access to, nor responsibility for maintaining the database." In the BLA submission, under section 16.1.14, however, you stated, "Quintiles will ensure that the following data is (sic) blinded to the SEEC, prior to submission of each dossier." This list included patient identifiers, and certain aspects of patient treatment to include hematocrit, total and plasma hemoglobin, methemoglobin levels, etc.

    a.  Please clarify who performed the "Biopure medical review" and whether the Biopure medical review referred to was for the safety endpoint.

    b.  Please clarify whether the safety data provided for the "BioPure medical review" was also cleared of the same entries and that the documents provided for the "Biopure medical review" were identical to the documents provided to the SEEC.

    c.  Please also clarify whether the documents submitted for the Biopure medical review corresponded to the first patient dossiers submitted to SEEC or to the second set of files.

3.    Please explain why CEVA was instructed by M. Hensley to stop collection of source documents for the week between February 13-20, 2001.

4.    Please explain why Biopure requested re-copying of all source documents from dossier files (via J. Cermak) on February 23, 2001. For what purpose were these files recopied? What files were recopied? To whom were the files provided?

5.    Please explain why the SEEC was asked to re-review patient records for a new adjudication for the primary safety endpoint. What "postsoftlock" changes were reviewed by the SEEC during the second review cycle?

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 8

6.    When 506 files were re-reviewed, did the original reviewers perform the second review? If not, why not?

7.    Please explain who attended the adjudication meetings documented in the historical chain of events document and what was the purpose of the meetings.

8.    In the chronology of major project developments for SEEC, you state that the first three submissions for 1st level SEEC review were submitted to SEEC before CEVA initiated site contacts for collection of source documents (November-December, 2000). The role of CEVA was to provide case report form and source documentation, which was "accurate, focused, and relevant." CEVA was also charged with resolving all site queries for certain critical fields BEFORE submission of any documents to SEEC. Please explain how the first three submissions were provided to SEEC before CEVA had contacted any sites.

9.    How was the toxicity grading scale used by the investigator? Was the toxicity grading scale used during any remonitoring of the clinical data or the clinical sites?

10.   Between February 26, 2001 and April 16, 2001, Biopure reviewed all source documents from the dossier file and submitted new AEs (N=1443) to CEVA for review by the SEEC. However, in the September 24, 2002 letter, you stated that Biopure did not have a direct role in providing information to the SEEC. Please explain the relationship and provide the identities of the clinical personnel contracted by Biopure to review and provide new source documents to the SEEC adjudicators for re-review. Were these personnel completely independent of Biopure? Why was this function not performed directly by CEVA, to whom this function was assigned by SEEC charter?

      a.   Please provide a detailed summary of the contractual obligations assumed by Quintiles and other data management services with regard to the "cleaning" of data for study HEM-0115.

      b.   Was the February 26, 2001 to April 16, 2001 review of all source documents the result of the July, 2000 remonitoring effort undertaken by the "new monitoring team?"

      c.   Were these adverse events also incorporated into the documentation upon which the Biopure medical review was based?

11.   In the historical chain of events, three transfers of the SEEC database to Biopure are documented. The last transfer occurred on August 9, 2001, and the notation "complete data, locked" is recorded. On September 24, 2002, you stated that, "at no time did Biopure have access to nor responsibility for maintaining the database." However, in the text of the original BLA submitted July 31, 2002, on page 65 of the report of study HEM-0115, you stated that, "The database was subsequently transferred to Red River Statistics (RRS), Shreveport, LA. RRS and Biopure jointly completed data cleaning activities."

Confidential Treatment
Requested by Biopure

BP 00151

, 07/30/03  WED 16:24 FAX 9 301 827 3524        CBER/OBRR/DBA                                    ☑010

STN: 125066/0, Page 9

These statements would appear to be contradictory. Please clarify and answer the following questions.

a. Who prepared the database from the output of the SEEC deliberations?

b. Did Biopure have access to the databases constructed from the SAF-1 and SAF-2 forms?

c. Who provided the analysis datasets to Red River Statistics?

d. You stated that Quintiles completed data management activities for and hardlocked the CEVA database on 8/9/01 and that the hardlocked CEVA database was transferred to both Red River Statistics and Biopure on August 9, 2001. However, the historical chronology provided in the BLA indicates that two transfers of incomplete data from the SEEC database to Biopure occurred on July 12 and July 20, 2001. How were these databases used by Biopure?

e. In the September 17, 2002 letter submitted from Red River Statistics, it is noted that changes to an interim dataset dated June 29, 2001 were made by Red River Statistics and that these changes are memorialized in a SAS program module named ERRATA.SAS. This file contains additional raw data for adverse events and concomitant medications received after the June 29, 2001 cutoff date. Please clarify whether the second SEEC review contained the information that is contained in ERRATA.SAS.

12. In the letter of May 12, 2003, you stated that "it was always Biopure's intention to derive the secondary safety endpoints for the HEM-0115 study from the Investigator Database, not the internal scoring of the SEEC." Please note that it was always FDA's intent that all of the analyses, including the secondary analyses, be performed using the database constructed from the blinded review by the SEEC. Please note that the FDA letter to you, dated September 15, 1999, explicitly stated that:

"The review of data by the Independent Data Monitoring Committee (N.B. later renamed the SEEC) at these various time points (including at the conclusion of the study) was to have been blinded to treatment allocation. The determination of severity and seriousness of adverse events by unblinded investigators on-site was to be masked from the Independent Data Monitoring Committee. The Independent Data Monitoring Committee was to evaluate all adverse events and make an independent determination of intensity and seriousness of the adverse events, all in blinded fashion."

That letter went on to state that all serious adverse events, as determined in blinded fashion by the IDMC, would be categorized and evaluated according to the proposed statistical analysis plan. This statement did not distinguish between the primary safety analysis and the secondary safety endpoints, and the FDA letter of December 10, 1999 simply summarized the secondary safety endpoints that would be evaluated. In the September 15 and December 10, 1999 letters, FDA provided adequate documentation of

Confidential Treatment
Requested by Biopure

SEC-Biopure
    00017

BP 00152

STN: 125066/0, Page 10

what was expected for a regulatory submission. Omission of the recommended design features did not constitute grounds for imposing a clinical hold. On March 27, 2000 and July 7, 2000, you received letters from FDA that stated, "The statistical plan described notwithstanding, ultimate approval of your product depends on the totality of the evidence submitted from appropriately designed and conducted clinical studies including satisfactory risk: benefit outcomes." Biopure acknowledged these statements.

Since Biopure did not perform the secondary safety analyses as expected and in the manner recommended by FDA, please clarify the following points:

a.  Who performed the medical evaluation of the secondary safety endpoints for the purpose of reporting in the BLA?

b.  Who generated the safety database for the secondary endpoints of study HEM-0115?

c.  Who audited the safety database against source records and who monitored and reconciled the data. When was the database audited and when were the data reconciled?

d.  What is the nature of affiliation and financial relationship to Biopure if the medical reviewers were not Biopure personnel?

e.  Were the medical reviewers blinded to treatment assignment?

13.    It is FDA's understanding that site-identified adverse events and source documents were provided to SEEC for determination of seriousness, intensity, and causality of the events, and that these, together with additional adverse events identified by each SEEC reviewer, were used to generate the SAF-1 dossier for each patient. This SAF-1 dossier was then used by each SEEC reviewer to assign a medical risk score that was recorded on SAF-2. Further, the SEEC charter stated that,

"SEEC identified adverse events: The SEEC is not charged with the task of identifying all potentially un-reported adverse events; however, if during the course of reviewing a case for adjudication, a SEEC reviewer notes an unreported adverse event, this data (sic) should be captured." The charter further states that the CEVA Data Coordinating Center will review all completed adjudication CRFs for potential adjudication data discrepancies. If discrepancies are identified, a query will be issued to the reviewer who supplied the data."

"In order to proactively prevent the need to issue queries, the CEVA Data Coordinating Center has prepared a guideline for the completion of the adjudication CRFs which will be utilized by the SEEC." (This guideline included information about both the SAF-1 and SAF-2 forms.)

If it is the case that the SEEC reviewers used adverse events recorded on the SAF-1 forms in order to generate the adjudication recorded on the SAF-2 forms, and that the

Confidential Treatment
Requested by Biopure

STIN: 125066/0, Page 11

adverse events recorded on the SAF-1 forms could originate either from the on-site
investigator or the SEEC reviewer, and it is also the case that the SAF-1 entries were not
completely monitored and/or reconciled against source documents, then it may be
concluded that the medical assessment of risk was based on a data set that did not
conform with cGCPs. Your letter of May 12, 2003 in response to the clinical hold
imposed on IND 10792 and also submitted to the BLA states that, "SEEC AE/SAE
database was not designed or chartered to be consistent with Good Clinical Practice
(GCP)". Please clarify how a database that was generated for the purpose of at least the
primary safety analysis was not designed or chartered to be consistent with Good Clinical
Practice.

a.  If SEEC members found additional adverse events over and above those reported
from the clinical sites, how was the validity of the findings by the SEEC members
determined, and were the additional, valid adverse events added to the database upon
which the Biopure medical assessment was made?

14.    In the May 12, 2003 letter, you stated that the SEEC AE/SAE database was not audited
against source documents nor was (sic) data monitored or reconciled. Based on these
statements, it would appear that the information reviewed for the secondary safety
endpoints may have differed substantially from the data reviewed by the SEEC. Please
clarify. Please explain why the SEEC AE/SAE database was not audited against source
material.

15.    In the May 12, 2003 letter, you stated that SEEC reviewers were not responsible for
assessing intensity and causality of adverse events classified as non-serious. Please note
that the December 10, 1999 letter from FDA clearly stated that it was FDA's intent that
the IDMC evaluate all adverse events, not only those deemed serious by the on-site
investigators. The specific language states, "The role of IDMC-2 is to review all adverse
events in blinded fashion for each individual subject and to perform a separate
determination of intensity and seriousness of the adverse events. The IDMC was to be
blinded to investigator determination of intensity and seriousness when making this
determination." Further, Biopure itself stated that the function of the IDMC-2 was "at the
conclusion of the study, in blinded fashion, to review listings of all adverse events,
whether serious or not, by individual subject for all subjects enrolled in the study."
Please comment.

16.    In the letter of September 24, 2002, you stated that:

"In July of 2000, it was learned by Biopure Regulatory Management that clinical sites
had inconsistently interpreted the type of adverse events that were to be recorded in the
CRFs. In order to ensure the accuracy of the data, it would be necessary to re-monitor all
clinical data submitted by the Investigators."

"In December of 2001, after a review of the data listings, it was discovered that not all of
the Investigators had consistently applied the SAE definitions when recording data. A
specially designated Biopure team conducted a complete Medical Review of all Serious

Confidential Treatment
Requested by Biopure

BP 00154

STN: 125066/0, Page 12

Adverse Event (SAE) listings against the original CRFs and source documents submitted to Biopure to assure consistent classification, processing, and reporting of Serious Adverse Events....As a result of the audits, DCFs were written and signed by the Investigators to correct any data discrepancies discovered."

In the letter of May 12, 2003, you stated that:

"SEEC reviewers did not always apply serious criteria consistently and tended to classify known side effects of HBOCs (e.g., elevated liver function tests, jaundice) more seriously and conservatively. This is particularly true for the serious criteria pertaining to persistent/significant disability/incapacity and important medical events...

There was a high degree of disparity among individual SEEC reviewers: e.g., the difference in the number of SAEs for any one subject was frequently between 10 and 20."

A number of comments pertain:

a.  These various statements, taken together, suggest that the data recorded may at best be incomplete and at worst not constitute an adequate basis upon which to make a determination of safety or efficacy of HBOC-201.

b.  What criteria were applied to the remonitoring efforts that occurred after July, 2000? Please provide the Monitoring Guidelines that were used for this effort.

c.  Why did the remonitoring actions that occurred after July, 2000 not capture the inconsistencies in the classifications of SAEs?

d.  Please provide the names and affiliations of all members of all monitoring and re-monitoring teams that visited the clinical sites.

e.  The comments suggest that corrections, changes, additions, or subtractions may have been made to the databases after the so-called hardlock of August 9, 2001. Specifically, the letter of September 24, 2002 documents re-review of source documents in December 2001, and corrections that were signed by the on-site investigators. Please comment.

f.  Why did the remonitoring that occurred not clarify all the adverse events that were to be reviewed by the SEEC? Were any of the adverse events recorded by the SEEC, but not recorded by the on-site investigators, valid? If so, please explain why these adverse events were not also captured by the investigators and/or the monitoring teams sent by Biopure.

Please provide a fully detailed flow diagram and narrative description of the handling of all source documents, including but not limited to case report forms, patient chart records, etc. from the time of completion at the investigative site to the generation of the databases ultimately submitted to the BLA. (see item 1 above)

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 13

Please provide a fully detailed flow diagram and narrative description of the generation of each database that was developed, to include, but not limited to, additions, subtractions, corrections, etc.

Please provide a fully detailed flow diagram and narrative description of all of the remonitoring efforts that occurred between the conclusion of the study and the submission of the BLA.

