## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION
N0. 05-11853 - PBS

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

In their motion for partial summary judgment, Defendants request that the Court conduct a simple act of judicial review: compare the letter dated July 30, 2003 received from the Food and Drug Administration, regarding Biopure's Biologics License Application, to the Company's press release about that letter dated August 1, 2003. That comparison compels partial summary judgment for Defendants on all claims about the press release.

## I.    Plaintiff's Contentions About Omissions Are Not Actionable.

Plaintiff contends that three omissions make the press release fraudulent: (1) the press release failed to mention "serious concerns" about Biopure's submission, pp. 7-9, and "extensive questions" about data, pp. 13, 14; (2) the press release failed to disclose that the July 30 BLA letter was allegedly a "Complete Response Letter," pp. 14-17; and (3) the press release failed to disclose a different letter dated July 30, 2003 about a proposed protocol for a different indication, not the BLA for orthopedic surgery. Pp. 17, 18.

**A.    Serious Concerns and Extensive Questions Are Characterizations, Not Facts.**

The press release reported that the letter requested "additional information" and that the letter "focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling." *See* Transmittal Affidavit of Robert A. Buhlman filed with Defendants' Motion for Partial Summary Judgment, Ex. A. As evidence that the July 30 BLA Letter does just that, the Letter reads: "please comment" - 26 times; "please explain" - 36 times; "please clarify" - 8 times; and "please describe" - 5 times.[1] July 30 BLA Letter, Buhlman Aff. Ex. E (hereafter, the "Letter"). The Letter requests seven lists, seven spreadsheets and four flow diagrams. The Letter refers to these as "the above steps for approval" and invites a meeting to discuss them. Letter, p. 34.

Plaintiff contends the press release was misleading because *the SEC contends* the FDA's questions were "negative comments," p. 7, "sharply criticized" Biopure's submission, p. 7, and were "not good news." P. 9

The July 30 BLA Letter does not say anywhere that it is "negative," "sharply critical" or "not good news." Plaintiff's characterizations are not facts -- they are litigious arguments. They should be disregarded by the Court in favor of what the Letter actually *says*. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 375-77 (3rd Cir. 1993), *cert. denied*, 510 U.S. 1178 (1994) (securities laws are concerned with disclosure of facts, not with the failure to characterize facts with pejorative adjectives); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory.")

---

[1] Plaintiff cannot seriously contend that it is securities fraud to use the phrase "clarification of clinical and preclinical data" instead of the phrase "explanations of, comments on and clarification of" data.

Plaintiff concedes "defendants did not need to communicate every single issue raised by the FDA, nor did they need to characterize the FDA's concerns." Opposition, p. 9. The case law establishes that proposition as well. *In re PLC Systems Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 119 (D. Mass. 1999). Thus, it is not actionable because the Letter did not disclose the details of how many questions or what data clarifications were requested.

Plaintiff also concedes that "it was literally true that FDA did not request additional clinical trials." Opposition, p. 13. What follows in the Opposition about why that was a "half truth" is simply a reiteration that the Letter contained *questions*. Opposition, p. 13 ("Letter contained extensive questions about the integrity and reliability about data."). The Letter did not request additional clinical trials -- fact -- and that is what the press release said -- fact. The specific data questions did not need to be disclosed.[2]

Plaintiff relies on three cases. However, by their distinctions, these cases actually show why defendants are entitled to partial summary judgment on the press release claims:

1.    *In re Transkaryotic Therapies, Inc.*, 319 F. Supp. 2d 152 (D. Mass. 2004).

> In this case, a decision on a motion to dismiss, not for summary judgment, shareholder plaintiffs alleged that the letter in question "stated bluntly and at length" that both clinical tests "failed to demonstrate efficacy." *Id.* at 156. Moreover, the letter allegedly stated "we recommend that you conduct additional clinical studies and submit the results to CBER." The Court noted this request could well have "amount[ed] to years of additional research." *Id.* at 161. The July 30 BLA Letter, which this Court can read on summary judgment, does *not* "state bluntly and at length" that the tests "failed to demonstrate" safety or efficacy and it does *not* recommend additional clinical trials.

