UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                      :
SECURITIES AND EXCHANGE COMMISSION, :
                                                      :
                        Plaintiff,          :        Civ. A No. 05-11853-PBS
            v.                                    :
                                                      :
BIOPURE CORPORATION,                   :
THOMAS MOORE, HOWARD RICHMAN,   :
and JANE KOBER                             :
                                                      :
                        Defendants.        :
_____:

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO COMPEL DEFENDANT MOORE'S
EXPERT WITNESS TO COMPLY WITH SUBPOENA
AND FOR EXPEDITED CONSIDERATION**

Plaintiff Securities and Exchange Commission ("Commission") respectfully requests that

Peter Barton Hutt, an attorney disclosed by defendant Moore as an expert witness, be required to

produce all documents that form the bases for his opinions and that he be ordered to do so in

advance of his deposition currently scheduled for Friday, October 20, 2006. Specifically, the

central focus of Mr. Hutt's Report involves a comparison of a July 30, 2003 letter that Biopure

received from the FDA to other similar (or purportedly dissimilar) letters the FDA has sent to

other companies. Yet, Mr. Hutt has refused to produce the other letters from the FDA that he is

relying upon, citing confidentiality concerns and burden. Rule 26(a)(2) requires that an expert

witness produce all documents and information that form the bases for his or her opinions. Here,

without access to the FDA letters that form the bases for Mr. Hutt's conclusions, the Commission

is deprived of an opportunity to cross-examine Mr. Hutt about the conclusions he has drawn, and

this Court and the jury will have no ability to evaluate Mr. Hutt's opinions.

The Commission's request is urgent. According to the schedule agreed to by the parties, Mr. Hutt is scheduled to be deposed on Friday, October 20. The Commission respectfully requests that this Court consider its request in advance of Mr. Hutt's deposition. Alternatively, the Commission requests that it be permitted to further depose Mr. Hutt after production of additional documents.

## Background

The Commission's Complaint alleges that during the period of April through December 2003, defendant Thomas Moore and others engaged in a fraudulent scheme to misrepresent and conceal from investors the truth about Biopure's applications for FDA approval to test and market a blood-substitute product called Hemopure. Among other things, the Commission alleges that defendant Moore and others made misleading statements and omitted to state material information about a July 30, 2003 letter Biopure received from the FDA (the "July 30, 2003 BLA Letter").

On October 6, 2006, defendant Moore disclosed an expert report from Peter Barton Hutt, an attorney who specializes in advising companies in connection with their dealings with the FDA. (Exhibit A). Mr. Hutt's report is, at least in part, a response to the expert report of Dr. Edward L. Snyder, a noted doctor of transfusion medicine and director of the blood bank at Yale-New Haven Hospital, who opined, among other things, that "[r]esponding completely and satisfactorily . . . to the two letters of July 30, 2003, would require . . . that Biopure undertake extensive and even Herculean efforts, including the performance of new pre-clinical trials." (Exhibit B at 2). In his report, Mr. Hutt, in contrast to Dr. Snyder, opines that "it was not unreasonable for Biopure to respond to the [July 30, 2003 BLA Letter] with optimism." (Ex. A

at 16).

Mr. Hutt bases his opinion in large part on a comparison between Biopure's July 30, 2003 BLA Letter and other FDA letters that Mr. Hutt has reviewed in other contexts.  For example, in paragraph 83, Mr. Hutt states that based on his experience "reading these types of letters from FDA," it was "unusual" for the July 30, 2003 BLA Letter to state that the review clock was "suspended."  (*Id.*, ¶ 83).  Similarly, in paragraph 52, Mr. Hutt states that, based on "reading dozens of letters like the [July 30, 2003 BLA Letter], the most important parts of a review letter from the FDA are the opening and closing paragraphs."  (*Id.*, ¶ 52).  In paragraph 54, Mr. Hutt compares specific language in the July 30, 2003 BLA Letter that final approval is not possible at this time with "literally dozens of letters, sent by the FDA at the same stage in the review process."  (*Id.*, ¶ 54).  In paragraph 55, Mr. Hutt compares a sentence in the July 30, 2003 BLA Letter that, "You may request a meeting with CBER to discuss the above steps for approval" with "these types of letters" that he has previously reviewed.  (*Id.*, ¶ 55).  In paragraphs 56 and 59, Mr. Hutt compares a purported absence of requests for new clinical trials in the July 30, 2003 BLA Letter with "countless letters" and "many instances" in which the FDA made that request.  (*Id.*, ¶¶ 56. 59).  In paragraph 88, Mr. Hutt compares the July 30, 2003 BLA Letter with "unapprovable" or "approvable" letters received by other of his clients from the FDA.  (*Id.*, ¶ 89).

On the morning of October 10, 2006 (the first business day after receiving Mr. Hutt's report), the Commission served a Subpoena seeking production of documents that form the bases for Mr. Hutt's conclusions.  (Exhibit C).  Requests 3 and 4, in particular, seek all FDA letters that Mr. Hutt is relying upon in making conclusions about the unusual-ness, significant or meaning of language that is in the July 30, 2003 BLA Letter:

3

Request 3.    All FDA letters you have reviewed, at any time, that form a basis for any of your opinions regarding the July 30, 2003 BLA Letter or with which you have compared the July 30, 2003 BLA Letter, including, but not limited to, all "complete response letters," "approvable letters," "unapprovable letters," "nonapproval letters" and "action letters" you have reviewed at any time (as you use those terms in your Report) and all letters referenced in your descriptions of "dozens of letters," "literally dozens of letters," "these types of letters," "countless letters," "many instances," "numerous clients who have received 'unapprovable' letters," and "clients that have received 'approvable' letters" in paragraphs 52, 54, 55, 56, 59, and 88, respectively, of your Report.

Request 4.    All documents on which you base your opinion that the language of the July 30, 2003 BLA Letter was "unusual," as stated in paragraph 83 of your Report.

(Ex. C).

On October 13, 2006, Mr. Hutt, through defense counsel, objected to producing any documents responsive to Request Nos. 3 and 4.  (Exhibit D).  Among other things, Mr. Hutt stated that responsive documents "contain confidential and/or trade secret information concerning other of Mr. Hutt's clients."  He further objected that producing responsive documents would be unduly burdensome and stated that he has no responsive documents that he is "authorized" to produce.

The Commission now brings this motion to compel Mr. Hutt to produce the other FDA letters that form the bases for his opinions or are letters to which he has compared the July 30, 2003 BLA Letter in this case.

**Argument**

**I.    Mr. Hutt Should Be Ordered To Disclose
the Documents That Form The Bases For His Opinions**

Expert witnesses are required to disclose the documents that they considered in forming

their opinions.  Rule 26(a)(2)(B) states that expert witnesses must disclose "the data or other information considered by the witness in forming the opinions."  Fed. R. Civ. P. 26(a)(2)(B). Rule 26(a)(5) further states that parties may obtain additional discovery by production of documents pursuant to Rule 45.  Fed. R. Civ. P. 26(a)(5).  The 1993 advisory committee notes to Rule 26 make clear that if an expert is testifying or being deposed, the expert must produce all information that he "considered," even if that information was "privileged or otherwise protected from disclosure" in the absence of expert testimony.  Advisory Committee Notes to 1993 Amendments to Rule 26(a)(2).

Here, Mr. Hutt's opinions are expressly based upon his comparison of the July 30, 2003 BLA Letter to other letters the FDA sent to other companies, which he has reviewed.  The other -- undisclosed -- letters form Mr. Hutt's basis for concluding, among other things, that the July 30, 2003 BLA Letter was "unusual" (Ex. A, ¶ 83), that the FDA was "working toward a goal of approving the product" rather than that it has concluded the product was "not safe or effective" (*Id.*, ¶¶ 52-54), that the FDA "clearly signal[ed]" a desire to work with Biopure (*Id.*, ¶ 55), that the FDA was not insisting on new clinical trials (*Id.*, ¶¶ 56, 59), and that the type of letter sent by the FDA is "meaningless" (*Id.*, ¶ 88).

Many of Mr. Hutt's assertions are inconsistent other evidence in this case, including evidence that the July 30, 2003 BLA Letter was an "Complete Response Letter" that ended FDA's review cycle (impacting the time-line for further FDA review) and that the July 30, 2003 BLA Letter, together with another letter sent by the FDA that same day, conveyed the FDA's detailed, extensive and serious concerns about the operation of Biopure's clinical trials, the integrity of the Biopure's data, and the safety of Hemopure.  *See, e.g.,* Ex. B.  Moreover, the only

other FDA letter that Mr. Hutt has produced does not support his opinions.  In that letter the FDA

used the same language that appears in the July 30 BLA Letter, that the review clock was

"suspended."  This directly contradicts Mr. Hutt's opinion that such language was "unusual."

The Federal Rules require that Mr. Hutt produce all documents that form the bases for his

opinions.  *See* Fed. R. Civ. P. 26(a)(2).  Without production of other FDA letters that he has

reviewed, the Commission cannot adequately depose or cross-examine Mr. Hutt about the

validity of his comparisons or the conclusions he has drawn.  The Commission does not dispute

that Mr. Hutt is an esteemed member of the bar with many years of experience in this area.  But

that experience does not insulate him from the requirements of expert disclosure under the

Federal Rules.  In essence, defendant Moore is asking the Commission, this Court and the jury to

assume that Mr. Hutt's conclusions from comparing the July 30, 2003 BLA Letter to these other

FDA letters are the only possible conclusions that can be drawn.  The Federal Rules, however,

require more; the Rules require Mr. Hutt to produce the documents and information that form the

bases for his opinions.  *See Suskind v. Home Depot Corporation*, No. 99-civ-10575-NG, 2001

WL 92183, *1 (D. Mass. Jan 2, 2001) (Collins, M.J.) (holding that expert witness must disclose

all documents "considered" by the witness, even if the documents would be otherwise protected

from disclosure by the attorney work-product doctrine).

Similarly, Mr. Hutt's assertion that the responsive documents are protected from

disclosure because they contain confidential information is insufficient to overcome his

discovery obligations under the Federal Rules.  Because Mr. Hutt is attempting to use these

letters affirmatively against the Commission, Mr. Hutt and defendant Moore -- not the

Commission -- has made it necessary for them to be produced.  Other courts have held that when

an expert witness makes affirmative use of confidential information, he or she waives confidentiality protection both for that information and for other confidential information pertaining to the same subject matter. *See, e.g., Vaughan Furniture Co., Inc. v. Featureline Manufacturing, Inc.*, 156 F.R.D. 123, 128-129 (M.D.N.C. 1994) (holding that when an attorney is named as an expert witness, the attorney must produce all documents considered by him or her in formulating expert opinion, including otherwise privileged or confidential material).  Here, if Mr. Hutt intends to use other FDA letters as a "sword" against the Commission, then he must produce them.

Moreover, neither Mr. Hutt nor defendant Moore has made any showing of what confidential information is purportedly contained in these letters.  Mr. Hutt has not identified the dates or recipients of these letters, nor has he identified the drugs described in the letters, whether the drugs have since been approved by the FDA or whether the letters (or their contents) have been made public by the recipients or the FDA.  Without this basic information, the Commission is not in a position to evaluate whether all parts of all of the letters responsive to Request Nos. 3 and 4 are, in fact, confidential.

Finally, Mr. Hutt's claim of burden is insufficient.  The Commission's request for documents is expressly limited to those documents that Mr. Hutt is relying upon.  The scope of material Mr. Hutt claims to be relying upon in broad:  Mr. Hutt states that he is relying on letters he has reviewed "over 40 years" (¶¶ 55, 83).  Thus, the Commission is entitled to production of letters he has reviewed over that time-period.  If, however, Mr. Hutt clarifies that he is relying upon only some more narrow scope of letters, the Commission would ask for responsive documents only within that more narrow scope.  Moreover, Mr. Hutt has not made an adequate

7

showing of the actual extent of his purported burden.  For example, he has not stated the number

of letters, where they are located, or how they are filed or maintained.  Without this information,

Mr Hutt's, the Commission cannot evaluate Mr. Hutt's assertion of burden.

