## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 05-11853-PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### THOMAS A. MOORE'S BRIEF IN RESPONSE TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS OF MR. MOORE'S EXPERT WITNESS

Plaintiff's motion to compel seeks the unreasonable and unduly burdensome production of "all FDA letters [Defendant's expert Peter Barton Hutt] has reviewed at, any time," during his 47 years of practicing food and drug law. In response to Plaintiff's subpoena, Mr. Hutt produced thousands of pages of documents that he considered when forming his opinions. As demonstrated in his attached declaration, Mr. Hutt did not review, consult, or consider those documents in forming his opinions, even though those documents form the foundation of Mr. Hutt's special knowledge and expertise in food and drug law. Under Federal Rule of Civil Procedure 26(a)(2)(B), he is *not* obligated to produce documents that enhanced his expertise in food and drug law.

Plaintiff's demand for "all FDA letters [Mr. Hutt] has reviewed, at any time," during his 47 years in private practice, academia, and as Chief Counsel of FDA from 1971-1975, reasonably suggests entitlement to, for example –

- every case he has read that influences his opinion;

- letters he received while Chief Counsel of FDA 30 years ago;
- every article he has read in the daily trade press bearing on his opinion;
- documents relating to every interaction he has had with FDA over 47 years, and
- countless other documents that, aggregated, form the basis for his unique expertise.

Such a requirement for an expert would make expert testimony wholly impractical – should an expert physician be required to turn over all patient files that built his or her expertise in the particular discipline? Should an expert economist be required to produce data underlying his or her dissertation?

Thankfully, the rules and case law do not support Plaintiff's demand, and the refusal of both Plaintiff and FDA to produce documents of the very same type Plaintiff's motion now seeks, confirms the point. Ultimately, this motion represents nothing more than a thinly-veiled attempt to construct a basis to exclude the expert testimony of Mr. Hutt because it is so very relevant to this case.

## BACKGROUND

Mr. Hutt received a B.A. from Yale University in 1956, a LL.B. from Harvard Law School in 1959, and an LL.M. in food and drug law from New York University in 1960. (Ex. A., Hutt Decl. ¶ 3.) Mr. Hutt has practiced food and drug law for 47 years, served as Chief Counsel of FDA from 1971 to 1975, and currently serves as senior counsel in the Washington, D.C. law firm of Covington & Burling LLP. (*Id.* ¶¶ 2, 4-5.) Not only has he assisted in the drafting of most major FDA legislation considered by Congress, but he has also advised many clients on the FDA's review and approval process for human biological products and human new drug products. (*Id.* ¶¶ 6-7.) With Professor Richard A. Merrill, Mr. Hutt co-authored a legal casebook on food and drug law, *Food and Drug Law: Cases and Materials.* (*Id.* ¶ 8.)

Mr. Hutt was retained to provide his opinions on the aspects of food and drug law and FDA procedure that are relevant to Plaintiff's claims against Mr. Moore. (*Id.* ¶ 2.) On October 6, 2006, Mr. Hutt timely provided Plaintiff with his expert report. (Ex. B., Hutt Expert Report, at 33.) In his report, Mr. Hutt stated that his opinions "are based upon [his] 47 years of experience in studying and teaching food and drug law, working for and dealing with the FDA, and practicing in the field of food and drug law and regulation, and on [his] review of the materials listed in Appendix B." (*Id.* at 5; *see also* Hutt Decl. ¶ 10.) None of the documents reviewed and relied upon in Appendix B are the documents that Plaintiff now seeks. (Hutt Expert Report, App. B; Hutt Decl. ¶¶ 9-10.)

On October 10, 2006, Plaintiff subpoenaed Mr. Hutt for numerous documents, including "[a]ll FDA letters [he has] reviewed, *at any time*" and "[a]ll documents on which [he] based [his] opinion that the language of the July 30, 2003 BLA was 'unusual.'" (Ex. C, SEC Subpoena, Attach. A (emphasis added).) Mr. Hutt provided his response and objections on October 13, 2006, stating that, apart from the documents listed on Appendix B of his report and produced to Plaintiff, he objected to these requests on grounds that they exceeded the obligations imposed by Rule 26(a)(2) and were unduly burdensome and overbroad. (Ex. D, Oct. 13, 2006, Letter, at 1.) Plaintiff refused to narrow the requests, and moved to compel production of these documents on October 16, 2006.

## ARGUMENT

Because Mr. Hutt provided the SEC with all the documents he reviewed and relied upon to arrive at the opinions in his expert report, he is under *no* obligation to produce any additional documents. Indeed, Federal Rule of Civil Procedure 26(a)(2)(B) prescribes what information an expert needs to disclose to the opposing side:

> [The required disclosure of experts] with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . [shall] be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information *considered* by the witness informing the opinions . . . .

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). The 1993 Advisory Committee's Note for Rule 26(a)(2)(B) states that "[t]he report is to disclose the data and other information *considered* by the expert and any exhibits or charts that summarize or support the expert's opinions." Fed. R. Civ. P. 26(a)(2)(B), 1993 Adv. Comm. Notes (emphasis added). Although "[n]either the amended Rule nor the Advisory Committee Note defines the term 'considered,' and courts have struggled to define the term," *Johnson v. Gmeinder*, 191 F.R.D. 638, 648 (D. Kan. 2000), no court has held that documents that have contributed to an expert's special knowledge in a particular field over the years are documents that an expert "considered" in forming the opinions in an expert report. Instead, this information is relevant to the specialized knowledge that assists the finder of fact understand the evidence in a case or determine an issue. *See* Fed. R. Evid. 702 (stating that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion").

A party can show that an expert did not consider certain documents in forming his opinion by presenting sworn "testimony clearly establishing that the testifying witness never read, reviewed, or considered the subject documents in forming his opinions." *Sicurelli v. Jeneric/Pentron Inc.*, No. 03-CV-4934, 2006 U.S. Dist. LEXIS 29813, at *13 (E.D.N.Y. May 16, 2006) (quotations and citation omitted); *accord Amway Corp. v. Procter & Gamble Co.*, No. 1:98cv726, 2001 U.S. Dist. LEXIS 5317, at *3-4 (W.D. Mich. Apr. 17, 2001) (denying plaintiff's motion to compel production of documents because "testifying expert witnesses never read, reviewed or considered the subject documents in forming their opinions"). Attached hereto

is a declaration from Mr. Hutt that satisfies this requirement, making three relevant points (Hutt Decl. ¶¶ 10-12.):

*First*, Mr. Hutt never read, reviewed, or even considered the requested FDA letters. (*Id* ¶ 10.) In fact, the *only* documents that he even read, reviewed, or considered in forming his opinion were listed in Appendix B of his expert report, all of which have been produced. (*Id* ¶ 9-10.) Instead, Mr. Hutt largely relied on "a culmination of [his] 47 years of experience studying and teaching food and drug law, working for and dealing with the FDA (including [his] service as Chief Counsel for the FDA), practicing in the field of food and drug law, and [his] continuing review of the trade publications." (*Id.* ¶ 10.) Indeed, he relied on this aggregated knowledge, not any specific document or documents, in forming the opinions expressed in his expert report. (*Id.*)

*Second*, some of the letters at issue were read to Mr. Hutt over the telephone; others were shown to him by clients but not given to him; still others were discussed in the trade press; he saw others while serving as Chief Counsel of FDA; and many others would be located in client files that have since been discarded. (*Id* ¶ 11.) Locating and reviewing all of the client files that Mr. Hutt has amassed over the course of his 47-year career and producing all of the letters demanded by Plaintiff would be unduly burdensome. (*Id*) Even if Mr. Hutt had wanted to review or consider any of the letters demanded by Plaintiff, it is unlikely that he could have succeeded, given that many or all of the letters are not even in his possession, custody, or control. (*Id*) Plaintiff has failed to cite any case holding that experts must produce all their files, when those records were not specifically considered in forming the expert's opinion. The SEC's own expert witness certainly did not produce such documents. Moreover, FDA has all of

these documents, and it is more logical that FDA would be the more appropriate source for obtaining any and all letters of this type. (*Id.*)

*Third*, many of the letters Mr. Hutt has reviewed were provided to him by clients in confidence, and his discussion of any such letter might very well implicate the attorney-client privilege he has with those clients. (*Id* ¶ 12.) As an attorney with Covington & Burling, Mr. Hutt represents many clients regarding the FDA's review and approval process for human biological products and human new drug products, including the FDA's review and approval of biological license applications. (*Id* ¶¶ 2, 5, 7.) Plaintiff's motion to compel essentially asks Mr. Hutt to break the privilege he shares with his clients and to reveal their confidential business information, but the motion fails to cite any cases to support such an extreme proposition. Instead, the cases that Plaintiff cites are inapplicable to this case. *Suskind v. Home Depot Corp*., No. 99-10575-NG, 2001 U.S. Dist. LEXIS 1349, at *14-17 (D. Mass. Jan. 2, 2001) (holding that a party waives attorney work-product protection if it provides the work product to an expert to assist in formulating the expert's opinion); *Vaughan Furniture Co. v. Featureline Mfg., Inc.*, 156 F.R.D. 123, (M.D.N.C. 1994) (ruling that when a party names its attorney as an expert witness, the witness must produce all documents that he reviewed and considered in forming his opinion). Indeed, it would be quite unusual – if not unprecedented – for an expert to produce materials from other clients in support of an expert report. (Hutt Decl. ¶ 12.)

Although Defendant strongly believes that the relief sought is unprecedented and inappropriate, any relief granted should, we respectfully submit, be reciprocal. Because both the Commission and the FDA have also refused to produce documents relied on by fact and expert witnesses in forming their knowledge base, any order that Mr. Hutt produce these documents

should apply equally to these government entities.[1]  To be clear, Mr. Moore contends that such a production would be unprecedented, unnecessary, and unduly burdensome for all the parties involved.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion to compel should be denied.[2]

Respectfully submitted,

___/s/ Edward P. Leibensperger_____
Edward P. Leibensperger
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel.: (617) 535-4000

Bobby R. Burchfield
Jason A. Levine
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, NW
Washington, D.C.  20005-3096
Tel.: (202) 756-8000

Date:   October 17, 2006

*Counsel for Defendant Thomas A. Moore*

---

[1] Indeed, at Plaintiff's insistence, Mr. Moore agreed in good faith to withdraw his request to Plaintiff's expert for "[a]ll documents sufficient to identify all of the 'clinical trials' in which [the expert was] a 'Principal Investigator,'" never even considering the possibility that the SEC would inconsistently demand such documents from Defendant's expert.  (Ex. E, Moore Subpoena, Schedule A, at 4.)

