## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 05-11853-PBS |
| BIOPURE CORPORATION, THOMAS MOORE, HOWARD RICHMAN, and JANE KOBER, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANT THOMAS A. MOORE'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF CERTAIN STATEMENTS MADE BY DOUGLAS J. SAYLES

Defendant Thomas A. Moore moves to bar the Securities and Exchange Commission ("SEC") from offering evidence at trial about unauthorized statements made to investors in August 2003 by Douglas Sayles, Biopure Corporation's Director of Corporate Communications, which the SEC apparently seeks to assert against Mr. Moore because he did not expressly correct them. Preclusion is appropriate for two reasons. *First*, the SEC did *not* plead facts pertaining to the statements of Mr. Sayles in the Complaint, but raised this new theory of liability for the first time during Mr. Moore's deposition on November 7, 2006 – after the formal close of discovery. Given the requirement that fraud claims must be pleaded with particularity (*see* Fed. R. Civ. P. 9(b)), the SEC's 11th-hour unpleaded theory is improper. *See, e.g.*, *Fisher v. Samuels*, 1998 WL 112196, at *1 (N.D. Ill. Oct. 20, 1988) (excluding evidence of misrepresentations that were not included in the Complaint); *John Does v. Covington Cty. Sch. Bd.*, 969 F. Supp. 1264, 1287 (M.D. Ala. 1997) (excluding fraud allegations that "lie outside the scope of the complaint").

*Second*, it was Biopure or Mr. Sayles himself, not Mr. Moore, that had a duty to correct Mr. Sayles' challenged statements if they were inaccurate at the time they were made. *In re E On AG,* Exchange Act Release No. 43,372, 2000 SEC LEXIS 2055, at *17 (Sept, 28, 2000) (Ex. 1) (duty to correct is borne by the "issuer"); *In re Bruno,* Exchange Act Release No. 40,769, 1998 SEC LEXIS 2666, at *8-*9 (Dec. 10, 1998) (same) (Ex. 2); *In re Biogen Sec Litig,* 179 F.R.D. 25, 34 (D. Mass. 1997) (duty to correct is borne by speaker). Accordingly, the statements are irrelevant as to Mr. Moore's liability and should be excluded pursuant to Federal Rule of Evidence 402.

## BACKGROUND

The SEC first issued Wells Notices to Mr. Moore and others on December 22, 2003, following an investigation that included the deposition of Douglas J. Sayles on December 3, 2003. Over the next nine months, the SEC continued its *ex parte* investigation, and then filed the Complaint against Biopure Corporation, Mr. Moore, and others on September 14, 2005. The 50-page Complaint pleads no facts whatsoever pertaining to Mr. Sayles, nor does it predicate any of its causes of action on statements he made to investors.

On or around August 1, 2003, Mr. Sayles publicly estimated the length of time required for Biopure to respond to the July 30, 2003 letter from the FDA that raised questions about the Biologics Licensing Application for Hemopure (the "BLA Letter"). Before Mr. Sayles made his estimates, the company had determined that it would state to the public that it would respond "as expeditiously as possible" to the FDA's questions. *See* Moore Tr. 197:12 to 198:7, 204:19 to 208:15 (Ex. 3). Mr. Sayles transgressed the bounds of his authority, however, and stated that Biopure would be able to respond to the BLA Letter "in one or two months." *See* August 1, 2003 article from Dow Jones Business News (Ex. 4). Mr. Moore did not approve Mr. Sayles'

estimates in advance, nor did Mr. Moore himself ratify or make any similar estimates to the

public. *See* Moore SEC Tr. 222:2-6 (Dec. 12, 2003) (Ex. 5); Moore Tr. 195:20 to 196:3 (Ex. 3).

Indeed, Mr. Moore learned of Mr. Sayles' statements on August 4, 2003, several days *after* they

were made. At this point, Mr. Moore instructed Mr. Sayles to make no further estimates of a

timeframe for Biopure's response to the BLA Letter. *See* Moore Tr. 198:8 to 199:9, 225:5-8,

232:9-21. Mr. Moore himself made no public predictions of a date when Biopure would respond

to the BLA Letter until October 30, 2003, when he provided an estimate of June 30, 2004. *See*

Biopure Press Release of Oct. 30, 2003 (Ex. 6).

**ARGUMENT**

I.  **THE SEC FAILED TO PLEAD THE STATEMENTS OF MR. SAYLES IN THE COMPLAINT.**

      The SEC's Complaint is devoid of *any* allegations relating to Mr. Sayles or his

unauthorized statements of August 1, 2003. For the SEC now to premise its claims against Mr.

Moore on these wholly unpleaded allegations would be contrary to Federal Rule of Civil

Procedure 9(b), which requires that "all averments of fraud . . . shall be stated with particularity."

This "particularity" requirement means that a Complaint must describe the "times, dates, places,

and other details of the alleged fraudulent involvement of the actors." *Serabian v. Amoskeag*

*Bank Shares*, 24 F.3d 357, 361 (1st Cir. 1994).

      For this reason, courts do not permit evidence at trial of purportedly fraudulent acts that

are not alleged in the Complaint. *See Fisher*, 1998 WL 112196, at *1 (granting defendant's

motion in limine and holding that because "fraud must be plead[ed] with particularity" under

Rule 9(b), "actionable misrepresentations must be included within the complaint."); *John Does*,

969 F. Supp. at 1287 (striking plaintiff's allegations of fraud "which lie outside the scope of the

complaint" pursuant to "the heightened pleading requirement placed on the plaintiff under Rule

- 3 -

9(b)"). These holdings comport with the underlying rationale of Rule 9(b), which is to provide defendants with specific notice of their conduct giving rise to claims of fraud. The Complaint provided no notice to Mr. Moore that the SEC would attempt to premise its securities fraud claims upon Mr. Sayles' unauthorized statements. The SEC's apparent attempt to interject these unpleaded allegations – and theory of liability – into this action after the close of discovery is wholly inappropriate, and should be barred.

## II.    MR. MOORE HAS NO LIABILITY FOR MR. SAYLES' UNAUTHORIZED STATEMENTS.

Evidence of Mr. Sayles' unauthorized statements should also be excluded from trial as irrelevant and unfairly prejudicial, because – if they were factually inaccurate – Mr. Moore had no duty to correct them as a matter of law. *See* Fed. R. Evid. 402. On the contrary, the SEC itself has determined that the "issuer" – not its Chief Executive Officer – bears the "duty to correct statements made by its corporate representatives which it learns were misleading or inaccurate when made." *In re E.On AG,* Exchange Act Release No. 43,372, 2000 SEC LEXIS 2055, at *17 (Ex. 1); *In re Bruno,* Exchange Act Release No. 40,769, 1998 SEC LEXIS 2666, at *8-*9 (Ex. 2). Accordingly, it was Biopure, as the "issuer," *not* Mr. Moore personally, that had a duty to correct any inaccurate public statement by Mr. Sayles. Alternatively, this Court has held in at least one case that the speaker himself bears the duty to correct a material misstatement. *See In re Biogen,* 179 F.R.D. at 34 (citing *Backman v. Polaroid Corp.,* 910 F.2d 10, 16-17 (1st Cir. 1990) ("[I]f a disclosure is in fact misleading when made, and the *speaker* thereafter learns of this, there is a duty to correct it" (emphasis added)). In neither instance would the duty to correct devolve to Mr. Moore.

The SEC may contend that Mr. Sayles' statements are nonetheless attributable to Mr. Moore because he approved them, but there is *no evidence* to this effect. On the contrary, Mr.

Moore testified – without contradiction – that Mr. Sayles was authorized only to state that Biopure was working "as expeditiously as possible" to answer FDA's questions in the BLA Letter. *See* Moore Tr. 197:12 to 198:7, 199:3 to 199:9, 204:19 to 208:15. When Mr. Moore learned of Mr. Sayles' statements on August 4, 2003 – several days *after* they were made – he instructed Mr. Sayles to make no further estimates of a timeframe for Biopure's response to the BLA Letter. *See* Moore Tr. 198:8 to 199:2, 225:5-8, 232:9-21.

Accordingly, because Mr. Moore bore no personal duty to correct Mr. Sayles' unauthorized statements, and because he is not otherwise liable for them, evidence pertaining to these statements should be excluded from trial on relevance grounds.