Please provide a detailed list of all the individuals, including affiliation and financial relationship to Biopure, who were involved in data management and database management activities for HEM-0115.

FDA reserves the right to re-evaluate the output of the SEEC adjudication and the determination that the primary safety endpoint was in fact met in HEM-0115 pending receipt of your answers to the above questions regarding study conduct and integrity of the data.

## Clinical Trials

### HEM-0115 (Efficacy):

1.  The case report forms provided and the case tabulations and patient summaries contain numerous discrepancies, cross-outs, and unexplained deletions with regard to allogeneic transfusions given. It will be necessary for you to reconcile the case report form information against blood bank records and the patient charts in order to ensure the accuracy of these data that contribute to the assessment of the efficacy endpoints of the trial.

    a.  Please provide blood bank records, physician orders, and patient chart data to confirm all transfusions and infusions given.

    b.  Please cross-check these source documents and provide an accounting of all transfusion requests, transfusions administered, used and unused bags returned to the blood bank, etc. to ensure the accuracy of the data entered into the case tabulations and the case report forms.

    c.  Please provide complete and accurate summary data for all transfusions administered including, but not limited to the type and volume of product administered etc.

    FDA reserves the right to re-evaluate the efficacy data pending receipt of this information. 

2.  Please provide the efficacy data for test and control groups in tabular format with each row of the table devoted to each individual patient. Each patient should have data entered on a single row and each row should contain all the information related to transfusion

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 14

decisions and transfusion outcomes (relationship to prior trauma event, volume of blood lost, volume of fluids administered, volume of autologous blood collected and administered, time of randomization, baseline hemoglobin and hematocrit, etc.). The database should be constructed such that chronological events related to the efficacy endpoints can be read from left to right across the table. Each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be accomplished readily. The column headings should include, but are not limited to, date and type of surgery, time of surgery start and stop, total hemoglobin and hematocrit at randomization, reticulocyte counts at various time points, etc. The table should be constructed such that running time analyses may be performed. The data points entered into the table should refer to the source laboratory document, and the laboratory site (central, local, point of care) should be documented in the table.

FDA reserves the right to re-evaluate the efficacy data pending receipt of a table constructed in this manner.

3.    Please provide all missing data for pre- and post-infusion total hemoglobin so that incremental increase in total hemoglobin due to administration of the product may be calculated. Significant numbers of data points appear to be missing from the case report forms. Based on the available data, the median increase in total hemoglobin following the loading dose of 60 g HBOC-201 would appear to be 0.3 g/dL rather than the expected 1.0 g/dL. Subsequent doses of 30 g HBOC-201 also appear to have increased the total hemoglobin concentration by approximately 0.2 to 0.3 g/dL. Please comment.

4.    The BLA text states that dosing of HBOC-201 by 30 g dose intervals was intended to maintain plasma hemoglobin levels at safe and physiologically appropriate ranges. The clinical trial, however, did not specify what the target plasma hemoglobin level should be, and dosing decisions were based on the total hemoglobin concentration rather than a combination of RBC hemoglobin levels plus plasma hemoglobin levels or the plasma hemoglobin levels alone. Of the 317 patients treated with less than the full 300 g dose of HBOC-201, approximately 30% ultimately were transfused with allogeneic red blood cells. Most of these patients were transfused because clinicians did not appear to be able to manage their patients based on assessment of total hemoglobin levels, because the total hemoglobin levels did not increase as expected.

The dosing recommendations provided in Table 1 of the proposed package insert are not supported by clinical data from HEM-0115 or HEM-0114. Any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial. In turn, support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data to suggest that dosing based on such a measure is safe and likely to be efficacious. Please comment.

Given the information from the clinical trial, it is not possible to write adequate and safe dosing guidelines, and the utility of the dosing guidelines in Table 1 (using plasma hemoglobin levels) of the proposed package insert cannot be confirmed. Please comment.

Confidential Treatment
Requested by Biopure

BP 00157

5.   Many transfusions in the control red blood cell group were given back-to-back. This is particularly true for those patients who received only two units of blood. It is not clear whether this phenomenon also occurred for patients randomized to HBOC-201 who also received allogenic red blood cells.

   a.  Please provide the records for each hospital transfusion oversight committee together with the records for each site for transfusion practices for the specific surgical procedures performed. What measures are in place at each of the study sites for control of transfusion decisions?

   b.  Please include information on allogeneic transfusion from each site for patients treated for the one year prior to initiation of the study and for concurrent patients who were not enrolled in the clinical trial. The report should include information about patients who underwent the specified orthopedic procedures and who did not predonate autologous red blood cells or use erythropoietin.

6.   It would appear that transfusion avoidance for study HEM-0115 was largely driven by avoidance of allogeneic transfusion among those subjects who received only 60-90 g of HBOC-201. In this group, the median time to transfusion was 2.5 days. At 91-180 g of product, only 50% of subjects avoided transfusion and the median time from randomization to transfusion was approximately 4.5 days. Between 181 and 270 g of product, only 32% of subjects avoided transfusion, and the median time to transfusion was 3.3 days. At 300 g of product, 75% of patients received allogeneic red blood cells. The median time to transfusion was approximately 3 days. Patients who received HBOC-201 in any dose and who also received allogeneic red blood cells, received a median dose of 2 units (mean approximately 3 units) of red blood cells. This dose of red blood cells was comparable to or slightly higher than the dose received by patients randomized to the control group. Thus, at doses above 90 g of HBOC-201, not only were many patients exposed to the dose of HBOC-201, they also were also exposed to allogeneic blood in the amounts received by the control group. Please comment.

7.   Patients in the test arm had, on average, approximately 1 g/dL lower total hemoglobin levels than did patients in the control arm for treatment days 2-6. At discharge, patients treated with HBOC-201 had hematocrits of 28 as compared to patients treated with allogeneic red blood cells who had discharge hematocrits of 31. Thus, patients treated with HBOC-201 were discharged from the hospital significantly more anemic than patients in the control group. Please comment.

Please re-analyze your efficacy database that FDA has asked you to construct and report your conclusions in your response to this letter. Your analyses might include, but should not be limited to, comparison of incremental increase in total hemoglobin levels as a result of administration of each unit of product or control, comparison of total hemoglobin levels on treatment days 2 through 6 for each group, a comparison of discharge hematocrits, review of changes in reticulocyte levels and other measures of oxygen delivery by the product, and an analysis of transfusions administered at each dose cohort of HBOC-201.

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 16

**HEM-0115 (Safety):**

1. Many of the CRF Adverse Experience pages have cross-outs, deletions, additions, missing dates and/or times, or are marked "re-monitored". It will be necessary to reconcile the CRF information against hospital records in order to ensure the accuracy of data that contribute to the safety profile.

   a. Please provide copies of source documents to substantiate <u>all</u> CRF Adverse Experience changes as enumerated above.

   b. Please provide the names and affiliations of <u>all</u> individuals who entered or modified data entries on a CRF-by-CRF basis, and the dates and times when these changes were made.

*FDA reserves the right to re-evaluate the safety data pending receipt of this information.*

2. Please provide the safety data for test and control groups in tabular format. Each row should contain all the information related to the adverse event (please request a sample copy from FDA). The database should be constructed in such a way that the chronology of the adverse event can be read from left to right and that can be readily analyzed using statistical software. The column headings should include, but are not limited to, age, gender, CTM dose, time of surgery, time of treatment-emergent AE, time of first CTM infusion, time of last CTM infusion, time from 1ˢᵗ CTM infusion to time of treatment-emergent AE, time from last CTM infusion to time of treatment-emergent AE, total amount of CTM administered at time of treatment-emergent AE, official time/date of premature discontinuation of CTM, official reason for premature discontinuation of CTM, and time/date of 1ˢᵗ non-CTM transfusion.

   *FDA reserves the right to re-evaluate the safety data pending receipt of tables constructed in this manner.*

3. The incidence of acute myocardial infarction is different between the SEEC and FDA (based on entries by investigators in the Adverse Events pages of the CRF) databases.

   a. Please provide FDA with copies of <u>all</u> source documents supplied to the SEEC regarding this issue.

   b. Please provide copies of <u>all</u> source documents for <u>all</u> subjects with respect to troponin and CK-MB values.

   c. Please supply tables for <u>all</u> CK-MB and troponin values, as outlined in question 2 (above). Note that each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be readily accomplished using statistical software.

Confidential Treatment
Requested by Biopure

BP 00159

SEC-Biopure
00024

STN: 125066/0, Page 17

     d.  There are numerous instances where datasets for the same subject report identical values on the same CRF page for both troponin I and T. Please explain how this occurred, which value/parameter is correct, and supply the correct CRF page for each value reported in these datasets.

     e.  *Subjects 0915 and 1113 had troponin values entered by hand on the CRF page, yet the data printout with troponin values for this day is missing. Please explain the origin of these troponin values.*

4.  The incidence of acute renal failure (pre-specified as dialysis-dependency) is different between the SEEC (7 vs. 2) and FDA (3 vs. 1) databases.

    Please provide FDA with all source documents provided to the SEEC regarding this issue and explain why there is a discrepancy between the investigator information and SEEC adjudication of the same events.

5.  Laboratory measurements of amylase, AST, and ALT are deleted (or missing) for many HBOC-201 subjects.

     a.  Please explain why these values are missing or deleted, provide raw data for these missing data, identify the particular analyzer used to make the measurement, and the methodology used to obtain corrected values that reflect the presence of HBOC-201 at each corresponding study site.

     b.  Please explain why the amount of missing data for AST and ALT at treatment days 2 and 3 is much greater in the HBOC-201 arm than in the control arm during the perioperative period.

6.  Progress notes for subject 2513 mention the possible necessity for renal dialysis, but omit entries on or around 9/16/1999.

     a.  Please provide source documents for all consultations and all progress, nursing, and (if applicable) dialysis nursing notes for this subject.

     b.  Similar requests pertain to subjects 4201, 4820, and 5405.

7.  In your table, "Summary of Data Changes Concerning Serious Adverse Events Generated from the HEM-0115 Medical Review", which was sent to FDA after BLA submission, you list changes in adjudication and/or severity made by Biopure to the SAEs. Please provide copies of all source documents to substantiate each change.

8.  Regarding product immunogenicity, please provide details of the antibody assay methodologies, including the definition of the IgG antibody unit, and the sensitivity and specificity used for positive and negative controls.

Confidential Treatment
Requested by Biopure

SEC-Biopure
00025

BP 00160

·07/30/03  WED 16:26 FAX 9 301 827 3524      CBER/OBRR/DBA                      ☒019

STN: 125066/0, Page 18

9.  Please evaluate the cross reactivity of these antibodies to human hemoglobin and describe
    a plan to assess the risks to patients who develop antibodies to HBOC-201 of repeat
    exposure to the drug.

10. Please provide an analysis of drug-drug interactions including interactions of HBOC-201
    with anti-hypertensives, vasodilators, diuretics, cardiac glycosides, and colloid solutions,
    etc.

11. Please provide a list of, and analyze the data from, patients who received product near the
    end of the expiration period.

**HEM-0114:**

1.  Please provide analyses on safety and efficacy data for patients who underwent
    orthopedic surgery in HEM-0114.

2.  Please clarify what sponsor responsibilities were transferred to CRO(s) for HEM-0114.

3.  The clinical protocol for HEM-0114 states that there is an Appendix G, "Clinical Safety
    Data Management: Definitions and Standards for Expedited Reporting; ICH E2A, March
    1995", but only Appendices A and B are present in the BLA. Please include *all*
    appendices for this protocol in your submission.

4.  Here were patients in the red blood cell treatment group who had neither completed six
    CTM infusions, nor reached the time limit for receiving CTM, but were transfused with
    allogeneic red blood cells considered as non-CTM. Please provide the reasons these
    transfusions were considered non-CTM.

5.  Please provide explanations for withholding CTM infusion(s) when such infusions are
    "permitted".

6.  Please detail the information on the patients not discharged from hospital, including their
    ultimate disposition.

7.  Please address the issue of interference of laboratory tests in HEM-0114 (see below,
    clinical laboratory).

8.  In the BLA, the normal ranges of the chemistry laboratory tests are given in a distinct
    tabulation. As the normal ranges might vary widely depending on the testing laboratory,
    the data in the listings for chemistry laboratory tests become incomprehensible in the
    absence of the normal range for each listing. Please provide the normal values for each
    laboratory test in the patient data listings adjacent to the test results. If central laboratory
    results are available, please provide this information as well.

Confidential Treatment
Requested by Biopure

BP 00161

STN: 125066/0, Page 19

9.    Please provide *all* post-baseline clinical hematology and chemistry data listings; including CPK, CK-MB and troponin, regardless of whether such data were from the treatment period or not.

10.   Please provide complete information on the assays for antibodies to HBOC-201 and the data obtained.

11.   Please provide an analysis of drug-drug interactions, including interactions of anti-hypertensives, vasodilators, diuretics, cardiac glycosides and colloid solutions with your product in HEM-0114.