---

[2] Remarkably, Plaintiff also cites *testimony* taken in its investigation not about what the Letter *said*, but about what FDA witnesses said to the SEC in their private, cooperative sharing of information. *See* Statement of Facts, ¶70. Clearly, if it was not stated by FDA *to the Company* in the formal written communication, then it is not relevant to the Company's disclosure about the Letter. The testimony cited by Plaintiff is irrelevant. It is also inadmissible. It also is not properly considered under Fed R. Civ. P. 56, because Defendants were not allowed to participate in that private sharing of information within the government. *See Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 16 (1st Cir. 1986); *Berwick Grain Co., Inc. v. Illinois Dept. of Agriculture*, 116 F.3d 231, 234 (7th Cir. 1997) (Interview transcript without affidavit not admissible under Fed. R. Civ. P. 56(e)).

2.    *In re Amylin Pharma., Inc. Sec. Litigation*, No. 0lCV1455, 2003 WL 21500525 (S.D. Cal. August 9, 2001).

This case is also a decision on a motion for reconsideration of the District Court's denial of a motion to dismiss.   It is not a summary judgment precedent. Furthermore, the allegedly misleading statements were specific statements about clinical results:

> These improvements in glucose were achieved *without an increase in the evidence of hypoglycemic events or clinically important safety issues.*

*Id.* at *2 (emphasis in the original).  Defendant also announced that the clinical trial "is sufficient to support approval," even though plaintiffs alleged that FDA said "current study data is not considered pivotal data for an NDA," meaning it could *not* support a marketing approval.  *Id.* at 1, 2.  On a motion to dismiss, allegations of specific statements of results that were allegedly misleading in light of actual data or statements allegedly *contradicted* by FDA were upheld at the pleading stage. Here, the press release makes no statement about results and the SEC has not asserted that a *statement about results* was wrong in light of *actual results.*

3.    *In re CV Thera. Inc. Sec. Litig.*, No. C 03-30709 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004)

This third case is also a motion to dismiss case.  Furthermore, it is also a case where alleged statements "we believe that for Ranolazine (ph) [the QT effect] won't be a particular problem for review by the agency" were contradicted by contemporaneous *facts.*  *Id.* at *6.  Here, on a motion for summary judgment, there is no statement of fact in the press release that it *contradicted* by the Letter.

What is instructive about these cases -- assertedly Plaintiff's best -- is that they demonstrate the core reason why Defendants deserve judgment.  Plaintiff has not alleged that the press release contains a statement of fact that is contradicted by what the July 30 BLA Letter actually *says.*

**B.    The Complete Response Letter Label Is Not An Actionable Omission.**

Plaintiff continues to argue that the August 1 press release was misleading because it did not label the Letter a "Complete Response Letter."  Plaintiff concedes, however, as it must, that the Letter does *not* say it is a complete response letter.

The press release said "FDA has completed its review of the company's biologics license application for Hemopure® [hemoglobin glutamer-250 (bovine)] and issued a letter requesting additional information." Thus, the Company used the same phrase as the Letter, "completed the review."

Plaintiff's contention that the label itself is material is contradicted *by the FDA*: "the issuance of complete response letters....[carry] no implication as to the ultimate approvability of the application." *See* Proposed Rules Department Of Health And Human Services: FDA 21 CFR Parts 312, 314, 600, and 601 Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications Tuesday, July 20, 2004 69 FR 43351-01, 2004 WL 1599720.[3] Moreover, it *cannot* be material when it was not in the Letter *and* the press release used the phrase the Letter used: "completed review." "Completed review" and "complete response" carry the same plain meaning.[4]

Plaintiff is left to argue that the label meant something to how long FDA would take to review Biopure's response. Opposition, p. 16. The press release did not *speculate* about how long FDA would have to review Biopure's response. Indeed, Plaintiff's own submission suggests the reason the July 30 Letter arrived 30 days early was because a reviewer was traveling later. Opposition, p. 19. That shows FDA can act when it chooses, for unpredictable reasons. The press release did use the word "suspended" because the July 30 BLA letter said the review clock was "suspended." *See* Letter, p. 34. It cannot be securities fraud to use the FDA's own words in the Letter in a press release about the Letter, especially when the contention is that the

---

[3] This was included in the Appendix of Citations to Defendants' Memorandum of Law, Ex. 3.