## II.    Expedited Consideration Is Necessary

The Commission respectfully requests expedited consideration of this Motion.  The

Commission brings this Motion at the earliest possible time.  Because Mr. Hutt's deposition is

currently scheduled for this Friday, October 20, 2006, however, the Commission requests

expedited consideration.

This issue developed very quickly.  Mr. Hutt produced his expert report late on Friday,

October 6, 2006.  The Commission served its Subpoena on the morning of the next business day,

Tuesday, October 10, 2006.  Mr. Hutt produced documents in the early evening of Friday,

October 13, 2006.  Commission counsel spoke with opposing counsel pursuant to Local Rules

7.1 and 37.1 in the morning of Monday, October 16, 2006, the first business day after receiving

Mr. Hutt's document production, and filed this Motion shortly thereafter.  Mr. Hutt's deposition

is currently scheduled for Friday, October 20, 2006, in Washington, D.C.  Defendant Moore's

counsel has stated that this Friday is the only day before the close of discovery that Mr. Hutt is

available.

As an alternative to expedited consideration, the Commission respectfully requests that it

be provided a further opportunity to depose Mr. Hutt after production of additional documents.

## Conclusion

For the forgoing reasons, the Commission respectfully requests that this Court order

defendant Moore's expert witness, Peter Barton Hutt, to produce all documents responsive to

Request Nos. 3 and 4 of the subpoena to him dated October 10, 2006, that Mr. Hutt be ordered to

produce such documents immediately, and that this Court consider the Commission's Motion on

an expedited basis, or alternatively, that the Commission be permitted to further depose Mr. Hutt,

if necessary, after production of all responsive documents.[1]

Dated: October 16, 2006                           Respectfully submitted,
       Boston, Massachusetts


                                                   /s/ Ian D. Roffman
                                                  Ian D. Roffman (BBO# 637564)
                                                  R. Daniel O'Connor (BBO# 634207)
                                                  Ellen Bober Moynihan (BBO#  567598)
                                                  ATTORNEYS FOR PLAINTIFF
                                                  SECURITIES AND EXCHANGE COMMISSION
                                                  33 Arch Street
                                                  Boston, Massachusetts 02110-1424
                                                  (617) 573-8987 (Roffman)


                          *Electronically Served by ECF*

---

[1]      There are other responsive documents that were not included in Mr. Hutt's production.
Counsel for the Commission is currently attempting to resolve this issue with defendant Moore's
counsel without need for judicial intervention.  In the event the parties are unable to reach a
resolution, the Commission expressly reserves its right to file a further motion to compel.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE )
COMMISSION, )
         )
        Plaintiff )
         )
        v. )      No. 05-11853-PBS
         )
BIOPURE COPRORATION, THOMAS )
MOORE, HOWARD RICHMAND, and JANE )
KOBER, )
         )
        Defendants. )

## EXPERT REPORT OF PETER BARTON HUTT

### October 6, 2006

**I.**     **Expert Qualifications**

     **A.**     **Background and Expertise**

        1.     My name is Peter Barton Hutt.  I am senior counsel in the Washington, D.C. law firm of Covington & Burling LLP (Covington & Burling), specializing in food and drug law.  I received a B.A., *magna cum laude*, from Yale University in 1956; an LL.B. from Harvard Law School in 1959; and an LL.M. in food and drug law from New York University in 1960.  My *curriculum vitae* is attached as Appendix A.

        2.     I first joined Covington & Burling in 1960, and became a partner in 1968.  In 1971, I left Covington & Burling to serve as Chief Counsel for the Food and Drug Administration (FDA).

3.     In 1975, I returned to private practice with Covington & Burling. As a partner in the food and drug law practice group, I have represented and continue to represent numerous clients in the food, drug, cosmetic, medical device, and biological product industries, including major national trade associations.

4.     I have participated in various capacities in the drafting of most major FDA legislation considered by Congress during the past forty years, including the Drug Amendments of 1962, the Controlled Substances Act of 1970, the Poison Prevention Packaging Act of 1970, the Drug Listing Act of 1972, the Medical Device Amendments of 1976, the Orphan Drug Act of 1983, the Federal Anti-Tampering Act of 1983, the Drug Price Competition and Patent Term Restoration Act of 1984, the Drug Export Amendments of 1986, the Prescription Drug Marketing Act of 1988, the Nutrition Labeling and Education Act of 1990, the Safe Medical Devices Act of 1990, the Generic Drug Enforcement Act of 1992, the Prescription Drug User Fee Act of 1992, the Food Quality Protection Act of 1996, the Drug Export Reform and Enhancement Act of 1996, the Food and Drug Administration Modernization Act of 1997, the Medicine Equity and Drug Safety Act of 2000, and the Public Health Security and Bioterrorism Preparedness and Response Act of 2002.

5.     I have advised numerous clients regarding FDA's review and approval process for human biological products under the Public Health Service Act (PHS Act) and human new drug products under the Federal Food, Drug, and Cosmetic Act (FD&C Act). This advice encompasses issues relating to current good manufacturing practices (GMP), good clinical practices (GCP), FDA review of applications for investigational new drugs (INDs), the conduct of clinical trials, issuance

2

of clinical holds, and FDA's review and approval of biological license applications (BLAs) and new drug applications (NDAs).

6.  I co-authored with Professor Richard A. Merrill a legal casebook on food and drug law, *Food and Drug Law: Cases and Materials* (Foundation Press 1st ed. 1980, 2d ed. 1991). The third edition is currently in progress. Since 1994, I have taught a course on food and drug law during Winter Term (January) at Harvard Law School. During my career, I have delivered more than 500 speeches on food and drug law and related issues. I have published numerous articles and book chapters dealing with a broad range of FDA-related topics, including the agency's regulation of biological products, new drugs, and other medical technologies.

7.  I have been a member of the Institute of Medicine of the National Academy of Sciences since it was founded in 1971. I have served on a wide variety of academic and scientific advisory boards, including most recently the Review Group for the Current State of FDA Science, FDA Science Board; the Working Group to Review the NIAID Division of AIDS Regulatory Activities, Advisory Council of the National Institute for Allergy and Infectious Diseases; the Panel on Administrative Restructuring of the National Institutes of Health, National Academy of Public Administration; the Board of Trustees, Food and Drug Law Institute; the Board of Trustees, Washington Lawyers Committee for Civil Rights and Urban Affairs; the Board of Trustees, Institute for Health Policy Analysis; the Advisory Board, the University of Virginia Center for Advanced Studies; the Board of Directors, Foundation for Biomedical Research (Vice Chairman); the Scientific Advisory Committee, Western Institutional Review Board; the Board of Directors, the California Healthcare Institute; and the Working Group on

3

Private Sector Incentives for Drugs for Diseases in Developing Countries of the Gates
Foundation.  I currently serve on venture capital advisory boards and the boards of
startup biotechnology companies.

    **B.**    **Compensation**

        8.    I have been retained by the law firm of McDermott Will & Emery
LLP to provide expert testimony in the above-captioned matter.  I am being compensated
at my standard rate of $690 per hour for my work prior to October 1, 2006, and $710 per
hour since then.  My compensation is not dependent upon the outcome of the case.

    **C.**    **Previous Expert Testimony**

        9.    I have prepared expert reports and testified as an expert by
deposition within the preceding four years in the following matters:

- *Prince* v. *B.F. Ascher Co., Inc.*, Case No. CJ-2002-5684,
  District Court of Oklahoma County, Oklahoma (2003)

- *In re* Remeron Direct Purchaser Antitrust Litigation, Master
  Docket No. 03-CV-0085 (FSH), United States District Court for
  the District of New York (2004)

- *Pharmanetics* v. *Aventis Pharm., Inc.*, Civil Action No. 5:03-
  CV-817-FL(2), United States District Court for the Eastern
  District of North Carolina, Western Division (2004)

- *Bristol-Myers Squibb Co.* v. *Pharmascience, Inc.*, Canadian
  Trade-Marks Office Application No. 883,974 (2004)

4

- *Thomas E. Blankenbaker, D.C.* v. *United Healthcare of Arizona, Inc.*, Civil Action No. CV 04-1600-PHX-FJM, United States District Court for the District of Arizona (2005)

- *Spinedex Physical Therapy, U.S.A., Inc.*, v. *United Healthcare of Arizona, Inc.*, Civil Action No. CV 04-1576-PHX-JAT, United States District Court for the District of Arizona (2005)

### D.     Materials Considered

10.    The opinions expressed in this report are based upon my 47 years of experience in studying and teaching food and drug law, working for and dealing with the FDA, and practicing in the field of food and drug law and regulation, and on my review of the materials listed in Appendix B.

## II.     Regulatory and Factual Background

### A.     The BLA Process for Approval of Biologics

11.    FDA has been delegated authority by the United States Congress to ensure the safety, purity, and potency of biological products by regulating all aspects of their approval for sale and subsequent commercialization.  Under the FD&C Act, 21 U.S.C. 301 *et seq.*, as well as section 351 of the PHS Act, 42 U.S.C. 262, FDA comprehensively regulates the review and approval of biological products for shipment and sale in interstate commerce, the content of product labeling for biological products, and the promotion and advertising of those products.  Section 123(f) of the Food and Drug Administration Modernization Act of 1997 requires FDA to minimize differences in the review and approval of biologics license applications (BLAs) and new drug applications (NDAs).

12.    Under the PHS Act, the FDA must ensure that each biological product is safe, pure, and potent for its intended use or uses before allowing that product to be shipped for sale in interstate commerce. 42 U.S.C. 262(a). The mechanism for obtaining FDA marketing approval of biological products is the biologics license application (BLA). The biological product's manufacturer is generally the submitter or "sponsor" of the BLA.

13.    Before a sponsor can submit a BLA, it must first develop evidence of the product's safety, purity, and potency by means of testing in animals (known as "nonclinical" or "preclinical" testing) and subsequent studies in humans (clinical testing). At this pre-BLA stage, the biological product's safety, purity, and potency have not yet been shown. In order for the appropriate testing to take place, the product must be shipped to researchers and administered to human subjects. FDA is authorized under the FD&C Act to grant an exemption to the general rule that unapproved new drug products, including biological products, may not be shipped in interstate commerce. This exemption is known as the investigational new drug (IND) exemption, which allows the shipment of unapproved biological products for the limited purpose of safety, purity, and potency testing. 21 U.S.C. 355(i); 21C.F.R. 312.2(a); *see generally* Peter Barton Hutt and Richard A. Merrill, *Food and Drug Law: Cases and Materials* 513-519 (Foundation Press 2d ed. 1991) (Hutt & Merrill).

14.    The IND application submitted to FDA must include the results of the preclinical tests, together with manufacturing information, analytical data, and other available information about the investigational biological product intended to

6

demonstrate its safety for testing in humans. The IND application also contains protocols describing one or more clinical studies that the sponsor intends to conduct.

15.    After submitting its IND application, the sponsor must wait 30 days before commencing the clinical trial in order to give the agency time to review the application. If FDA determines that the investigational biological product is not suitable for testing in human subjects, the agency institutes what is known as a "clinical hold." 21 U.S.C.355(i)(2); 21 C.F.R. 312.42. A clinical hold may block commencement of a clinical trial specified in the IND application or may terminate an ongoing study until such time as FDA may determine to lift the hold. FDA may issue a clinical hold at any time, before or after the expiration of the 30-day waiting period after submitting an IND application.

16.    Preclinical testing typically lasts two to three years, and clinical studies generally take five or six additional years, bringing the total preapproval research period to eight or nine years. These are generalities, however, and actual research time varies widely from product to product.

17.    When the sponsor concludes that it has assembled sufficient evidence of safety, purity, and potency to support an application for marketing approval, the BLA is assembled. The BLA must contain all information, both favorable and unfavorable, that the sponsor has obtained in the course of its investigations into its product. 21 C.F.R. 601.2. The BLA file, which generally consists of large amounts of summary material accompanied by dozens or even hundreds of volumes of raw data, is divided into sections that include the following:

- data derived from nonclinical and clinical studies demonstrating that the product meets the requirements for safety, purity, and potency.

- a full description of the manufacturing methods.

- data establishing product stability.