[2] Just as this paper was being finalized, the SEC sent a letter offering a "compromise."  (Ex. F, October 18, 2006, Letter.)  Although it is most common (and the Rules require the parties) to negotiate before filing a motion to compel, Defendant will pursue with the SEC whether there is a reasonable resolution.

## CERTIFICATION UNDER LOCAL RULES 7.1 AND 37.1

The undersigned hereby certifies that counsel for Defendant Thomas A. Moore conferred with counsel for the SEC in a good faith attempt to resolve or narrow the above-discussed issues.

/s/ Edward P. Leibensperger

Edward P. Leibensperger

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-11853-PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER, | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## DECLARATION OF PETER BARTON HUTT

Pursuant to 28 U.S.C. § 1746 (2000), I, Peter Barton Hutt, do hereby declare as follows:

1.      I am over the age of eighteen, am legally competent to execute this declaration, and make this declaration based upon my own personal knowledge.

2.      I am senior counsel in the Washington, D.C. law firm of Covington & Burling LLP (Covington & Burling), specializing in food and drug law.  I was retained by McDermott Will & Emery LLP to provide expert testimony in the above-captioned matter.

3.      I received a B.A., *magna cum laude*, from Yale University in 1956; an LL.B. from Harvard Law School in 1959; and an LL.M. in food and drug law from New York University in 1960.

4.      I first joined Covington & Burling in 1960, and became a partner in 1968.  In 1971, I left Covington & Burling to serve as Chief Counsel for the Food and Drug Administration (FDA).

5.     In 1975, I returned to private practice with Covington & Burling.  As a partner in the food and drug law practice group, I have represented and continue to represent numerous clients in the food, drug, cosmetic, medical device, and biological product industries, including major national trade associations.

6.     I have participated in various capacities in the drafting of most major FDA legislation considered by Congress during the past 40 years, including among others the Prescription Drug User Fee Act of 1992, and the Food and Drug Administration Modernization Act of 1997.

7.     I have advised numerous clients regarding FDA's review and approval process for human biological products under the Public Health Service Act and human new drug products under the Federal Food, Drug, and Cosmetic Act.

8.     I co-authored with Professor Richard A. Merrill a legal casebook on food and drug law, *Food and Drug Law:  Cases and Materials* (Foundation Press 1st ed. 1980, 2d ed. 1991).  The third edition is currently in progress.  Since 1994, I have taught a course on food and drug law during the Winter Term at Harvard Law School.  During my career, I have also delivered more than 500 speeches on food and drug law and related issues, and published numerous articles and book chapters dealing with a broad range of FDA-related topics.

9.     In response to the subpoena issued by the Securities and Exchange Commission (SEC), and pursuant to Appendix B of my Expert Report in the above-captioned matter, I produced the documents I reviewed and relied upon in the course of preparing my Expert Report.

10.     In preparing my Expert Report, I did not review or consult any of the letters at issue in the SEC's Motion to Compel aside from the documents listed in Appendix B of my Expert Report.  Rather, the opinions expressed therein are based upon a culmination of my 47

years of experience studying and teaching food and drug law, working for and dealing with the FDA (including my service as Chief Counsel for the FDA), practicing in the field of food and drug law, and my continuing review of the trade publications. It is this aggregated knowledge, not any specific document or documents, that I have relied upon in forming the opinions expressed in my Report.

11.     Some of the letters at issue were read to me over the telephone, others were shown to me by clients but not given to me, still others were discussed in the trade press, others I saw while serving as Chief Counsel of FDA, and many others would be located in client files in storage or have since been discarded. Locating and reviewing all of the client files that I have amassed over the course of my 47-year career and producing all of the letters demanded by the SEC would be impossible. Indeed, even if I had wanted to review or consult any of the letters demanded by the SEC, it is unlikely that I could have, given that many or most of the letters are not even in my possession, custody, or control. FDA has all of these documents, and it is more logical that FDA would be the more appropriate source for obtaining any and all letters of this type.

12.     Lastly, many of the letters I have reviewed were provided to me by clients in confidence, and my discussion of any such letter might very well implicate the attorney-client privilege I have with those clients. I have served as an expert witness numerous times, and have never been required to produce, or heard of any other expert being required to produce, materials from other clients in support of an expert report.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this *17th* day of October, 2006.

*Peter Barton Hutt*

Peter Barton Hutt

- 3 -

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff <br><br> v. <br><br> BIOPURE COPRORATION, THOMAS MOORE, HOWARD RICHMAND, and JANE KOBER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 05-11853-PBS

## EXPERT REPORT OF PETER BARTON HUTT

### October 6, 2006

**I.     Expert Qualifications**

    **A.     Background and Expertise**

        1.     My name is Peter Barton Hutt.  I am senior counsel in the Washington, D.C. law firm of Covington & Burling LLP (Covington & Burling), specializing in food and drug law.  I received a B.A., *magna cum laude*, from Yale University in 1956; an LL.B. from Harvard Law School in 1959; and an LL.M. in food and drug law from New York University in 1960.  My *curriculum vitae* is attached as Appendix A.

        2.     I first joined Covington & Burling in 1960, and became a partner in 1968.  In 1971, I left Covington & Burling to serve as Chief Counsel for the Food and Drug Administration (FDA).

3.     In 1975, I returned to private practice with Covington & Burling. As a partner in the food and drug law practice group, I have represented and continue to represent numerous clients in the food, drug, cosmetic, medical device, and biological product industries, including major national trade associations.

4.     I have participated in various capacities in the drafting of most major FDA legislation considered by Congress during the past forty years, including the Drug Amendments of 1962, the Controlled Substances Act of 1970, the Poison Prevention Packaging Act of 1970, the Drug Listing Act of 1972, the Medical Device Amendments of 1976, the Orphan Drug Act of 1983, the Federal Anti-Tampering Act of 1983, the Drug Price Competition and Patent Term Restoration Act of 1984, the Drug Export Amendments of 1986, the Prescription Drug Marketing Act of 1988, the Nutrition Labeling and Education Act of 1990, the Safe Medical Devices Act of 1990, the Generic Drug Enforcement Act of 1992, the Prescription Drug User Fee Act of 1992, the Food Quality Protection Act of 1996, the Drug Export Reform and Enhancement Act of 1996, the Food and Drug Administration Modernization Act of 1997, the Medicine Equity and Drug Safety Act of 2000, and the Public Health Security and Bioterrorism Preparedness and Response Act of 2002.

5.     I have advised numerous clients regarding FDA's review and approval process for human biological products under the Public Health Service Act (PHS Act) and human new drug products under the Federal Food, Drug, and Cosmetic Act (FD&C Act).  This advice encompasses issues relating to current good manufacturing practices (GMP), good clinical practices (GCP), FDA review of applications for investigational new drugs (INDs), the conduct of clinical trials, issuance

2

of clinical holds, and FDA's review and approval of biological license applications

(BLAs) and new drug applications (NDAs).

6.    I co-authored with Professor Richard A. Merrill a legal casebook on

food and drug law, *Food and Drug Law:  Cases and Materials* (Foundation Press 1st ed.

1980, 2d ed. 1991).  The third edition is currently in progress.  Since 1994, I have taught

a course on food and drug law during Winter Term (January) at Harvard Law School.

During my career, I have delivered more than 500 speeches on food and drug law and

related issues.  I have published numerous articles and book chapters dealing with a

broad range of FDA-related topics, including the agency's regulation of biological

products, new drugs, and other medical technologies.

7.    I have been a member of the Institute of Medicine of the National

Academy of Sciences since it was founded in 1971.  I have served on a wide variety of

academic and scientific advisory boards, including most recently the Review Group for

the Current State of FDA Science, FDA Science Board; the Working Group to Review

the NIAID Division of AIDS Regulatory Activities, Advisory Council of the National

Institute for Allergy and Infectious Diseases; the Panel on Administrative Restructuring

of the National Institutes of Health, National Academy of Public Administration; the

Board of Trustees, Food and Drug Law Institute; the Board of Trustees, Washington

Lawyers Committee for Civil Rights and Urban Affairs; the Board of Trustees, Institute

for Health Policy Analysis; the Advisory Board, the University of Virginia Center for

Advanced Studies; the Board of Directors, Foundation for Biomedical Research (Vice

Chairman); the Scientific Advisory Committee, Western Institutional Review Board; the

Board of Directors, the California Healthcare Institute; and the Working Group on

Private Sector Incentives for Drugs for Diseases in Developing Countries of the Gates
Foundation. I currently serve on venture capital advisory boards and the boards of
startup biotechnology companies.

### B.    Compensation

8.    I have been retained by the law firm of McDermott Will & Emery
LLP to provide expert testimony in the above-captioned matter. I am being compensated
at my standard rate of $690 per hour for my work prior to October 1, 2006, and $710 per
hour since then. My compensation is not dependent upon the outcome of the case.

### C.    Previous Expert Testimony

9.    I have prepared expert reports and testified as an expert by
deposition within the preceding four years in the following matters:

- *Prince* v. *B.F. Ascher Co., Inc.*, Case No. CJ-2002-5684,
  District Court of Oklahoma County, Oklahoma (2003)

- *In re* Remeron Direct Purchaser Antitrust Litigation, Master
  Docket No. 03-CV-0085 (FSH), United States District Court for
  the District of New York (2004)

- *Pharmanetics* v. *Aventis Pharm., Inc.*, Civil Action No. 5:03-
  CV-817-FL(2), United States District Court for the Eastern
  District of North Carolina, Western Division (2004)

- *Bristol-Myers Squibb Co.* v. *Pharmascience, Inc.*, Canadian
  Trade-Marks Office Application No. 883,974 (2004)

- *Thomas E. Blankenbaker, D.C.* v. *United Healthcare of Arizona, Inc.*, Civil Action No. CV 04-1600-PHX-FJM, United States District Court for the District of Arizona (2005)

- *Spinedex Physical Therapy, U.S.A., Inc.,* v. *United Healthcare of Arizona, Inc.*, Civil Action No. CV 04-1576-PHX-JAT, United States District Court for the District of Arizona (2005)

**D.    Materials Considered**

10.    The opinions expressed in this report are based upon my 47 years of experience in studying and teaching food and drug law, working for and dealing with the FDA, and practicing in the field of food and drug law and regulation, and on my review of the materials listed in Appendix B.