## CONCLUSION

For the foregoing reasons, the SEC should be barred from offering evidence at trial regarding Mr. Sayles' unauthorized statements about Biopure's timeframe for responding to the BLA Letter.

## CERTIFICATION

Pursuant to Local Rule 7.1, the undersigned hereby certify that they have conferred on behalf of Mr. Moore with opposing counsel in an attempt to resolve and narrow the issues in the foregoing Motion.

Respectfully submitted,

/s/ Bobby R. Burchfield
Edward P. Leibensperger (BBO# 292620)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
617.535.4000 phone
617.535.3800 facsimile

Bobby R. Burchfield
Jason A. Levine
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005-3096
202.756-8000 phone
202.756-8087 facsimile

Date:   November 29, 2006                *Counsel for Defendant Thomas A  Moore*

# EXHIBIT 1

1 of 1 DOCUMENT

In the Matter of E.ON AG, Respondent

ADMINISTRATIVE PROCEEDING File No. 3-10318

SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934 Release No. 43372

*2000 SEC LEXIS 2055, 54 S E C  876*

September 28, 2000

**ACTION:**
[*1] ORDER INSTITUTING PUBLIC PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER

**TEXT: [**876]**

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against E ON AG ("E ON"), formerly known as Veba AG ("Veba").

**II.**

In anticipation of the institution of these proceedings, E.ON has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, E ON, without admitting or denying the findings set forth herein, except as to the Commission's jurisdiction over it and over the subject matter of these proceedings, which is admitted, consents to the entry of this Order Instituting Public Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing A Cease-and-Desist Order.

[**877]

**III.**

**FACTS**

On the basis of this Order and E.ON's Offer of [*2] Settlement, the Commission makes the following findings:

**A. Summary**

Veba, one of Germany's five largest industrial holding companies with securities registered with the Commission under the Exchange Act, engaged in a month-long, deliberate pattern of issuing materially false denials concerning merger negotiations with Viag AG ("Viag"), another large German company. n1 Beginning July 29, 1999 and continuing until August 31, 1999, Veba made a series of statements in which it falsely denied press reports that it was engaged in merger negotiations with Viag. In fact, as of July 29, the two companies had, among other things, executed a confidentiality agreement, retained investment bankers and legal advisors, exchanged financial forecasts, and engaged in high-level talks concerning proposed deal structures, valuation methods, corporate governance and other merger issues.

> n1 On June 16, 2000, Veba's merger with Viag was consummated  The combined entity was renamed E ON AG  Effective June 19, 2000, Veba's American Depositary Receipts ("ADRs") continued trading on the New York Stock Exchange under the name E ON AG. When referring to conduct in 1999, the Commission's Order will refer to the Respondent as Veba.

2000 SEC LEXIS 2055, *; 54 S.E.C. 876, **

**[*3]**

Veba's repeated denials were widely disseminated in Germany and were also reported in the United States. Certain denials, drafted by Veba in both German and English, were made with the expectation that the denials would be published by the U.S. press and read by U.S. investors. Veba's denials were made pursuant to a policy of "absolute denial." This policy was implemented in June 1999 at the direction of Veba's CEO and the Chairman of its Board of Management ("Chairman"). The policy was maintained until August 31, 1999. On September 1, 1999, Veba publicly acknowledged for the first time that it had been engaged in merger negotiations and had agreed with Viag on the framework of a merger.

**[**878] B. Respondent**

**E.ON AG, formerly Veba,** is a German corporation that was formed as a result of the merger between Veba and Viag. The combined entity is Germany's third largest industrial holding company encompassing industries such as energy, chemicals, real estate management and telecommunications. In 1997, prior to its merger with Viag, Veba registered with the Commission pursuant to Section 12(b) of the Exchange Act and began to list its ADRs on the NYSE. The total number of ADRs outstanding **[*4]** in 1999 fluctuated between 1.3 and 1.6 million. Worldwide, Veba had approximately 500 million shares outstanding. According to Veba's 1999 Annual Report on Form 20-F, U.S. investors owned approximately 11 percent, or $ 3.3 billion, of Veba's outstanding share capital. Veba's shares were listed on all eight German stock exchanges, as well as those in Amsterdam, Vienna and Switzerland. n2 E.ON's executive offices are located in Dusseldorf, Germany.

n2 Veba's shares ceased to be listed on the Amsterdam and Vienna stock exchanges in October 1999.

Veba's market capitalization in July 1999 approximated $ 30 billion. Total revenues in 1999 exceeded $ 50 billion. Veba had a significant presence in the U.S. In 1999, companies under Veba's control had 12,300 U.S.-based employees, and Veba derived approximately $ 4 billion, or eight percent of its 1999 revenues, from its U.S. operations. Veba also owned a controlling interest in MEMC Electronic Materials, a NYSE-listed company.

**C. The Status of Merger Negotiations as of July [*5] 29, 1999**

In April 1999, Veba's Chairman, and Viag's CEO and Chairman, met to discuss a possible merger of the two companies. Substantive, high-level merger discussions followed this April meeting and intensified in June 1999. Veba's Chairman, along with Veba's Chief Financial Officer ("CFO") and its Chief Legal Officer ("CLO"), were directly involved in and responsible for these merger discussions on behalf of Veba.

By July 29, Veba and Viag had retained investment bankers and legal counsel to advise on the merger negotiations, exchanged **[**879]** financial forecasts, executed a confidentiality agreement, advised the German Cartel Office of the potential merger and engaged in high-level discussions concerning proposed deal structures, valuation methods, corporate governance and related merger issues.

**D. Veba's Corporate Communication Policies**

One month earlier, on June 28, 1999, Veba and Viag reached a mutual understanding concerning potential inquiries from the press. Veba and Viag agreed that until further notice they would deny absolutely the existence of any merger negotiations. Veba's Chairman implemented this policy of "absolute denial" within Veba. The policy was implemented because **[*6]** Veba was concerned that disclosure might decrease its ability to obtain the support of labor, government officials and German state governments, particularly the support of the Free State of Bavaria which had the ability to veto the merger (the merger required 75 percent shareholder approval and Bavaria owned 25.1 percent of Viag's stock).

Veba's Chairman, Veba's Director of Corporate Communications ("Director of Communications"), and Veba's Spokesperson ("Spokesperson"), were the only persons authorized to speak or issue statements to the press on behalf of Veba. Generally, the Spokesperson reported to the Director of Communications who reported directly to Veba's Chairman. All of Veba's communications with the press concerning Viag were pre-approved by or coordinated with Veba's Chairman, CFO or CLO.

Veba monitored the press closely, including selected U.S. publications such as the *Wall Street Journal* and *Newsweek*. Twice a day, clippings of news articles discussing Veba were distributed to the Chairman and others within Veba. In implementing its policy of denying merger negotiations, Veba knew and expected that the company would be covered by U.S. publications such as the [*7] *Wall Street Journal*. On several occasions noted below, Veba prepared denials in English in anticipation of inquiries from the English-speaking press.

[**880]  E. Veba Falsely Denies that it is in Merger Negotiations

1. Veba's First Denial

The first press inquiry regarding merger negotiations between Veba and Viag occurred on Thursday, July 29, 1999. On that day, a reporter for the German newspaper *Handelsblatt* advised Veba's Spokesperson that he had information that Veba and Viag had delivered a so-called "Voranfrage" or preliminary request to the German Cartel Office seeking the preliminary approval of a merger. Veba was asked to comment. After consulting with the CLO, the Spokesperson accurately told the reporter that a preliminary request had not been delivered to the Cartel Office. When asked how he explained this information, the Spokesperson responded "I've got the impression that it's one of many speculations in the air at this time."

Undeterred, the *Handelsblatt* reported on July 30 that Veba and Viag were planning a merger and that they had sought preliminary approval of the merger from the German Cartel Office. The *Handelsblatt* article also contained the Spokesperson's [*8] comment that the information was "one of many speculations." That day, Veba's press department distributed the *Handelsblatt* article to the Chairman, the CFO and the CLO as part of Veba's daily press clippings.

On that same morning, the Director of Communications was called into a meeting with the Chairman, the CFO and the CLO. Veba's senior management was very upset about this article, and ordered the Director of Communications to deny the existence of any negotiations. She was also instructed to contact her counterpart at Viag to "get a common understanding" on a statement. Despite inquiries from the Director of Communications, senior management refused to provide any further details about the merger negotiations.