12.   Please provide all CRFs for HEM-0114, including laboratory printouts. In addition, please also provide:

      a.  Copies of source documents to substantiate all CRF Adverse Experience changes as enumerated elaborated in question 1 a (above) under HEM-0115 (Safety).

      b.  Names and affiliations of all individuals who entered or modified data entries on a CRF-by-CRF basis, and the dates and times when these changes were made.

13.   Please provide tables for all treatment-emergent adverse events, as outlined in question 2 (above) under HEM-0115 (Safety).

14.   Please provide a list of the subjects who were administered product near the end of the expiration period of the lot.

15.   Please provide a copy of all training materials supplied to investigators, a check-off list to verify their attendance at all training sessions, and results of tests you administered to verify their understanding of GCP.

## Other Clinical Studies

**General Comments about the phase 2 studies:**

1.    Please provide all case report forms, individual patient data, laboratory printouts, and source documents to support claims of safety and efficacy for all phase 2 studies.

2.    The case report forms that were provided for the phase II studies contain numerous discrepancies, cross-outs and unexplained alterations with regard to transfusions given. Accordingly, please provide explanations for missing and crossed-out data in the case reports a.) originally submitted with the phase 2 studies in this BLA and b.) all additional requested case report forms for the phase 2 studies.

3.    Please provide the anesthesia records for all surgical patients in all of the phase 2 studies.

Confidential Treatment
Requested by Biopure

BP 00162

SEC-Biopure
00027

STN: 125066/0, Page 20

4.   For all phase 2 studies in which hemodynamic monitoring was performed using a PA catheter, please present a table that includes individual patient data listings for the following calculated hemodynamic parameters: systemic vascular resistance, oxygen delivery, oxygen consumption, and oxygen extraction ratio.

5.   Please provide final study reports for all phase 2 studies conducted to support claims of efficacy and safety for your product.

6.   Please provide the efficacy data for the test and control groups for all phase 2 studies in a tabular format with each row of the table devoted to each individual patient. Each patient should have data entered on a single row and each row should contain all the information related to transfusion decisions and transfusion outcomes (relationship to prior event, volume of blood lost volume of fluids administered, volume of autologous blood collected and administered, time of randomization, baseline hemoglobin and hematocrit, etc.) The database should be constructed such that chronological events related to the efficacy endpoints can be read from left to right across the table. Each laboratory test entered into a column of the table should have the same unit of measure so that data analysis may be accomplished readily. The column headings should include, but are not limited to, date and type of surgery, time of surgery, total hemoglobin at baseline and then at randomization, etc. The data points entered into the table should refer to the source laboratory document, and the laboratory site (local or central) should be documented in the table.

7.   Please address the issue of laboratory interferences on laboratory tests in the phase 2 clinical trials.

**Study M9990-0075:**

8.   Please provide the reasons for CTM transfusion and the data to support the decision to transfuse for each patient and each transfusion in this clinical trial.

9.   You state the following conclusion for the above referenced study:

" In summary, in the present study, HBOC-201 was used to treat post-operative anemia in cardiovascular surgery patients in the intensive care unit. We found that: HBOC –201 eliminated the need for postoperative allogeneic transfusion." (Page 106). The statement is misleading. Only 34% of the patients who were randomized to the HBOC-201 group required no postoperative allogeneic RBC's. Please provide information on the number of patients who avoided allogeneic transfusion port operatively but who had been transfused intraoperatively..

10.  The conclusions on page 106 also state that HBOC-201 was safe and well tolerated; however, the following adverse events were seen in this clinical trial:

a.   Serious adverse events in HBOC-201 group had more SAE's than the RBC group: 19 vs. 4. Of the HBOC-201 SAE's, 11/19 were cardiovascular events such as ventricular

Confidential Treatment
Requested by Biopure

07/30/03  WED 16:29 FAX 9 301 827 3524    CBER/OBRR/DBA    @022

STN: 125066/0, Page 21

tachycardia, atrial fibrillation, arterial desaturation, pericardial effusions, CHF, respiratory distress and dysrhythmias. In the RBC group, the SAE's consisted primarily of infections/ cellulitis (3/4) and small bowel obstruction (1/4). Please comment.

11.    FDA notes that the only death in this study, patient 310, was infused with CTM#2 without having met the post- operative transfusion trigger criterion. According to protocol, the patient could be transfused with CTM if the hemoglobin was between 6.5 and 9 g/dl. In the case of patient 310, the pre-CTM #2 hemoglobin level was 9.5. Please provide an explanation for why this patient was given additional CTM for a low hemoglobin, when in fact the patient's recorded hemoglobin was above the level required for CTM infusion.

12.    FDA notes that for subjects who discontinued CTM (section 12.2), most were stopped due to investigator concerns about safety (cardiorespiratory or neurological deterioration) and subjects experiencing adverse events. Please comment.

**Study BR-0049-0144:**

13.    Study BR-0049-0144 references the following publication: "The Effects of Increased Doses of Bovine Hemoglobin on Hemodynamics and Oxygen Transport in Patients Undergoing Preoperative Hemodilution for Elective Abdominal Aortic Surgery", Kasper, et al. *Anesth Analg* 1998; 87: 284-291. The author of the publication concludes that Bovine hemoglobin in doses ranging between 55 and 97 grams of hemoglobin increased vascular resistance and decreased cardiac output in anesthetized surgical patients. Furthermore, he states that hemodilution with bovine hemoglobin in those doses ranges provided no apparent benefit over hemodilution with hydroxyethyl starch. Given the data that you provided for this study, please comment on the validity of the above statements.

14.    In addition to intraoperative anesthesia records, please provide individual patient data listings for the following hemodynamic parameters: oxygen extraction ratio, systemic vascular resistance, oxygen consumption and oxygen delivery.

15.    Please provide the DSMB members and charter for this study.

        FDA reserves the right to review the clinical data of all phase 2 studies pending the receipt of all requested information.

**General Comments on Clinical Studies**

1.    Please provide hospital records for all patients who received HBOC-201 on the basis of compassionate use.

2.    Please provide data, which show that HBOC-201 can be administered safely at clinically relevant rates in the setting of uncontrolled surgical bleeding.

Confidential Treatment
Requested by Biopure

BP 00164

STN: 125066/0, Page 22

3.  Please submit Full Study Reports for studies where there are only abstracts and/or manuscripts in the BLA.

## Statistics

1.  It is not clear why the sample size was amended shortly before completion of study HEM-0115. Please explain whether the sample size was amended because of observations about the data collected to the point of sample size increase, if not, please explain why the sample size was increased.

2.  An annual report was submitted on June 6, 2002 under BB-IND 2935 for the reporting period from February 1, 2000 through January 31, 2001. Study HEM-0115 was completed two and a half months before the end of the reporting period. However, the numbers of deaths reported in the annual report in the HBOC and RBC arms were 6 and 1 respectively, compared with 10 and 6, respectively, in the BLA submissions. Please explain the discrepancy in reporting and account for the under-reporting of deaths, considered to be serious adverse events, in the annual report.

3.  In the HBOC-201 group, 5 deaths occurred among 31 patients who were older than 80 years compared to 1 death out of 26 in the RBC group. The difference is marginally significant (p = 0.074; one-sided Fisher's exact test). Please comment.

4.  Although there is no significant difference between the two arms (10/350 vs 6/338; p = 0.45), the number of deaths observed in the study seems a little too high in consideration that these are elective surgeries (16/688 = 2.3%; 95% confidence interval is (1.3%, 3.7%)). Please comment on this observation in light of the mortality rate of a similar patient population with similar types of surgery from historical data.

5.  Please provide the randomization code with detailed description of the randomization scheme and patient ID. Please also identify those who died.

6.  Table 14.5.1 of BLA Amendment 2 also shows that there is a highly significant difference between the two arms (HBOC vs RBC: 81/350 vs 46/338; p < 0.001) in proportions of patients experiencing at least one SAE that resulted in death or persistent disability. Furthermore, there are 23.7% (83/350) of patients in the HBOC group who prematurely discontinued from CTM compared with 2.4% (8/338) in the RBC group.

    a.  Please justify the benefit of avoidance of allogeneic blood transfusion by administration of HBOC in light of higher proportions of patients experiencing at least one SAE that resulted in death or persistent disability and higher rate of prematurely discontinuation from CTM.

    b.  In connection with (a) above, please provide a 2 by 2 table defined by avoidance and SAE that resulted in death or persistent disability for the HBOC group.

Confidential Treatment
Requested by Biopure

.07/30/03   WED 18:30 FAX 9 301 827 3524     CBER/OBRR/DBA                    ☒024

STN: 125066/0, Page 23

## Clinical Laboratory Measurements

1.  Although the BLA text states that in situations where the central laboratory(ies) was or were used, data management rules dictated use of the central laboratory data; however, it is not clear from the BLA text, the case report forms, the case tabulations, or the individual patient summaries which clinical laboratory results, i.., local, central laboratory, or point-of-care, were captured in the clinical database. In addition, the hypertext links from the patient summaries take the reader to one of several different reportings of individual patient laboratory results. In some instances, the link takes the reader to the central laboratory result. In other instances, the link takes the reader to the case report forms. Some case report forms are associated with clinical laboratory printouts while many others are not. Thus, it is not possible to be sure whether the data reported in the case report forms represent local laboratory results or central laboratory results.

    a.  Please provide clear documentation for each clinical laboratory result for each site about what laboratory results have been submitted to the BLA for review.

    b.  The BLA text states that three different central laboratories, one each in the United States, Europe, and South Africa, were used for reporting of the clinical laboratory data. Since the data from these various sources are to be combined for study HEM-0115, please provide information about the clinical laboratory reference ranges, documentation of your efforts to assure that clinical data reported from each of the central laboratories were comparable such that the data could be combined for reporting purposes, the results of such studies, and a description of the instrumentation used for each laboratory assay at each of the three central laboratory sites.

2.  Each hospital's laboratory was supposed to have been evaluated, and an assay limitation sheet listing all parameters available for patient management and for the study, was to have been provided to the hospital's laboratory and the investigator. In regard to these preconditions, please provide the following:

    a.  Documentation that this evaluation was performed at each site and that each investigator and each hospital laboratory was provided with the appropriate assay limitation sheet.

    b.  The assay limitation sheet for each site listing all parameters available for patient management.

    c.  The data from each clinical site and for each central laboratory regarding colorimetric and other potential interferences in assay results due to the presence of HBOC-201 in the plasma or serum samples.

Confidential Treatment
Requested by Biopure

SEC–Biopure
00031

BP 00166

STN: 125066/0, Page 24

    d.  The information about what backup facilities were available to ensure that parameters required for patient management and study conduct were available, and the results of studies to evaluate these back-up sites.

    e.  The information about the training of and the specific procedures followed by both local laboratory and central laboratory personnel for the conduct of the various clinical studies reported in the BLA.

    f.  The information about the training, the specific procedures used, and quality control methods used for all assays performed on point-of-care instruments used in the clinical studies.

    g.  Clarify if clinical results reported in the BLA were corrected for assay interference by HBOC-201. Absent such information, it is not possible to review clinical laboratory data sufficiently to make accurate conclusions about the effect of the drug on patient care or patient safety.

    In the tabulations and case report forms, you report that various clinical chemistry and other laboratory data have been deleted. Why were these data deleted?

3.  The BLA contains articles and abstracts summarizing data regarding potential interference by HBOC-201 in clinical laboratory assays but does not contain any raw data documenting the interferences for commonly used laboratory assays, commonly used laboratory instrumentation, and commonly used point-of-care instrumentation.

    a.  Please provide for review the data from studies to assess the degree of interference by HBOC-201 for commonly used clinical assays. These studies should provide information about interferences over the full range of concentrations of HBOC-201 to which patients will be exposed and should assess interference over the full range of likely analyte concentrations.

    If HBOC-201 interferes with clinical measurements, please provide information characterizing the direction and magnitude of the bias associated with varying drug levels.

    b.  Please provide information about point-of-care assays (including the name of the test system), which you have tested.

    c.  Please provide a list of all analytes, by instrument used, for which
        ii.   there is no interference
        iii.  interfernce can be corrected
        iv.   no results can be obtained while HBOC-201 is still present in the circulation, above a specified threshold.

Confidential Treatment
Requested by Biopure

SEC-Biopure
00032

BP 00167

STN: 125066/0, Page 25

    d.  Please provide validation data supporting the use of commonly used clinical laboratory and point-of-care instruments for analyzing patient samples containing HBOC-201.

    e.  Additional interference studies should be ongoing with samples drawn from study patients. The purpose of these studies is to validate other methods and analytes using real patients samples by using established methods as comparators. Patient samples should be banked for future use. Please comment.

## Pharmacology/toxicology

**Study (NC101):**

1.  Based on results from NC101 it appears that HBOC-201 delivers excessive amounts of oxygen to the tissue evaluated (left quadriceps muscle) and results in equally excessive global oxygenation and tissue oxygen extraction. Conversely, both stored and fresh blood normalizes tissue oxygenation parameters relative to pre-hemodilution values.