[4] Notably, in *Transkaryotic*, the parties and the Court actually refer to the letter as a "Complete Review Letter." *See, In re Transkaryotic,* 319 F. Supp. at 156. Furthermore, FDA's Manual of Standard Operating Procedures and Policies, SOPP 8405, refers several times to "complete review." *See* SOPP 8405, attached hereto as Exhibit A. (Both parties submitted later versions of this SOPP with their briefs. This version attached as Exhibit A was in effect on July 30, 2003, but it is the same as the later versions on this point.)

press release did not *speculate* about the length of a *future* review period that was not mentioned in the Letter.[5]

### C.    The Press Release Was Not About The Separate Trauma Indication.

The SEC contends that partial summary judgment should not be granted because the press release about the Company's July 30 BLA Letter did *not* disclose that there was a second letter dated July 30, 2003 about a proposed clinical trial protocol for a different indication (i.e., the trauma protocol). The SEC's contention is off-point. The subject of this motion for partial summary judgment is limited to Biopure's disclosure in the August 1 press release concerning the July 30 BLA Letter and does not concern the disclosure or non-disclosure of the July 30 letter regarding the trauma protocol.

Furthermore, at trial, defendants will demonstrate why the SEC cannot prove its claims for omissions about the trauma protocol. The July 30, 2003 letter about the trauma protocol is about a *different* IND and a *specific protocol* regarding a possible test in trauma patients. *See* SEC Exhibit 49, p. 1 (identifying the specific IND by number and the protocol by name). By regulation a clinical hold applies only to *the specific* IND and specific *trial identified*:

> A clinical hold is an order issued by FDA to the sponsor to delay a proposed clinical investigation.... It will identify the studies under the IND to which the hold applies.

21 C.F.R. 312.42. The July 30 trauma clinical hold letter was *not* about the BLA and did not need to be mentioned in the press release *about the July 30 BLA Letter*.

In addition, the July 30 trauma letter was *virtually identical* to the July 30 BLA Letter in terms of the questions asked. The first 14 pages of the trauma letter are verbatim questions

---

[5] What others *allegedly said* the Letter was, whether Franklin Stephenson or a lawyer who did not read it, does not matter. First, the press release was still accurate in saying "completed review" because that is what the official agency writing said. Off-hand remarks cannot control. Second, the label was not material for the reason just discussed and for the reasons set forth in Defendants' opening brief.

copied from the first 13 pages of the BLA letter. Compare SEC Ex. 49, pp. 1-14 with SEC Ex. 48, pp. 1-13. The trauma letter made *two* comments on the last page that did not appear in the July 30 BLA Letter. One comment was about stratum specific randomization for patients over 75 and the second comment asked Biopure to submit some final study reports to supplement earlier abstracts. *See* SEC's Appendix, Ex. 49, p. 14. There was nothing material about those two comments in a different letter about a different proposed protocol for a different indication that was omitted from the press release about the *BLA Letter*.

II.    **The August 1 Press Release Did Not Misstate Material Facts.**

Plaintiff contends the press release contained two "false statements:" that the Letter "focuses primarily" on clarification of clinical and preclinical data and that Mr. Moore was "encouraged," as he was quoted as saying, because "FDA finished its review and provided comprehensive feedback in advance of the final action due date" and FDA was "encouraging" Biopure to work with them to complete the approval process as quickly as possible.

As described above, the Letter asks Biopure to "explain," "clarify," and "comment" on data repeatedly. The assertion in the release that the July 30 BLA Letter "focuses primarily" on clarification of clinical and preclinical data will withstand judicial scrutiny. The Letter does just that.