- samples of the product as proposed to be introduced for commercial marketing.

- summaries of results of tests performed on the lot(s) represented by the submitted sample(s).

- specimens of the proposed product labels, enclosures, and containers.

- a description of the statistical evaluation of clinical data.

21 C.F.R. 601.2.

18.    BLAs are reviewed by FDA's Center for Biologics Evaluation and Research (CBER).

19.    Once submitted to FDA, a BLA is subjected to rigorous review by a team of expert reviewers who determine the safety, purity, and potency of the product for its intended uses. The review team includes one or more clinical reviewers (also known as medical reviewers) who evaluate the clinical data to determine if the biological product is safe, pure, and potent. Clinical reviewers are trained to assess the biological product's likely therapeutic benefits against the risk of any adverse events.

20.    FDA reviewers work in close consultation with each other to evaluate the BLA package. In addition, FDA reviewers will consult with specialists from particular disciplines as necessary to facilitate their review. At any time during the review process, FDA reviewers may consult with the sponsor regarding any of the information included in the BLA.

21.    As part of the BLA review process, FDA also regularly calls upon advisory committees composed of outside experts to obtain further information on the

safety, purity, and potency of the biological product. When the advisory committee has completed its review, the committee makes a recommendation to FDA as to whether the product should be approved for its intended uses. These recommendations can be persuasive to FDA's review team, but are not binding on the agency.

22.    As FDA's review of the BLA progresses, each FDA reviewer develops a written analysis presenting conclusions and recommendations regarding approval of the biological product. One member of the team, generally a clinical reviewer, evaluates and summarizes the conclusions contained in the reports of the other reviewers.

23.    The summary recommendation of the review team is then passed along to the director of the applicable review division, who performs an additional review, often involving further input from individual reviewers.

24.    FDA then issues a letter containing a recommendation on the BLA. In rare cases, FDA issues a letter designated as an "approval letter," and the drug is considered approved as of the date of that letter. More often, the sponsor receives a letter designated as a "complete response letter," "approvable letter," "unapprovable letter," or "action letter," or a letter which has no designation (commonly called an "untitled letter"), setting forth specific requests for further data or information needed to obtain marketing approval. Since 2004, when FDA published a proposed regulation to standardize its response letters, FDA has made more frequent use of "complete response letters" for biological products, and less use of letters with another or no designation, but has not yet achieved consistency. FDA may also issue a letter designated as a "nonapproval" or similarly titled letter.

25.     The letters described above range in length depending upon the number of issues identified by the agency.  In many cases these letters re-raise issues that the agency has already raised in previous letters or during previous meetings or phone calls with the sponsor.  One therefore cannot always judge the significance of an FDA letter simply by its length.  These letters are confidential, and normally are not released to the public either by the sponsor or FDA.

26.     After FDA has completed its review and issued its letter to the sponsor, it is typical for the agency to meet with the sponsor (if the sponsor desires such a meeting) to determine the appropriate next steps in pursuing an NDA or BLA, even if FDA has denied the application outright.

27.     The timing for FDA's review of a an NDA or BLA is governed by performance goals established pursuant to the Prescription Drug User Fee Act (PDUFA), as amended.  Originally enacted by Congress in 1992, PDUFA contains a five year sunset provision and therefore must be reauthorized every five years.  PDUFA was reauthorized in 1997 (PDUFA II) and 2002 (PDUFA III), and is set to expire again in 2007 unless reauthorized.

28.     PDUFA requires that NDA and BLA sponsors pay "user fees" in conjunction with submission of an original NDA or BLA, submission of a supplement, registration of an establishment for manufacture of human drugs or biological products, and marketed products.  21 U.S.C. 379h.  The PDUFA fees are established annually through a notice in the Federal Register.

29.     In conjunction with the establishment of user fees under PDUFA, FDA has reached a "side letter" agreement to establish performance goals for specified

FDA processes such as review of an original application BLA, review of a supplement, or responses to requests for meetings with the agency. Performance goals also may change annually and are not binding on the agency, though it is understood that failure to adhere with the performance goals, at least in large part, could jeopardize PDUFA reauthorization.

      30.    FDA's current performance goals call for the agency to complete its review of an original standard (not priority) NDA or BLA within 10 months. Pursuant to the side letter establishing the performance goals, the 10-month review clock can be extended or reset upon the occurrence of specified events, such as submission by the sponsor of a major amendment - - as determined by FDA - - to an application.

     **B.**    **Hemopure®**

      31.    On July 31, 2002, Biopure Corporation (Biopure) submitted a BLA for its biological product, Hemopure, for FDA approval to use Hemopure in the treatment of acutely anemic patients undergoing orthopedic surgery (the Hemopure BLA). Among other required data and information, the Hemopure BLA contained a report on the pivotal clinical trial known as HEM-0115, testing the Hemopure biological product in acutely anemic patients undergoing orthopedic surgery. That clinical trial was conducted under an IND that had been assigned the FDA internal reference number IND 2935 (the Anemia IND).

      32.    During its review of a BLA, it is common for FDA to contact the BLA sponsor to ask for clarification of certain issues, to request additional information, or otherwise to discuss the review. On January 7, 2003, FDA placed such a call to Biopure. According to Biopure's notes of that conversation, the FDA official indicated

that FDA's review of the Biopure BLA had reached the halfway point and that so far the agency had not seen any "show stoppers."

33.    While the Hemopure BLA was under review at FDA, Biopure determined to conduct clinical testing on an additional indication for Hemopure with trauma subjects.  To this end, on or around March 7, 2003, Biopure submitted an IND application to FDA seeking permission to conduct a clinical study to evaluate the safety and tolerability of Hemopure in trauma subjects (the Trauma Study).  FDA assigned this IND the internal reference number IND 10962 (the Trauma IND).

34.    On April 9, 2003, FDA placed a phone call to Biopure, informing the company that FDA was placing the Trauma IND on clinical hold.  In a subsequent letter dated April 25, 2003, FDA stated that it was placing the IND on clinical hold, citing FDA's regulations at 21 C.F.R. 312.42(b)(1)(iv), "because subjects would be exposed to an unreasonable and significant risk of injury."  Specifically, the agency specified three concerns that had arisen from FDA's review of the BLA:

1.    That Hemopure may be associated with a high incidence of specified  life-threatening serious adverse events (SAEs) as compared with allogeneic blood.

2.    That Hemopure had caused an increase in patient hypertension as compared to patients receiving the control allogeneic blood.  FDA noted that this increased hypertension could be particularly problematic in a trauma patient population like the one proposed by the Trauma Study.

3.    That the independent, blinded Data Monitoring Board (otherwise known as the Safety Endpoint Evaluation Committee, or "SEEC") database also

indicated between-group differences in the incidence of SAEs that were

statistically significant, and favored the control allogeneic group.

FDA requested that Biopure respond to these concerns.

35.    Biopure sent its response to FDA by a letter dated May 12, 2003.

This letter made three main points.  With respect to Comment 1 from FDA's April 25

letter, Biopure stated that the differences in SAEs between Hemopure and control

allogeneic blood seen in the HEM-115 study were largely due to imbalances in age and

illness related factors between the two patient groups.  Specifically, there were more

patients above the age of 75 in the Hemopure arm than in the control arm, and more

patients with co-morbidities or other illnesses in the Hemopure arm.  With respect to

Comment 2 in FDA's April 25, 2003 letter, Biopure provided additional data to

demonstrate that Hemopure does not pose a particular risk to trauma patients due to

hypertension.  With respect to FDA's Comment 3 from the April 25, 2003 letter, Biopure

responded "that the SEEC AE/SAE database was not designed or chartered to be

consistent with Good Clinical Practice (GCP)" and that Biopure had intended "to derive

the secondary safety endpoints for the HEM-0115 study from the Investigator Database,

not the internal scoring of the SEEC."  Based on these responses, Biopure asked the

agency to lift its clinical hold on the Trauma IND.

36.    On May 27, 2003, Biopure contacted FDA by telephone.  During

this call Biopure and FDA discussed Biopure's May 12, 2003 letter as well as the

ongoing review of the Biopure BLA.  As reflected by Biopure's notes of the telephone

conference, FDA again made positive statements regarding the status of the BLA review

and the ultimate approvability of the Hemopure product, stating that the FDA reviewers

were taking additional time to complete their review because they "want to approve the product, but they want to do it in the right way."

37. FDA responded to Biopure's May 12, 2003 letter with two letters, each dated May 30, 2003. The first May 30 letter was addressed to the Trauma IND. This letter denied Biopure's request to lift the clinical hold. The agency requested additional explanation of what the agency felt were "contradictory statements" made by Biopure regarding the SEEC database. The second May 30 letter was addressed to the Hemopure BLA file. It indicated that the agency acknowledged that Biopure had sent the May 12, 2003 letter to the agency's BLA file and that the agency was continuing to consider Biopure's responses as they concerned the BLA.

38. By letter dated July 2, 2003, Biopure responded to FDA's May 30, 2003 letter, and again asked the agency to lift the clinical hold. Biopure's July 2 letter provided additional clarification regarding how the SEEC AE/SAE database was prepared and attempted to resolve the "contradictory statements" highlighted by the agency.

39. On July 30, 2003, FDA again sent two letters to Biopure. The first of these was addressed to Biopure's Trauma IND file (the July 30 Trauma IND Letter). It stated that FDA was denying Biopure's second request to lift the clinical hold on the Trauma IND. The agency stated that Biopure's responses to the agency's inquiries into the differences between the safety dataset based on investigator assessments and the safety dataset based on SEEC evaluation of safety information did not "fully clarify" the issues. FDA therefore requested additional documentation and data from Biopure.

14

40.    The second July 30, 2003 letter from FDA to Biopure was addressed to Biopure's BLA file and had no designation or title (the Untitled Letter). This letter indicated that FDA had completed its review of Biopure's BLA and determined that "the information and data submitted [with the BLA] are inadequate for final approval action at this time" based on deficiencies specified in the Untitled Letter. Approximately the first 14 pages of the Untitled Letter were copied virtually verbatim from the July 30 Trauma IND Letter, and therefore requested the same data and information from Biopure. The remainder of the Untitled Letter specified additional questions and requests for information particular to FDA's review of the BLA. The Untitled Letter did not require Biopure to conduct additional clinical testing.

41.    The Untitled Letter concluded by noting that FDA was suspending the PDUFA review clock pending Biopure's response to the Untitled Letter, and that the clock would not be reactivated until Biopure responded to all of the deficiencies noted in the Untitled Letter.

42.    On August 1, 2003, Biopure issued a press release (the Press Release). The Press Release stated that Biopure had received the Untitled Letter specifying that FDA had completed its review of the Hemopure BLA and had requested additional information. It also stated that FDA's letter did not request additional clinical trials and that the review clock had been suspended by FDA pending Biopure's responses to FDA's requests for information.

## III.    Expert Opinions

43.    In my professional opinion, based on my experience as FDA Chief Counsel for four years and over forty years of private practice in food and drug law, the Untitled Letter presented reasonable grounds for optimism by Biopure at the time

15

Biopure received it.  First, the Untitled Letter did not require Biopure to conduct clinical

trials.  This in itself was a significant positive development for the company and grounds

for optimism.  Just how optimistic Biopure should have been depends in large part on

Biopure's internal scientific and medical assessment of how quickly and how

successfully it felt, at the time, it could respond to the issues FDA raised in its letter.

Despite claims by the Government and its expert to the contrary, only the company's

scientific and medical experts are in a position to know the answer to this question.

A.     **It Was Not Unreasonable for Biopure to Respond to the Untitled
Letter With Optimism**

44.     As discussed above, after FDA has completed its review of a

sponsor's NDA or BLA, the agency sends the sponsor a letter.  There are, essentially,

four approaches that the agency can take at this point.

45.     First, the agency can deny the applicant's NDA or BLA outright.

FDA will take this approach if it determines that the clinical studies submitted with the

application do not establish the proposed product's safety, purity, and potency, and if it

determines that there are no additional studies that the sponsor could conduct that could

provide the necessary data.  FDA's outright denial of an NDA or BLA effectively ends

the application process unless the applicant persuades the agency that its determination is

incorrect or submits additional data and information.