**II.    Regulatory and Factual Background**

**A.    The BLA Process for Approval of Biologics**

11.    FDA has been delegated authority by the United States Congress to ensure the safety, purity, and potency of biological products by regulating all aspects of their approval for sale and subsequent commercialization. Under the FD&C Act, 21 U.S.C. 301 *et seq.*, as well as section 351 of the PHS Act, 42 U.S.C. 262, FDA comprehensively regulates the review and approval of biological products for shipment and sale in interstate commerce, the content of product labeling for biological products, and the promotion and advertising of those products. Section 123(f) of the Food and Drug Administration Modernization Act of 1997 requires FDA to minimize differences in the review and approval of biologics license applications (BLAs) and new drug applications (NDAs).

5

12.     Under the PHS Act, the FDA must ensure that each biological product is safe, pure, and potent for its intended use or uses before allowing that product to be shipped for sale in interstate commerce. 42 U.S.C. 262(a). The mechanism for obtaining FDA marketing approval of biological products is the biologics license application (BLA). The biological product's manufacturer is generally the submitter or "sponsor" of the BLA.

13.     Before a sponsor can submit a BLA, it must first develop evidence of the product's safety, purity, and potency by means of testing in animals (known as "nonclinical" or "preclinical" testing) and subsequent studies in humans (clinical testing). At this pre-BLA stage, the biological product's safety, purity, and potency have not yet been shown. In order for the appropriate testing to take place, the product must be shipped to researchers and administered to human subjects. FDA is authorized under the FD&C Act to grant an exemption to the general rule that unapproved new drug products, including biological products, may not be shipped in interstate commerce. This exemption is known as the investigational new drug (IND) exemption, which allows the shipment of unapproved biological products for the limited purpose of safety, purity, and potency testing. 21 U.S.C. 355(i); 21C.F.R. 312.2(a); *see generally* Peter Barton Hutt and Richard A. Merrill, *Food and Drug Law: Cases and Materials* 513-519 (Foundation Press 2d ed. 1991) (Hutt & Merrill).

14.     The IND application submitted to FDA must include the results of the preclinical tests, together with manufacturing information, analytical data, and other available information about the investigational biological product intended to

6

demonstrate its safety for testing in humans. The IND application also contains protocols describing one or more clinical studies that the sponsor intends to conduct.

15.    After submitting its IND application, the sponsor must wait 30 days before commencing the clinical trial in order to give the agency time to review the application. If FDA determines that the investigational biological product is not suitable for testing in human subjects, the agency institutes what is known as a "clinical hold." 21 U.S.C.355(i)(2); 21 C.F.R. 312.42. A clinical hold may block commencement of a clinical trial specified in the IND application or may terminate an ongoing study until such time as FDA may determine to lift the hold. FDA may issue a clinical hold at any time, before or after the expiration of the 30-day waiting period after submitting an IND application.

16.    Preclinical testing typically lasts two to three years, and clinical studies generally take five or six additional years, bringing the total preapproval research period to eight or nine years. These are generalities, however, and actual research time varies widely from product to product.

17.    When the sponsor concludes that it has assembled sufficient evidence of safety, purity, and potency to support an application for marketing approval, the BLA is assembled. The BLA must contain all information, both favorable and unfavorable, that the sponsor has obtained in the course of its investigations into its product. 21 C.F.R. 601.2. The BLA file, which generally consists of large amounts of summary material accompanied by dozens or even hundreds of volumes of raw data, is divided into sections that include the following:

- data derived from nonclinical and clinical studies demonstrating that the product meets the requirements for safety, purity, and potency.

7

- a full description of the manufacturing methods.

- data establishing product stability.

- samples of the product as proposed to be introduced for commercial marketing.

- summaries of results of tests performed on the lot(s) represented by the submitted sample(s).

- specimens of the proposed product labels, enclosures, and containers.

- a description of the statistical evaluation of clinical data.

21 C.F.R. 601.2.

18.    BLAs are reviewed by FDA's Center for Biologics Evaluation and Research (CBER).

19.    Once submitted to FDA, a BLA is subjected to rigorous review by a team of expert reviewers who determine the safety, purity, and potency of the product for its intended uses.  The review team includes one or more clinical reviewers (also known as medical reviewers) who evaluate the clinical data to determine if the biological product is safe, pure, and potent.  Clinical reviewers are trained to assess the biological product's likely therapeutic benefits against the risk of any adverse events.

20.    FDA reviewers work in close consultation with each other to evaluate the BLA package.  In addition, FDA reviewers will consult with specialists from particular disciplines as necessary to facilitate their review.  At any time during the review process, FDA reviewers may consult with the sponsor regarding any of the information included in the BLA.

21.    As part of the BLA review process, FDA also regularly calls upon advisory committees composed of outside experts to obtain further information on the

safety, purity, and potency of the biological product. When the advisory committee has completed its review, the committee makes a recommendation to FDA as to whether the product should be approved for its intended uses. These recommendations can be persuasive to FDA's review team, but are not binding on the agency.

22.    As FDA's review of the BLA progresses, each FDA reviewer develops a written analysis presenting conclusions and recommendations regarding approval of the biological product. One member of the team, generally a clinical reviewer, evaluates and summarizes the conclusions contained in the reports of the other reviewers.

23.    The summary recommendation of the review team is then passed along to the director of the applicable review division, who performs an additional review, often involving further input from individual reviewers.

24.    FDA then issues a letter containing a recommendation on the BLA. In rare cases, FDA issues a letter designated as an "approval letter," and the drug is considered approved as of the date of that letter. More often, the sponsor receives a letter designated as a "complete response letter," "approvable letter," "unapprovable letter," or "action letter," or a letter which has no designation (commonly called an "untitled letter"), setting forth specific requests for further data or information needed to obtain marketing approval. Since 2004, when FDA published a proposed regulation to standardize its response letters, FDA has made more frequent use of "complete response letters" for biological products, and less use of letters with another or no designation, but has not yet achieved consistency. FDA may also issue a letter designated as a "nonapproval" or similarly titled letter.

25.    The letters described above range in length depending upon the number of issues identified by the agency. In many cases these letters re-raise issues that the agency has already raised in previous letters or during previous meetings or phone calls with the sponsor. One therefore cannot always judge the significance of an FDA letter simply by its length. These letters are confidential, and normally are not released to the public either by the sponsor or FDA.

26.    After FDA has completed its review and issued its letter to the sponsor, it is typical for the agency to meet with the sponsor (if the sponsor desires such a meeting) to determine the appropriate next steps in pursuing an NDA or BLA, even if FDA has denied the application outright.

27.    The timing for FDA's review of a an NDA or BLA is governed by performance goals established pursuant to the Prescription Drug User Fee Act (PDUFA), as amended. Originally enacted by Congress in 1992, PDUFA contains a five year sunset provision and therefore must be reauthorized every five years. PDUFA was reauthorized in 1997 (PDUFA II) and 2002 (PDUFA III), and is set to expire again in 2007 unless reauthorized.

28.    PDUFA requires that NDA and BLA sponsors pay "user fees" in conjunction with submission of an original NDA or BLA, submission of a supplement, registration of an establishment for manufacture of human drugs or biological products, and marketed products. 21 U.S.C. 379h. The PDUFA fees are established annually through a notice in the Federal Register.

29.    In conjunction with the establishment of user fees under PDUFA, FDA has reached a "side letter" agreement to establish performance goals for specified

FDA processes such as review of an original application BLA, review of a supplement, or responses to requests for meetings with the agency. Performance goals also may change annually and are not binding on the agency, though it is understood that failure to adhere with the performance goals, at least in large part, could jeopardize PDUFA reauthorization.

30.     FDA's current performance goals call for the agency to complete its review of an original standard (not priority) NDA or BLA within 10 months. Pursuant to the side letter establishing the performance goals, the 10-month review clock can be extended or reset upon the occurrence of specified events, such as submission by the sponsor of a major amendment - - as determined by FDA - - to an application.

**B.     Hemopure®**

31.     On July 31, 2002, Biopure Corporation (Biopure) submitted a BLA for its biological product, Hemopure, for FDA approval to use Hemopure in the treatment of acutely anemic patients undergoing orthopedic surgery (the Hemopure BLA). Among other required data and information, the Hemopure BLA contained a report on the pivotal clinical trial known as HEM-0115, testing the Hemopure biological product in acutely anemic patients undergoing orthopedic surgery. That clinical trial was conducted under an IND that had been assigned the FDA internal reference number IND 2935 (the Anemia IND).

32.     During its review of a BLA, it is common for FDA to contact the BLA sponsor to ask for clarification of certain issues, to request additional information, or otherwise to discuss the review. On January 7, 2003, FDA placed such a call to Biopure. According to Biopure's notes of that conversation, the FDA official indicated

that FDA's review of the Biopure BLA had reached the halfway point and that so far the agency had not seen any "show stoppers."

33.    While the Hemopure BLA was under review at FDA, Biopure determined to conduct clinical testing on an additional indication for Hemopure with trauma subjects. To this end, on or around March 7, 2003, Biopure submitted an IND application to FDA seeking permission to conduct a clinical study to evaluate the safety and tolerability of Hemopure in trauma subjects (the Trauma Study). FDA assigned this IND the internal reference number IND 10962 (the Trauma IND).

34.    On April 9, 2003, FDA placed a phone call to Biopure, informing the company that FDA was placing the Trauma IND on clinical hold. In a subsequent letter dated April 25, 2003, FDA stated that it was placing the IND on clinical hold, citing FDA's regulations at 21 C.F.R. 312.42(b)(1)(iv), "because subjects would be exposed to an unreasonable and significant risk of injury." Specifically, the agency specified three concerns that had arisen from FDA's review of the BLA:

1.    That Hemopure may be associated with a high incidence of specified life-threatening serious adverse events (SAEs) as compared with allogeneic blood.

2.    That Hemopure had caused an increase in patient hypertension as compared to patients receiving the control allogeneic blood. FDA noted that this increased hypertension could be particularly problematic in a trauma patient population like the one proposed by the Trauma Study.

3.    That the independent, blinded Data Monitoring Board (otherwise known as the Safety Endpoint Evaluation Committee, or "SEEC") database also

12

indicated between-group differences in the incidence of SAEs that were

statistically significant, and favored the control allogeneic group.

FDA requested that Biopure respond to these concerns.