A statement of denial consistent with these specific instructions was prepared in English as well as German. The English version of the statement, which was drafted by Veba for the express purpose of responding to inquiries from the English-speaking press, read as follows: "VEBA denies merger talks with VIAG. In the new competitive situation brought on by the liberalization of Europe's power markets, all market participants are in contact with one another. Veba is not [*9] in merger talks or negotiations with VIAG or any other market player."

[**881]

Veba issued the English and German versions of this statement to the press, including wire and news services. Veba's statement was carried by a number of publications, and was quoted in a *Wall Street Journal* story dated August 2, 1999. These articles were disseminated within Veba as part of the daily press clippings and Veba's senior management, including its Chairman, were aware that Veba's initial denial was being reported in the press.

2. Veba's Subsequent False Denials

a. The August 16 *Handelsblatt* Article

On Monday, August 16, Veba's Chairman and its CFO met with their counterparts at Viag to discuss the terms and conditions of the proposed merger. On the same day *Handelsblatt* published an article quoting the chief of the German Cartel Office as stating that under certain circumstances his office would look favorably on mergers in the electrical energy markets, and confirming that Veba and Viag had conducted preliminary discussions with his office concerning a possible merger.

In response to the August 16 *Handelsblatt* article, the Director of Communications again met with the Chairman, [*10] the CFO and the CLO. During the meeting, she was instructed to draft a press statement to respond to inquiries concerning the *Handelsblatt* article. That statement, translated into English, stated that: "within the framework of the liberalization of the electrical energy markets we, as the entire German energy branch, need to talk regularly with the Cartel Office. We know nothing of preliminary discussions about a merger between Veba and Viag."

This statement was reviewed and approved by the CLO. It was also provided to the Chairman and the CFO and then widely disseminated outside the company. The German Press Agency ("DPA") picked up the denial and ran a

2000 SEC LEXIS 2055, *; 54 S.E.C. 876, **

story. Reuters also picked up the denial and ran a story in English. Copies of the Reuters article were distributed within Veba. No one within Veba raised any objections to the denial.

### [**882] b. The *Manager Magazine* Article

On August 19, the Chairman met with the chairman of Veba's Supervisory Board, and advised him of the negotiations with Viag. That same day, Veba received an advance copy of the September issue of *Manager Magazine*. The *Manager Magazine* article reported that Veba and Viag were quietly negotiating [*11] a merger and that a management team had been discussed for the new company. Later that day, senior management instructed the Director of Communications to prepare a statement consistent with the company's policy of absolute denial for use in responding to any press inquiries resulting from the article. That statement, drafted in both English and German and approved by the CLO, stated that: "we stand by our recent statement: VEBA stays in contact with a number of market players. There are no concrete merger negotiations with Viag. We do not comment on details of the Manager Magazine article."

Reuters carried Veba's August 19 statement that same day. DPA also released the statement over its wire service. The August 19 statement was quoted by the *Wall Street Journal* in two articles published on August 20, 1999.

### c. The *Wirtschaftswoche* Article

On August 23, an article was posted on the website of *Wirtschaftswoche*, a weekly business newspaper. The article claimed that the Bavarian government had confirmed the existence of discussions with Veba and Viag, and that Bavaria would sell its interest in Viag to Veba. The author contacted Veba's Spokesperson and asked for a [*12] personal statement from the Chairman concerning the "real" status of discussions between Veba and Viag.

After consulting with the Chairman, the Spokesperson drafted a statement for his review. The Chairman made certain revisions to the statement and authorized its release. The revised statement read as follows: "We are not carrying on negotiations about a merger with Viag or acquiring a stake in Viag. In the context of the coming consolidation in the German and European energy industry, we are naturally talking with many companies in order, among other things, to explore the possibilities for future cooperative agreements."

### [**883]

Negotiations between Veba and Viag continued throughout this period. For example, later that same day, the Chairman advised Veba's Board of Management about the status of negotiations and the contemplated structure and timing of the transaction. Then, on August 26 and 27, the Chairman, the CFO and the CLO, together with their counsel, met with senior Viag officers to discuss terms of the proposed memorandum of understanding. The parties agreed upon a basic framework for a merger during these meetings.

### d. The *Focus* Magazine Article

On Saturday, August [*13] 28, the weekly magazine *Focus* publicly announced its intention to publish an article on Monday, August 30, stating that Veba and Viag were close to a merger and that the Board of Management of the new company would have five members. A Reuters reporter then asked for a statement. Veba's Spokesperson consulted the Chairman and asked whether Veba should continue its denials or whether Veba should issue a comment. The Spokesperson was advised not to comment on "speculations like this" and to continue to deny the existence of merger discussions or negotiations. The Spokesperson then called the Reuters reporter and provided the following statement: "there continue to be no merger negotiations with Viag. We do not comment on individual speculations." On August 28, the Reuters reporter disseminated an article with this inaccurate statement.

On August 29, the Spokesperson was contacted by DPA for a statement. DPA was provided a similar statement denying negotiations with Viag. DPA then used the statement in an article discussing the *Focus* magazine article. Reuters picked up the DPA article and issued another story carrying the same statement.

### F. Veba Begins to Say "No Comment" in [*14] Response to Press Inquiries

On Monday, August 30, Veba's CLO and a Viag representative met with the Cartel Office in Berlin. That same day, the Chairman met with the Director of Communications. After discussing the matter and Veba's policy of denial, the Chairman advised the Director of Communications that she could respond to future press [**884] inquires about merger negotiations by stating that Veba had "no comment." This change was made because the Chairman believed that the likelihood of the merger being completed was much greater and because the press was asking questions about spe-

cific aspects of the merger. There was no discussion concerning whether Veba's past statements should be corrected. On August 31, Veba made its first statements to the press using "no comment."

### G. Veba and Viag Publicly Confirm Merger Discussions

On September 1, the Chairmen of Veba and Viag met with the Premier and other officials of the Free State of Bavaria to discuss the proposed transaction and a possible sale of some or all of Bavaria's stake in Viag. The two Chairmen were confronted by reporters as they emerged from the meeting, at which time they acknowledged for the first time that they had **[*15]** agreed on the basic outline of a merger.

On September 2, the *Wall Street Journal* published an article referencing the comments of the two Chairmen made on September 1. This article, which was distributed within Veba, stated in part: "After weeks of speculation and investor confusion because of the companies' repeated denials, trading in Veba and Viag shares soared Wednesday." There were no discussions within Veba at any time concerning whether to correct its past statements.

On September 26, Veba's Supervisory Board approved the Memorandum of Understanding between Veba and Viag. On September 27, Veba and Viag signed the Memorandum of Understanding and held a joint press conference to announce the merger.

### H. Veba's Denials Caused Investor Confusion

Throughout the month of August 1999, Veba received between 10 and 30 press inquiries per day concerning the rumored merger. Veba consistently responded to each of these inquiries by denying the existence of any merger discussions. In addition, Veba responded proactively by drafting and providing statements to the press denying any negotiations. Veba's senior management was directly involved in drafting and approving public statements **[*16]** that they knew were false.

**[**885]**

Veba's policy of denial caused a period of investor confusion that continued through September 1. Over the month of denials, the price of Veba's ADRs fluctuated between 59 1/2 and 66 1/4.

### IV.

### LEGAL DISCUSSION

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit an issuer from making public statements that are false or that fail to include material facts necessary to make the statements made, in light of the circumstances under which they are made, not misleading. See, e.g., *SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860-2 (2nd Cir. 1968)* (en banc), cert. denied sub nom., *Coates v. SEC, 394 U.S. 976 (1969); Schlanger v. Four-Phase Systems, Inc., 582 F.Supp. 128 (S.D.N.Y. 1984).* Where a corporation denies the existence of merger negotiations, or makes a partial disclosure of information, it is under a duty to disclose material facts necessary to make the statements not misleading. See, e.g., *Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988), Taylor v. First Union Corp., 857 F.2d 240, 243 (4th Cir. 1988),* **[*17]** *Schlanger v. Four-Phase Systems, Inc. 582 F.Supp. at 133.* See also In the Matter of Carnation Company, Exchange Act Release No. 22214 at 1031-32 (July 8, 1985). In addition, an issuer has a duty to correct statements made by its corporate representatives which it learns were misleading or inaccurate when made. See, e.g., *Backman v. Polaroid Corp., 910 F.2d 10, 16-17 (1st Cir. 1990), Ross v. A.H. Robbins Co., 465 F.Supp. 904, 908 (S.D.N.Y.),* rev'd on other grounds, *607 F.2d 545 (2nd Cir. 1979),* cert. denied, *446 U.S. 946 (1980),* SEC v. Mesa Ltd. Partnership, Lit. Release No. 12637 (Sept. 27, 1990).