    Please comment on the performance of stored and fresh whole blood in this model and provide a rationale for why apparent tissue over oxygenation by HBOC-201 is appropriate.

2.  Under conditions of hypoxia, excess oxygen delivery inevitably will lead to oxidative cascades and tissue injury.

        a.  Please comment on the potential longer-term effects of excessive oxygen delivery apparently mediated by HBOC-201.

        b.  Please comment on the study duration and why a short-term evaluation was chosen to address a pivotal question (i.e. does HBOC-201 provide optimal tissue oxygenation?) most appropriately determined over a minimum of 24 hours. .

        c.  Please provide metHb concentrations for at least 24 hours following the final infusion of HBOC-201, tissue oxygenation parameters for at least 24 hours following the final infusion of HBOC-201 and an assessment of any tissue oxidative damage.

3.  Study NC101 models a severe situation of isovolemic anemia and is intended to mimic the expected scenario for HBOC-201 utilization in clinical situations of surgical anemia related to blood loss. However, an important clinical parameter is volume status and patients generally don't require blood unless Hb falls below 6-7 g/dL. In study NC101 HES maintains the intra-vascular volume of swine.

    Please comment on and provide evidence that clinically relevant HBOC-201 administration volumes provide adequate volume expansion in a clinically relevant large animal model.

Confidential Treatment
Requested by Biopure

STN: 125066/0, Page 26

4.  Measurements of tissue oxygen debt such as arterial acid base balance are progressively
    worsened in all groups following transfusion. This has been associated with poor
    prognosis in clinical cases of hemorrhagic shock and is difficult to explain in this model
    given the improvements in other parameters of oxygenation.

    Please provide an explanation for this paradox.

5.  The model presented in study NC101 and other subsequent canine models presented in
    the submission involves anesthetized animals. Inclusion of a conscious animal model
    would have been useful to assess oxygenation parameters in the absence of mechanical
    ventilation and anesthetic agents.

    Please comment on why a conscious animal model was not used in any evaluation of
    tissue/global oxygenation.

Study (NC093):

6.  The fact that continuous infusion of pentobarbital was used as the anesthetic may present
    a problem. Typically if an anesthetic is to be used in a study assessing hemodynamics
    one would specifically avoid pentobarbital. Pentobarbital may blunt the vasoreactivity
    caused by infusion of HBOC-201. Without a positive hypertensive control it would be
    difficult to assess the effects of the anesthetic.

    a.  Please comment on why pentobarbital was used and any effect the choice of
        anesthetic may have had on the study outcome as related to hemodynamics and tissue
        oxygenation. Previous publications by your group (e.g. Lee, et al., J. Appl. Physiol.
        79(1): 236-242, 1995.) demonstrate hypertension following Oxyglobin (earlier
        version of HBOC-1) administration.

    b.  While, it is understood that Oxyglobin and HBOC-201 different it is unclear from the
        data provided how HBOC-201 affects hemodynamics in a conscious animal model.
        Subsequently HBOC-201 may alter hemodynamic parameters (i.e. vasoconstriction)
        in conscious animals, which may go on to negatively influence tissue oxygenation.
        Please provide evidence from a conscious large animal model that vasoconstriction
        does not adversely influence tissue oxygenation following infusion of clinically
        relevant volumes of HBOC-201.

    c.  Also, please comment on the relevance of reporting oxygen delivery determined from
        cardiac output without knowing organ blood flow. Can you please confirm that the
        distribution of cardiac output or blood flow is optimal to specific organs following
        HBOC-201 infusion? If not, oxygen delivery and the values of oxygenation
        calculated from it become less meaningful.

Confidential Treatment
Requested by Biopure

BP 00169

STN: 125066/0, Page 27

### Tumor oxygenation studies:

All studies provided addressing tumor oxygenation by HBOC-201 are not relevant to the application and should not be considered in support of the concept of adequate tissue oxygen delivery in anemia. Please comment on tumor vascular similarities to that of essentially normal tissue, which would allow for a correlation of oxygen delivery within a tumor to that of normal tissue.

### Population pharmacokinetic analyses

Under the pharmacokinetics portion of the label, you indicated that a weight-based dosing approach would yield a more consistent systemic exposure to HBOC-201. This approach may be anticipated to yield safer and equally efficacious clinical outcomes. However, your proposed dosing regimen is not weight-based. In your population pharmacokinetics analysis, clearance was found to increase with increasing body weight, which varied over the range of 23.4 kg to 170.1 kg (age: 8-90 years). HBOC-201 clearance as predicted by the model was 81% higher over the weight range of patients studied. Since the impact of body weight on HBOC-201 clearance may be different between pediatric and adult populations, please perform a separate analysis using pharmacokinetic data in adult population to examine the effect of body weight on HBOC-201 clearance. Furthermore, please determine whether weight-based dosing for HBOC-201 should be adopted. These determinations notwithstanding, as noted in question 4 under HEM-0115 (Efficacy), any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial. In turn, support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data to suggest that dosing based on such a measure is safe and likely to be efficacious. Please comment.

1.   Your phase I studies indicated the dependence of elimination half-life of HBOC-201 on dose, but your population PK analysis did not include dose as a covariate.

     Please include dose as a covariate in your population PK model to investigate the effect of dose on HBOC-201 clearance.

2.   Your population pharmacokinetic analysis report is incomplete. It did not include the final model equation and examples of its application.

     Please submit the complete study report with the results of the newly requested analyses.

### Phase I pharmacokinetics studies:

1.   You claim that the plasma concentration of and plasma exposure to HBOC-201 (hemoglobin) are approximately proportional to dose, but no formal proportionality analysis has been done on your pharmacokinetics data.

     Please perform such an analysis using AUC vs. Dose and $C_{max}$ vs. Dose.

Confidential Treatment
Requested by Biopure

BP 00170

STN: 125066/0, Page 28

### Dosing in patients with hepatic and renal impairment:

1.  Your proposed indication for HBOC-201 is for the treatment of the signs and symptoms of acute anemia in adult patients undergoing orthopedic surgery. This patient population includes patients with hepatic and/or renal impairment. Elevations of serum creatinine and blood urea nitrogen were observed in patients administered HBOC-201. However, the impact of renal and hepatic impairment on HBOC-201 clearance has not been studied and the routes and mechanisms for clearance of HBOC-201 are not clearly described.

    Please address these issues.

*We have this already to Bruce*

### Repeat dose pharmacokinetics:

1.  You have not conducted repeated dose pharmacokinetic studies using HBOC-201. Your population pharmacokinetic analysis indicated that patients who received HBOC-201 pre-operatively had, on average, a 61% lower clearance and 29% lower volume than those who did not receive HBOC-201 pre-operatively. These findings indicate that HBOC-201 involves a saturable elimination process. However, your proposed dosing regimen for HBOC-201 is up to 5 doses in 6 days, and has not characterized for its pharmacokinetics as repeated dose may lead to unanticipated accumulation of HBOC-201, it is necessary to characterize repeated dose pharmacokinetics by conducting a multiple dose pharmacokinetic study.

    Please submit study protocol for our comments.

*Another trial ?*

### Change in mean plasma hemoglobin following infusion of HBOC-201:

1.  You have provided a table with change in mean plasma hemoglobin following infusion of HBOC-201.

    Please also provide median with range for change in plasma hemoglobin following infusion of HBOC-201.

### Other Pharmacology/Toxicology studies

1.  The first section of your proposed label (Section 2, Dosage and Administration) describes human dosing in the context of both preclinical and clinical pharmacokinetic studies. In Section 2.2, "Additional Dose," the sentence in lines 35-37 reads that an initial dose of 60 grams of HBOC-201 will result in a plasma hemoglobin concentration of approximately 1.4 g/dL, based on data from pharmacokinetic studies in animals and humans." Please delete the word "preclinical" from this language since human dosing guidance in product labeling is not predicated on animal pharmacokinetic data. Language regarding plasma

Confidential Treatment
Requested by Biopure

07/30/03   WED 16:33 FAX 9 301 827 3524        CBER/OBRR/DBA                                    ✉006

STN: 125066/0, Page 29

hemoglobin levels achieved after administration of 60 g of HBOC-201 must be based on clinical data. (Please see question 4 in the review of efficacy of Study HEM-0115).

2.  In Section 2.2 of the label, Table 1 entitled, "Extrapolated Dosage Guideline" is not informative because human dosing and administration needs to be based solely on human clinical data. As noted in question 4 under HEM-0115 (Efficacy), any dosing guidelines based on plasma hemoglobin levels require confirmation in an adequately sized and adequately powered phase 3 clinical trial. Human dosing based on plasma hemoglobin levels requires phase 2 data demonstrating that this approach is safe and efficacious. Please comment.

3.  The language of lines 236-263 of the proposed package insert imply that the rat reproductive toxicity studies are less informative than the dog reproductive toxicity studies for predicting human developmental toxicities because of the lack of an inverted yolk sac structure in the human fetus and a longer time interval of histiotrophic nutrition in the rat compared to the dog. Although humans do not have an inverted yolk sac, and depend quite early in development on hemotrophic nutrition compared to other species, the histiotrophic process may supply the fetus with nutrients throughout gestation. Thus, FDA recommends that lines 257-263 of the proposed label be deleted and that more details are provided on the teratogenicity findings in the rat model. We also recommend that the rat teratogenicity results precede the language describing the dog reproductive toxicity studies in the label.

4.  Instead of Pregnancy Category "C," FDA recommends that the product be labeled as Pregnancy Category "X" because:

    a.  The product is teratogenic in the rat

    b.  FDA does not envision a situation where use of HBOC-201 is less of a risk to a pregnant woman than red blood cells. Accordingly, please change the language of this section of the label to that stated in 21 CFR 201.57 for drugs with a pregnancy category of "X." Please comment.

5.  Please refer to lines 416-421 of the proposed label. Your contention that preclinical studies suggest that Hemopure transports oxygen more effectively than red blood cells is not supported by the preclinical studies you submitted because most of the preclinical studies do not directly compare HBOC-201 treatment(s) with autologous or homologous red blood cell treatment(s). Please comment.



6.  Preclinical studies with HBOC-201 in the cynomolgus model provide evidence of cardiotoxicity. The pathologic review of the studies noted that there was "a fairly strong association of HBOC-201 with heart lesions consisting of interstitial fibrosis accompanied by myocyte hypertrophy." The findings of cardiac toxicity in the Cynomolgus monkey studies should be described in detail in the HBOC- label. Please comment.

Confidential Treatment
Requested by Biopure

BP 00172

STN: 125066/0, Page 30

## Chemistry, Manufacturing and Controls

**Herd Management Program:**

1.  Please explain how Animal husbandry practices (vaccines used, vaccination schedules, anthelminthic treatments, veterinary evaluation, and quarantine of new or sick animals and effective housing facilities) are being ensured and documented in the housing facilities that are providing the source herds for your product.

2.  Please describe the health-screening program of source herds, including a list of agents that are screened, the frequency of testing, the proximity of test date to the slaughter date and the methodologies used for testing including positive and negative controls. In your response, please indicate whether necropsies are performed on animals that die unexpectedly at source herd farms. If so, how are results of these necropsies included in herd health assessment?

3.  Please provide a description of the method for the assessment of "fallen stock" as well as for any other clinical signs of disease in animals that are presented at the abattoir for blood collection. Please explain any exception with regard to the exclusion of "fallen stock" and animals with clinical signs of diseases as source animals.

**Blood Collection:**

1.  Please provide information on the type of dissection equipment that is used to isolate the jugular, its method of sanitization, and whether such equipment is single use or shared use among animals. Furthermore, please describe procedures used in dealing with accidental contamination by brain matter during the captive bolt process, and accidental contamination by the contents of the rumen following the hoisting of the animal.

2.  For general guidance, we have previously provided you with a list of Core Cattle Diseases that the Agency uses as species-specific agents of concern when bovine-derived materials are used for human biologicals production.

**Transmissible spongiform encephalopthies (TSE):**

1.  The performance of your TSE clearance studies provides some assurance of safety, however if TSE agents were discovered in source cattle for this product, these studies would not necessarily support release of the product. Additional studies may be requested by FDA in the future, as improved models for blood TSE infectivity are defined, when more is known about blood infectivity in bovines, and as assays are improved. Any safety claim with regard to TSE's in the package insert, must note the limitations inherent in the current validation studies including potential differences between TSE infectivity in blood of an infected animal and that of brain homogenates. Please comment.

Confidential Treatment
Requested by Biopure

BP 00173

'07/30/03  WED 16:34 FAX 9 301 827 3524      CBER/OBRR/DBA                                    ☑008

STN: 125066/0, Page 31

**Process Validation:**

1.   Please explain the discrepancies with regard to the concentration of IgG after
     ultrafiltration stage I and II and that of post-final filtration (Tables 2.5.4.1.2.6 and
     2.5.4.1.2.7, Page 3150) of C-500 intermediate. The data show an increased concentration
     of IgG after second filtration, whereas a decrease in the concentration is expected

2.   Please explain the rationale for the change in IgG specification for C-800 from <15.6
     ng/ml in 1997 to ≤25 ng/ml in 2002 (Page 3153) as an indicator or parameter for
     purification.