As for Mr. Moore's quote, the *fact* in the quote, that the July 30 BLA Letter arrived 30 days in advance of the expected date, is undisputed. The Letter was dated and sent on July 30, 2003 - thirty days before the expected date of August 29, 2003. Plaintiff is left to claim fraud on whether Mr. Moore was "encouraged" by that at the time. As it must under Fed. R. Civ. P. 56(e) in opposing a motion for summary judgment, the SEC has offered nothing in its Statement of Facts to demonstrate that Mr. Moore did not believe these opinions when quoted and it cannot

because Mr. Moore testified to the SEC that he was encouraged and optimistic when he made the statements. Interpreting an early arrival as encouraging (with the fact the letter did *not* request additional trials) is certainly not *per se* unreasonable. As such, Plaintiff lacks the core element of *any* fraud claim: an untrue statement.

Moreover, the statements are not guarantees of FDA approval and are not actionable. *See In re PLC Systems, Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 118 (D. Mass. 1999) (quoting *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 964 (D. Md. 1995)) ("While it is true that a 'guarantee' of approval of a product by a federal agency might be actionable, ... the key word is 'guarantee.' Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable"); *Noble Asset Management v. Allos, Therapeutics, Inc.,* 1:04-cv-01030-RPM (D. Colo. Oct. 10, 2005) (optimistic statements concerning FDA approval not actionable; there was no statement guaranteeing approval). They are soft, forward-looking and not actionable.

Indeed, in this case, the quoted statements were not even optimistic about FDA *approval*. They were optimistic about FDA's willingness to *work with* the Company *in the approval process. See* Buhlman Aff., Ex. A ("We're encouraged that FDA has finished its review and provided comprehensive feedback" and "FDA is encouraging us to work with them"). *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) *superceded by statute on other grounds as recognized in Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir. 1999) ("Courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so

clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

## **Conclusion**

For these reasons, Defendants should be granted partial summary judgment on all claims that Biopure's August 1, 2003 press release was misleading, as requested in their Motion for Partial Summary Judgment.

COUNSEL FOR DEFENDANT
JANE KOBER

By her attorneys,


/s/ Thomas J. Dougherty
Thomas J. Dougherty BBO #132300
Justin J. Daniels BBO #656118
Scott T. Lashway BBO #655268
Skadden, Arps, Slate,
  Meagher & Flom LLP
One Beacon Street
Boston, MA 02108
(617) 573-4800


COUNSEL FOR DEFENDANT
HOWARD RICHMAN

By his attorneys,

/s/ John D. Hughes
John D. Hughes BBO #243660
Cathy A. Fleming (*pro hac vice*)
Mary P. Cormier BBO #635756
Edwards Angell Palmer & Dodge, LLP
111 Huntington Avenue
Boston, MA 02199
617-951-2225

COUNSEL FOR DEFENDANT
BIOPURE CORPORATION

By its attorneys,


/s/ Robert A. Buhlman
Robert A. Buhlman, BBO #554393
Donald J. Savery, BBO #564975
Michael D. Blanchard, BBO #636860
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

COUNSEL FOR DEFENDANT
THOMAS MOORE

By his attorneys,

/s/ Edward P. Leibensperger
Edward P. Leibensperger, Esq. BBO #292620
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
(617) 535-4000

Bobby R Burchfield (*pro hac vice*)
Jason A. Levine (*pro hac vice*)
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8021

Dated:  February 16, 2006

## Certificate of Service

I, Michael D. Blanchard, hereby certify that on February 16, 2006, a true and correct copy of the foregoing Reply Memorandum In Support of Defendants' Motion for Partial Summary Judgment was electronically upon counsel of record for each other party.

/s/ Michael D. Blanchard
Michael D. Blanchard

# EXHIBIT A

U.S. Food and Drug Administration

**CENTER FOR BIOLOGICS EVALUATION AND RESEARCH**

# Manual of Standard Operating Procedures and Policies

# License Applications

## Complete Review and Issuance of Action Letters          SOPP 8405

### 1. Purpose

Describes the process that The Center for Biologics Evaluation and Research (CBER) staff should follow to perform complete reviews of applications and supplements and communicate deficiencies to applicants.