46.     Second, the agency can request that the sponsor conduct additional

clinical studies, and frequently does so.  FDA will take this approach if it determines that

the clinical studies submitted with an application do not, by themselves, establish safety,

purity, and potency, but additional clinical data could fill the gaps and permit the sponsor

to meet its burden.  In this case the FDA letter could be entitled an approvable letter, an

unapprovable letter, an action letter, or a complete response letter, or the letter could have

no title at all, depending on the personal preference of the FDA reviewer. Whatever the

title of the letter, it would describe the type(s) of clinical study or studies that the agency

requires. Clinical studies are both costly and time-consuming, and many NDA or BLA

applicants do not have the resources to conduct additional studies upon FDA's request,

particularly if the agency asks for a large clinical study. As a result, these types of letters

can have an effect similar to an outright denial of the sponsor's NDA or BLA.

47.     Third, the agency can approve the NDA or BLA without comment

or request for additional data. This happens in a minority of cases. In my forty years of

experience in assisting applicants with FDA review and approval, I have seen an outright

approval of a BLA or an NDA on the first review "cycle" without requests for further

data or information only a relatively few times.

48.     Finally, the agency can request additional data or information to

clear up discrepancies or inconsistencies in the NDA or BLA file without asking for

additional clinical trials. In general, FDA takes this approach when it has determined that

the clinical data submitted with the application can establish the product's safety, purity,

and potency (in the case of a BLA) if the open issues are resolved to the agency's

satisfaction. These letters (which can also be in the form of an approvable, action,

unapprovable, complete response, or untitled letter) do not approve the application

outright because FDA has open questions that the sponsor must answer. FDA may

require additional nonclinical testing to resolve questions, for example, about

immunogenicity or impurities, or it may have significant questions about the accuracy

and integrity of the underlying clinical data. The point of this approach is, however, that

17

these kinds of letters provide a roadmap to final approval without further clinical testing. If the sponsor is able to answer FDA's questions to the agency's satisfaction, the application will be approved. As a result, these letters can be a very positive development for the sponsor.

49.     FDA refers its open questions to the sponsor because it understands that the sponsor, not FDA, is the best source of information and understanding about an investigational biological product. It is the sponsor, not the FDA, who has conducted preclinical and clinical trials on the product, and understands how the studies were run and how the data were generated. At the time of submission of an NDA or BLA, the sponsor's scientists and physicians typically have been working with the biological product for years, if not decades, whereas FDA's reviewers have had only a few months of exposure to the product and the data.

50.     As a result, FDA's review of an NDA or BLA is an iterative process that resembles a negotiation between the sponsor and the agency. It is typical for the agency to send letters to the sponsor that raise issues and concerns and ask for additional data or information in order to satisfy these concerns. Because FDA recognizes that it is not the sole, or even the best, source of expertise on the product at issue, these letters generally serve as an invitation to the sponsor to provide additional data or information to FDA in order to address and resolve the particular issues it has raised. When the sponsor reads such a letter from FDA, its reaction is directly related to how strong it feels its own case is about the issues FDA has raised.

51.     In my opinion, FDA's Untitled Letter was the fourth type of communication identified above. It did not deny or approve the BLA, nor did it request

additional clinical trials.  Thus, the letter signified that if Biopure could provide the

additional information requested by the agency and satisfactorily answer its questions, the

agency would likely approve the BLA.  A review of the basic features of the Untitled

Letter makes this clear.

   52. In my experience reading dozens of letters like the Untitled Letter,

the most important parts of a review letter from FDA are the opening and closing

paragraphs on the first and last pages, respectively.

   53. The second paragraph of the Untitled Letter states:

> The Center for Biologics Evaluation and Research (CBER)
> has completed the review of all submissions made relating
> to your Biologics License Application.  Our review finds
> that the information and data submitted are inadequate for
> final approval action at this time based on the deficiencies
> outlined below.

   54. First, FDA states that *final approval* is not possible *at this time* due

to the deficiencies outlined.  This language strongly suggests that the agency is working

toward a goal of approving the product and is open to continued dialogue and negotiation

with the sponsor regarding the issues raised.  This interpretation is consistent with the

positive statements made by FDA to Biopure during the course of the review of the BLA,

for example in the telephone conversations between Biopure and FDA of January 7, 2003

and May 27, 2003 (described above).  FDA is not obliged to make any such statements to

a drug sponsor and it is reasonable to evaluate written correspondence from FDA in the

context of such statements.  I have read literally dozens of letters, sent by FDA at the

same stage in the review process, in which the FDA simply states that the product cannot

be approved at any time because the agency has concluded that the drug is not safe or

effective, or both, or that approval will require one or more additional clinical trials.

FDA's Untitled Letter, however, expresses no such conclusions. Instead, it invites the sponsor to come in and discuss the issues with the agency in the hopes of resolution and, ultimately, product approval.

55.    The third to last paragraph, on the last page of the Untitled Letter reinforces this impression. That paragraph starts by saying that "You may request a meeting with CBER to discuss the above steps for approval." Based on my experience reviewing these types of letters over 40 years, this statement clearly signals FDA's intent to work with the sponsor to resolve the issues presented in the Untitled Letter in order to support eventual approval. This is in stark contrast to letters where FDA concludes that the product is unsafe or ineffective and cannot be approved, or requires additional clinical studies. Next, the last paragraph of the letter states that FDA is suspending its PDUFA review clock. There is no requirement for FDA to suspend the review clock. Alternatively, FDA could have stated that its Untitled Letter constituted the conclusion of its review and, therefore, the meeting of its performance goal. I read FDA's suspension of the review clock, therefore, as further invitation to the sponsor to enter into a negotiation with FDA regarding the issues presented in the Untitled Letter, and a desire by the agency to continue to pursue approval of the product.

56.    Finally, the opening and closing paragraphs of the Untitled Letter are remarkable for what they do not say -- namely that they do not require Biopure to conduct new clinical trials. I have read countless letters from FDA wherein the agency concludes that the studies contained in the application cannot support approval, and new clinical trials are needed. In review letters such as the Untitled Letter, such a requirement is usually stated at the outset, in the first two paragraphs of the letter.

57.    Requiring the sponsor to conduct new clinical trials is often tantamount to an outright rejection of the NDA or BLA. Smaller companies such as Biopure often simply do not have the financial resources to conduct new, costly clinical trials that can take years to complete. Thus, I regard the absence from the Untitled Letter of a request for additional clinical studies as a very encouraging sign.

58.    The only place in the letter where FDA referred to a clinical trial is on page 14 of the Untitled Letter. Specifically, the letter states that "Any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial [and] support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data . . . . Please comment." Similarly, the agency stated that "it is not possible to write adequate and safe dosing guidelines . . . . Please comment."

59.    Even here, however, the agency did not state that a new clinical trial would be required. Rather, FDA raised the question whether such trial should be conducted and specifically asked Biopure to comment. If FDA had already concluded that a new trial was required it would have said so on the first page of the letter and would not have posed the matter as a question. I have seen many instances where FDA has suggested that further clinical studies *may* be required, only to change its mind later after negotiations with the sponsor. In my opinion, therefore, there is a significant difference between the agency suggesting that a trial may be necessary and asking the sponsor to comment and the agency actually requiring a new clinical study.

60.    Rather than rejecting the BLA outright, or requiring additional clinical trials, FDA's Untitled Letter raises a list of issues and concerns and makes

requests for additional data and information. These issues primarily deal with the

integrity of the processes used to generate the adverse event databases from the HEM-

0115 pivotal clinical trial. As discussed above, FDA's Untitled Letter clearly invites

Biopure to submit this information and discuss these issues with the agency in the hopes

of resolving them.

61.     In light of this, were I Biopure's CEO at the time it received the

Untitled Letter, I would have regarded FDA's decision not to deny the Hemopure BLA

outright and not to require additional clinical trials as positive developments. My overall

assessment of the impact of the Untitled Letter, at the time Biopure received it, would

have depended entirely on how quickly and how successfully Biopure's scientists,

physicians, and regulatory affairs personnel felt they could address the issues that FDA

raised.

**B.     Biopure's Level of Optimism Should Have Depended on How Well
        and How Quickly it Felt it Could Respond to FDA**

62.     FDA frequently raises concerns regarding the conduct of clinical

trials, integrity of the data generated from those trials, or the meaning of that data. In and

of itself, this is not exceptional. It is well understood both by industry and FDA that no

clinical trial is perfect and the fact that FDA expresses concerns does not mean that the

data, ultimately, cannot support approval. As discussed above, FDA is not the sole, or

even the best, repository of information and expertise relating to a biological product or

its clinical trials. Thus, it is common for FDA to raise data integrity concerns only to

have those concerns laid to rest by the company through provision of data and/or

explanation of the meaning of those data, ultimately resulting in product approval. It is

also common for FDA to ask questions or request large amounts of additional data and

then later rescind some or all of those requests because the sponsor has convinced the agency that the additional information is not necessary or has already been provided.

63.    For example, I have been personally involved as outside food and drug legal counsel in many instances where the agency has raised seemingly serious concerns regarding data integrity and/or the interpretation of clinical trial results.  On several of these occasions, the sponsor has disagreed with FDA and has been able to convince the agency of its view through meetings, additional submissions, or otherwise, and ultimately secure approval.  It is therefore appropriate, indeed essential, for sponsors to view letters such as the Untitled Letter not as a definitive setback, but as an opportunity to engage FDA about the issues raised and negotiate with the agency to find the appropriate resolution.

64.    I have been involved in many situations where FDA requested a large amount of additional data and information because the agency misread or misinterpreted data that the sponsor had already provided.  In some of these cases, negotiation with the sponsor has convinced FDA of its mistake, and the agency withdrew (or significantly decreased) its burdensome request for information.

65.    In light of the above, Biopure's reaction to the Untitled Letter should have been directly related to how quickly and successfully Biopure's scientists, physicians, and regulatory affairs personnel felt at the time they could respond to the issues raised by the letter, either as posed or after negotiation with FDA as described above.

**C.      Only the Company Can Know How Well and How Fast it Could Respond To FDA's Requests In the Untitled Letter**

66.      Were I a business executive at Biopure, upon receipt of the Untitled Letter I would have relied upon my scientists, physicians, and regulatory affairs personnel to determine how well and how fast Biopure could respond, because these individuals at the company are the only people who could possibly have known, at that time, what was required to satisfy FDA's concerns.

67.      As stated above, the sponsor, not FDA, is the best source of information and understanding about an investigational new drug or biological product. It is the sponsor, not the FDA, who has conducted preclinical and clinical trials on the product, and understands how the studies were run and how the data were generated.  In particular, by the time a company submits an NDA or BLA, the sponsor's scientists and physicians have typically been working with the  product for many years, and the sponsor's regulatory affairs personnel have been intimately familiar with the underlying clinical studies since the planning stages.  Thus these individuals are the ones with the most in-depth understanding of the product and the most detailed knowledge of the clinical data and how it was collected.

68.      As a result, these individuals at Biopure were the most qualified, indeed the only ones qualified to assess how well and how fast Biopure could have responded to FDA's concerns, and the extent to which Biopure should have negotiated with FDA over the questions to be answered.  Anyone without such a detailed knowledge of the product and access to Biopure's data (both submitted to FDA in the BLA and other data not yet submitted to the FDA) could possibly know what responses were available to Biopure or how quickly Biopure could have submitted these responses to FDA.  Any

24

attempt by someone outside the company to draw conclusions about how well or how fast Biopure could have responded to FDA's concerns is mere speculation.

69.    For example, I have read the expert report of Dr. Edward L. Snyder, M.D., filed on behalf of the SEC in this case.[1] In several places in his report, Dr. Snyder states that responding to the data requests FDA made in its Untitled Letter would have required "Herculean" efforts or otherwise have taken an extended time period. Without access to Biopure's internal files or the underlying data from the Hemopure clinical studies, however, Dr. Snyder cannot possibly know this. He cannot know, for instance, whether Biopure had access to additional data or information that, once presented to the agency, would have satisfied the agency's concerns about the integrity of the clinical trial data submitted with the BLA. Similarly, he cannot know whether FDA's concerns were the result of a misinterpretation of already submitted data or information that, once corrected by Biopure through negotiations, would have allayed FDA's concerns.