35.    Biopure sent its response to FDA by a letter dated May 12, 2003.

This letter made three main points. With respect to Comment 1 from FDA's April 25

letter, Biopure stated that the differences in SAEs between Hemopure and control

allogeneic blood seen in the HEM-115 study were largely due to imbalances in age and

illness related factors between the two patient groups. Specifically, there were more

patients above the age of 75 in the Hemopure arm than in the control arm, and more

patients with co-morbidities or other illnesses in the Hemopure arm. With respect to

Comment 2 in FDA's April 25, 2003 letter, Biopure provided additional data to

demonstrate that Hemopure does not pose a particular risk to trauma patients due to

hypertension. With respect to FDA's Comment 3 from the April 25, 2003 letter, Biopure

responded "that the SEEC AE/SAE database was not designed or chartered to be

consistent with Good Clinical Practice (GCP)" and that Biopure had intended "to derive

the secondary safety endpoints for the HEM-0115 study from the Investigator Database,

not the internal scoring of the SEEC." Based on these responses, Biopure asked the

agency to lift its clinical hold on the Trauma IND.

36.    On May 27, 2003, Biopure contacted FDA by telephone. During

this call Biopure and FDA discussed Biopure's May 12, 2003 letter as well as the

ongoing review of the Biopure BLA. As reflected by Biopure's notes of the telephone

conference, FDA again made positive statements regarding the status of the BLA review

and the ultimate approvability of the Hemopure product, stating that the FDA reviewers

13

were taking additional time to complete their review because they "want to approve the product, but they want to do it in the right way."

37.    FDA responded to Biopure's May 12, 2003 letter with two letters, each dated May 30, 2003. The first May 30 letter was addressed to the Trauma IND. This letter denied Biopure's request to lift the clinical hold. The agency requested additional explanation of what the agency felt were "contradictory statements" made by Biopure regarding the SEEC database. The second May 30 letter was addressed to the Hemopure BLA file. It indicated that the agency acknowledged that Biopure had sent the May 12, 2003 letter to the agency's BLA file and that the agency was continuing to consider Biopure's responses as they concerned the BLA.

38.    By letter dated July 2, 2003, Biopure responded to FDA's May 30, 2003 letter, and again asked the agency to lift the clinical hold. Biopure's July 2 letter provided additional clarification regarding how the SEEC AE/SAE database was prepared and attempted to resolve the "contradictory statements" highlighted by the agency.

39.    On July 30, 2003, FDA again sent two letters to Biopure. The first of these was addressed to Biopure's Trauma IND file (the July 30 Trauma IND Letter). It stated that FDA was denying Biopure's second request to lift the clinical hold on the Trauma IND. The agency stated that Biopure's responses to the agency's inquiries into the differences between the safety dataset based on investigator assessments and the safety dataset based on SEEC evaluation of safety information did not "fully clarify" the issues. FDA therefore requested additional documentation and data from Biopure.

40.    The second July 30, 2003 letter from FDA to Biopure was addressed to Biopure's BLA file and had no designation or title (the Untitled Letter). This letter indicated that FDA had completed its review of Biopure's BLA and determined that "the information and data submitted [with the BLA] are inadequate for final approval action at this time" based on deficiencies specified in the Untitled Letter. Approximately the first 14 pages of the Untitled Letter were copied virtually verbatim from the July 30 Trauma IND Letter, and therefore requested the same data and information from Biopure. The remainder of the Untitled Letter specified additional questions and requests for information particular to FDA's review of the BLA. The Untitled Letter did not require Biopure to conduct additional clinical testing.

41.    The Untitled Letter concluded by noting that FDA was suspending the PDUFA review clock pending Biopure's response to the Untitled Letter, and that the clock would not be reactivated until Biopure responded to all of the deficiencies noted in the Untitled Letter.

42.    On August 1, 2003, Biopure issued a press release (the Press Release). The Press Release stated that Biopure had received the Untitled Letter specifying that FDA had completed its review of the Hemopure BLA and had requested additional information. It also stated that FDA's letter did not request additional clinical trials and that the review clock had been suspended by FDA pending Biopure's responses to FDA's requests for information.

## III.    Expert Opinions

43.    In my professional opinion, based on my experience as FDA Chief Counsel for four years and over forty years of private practice in food and drug law, the Untitled Letter presented reasonable grounds for optimism by Biopure at the time

Biopure received it.  First, the Untitled Letter did not require Biopure to conduct clinical

trials.  This in itself was a significant positive development for the company and grounds

for optimism.  Just how optimistic Biopure should have been depends in large part on

Biopure's internal scientific and medical assessment of how quickly and how

successfully it felt, at the time, it could respond to the issues FDA raised in its letter.

Despite claims by the Government and its expert to the contrary, only the company's

scientific and medical experts are in a position to know the answer to this question.

### A.    It Was Not Unreasonable for Biopure to Respond to the Untitled Letter With Optimism

44.    As discussed above, after FDA has completed its review of a

sponsor's NDA or BLA, the agency sends the sponsor a letter.  There are, essentially,

four approaches that the agency can take at this point.

45.    First, the agency can deny the applicant's NDA or BLA outright.

FDA will take this approach if it determines that the clinical studies submitted with the

application do not establish the proposed product's safety, purity, and potency, and if it

determines that there are no additional studies that the sponsor could conduct that could

provide the necessary data.  FDA's outright denial of an NDA or BLA effectively ends

the application process unless the applicant persuades the agency that its determination is

incorrect or submits additional data and information.

46.    Second, the agency can request that the sponsor conduct additional

clinical studies, and frequently does so.  FDA will take this approach if it determines that

the clinical studies submitted with an application do not, by themselves, establish safety,

purity, and potency, but additional clinical data could fill the gaps and permit the sponsor

to meet its burden.  In this case the FDA letter could be entitled an approvable letter, an

unapprovable letter, an action letter, or a complete response letter, or the letter could have no title at all, depending on the personal preference of the FDA reviewer. Whatever the title of the letter, it would describe the type(s) of clinical study or studies that the agency requires. Clinical studies are both costly and time-consuming, and many NDA or BLA applicants do not have the resources to conduct additional studies upon FDA's request, particularly if the agency asks for a large clinical study. As a result, these types of letters can have an effect similar to an outright denial of the sponsor's NDA or BLA.

47.    Third, the agency can approve the NDA or BLA without comment or request for additional data. This happens in a minority of cases. In my forty years of experience in assisting applicants with FDA review and approval, I have seen an outright approval of a BLA or an NDA on the first review "cycle" without requests for further data or information only a relatively few times.

48.    Finally, the agency can request additional data or information to clear up discrepancies or inconsistencies in the NDA or BLA file without asking for additional clinical trials. In general, FDA takes this approach when it has determined that the clinical data submitted with the application can establish the product's safety, purity, and potency (in the case of a BLA) if the open issues are resolved to the agency's satisfaction. These letters (which can also be in the form of an approvable, action, unapprovable, complete response, or untitled letter) do not approve the application outright because FDA has open questions that the sponsor must answer. FDA may require additional nonclinical testing to resolve questions, for example, about immunogenicity or impurities, or it may have significant questions about the accuracy and integrity of the underlying clinical data. The point of this approach is, however, that

these kinds of letters provide a roadmap to final approval without further clinical testing. If the sponsor is able to answer FDA's questions to the agency's satisfaction, the application will be approved. As a result, these letters can be a very positive development for the sponsor.

49.     FDA refers its open questions to the sponsor because it understands that the sponsor, not FDA, is the best source of information and understanding about an investigational biological product. It is the sponsor, not the FDA, who has conducted preclinical and clinical trials on the product, and understands how the studies were run and how the data were generated. At the time of submission of an NDA or BLA, the sponsor's scientists and physicians typically have been working with the biological product for years, if not decades, whereas FDA's reviewers have had only a few months of exposure to the product and the data.

50.     As a result, FDA's review of an NDA or BLA is an iterative process that resembles a negotiation between the sponsor and the agency. It is typical for the agency to send letters to the sponsor that raise issues and concerns and ask for additional data or information in order to satisfy these concerns. Because FDA recognizes that it is not the sole, or even the best, source of expertise on the product at issue, these letters generally serve as an invitation to the sponsor to provide additional data or information to FDA in order to address and resolve the particular issues it has raised. When the sponsor reads such a letter from FDA, its reaction is directly related to how strong it feels its own case is about the issues FDA has raised.

51.     In my opinion, FDA's Untitled Letter was the fourth type of communication identified above. It did not deny or approve the BLA, nor did it request

18

additional clinical trials. Thus, the letter signified that if Biopure could provide the

additional information requested by the agency and satisfactorily answer its questions, the

agency would likely approve the BLA. A review of the basic features of the Untitled

Letter makes this clear.

52. In my experience reading dozens of letters like the Untitled Letter,

the most important parts of a review letter from FDA are the opening and closing

paragraphs on the first and last pages, respectively.

53. The second paragraph of the Untitled Letter states:

> The Center for Biologics Evaluation and Research (CBER)
> has completed the review of all submissions made relating
> to your Biologics License Application. Our review finds
> that the information and data submitted are inadequate for
> final approval action at this time based on the deficiencies
> outlined below.

54. First, FDA states that *final approval* is not possible *at this time* due

to the deficiencies outlined. This language strongly suggests that the agency is working

toward a goal of approving the product and is open to continued dialogue and negotiation

with the sponsor regarding the issues raised. This interpretation is consistent with the

positive statements made by FDA to Biopure during the course of the review of the BLA,

for example in the telephone conversations between Biopure and FDA of January 7, 2003

and May 27, 2003 (described above). FDA is not obliged to make any such statements to

a drug sponsor and it is reasonable to evaluate written correspondence from FDA in the

context of such statements. I have read literally dozens of letters, sent by FDA at the

same stage in the review process, in which the FDA simply states that the product cannot

be approved at any time because the agency has concluded that the drug is not safe or

effective, or both, or that approval will require one or more additional clinical trials.

19

FDA's Untitled Letter, however, expresses no such conclusions. Instead, it invites the sponsor to come in and discuss the issues with the agency in the hopes of resolution and, ultimately, product approval.