Veba violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by deliberately issuing a series of materially false and misleading statements over a month-long period in which it denied the existence of any merger discussions or negotiations with Viag. These statements, which were drafted and provided to the press at the direction of Veba's senior management, were made at a time when the negotiations had advanced to **[*18]** a point where they were material. In fact, as of July 29, 1999, investment bankers and legal counsel had been retained to advise on the merger, negotiations had occurred **[**886]** at the highest corporate levels, financial forecasts had been exchanged, a confidentiality agreement had been signed and the German Cartel Office had been advised of the discussions relating to a potential merger between Veba and Viag. Moreover, Veba drafted certain statements in English in anticipation that such statements would be carried by the English-speaking press. Indeed, during this period, Veba had direct contact with publications such as the *Wall Street Journal*, which published Veba's denials in the United States. These articles were then disseminated to Veba's senior management, which failed to correct the false and misleading statements.

2000 SEC LEXIS 2055, *; 54 S.E.C. 876, **

The Commission recognizes that disclosure practices and laws regarding the existence of merger negotiations may differ in other jurisdictions. Where jurisdictional requirements are met, however, there is no safe harbor for foreign issuers from violations of the antifraud provisions of the U.S. federal securities laws. The Commission will not apply a different standard [*19] with respect to foreign issuers commenting on merger discussions or negotiations. When a foreign issuer voluntarily avails itself of the opportunities in the U.S. capital markets, it must adhere to the U.S. federal securities laws.

The Commission has long emphasized "the importance of accurate and complete issuer disclosure to the integrity of the securities markets ... To the extent that investors cannot rely upon the accuracy and completeness of issuer statements, they will be less likely to invest, thereby reducing the liquidity of the securities markets to the detriment of investors and issuers alike." In the Matter of Carnation Company, Exchange Act Release No. 22214 at 1030. This fundamental principle applies to statements made by foreign issuers just as fully as it applies to statements made by domestic issuers. Compliance with this principle will serve to ensure transparency, foster investor protection and confidence, and thus, enhance the liquidity of the U.S. capital markets.

**V.**

**FINDINGS**

Based on the foregoing, the Commission finds that E.ON AG (formerly Veba AG) committed violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

[**887]

**VI.**

**ORDER [*20]**

Based on the foregoing, the Commission deems it appropriate to accept the Offer of Settlement submitted by E.ON AG (formerly Veba AG) and accordingly,

IT IS HEREBY ORDERED, pursuant to Section 21C of the Exchange Act that E.ON AG (formerly Veba AG) cease and desist from committing or causing any violation and any future violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

By the Commission.

# EXHIBIT 2

1 of 1 DOCUMENT

In the Matter of ANTHONY J. BRUNO and JAMES A. BRUNO, Respondents

ADMINISTRATIVE PROCEEDING File No. 3-9787

SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934 Release No. 40769

*1998 SEC LEXIS 2666*

December 10, 1998

**ACTION:**
 [*1]  ORDER INSTITUTING PUBLIC PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING CEASE-AND-DESIST ORDER

**TEXT:** I.

The Securities and Exchange Commission deems it appropriate and in the public interest that public administrative proceedings pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") be, and they hereby are, instituted against Anthony J. Bruno ("Anthony Bruno"), the former chairman of the board and chief executive officer of Big B Inc. ("Big B" or "the Company"), and against James A. Bruno ("James Bruno"), the former executive vice president of Big B (collectively "the Brunos").

II.

In anticipation of the institution of these administrative proceedings, the Brunos have submitted Offers of Settlement ("Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, the Brunos, without admitting or denying the findings set forth herein, except as to the Commission's jurisdiction over them, and the findings contained in paragraph II A., which are admitted, consent to [*2] the entry of this Order Instituting Public Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Cease-and-Desist Order.

III.

Based upon the Offers submitted by the Brunos, the Commission finds that:

A. RESPONDENTS

Anthony Bruno, of Birmingham, Alabama, was the chairman of the board and chief executive officer of Big B in 1996.

James Bruno, of Vestavia Hills, Alabama, was a director, an executive vice president and a designated spokesperson of Big B in 1996.

B. ENTITY INVOLVED

Until December 1996, Big B was headquartered in Bessemer, Alabama and operated approximately 400 retail drug and home healthcare stores in a five-state area in the southeastern United States. Big B's common stock was registered pursuant to Section 12(g) of the Exchange Act and was listed on the NASDAQ National Market Issues System. In December 1996, Big B was acquired by Revco D.S., Inc. ("Revco"), which prior to the acquisition operated about 2,700 retail drugstores in the midwestern, eastern and southeastern United States.

C. FACTS

1998 SEC LEXIS 2666, *

On April 24, 1996, the president of Bruno's Inc., a privately-held retail grocery chain, met Anthony Bruno at Big B's offices [*3] and took him to lunch. During lunch, the president indicated that Bruno's was interested in acquiring Big B. Anthony Bruno responded that Big B was not for sale and desired to stay independent. He also expressed the view that Big B's stock was undervalued. James Bruno knew at the time that Anthony Bruno and the president of Bruno's Inc. were meeting for lunch.

In mid-May 1996, the chief executive officer of Rite Aid Corporation ("Rite Aid") contacted Anthony Bruno twice by telephone during a one-week period to communicate Rite Aid's interest in acquiring Big B. Anthony Bruno responded that Big B was not for sale. James Bruno knew at the time that Anthony Bruno had spoken with the chief executive officer of Rite Aid.

At a regular board meeting on May 28, 1996, attended by the Brunos, Big B adopted a policy entitled, Procedures and Guidelines for Public Disclosures and Communications with Analysts. Among other things, the Company's procedures and guidelines required that Big B's spokespersons be kept informed of all material information about Big B. The policy stated that, "Company information which is normally material includes ... (iv) potential mergers and acquisitions"

In June [*4] 1996, the chief financial officer of Bruno's Inc. met Big B's president for lunch and told him that Bruno's Inc. remained interested in acquiring Big B.

Then, on July 29, 1996 Revco's president and chief executive officer called Anthony Bruno and requested a meeting in Birmingham, Alabama. Anthony Bruno, surmising that Revco's president intended to express an interest in acquiring Big B, stated that Big B was not for sale. Nevertheless, on Thursday, August 1, 1996, Revco's president met with Anthony Bruno at the headquarters of Big B and indicated that Revco was interested in acquiring all of Big B, and that the Revco board had already met and approved an offer to buy Big B. Anthony Bruno responded that Big B was not currently interested in selling itself and mentioned that Big B's stock was undervalued by the market. Undeterred, Revco's president responded that he would send Anthony Bruno Revco's written proposal to buy Big B.

Previously, during an early July 1996 telephone call with a managing director of Big B's investment banking firm, Anthony Bruno had authorized the investment banking firm to develop various strategic alternatives for Big B, including a leveraged buyout. On [*5] August 1, 1996, the same day as Anthony Bruno's meeting with the president of Revco, a senior official with Big B's investment banking firm sent Big B's president two preliminary financial analyses for a leveraged buyout of Big B. The analyses assumed both a 100% and an 80% leveraged buyout of Big B and assumed a maximum buyout price of approximately $ 12 per share.

Subsequently, on August 5, 1996, Anthony Bruno received a letter from Revco which included, among other things, a proposal to purchase all of Big B's outstanding shares at $ 14 per share. On August 7, 1996, Anthony Bruno told Revco's president in a telephone conversation that Revco's proposed offer was inadequate, that Big B's stock was undervalued in the market, and that he preferred that Big B remain independent.

Anthony Bruno and James Bruno spoke several times from April 1996 through early August 1996.