3.   Please explain how the deviation with regard to elevated OxyHb was resolved in C-800
     PQ studies (Table 2.5.4.1.4.5, and Table 2.5.4.1.4.6, Page 3161-2). Please provide
     complete deviation investigation reports with supporting data. It appears that increase in
     the % oxyHb has been a frequent occurrence, as demonstrated in the course of process
     validation. Please explain.

4.   Please explain how the deviation with regard to low total Hb concentration was resolved
     (Table 2.5.4.1.4.11, Page 3164).

5.   Please note that specification level for Boron concentration indicated for diafiltration step
     (DFA), as "*post-diafiltration less than pre-diafiltration result*" is unacceptable,
     considering that the limit of this compound may range from 600 ppm to 2.9 ppm. Please
     specify a numerical value for an upper acceptable limit of Boron, following diafiltration,
     and explain the rationale for choosing the specified limit.

6.   Following diafiltration against DFC and concentration of hemoglobin, you have specified
     the pH of the final solution as ≤ 9.0 at 20°C (Table 2.5.4.1.4.12, Page 3165). Please
     explain what would be the acceptable lower limit for pH at this stage. In your response,
     please provide data supporting your rationale for the specification.

7.   You have indicated that the bands that are detected between 66 and 22kD in SDS-PAGE
     analysis of Hemopure are likely to be stabilized hemoglobin subunits and not plasma
     protein impurities. Please provide characterization data to support your conclusion
     regarding the identity of these bands.

8.   Your viral validation studies of the ultrafiltration step used in purification of C-500
     compound was performed prior to recent changes in your process. Please provide
     validation data to establish the relevancy of the scaled-down model, used in this
     validation, to the current purification conditions indicated for this step. In addition, you
     have indicated that you could not successfully produce three batches of C-500 for the
     validation of the scaled-down ultrafiltration step. In your response please provide
     completed validation data for this step.

Confidential treatment
Requested by Biopure

BP 00174

STN: 125066/0, Page 32

9.  Please provide validation data demonstrating that the of the 100kD Fractionation Ultrafilter from Pall Filtron Centrasette open channel filter to Pall Filtron Maxisette Filter, would not alter viral clearance capacity of the filtration step. In your evaluation please consider the following parameters: changes in flow rate, filter conditioning step and change from constant diafiltration volume process to constant retentate hemoglobin concentration process.

**Product Characterization:**

1.  Your current measurements of oxygen dissociation equilibrium (i.e., $P_{50}$ values) of the final product, using the Hemox-Analyzer are not based on complete oxygen saturation of hemoglobin, but rather are derived at approximately 80% saturation. Therefore these values do not reflect the actual $P_{50}$ of the test article. Please provide corrected $P_{50}$ values, taking into account the level of oxygen saturation in the test article. Both the corrected value of $P_{50}$ as well as the calculated oxygen binding cooperativity (Hill coefficient) should be included in the final product specifications.

    Please note that we reserve comments on "mechanism of action " of this product as described in your label until these issues are resolved.

2.  The functional assays, used for the characterization of your product, are limited to measuring oxygen dissociation equilibrium parameters mentioned above. Please expand on these functional characteristics of HBOC-201 by determining the dependence of oxygen binding on pH (Bohr effect), chloride (Cl⁻) and temperature.

3.  Since HBOC-201 is composed of several molecular weight species, some understanding of the contributions of individual molecular species to the overall oxygen affinity ($P_{50}$) and cooperativity of the product should be established. Accordingly, please evaluate the contributions of individual molecular species to the overall oxygen affinity and cooperativity of the product and report these results to the BLA.

4.  Your data indicated that Lot H6C014 had low total hemoglobin concentration and high $P_{50}$ value. Please explain these results, and comment on a possible relationship between $P_{50}$ measurement and hemoglobin concentration, including the effect of total hemoglobin and hemoglobin species such as methemoglobin (MetHb).

5.  Carbonic anhydrase (CA) is the only impurity found in the C-500 and C-800 intermediates as detected by SDS-PAGE, immunoblotting and isoelectric focusing techniques. Other possible impurities, specifically red cell enzymes (i.e., superoxide dismutase and catalase) or their fractions should be detected by more sensitive methods. Accordingly, please present data about impurities from more sensitive assays such as, but not limited to immunoaffinity chromatography (see for example, Privalle et al., *Free Rradic Biol Med* 28:1507, 2000).

Confidential Treatment
Requested by Biopure

SEC-Biopure
00040

BP 00175

STN: 125066/0, Page 33

**Stability:**

1. Final product stability data indicate an apparent temperature-dependent increase in the high molecular weight fraction over time (>500 kD). As a case in point, it appears that at the 25 °C storage condition the high molecular weight fraction (>500 kD) will exceed its specification limit (≤15%) *prior* to the proposed 3-yr expiration (Page 6697-6705, Lots H01C03 – H01C11).

   a. Please explain the apparent temperature-dependent increase in the high molecular weight fraction (>500 kD) over time, and its potential impact on your proposed shelf life for the product at 25 °C.

   b. Please provide updated stability data for final product lots manufactured in 2002 and 2001.

2. You have indicated that a two-column high performance size exclusion chromatography (HP-SEC) system (YMC-S, QT-0541) will be used to determine the molecular weight size distribution of final product instead of the one-column system (BioRad BioSil, QT-0394). Used in previous analysis.

   a. Please provide complete validation studies for the newly developed HP-SEC method, and explain the rationale for implementing this new methodology.

   b. You have indicated that the high molecular weight species (>500 kD) are not resolved using the newly developed two-column HP-SEC system (YMC-S). Please explain how the high molecular weight species will be measured in the final product.

   c. Please provide data to demonstrate the comparability of molecular size determinations obtained using the one-column HP-SEC system (BioRad BioSil, QT-0394) with those obtained using the two-column HP-SEC system (YMC-S, QT-0541). In your response please indicate how the use of two different systems, over time, will effect the interpretation of the stability data with regard to the molecular size determination.

3. The final product release specification for N-acetylcysteine (0.13 – 0.22%) differs from its specification for the stability of the final product (0.02 – 0.22%). Please explain why is stability specification lower than release specification for -N-acetylcysteine.

4. Please measure the degree of autoxidation (i.e., methemoglobin formation) of final product at different temperatures (i.e., 5, 25, and 37°C) once it is removed from the inner pouch. For a given lot of the product, please compare these measurements at the beginning and at the end of the product shelf life.

Confidential Treatment
Requested by Biopure

BP 00176

.07/30/03  WED 16:35 FAX 8 301 827 3524      CBER/OBRR/DBA                    @011

STN: 125066/0, Page 34

5.  Please include the measurement of free iron/chelatable iron in the final product as an additional product release specification and as a stability-indicating test, to assess and monitor potential product degradation.

6.  In- process testing of phospholipid content was conducted in the manufacturing of C-500 qualification lots. However, this measurement was discontinued in lots that have been manufactured subsequently. Pease note that phospholipid content is considered a critical measure of purity for this intermediate, and therefore its determination should be included as a final release test for the C-500 intermediate

**Package Inserts:**

We reserve comments on the labeling issues for the package insert until the BLA is otherwise acceptable.

**Preapproval Inspection:**

1.  Inspectional issues from the February 3 through 7, 2003 and March 17 through 27, 2003 pre-approval inspection have not been resolved.

You may request a meeting with CBER to discuss the above steps for approval. Please request the meeting at least 15 days prior to the proposed meeting date. Alternatively, you may choose to discuss this matter via a telephone call. Should you wish this meeting or a telephone discussion please call Mr. Franklin T. Stephenson in the Division of Blood Applications at 301-827-3524.

Within 10 days after the date of this letter, you are requested to take one of the following actions: (1) amend the application; (2) notify us of your intent to file an amendment or a new submission; (3) withdraw the application; or (4) request an opportunity for a hearing on the question of whether there are grounds for denying approval of the application. In the absence of any of the above responses, CBER may initiate action to deny the application.

Please note our review clock has been suspended with the issuance of this letter. Note also that any amendment should respond to all deficiencies listed and that a partial reply will not be considered for review nor will the review clock be reactivated until all deficiencies have been addressed.

Sincerely yours,

Basil Golding, M.D.
Director,
Division of Hematology
Office of Blood Research and Review
Center for Biologics
  Evaluation and Research

Confidential Treatment
Requested by Biopure

| **Telecon with Biopure** | **Thrusday July 31, 2003  9:00 am to 9:10 a.m.**<br><br>**RE:  BLA 125066/0 and IND 10962**<br>**Clarification call** | | |
|---|---|---|---|
| **Meeting called by:** | Franklin.<br>Stephenson/ RPM | **Type of meeting:** | Telecon |

**FDA Participants:  Franklin Stephenson,**
**Participants:** Dr. Howard Richman

## Agenda

**Conversation Record:**

- Dr. Richman contacted me in order to clarify what was the next step they should be taking after receipt of the CR letter.
- I responded that the first thing to do was to read the letter. I told him that within 10 days of receipt of the CR letter he should take one of the following actions: amend the application; notify us of their intent to amend the application; withdraw the application; or request a hearing.
- He indicated to me that he had a sleepless night reading all 51 pages of the faxed letters and asked me since the CR letter was issued 30 days before the due date of September 1, 2003, if they were able to respond to the CR letter within the 30 days, would they get approval?
- I told him that with the issuance of a CR letter the review clock had stopped and no further review would be considered until Biopure responded to all deficiencies listed in the CR letter. I further told him that a partial response would not be considered for review, a response to all listed deficiencies was required in order to re-start the clock. I also told him that once we receive their response to our complete response letter the agency gets a new review cycle of 6 months to review those responses.
- He responded that they would be submitting an acknowledgement of receipt letter and their intent to respond to the deficiencies listed in CR letter. He also mentioned that the same items listed on the CR letter were listed on the continue hold letter under IND 10962.

The conversation ended cordially,

*Franklin T. Stephenson*
**Regulatory Project Manager**
**OBRR/DBA**

SEC LIT 000728

| **Telecon with Biopure** | **Tuesday, August 5, 2003 11:15 AM-11:20 AM.** |
|---|---|
| | RE:  **BLA 125066/0**<br>**Verification of Faxed amendment** |

| **Meeting called by:** | Franklin.<br>Stephenson/ RPM | **Type of meeting:** | Telecon |
|---|---|---|---|

FDA Participants:  Franklin Stephenson, Cheryl Campbell
**Participants:** Mr. William Tubbs

## Agenda

**Conversation Record:**
Mr Tubbs contacted us to verify that we received a faxed  letter acknowledging receipt of the CR letter and their intent to file an amendment. We indicated to him that this letter should be submitted electronically to the file to be entered into the EDR. Mr. Tubbs was not aware that it needed to be sent electronically but, he agreed to do so.

*Franklin T. Stephenson*
*Regulatory Project Manager*
*OBRR/DBA*

SEC LIT 000729

# Telecon with Biopure

**Friday, August 15, 2003 sometime after 4:00 pm.**

**RE:  BLA 125066/0**
**Message on voice mail**

| | | | |
|---|---|---|---|
| **Meeting called by:** | Franklin. Stephenson/ RPM | **Type of meeting:** | Telecon |

**FDA Participants:**  Franklin Stephenson,
**Participants:** Dr. Howard Richman

## Agenda

**Conversation Record:**

Transcript of voice mail:

" Hi Franklin, how are you? Thanks for your help. I want to confirm that this was a CR letter and that it wasn't really clear, it was my assumption it was. So we know this is all we are going to get...If I don't speak to you again, have a great vacation."

*Franklin T. Stephenson*
**Regulatory Project Manager**
**OBRR/DBA**

SEC LIT 000730

# Telecon with Biopure

**Tuesday, August 26, 2003, 2:45pm – 3:00 pm**

**RE:  BLA 125066/0**
**ADVICE/CLARIFICATION**

| **Meeting called by:** | Franklin Stephenson/ RPM | **Type of meeting:** | Telecon |
|---|---|---|---|

**FDA Participants:**  Franklin Stephenson, Sheila Rawls
**Participants:** Dr. Howard Richman

## Agenda

**Conversation Record:**

We contacted Biopure in order to clarify the secure-email and fax sent to CBER on 26-Aug-03 to request a meeting with FDA representatives.

The request states "Biopure is requesting a Type A meeting (in person) with FDA representatives for the week of 15-Sep-03 to discuss the FDA observations regarding Good Clinical Practice and data integrity in the conduct of Biopure's clinical trials."

We indicated to Dr. Richman that Type A meetings are reserve for dispute resolution meetings and meetings to discuss clinical hold issues for INDs. This request should be a Type B meeting for the eBLA to be scheduled to occur within 60 days of the Agency's receipt of the written request.

The request states, " The purpose of the meeting is to discuss several of the steps for approval outlined in FDA's 30-July-03 letter."

We indicated to Dr. Richman that the letter FDA issued to Biopure on 30-Jul-03 was a CR letter that stated that these were deficiencies not steps for approval.  Dr. Richman responded that he would correct and resubmit the request. We also requested the sponsor to include specific questions on the issues they want to discuss and on the issues they needed clarification on for each of the questions listed on the request.  The sponsor had copied verbatim questions that were included in the CR letter dated 30-Jul-03.