### 2. Applicability

This Center guidance on complete review and issuance of action letters is effective immediately for both user fee and non-user fee products.

### 3. History

This instruction replaces SOPP 8405 issued October 7, 1997.

### 4. Definitions

**Backlog**

For user fee purposes, CBER committed to eliminating the overdue backlog of PLAs, ELAs and amendments pending as of October 1, 1992 within 24 months of the initiation of user fee payments. Applications and amendments pending at CBER on October 1, 1992, were considered in backlog status when no action was taken within the preceding twelve month period.

Applications and supplements received after October 1, 1992 will be in backlog status when a complete action has not been taken within the time frames specified in the Secretary's letter for priority applications and standard applications for the first review cycle. Subsequently, Agency action on complete responses from the applicant will be in backlog status if not acted on within the time frames specified for resubmissions in the Secretary's letter, SOPP 8405.1.

**Complete Biologics License Application**

A biologics license application will be considered complete for filing purposes if it contains all of the data and critical review elements necessary for initiating a meaningful review process. In considering the completeness of an application, CBER staff should determine whether the application contains the elements described in the Guidance for Industry on the Chemistry Manufacturing and Controls and Establishment Description Information appropriate for the product, in addition to the applicable requirements outlined in Title 21, Code of Federal Regulations (21 CFR) Sections 601.2 and 601.3 and

the elements described in the CBER "Refusal To File" (RTF) guidance, <u>SOPP 8404</u>.

## Complete Establishment License Application

An establishment license application will be considered complete for filing purposes if it contains all of the data and critical review elements necessary for initiating a meaningful review process. In considering the completeness of an ELA application, CBER staff should determine whether the application contains the elements described in the CBER establishment license application form and filing instructions in addition to the applicable requirements outlined in Sections 601.2 and 601.3 of Title 21 of the Code of Federal Regulations and the elements described in the CBER RTF policy, SOPP 8404.

## Complete Product License Application

A product license application will be considered complete for filing purposes if it contains all of the data and critical review elements necessary for initiating a meaningful review process. In considering the completeness of an application, CBER staff should determine whether the application contains the elements described in the appropriate product license application form, in addition to the applicable requirements outlined in Title 21, Code of Federal Regulations (21 CFR) Sections 601.2 and 601.3 and the elements described in the CBER "Refusal To File" (RTF) guidance, SOPP 8404.

## Information Requests

Communications that convey deficiencies in applications or supplements. They are not considered to be Action Letters because they do not represent a complete review of the submission and therefore do not stop the review clock. Information Requests can include letters, facsimiles, documented telecons, etc.

## Priority Applications

The product, if approved by CBER or the Center for Drug Evaluation and Research (CDER), would be a significant improvement in the safety or effectiveness of the treatment, diagnosis or prevention of a serious or life-threatening disease. In addition, for drug products under CDER's jurisdiction, the product, if approved, would be a significant improvement in the treatment, diagnosis or prevention of a non-serious disease. Examples include:

- documented improvement in patient compliance; or
- elimination or significant reduction of a treatment-limiting drug reaction, or
- demonstration of safety or effectiveness in a new subpopulation of patients with the disease.

## Standard Applications

All non-priority applications will be considered "standard" applications.

## Action Letters

The following letter types constitute complete Agency actions (for performance goal and review clock purposes) in response to the license application or supplement review process. Action letters are the result of complete Agency review of applications or supplements and stop the review clock.

- **Complete Response Letter** - This letter will be issued when the complete review indicates

that there are deficiencies remaining which preclude the approval of the application or supplement at that time. The Complete Response Letter will:

- o Summarize all of the deficiencies remaining, and
- o Where appropriate, describe actions necessary to place the application/supplement in a condition for approval.

- **Approval Letter -** Following completion of all aspects of the review process for both the product and establishment license application, including testing of submitted product lots, pre-licensing inspection and evaluation of final printed labeling or a suitable alternative, an approval letter and accompanying issuance of appropriate license(s) will constitute the final action on the outstanding reference number(s).