70.    Even if no quick answers were available, neither Dr. Snyder nor anyone else outside the company can know how long it might have taken Biopure to respond to FDA's requests for additional data, or how convincing those responses would be. Dr. Snyder cannot know what resources Biopure had available to it to gather the requested information or indeed how much of that information had already been gathered and was prepared to be delivered to the agency.

71.    Dr. Snyder also asserts in his expert report that to satisfy FDA's concerns, Biopure would almost certainly have to have conducted additional clinical trials. This also is mere speculation. First, the assertion is flatly inconsistent with FDA's

---

[1] I am not a physician and do not have scientific training so I am in no position to take issue with Dr. Snyder's medical or scientific opinions.

failure to require additional clinical trials in its Untitled Letter. Second, because Dr.

Snyder did not have access to Biopure's internal data and information, he cannot know

whether the responses Biopure was prepared to give FDA would have put the agency's

concerns to rest without the need for further clinical study.

72.    It is important to realize that Biopure's CEO, Thomas Moore, was

also not in a position to judge, on his own, how quickly and how persuasively Biopure

could have responded to FDA's concerns. Over my 40 years of practice I have worked

with hundreds of large and small pharmaceutical and biotech companies, and served on

the Boards of Directors of about 20  such companies. In my experience, CEOs of such

companies do not possess the level of familiarity with or understanding of the underlying

product data or regulatory background necessary to make these kinds of judgments unless

they have advanced scientific or medical degrees. Indeed, most CEO's cannot obtain the

necessary detailed technical understanding even if they were so inclined due to the

competing demands inherent in their position.

73.    As a result, CEOs without advanced scientific or medical degrees

must rely on the advice and guidance given to them by the company's scientists,

physicians, and regulatory affairs officers. These individuals are specifically trained to

respond to inquiries such as the Untitled Letter and are in the best position to assess the

company's ability to respond and negotiate with FDA over the questions to be answered.

**D.    The August 1 Press Release Was Appropriate and Not Overly-Optimistic**

74.    My understanding is that, at the time that Biopure received the

Untitled Letter, Biopure's CEO sincerely believed that Biopure had a good answer, or

could promptly formulate a good answer, to all of the questions that FDA raised and,

subject to negotiations with FDA, could provide the data that FDA asked for quickly.

Based on that understanding, in my professional opinion based on four years as FDA

Chief Counsel and 40 years in private food and drug law practice, the August 1 Press

Release was appropriate and not overly optimistic.

       75.    First, FDA had completed its review without requiring additional

clinical trials. The importance of this cannot be overstated. FDA does not hesitate

explicitly to state that additional clinical trials are required when it believes that they are

in fact required for approval of an NDA or BLA. Clinical trials, particularly Phase III

pivotal clinical trials such as the HEM-0115 Study, are time consuming and extremely

expensive. Most companies such as Biopure, with no significant revenue generating

products, are simply not in a financial position to finance an additional pivotal study at

this stage in the development process. Planning a study protocol, receiving FDA

clearance for the protocol, enrolling patients, running the study, and analyzing the data in

a pivotal study typically takes at least two to three years. For FDA to complete its review

of the Biopure BLA and not require additional clinical study was a major positive for the

company.

       76.    Second, whether or not the Untitled Letter was properly

characterized as a "complete response letter," it clearly indicates that FDA had completed

its review of the BLA. As a result, the letter sets forth all of FDA's remaining questions

and concerns and lays out the steps that must be taken for the agency to approve the

BLA. As discussed above, I have been told that at the time that Biopure received the

Untitled Letter Biopure's CEO had a good faith belief that Biopure could quickly and

successfully satisfy, or negotiate over, all of FDA's concerns. As a result, it was reasonable for the CEO to view receipt of the Untitled Letter as a positive development.

77.     In light of this fact, I believe that the August 1 Press Release accurately reflected the regulatory status of the company as of that date and is not overly-optimistic.

78.     It is also my opinion that the August 1 Press Release presents a fair and accurate representation of the Untitled Letter. First, I understand that one of the issues in this case is the company's failure to disclose that the Untitled Letter was a "complete response letter." The regulatory purpose of a complete response letter is to signal to the sponsor that FDA has completed its review of the BLA, list any deficiencies in the application and, if final approval is feasible, to inform the sponsor of any actions necessary to place the application in condition for approval. 69 Fed. Reg. 43351 (July 20, 2004). Although the August 1 Press Release does not specifically define the letter as a complete response letter, it does indicate that FDA has completed its review, has not approved the BLA, and has requested additional information. Thus, for all practical purposes, the August 1 Press Release makes the regulatory equivalent of a disclosure of receipt of a complete response letter.

79.     In fact, had I been Biopure's food and drug counsel at the time it drafted the August 1 Press Release, I would have advised Biopure to address the "complete response" issue exactly as it did. The Untitled Letter does not contain any title, or otherwise identify itself as a "complete response letter." Instead, it states simply that FDA has completed its review of the BLA. Biopure repeated this language almost verbatim in the August 1 Press Release, stating that FDA "has completed its review of the

biologics license application (BLA) for Hemopure . . . ."  In my experience the best

practice when a company publicizes an FDA action is to repeat the language that FDA

used in its communication to the company without attempting to characterize what FDA

has done.  This is exactly the approach Biopure took in its August 1 Press Release.

80.    Second, the August 1 Press Release clearly discloses that FDA has

not approved the BLA and has requested additional information from the company.

Furthermore, the August 1 Press Release accurately describes these requests as seeking

clarification of the preclinical and clinical data.  In my judgment, this was the most

appropriate way to describe the Untitled Letter.  It covers the main points of the letter

(*i.e.*, no approval at this time, additional data and information requested to clarify existing

data, but no new clinical trials required) without engaging in subjective characterization

of FDA's requests or concerns.  Such further characterization could only leave Biopure

open to criticism by those that did not agree with the characterization, and I would have

advised against it.

81.    Third, with respect to the PDUFA review clock, the August 1 Press

Release states that "With 30 days remaining in the original BLA review cycle, the

issuance of the letter has suspended the FDA review clock until Biopure submits a

complete response."  This is almost verbatim from FDA's own Untitled Letter, which

states that "our review clock has been suspended with the issuance of this letter.  Note

also that any amendment should respond to all deficiencies listed and that a partial reply

will not be considered for review nor will the review clock be reactivated until all

deficiencies have been addressed."  It is difficult to imagine a less misleading approach

than to practically quote from FDA's own letter.

82.    Fourth, the August 1 Press Release states that Biopure is encouraged that FDA has finished its review and provided feedback before the PDUFA due date.  For the reasons stated in Parts III(A), (B), and (C), above, I believe it was reasonable for Biopure to have taken the Untitled Letter, as a whole, as a positive development.

83.    Finally, the August 1 Press Release states that "By maintaining thirty days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible . . . ."  This was not an unreasonable conclusion by the company.  In my opinion, based on 40 years of reading these types of letters from FDA, it was unusual for FDA to have "suspended" the PDUFA review clock and promised to reactivate it after receipt of Biopure's complete response.  Because FDA had completed its review of the BLA and issued a comprehensive response, FDA could have terminated the review clock permanently, and was not obligated to "suspend" it or reactivate it.  Thus, at least at the time that Biopure issued the August 1 Press Release, it was reasonable for the company to assume that FDA's actions were intended to speed the continuing review process along as quickly as possible.

### E.    Whether the Untitled Letter Was a "Complete Response Letter" Is Irrelevant

84.    The Government appears to attach great significance to the question of whether the Untitled Letter was a "complete response letter."  In my view, however, what label, if any, CBER attached to the Untitled Letter has little bearing on how Biopure should have interpreted it or reacted to it.

85.    The Government appears to take the position that a "complete response letter" constitutes FDA's final decision on a BLA.  As discussed above, that is

clearly not the case here. FDA's Untitled Letter clearly invites Biopure to enter into a dialogue with the agency about the concerns it expresses in the letter. Specifically, it requests additional information, invites Biopure to schedule a meeting with the agency to discuss the issues, and suspends the PDUFA review clock pending receipt of the requested information and data from Biopure.

86.    As a result, whether the Untitled Letter was officially an "approvable letter" an "unapprovable letter" a "complete response letter" or simply an "action" letter, is of no relevance. What is important is what the agency actually said in the letter, which in this case was that more information and discussion is required before the application can be approved.

87.    FDA has struggled over the years to establish a consistent approach to categorizing response letters to applications. Historically, FDA has responded to marketing applications either by approving the application outright, or through the issuance of "approvable" or "unapprovable" letters. The distinction between these latter two types of letters has always been unclear. In both cases, the letters set forth issues that needed to be clarified, data or information that needed to be provided, or further clinical trials that needed to be run before the application could be approved. Whether the letter was categorized as an "approvable" letter or an "unapprovable" letter depended on the arbitrary judgment of the particular reviewer at FDA in charge of the particular application.

88.    In practice, however, the distinction has been nearly meaningless. As discussed above, just because FDA raises issues that it thinks are serious does not mean that FDA is correct in its assessment. I have advised numerous clients who have

received "unapprovable" letters from FDA that were ultimately able to prevail upon the

agency that its position was wrong and that the data did indeed support approval.

Similarly, I have worked with clients that have received "approvable" letters that

contained seemingly minor requests from FDA but nonetheless required millions of

dollars and years of additional testing and research to fulfill before FDA granted final

approval.

       89.    In 2004, FDA attempted to clarify the confusion caused by the

"approvable/unapprovable" distinction.  In a proposed rule published in the Federal

Register, FDA proposed regulations that would abolish "approvable" and "unapprovable"

letters.  Instead, after completion of its review of any marketing application, FDA would

issue "complete response letters."  69 Fed. Reg. 43351 (July 20, 2004).  FDA proposed to

establish this regulation for all types of applications, including BLAs.[2]  To date, however,

FDA has failed to promulgate final regulations.  As a result, FDA continues to issue

"approvable," "unapprovable," "complete response," "action," and "untitled" letters,

subject to the discretion of the principal reviewers of the marketing application as well as

the Directors of the Divisions, Offices, and Centers.

       90.    For all of these reasons, whether the Untitled Letter was a complete

response letter or some other type of letter has little or no impact on the reaction the

company should have had to the letter.  As stated above, that reaction should have been

---

[2] The preamble to FDA's proposal indicated that CBER had been following the practice of issuing "complete response" letters since 2002 but nevertheless proposed to adopt a conforming regulation for biologics in order to resolve any confusion.  As with the regulations on the drug side, the CBER regulation has not been promulgated in final form, and the agency has not achieved consistency in this approach.

entirely dependent upon how quickly and successfully Biopure thought it could respond

to the issues FDA raised.

October 6, 2006

Peter Barton Hutt

# EXHIBIT B

**Edward L. Snyder, MD**
**Yale School of Medicine**
**Yale-New Haven Hospital**
**Blood Bank  CB-459**
**20 York Street**
**New Haven, CT 06510**

February 23, 2006

Ian D. Roffman
R. Daniel O'Connor
Ellen Bober Moynihan
Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, MA  02108

**Securities and Exchange Commission  v.**
**Biopure Corp., Thomas Moore, Howard Richman and Jane Kober**
**Civ. A. No. 05-11853-PBS**

Dear Attorneys Roffman, O'Connor and Moynihan:

I am writing to provide my opinion in the above named legal action. I herein will provide my opinions and provide necessary justification. I am a Professor of Laboratory Medicine at Yale University School of Medicine and Director of the Blood Bank/Apheresis/Cell Processing Service at Yale New-Haven Hospital. I have for the last 28 years been a practicing physician in the field of Transfusion Medicine and also a site Principal Investigator on a number of clinical trials many of which have been submitted to the FDA for licensure of various transfusion medicine products.  The opinions offered represent solely my own and in no way represent opinions or comments of my employer Yale University, of Yale-New Haven Hospital, or any of either of their subsidiaries.