55.     The third to last paragraph, on the last page of the Untitled Letter reinforces this impression. That paragraph starts by saying that "You may request a meeting with CBER to discuss the above steps for approval." Based on my experience reviewing these types of letters over 40 years, this statement clearly signals FDA's intent to work with the sponsor to resolve the issues presented in the Untitled Letter in order to support eventual approval. This is in stark contrast to letters where FDA concludes that the product is unsafe or ineffective and cannot be approved, or requires additional clinical studies. Next, the last paragraph of the letter states that FDA is suspending its PDUFA review clock. There is no requirement for FDA to suspend the review clock. Alternatively, FDA could have stated that its Untitled Letter constituted the conclusion of its review and, therefore, the meeting of its performance goal. I read FDA's suspension of the review clock, therefore, as further invitation to the sponsor to enter into a negotiation with FDA regarding the issues presented in the Untitled Letter, and a desire by the agency to continue to pursue approval of the product.

56.     Finally, the opening and closing paragraphs of the Untitled Letter are remarkable for what they do not say -- namely that they do not require Biopure to conduct new clinical trials. I have read countless letters from FDA wherein the agency concludes that the studies contained in the application cannot support approval, and new clinical trials are needed. In review letters such as the Untitled Letter, such a requirement is usually stated at the outset, in the first two paragraphs of the letter.

57.     Requiring the sponsor to conduct new clinical trials is often tantamount to an outright rejection of the NDA or BLA.  Smaller companies such as Biopure often simply do not have the financial resources to conduct new, costly clinical trials that can take years to complete.  Thus, I regard the absence from the Untitled Letter of a request for additional clinical studies as a very encouraging sign.

58.     The only place in the letter where FDA referred to a clinical trial is on page 14 of the Untitled Letter.  Specifically, the letter states that "Any dosing guidelines based on plasma hemoglobin levels would require confirmation in an adequately sized and adequately powered phase 3 clinical trial [and] support for dosing based on plasma hemoglobin levels would require sufficient phase 2 data . . . .  Please comment."  Similarly, the agency stated that "it is not possible to write adequate and safe dosing guidelines . . . .  Please comment."

59.     Even here, however, the agency did not state that a new clinical trial would be required.  Rather, FDA raised the question whether such trial should be conducted and specifically asked Biopure to comment.  If FDA had already concluded that a new trial was required it would have said so on the first page of the letter and would not have posed the matter as a question.  I have seen many instances where FDA has suggested that further clinical studies *may* be required, only to change its mind later after negotiations with the sponsor.  In my opinion, therefore, there is a significant difference between the agency suggesting that a trial may be necessary and asking the sponsor to comment and the agency actually requiring a new clinical study.

60.     Rather than rejecting the BLA outright, or requiring additional clinical trials, FDA's Untitled Letter raises a list of issues and concerns and makes

21

requests for additional data and information. These issues primarily deal with the integrity of the processes used to generate the adverse event databases from the HEM-0115 pivotal clinical trial. As discussed above, FDA's Untitled Letter clearly invites Biopure to submit this information and discuss these issues with the agency in the hopes of resolving them.

61. In light of this, were I Biopure's CEO at the time it received the Untitled Letter, I would have regarded FDA's decision not to deny the Hemopure BLA outright and not to require additional clinical trials as positive developments. My overall assessment of the impact of the Untitled Letter, at the time Biopure received it, would have depended entirely on how quickly and how successfully Biopure's scientists, physicians, and regulatory affairs personnel felt they could address the issues that FDA raised.

**B.    Biopure's Level of Optimism Should Have Depended on How Well and How Quickly it Felt it Could Respond to FDA**

62. FDA frequently raises concerns regarding the conduct of clinical trials, integrity of the data generated from those trials, or the meaning of that data. In and of itself, this is not exceptional. It is well understood both by industry and FDA that no clinical trial is perfect and the fact that FDA expresses concerns does not mean that the data, ultimately, cannot support approval. As discussed above, FDA is not the sole, or even the best, repository of information and expertise relating to a biological product or its clinical trials. Thus, it is common for FDA to raise data integrity concerns only to have those concerns laid to rest by the company through provision of data and/or explanation of the meaning of those data, ultimately resulting in product approval. It is also common for FDA to ask questions or request large amounts of additional data and

then later rescind some or all of those requests because the sponsor has convinced the agency that the additional information is not necessary or has already been provided.

63.     For example, I have been personally involved as outside food and drug legal counsel in many instances where the agency has raised seemingly serious concerns regarding data integrity and/or the interpretation of clinical trial results. On several of these occasions, the sponsor has disagreed with FDA and has been able to convince the agency of its view through meetings, additional submissions, or otherwise, and ultimately secure approval. It is therefore appropriate, indeed essential, for sponsors to view letters such as the Untitled Letter not as a definitive setback, but as an opportunity to engage FDA about the issues raised and negotiate with the agency to find the appropriate resolution.

64.     I have been involved in many situations where FDA requested a large amount of additional data and information because the agency misread or misinterpreted data that the sponsor had already provided. In some of these cases, negotiation with the sponsor has convinced FDA of its mistake, and the agency withdrew (or significantly decreased) its burdensome request for information.

65.     In light of the above, Biopure's reaction to the Untitled Letter should have been directly related to how quickly and successfully Biopure's scientists, physicians, and regulatory affairs personnel felt at the time they could respond to the issues raised by the letter, either as posed or after negotiation with FDA as described above.

23

**C.    Only the Company Can Know How Well and How Fast it Could Respond To FDA's Requests In the Untitled Letter**

66.    Were I a business executive at Biopure, upon receipt of the Untitled Letter I would have relied upon my scientists, physicians, and regulatory affairs personnel to determine how well and how fast Biopure could respond, because these individuals at the company are the only people who could possibly have known, at that time, what was required to satisfy FDA's concerns.

67.    As stated above, the sponsor, not FDA, is the best source of information and understanding about an investigational new drug or biological product. It is the sponsor, not the FDA, who has conducted preclinical and clinical trials on the product, and understands how the studies were run and how the data were generated. In particular, by the time a company submits an NDA or BLA, the sponsor's scientists and physicians have typically been working with the product for many years, and the sponsor's regulatory affairs personnel have been intimately familiar with the underlying clinical studies since the planning stages. Thus these individuals are the ones with the most in-depth understanding of the product and the most detailed knowledge of the clinical data and how it was collected.

68.    As a result, these individuals at Biopure were the most qualified, indeed the only ones qualified to assess how well and how fast Biopure could have responded to FDA's concerns, and the extent to which Biopure should have negotiated with FDA over the questions to be answered. Anyone without such a detailed knowledge of the product and access to Biopure's data (both submitted to FDA in the BLA and other data not yet submitted to the FDA) could possibly know what responses were available to Biopure or how quickly Biopure could have submitted these responses to FDA. Any

24

attempt by someone outside the company to draw conclusions about how well or how fast Biopure could have responded to FDA's concerns is mere speculation.

69.     For example, I have read the expert report of Dr. Edward L. Snyder, M.D., filed on behalf of the SEC in this case.[1]  In several places in his report, Dr. Snyder states that responding to the data requests FDA made in its Untitled Letter would have required "Herculean" efforts or otherwise have taken an extended time period.  Without access to Biopure's internal files or the underlying data from the Hemopure clinical studies, however, Dr. Snyder cannot possibly know this.  He cannot know, for instance, whether Biopure had access to additional data or information that, once presented to the agency, would have  satisfied the agency's concerns about the integrity of the clinical trial data submitted with the BLA.  Similarly, he cannot know whether FDA's concerns were the result of a misinterpretation of already submitted data or information that, once corrected by Biopure through negotiations, would have allayed FDA's concerns.

70.     Even if no quick answers were available, neither Dr. Snyder nor anyone else outside the company can know how long it might have taken Biopure to respond to FDA's requests for additional data, or how convincing those responses would be.  Dr. Snyder cannot know what resources Biopure had available to it to gather the requested information or indeed how much of that information had already been gathered and was prepared to be delivered to the agency.

71.     Dr. Snyder also asserts in his expert report that to satisfy FDA's concerns, Biopure would almost certainly have to have conducted additional clinical trials.  This also is mere speculation.  First, the assertion is flatly inconsistent with FDA's

---

[1] I am not a physician and do not have  scientific training so I am in no position to take issue with Dr. Snyder's medical or scientific opinions.

failure to require additional clinical trials in its Untitled Letter. Second, because Dr.

Snyder did not have access to Biopure's internal data and information, he cannot know

whether the responses Biopure was prepared to give FDA would have put the agency's

concerns to rest without the need for further clinical study.

72.    It is important to realize that Biopure's CEO, Thomas Moore, was

also not in a position to judge, on his own, how quickly and how persuasively Biopure

could have responded to FDA's concerns. Over my 40 years of practice I have worked

with hundreds of large and small pharmaceutical and biotech companies, and served on

the Boards of Directors of about 20 such companies. In my experience, CEOs of such

companies do not possess the level of familiarity with or understanding of the underlying

product data or regulatory background necessary to make these kinds of judgments unless

they have advanced scientific or medical degrees. Indeed, most CEO's cannot obtain the

necessary detailed technical understanding even if they were so inclined due to the

competing demands inherent in their position.

73.    As a result, CEOs without advanced scientific or medical degrees

must rely on the advice and guidance given to them by the company's scientists,

physicians, and regulatory affairs officers. These individuals are specifically trained to

respond to inquiries such as the Untitled Letter and are in the best position to assess the

company's ability to respond and negotiate with FDA over the questions to be answered.

**D.    The August 1 Press Release Was Appropriate and Not Overly-
Optimistic**

74.    My understanding is that, at the time that Biopure received the

Untitled Letter, Biopure's CEO sincerely believed that Biopure had a good answer, or

could promptly formulate a good answer, to all of the questions that FDA raised and,

subject to negotiations with FDA, could provide the data that FDA asked for quickly. Based on that understanding, in my professional opinion based on four years as FDA Chief Counsel and 40 years in private food and drug law practice, the August 1 Press Release was appropriate and not overly optimistic.

75.    First, FDA had completed its review without requiring additional clinical trials. The importance of this cannot be overstated.  FDA does not hesitate explicitly to state that additional clinical trials are required when it believes that they are in fact required for approval of an NDA or BLA.  Clinical trials, particularly Phase III pivotal clinical trials such as the HEM-0115 Study, are time consuming and extremely expensive.  Most companies such as Biopure, with no significant revenue generating products, are simply not in a financial position to finance an additional pivotal study at this stage in the development process.  Planning a study protocol, receiving FDA clearance for the protocol, enrolling patients, running the study, and analyzing the data in a pivotal study typically takes at least two to three years.  For FDA to complete its review of the Biopure BLA and not require additional clinical study was a major positive for the company.