On or about August 7, 1996, James Bruno was interviewed by a Wall Street Journal ("WSJ") reporter. James Bruno made no inquiries within Big B before speaking to the WSJ reporter. Then, on August 14, the WSJ published an article about Big B stating, among other things, that the investment community believed Big B had received [*6] and rejected acquisition offers from Eckerd Corporation ("Eckerd") and Rite Aid. The article stated that both Eckerd and Rite Aid would not comment on this information. However, the WSJ attributed the following statement to James Bruno: "He insists that neither Eckerd nor Rite Aid nor any other company has even approached Big B, much less made an offer to buy it."

Anthony Bruno read the WSJ article on or about August 14, 1996 and realized that the statement attributed to James Bruno was incorrect in so far as it related to the reference to "Rite Aid nor any other company ..."

The Brunos discussed that there were factual inaccuracies in the WSJ article on or about August 14, 1996. Neither Anthony Bruno nor James Bruno did anything to correct the statement attributed to James Bruno in the WSJ.

On or about August 20, 1996, James Bruno was interviewed by a Birmingham Business Journal ("BBJ") reporter. James Bruno indicated that Big B wanted to remain an independent company, and that no competitors had approached with offers.

Three days later, on August 23, Big B's president met with representatives of Big B's investment banking firm. The investment bankers were asked to provide strategic [*7] advice to Big B in connection with the letter received from Revco on August 5.

Then, on August 26, 1996, the BBJ published an article about Big B's second quarter earnings and speculation regarding mergers and acquisitions of Big B. In the article, the BBJ published the following statement which it attributed to James Bruno: "[James] Bruno said Big B wants to remain an independent company, and that no competitors have approached with an offer."

Revco sent a second letter to Bruno and Big B's directors on September 3, 1996. The letter stated, among other things, that Revco was prepared and determined to acquire Big B, and that Revco would consider taking its acquisition proposal directly to Big B's shareholders if Big B did not commence negotiations. On or about September 5, 1996, Bruno responded by telling Revco's president that he believed Big B would benefit by remaining independent.

On September 9, 1996 Revco issued a press release announcing that Revco was commencing a cash tender offer to buy all Big B shares for $ 15 per share.

Ultimately, on October 27, 1996 Revco and Big B signed a definitive merger agreement for Revco to acquire Big B at $ 17.25 per share.

D. THE BRUNOS CAUSED [*8] VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require issuers that make public statements to speak truthfully and to include all material facts necessary to make the statements made, in light of the circumstances under which they were made, not materially misleading. See *SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d. Cir. 1968)*, cert denied, sub nom., *Coates v. SEC, 394 U.S. 976 (1969)* In addition, an issuer has a duty to correct material, inaccurate statements made by its corporate representatives. See *In re Carnation Co., Securities Exchange Act Release No. 22214, 33 S.E.C. Docket 1025 (July 8, 1985)*; *In re Time Warner, Inc. Securities Litigation, 9 F.3d 259, 264-67 (2d Cir. 1993)*. See also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997), Stranksy v. Cummins Engine Co., 51 F.3d 1329 (7th Cir. 1995), Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990)*

In [*9] view of the facts set forth above, Anthony Bruno and James Bruno caused violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In August 1996, James Bruno spoke to reporters from the WSJ and BBJ in his capacity as an official spokesperson of Big B. At the time, Anthony Bruno knew that several competitors had expressed interest in acquiring Big B and that one had made an offer at a specific price. James Bruno, who had spoken with Anthony Bruno several times during the months in question and who knew that Anthony Bruno had had conversations with senior officials of two competitors, made no inquires within Big B before the first interview. He indicated to both reporters that rumors concerning the possible acquisition of Big B were not true. Moreover, after they read the August 14, 1996 WSJ article and discussed the inaccuracies in the article with each other, neither Anthony Bruno nor James Bruno acted to correct those inaccuracies. Through this conduct, the Brunos caused Big B to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making materially inaccurate statements to reporters and by failing to correct those statements when they were published. [*10]

Pursuant to Section 21C of the Exchange Act, the Commission may enter an order against any person who "causes" a violation of, among other things, the antifraud provisions. A person is a cause of a violation if it occurred "due to an act or omission the person knew or should have known would contribute to such violation."

IV.

Based on the foregoing, the Commission deems it appropriate and in the public interest to accept the Offers submitted by the Brunos and accordingly,

IT IS HEREBY ORDERED, pursuant to Section 21C of the Exchange Act that Anthony J. Bruno and James A. Bruno cease and desist from committing or causing any violation and any future violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

By the Commission

# EXHIBIT 3

Transcript of

# Moore, Thomas (Vol. 01) - 11/07/2006

Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 1

```
 1                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MASSACHUSETTS

 2        ---------------------------x

          U.S. SECURITIES AND          :

 3        EXCHANGE COMMISSION,          :

 4                    Plaintiff,        :

 5                    v.                :   No. 05-11853-PBS

 6        BIOPURE CORPORATION et al., :

 7                                      :

                      Defendants.       :

 8        ---------------------------x

 9                              Tuesday, November 7, 2006

          Videotaped deposition of

10                         THOMAS MOORE

          a Defendant, called for examination by counsel for

11        Defendants pursuant to notice and agreement of

          counsel, beginning at approximately 9:39 a.m. at the

12        offices of the U.S. Securities and Exchange

          Commission, 100 F Street, NE, Washington, D.C.,

13        before Karen Young of Beta Court Reporting, notary

          public in and for the District of Columbia, when

14        were present on behalf of the respective parties:
```

**Moore**

Page 2

```
 1    APPEARANCES:
 2      On behalf of Defendants:
 3         IAN D. ROFFMAN, ESQUIRE
           DANIEL O'CONNOR, ESQUIRE
 4         ELLEN MOYNIHAN, ESQUIRE
           U.S. Securities and Exchange Commission
 5         Division of Enforcement
           Boston District Office
 6         Arch Street
           Boston, Massachusetts  02110-1424
 7         roffmani@sec.gov
           (617) 573-8987
 8
           On behalf of Deponent:
 9
           BOBBY R. BURCHFIELD, ESQUIRE
10         JASON A. LEVINE, ESQUIRE
           McDermott Will & Emery, LLP
11         600 Thirteenth Street, NW
           Washington, D.C.  20005-3096
12         bburchfield@mwe.com
           (202) 756-8003
13
           On behalf of Howard Richman:
14
           CATHY FLEMING, ESQUIRE
15         Edwards Angell Palmer & Dodge, LLP
           750 Lexington Avenue
16         New York, New York  10022
           (212) 308-4411
17
      ALSO PRESENT:
18
           Bryce Hixson, Videographer
19
20
21
22
                    BETA COURT REPORTING
                    www.betareporting.com
          202-464-2400                    800-522-2382
```

## Moore

Page 195

1    I'm trying to not have to go over the same

2    topics again.

3         A    Right.

4         Q    So I apologize if this is -- if I'm

5    trying to start two steps down the road.

6         A    It's all right.

7         Q    Were you aware prior to issuing the

8    August 1st press release that company

9    spokespeople were going to talk to the media

10   about the subject matters in it?

11        A    At least that Doug Sayles would.  I

12   don't think anyone else was authorized to

13   speak for us.

14        Q    The company had engaged a PR firm

15   as well; correct?

16        A    Yes.

17        Q    Did they refer calls to Doug

18   Sayles?

19        A    Yes.

20        Q    Did you speak with any member of

21   the media after issuing the August 1 press

22   release?

CONFIDENTIAL

**Moore**

Page 196

```
 1        A    I don't believe I did.  I think

 2   Doug handled all calls, at least for the

 3   first few days.

 4        Q    And did you read newspaper articles

 5   or analyst reports that were written after

 6   issuance of the August 1st press release?

 7        A    I did.

 8        Q    And did you read them

 9   contemporaneously?  In other words, did you

10   read them on August 1st and 2nd?

11        A    Yes.  Well, yes, I mean, that was a

12   weekend so there are some that I didn't get

13   to read until Monday the 4th or Tuesday the

14   5th.

15        Q    Did you become aware at any time of

16   any company spokesperson saying anything to

17   the media that they were not authorized to

18   say?

19        A    On the 4th I became aware, yeah, of

20   that, yes.

21        Q    And what were you aware of?

22        A    I was aware that Doug Sayles had
```

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 197

1    given an estimate of when we would answer

2    these questions that was one to two months.