Dr. Richman again reiterated that he would correct and include the specific questions and resubmit the request.

*Franklin T. Stephenson*
*Regulatory Project Manager*
*OBRR/DBA*

SEC LIT 000731

| **Telecon with Biopure** | **Tuesday, September 16, 2003 3:50 pm**<br><br>RE:  __BLA 125166/0__<br>**Response to FAX dated 16-Sep-03** |
|---|---|
| **Meeting called by:** | Franklin. Stephenson/ RPM | **Type of meeting:** | Telecon |

FDA Participants:  Franklin Stephenson, Dr. Toby Silverman
**Participants:** Mr. Tom Moore, Mr. Doug Hansell, Mr Wolf, Dr. Howard Richman

**Agenda**

SEC LIT 000743

## Conversation Record:

We contacted Biopure in response to a FAX dated 16-Sep-03 sent at 3:44 pm.

1.      Biopure proposes to discuss methods for verifying and validating data submitted to FDA and wants FDA input that the proposed methods of validation and verification will meet FDA requirements. Dr. Silverman indicated that while FDA could comment on the methods, FDA could not provide complete assurance that the proposed methods would in fact result in a dataset that comported with FDA requirements. The reason for this is that the plan may look good in theory but may not produce the desired results. Thus, FDA would be able to evaluate the sufficiency and adequacy of the database only after Biopure had submitted the findings in a response to the CR letter.

Mr. Moore responded that with the right approach, Biopure ought to be able to answer some of the GCP questions. He inquired if a GCP compliant process could be created to verify the data. Dr. Silverman responded that while a GCP compliant process could be created, one could not know until all the information was available whether the GCP compliant process had worked. Thus, as above, only a review of the information resulting from the process would answer whether the process had been successful. Dr. Silverman indicated that the request could be submitted to BIMO but that again, only a review of the information resulting from the retrieval process would indicate whether the process had been successful or not. FDA agreement with the proposal could not alter that fact.

2.      Mr. Moore stated that FDA was asking for source data. Biopure proposes to visit sites contributing approximately 82% of the data. Biopure wants to know if such data suffice for FDA purposes. Dr. Silverman responded that selected data probably would not suffice since so much of the information was being questioned by FDA. FDA has concerns about the report forms, when they were filled out and by whom, who reviewed the data in the case report forms, who revised the forms and when, etc. FDA cannot determine what the SEEC reviewers saw and how much of the SEEC database was re-reviewed. FDA cannot determine if the dataset supplied to FDA corresponds to the dataset reviewed by the SEEC. The CR letter has outlined FDA's concerns about the databases.

Dr. Silverman noted that FDA had asked questions about the handling of data forms. Specifically, FDA needs to understand who had access to case report forms and databases, when data were entered, by whom and under what conditions. Dr. Richman stated that Biopure would get a clearer picture of what had happened after revisiting each of the sites. Dr. Silverman stated that Biopure had already revisited and remonitored each site at least once if not twice. There was discussion about the value of revisiting and remonitoring each site one more time.

3.      Dr. Silverman noted that even under a best case scenario (assuming all the data already submitted were valid), FDA had determined that the product was not safe. Thus, FDA had sent Biopure not only a BLA CR letter, but also a clinical hold letter for its proposed trauma study. The hold letter and subsequent continue hold

SEC LIT 000744

letters were necessary because FDA had to act to stop the trauma trial from proceeding while Biopure answered the significant safety concerns for the BLA. While the BLA letter had left open the possibility that Biopure might address FDA's decision about safety, the IND hold letter said that Biopure could not proceed absent the answers to FDA's significant concerns.

One problem with the proposed IND study in trauma is that RBC are available. Since study HEM-0115 had already been determined by FDA to show that HBOC-201 was not as safe as RBC, it was FDA's assessment that a study of HBOC-201 against RBC in a setting where RBC are available could not move forward at this time. Biopure stated that FDA's position that the product was unsafe was a hard position. Dr. Silverman agreed but noted that FDA had provided Biopure an opportunity to respond to the BLA. In addition, FDA was providing Biopure with the opportunity to address the safety concerns for the trauma study by recommending that Biopure conduct three preclinical studies. Thus, for Biopure, the path to performing the proposed trauma study includes but is not limited to successful preclinical demonstration that the product can be used in the manner proposed for the trauma study.

4.      Dr. Silverman noted that Biopure's reanalysis of the data from HEM-0115 amounted to a post hoc assessment of baseline factors that resulted in a different outcome for the product than for RBC. She noted that this analysis suggested that the randomization process had not been adequate. Further, Biopure had submitted a BLA stating that there were no statistically significant differences between the two cohorts at baseline. Mr. Hansell indicated that Biopure had submitted proposed labeling that took patient underlying condition into account. Dr. Silverman noted that retrospective analyses to show that there were minor differences at baseline could not be used to explain away the study findings. Such analyses are post hoc and hypothesis generating.

5.      Dr. Silverman noted that many patients in study HEM-0115 who were eligible to receive another dose of HBOC-201 instead were switched to pRBC. It was not clear to FDA why those patients had not received the next unit of HBOC-201. Mr. Hansell responded that a proportion of the patients had lost large volumes of blood. Dr. Silverman noted that the majority of patients who were switched to pRBC prematurely were not actively bleeding and were classified by the clinicians as being tired (transfusion reason 7). In only a few cases was rapid blood loss listed as a reason for transfusion.

6.      There was discussion about why FDA had commented on Biopure's proposed labeling for HBOC-201. Dr. Silverman noted that only through review of the labeling did FDA have some idea of how Biopure wanted to use its data. FDA quoted the proposed labeling as a way to begin a discussion with Biopure about what was and what was not supported by the data. Thus, the proposed dosing algorithm is not supported by any clinical data and will not be acceptable for a package insert. It had not been FDA's intent that Biopure interpret the discussion as negotiation about

SEC LIT 000745

final labeling. Negotiations about final labeling occurs when FDA agrees about the databases and their interpretation and the product is on its way to licensure. Since that is not the case here, it would not be appropriate to suggest that FDA is negotiating the package insert.

Biopure appretiated our time and candor. End of discussion

*Franklin T. Stephenson*
**Regulatory Project Manager**
**OBRR/DBA**

SEC LIT 000746

CONFIDENTIAL *** FOR OFFICE USE ONLY          CBER BIMS Report
13-JAN-04 04:15 PM                                          Page 1

## RECORD OF TELEPHONE CONVERSATION

| IND | Number | Office | Telecon Date/Time | Date of Memo | Date of Last Revision |
|-----|--------|--------|-------------------|--------------|------------------------|
| IND | 10962  | OBRR   | 13-MAR-2003 17:05:59 | 13-MAR-2003 | 13-MAR-2003 |

Title: Polymerized Bovine Hemoglobin (Hemopure 2)

Sponsor: Biopure Corp

---

Initiated by FDA ___   Sponsor _X_ Other ___

Contact Persons: HOWARD P RICHMAN, DPM
BILL TUBBS

Telephone Number: (617) 234-6653

FDA Participants: JOHN CAPEN

Purpose: INFORMATION REQUEST (IR)

Summary:
Dr. Richman asked about duplicating information that is in IND 2935 and whether he could cross reference that IND. I replied that we would need a cross-reference letter giving FDA permission to review IND 2935 while reviewing this IND.

Mr. Tubbs will be an alternated contact for this IND. I asked that in the cross-reference letter Dr. Richman identify Mr. Tubbs as an alternate contact.

Signature: _____    Mail Code: _____

Forward the signed original of this form to DCC for filing in the IND

SEC LIT 000739

CONFIDENTIAL *** FOR OFFICE USE ONLY                    CBER BIMS Report
13-JAN-04 04:16 PM                                                Page 1

## RECORD OF TELEPHONE CONVERSATION

| IND | Number | Office | Telecon Date/Time | Date of Memo | Date of Last Revision |
|-----|--------|--------|-------------------|--------------|-----------------------|
| IND | 10962 | OBRR | 09-APR-2003 16:05:48 | 18-JUL-2003 | 18-JUL-2003 |

Title:Polymerized Bovine Hemoglobin (Hemopure 2)

Sponsor:Biopure Corp

---

Initiated by FDA _X_  Sponsor ___  Other ___

Contact Persons:HOWARD RICHMAN

Telephone Number:617-234-6653

FDA Participants:LAURENCE LANDOW
                 TOBY SILVERMAN

Purpose:HOLD (HO)

Summary:
We telephoned the sponsor to inform them that their phase 2 trauma
trial for IND 10962 was on clinical hold and that the trial should
not proceed. We explained that the basis for this assessment was
information derived from the BLA which showed that the product was
not safe.

There were no questions from the sponsor, who was told to expect a
Clinical Hold letter in a few days.

Signature: _____    Mail Code: _____

Forward the signed original of this form to DCC for filing
                      in the IND

SEC LIT 000740

CONFIDENTIAL *** FOR OFFICE USE ONLY
CBER BIMS Report
13-JAN-04 04:17 PM
Page 1

## RECORD OF TELEPHONE CONVERSATION

| IND | Number | Office | Telecon Date/Time | Date of Memo | Date of Last Revision |
|-----|--------|--------|-------------------|--------------|-----------------------|
| IND | 10962 | OBRR | 13-MAR-2003 16:00:30 | 13-MAR-2003 | 13-MAR-2003 |

Title:Polymerized Bovine Hemoglobin (Hemopure 2)

Sponsor:Biopure Corp

---

Initiated by FDA _X_  Sponsor ___  Other ___

Contact Persons:HOWARD P RICHMAN, DPM

Telephone Number:(617) 234-6653

FDA Participants:JOHN CAPEN

Purpose:OTHER (OT); NEW IND FROM AN AMENDMENT

Summary:

3:37 PM 3/13/2003

Called DCC to create IND 10962 from IND 2935-351

Richman, DPM, Howard P,
BioPure
Sr. Vice President, Regulatory Affairs

TEL (617) 234-6653

RE: 07-Mar-03, Serial 330, Received 10-Mar-03

This amendment has been found to be a new indication; therefore we
are creating a new IND.  New IND number is 10962.  We are
preparing an acknowledgement letter this afternoon.

13-Mar-2003 16:00:55

Contacted Dr. Richman and relayed the above information and noted
that the review team would contact him with their comments and
questions.

SEC LIT 000741

Signature: _____      Mail Code: _____

CONFIDENTIAL *** FOR OFFICE USE ONLY
13-JAN-04 04:17 PM

Page 2

## RECORD OF TELEPHONE CONVERSATION

| IND | Number | Office | Telecon Date/Time | Date of Memo | Date of Last Revision |
|-----|--------|--------|-------------------|--------------|-----------------------|
| IND | 10962 | OBRR | 13-MAR-2003 16:00:30 | 13-MAR-2003 | 13-MAR-2003 |

Forward the signed original of this form to DCC for filing
in the IND

SEC LIT 000742

**ATTORNEY COMMUNICATION TO CLIENT**
**DRAFT**

**Voicemail from Howard Richman to Franklin Stephenson #9 (10-Sep-03 7:12 am)**

Richman:  Good Morning Franklin, it's Howard.  I hope you had a good night.  I was here late

because I'm going crazy.  Franklin thank you for the discussion yesterday and your assistance.

Could you please call me back at (617) 234-6653.  I just want to clarify something from our

conversation yesterday to make sure I am not as stupid as I think I am.  Thanks my friend.  I look

forward to speaking to you this morning at (617) 234-6653.  Thanks.  Bye, bye.  [CLICK AND

PAUSE]

Other Voice:  All right, well, again we want to plan and we want to ask the questions that the

agency _____ _____.  So, _____.  This morning we'll drive and _____.

Richman:  We got to drive it, because we said this . . . we wrote this.  Right, _____ page two,

question 3.  Right, and it accomplished everything.  The response says yadi, yadi, yadi, okay.

What's the five or ten most important questions _____ _____ _____.  Okay.  _____.

Other Voice:  I'd say _____ of the things Joe has to do . . . she has probably 70%; she has

appealed for, uh, _____.  But, there is some in there like, uh, we messed up during the

inspection you guys, you know, you screwed up and you didn't do anything.

Richman:  It's right there.  How come?

Other Voice:  Those are the ones that she is hung up on.

Richman:  You know what the response to the question is.  We made a mistake.  We didn't have

direct clinical operation oversight.  It was not managed appropriately.  There was no intent not

to, it is what it is.  I mean that is not the word to use, but that's the fact.  We intended to, but in

the absence of a direct operation, it just was not followed through.

Other Voice:  Those are the ones where she is hung up, right now.

SEC LIT 000747

**ATTORNEY COMMUNICATION TO CLIENT**
**DRAFT**

<u>Richman</u>:  Those come right from when David was here.  How come?  That's the answer; that's the truth.  She can't say I did this.  You know what, that's, it doesn't matter.

<u>Other Voice</u>:  But now as a plan to . . .