## 5. Background

CBER will utilize Action Letters (i.e. complete response and approval) following each complete review cycle for biologics, product and/or establishment license applications (BLA's, PLA's and ELA's) and supplements. FDA committed to meeting various performance goals in support of the user fee program established by the Prescription Drug User Fee Act of 1992 (PDUFA). CBER intends to perform an initial, complete review of an application or supplement subject to user fees within the time frames contained in the FDA's letter to Congress setting out the performance goals regarding the Food and Drug Administration Modernization Act of 1997 (FDAMA), in which PDUFA (PDUFA 2) was reauthorized. CBER staff should conduct a complete review of a manufacturer's complete response to a previously issued action letter (resubmission) according to the procedures set out in SOPP 8405.1.

## 6. Policy

In the Secretary's letter to Congress setting out the performance goals regarding PDUFA 2, yearly interim application goals with annually increasing percentages to fiscal year 2002 were defined. CBER staff should review all priority and standard license applications and amendments subject to PDUFA 2 within established time frames. The results of each complete review will be communicated to the applicant via the appropriate Action Letter. The signature authorities for Action Letters issued by the various offices are contained in the Appendix of this guide.

Additionally, as agreed during the 1993 senior management go-away, the same guidance for complete review and issuance of action letters will apply to products not subject to user fees, with the exception that strict adherence to the time lines will be recommended as resources permit but not required.

## 7. Procedures

## User Fee Applications

Follow the general guidance specified below for all applications and supplements subject to user fees (on or after September 1, 1992, and not specifically exempted by the legislation).

- Designate the status of the application (i.e. priority or standard) at the time of the pre-BLA/PLA/ELA meeting or as soon as possible after receipt.

- Verify the status of all fees owed by the applicant. The User Fee Act provides that an application will not be accepted for filing unless the applicant has paid all fees due. Information regarding payment of fees will be provided to CBER in reports issued by the Office of Financial

Management (OFM), FDA.

- Assign the reference number when the application is received in the application division of each office and correlate the receipt of payment with the submitted application.

- Use an administrative screening procedure as an initial step to document that the filing contains all of the required filing elements (this is not an in-depth review as to the quality of the submitted data).

- Form the review committee and meet in accordance with guidance established and issued by each office.

- Make a refusal to file decision by the time of the 45 day meeting (for priority applications) or 60 day meeting (for standard applications). Notify the applicant of the decision in accordance with the CBER refusal to file guidance document.

- If the application/supplement is accepted for filing, information requests may be utilized up to the time that a complete action is taken.

- The application/supplement should be acted on within the appropriate time frame. Such action consists of a complete review followed by issuance of an action letter (complete response, or approval). If information requests were utilized, the dates and status of the applicant's response to such requests should be acknowledged in the action letter.

- Other actions which may be taken include inactivation, withdrawal or denial.

## Applications/Supplements not Subject To User Fees

- Designate the status of the application as either priority or standard.

- Assign the reference number when the application is received in the application division of each office.

- Use an administrative screening procedure as an initial step to document that the filing contains all of the required filing elements (this is not an in-depth review as to the quality of the submitted data). Each office will define and issue a procedure for administrative screening.

- Form the review committee and meet in accordance with guidance established and issued by each office.

- Make an RTF decision by the time of the 45 day meeting for priority applications or 60 day meeting for standard applications as resources permit.

- The application/supplement should be acted on within the appropriate time frame as resources permit. Such action consists of a complete review followed by issuance of an action letter (complete response or approval). If information requests were utilized, the dates and status of the applicant's response to such requests should be acknowledged in the action letter.

- Other actions which may be taken include inactivation, withdrawal or denial.

## 8. Effective Date

May 1, 1998

## 9. Appendix

Signature Authority for Action Letters

---



FDA | CBER HOME | Inside CBER | Prod Info | Pubs | Conf/Mtgs | FOI
What's New | Public Inquiries | FDAMA | Search

---

*Page Last Updated: **9/30/98***