I.     **INTRODUCTION**

A.     I have formed my opinions based on:

- My review of selected materials, focusing on communications between the FDA and Biopure, which are categorized and appended as Attachment 1

- On my past 28 years of experience in my capacity as Director of a Blood Bank/Transfusion Service at an academic medical center

- On my experience as a Principal Investigator on a number of clinical trials

- On my other relevant professional experience as more fully described in my attached CV (Attachment II)

B. I have agreed to receive compensation for my time and services at the rate of $200 per hour. This is per hour for expert consultation, deposition and/or testimony.

C. I have retained a colleague to assist in my review. Her rate is $100/hour

D. In the preceding four years, I have been deposed once. The case currently pending is:

**Beglin v. University Medical Center in Louisville Kentucky in the Jefferson Circuit court**

II. **OPINIONS:**

**It is my overarching opinion, based on my experience and my review of the communications between the FDA and Biopure, including the FDA letters of July 30, 2003, that the FDA in its review of the BLA and Trauma IND was raising fundamental questions about the following:**

- **Design and conduct of the supporting trials**
- **Integrity of data**
- **Safety of the product**
- **Efficacy of the product**

**Responding completely and satisfactorily as required and requested by the FDA, to the two letters of July 30, 2003, would require in my opinion, that Biopure undertake extensive and even Herculean efforts, including the performance of new pre-clinical trials. Further, after successful and satisfactory response to the data issues raised in the letters of July 30, 2003, Biopure would likely have had to conduct new clinical trials. The concerns delineated in the above mentioned two letters show, in my opinion, the low impression the FDA held of the quality and integrity of the Biopure HBOC-201 pivotal clinical trial starting with safety and quality issues related to the extraction of starting material, i.e., bovine hemoglobin from the animals in the abbatoirs, to the labeling copy of the final product and almost every manufacturing step in between. It is obvious, in my opinion, from reading each of the FDA espoused concerns, that the FDA did not have confidence that Biopure had conducted the pivotal HBOC-201 clinical trial in a fashion consistent with a requisite level of investigational quality, and that the FDA had serious concerns regarding the clinical trial data integrity, quality, validity and veracity. FDA was also, in my opinion deeply concerned about product safety and whether the subjects in the HBOC-201 pivotal trial were enrolled and treated appropriately. FDA, in my opinion was also concerned, based on their comments in the two letters of July 30, 2003, as to whether infusion of the Hemopure product at the clinical sites was performed in a safe manner, following required subject inclusion and exclusion criteria, performed by well trained investigators, supported by quality and timely laboratory and ancillary clinical testing (e.g., plasma hemoglobins and ECGs, etc) that would ensure the subject in**

3

the trial was being monitored in the safest possible manner. Concerns regarding the efficacy of the HBC-201 compound are also raised. These concerns are in part attributable, as I read the FDA's July 30, 2003 comments, to the Agency's inability to judge product efficacy due to FDA's existing concerns regarding the validity and quality of the data Biopure submitted in support of the BLA.

In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency.

I do not believe, that one could read these two FDA opinions contained in the letters of July 30, 2003 and abstract a belief that the FDA was enthusiastic about the BLA submission, or viewed the BLA and IND submissions as acceptable and approvable, in any way.

A. An <u>overall timeline</u> for key events could be generally summarized as follows:

### TIMELINE

1. On or about **July 31, 2002** Biopure submitted a BLA to the FDA in support of the licensure of Hemopure, a blood substitute intended for use in human patients who were acutely anemic and undergoing elective orthopedic surgery.

2. During the **September 2002** timeframe, the FDA conveyed several times to Biopure, the Agency's concerns regarding the integrity of the data submitted in support of the HBOC-201 BLA, including, but not limited to, the concept of "soft-locking" and subsequent re-opening of the database.

3. On or about **March 7, 2003** Biopure, based on the pending BLA, applied for an IND approval for a clinical trial involving use of Hemopure in trauma victims.

4. On or about April **9, 2003** Dr. Landow of the FDA telephoned Howard Richman at Biopure to notify them that the FDA was placing Biopure IND 10962 (A multi-center study to evaluate the safety and tolerability of hemoglobin-based oxygen carrier –201 [HBOC-201] in trauma subjects) on Clinical Hold based on safety concerns determined during the FDA's ongoing review of the Biopure BLA submission. The Clinical Hold was placed due to the FDA's belief that subjects would be exposed to unreasonable and significant risk of injury [CFR 312.42(b)(1)(iv)].

5. On or about **April 25, 2003** the FDA sent a follow-up letter related to their placing the IND on Clinical Hold as discussed in the call of **April 9, 2003**.

6. On or about **May 12, 2003**, Biopure sent a letter to the FDA regarding the clinical hold on the Biopure IND. This was sent as a "Clinical Hold Complete Response" letter in response to the FDA's April 25, 2003 letter. Biopure also sent a second

4

letter stating that Biopure's response to the clinical hold was also being submitted in connection with (as an amendment to) Biopure's BLA.

7. On or about **May 30, 2003**, the FDA sent Biopure two letters. The first stated that the FDA would not lift the clinical hold on the Biopure IND regarding the use of Hemopure in a human Trauma Trial. The FDA also required that Biopure conduct a series of three pre-clinical (animal) studies in conscious swine. The second letter was a letter stating that the FDA deadline for the review of the Biopure BLA was being extended 90 days until **August 29, 2003**. This was being done inasmuch as the FDA viewed the new data analyses provided in the letter and new information regarding the SEEC (Data and Safety Monitoring) committee contained in the Biopure letter of **May 12, 2003** as constituting a major amendment and extended the deadline for a final decision on the Biopure BLA, by 90 days as noted above until August 29, 2003.

8. On or about **July 2, 2003** Biopure again contacted the FDA for a 2nd time, to request that the FDA lift the clinical hold on the Biopure IND regarding the use of Hemopure in a human Trauma Trial. The letter was in the form of a "Clinical Hold Complete Response" letter in response to the FDA's May 30, 2003 letter.

9. On or about **July 30, 2003**, the FDA sent Biopure a Complete Response Letter (FDA reference STN: 125066/0) which was a 34 page document outlining myriad concerns that the FDA had raised during their review of the Biopure BLA. The FDA stated that the letter was in regard the BLA for Hemoglobin Glutamer-250 (Bovine) also known as HBOC-201 submitted under section 351 of the PHSA. It stated that the FDA had completed its review of all submissions made relating to the BLA. Their review found that the information and data submitted were inadequate for final approval action at that time based on the deficiencies the FDA outlined in the disapproval letter. The letter suggested that Biopure could choose to discuss the matter in person or via telephone and referred Howard Richman to Franklin T. Stephenson in the Division of Blood Applications. Biopure was given four options in the letter:

    i.  amend the application
    ii.  notify FDA of intent to file an amendment or a new submission
    iii.  withdraw the application
    iv.  request an opportunity for a hearing regarding denying approval

In the absence of the above, CBER it stated, may initiate action to deny the application. Biopure was told that any amendment should respond to all deficiencies listed and that a partial reply would not be considered for review.

10. On or about July 30, 2003 the FDA sent a second letter to Biopure informing Biopure that the Trauma IND 10962 would remain on clinical hold because the FDA felt that human subject enrollees would be exposed to an unreasonable and significant risk of illness or injury.

**B. Opinion re: April 25, 2003 FDA letter related to their placing the Biopure IND 10962 on Clinical Hold as discussed in the call of April 9, 2003.**

**In my opinion, this letter shows that the FDA was deeply concerned about the safety of the HBOC-201 product, to such a degree that they were unwilling to permit the use of the product in humans. Further, it is my opinion that the SAEs alluded to in the FDA's statements were exactly those that were likely to encountered and to be of greatest concern since it is known that plasma free-hemoglobins, such as was HBOC-201, bind to nitric oxide (NO) and thus might predispose recipients to hypertension, cardiovascular and other life-threatening complications.**

This letter contained three major points and many subpoints.

- The first point stated that based on the review of the BLA and the pivotal trial HEM-0115 (n=693), the FDA concluded that compared to allogeneic blood the there was a higher incidence of life threatening SAEs. This was seen and statistics provided for the following SAEs:

    o Death
    o Cardiac arrest
    o Acute renal failure requiring dialysis
    o Congestive heat failure/pulmonary edema
    o Atrial fibrillation/flutter
    o Cerebrovascular accidents/TIA/RIND

- The second point was that systemic hypertension which can lead to increased blood loss as well as many of the SAEs listed in the bullet directly above, was observed much more frequently in HBOC-201 subjects than control (63 vs 21; p<0.0001). Since the IND 10962 was to be used in an in-hospital setting, enrolled subjects would be exposed to an unreasonable risk of injury.

- The third point was supported by the Biopure DMB (SEEC), and found that SAEs were statistically significantly greater in the HBOC-201 group vs. control. These SAEs were related to:

    o permanent disability
    o death or permanent disability
    o An increase in incidence of moderate to severe SAEs
    o SAEs related to CTM

Biopure was told that they "May not initiate clinical trials under the IND" -- until the deficiencies noted were satisfactorily address and accepted by the FDA.

C. **May 30, 2003 Letter: In my opinion, this letter demonstrates the FDA's continued significant concerns over the safety of the HBOC-201 product. The letter clearly states that the IND will remain on clinical hold due to safety concerns raised during communications between the FDA and Biopure in April, 2003. The FDA also stated that Biopure was required to resolve contradictory statements between the investigator database and the SEEC AE/SAE databases regarding safety endpoints for the HEM-0115 study. In addition, the FDA expressed concerns regarding the review of all**

6

AE's and SAE's by the SEEC.  Further, the FDA communicated concerns regarding the validity of Biopure's post hoc analysis in the HEM-0115 data. Lastly, the FDA stated that three additional studies in conscious swine would be required to address tissue perfusion and oxygenation issues regarding infusion of HBOC-201.  In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency.   A strong linkage exists between the BLA and the IND Clinical Hold Letter that derives from the fact that the data submitted for the IND was cross-referenced to the BLA.  Moreover, the nature of the concerns that led to the clinical hold clearly give rise to concerns regarding the approvability of the BLA.

D.  Opinion re: Letter dated on July 30, 2003 from FDA to Biopure regarding the FDA's responses to the BLA.  The FDA was raising fundamental questions about the following:

- **Design and conduct of the trials**
- **Integrity of data**
- **Safety of the product**
- **Efficacy of the product**

It is my opinion that to respond fully to the concerns raised in the letter of July 30, 2003 would take an extremely long period of time since the concerns were of such a fundamental nature so as to make a rapid response to the questions and a subsequent quick review by the FDA improbable. Having been a PI on many clinical trials, I was immediately struck upon reading this letter by the intensity, depth and breadth of the deficiencies and queries made in the letter from the FDA to Biopure, and the implications that this would have for the approvability of the BLA.   The issues raised were not a cause for optimism. Indeed, they should have been considered substantially negative comments and a major cause of concern. These comments do not imply, again, in my opinion, a message that the FDA is willing to work with Biopure to get the product approved and indicated that Biopure faced major hurdles in trying to obtain approval for the BLA.

1.  Bioresearch Monitoring Inspections: In my opinion, the FDA asked a series of fundamental questions that called into question the integrity of the data collected.  There were four major questions asked of Biopure with eleven subparts in total. These questions address deficiencies that should have not been an issue for the BLA submission; in my opinion, deficiencies of this nature should never have occurred.  The specific obligations and responsibilities of the CRO and the internal monitors are to ensure that the data submitted by Biopure would be valid and verifiable. Clinical trials rely on the integrity of the data submitted in support of a licensure application. Biopure had, as per the FDA letter, failed to satisfy the FDA in this regard. Given the number of sites and

patients, addressing and responding to the critique in the needed detail would have required a substantial amount of time and effort.