76.    Second, whether or not the Untitled Letter was properly characterized as a "complete response letter," it clearly indicates that FDA had completed its review of the BLA.  As a result, the letter sets forth all of FDA's remaining questions and concerns and lays out the steps that must be taken for the agency to approve the BLA.  As discussed above, I have been told that at the time that Biopure received the Untitled Letter Biopure's CEO had a good faith belief that Biopure could quickly and

successfully satisfy, or negotiate over, all of FDA's concerns. As a result, it was reasonable for the CEO to view receipt of the Untitled Letter as a positive development.

77.    In light of this fact, I believe that the August 1 Press Release accurately reflected the regulatory status of the company as of that date and is not overly-optimistic.

78.    It is also my opinion that the August 1 Press Release presents a fair and accurate representation of the Untitled Letter. First, I understand that one of the issues in this case is the company's failure to disclose that the Untitled Letter was a "complete response letter." The regulatory purpose of a complete response letter is to signal to the sponsor that FDA has completed its review of the BLA, list any deficiencies in the application and, if final approval is feasible, to inform the sponsor of any actions necessary to place the application in condition for approval. 69 Fed. Reg. 43351 (July 20, 2004). Although the August 1 Press Release does not specifically define the letter as a complete response letter, it does indicate that FDA has completed its review, has not approved the BLA, and has requested additional information. Thus, for all practical purposes, the August 1 Press Release makes the regulatory equivalent of a disclosure of receipt of a complete response letter.

79.    In fact, had I been Biopure's food and drug counsel at the time it drafted the August 1 Press Release, I would have advised Biopure to address the "complete response" issue exactly as it did. The Untitled Letter does not contain any title, or otherwise identify itself as a "complete response letter." Instead, it states simply that FDA has completed its review of the BLA. Biopure repeated this language almost verbatim in the August 1 Press Release, stating that FDA "has completed its review of the

28

biologics license application (BLA) for Hemopure . . . ." In my experience the best practice when a company publicizes an FDA action is to repeat the language that FDA used in its communication to the company without attempting to characterize what FDA has done. This is exactly the approach Biopure took in its August 1 Press Release.

80. Second, the August 1 Press Release clearly discloses that FDA has not approved the BLA and has requested additional information from the company. Furthermore, the August 1 Press Release accurately describes these requests as seeking clarification of the preclinical and clinical data. In my judgment, this was the most appropriate way to describe the Untitled Letter. It covers the main points of the letter (*i.e.*, no approval at this time, additional data and information requested to clarify existing data, but no new clinical trials required) without engaging in subjective characterization of FDA's requests or concerns. Such further characterization could only leave Biopure open to criticism by those that did not agree with the characterization, and I would have advised against it.

81. Third, with respect to the PDUFA review clock, the August 1 Press Release states that "With 30 days remaining in the original BLA review cycle, the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response." This is almost verbatim from FDA's own Untitled Letter, which states that "our review clock has been suspended with the issuance of this letter. Note also that any amendment should respond to all deficiencies listed and that a partial reply will not be considered for review nor will the review clock be reactivated until all deficiencies have been addressed." It is difficult to imagine a less misleading approach than to practically quote from FDA's own letter.

82.    Fourth, the August 1 Press Release states that Biopure is encouraged that FDA has finished its review and provided feedback before the PDUFA due date.  For the reasons stated in Parts III(A), (B), and (C), above, I believe it was reasonable for Biopure to have taken the Untitled Letter, as a whole, as a positive development.

83.    Finally, the August 1 Press Release states that "By maintaining thirty days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible . . . ."  This was not an unreasonable conclusion by the company.  In my opinion, based on 40 years of reading these types of letters from FDA, it was unusual for FDA to have "suspended" the PDUFA review clock and promised to reactivate it after receipt of Biopure's complete response.  Because FDA had completed its review of the BLA and issued a comprehensive response, FDA could have terminated the review clock permanently, and was not obligated to "suspend" it or reactivate it.  Thus, at least at the time that Biopure issued the August 1 Press Release, it was reasonable for the company to assume that FDA's actions were intended to speed the continuing review process along as quickly as possible.

### E.    Whether the Untitled Letter Was a "Complete Response Letter" Is Irrelevant

84.    The Government appears to attach great significance to the question of whether the Untitled Letter was a "complete response letter."  In my view, however, what label, if any, CBER attached to the Untitled Letter has little bearing on how Biopure should have interpreted it or reacted to it.

85.    The Government appears to take the position that a "complete response letter" constitutes FDA's final decision on a BLA.  As discussed above, that is

30

clearly not the case here. FDA's Untitled Letter clearly invites Biopure to enter into a dialogue with the agency about the concerns it expresses in the letter. Specifically, it requests additional information, invites Biopure to schedule a meeting with the agency to discuss the issues, and suspends the PDUFA review clock pending receipt of the requested information and data from Biopure.

86. As a result, whether the Untitled Letter was officially an "approvable letter" an "unapprovable letter" a "complete response letter" or simply an "action" letter, is of no relevance. What is important is what the agency actually said in the letter, which in this case was that more information and discussion is required before the application can be approved.

87. FDA has struggled over the years to establish a consistent approach to categorizing response letters to applications. Historically, FDA has responded to marketing applications either by approving the application outright, or through the issuance of "approvable" or "unapprovable" letters. The distinction between these latter two types of letters has always been unclear. In both cases, the letters set forth issues that needed to be clarified, data or information that needed to be provided, or further clinical trials that needed to be run before the application could be approved. Whether the letter was categorized as an "approvable" letter or an "unapprovable" letter depended on the arbitrary judgment of the particular reviewer at FDA in charge of the particular application.

88. In practice, however, the distinction has been nearly meaningless. As discussed above, just because FDA raises issues that it thinks are serious does not mean that FDA is correct in its assessment. I have advised numerous clients who have

31

received "unapprovable" letters from FDA that were ultimately able to prevail upon the agency that its position was wrong and that the data did indeed support approval. Similarly, I have worked with clients that have received "approvable" letters that contained seemingly minor requests from FDA but nonetheless required millions of dollars and years of additional testing and research to fulfill before FDA granted final approval.

89.     In 2004, FDA attempted to clarify the confusion caused by the "approvable/unapprovable" distinction. In a proposed rule published in the Federal Register, FDA proposed regulations that would abolish "approvable" and "unapprovable" letters. Instead, after completion of its review of any marketing application, FDA would issue "complete response letters." 69 Fed. Reg. 43351 (July 20, 2004). FDA proposed to establish this regulation for all types of applications, including BLAs.[2] To date, however, FDA has failed to promulgate final regulations. As a result, FDA continues to issue "approvable," "unapprovable," "complete response," "action," and "untitled" letters, subject to the discretion of the principal reviewers of the marketing application as well as the Directors of the Divisions, Offices, and Centers.

90.     For all of these reasons, whether the Untitled Letter was a complete response letter or some other type of letter has little or no impact on the reaction the company should have had to the letter. As stated above, that reaction should have been

---

[2] The preamble to FDA's proposal indicated that CBER had been following the practice of issuing "complete response" letters since 2002 but nevertheless proposed to adopt a conforming regulation for biologics in order to resolve any confusion. As with the regulations on the drug side, the CBER regulation has not been promulgated in final form, and the agency has not achieved consistency in this approach.

entirely dependent upon how quickly and successfully Biopure thought it could respond to the issues FDA raised.

October 6, 2006

Peter Barton Hutt

**Appendix B**

**Documents Reviewed and Relied Upon**

1. The Federal Food, Drug, and Cosmetic Act of 1938, as amended, 21 U.S.C. 301, *et seq.* and the regulations promulgated thereunder.

2. Complaint of the Securities and Exchange Commission in this case.

3. Expert Report of Edward L. Snyder, MD (February 23, 2006).

4. Letter from Basil Golding, M.D., FDA, to Howard P. Richman, D.P.A., Biopure Corporation (April 25, 2003).

5. Letter from Howard P. Richman, D.P.A., Biopure Corporation to Basil Golding, M.D., FDA (May 12, 2003).

6. Letter from Basil Golding, M.D., FDA, to Howard P. Richman, D.P.A., Biopure Corporation, regarding IND clinical hold and Biopure's May 12, 2003 response (May 30, 2003).

7. Letter from Howard P. Richman, D.P.A., Biopure Corporation to Basil Golding, M.D., FDA (July 2, 2003).

8. Letter from Basil Golding, M.D., FDA to Howard P. Richman, D.P.A., Biopure Corporation, regarding IND 10962 (July 30, 2003).

9. Letter from Basil Golding, M.D., FDA to Howard P. Richman, D.P.A., Biopure Corporation, regarding the Hemopure BLA (July 30, 2003).

10. Biopure Draft Regulatory Agency Telephone Contact Reports dated:

    - January 7, 2003

    - May 27, 2003

11. Letter from Howard P. Richman, D.P.A., Biopure Corporation to FDA (August 9, 2002).

12. Department of Health and Human Services, Food and Drug Administration, Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications (Proposed Rule). 69 Fed. Reg. 43351 (July 20, 2004).

13. Biopure Corporation Press Release: Biopure Receives FDA Response to Hemopure(R) Marketing Application (August 1, 2003).

# EXHIBIT C

10/10/06  TUE 09:10 FAX 617 424 5940    SEC-BDO    ☑002



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BOSTON DISTRICT OFFICE
33 ARCH STREET
23RD FLOOR
BOSTON, MA 02110-1424
PHONE: 617-573-8900
FACSIMILE: 617-573-4590

IAN D. ROFFMAN
PHONE: 617-573-8987
EMAIL: ROFFMANI@SEC.GOV

October 10, 2006

<u>**Via Facsimile and U.S. Mail**</u>

Jason A. Levine
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC 20005-3096

Re:    <u>SEC v. Biopure, Civ. A. No. 05-11853-PBS (D. Mass.)</u>

Dear Jason:

Enclosed is a subpoena to Peter Barton Hutt reflecting our agreed schedule. Thank you for agreeing to accept service. Please let me know if you have any questions.