3        Q    And is it your belief that Mr.

4    Sayles was not authorized to give that

5    estimate?

6        A    Yes.

7        Q    Are you aware of anything else that

8    any company spokesperson said to the media

9    that they were not authorized to say?

10       A    That was the only thing I was aware

11   of.

12       Q    Did you ever have a conversation

13   with Mr. Sayles about the fact that he had

14   said something that you believed he was not

15   authorized to say?

16       A    We had a conversation -- we had an

17   e-mail conversation about it where he had

18   said I think we need to talk about a specific

19   timeline when we were going to respond.  This

20   is after -- in our press release, we had not

21   given such a timeline, and I e-mailed back to

22   him that we weren't going to change that,

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 198

 1    that we were going to stay with saying that

 2    we would respond as expeditiously as we

 3    could.

 4        Q    Was that before or after you

 5    learned that he had made statements to the

 6    media about the timeline?

 7        A    That was before.

 8        Q    Did you have any conversations with

 9    him after learning that he had made

10    statements to the media about the timeline?

11        A    I did.

12        Q    What conversation was that?

13        A    I said in the future we're not

14    going to give any such timelines, and to my

15    knowledge, he did not give any such timelines

16    after that.

17        Q    Did you tell him in any way that he

18    had said something he was not authorized to

19    say?

20        A    I don't recall.  At the time, I

21    wasn't trying to -- the answer is I don't

22    recall whether I told him that he had done

**Moore**

Page 199

```
 1    something unauthorized.  I did instruct him

 2    not to say that again.

 3       Q    Is it your -- is it your testimony

 4    as you sit here today that you did not

 5    authorize any company spokesperson to say

 6    that the company expected to respond to the

 7    letter relating to the BLA within one to two

 8    months?

 9       A    That is my testimony.

10       Q    Did you ever hold a meeting during

11    the period of between getting the letter on

12    July 30 and issuing the press release with

13    Biopure employees in which you discussed

14    whether the company would publicly disclose

15    that they expected to respond within one to

16    two months?

17       A    I held a meeting with Biopure

18    employees to inform them about the letter.  I

19    timed it so that it was -- it would be -- the

20    meeting would conclude after the press

21    release had gone out.  In that meeting, I

22    don't recall what I said about the time frame
```

## Moore

Page 204

```
 1    that one to two months was a reasonable

 2    estimate for the amount of time it would take

 3    Biopure to respond to the July 30 letter

 4    about the BLA?

 5        A    I really did not know so I

 6    didn't -- I did not know.

 7        Q    So did you -- is it correct that

 8    you did not hold a belief that one to two

 9    months was a reasonable estimate for the

10    amount of time it would take Biopure to

11    respond to the July 30 -- to the July 30

12    letter?

13            MR. BURCHFIELD:  Objection, asked

14    and answered.

15            THE WITNESS:  I didn't know how

16    long it would take.  I could have hoped it

17    would be a month or two, but I did not know

18    how long it would take.

19            BY MR. ROFFMAN:

20        Q    Prior to issuing the press release

21    on August 1st, did you have any discussions

22    with Doug Sayles about the amount of time it
```

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 205

```
 1    would take Biopure to respond to the July 30

 2    letter?

 3        A    I don't recall the specifics, but I

 4    must have had some discussion because it was

 5    out of that discussion that we agreed we

 6    would say as expeditiously as possible rather

 7    than stating a specific time frame.

 8        Q    Did you have a discussion with Doug

 9    Sayles prior to issuing the press release on

10    August 1st about providing a timeline to the

11    public for how long it would take the company

12    to respond to the July 30 letter?

13        A    Well, we discussed it in the

14    context of the press release, and in the

15    context of the press release, we agreed we

16    would not give a timeline.  We would simply

17    say as expeditiously as possible.

18        Q    As of the time that the press

19    release was issued on August 1st, had you

20    instructed Doug Sayles not to provide a

21    timeline to the public?

22        A    I had expected that he would act
```

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 206

```
 1    consistent with the press release the company

 2    had made.  I guess I didn't think that was an

 3    unreasonable expectation.

 4        Q    Well, had you had discussions with

 5    Mr. Sayles prior to issuing the press release

 6    about his view that he thought it was a good

 7    idea to provide a timeline to the public?

 8        A    He sent me an e-mail concerning

 9    that, which occurred -- I guess the e-mail

10    was sent, would have been -- it would be late

11    on July the 31st, as I recall.

12        Q    And did you receive that e-mail

13    late on July 31st?

14        A    It went into my account.  I did not

15    read it until actually a day and a half

16    later.

17        Q    Did you have any discussions with

18    Mr. Sayles prior to issuing the press release

19    about his view that the company should

20    provide a timeline to the public?

21             MR. BURCHFIELD:  Objection.  I

22    think that's been asked a few times.
```

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

**Moore**

Page 207

1    Mr. Moore, you may answer it again.

2            THE WITNESS:  We talked about what

3    the right time frame was.  We talked about

4    the succession of thinking that led us to say

5    as expeditiously as possible.

6            BY MR. ROFFMAN:

7        Q    Now, the discussion that you had

8    about the timeline, was the topic about

9    whether to provide a specific timeline to the

10   public, did that come up prior to issuing the

11   press release?

12       A    Yes, it did.

13       Q    And did you give instructions to

14   Mr. Sayles not to provide a timeline?

15       A    We agreed in the press release that

16   we would say as expeditiously as possible.

17       Q    Did you have discussions with

18   Mr. Sayles about providing a timeline in

19   conversations to -- with the media outside of

20   the press release?

21       A    Outside of the press release.  He

22   may have asked that question, but the press

---
**Moore**
---

Page 208

```
 1   release represented our distillation of what

 2   it is we wished to say.  It would be kind of

 3   silly, if you'll forgive me, to do a press

 4   release and the next day contravene it.

 5        Q    Can you think of any reason why

 6   Mr. Sayles would be under the impression that

 7   he was authorized to tell the public that

 8   Biopure expected to provide a response in one

 9   to two months?

10        A    No.  In fact, reviewing his e-mail,

11   he was advocating that he should be allowed

12   to give it, so I believe that clearly says

13   that he felt he wasn't permitted a timeline

14   and he was begging for the opportunity to do

15   that.

16        Q    And you thought it was

17   inappropriate to provide a specific timeline;

18   correct?

19        A    Because I did not know how long it

20   would take.

21        Q    And that was a view that you held

22   on August 1st.
```

CONFIDENTIAL

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

Moore

Page 225

```
 1    perform some sort of specific inquiry.

 2              BY MR. ROFFMAN:

 3        Q    Did you perform any general

 4    inquiry?

 5        A    No inquiry.  I responded to

 6    Mr. Sayles' note by saying we weren't going

 7    to do that, but I didn't take it any further

 8    than that.

 9        Q    Did you seek any legal counsel as

10    to whether Biopure had any obligations to do

11    anything?

12        A    I did not.

13        Q    I'd like to focus on August 1st

14    itself.  Let me show you what's been

15    previously marked as Exhibit 212.

16    Exhibit 212 is an e-mail from your assistant

17    to all Biopure employees announcing a

18    company-wide meeting at 8:30 in the morning

19    for August 1st; correct?

20        A    That's correct.

21        Q    And did you hold such a meeting?

22        A    I did.
```

Transcript of Moore, Thomas (Vol. 01) - 11/07/2006
Saturday, November 18, 2006, 6:29:38 PM

Moore

```
 1   important difference?
 2       A    I didn't know how important that
 3   was.
 4       Q    Why not?  What -- in other words,
 5   how would you determine how important that
 6   was?
 7       A    I didn't know how to determine
 8   that.
 9       Q    Well then why were you concerned
10   about Mr. Sayles making public statements
11   about one to two months being a reasonable
12   estimate?
13       A    Because I didn't feel that we
14   really knew that one or two months was a
15   reasonable estimate.  It would be a
16   delightful thing if we could do that, but I
17   also didn't know that he was necessarily
18   wrong, and so I asked them to stop doing
19   that, but I didn't treat it as a
20   contravention of fact because there wasn't a
21   fact in this.  We just didn't know.
22       Q    I see.  Did there come a time when
```

# EXHIBIT 4

Biopure Shares Rise on FDA Letter on Anemia Treatment Dow Jones Business

Copyright 2003 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



factiva

(Copyright (c) 2003, Dow Jones & Company, Inc.)