<u>Richman</u>:  The plan is, now that there is clinical operation, there is direct oversight and management of the procedures in terms of the clinical function of Biopure to ensure that there is no reoccurrence of this again.  And, Biopure has built a quality system review, which we have, that will review Biopure's procedures and operations on an annual basis.

<u>Other Voice</u>:  I like that.

<u>Richman</u>:  That's the truth.  I think what we should do then is we'll have this meeting we'll go through all the stuff [Beep Sound]

SEC LIT 000748

EXHIBIT S

FEB-02-2006  17:06        CHIEF COUNSEL/FDA                    301 443 0739    P.01



**U.S. Department of Health and Human Services**
**Office of the General Counsel**
**Food and Drug Division**
**Food and Drug Administration**
**Office of the Chief Counsel**
**Mailcode GCF-1**
**5600 Fishers Lane**
**Rockville, Maryland 20857**

## FAX TRANSMISSION COVER SHEET

DATE: February 2, 2006

TO:
  **Donald Savery**
  **Bingham McCutchen LLP**
  **150 Federal Street**
  **Boston, MA 02110**

  FAX:  (617) 951-8736          PHONE:    (617) 951-8717

FROM: Michael Shane

  FAX: (301) 827-7876           PHONE:    (301) 827-2802

PAGES (INCLUDING THIS COVER SHEET): 2

Subject:    SEC v. Biopure Corp., et al.

MESSAGE:    Please see the attached letter.

NOTE:  IF YOU DO NOT RECEIVE A LEGIBLE DOCUMENT OR ALL OF THE PAGES, PLEASE TELEPHONE US.

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY
CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE
UNDER APPLICABLE LAW. IF YOU ARE NOT THE ADDRESSEE, OR A PERSON AUTHORIZED TO DELIVER THE DOCUMENT TO THE
ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, DISCLOSURE, DISSEMINATION, COPYING, OR OTHER ACTION BASED ON
THE CONTENT OF THIS COMMUNICATION IS NOT AUTHORIZED. IF YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, PLEASE
IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN IT TO US BY MAIL.

FEB-02-2006  17:07    CHIEF COUNSEL/FDA              301 443 0739    P.02

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Office of the General Counsel

Office of the Chief Counsel
Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD 20857

February 2, 2006

<u>**VIA FACSIMILE AND**</u>
<u>**FEDEX (617-951-8736)**</u>

Donald Savery
Bingham McCutchen LLP
150 Federal Street
Boston MA 02110

Re:  Securities and Exchange Commission v. Biopure Corp., et al.,
Civil Action No. 05-11853-PBS

Dear Mr. Savery:

Yesterday, FDA received notice of your motion to reconsider and set aside Magistrate Kay's January 20 Order. Your motion for reconsideration makes it clear that Biopure is still seeking full compliance with its subpoenas, even though the court held that they were not enforceable against FDA. As your motion brings the parties back to court in any event, and the agency believes that the January 20 Order directing the parties to meet and confer is inconsistent with the underlying holding, we believe that it is in the interests of all to await the court's ruling. As such the meeting scheduled for February 6 has been cancelled.

Sincerely,

Michael Shane
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration

cc:  AUSA Claire Whitaker

**EXHIBIT T**

**BINGHAM McCUTCHEN**

Donald J. Savery
Direct Phone: (617) 951-8709
Direct Fax:    (617) 951-8736
don.savery@bingham.com

February 2, 2006

**BY FAX & FEDERAL EXPRESS**

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Michael Shane, Esq.
Associate Chief Counsel
Office of Chief Counsel
U.S. Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD  20857-0001

*Re:*   *SEC v. Biopure Corporation*
        *Civil Action No. 05-11853-PBS (D. Mass.)*

Dear Mr. Shane:

We are in receipt of your February 2, 2006 letter (faxed to us at 5:07 this evening) in which you purport to unilaterally cancel our February 6, 2006 meeting, which has been scheduled since January 26, 2006.  The fact that Biopure has sought to preserve its rights by way of a motion for reconsideration in no way affects FDA's obligation to meet and confer.  The notion that Biopure's motion reflects a position on the part of Biopure not to negotiate in good faith is plainly belied by the letter I sent to you yesterday, February 1, 2006, setting forth a narrower list of documents Biopure is presently seeking.

Biopure intends to stand by its agreement to meet and confer with you. Representatives of the parties will arrive at your offices as planned on February 6, 2006 at 1:00 P.M. to negotiate in good faith a resolution to the outstanding requests for discovery.

Very truly yours,

Donald J. Savery

/caw
Enclosure

**MICHAEL SHANE, ESQ.**
**February 2, 2006**
Page 2

cc:    Thomas J. Dougherty, Esq.
        Edward P. Leibensperger, Esq.
        John D. Hughes, Esq.

EXHIBIT U

# BINGHAM McCUTCHEN

Donald J. Savery
Direct Phone:  (617) 951-8709
Direct Fax:     (617) 951-8736
don.savery@bingham.com

February 3, 2006

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

**BY FAX & FEDERAL EXPRESS**

Claire Whitaker, Esq.
Assistant United States Attorney
U.S. Attorney's Office
Judiciary Center Building
555 4th Street, N.W.
Washington, DC 20530

*Re:*    ***SEC v. Biopure Corporation***
         ***Civil Action No. 05-11853-PBS (D. Mass.)***

Dear Ms. Whitaker:

You advised in our telephone conference this afternoon that the FDA will not be available to meet with Biopure next Monday, February 6, 2006.  Biopure objects to the FDA unilaterally canceling this meeting, which *the FDA itself* scheduled on January 26, 2006.

While we appreciate that you have personal commitments that are causing you to be away from the office later in the week next week, you advised that you will be in your office on Monday but you are, nonetheless, not willing to permit the meeting to go forward.  Because the prompt production of documents from the FDA and FDA depositions are critical to Biopure and its co-defendants in the above-referenced SEC enforcement action, we make the following proposal without awaiting a face-to-face meeting:  If the FDA produces by February 27, 2006 the documents identified in my February 1, 2006 letter to Michael Shane and commits to make available for deposition on a mutually agreeable date the FDA employees identified in the letter, Biopure will withdraw its motion for reconsideration (after it receives the documents and deposition dates).

Because any delay in responding to this request will only further prejudice Biopure's position in the SEC litigation, we must ask that the FDA respond to this request by the close of business on Monday, February 6, 2006.

LITDOCS/630007.3

Claire Whitaker, Esq.
February 3, 2006
Page 2

We look forward to hearing from you.

Very truly yours,

*[signature]*

Donald J. Savery

Bingham McCutchen LLP

bingham.com

/caw

cc:     Michael Shane, Esq.
        Thomas J. Dougherty, Esq.
        Edward P. Leibensperger, Esq.
        John D. Hughes, Esq.

**EXHIBIT V**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITY AND EXCHANGE COMMISSION,    )
                                     )
        Plaintiff,                   )
                                     )    Civil No. 05-0506 (RWR)
    v.                               )
                                     )
BIOPURE CORPORATION, THOMAS MOORE,   )
HOWARD RICHMAN, and JANE KOBER,      )
                                     )
    Defendants.                      )
─────────────────────────────────────)

DECLARATION OF JOANNE BINKLEY

    I, Joanne Binkley, declare as follows:

    1.  I am the Director of the Division of Disclosure and
Oversight Management ("DDOM"), Office of Communication, Training
and Manufacturers Assistance, Center for Biologics Evaluation and
Research ("CBER"), United States Food and Drug Administration
("FDA"), in Rockville, Maryland.

    2.  I have supervisory authority over DDOM, which is
responsible for the disclosure of documents officially maintained
by CBER.  DDOM responds to Freedom of Information Act ("FOIA")
requests, written and oral inquiries from the United States
Congress, the Office of the Inspector General ("OIG"), and the
General Accounting Office ("GAO"), and to subpoenas and court
orders for information and documents.  In addition, pursuant to
the 1996 Electronic Freedom of Information Act Amendments
("EFOIA"), DDOM proactively reviews, redacts, and posts on FDA's

website documents anticipated to be frequently requested, such as approval letters, inspection reports, and warning letters.

3. DDOM is composed of two branches, the Access Litigation and Freedom of Information Branch ("ALFOI") and the Congressional and Oversight Branch ("COB"). I have been the director of DDOM for approximately six years. Before assuming my current duties as Division Director, I served as Branch Chief of the Congressional and Consumer Affairs Branch for approximately two years.

4. At my direction and the direction of the branch chiefs who work directly under my supervision, DDOM personnel search records systems for documents under CBER's control that may respond to particular document requests. DDOM staff gather and review potentially responsive documents to determine, before they are provided to the requester, whether they contain information that is protected from disclosure and should be redacted in part or entirely, under any applicable exemptions or privileges. DDOM also reviews and, in certain circumstances, redacts, non-disclosable information from documents that respond to requests from Congress, other federal agencies, and foreign, state, and local governments.

5. The statements made in this declaration are based upon my personal knowledge, information made known to me in my official capacity, and information available to me in my official

capacity and about which I have become knowledgeable.

6.    I have reviewed the three third-party subpoenas served by Biopure in the above-captioned case on FDA and CBER Keepers of Records, and on Laurence Landow, a CBER employee ("Subpoenas"). I submit this declaration in support of the government's Memorandum in Support of Motion to Quash or Modify Subpoenas Duces Tecum and in Opposition to Biopure's Motion to Compel.  The purpose of this declaration is to: (a) describe DDOM's processing of document requests, including those made pursuant to subpoenas and FOIA; (b) give an account of DDOM's current workload for all requests for information, including litigation; (c) explain the current backlog of document production requests and the efforts to reduce that backlog; (d) describe the events to date with respect to Biopure's Subpoena; and (e) describe the process and time required to respond to Biopure's Subpoena.

## REQUEST PROCESSING BY DDOM

7.    DDOM consists of fourteen people: myself, the division director, two branch chiefs (one a supervisory consumer safety officer and the other a supervisory regulatory counsel), eight full time consumer safety officers ("CSOs"), one regulatory counsel, and one paralegal specialist and one policy analyst.  In addition, DDOM contracted for three full-time attorneys, all of whom assist in producing documents in litigation matters.

3

8. FOIA requests for FDA documents are received by the agency's main Freedom of Information office. That office logs each request, assigns it a number, and refers it to the agency component responsible for maintaining the records expected to be relevant to the request. CBER is the center within FDA responsible for the regulation of biologic products, which include, for example, blood, vaccines, cellular and gene therapy, and tissue. FOIA requests referred to CBER are sent to ALFOI. ALFOI may also receive requests for documents that are presented to FDA via third-party subpoenas. In light of recent court decisions ruling that federal agencies are not subject to subpoena under Rule 45, FDA requests that third-party litigants seeking FDA documents submit their request under FOIA so that they can be processed in an appropriate queue.

9. In ALFOI, each request is placed in one of five queues of pending document requests, based on complexity and type of request. When a request comes up in a queue, it is assigned to a member of ALFOI. Requests from each queue are generally assigned for processing on a first-in, first-out basis. The ALFOI employee handling the request is responsible for ensuring that responsive documents are gathered, copied, reviewed and redacted in a timely manner.

10. ALFOI has the following five queues: Fast Track,

4

Simple Track, Adverse Event Track, Counter-Terrorism-Related Track, and Complex Track. It is possible for one request to be assigned to more than one queue. For example, a portion of an otherwise complex request may be assigned to the Simple Track, thereby allowing ALFOI to complete the Simple Track portion of the request before the more complex portions. It is also possible that once a reviewer starts working on a request, they discover that the request is either more or less complex than originally thought. In such cases, the request is moved to the appropriate queue and assigned a queue position consistent with the date upon which the request was originally received.

11. Requests which can be answered quickly with readily available documents that do not need review or redaction are considered Fast Track requests and can be processed more quickly than other requests. Generally, ALFOI places a request on the Fast Track if the responsive documents have already been reviewed and redacted (often in response to a previous document request), the information requested is publicly available, or it is apparent that the information does not exist in CBER's records. Requests assigned to the Fast Track are generally processed on a first-in, first-out basis within the queue.

12. ALFOI's Simple Track requests require minimal processing time, that is, the request requires about one day of

5

staff time for processing. For these requests, it is clear to
the branch staff where to find the responsive document, and it is
also clear that the document(s) can be reviewed and redacted in a
day or less, thus allowing the complete request to be finished in
a relatively short amount of time. Simple Track requests are
generally processed on a first-in, first-out basis within the
queue.

13. ALFOI's Adverse Event Track has two sub-queues. The
first is for requests pertaining to printouts from the adverse
events databases. These printouts usually do not require
redaction and, thus, such requests are placed in the Simple
Adverse Event Track. The second queue is for the actual
documents in FDA's files regarding adverse events, including
actual adverse event reports. These documents require review and
redaction and requests for them are assigned to the Complex
Adverse Event Track. All of the requests in the Adverse Event
Track are assigned to the paralegal specialist and are generally
processed on a first-in, first-out basis within their assigned
queue.