FDA questions to Biopure included concerns regarding documentation of:

    a.  time of monitoring inspections
    b.  obligations and responsibilities of the CRO
    c.  completion of procedures for making changes to the CRFs
    d.  handling of data clarification requests
    e.  reporting of SAEs and AEs
    f.  training of CRO or Biopure monitors as per Biopure's SOPs
    g.  knowledge of and proficiency in implementing Biopure's SOPs by external contract monitors
    h.  consistency of monitoring activities among the various monitors from Biopure, external CROs and private consultants
    i.  how the various monitors reported their results – separately, or integrated
    j.  why 8 of 10 pre-study monitoring reports covering six sites were not finalized and reviewed as per Biopure's SOPs
    k.  why 5 of 8 initiation monitoring reports covering six sites were not finalized
    l.  why there were still problems at the November 2002 FDA inspection of Bipure regarding timely submission of monitoring reports.
    m.  Why Biopure failed to take corrective action in regards to submission of monitoring reports as noted by the FDA in November 1999.

## 2. Clinical Investigator Issues:

**In my opinion, the issues raised in this section call the integrity of the entire clinical trial into question, not only because of their nature but also because of the presence of a pattern of inadequate data reporting. In my opinion, of serious concern is a statement by the FDA that they noted a "pattern of protocol violations" that continued unabated despite repeated monitoring visits that disclosed these on-going problems. For example, the FDA noted that pre-transfusion hematology and chemistry assessment were not drawn, or not consistently drawn, such that they question whether Biopure had the necessary data to draw conclusions about patient outcomes. In essence, the FDA impugned the integrity of the clinical study at all 14 sites that were inspected and potentially at the other 32 sites that were not, and questioned how Biopure could ensure that it met safety and efficacy endpoints.**

Specific concerns cited by the FDA related to:

a.  Failure to report many SAEs and AEs.
b.  Ineligible subjects enrolled including those with known excludable medical risks
c.  Lack of proper consent of all subjects
d.  Key protocol assessments not performed including key laboratory assays such as plasma hemoglobin, ECGs and physical examinations

e.  Lack of information regarding training of all investigators at the clinical sites before enrolling subjects or before using the investigational product.

f.  Missing source documents, incomplete CRFs, discrepancies with test product records among the CRFs, hospital records, and drug accountability records. This calls the integrity of the entire study into question.

g.  Biopure's failure to initiate corrective action such as suspending enrollment at sites where deficiencies were noted.

3.  **Study Conduct: This section again calls into question the integrity of the data used to support the BLA, and in particular, focuses on the presentation to and review of data by the SEEC. The FDA questioned whether the data was improperly changed during the review process. FDA asked Biopure, based on my reading of the July 30, 2003 letter, to document and show FDA that the sanctity, validity and veracity of the HBOC-201 pivotal clinical trial data used to support the BLA was maintained during and after the trials were completed and that the data was not tainted. The FDA noted that statements that Biopure made in several communications with the FDA regarding data handling "suggest that the data recorded may at best be incomplete and at worst not constitute an adequate basis upon which to make a determination of safety or efficacy."**

The FDA raised a series of issues including:

a.  Concerns that the term "softlocking" of the database had no official regulatory meaning and appeared to denote a number of different data management actions, including Biopure's potentially inappropriate involvement in data management activities.

b.  Whether the data review completed by the SEEC as related to their identification and characterization of adverse events was properly used to determine whether safety endpoints were met.

c.  Concerns over the handling of source documents and blinding for patient identifiers.

4.  **Clinical Trials: Queries related to HEM -115 (Efficacy): This section contains numerous concerns related to whether the quality of the conduct of the clinical trials was sufficient to allow for the evaluation of the efficacy of the product. As an example, the FDA asked Biopure to address the question of why the transfusion avoidance for Hem-0115 was driven by avoidance of allogeneic transfusion in the subjects who received the least amount (60-90g) of HBOC-21, while a larger number of those subjects who received higher doses of HBOC-201 received a larger number of allogeneic transfusions. This would seem counterintuitive to me. In my opinion, the FDA's concerns here were not only related to the efficacy of HBOC-201, but also to whether the clinical trial data were accurate, and verifiable. I base this conclusion on the FDA's stated concerns vis-a–vis study integrity as outlined in the section on Study Conduct. Also, the FDA states that given the**

information from the clinical trials, it is not possible to write adequate and safe dosing guidelines and notes that resolution of this issue will likely involve an adequately sized and powered phase 3 trial. After reading these statements, and based on my experience, it is my opinion that addressing these concerns would require that extensive new clinical data be provided. This requirement would, again in my opinion, likely take years to complete.

The importance of this section relates to the conduct of the clinical trial. Deficiencies noted include:

a.    The CRFs contain numerous discrepancies, cross outs, missing data, and deletions. The accuracy and integrity of the data are seriously in question. Reconciling these data represent a major task in light of the number of patients enrolled.

b.    Similar concerns are raised as to missing or incomplete data regarding the pre and post HBOC-201 infusion, total hemoglobin levels. This query is key since Hemopure is a free hemoglobin material and its level post-infusion is a major clinical outcome.

c.    Dosing recommendations provided by Biopure in their Table 1 of the proposed package insert are not supported by clinical data from Hem –0114 or Hem-0115. The FDA states that Biopure would need to perform new Phase II and/or Phase III clinical trials to provide evidence of product efficacy (the FDA again informed Biopure that it would need to conduct additional Phase II and Phase III clinical trials to address dosing issues in its discussion of pharmacokinetics later in the BLA letter). The FDA stated that adequate and safe dosing guidelines cannot be derived from the submitted clinical trial data.

5.    **Clinical Trials: Queries related to HEM-115 (Safety): The FDA's comments in the letter of July 30, 2003, state that the Agency is concerned as to why the reports of SAEs between the SEEC and the FDA databases are different. In my opinion, this represents a substantial issue for Biopure to address.  The FDA punctuates this concern, by requesting that Biopure provide the Agency with copies of all source documents supplied to the SEEC relating to AEs and SAEs.  A response to this request, again in my opinion, would require a massive clerical effort.  It is also my opinion that it is an important point to note that even if Biopure successfully completed this undertaking, the FDA stated that it still reserved the right to re-evaluate the safety data.**

Deficiencies noted include:

a.   CRF AE pages contain numerous discrepancies, cross outs, missing data, markings entitled "re-monitored", and deletions. The accuracy and integrity of the data are seriously in question. Reconciling these data represent a major task considering the number of patients enrolled.

b. The incidence of acute MI is different between the SEEC and the FDA databases, the latter based on the CRFs submitted.

c. There are missing cardiac and renal laboratory data and discrepancies between the handwritten and data printouts for some patient data.

d. There are requests to evaluate the cross-reactivity of antibodies to bovine hemoglobin to human hemoglobin, and to provide analyses of drug-drug interactions between HBOC-201 with antihypertensives, vasodilators, diuretics, cardiac glycosides, etc.

6. **Hem-0114/Other Clinical Studies: In my opinion the FDA's comments, questions and requests for data as it relates to Other Clinical Studies (besides Hem-0115) shows that the FDA had similar concerns with respect to data integrity, efficacy and safety findings. Moreover as with requests relevant to Hem-0115, gathering the responsive materials would require a substantial undertaking.**

Sample queries for this section include:

a. Requests for myriad amounts of missing data and explanations for their absence.

b. Requests for anesthesia records on all surgical patients in all phase 2 studies.

c. Requests for all pertinent CRFs and copies of all source documents to substantiate reported AEs.

d. Requests for training records.

e. Requests for all CRFs and source documents for all phase 2 studies.

f. Requests for anesthesia records for all surgical patients in all phase 2 studies.

g. Requests for final study reports for all phase 2 studies.

7. **Statistics: In my opinion the essence of the FDA's statistical questions goes to the basic issue of whether HBOC-201 is safe. I believe the Agency is questioning the safety of HBOC-201 by pointing out that the SAEs in the HBOC-201 group were higher than those in the RBC group and then asking Biopure to justify the benefit of use of HBOC-201 if the group that received the compound sustained higher morbidity and mortality than was seen in the control (allogeneic RBC) group as per the HBOC-201 BLA data submission.**

8. **Clinical Laboratory Measurements: As in other sections, the FDA has once again raised multiple concerns related to the integrity, validity and veracity of the data submitted relative to the HBOC-201 BLA. To**

supply clear documentation for each clinical laboratory result from each site about what laboratory results have been submitted to the BLA is a monumental task that could involve documentation of hundreds of thousands of individual laboratory data points.

The FDA raised:

a. Concerns that the reference labs in Europe, South Africa and the US used different reference ranges and the FDA needed to have the results from these central laboratories reconciled since results from all three sites were combined for HEM-0115—again, integrity of the data is being called into question.

b. Concerns over data deletions and accordingly, requested explanations for the deleted data.

c. Concerns over lack of instrumentation training records and instrument validation records and requests for documentation.

d. Concerns over how some analytes can be measured due to varying degrees of interference of HBOC-201 with analyte measurements.

9.  **Pharmacology/Toxicity:  In the May 30, 2003 letter from FDA to Biopure reaffirming the Clinical Hold status of the Trauma IND, the FDA raised concerns regarding the risk of vasoconstriction and resultant tissue hypoperfusion following administration of HBOC-201 as revealed in Biopure's BLA data.  At that time, the FDA requested at least three additional studies in conscious swine to address issues of tissue perfusion, oxygenation and volume hemo-dynamics. In the July 30, 2003 BLA Complete Response Letter, the Agency again requests that Biopure provide evidence from a conscious large animal model that vasoconstriction will not adversely influence tissue oxygenation following infusion of clinically relevant volumes of HBOC-201. Additionally, serious issues raised by the FDA, with regard to patients with hepatic and renal impairment as well as issues related to the pharmacokinetics of repeated dosing of HBOC-201, in my opinion, will likely require additional new pre-clinical and/or clinical trials.**

FDA has again requested information and data:

a.  Numerous toxicological questions were raised.

b.  There were requests for preclinical data from large animal studies.

c.   FDA cited myriad incomplete pharmacokinetic analysis reports.

d.  Labeling issues were cited re: teratogenicity studies and label copy for pregnant women.

10. <u>Herd Management Program</u>: In my opinion these questions relate to the very cleanliness and purity of the starting product for manufacture, which shows that in addition to questions as to the clinical trials that the FDA was concerned with the production of the product.

FDA cited issues regarding the need for:

a. verification that animal husbandry practices were acceptable

b. assessment of fallen stock management that assured exclusion of sick animals from the manufacturing process

c. details on blood collection and prevention of contamination of the blood product from brain matter following the captive bolt process.

d. responses to the nine listed queries from the FDA regarding process validation.

11. <u>Product characterization/Stability</u>:  The FDA asked a series of questions regarding Biopure's understanding of the HBOC-201 product's quality and stability. These issues speak to the idea that the FDA is not yet satisfied with the HBOC-201 product characterization. Additional laboratory analyses will likely be needed including studies of degree of autoxidation, and analyses of the contributions of the various molecular weight species that comprise the HBOC-201 to overall oxygen affinity.

12. <u>Package Inserts</u>: In my opinion, the FDA's view of the BLA is that the data Biopure has submitted is so deficient that the Agency would not even begin to evaluate the label copy.  These include claims for HBOC-201 relating to mechanism(s) of action, dosing, pharmacology, safety, efficacy and indications for use among many other issues.

13. <u>Preapproval Inspection</u>:  FDA pointed out that inspection issues from February 3-7, 2003 and March 17-27, 2003 were not resolved.

E.    <u>FDA Response to Biopure BB-IND 10962 (7/30/03)</u>

In this letter, also dated July 30, 2003, the FDA explicitly notified Biopure that the Agency was maintaining the Clinical Hold on the Trauma IND 10962 for safety reasons. In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency.   A strong linkage exists between the Complete Response Letter and the IND Clinical Hold Letter that derives from the fact that the data submitted for the IND was cross-referenced to the BLA.

13

Moreover, the nature of the data integrity and safety issues that led to the clinical hold clearly gave rise to concerns regarding the approveability of the BLA. Indeed, the IND Clinical Hold Letter sets forth many of the same deficiencies and concerns as the Complete Response Letter and led the FDA to maintain the IND Clinical Hold.