Very truly yours,

Ian D. Roffman

Enclosure
cc: Cathy Fleming

10/10/06  TUE 09:10 FAX 617 424 5940    SEC-BOO    @003

AO 88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

## UNITED STATES DISTRICT COURT

DISTRICT OF _____ Massachusetts

| | |
|---|---|
| Securities and Exchange Commission, | |
| Plaintiff, | **SUBPOENA IN A CIVIL CASE** |
| v. | |
| Biopure Corporation, et al | CASE NUMBER: 05-CA-11853-PBS[1] |
| Defendants. | District of Massachusetts |
| | TO:    Peter Barton Hutt |

YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

[X]    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| U.S. Securities and Exchange Commission<br>100 F Street, NE<br>Washington, DC 20549 | October 20, 2006 at 9:30 am |

[X]    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| U.S. Securities and Exchange Commission<br>33 Arch Street, 23rd Floor<br>Boston, MA 02110 | October 13, 2006 at 9:30 am |

[ ]    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Ian D. Roffman<br>Attorney for Plaintiff | October 10, 2006 |
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER    Securities and Exchange Commission, 33 Arch Street | |
| Boston, MA  02110    617-573-8987 | |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| served |  |  |

| SERVED ION (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
          DATE                              SIGNATURE OF SERVER


                                            ADDRESS OF SERVER



Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is no limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause
(c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**ATTACHMENT A**
**Subpoena to Peter Barton Hutt**
**October 10, 2006**

**DOCUMENTS REQUIRED TO BE PRODUCED**

Please produce the following documents:

1.    For the period prior to August 1, 2006, all documents concerning communications between you and any Defendant or attorney thereof. (Please note the definition of "Defendant" includes all current and previous defendants in this action).

2.    All documents that you considered in forming your opinions in this matter whether or not referred to or relied upon in your Report, including, but not limited to, all documents listed on Appendix B of your Report and all notes written about or on the documents listed on Appendix B of your Report.

3.    All FDA letters you have reviewed, at any time, that form a basis for any of your opinions regarding the July 30, 2003 BLA Letter or with which you have compared the July 30, 2003 BLA Letter, including, but not limited to, all "complete response letters," "approvable letters," "unapprovable letters," "nonapproval letters" and "action letters" you have reviewed at any time (as you use those terms in your Report) and all letters referenced in your descriptions of "dozens of letters," "literally dozens of letters," "these types of letters," "countless letters," "many instances," "numerous clients who have received 'unapprovable' letters," and "clients that have received 'approvable' letters" in paragraphs 52, 54, 55, 56, 59, and 88, respectively, of your Report.

4.    All documents on which you base your opinion that the language of the July 30, 2003 BLA Letter was "unusual," as stated in paragraph 83 of your Report.

5.    Documents sufficient to identify any other person who assisted you in connection with any of the analyses described in your Report.

6.    All drafts of your Report created prior to August 1, 2006.

7.    All documents provided to you by the Defendants or any others in connection with your work in this matter, including, but not limited to, any documents provided for purposes of your Report whether or not referred to or relied upon therein and any documents provided for purposes of preparing for meetings with the staff of the Securities and Exchange Commission.

8.    All documents concerning meetings between you and the staff of the U.S. Securities and Exchange Commission concerning Defendants, including, but not limited to, all notes made or reviewed by you before, during or after such meetings, all prepared remarks, all documents reviewed, and all communications with any Defendant or counsel for any Defendant in connection with such meetings.

9.    All written reports prepared pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), or other documents or materials prepared to fulfil a similar function, that have been produced in the course of a dispute wherein you have testified as an expert at trial or by deposition within the preceding four years.

## DEFINITIONS AND INSTRUCTIONS

The Uniform Definitions set forth in Local Rule 26.5(c) of the District of Massachusetts are hereby adopted.  In addition:

A.    "Report" means the report entitled, Expert Report of Peter Barton Hutt, disclosed in this matter on October 6, 2006.

B.    "You" means Peter Barton Hutt and anyone working with you or at your direction in connection with your Report.

C.    "Defendant" means Thomas Moore, Jane Kober, Howard Richman and Biopure Corporation, separately and collectively, and any representative, employee, attorney or agent thereof.

D.    The "July 30, 2003 BLA Letter" means the letter you refer to in your Report as the Untitled Letter.

E.    The singular includes the plural and visa versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" means "any and all"; the word "any" means "any and all"; the word "including" means "including without limitation."

F.    "Concerning" means referring to, describing, evidencing, or constituting.

# EXHIBIT D

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Jason A. Levine
Partner
jlevine@mwe.com
202.756.8021

October 13, 2006

**BY HAND DELIVERY**

Ian D. Roffman, Esq.
U.S. Securities and Exchange Commission
Boston District Office
33 Arch Street
Boston, MA 02110

Re:    *SEC v. Biopure,* **Civ. A. No. 05-11853-PBS (D. Mass.)**

Dear Ian:

Pursuant to Federal Rules of Civil Procedure 26 and 45, Peter Barton Hutt, Esq. hereby responds
to the Securities and Exchange Commission's ("SEC") subpoena duces tecum dated October 10,
2006 via this letter and the enclosed documents.

## General Objections

1.     Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they purport to impose obligations beyond the requirements of the Federal Rules of Civil
Procedure and the Local Rules of the United States District Court for the District of
Massachusetts, including specifically those obligations imposed by Fed. R. Civ. P. 26(a)(2).

2.     Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they call for information protected by the attorney-client privilege, protective order entered in
another matter, or any other applicable privilege or immunity, and no production of documents
herewith constitutes a waiver thereof.  (With the exception of his responses to Document
Requests Nos. 3 and 9, Mr. Hutt has withheld no documents on these grounds).

3.     Mr. Hutt objects to the document requests, definitions, and instructions on grounds of
overbreadth, undue burden, and harassment to the extent that they seek documents or
information that are not obtainable through a reasonably diligent search or information that is not
currently within his custody, possession, or control.

4.     Mr. Hutt objects to the document requests, definitions, and instructions to the extent that
they seek documents or information not reasonably calculated to lead to the discovery of
admissible evidence.

Ian Roffman, Esq.
October 13, 2006
Page 2

5.      Mr. Hutt objects to the document requests, definitions, and instructions to the extent that they are not limited to a specific time period.

6.      Mr. Hutt expressly reserves all objections as to relevance, authenticity, or admissibility with respect to any of the documents produced herewith or the subject matter thereof in any subsequent trial or other proceeding in this action.

### Responses

**Request No. 1**:  For the period prior to August 1, 2006, all documents concerning communications between you and any Defendant or attorney thereof.

**Response No. 1**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 2**:  All documents that you considered in forming your opinions in this matter, whether or not referred to or relied upon in your Report, including, but not limited to, all documents listed on Appendix B of your Report and all notes written about or on the documents listed on Appendix B of your Report.

**Response No. 2**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith, with the exception of the Federal Food, Drug, and Cosmetic Act of 1938, as amended, 21 U.S.C. 301, *et seq.* and the regulations promulgated thereunder, which are publicly available government documents, the production of which would be unduly burdensome and would not lead to the discovery of admissible evidence.

**Request No. 3**:  All FDA letters you have reviewed, at any time, that form a basis for any of your opinions regarding the July 30, 2003 BLA Letter or with which you have compared the July 30, 2003 BLA Letter, including but not limited to, all "complete response letters," "approvable letters," "unapprovable letters," "nonapproval letters" and "action letters" you have reviewed at any time (as you use those terms in your Report) and all letters referenced in your descriptions of "dozens of letters," "literally dozens of letters," "these types of letters," "countless letters," "many instances," "numerous clients who have received 'unapprovable' letters," and "clients that have received 'approvable' letters" in paragraphs 52, 54, 55, 56, 59, and 88, respectively, of your Report.

**Response No. 3**:  Mr. Hutt incorporates by reference General Objection Nos. 1-5. Mr. Hutt specifically objects on grounds that this Request seeks documents that contain confidential and/or trade secret information concerning other of Mr. Hutt's clients, which are prohibited from disclosure absent express approval from these clients and the FDA. Mr. Hutt further specifically objects that the absence of a time limitation on this Request, given his 40 years of private practice receiving and reviewing materials of the sort described in the Request, renders it unduly

Ian Roffman, Esq.
October 13, 2006
Page 3

burdensome. Subject to and without waiving these objections, Mr. Hutt states that he has no responsive documents in his possession, custody, or control that he is authorized to produce.

**Request No. 4**: All documents on which you base your opinion that the language of the July 30, 2003 BLA Letter was "unusual," as stated in paragraph 83 of your Report.

**Response No. 4**: Mr. Hutt incorporates by reference General Objection Nos. 1-5. Mr. Hutt specifically objects on grounds that this Request seeks documents that contain confidential and/or trade secret information concerning other of Mr. Hutt's clients, which are prohibited from disclosure absent express approval from these clients and the FDA. Mr. Hutt further specifically objects that the absence of a time limitation on this Request, given his 40 years of private practice receiving and reviewing documents of the sort described in the Request, renders it unduly burdensome. Subject to and without waiving these objections, Mr. Hutt states that he has no responsive documents in his possession, custody, or control that he is authorized to produce.

**Request No. 5**: Documents sufficient to identify any other person who assisted you in connection with any of the analyses described in your Report.

**Response No. 5**: Mr. Hutt incorporates by reference General Objection Nos. 1 and 4. Subject to and without waiving these objections, he responds as follows: None, although Mr. Hutt can identify such persons during his deposition.

**Request No. 6**: All drafts of your Report created prior to August 1, 2006.

**Response No. 6**: Mr. Hutt incorporates by reference General Objection Nos. 1-4. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 7**: All documents provided to you by the Defendants or any others in connection with your work in this matter, including, but not limited to, any documents provided for purposes of your Report whether or not referred or relied upon therein and any documents provided for purposes of preparing for meetings with the staff of the Securities and Exchange Commission.

**Response No. 7**: Mr. Hutt incorporates by reference General Objection Nos. 1-5. He specifically objects that the term "any others" is unintelligible as used in this Request. Subject to and without waiving these objections, and based upon a reasonable interpretation of the term "any others," he has produced responsive documents herewith.

**Request No. 8**: All documents concerning meetings between you and the staff of the U.S. Securities and Exchange Commission concerning Defendants, including, but not limited to, all notes made or reviewed by you before, during or after such meetings, all prepared remarks, all documents reviewed, and all communications with any Defendant or counsel for any Defendant in connection with such meetings.

Ian Roffman, Esq.
October 13, 2006
Page 4

**Response No. 8**:  Mr. Hutt incorporates by reference General Objection Nos. 1-5. Subject to and without waiving these objections, he has produced responsive documents herewith.

**Request No. 9**:  All written reports prepared pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), or other documents or materials prepared to fulfill a similar function, that have been produced in the course of a dispute wherein you have testified as an expert at trial or by deposition within the preceding four years.