## Dow Jones Business News

Dow Jones Business News

August 1, 2003 Friday 6:13 PM GMT

**LENGTH:** 660 words

**HEADLINE:** Biopure Shares Rise on FDA Letter on Anemia Treatment

**BYLINE:** By Tiffany Kary

**BODY:**

Dow Jones Newswires

NEW YORK -- Biopure Corp. (BPUR) shares jumped Friday after a letter from the U.S. Food and Drug Administration (FDA) signaled good news for Hemopure, the company's potential treatment for acute anemia.

The letter puts a hold on the regular review timetable and requests additional information without calling for additional clinical trials.

ThinkEquity analyst Sapna Srivastava said the letter makes it less likely the drug will receive a negative review and provides a "road map to approval." The analyst said most investors had been assuming the company would get a negative answer from the FDA on Aug. 29.

Hemopure is under review for approval to treat anemia in patients undergoing orthopedic surgery. The drug is an oxygen therapeutic, made of bovine hemoglobin that can be administered intravenously to increase oxygen delivery.

Biopure also plans to develop the drug for other markets, but orthopedic surgery is the only indication currently under review by the FDA. Biopure spokesman Douglas Sayles said the market opportunity is around $300 million, based on a per unit cost of $700 to $800 a bag for Hemopure.

"We believe the news is very positive for Biopure and brings them one step closer to approval," Ms. Srivastava said. She also noted that most of the information requested revolved around Hemopure's labeling, something that is encouraging.

Mr. Sayles said all the questions are "answerable" and the letter "further defines the requirements for approval." He added that it will likely take Biopure about 1 to 2 months to provide the FDA with the additional information. After that, the FDA has said it will respond in 30 days. That means the drug could be on the market around next spring, he added.

Biopure shares were up $1.56, or 26%, to $7.53 in afternoon trading on the Nasdaq Stock Market.

The good news for Hemopure comes just after another boon for the company -- a $17 million cash infusion, raised through an offering of 3.1 million shares on July 23. The money will give Biopure enough cash to carry it through to next spring, according to spokesman Sayles.

The company had previously said in a Securities and Exchange Commission filing that its cash and cash equivalents would only be enough to fund operations until November.

Though Biopure already has one drug on the market, Oxyglobin, a treatment for canine anemia, the company has operated at a loss since its inception.

Biopure Shares Rise on FDA Letter on Anemia Treatment Dow Jones Business

ThinkEquity analyst Srivastava expects the company to be profitable by 2006 and said she isn't especially concerned about the company's cash position.

Aside from cash challenges, risks listed in the company's SEC filings include the need to produce Hemopure and Oxyglobin at higher capacity levels and to find marketing partners for Hemopure.

Mr. Sayles said the company is looking for funding for an additional manufacturing facility and currently plans on marketing Hemopure itself. With additional manufacturing capacity, the company would consider a marketing partner, he added.

While Hemopure is the only potential anemia treatment to deliver oxygen, it will go up against alternatives such as red blood cell transfusions, which can be used to prevent anemia in surgery.

Mr. Sayles said that while the company has no direct competitors, there is "already a blood avoidance market" for patients who wish to avoid blood transfusions because of risk or availability issues.

Patients can donate their own blood in advance of surgery, use machines that recycle the blood during operations or take erythropoietin EPO, a hormone naturally produced by the kidneys to stimulate red blood cell production.

"Compared to other blood avoidance techniques, Hemopure can be administered at the point of care," Mr. Sayles said.

Clinical trials to test the drug for use in trauma and cardiac ischemia, or reduced blood flow to the heart, are next on the company's agenda, he added.

-Tiffany Kary, Dow Jones Newswires; 201-938-5285

(END) Dow Jones Newswires

08-01-03 1413ET

**NOTES:**
PUBLISHER: Dow Jones & Company

# EXHIBIT 5

Multi-Page™

Page 1

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3  In the Matter of:              )

4                                 )   File No.:  B-01987-A

5  BIOPURE CORPORATION            )

6  WITNESS:  THOMAS A. MOORE

7  PAGES:    1 through 250

8  PLACE:    Securities & Exchange Commission

9            Boston District Office

10           73 Tremont Street, Suite 600

11           Boston, Massachusetts

12  DATE:    Friday, December 12, 2003

13

14          The above-entitled matter came on for hearing at

15  10:22 a.m. pursuant to notice.

16

17

18

19

20

21

22

23

24           Diversified Reporting Services, Inc.

25                  (202) 467-9200

Page 2

1  APPEARANCES:

2

3  On behalf of the Securities & Exchange Commission:

4       ELLEN BOBER, Senior Counsel

5       CELIA MOORE, Deputy Assistant District Administrator

6       Securities and Exchange Commission

7       73 Tremont Street, Suite 600

8       Boston, MA  02108

9       (617) 424-5900

10

11  On Behalf of the Witness:

12       ROBERT A. BUHLMAN, ESQ.

13       Bingham McCutchen

14       150 Federal Street

15       Boston, MA  02110

16       (617) 951-8717

17

18

19

20

21

22

23

24

25

Page 3

1                  C O N T E N T S

2

3  WITNESS                                    EXAMINATION

4  Thomas A. Moore    Examination by Ms. Bober      4

5

6  EXHIBITS  DESCRIPTION                       IDENTIFIED

7  #60  Subpoena                                    6

8  #61  Series of handwritten notes               130

9  #62  Series of e-mails, first being 8/18       149

10  #12A Press release, 8/1/03                     202

11  #63  Note from Mr. Moore to Mr. Sayles         220

12  #64  Minutes of FDA response planning meeting  240

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                  P R O C E E D I N G S

2       MS. BOBER:  We're on the record at 10:22 A.M. on

3  Friday, December 12, 2003.  Sir, please raise your right

4  hand.  Please state your name — your full name for the

5  record.

6       THE WITNESS:  Thomas Andrew Moore.

7  Whereupon,

8             THOMAS ANDREW MOORE

9  the witness herein, having been first duly sworn to tell the

10  truth, the whole truth, and nothing but the truth, was

11  examined and testified under oath as follows:

12  EXAMINATION BY MS. BOBER:

13       Q  Please spell your name for the record.

14       A  My last name?

15       Q  Your whole name.

16       A  Thomas, T-h-o-m-a-s, Andrew, A-n-d-r-e-w, Moore, M-

17  o-o-r-e.

18       Q  My name is Ellen Bober.  With me today is Celia

19  Moore.  We are officers of the Commission for the purposes of

20  today's proceeding.  While I will be asking the majority of

21  questions, Ms. Moore may also ask you some questions.

22          This is an investigation by the United States

23  Securities & Exchange Commission in the matter of Biopure

24  Corporation to determine whether there have been any

25  violations of certain provisions of the federal securities

| Page 221 | Page 223 |
|---|---|
| 1 did this without my agreement.<br>2 EXAMINATION BY MS. BOBER:<br>3 Q I'm now handing you a document which has previously<br>4 been marked as Exhibit #17A. Do you recognize this document<br>5 (indicating)?<br>6 A (Looking at exhibit) I do.<br>7 Q What is it?<br>8 A It's a revised list of talking points that Doug<br>9 Sayles prepared and sent out on Monday morning.<br>10 Q After receiving any version of the talking points,<br>11 did you participate in any meetings to discuss them?<br>12 A Well, this was simultaneous with the meeting<br>13 previously described on August 4th where he brought the key<br>14 people involved in the response together. And based on that<br>15 preliminary input, it became clear that it was going to take<br>16 longer than -- it would take longer than the initial period<br>17 of time we thought to answer.<br>18 This was done before that meeting actually got<br>19 underway. And unless that's -- this was added in the belief<br>20 that we needed to better specify what the FDA letter was<br>21 about.<br>22 Q Were you talking points subsequently amended after<br>23 the estimate of how long it was going to take was revised?<br>24 A I don't think we -- I don't know because Doug<br>25 actually prepared the talking points and he used them -- I | 1 A (No response)<br>2 Q Did you have any discussions with Howard about<br>3 adding those points?<br>4 A Only that I agreed that it was right for us to give<br>5 more specificity and underscore the length of the letter.<br>6 Q Do you know what the basis of the statement that,<br>7 'It's typical in its breadth and content for a major new<br>8 product application' is?<br>9 A That was based on Howard's assurances and<br>10 assessment.<br>11 Q Did you take any steps to try to verify whether<br>12 that was a reasonable statement?<br>13 A I did not.<br>14 Q Did you have full confidence in Howard Richman at<br>15 that point in time?<br>16 A As of this time, August 4, 2003, were you pleased<br>17 with Howard Richman's performance?<br>18 A Howard Richman's performance, vis a vis FDA<br>19 communications, I was pleased with. He had other<br>20 responsibilities which he wasn't executing as well.<br>21 Q What was he not executing as well?<br>22 A His management of the manufacturing side where he<br>23 was -- he was perceived as dictatorial and not -- not<br>24 allowing as much team participation as the manufacturing team<br>25 would like to have. |