14. ALFOI's Counter-Terrorism-Related Track also has queues
for simple and complex document production requests, which are
generally processed on a first-in, first-out basis. Requests
assigned to this track include documents related to the anthrax

6

vaccine, smallpox vaccine, plague vaccine, vaccinia immune globulin, and other issues related to counter-terrorism. One full-time employee handles all FOIA and other counter-terrorism document requests.

15. Complex Track requests include all other requests, namely, those requests that do not meet the criteria for one of the tracks listed above. Complex requests often involve voluminous records and require substantive input in determining whether a given document or portion of a document is releaseable. These requests require extensive time to locate, review, and redact records in order to prepare them for release. As in all other tracks, these requests are generally processed on a first-in, first-out basis.

16. In addition, a FOIA request may receive expedited processing if the requester demonstrates a "compelling need." See 5 U.S.C. § 552(a)(6)(E)(v)(I) and (II). A compelling need exists when either: (1) a failure to obtain requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or (2) the requester is a person primarily engaged in disseminating information and there is "urgency to inform the public concerning actual or alleged Federal Government activity." Id.

7

17.  For Complex document requests, ALFOI may need to
contact many individuals and direct them to search their files.
After ALFOI collects the potentially responsive documents, it
conducts a preliminary review to verify that the documents
pertain to the request.  This is followed by a line-by-line,
word-by-word review of the responsive documents to determine
whether any exemptions or privileges apply.  Any exempt material
is then redacted.  Frequently, the branch chief conducts a
quality control review to ensure that the responsive documents
have been properly prepared for public disclosure.  Often the
branch chief meets with the division director to discuss
disclosure issues in complex documents.  This process is in an
attempt to ensure that the FOIA exemptions have been properly
applied, that no releasable material has been withheld, that no
material requiring protection has been released, and that other
government agency information and documents have been handled
properly.  Finally, the employee assigned to the request prepares
copies of the responsive documents for delivery to the requester
and, when appropriate, for FDA's central repository.

18.  It is not always efficient to complete one request
before moving on to the next.  ALFOI personnel therefore often
work on more than one request at a time.  The processing of a
complex document request may be delayed for a variety of reasons,

8

such as determining if any information in the responsive
documents is exempt from disclosure, locating missing records, or
consulting with other parties or other sources about the
propriety of releasing certain information. In the interest of
efficiency during this waiting period, another request may be
processed and released. Therefore, large requests often proceed
alongside smaller requests in the Complex queue, in an attempt to
ensure that one requester does not consume a disproportionate
share of ALFOI resources. This approach likewise reduces the
processing time for many document requests.

### DDOM'S WORKLOAD

19. DDOM received an average of approximately 440 FOIA
requests per year for each of the past three years (530 in 2003,
456 in 2004, and 340 thus far in 2005). DDOM completed an
average of approximately 615 FOIA requests per year for each of
the past three years (699 in 2003, 794 in 2004, and 353 thus far
in 2005). These figures do not represent the size and
complexity of the requests, and DDOM's resources are not
sufficient to eliminate its backlog due to the complexity of many
of the pending requests. DDOM therefore, has a total pending
backlog of approximately 650 requests.

20. In compliance with the provisions of the EFOIA
amendments, DDOM also reviews and redacts documents expected to

9

be frequently requested for posting on FDA's website.  Thus far
in 2005, DDOM has processed approximately 100 projects for
posting on FDA's website.  Some of these projects are very
technical and may contain multiple documents, with complex
redaction issues that require a substantial amount of a
reviewer's and supervisor's time.

21.  In addition to its FOIA and EFOIA responsibilities,
DDOM also reviews and redacts documents requested by foreign
governments.  DDOM has performed approximately four document
productions thus far this year in response to these requests.
One such request from Canada was especially complex and required
significant resources.

22.  Over the past four years, DDOM has also responded to an
average of more than 150 congressional requests for information
annually (125 in 2005, 150 in 2004, 182 in 2003, and 160 in 2002)
and 9 requests on average for documents related to congressional
investigations (7 in 2005, 14 in 2004, 21 in 2003, and 7 in
2002).  DDOM also serves as the CBER liaison for document
requests and questions from both the GAO and the OIG.  On average
there are 16 such audits or investigations per year (12 in 2005,
11 in 2004, 12 in 2003, and 29 in 2002).  These audits often
overlap and involve several Complex document requests.  In some
cases, DDOM is also asked to redact information for the auditors

10

to use in their public reports.

23.  This year, DDOM has already responded, or is in the process of doing so, to seven court orders for the production of documents.  These document productions place enormous demands on DDOM's small staff.  By way of example, two of these court-ordered document productions are discussed in greater detail in paragraphs 24-25 below.

24.  In the spring of 2002, hundreds of petitioners began to file claims the against the U.S. Department of Health and Human Services pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq.  To date, there are approximately 2,000 petitioners, who allege that certain childhood vaccines have caused autism.  The Special Master presiding over these cases has issued an order, Autism General Order #1, In re: Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder v. Secretary of HHS, (Fed. Cl. July 3, 2002), which governs the discovery procedures and schedule in these cases.  Under that order, FDA is required to produce all information it maintains concerning numerous different vaccines and the approval process for these vaccines.  ALFOI has begun this document production and is presently searching for, reviewing, redacting, and indexing over 100,000 pages of documents.  For the past eight months, two ALFOI staff members,

11

one COB staff member, and three contract attorneys have worked exclusively on producing documents for this litigation.

25. In <u>Gannon v. United States</u>, Civil Action No. 03-6626 (E.D. Pa. Dec. 9, 2003), the plaintiff has submitted a broad request for records pertaining to several polio vaccines. DDOM has been working with the Department of Justice to prepare a defense and respond to the plaintiffs' voluminous requests. Discovery will be ongoing over the next year, and the document production is very complex and requires a substantial amount of search time to identify and isolate responsive documents. For the past two months, two members of DDOM's staff have been dedicating nearly all of their time to this litigation. This is expected continue well into next year.

26. In summary, DDOM's present document production workload includes: a stream of new FOIA requests at the rate of approximately 35 per month; a backlog of approximately 650 FOIA requests; several complex court-ordered productions; ongoing GAO and OIG audits, inquiries from the United States Congress; and requests for documents from foreign countries. This workload has resulted in substantial processing delays within DDOM.

ALFOI BACKLOG AND RESPONSIVE ACTION

27. Among the many measures implemented in an attempt to reduce DDOM's backlog of document requests, has been the

12

reassignment some of the more routine FOIA requests from ALFOI personnel to COB staff. Although the staff is divided into two branches, staff from COB often work on FOIA and other document production obligations when their workloads permit. For example, since March 2003, one member of the COB staff has dedicated approximately 50% of her time to document production requests. Another member has dedicated approximately 30% of her time to providing documents responsive to a request from the Canadian government, as well as processing several document production requests.

28. DDOM has obtained funds to retain several attorneys to assist with the court-ordered document production in the autism litigation. In addition, DDOM has assigned one, and at times two, full-time COB staff members to help with the burden of this large document production.

29. In addition, DDOM has put in a request to hire one more full-time employee to assist with document production work. Providing resources remain available, DDOM expects to hire this new employee as early in 2006 as possible.

### PLAINTIFF'S REQUEST

30. Because of the great demands already straining its document production resources, DDOM would not be able to produce the large number of documents sought by Biopure within the 30-day

13

time limit provided under the Subpoenas.

31.  In order to gather the documents responsive to Biopure's Subpoenas, DDOM staff must coordinate with at least five other offices within CBER.  In addition, other offices within FDA will need to be included in the search, such as FDA's Office of Regulatory Affairs and Office of the Commissioner and many of its component offices.  The task is further complicated because, in addition to requesting documents contained in official files, Biopure's Subpoenas also seek documents and electronic mail messages possibly maintained in the individual files of FDA employees.

32.  The scope of documents sought by Biopure's Subpoenas is exceptionally broad, and obtaining and redacting responsive documents will require an extraordinary expenditure of resources.  For example, items 7 and 8 of the Subpoenas demand copies of "[a]ll complete response letters, as described in the Standard Operating Procedures in effect on July 30, 2003, sent out by FDA at any time" and "[a]ll complete response letters, as described in the Standard Operating Procedures and/or rules or regulations as amended after July 30, 2003, sent out by FDA at any time." Because FDA's Center for Drug Evaluation and Research (CDER) is also responsible for regulating some biologic products (see Drug and Biological Product Consolidation, 68 Fed. Reg. 38,067, June

14

26, 2003), identifying responsive documents will require a hand
search through biologic product applications in at least two of
the Agency's Centers, CBER and CDER, covering a window of over
seven years.  To identify responsive documents, FDA will need to
search through all volumes of documents within biologic license
application files in order to locate over 4500 complete response
letters that were issued during the time windows specified in
Biopure's Subpoenas.  Because each BLA file may have between 50
and 100 volumes, and each volume is expected to contain between
100 and 500 pages, approximately 5,000 to 50,000 pages will need
to be searched for each BLA that has one or more of the
responsive letters.

    33.  Similarly, the broad group of documents demanded in
items one through four of Biopure's Subpoenas will require
coordination and possibly extensive searches for documents within
numerous offices within CBER and FDA, including: FDA's Office of
the Commissioner, Office of Chief Counsel, Office of External
Relations, Office of Executive Secretariat, Office of Public
Affairs, Office of Special Health Issues, Office of Legislation,
Office of Science and Health Coordination, Office of Management,
Office of Regulatory Affairs, Office of Regional Operations,
Office of Enforcement, and the Division of Federal State
Relations.  Within CBER alone, locating documents in response to

15

the first four items in Biopure's Subpoenas will require a search
by CBER's Office of the Center Director, Office of Biostatistics
and Epidemiology, Office of Communication, Training and
Manufacturers Assistance, Office of Blood Research and Review,
and the Office of Compliance and Biologics Quality.

34. After responsive documents are identified, DDOM must
conduct a line-by-line, word-by-word review of the documents to
determine whether any exemptions are applicable, redact exempt
materials, review for quality control purposes, and copy the
documents for production. Reviewing and redacting the documents
sought by Biopure, particularly those unrelated to Biopure, are
likely to require a significant amount of time because these
types of documents normally contain a large amount of trade
secret and confidential commercial information, which FDA is
prohibited by law from releasing. See 21 U.S.C. § 331(j), 18
U.S.C. § 1905, 21 C.F.R. § 20.61.

35. Because of the complexity of Biopure's document
request, DDOM is unable at this time to offer an firm estimate
regarding the period of time necessary to produce the documents
demanded in Biopure's Subpoenas. The best, conservative estimate
that can presently be offered is that it may be approximately
three years before Biopure's request reaches the top of the
Complex Track queue. Once the request reaches the top of the

16

queue, it is estimated that it will take approximately one year to search for, identify, and copy all the responsive documents. Redaction of responsive documents would require an additional six months to a year.  This estimate reflects the fact that DDOM is currently strained by other substantial document production obligations.  This includes document requests related to other current litigation demands; document requests from Congress, the OIG, and the GAO; DDOM's concurrent disclosure obligations under FOIA and EFOIA; and the processing time for the document requests already in the Complex Track.

17

36.   If DDOM were to attempt to immediately produce the documents sought by Biopure in its Subpoeans, it would be unable to comply with its other disclosure obligations.  Of course, the time required to process Biopure's request (after it rises to the top of the queue) could be shortened if Biopure were to narrow its request.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

*Joanne Binkley*
Joanne Binkley
Director, Division of Disclosure and
Oversight Management,
Office of Communication, Training and
Manufacturers Assistance
Center for Biologics Evaluation and Research
Food and Drug Administration
Department of Health and Human Services

Executed on December 20, 2005, in Washington, D.C.

18

EXHIBIT W



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Center for Biologics Evaluation and
  Research
1401 Rockville Pike
Rockville MD 20852-1448

October 31, 2003

Via Facsimile (617-424-5940)
And First Class Mail

Ellen E. Bober
Senior Enforcement Counsel
Boston District Office
U.S. Securities and Exchange Commission
73 Tremont Street, Sixth Floor
Boston, MA 02108

Re: Biopure Corporation, your reference #MB-01987

Dear Ms. Bober:

    Enclosed, as requested by your letter dated October 22, 2003, are copies of certain
records in connection with the SEC investigation of Biopure's applications for approval
of its hemoglobin-based oxygen therapeutics. These records respond to the four specific
points listed in your letter. Please note that since some of our staff are currently on leave,
it is possible that additional notes may be located for items #3 and #4. As stated in your
letter, these records are being exchanged under the existing SEC – FDA agreement
concerning the safeguarding of non-public information. If there are any questions, please
call me at 301-827-6352.

                                        Very Truly Yours,

                                        Elaine Knowles Cole
                                        Director, Division of Inspections
                                        and Surveillance (HFM-650)
                                        Office of Compliance and Biologics
                                        Quality

Enclosures:
3 Letters - April 25, 2003, May 30, 2003, July 30, 2003
5 Telecon notes – July 31, 2003, August 5, 2003, August 15, 2003,
  and August 26, 2003 (two notes)

SEC LIT 000405