Respectfully,

*Edward L. Snyder, MD*    2/23/06

Edward L. Snyder, MD

# EXHIBIT C



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BOSTON DISTRICT OFFICE
33 ARCH STREET
23ʳᵈ FLOOR
BOSTON, MA 02110-1424
PHONE: 617-573-8900
FACSIMILE: 617-573-4590

IAN D. ROFFMAN
PHONE: 617-573-8987
EMAIL: ROFFMANI@SEC.GOV

October 10, 2006

**Via Facsimile and U.S. Mail**

Jason A. Levine
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC 20005-3096

Re:    <u>SEC v. Biopure, Civ. A. No. 05-11853-PBS (D. Mass.)</u>

Dear Jason:

    Enclosed is a subpoena to Peter Barton Hutt reflecting our agreed schedule. Thank you for agreeing to accept service. Please let me know if you have any questions.

Very truly yours,

Ian D. Roffman

Enclosure
cc: Cathy Fleming

## Issued by the
# UNITED STATES DISTRICT COURT

### DISTRICT OF _____ Massachusetts _____

Securities and Exchange Commission,

                              Plaintiff,         **SUBPOENA IN A CIVIL CASE**

            v.

                                                 CASE NUMBER: 05-CA-11853-PBS[1]
Biopure Corporation, et al                       District of Massachusetts

                              Defendants.

                              TO:     Peter Barton Hutt

YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

[X]    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| U.S. Securities and Exchange Commission<br>100 F Street, NE<br>Washington, DC 20549 | October 20, 2006 at 9:30 am |

[X]    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| U.S. Securities and Exchange Commission<br>33 Arch Street, 23rd Floor<br>Boston, MA 02110 | October 13, 2006 at 9:30 am |

[ ]   YOU ARE COMMANDED to permit inspection of the following premises at the date, and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Ian D. Roffman<br>Attorney for Plaintiff | October 10, 2006 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | Securities and Exchange Commission, 33 Arch Street |
|---|---|
| Boston, MA  02110    617-573-8987 |  |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| served | | |

| SERVED ION (PRINT NAME) | | MANNER OF SERVICE |
|---|---|---|
| | | |

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is no limited to, lost earnings and a reasonable attorney's fee.

(2) (A)  A person commanded to produce and permit inspection and copying of designated books  papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i)  fails to allow reasonable time for compliance;
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that , subject to the provisions of clause
(c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden
(B)  If a subpoena
(I)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**ATTACHMENT A**
**Subpoena to Peter Barton Hutt**
**October 10, 2006**

## DOCUMENTS REQUIRED TO BE PRODUCED

Please produce the following documents:

1.      For the period prior to August 1, 2006, all documents concerning communications between you and any Defendant or attorney thereof.  (Please note the definition of "Defendant" includes all current and previous defendants in this action).

2.      All documents that you considered in forming your opinions in this matter whether or not referred to or relied upon in your Report, including, but not limited to, all documents listed on Appendix B of your Report and all notes written about or on the documents listed on Appendix B of your Report.

3.      All FDA letters you have reviewed, at any time, that form a basis for any of your opinions regarding the July 30, 2003 BLA Letter or with which you have compared the July 30, 2003 BLA Letter, including, but not limited to, all "complete response letters," "approvable letters," "unapprovable letters," "nonapproval letters" and "action letters" you have reviewed at any time (as you use those terms in your Report) and all letters referenced in your descriptions of "dozens of letters," "literally dozens of letters," "these types of letters," "countless letters," "many instances," "numerous clients who have received 'unapprovable' letters," and "clients that have received 'approvable' letters" in paragraphs 52, 54, 55, 56, 59, and 88, respectively, of your Report.

4.      All documents on which you base your opinion that the language of the July 30, 2003 BLA Letter was "unusual," as stated in paragraph 83 of your Report.

5.      Documents sufficient to identify any other person who assisted you in connection with any of the analyses described in your Report.

6.      All drafts of your Report created prior to August 1, 2006.

7.      All documents provided to you by the Defendants or any others in connection with your work in this matter, including, but not limited to, any documents provided for purposes of your Report whether or not referred to or relied upon therein and any documents provided for purposes of preparing for meetings with the staff of the Securities and Exchange Commission.

8.      All documents concerning meetings between you and the staff of the U.S. Securities and Exchange Commission concerning Defendants, including, but not limited to, all notes made or reviewed by you before, during or after such meetings, all prepared remarks, all documents reviewed, and all communications with any Defendant or counsel for any Defendant in connection with such meetings.

9.    All written reports prepared pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), or other documents or materials prepared to fulfil a similar function, that have been produced in the course of a dispute wherein you have testified as an expert at trial or by deposition within the preceding four years.

## DEFINITIONS AND INSTRUCTIONS

The Uniform Definitions set forth in Local Rule 26.5(c) of the District of Massachusetts are hereby adopted.  In addition:

A.    "Report" means the report entitled, Expert Report of Peter Barton Hutt, disclosed in this matter on October 6, 2006.

B.    "You" means Peter Barton Hutt and anyone working with you or at your direction in connection with your Report.

C.    "Defendant" means Thomas Moore, Jane Kober, Howard Richman and Biopure Corporation, separately and collectively, and any representative, employee, attorney or agent thereof.

D.    The "July 30, 2003 BLA Letter" means the letter you refer to in your Report as the Untitled Letter.

E.    The singular includes the plural and visa versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" means "any and all"; the word "any" means "any and all"; the word "including" means "including without limitation."

F.    "Concerning" means referring to, describing, evidencing, or constituting.

# EXHIBIT D

# McDermott
# Will&Emery

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Jason A. Levine
Partner
jlevine@mwe.com
202.756.8021

October 13, 2006

**BY HAND DELIVERY**



Ian D. Roffman, Esq.
U.S. Securities and Exchange Commission
Boston District Office
33 Arch Street
Boston, MA  02110

Re:    *SEC v. Biopure,* Civ. A. No. 05-11853-PBS (D. Mass.)

Dear Ian:

Pursuant to Federal Rules of Civil Procedure 26 and 45, Peter Barton Hutt, Esq. hereby responds
to the Securities and Exchange Commission's ("SEC") subpoena duces tecum dated October 10,
2006 via this letter and the enclosed documents.

## General Objections

1.      Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they purport to impose obligations beyond the requirements of the Federal Rules of Civil
Procedure and the Local Rules of the United States District Court for the District of
Massachusetts, including specifically those obligations imposed by Fed. R. Civ. P. 26(a)(2).

2.      Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they call for information protected by the attorney-client privilege, protective order entered in
another matter, or any other applicable privilege or immunity, and no production of documents
herewith constitutes a waiver thereof.  (With the exception of his responses to Document
Requests Nos. 3 and 9, Mr. Hutt has withheld no documents on these grounds).

3.      Mr. Hutt objects to the document requests, definitions, and instructions on grounds of
overbreadth, undue burden, and harassment to the extent that they seek documents or
information that are not obtainable through a reasonably diligent search or information that is not
currently within his custody, possession, or control.

4.      Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they seek documents or information not reasonably calculated to lead to the discovery of
admissible evidence.

Ian Roffman, Esq.
October 13, 2006
Page 2

5.      Mr. Hutt objects to the document requests, definitions, and instructions to the extent that they are not limited to a specific time period.

6.      Mr. Hutt expressly reserves all objections as to relevance, authenticity, or admissibility with respect to any of the documents produced herewith or the subject matter thereof in any subsequent trial or other proceeding in this action.

## Responses

**Request No. 1**:  For the period prior to August 1, 2006, all documents concerning communications between you and any Defendant or attorney thereof.

**Response No. 1**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 2**:  All documents that you considered in forming your opinions in this matter, whether or not referred to or relied upon in your Report, including, but not limited to, all documents listed on Appendix B of your Report and all notes written about or on the documents listed on Appendix B of your Report.

**Response No. 2**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith, with the exception of the Federal Food, Drug, and Cosmetic Act of 1938, as amended, 21 U.S.C. 301, *et seq.* and the regulations promulgated thereunder, which are publicly available government documents, the production of which would be unduly burdensome and would not lead to the discovery of admissible evidence.

**Request No. 3**:  All FDA letters you have reviewed, at any time, that form a basis for any of your opinions regarding the July 30, 2003 BLA Letter or with which you have compared the July 30, 2003 BLA Letter, including but not limited to, all "complete response letters," "approvable letters," "unapprovable letters," "nonapproval letters" and "action letters" you have reviewed at any time (as you use those terms in your Report) and all letters referenced in your descriptions of "dozens of letters," "literally dozens of letters," "these types of letters," "countless letters," "many instances," "numerous clients who have received 'unapprovable' letters," and "clients that have received 'approvable' letters" in paragraphs 52, 54, 55, 56, 59, and 88, respectively, of your Report.

**Response No. 3**:  Mr. Hutt incorporates by reference General Objection Nos. 1-5.  Mr. Hutt specifically objects on grounds that this Request seeks documents that contain confidential and/or trade secret information concerning other of Mr. Hutt's clients, which are prohibited from disclosure absent express approval from these clients and the FDA. Mr. Hutt further specifically objects that the absence of a time limitation on this Request, given his 40 years of private practice receiving and reviewing materials of the sort described in the Request, renders it unduly

Ian Roffman, Esq.
October 13, 2006
Page 3

burdensome. Subject to and without waiving these objections, Mr. Hutt states that he has no responsive documents in his possession, custody, or control that he is authorized to produce.

**Request No. 4**: All documents on which you base your opinion that the language of the July 30, 2003 BLA Letter was "unusual," as stated in paragraph 83 of your Report.

**Response No. 4**: Mr. Hutt incorporates by reference General Objection Nos. 1-5. Mr. Hutt specifically objects on grounds that this Request seeks documents that contain confidential and/or trade secret information concerning other of Mr. Hutt's clients, which are prohibited from disclosure absent express approval from these clients and the FDA. Mr. Hutt further specifically objects that the absence of a time limitation on this Request, given his 40 years of private practice receiving and reviewing documents of the sort described in the Request, renders it unduly burdensome. Subject to and without waiving these objections, Mr. Hutt states that he has no responsive documents in his possession, custody, or control that he is authorized to produce.

**Request No. 5**: Documents sufficient to identify any other person who assisted you in connection with any of the analyses described in your Report.

**Response No. 5**: Mr. Hutt incorporates by reference General Objection Nos. 1 and 4. Subject to and without waiving these objections, he responds as follows: None, although Mr. Hutt can identify such persons during his deposition.

**Request No. 6**: All drafts of your Report created prior to August 1, 2006.

**Response No. 6**: Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 7**: All documents provided to you by the Defendants or any others in connection with your work in this matter, including, but not limited to, any documents provided for purposes of your Report whether or not referred or relied upon therein and any documents provided for purposes of preparing for meetings with the staff of the Securities and Exchange Commission.

**Response No. 7**: Mr. Hutt incorporates by reference General Objection Nos. 1-5. He specifically objects that the term "any others" is unintelligible as used in this Request. Subject to and without waiving these objections, and based upon a reasonable interpretation of the term "any others," he has produced responsive documents herewith.

**Request No. 8**: All documents concerning meetings between you and the staff of the U.S. Securities and Exchange Commission concerning Defendants, including, but not limited to, all notes made or reviewed by you before, during or after such meetings, all prepared remarks, all documents reviewed, and all communications with any Defendant or counsel for any Defendant in connection with such meetings.

Ian Roffman, Esq.
October 13, 2006
Page 4

**Response No. 8**:  Mr. Hutt incorporates by reference General Objection Nos. 1-5. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 9**:  All written reports prepared pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), or other documents or materials prepared to fulfill a similar function, that have been produced in the course of a dispute wherein you have testified as an expert at trial or by deposition within the preceding four years.

**Response No. 9**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4.  He specifically objects that the Request is unintelligible because it does not specify by whom the requested written reports were prepared.  He further objects to the production of his prior written expert reports because, with one exception, they are subject to protective orders that he cannot be compelled to violate in this proceeding.  Subject to and without waiving these objections, and based upon the reasonable interpretation that the Request seeks written reports or other materials of which Mr. Hutt was the author, he has produced herewith those responsive documents that are not subject to protective orders.

Sincerely yours,

Jason A. Levine

cc:    Bobby R. Burchfield, Esq.
       Cathy Fleming, Esq.