**Response No. 9**:  Mr. Hutt incorporates by reference General Objection Nos. 1-4.  He specifically objects that the Request is unintelligible because it does not specify by whom the requested written reports were prepared.  He further objects to the production of his prior written expert reports because, with one exception, they are subject to protective orders that he cannot be compelled to violate in this proceeding.  Subject to and without waiving these objections, and based upon the reasonable interpretation that the Request seeks written reports or other materials of which Mr. Hutt was the author, he has produced herewith those responsive documents that are not subject to protective orders.

Sincerely yours,

Jason A. Levine

cc:    Bobby R. Burchfield, Esq.
       Cathy Fleming, Esq.

# EXHIBIT E

# McDermott
# Will&Emery

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Jason A. Levine
Partner
jlevine@mwe.com
202.756.8021

**BY OVERNIGHT MAIL**

July 11, 2006

Edward L. Snyder, M.D.
Yale School of Medicine
Yale-New Haven Hospital
Blood Bank CB-459
20 York Street
New Haven, CT 06510

       Re:    *SEC v. Biopure Corp.,* Civ. No. 05-11853-PBS (D. Mass.)

Dear Dr. Snyder:

I am counsel for defendant Thomas Moore in the case referenced above.  In connection with your expert disclosure in this case, enclosed is a subpoena requiring you to appear and provide testimony on Wednesday, August 2, 2006, at 9:00 a.m. in the office of McDermott Will & Emery LLP, located at 28 State Street, Boston, MA 02109.  We are prepared to change the date if necessary to accommodate your schedule.  The enclosed subpoena also requires the production of documents at or before the deposition, as set forth in the attached Schedule A.

Ian Roffman, counsel for the SEC, has agreed to accept service of this subpoena on your behalf, and we send you this copy as a courtesy.  Please feel free to contact me with any questions you may have.

Sincerely,

Jason A. Levine

Enclosure

cc:    Ian Roffman, Esq.

S. AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ Massachusetts

U.S. Securities and Exchange Commission

V.

**SUBPOENA IN A CIVIL CASE**

Biopure Corporation, Thomas Moore, Howard
Richman, and Jane Kober

Case Number:[1]  05-11853-PBS

TO:  Edward L. Snyder, M.D. / Yale School of Medicine
Yale-New Haven Hospital / Blood Bank CB-459
20 York Street / New Haven, CT 06510

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION   McDermott Will & Emery LLP / 28 State Street / Boston, MA 02109 | DATE AND TIME |
|---|---|
|  | 8/2/2006 9:00 am |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Schedule A (attached)

| PLACE   McDermott Will & Emery LLP / 28 State Street / Boston, MA 02109 | DATE AND TIME |
|---|---|
|  | 8/2/2006 9:00 am |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
|  | 7/11/2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Jason A. Levine / McDermott Will & Emery LLP / 600 Thirteenth Street, NW / Washington, DC 20005 / 202.756.8000
Attorney for Defendant Thomas A. Moore

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

**SCHEDULE A**

**(Edward L. Snyder, M.D.)**

**INSTRUCTIONS**

(A)    Each request for documents seeks production of the document in its entirety, without abbreviation or expurgation, including all attachments or other matters affixed thereto.

(B)    Where any copy (or copies) of any document sought is (or are) not identical to any other copy thereof, by reason of any alterations, notes, comments, or other material contained thereon, or attached thereto, or otherwise, all such non-identical copies shall be produced separately.

(C)    In producing documents, all documents that are physically attached to each other in files shall be left so attached.  Documents that are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by the use of dividers, tabs, or any other method, shall be left so segregated or separated.  Documents shall be retained in the order in which they were maintained.

(D)    If any document requested was, but no longer is, in your possession, custody, or control, or is no longer in existence, please provide information sufficient to identify the document(s) and the reason(s) why such document(s) is (or are) no longer in your possession, custody, or control.

(E)    If any document covered by this Subpoena is withheld by reason of a claim of privilege or exemption, a list is to be furnished at the time that documents are produced identifying any such documents for which the privilege is claimed together with the following information with respect to any such document withheld:  date, sender, recipient, any person to whom copies were furnished and the identity of any person, general subject matter, basis on which privilege is claimed, and the paragraph of this Subpoena to which such document relates.

(F)    In the event that any document called for by this Subpoena has been destroyed, lost, discarded or otherwise disposed of within the twelve months preceding the date of this Subpoena, any such document is to be identified as completely as possible, including, without

limitation, the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal, and person disposing of the document.

(G)    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, this Subpoena shall be deemed continuing so as to require further and supplemental production between the time of initial production and the time of hearing or trial.

(H)    All documents are to be produced as they are kept in the usual course of business.

## DEFINITIONS

Defendant Thomas Moore incorporates by reference the Uniform Definitions in Discovery Subpoenas as set forth in United States District Court for the District of Massachusetts Local Rule 26.5. In addition, the following definitions shall apply:

(A) "Biopure" includes Biopure Corporation and all parents, subsidiaries, wholly-owned or otherwise, affiliates, officers, directors, employees, representatives, agents, and all other persons or entities acting on its behalf.

(B)    "You" and "your" refers to Edward L. Snyder, M.D., including all employees, representatives, agents, and all other persons or entities acting on your behalf.

(C)    "Report" refers to the Report, dated February 23, 2006, pursuant to Fed. R. Civ. P. 26(a)(2), prepared by you for Ian D. Roffman, R. Daniel O'Connor, and Ellen Bober Moynihan of the United States Securities and Exchange Commission in connection with *SEC v. Biopure Corp.*, Civ. No. 05-11853-PBS (D. Mass.).

(D)    "Defendants" refers to the defendants in the matter identified above, Biopure Corporation, Mr. Thomas Moore, Ms. Jane Kober, and Mr. Howard Richman.

(E)    The term "document" is used in the broadest sense and includes, but it not limited to, all writings of any description, whether typed or handwritten, in hardcopy or electronic form.

(F)    The terms "communication" and "communications" are used in the broadest sense and mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise)

2

whether written or oral, and include without limitation all forms of electronic mail, voice mail, or other recorded forms of communication. To the extent that a communication is a meeting or conversation, you are requested to (a) identify all participants in the meeting or conversation; and (b) state the nature, date, location, and substance of the meeting or conversation.

(G)    The term "person" includes natural persons or any business, legal, or governmental entity or association.

(H)    The terms "relating to" and "regarding" mean referring to, concerning, describing, referencing, evidencing, summarizing, recording, regarding, mentioning, or constituting.

(I)    The term "reflecting" means evidencing, demonstrating, touching upon, mentioning, commenting on, incorporating, analyzing, transcribing, noting, evaluating, reviewing, reporting on, critiquing, criticizing, or showing in any way.

(J)    The singular includes the plural and the plural includes the singular; the words "and" and "or" shall be both conjunctive and disjunctive; "any" means "any and all"; and the words "include" or "including" mean including without limitation.

## <u>DOCUMENTS TO BE PRODUCED</u>

1.  All drafts of your Report, including the final Report.

2.  All documents referenced in Paragraphs 2 and 3 of Attachment 1 to your Report, respectively concerning: (a) written correspondence between the FDA and Biopure occurring between September 15, 1999 and March 16, 2004; and (b) summaries of telephone communications between the FDA and Biopure.

3.  Apart from pleadings in this matter, all documents upon which you relied or which you consulted in drafting your Report.

4.  All documents provided to you by the United States Food and Drug Administration or the United States Securities and Exchange Commission in connection with your work in this matter, including but not limited to any documents provided for purposes of your Report whether or not referred to or relied upon therein.

3

5.  All documents concerning, constituting or reflecting any communications between you (or your representatives or agents) and the United States Food and Drug Administration, or any division or department thereof, regarding this matter, any of the Defendants, and the opinions or facts expressed in your Report.

6.  All documents concerning, constituting or reflecting any communications between you (or your representatives or agents) and the United States Securities and Exchange Commission regarding this matter any of the Defendants, and the opinions or facts expressed in your Report.

7.  All documents concerning, constituting or reflecting any communications between you (or your representatives or agents) and any other person regarding this matter, any of the Defendants, and the opinions or facts expressed in your Report.

8.  All documents prepared by you at any time for any purpose that refer or relate to any of the Defendants.

9.  All documents sufficient to identify all of the "clinical trials" in which you were a "Principal Investigator" as identified on page 1 of your Report, including without limitation documents sufficient to identify the subject matter of such clinical trials.

10. All documents sufficient to identify the scope of your role as a "Special Government Employee (SGE) for the Office of Blood CBER" as described on page 8 of Attachment 2 to your report, including without limitation any job descriptions, retainer or employment agreements, policies, guidelines, or written manuals.

11. All documents prepared by you in connection with your expert testimony in Beglin v. University Medical Center in Louisville Kentucky, as described in Page 2 of your Report.

12. All documents sufficient to identify all other matters in which you have been retained to provide expert testimony, including without limitation the subject matter thereof.

4

# EXHIBIT F



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BOSTON DISTRICT OFFICE
33 ARCH STREET
23ᵀᴴ FLOOR
BOSTON, MA 02110-1424
PHONE: 617-573-8900
FACSIMILE: 617-573-4590

IAN D. ROFFMAN
PHONE: 617-573-8987
EMAIL: ROFFMANI@SEC.GOV

October 18, 2006

<u>**Via Facsimile and U.S. Mail**</u>

Heather Sidwell
McDermott, Will & Emery
600 13th Street, N.W.
Washington, DC 20005-3096

Re:   <u>SEC v. Biopure, Civ. A. No. 05-11853-PBS (D. Mass.)</u>

Dear Heather:

Thank you for your letter, dated October 16, 2006. I appreciate your efforts to try to get your letter to me Monday evening, but because I was traveling for yesterday's deposition, I did not receive it until I returned to Boston last night.

We have requested other FDA letters from Mr. Hutt because in his report, Mr. Hutt expresses opinions based on comparisons between specific language in the Biopure letter and in other letters. This is very different from an expert or witness who bases his or her opinion on past experience, generally.

However, to reduce the breadth of the requests and to minimize the burden on Mr. Hutt, we would be willing to accept a production of responsive letters that is limited to letters issued only by CBER and only during the period from January 1998 through December 2003. I would also be willing to discuss reaching an agreement to protect confidential information that belongs to companies other than Biopure. Please let me know if this compromise is acceptable to you.

Very truly yours,

Ian D. Roffman

cc:    Cathy Fleming