| Page 222 | Page 224 |
|---|---|
| 1 didn't use them -- so I knew all this.<br>2 Q Did he need your authorization before he was<br>3 allowed to comment on these matters to the press?<br>4 A Doug can generally comment to the press directly<br>5 based on his understanding of what's going on. I don't<br>6 approve, in general, everything he says.<br>7 Q Was this an issue on which your approval was<br>8 required?<br>9 A It wasn't required, but he did share these talking<br>10 points with me.<br>11 Q The first page of the exhibit says that, 'The<br>12 attached talking points have been revised per Howard's<br>13 input.' Did anyone else provide any input into the revised -<br>14 -<br>15 A I don't believe so. I believe the only changes are<br>16 the discussion of the length of the FDA letter and the number<br>17 of questions.<br>18 Q And is that the last bullet point, major bullet<br>19 point on the --<br>20 A Yes, it is.<br>21 Q -- second page?<br>22 A Yes, it is.<br>23 Q Was that Howard's --<br>24 A Yes, it is.<br>25 Q -- creation? | 1 Q Were there any other areas in which he was not<br>2 performing as well?<br>3 A That was really the principal concern.<br>4 MS. MOORE: Had you communicated your concern about<br>5 his performance to Mr. Richman at that point?<br>6 THE WITNESS: Yes, I had.<br>7 MS. MOORE: Did you do that in writing?<br>8 THE WITNESS: No, I did that in a face-to-face<br>9 communication.<br>10 BY MS. BOBER:<br>11 Q Did you prepare a written review --<br>12 A No.<br>13 Q -- of Mr. Richman?<br>14 A (No response)<br>15 Q Never?<br>16 A Never.<br>17 Q Did someone else?<br>18 A No.<br>19 Q At that time, did you feel that this was -- this<br>20 statement that, 'The letter is typical in breadth and content<br>21 for a new product application,' was a fair statement of what<br>22 was presented in the FDA letter?<br>23 A I don't mean to -- well, I did, based on Howard's<br>24 assurances, yes.<br>25 Q Did anyone express any concern or disagreement with |

# EXHIBIT 6

Biopure Corporation (ticker: BPUR, exchange: NASDAQ Stock Exchange ( O)) News Release - 10/30/2003

## Biopure Updates Regulatory and Operating Plans

### Conference Call Scheduled For 11:30 a.m. ET Today, October 30, 2003

CAMBRIDGE, Mass , Oct. 30 /PRNewswire-FirstCall/ -- Biopure Corporation (Nasdaq: BPUR) today announced its plan to respond by June 30, 2004, to the Food and Drug Administration's (FDA) questions regarding its biologic license application (BLA) for Hemopure(R) [hemoglobin glutamer - 250 (bovine)]. The company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA.

Biopure applied for FDA approval to market the company's oxygen therapeutic, Hemopure, in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients.

During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

Biopure has engaged David Zuchero, President of Chesapeake Regulatory Group (CRG), as its interim senior regulatory officer to direct the FDA response activities of Biopure's in-house regulatory team, the CRG team and other external consultants. He replaces Howard Richman, former Senior Vice President of Regulatory and Operations, who has left Biopure to pursue other interests. A 25-year industry veteran, Zuchero has provided strategic counsel and managed several major regulatory submissions during his 13-year tenure at CRG and in his previous regulatory positions at Pharmakinetics Laboratories, Inc , Chelsea Laboratories, Inc , and Ayerst (now Wyeth-Ayerst) Laboratories. He is a certified regulatory affairs expert, attorney and former microbiologist.

Biopure has also implemented cost reductions designed to minimize its ongoing cash burn, which include reducing the workforce by approximately 30 percent and decreasing forecast manufacturing expenses for fiscal 2004. These measures represent overall anticipated savings of approximately $12 million in fiscal 2004, despite higher costs associated with FDA response activities. The company is in the process of renewing a standby equity distribution agreement to provide up to $15 million as needed. Biopure's current cash and anticipated Oxyglobin revenues together with this standby facility are expected to fund operations through December 2004.

"In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions," said Biopure President and CEO Thomas A. Moore. "We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the United States as expeditiously as possible."

Biopure's updated plans continue to include clinical development of Hemopure for other potential indications. A Phase II cardiac revascularization trial in patients undergoing elective percutaneous coronary intervention (e g., angioplasty, stent) is scheduled to begin enrolling patients in Europe this year, and a Phase II trauma trial co-sponsored by the U S Army and Navy is anticipated in 2004. These new trials are unrelated to the current Hemopure BLA.

Conference Call

Biopure President and CEO Thomas A. Moore will discuss the company's regulatory and operating plans in a conference call and webcast on Thursday, October 30, 2003, at 11:30 a.m. ET. The dial-in numbers are 1-800-535-9844 (US/Canada) and 1-706-634-7089 (International) A live audio webcast of the conference call will be available from the investor section of Biopure's web site at www.biopure.com and will be archived for at least one week. The webcast can also be heard by individual investors at www.companyboardroom.com and by institutional investors who subscribe to StreetEvents at www.streetevents.com. An audio replay of the conference call will be available at approximately 2:30 p m. ET, October 30, 2003, until midnight ET, November 7, 2003. To access the replay, dial 1-800-642-1687 (US/Canada) or 1- 706-645-9291 (International/Local) and reference conference ID number 3753466.

Biopure Corporation

Biopure Corporation, headquartered in Cambridge, Mass., is a leading developer, manufacturer and marketer of oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's tissues Hemopure(R) [hemoglobin glutamer - 250 (bovine)], or HBOC- 201, is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for eliminating, delaying or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's veterinary product Oxyglobin(R) [hemoglobin glutamer - 200 (bovine)], or HBOC-301, the only oxygen therapeutic approved by the FDA and the European Commission, is indicated for the treatment of anemia in dogs

The content of this press release does not necessarily reflect the position or the policy of the U.S. Government or the Department of Defense, and no official endorsement should be inferred  Completion of the pivotal RESUS clinical trial of Hemopure in trauma is contingent upon further funding  Statements in this press release that are not strictly historical may be forward-looking statements. There can be no assurance that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained, that anticipated milestones will be met in the expected timetable, that any clinical trials will be successful, or that any approved product will find market acceptance and be sold in the quantities anticipated. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, and uncertainties and possible delays related to clinical trials, regulatory approvals, possible healthcare reform, manufacturing capacity, marketing, market acceptance, competition and the availability of sufficient financing to support operations  The company undertakes no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date hereof  A full discussion of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found on the company's Web site at www.biopure.com/corporate/legal/home_legal.htm and in the company's filings with the U.S. Securities and Exchange Commission, which can be accessed in the EDGAR database at the SEC Web site, www.sec.gov, or through the Investor section of Biopure's Web site, www.biopure.com.

* $4,502,900 is from Grant DAMD17-02-1-0697. The U S  Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office.

Contact: Douglas Sayles (617) 234-6826
Tom Nealon (617) 234-6873
Biopure Corporation IR@biopure.com

SOURCE Biopure Corporation
10/30/2003

CONTACT: Douglas Sayles, +1-617-234-6826, or Tom Nealon, +1-617-234-6873 both of Biopure Corporation, IR@biopure.com

Web site: http://www.biopure.com
(BPUR)