UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
:
SECURITIES AND EXCHANGE COMMISSION, :
:
Plaintiff,    :    Civ. A. No. 05-11853-PBS
v.    :
:
BIOPURE CORPORATION,    :
THOMAS MOORE, and    :
HOWARD RICHMAN    :
:
Defendants.    :
_____:

**MEMORANDUM IN SUPPORT OF
SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY
MOTION FOR A CONTINUANCE OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OR IN THE ALTERNATIVE, REQUEST FOR A STATUS CONFERENCE**

Trial in this matter is scheduled to begin in six weeks.  On Thursday, defendant Moore

filed a Motion for Summary Judgment that (1) even if granted (and it should not be), would *not*

eliminate the need for a trial on the remaining issues, and (2) on its face raises genuine issues of

disputed fact that preclude summary judgment.  Drafting a full response to this Motion, however,

would require the Commission to expend substantial time and resources during the same period

that it is preparing for trial.  Moreover, this Court expressly told the parties during a status

hearing that it would not consider a summary judgment motion that was filed this close to trial.

Accordingly, the Commission respectfully requests that Defendant's Motion be continued

and that the Commission not be required to file a response.  To the extent that defendant's

Motion raises legal issues to be resolved by this Court, those issues may be resolved on *motions*

*in limine* or in jury instructions.  In the alternative, the Commission respectfully requests that this

Court hold a status conference for the purpose of setting a reasonable briefing schedule on

defendant's Motion and re-scheduling the commencement of trial.

## Background

The Commission's Complaint charges that from April 9, 2003 through December 24, 2003, defendant Thomas Moore and others engaged in a fraudulent scheme to misrepresent and conceal from investors the truth about Biopure's applications for FDA approval to test and market a blood-substitute product called Hemopure. During this same period, acting on defendant Moore's approval, Biopure raised approximately $35 million from the public capital markets through the sale of securities.

During the relevant period, Biopure had two submissions pending with the FDA: (1) a biologics license application ("BLA") seeking permission to market Hemopure for treatment of acute anemia in orthopedic surgery patients; and (2) a clinical trial protocol seeking to conduct clinical trials of Hemopure for treatment of trauma patients in hospitals ("Trauma IND"). The Commission charges that defendant's scheme consisted of many acts, statements and omissions relating to the status of the BLA and the Trauma IND while the company was seeking and obtaining financing from public capital markets. Among other things, the Commission charges that defendant Moore: (1) failed to disclose substantial safety concerns raised by the FDA based on its review of the BLA's pivotal trial data; (2) failed to disclose that those safety concerns prompted the FDA to impose a clinical hold on the Trauma IND; (3) failed to disclose Biopure's repeated unsuccessful attempts to have the safety hold lifted; (4) misrepresented the reasons that the FDA gave itself a 90-day extension to review Biopure's BLA; (5) failed to disclose that Biopure had received a complete response letter at the conclusion of the FDA's review of the

BLA; (6) failed to disclose the magnitude and scope of deficiencies identified by the FDA in its

complete response letter; (7) misrepresented the nature of the FDA's complete response letter to

the Biopure stating that the FDA had done the company a "big favor" by issuing a "hybrid letter"

rather than a complete response letter; and (8) failed to disclose that the FDA's safety concerns

prompted the company to pursue a significantly more narrow use of its product only in situations

where real human blood would not be available to patients.  The Commission further charges that

throughout the relevant period, defendant Moore directly oversaw and participated in Biopure's

continuing efforts to raise money from public capital markets to finance Biopure's ongoing

operations by authorizing multiple sales of stock by Biopure while in possession of the material

non-public information about the status of Biopure FDA submissions.

     Now, on the eve of trial, defendant Moore has filed a Motion for Summary Judgment that

does not address all of the Commission's charges and lacks merit on its face, but would require

the Commission to consume considerable resources to respond at the same time it is preparing

for trial.  For the reasons described in this memorandum, the Commission respectfully requests

that defendant's Motion, which lacks merit on its face, be continued and the Commission not be

required to respond at this time.

**<u>Argument</u>**

**I.    Defendant's Motion Does Not Address All of the Charges
      In This Case, And Thus, Even if Granted (And It Should Not Be),
      <u>A Trial Would Be Necessary To Resolve the Commission's Remaining Charges</u>**

     Defendant's Motion does not address all of the charges in this case.  Thus, even if it were

granted (and it should not be), it would not eliminate the need for a trial.  Defendant's Motion

3

argues three points, which taken together address only a small portion of the Commission's charges in this matter. Defendant contends: (1) that the failure to disclose the clinical hold imposed by the FDA in April 2003 was not material; (2) that misstatements and omissions regarding whether a July 30, 2003 letter from the FDA was a "complete response letter" were not material and that defendant Moore did not act with scienter; and (3) that optimistic statements in an August 1, 2003 Press Release generally are not actionable, especially in light of cautionary disclaimers that appeared in company releases.

Defendant's Motion does not address the Commission's basic charge: that defendants engaged in a scheme to misrepresent the status of its FDA applications during a period in which it raised approximately $35 million from the public capital markets to finance its ongoing operations. (Compl. ¶¶ 1, 4, 5, 105). In addition to the three specific incidents of misrepresentations and omissions acknowledged in defendant's Motion, the Commission's Complaint charges liability for additional actions, statements and omissions, including:

- Beginning on April 9, 2003, Moore learned of substantial safety concerns raised by the FDA based on its review of the BLA's pivotal trial data, but between April and July 2003 he failed to disclose these concerns in public filings, press releases, analyst calls, and individual presentations to a stock analyst, an investment bank's sales force, and numerous investors.[1] (*See, e.g.*, Compl. ¶¶ 1, 4, 5, 33, 36, 40, 43, 45, 51, 52, 55, 60, 64, 66; *see also* Exhibit A hereto (Moore Tr. 11/7/06 at 133:11-15, 142:12-19, 150:22-151:4, 167:19-170-9)).

- On May 30, 2003, Moore misrepresented the nature of and reason for the FDA's decision to extend the review cycle for the BLA by 90 days in a press release and analyst call. Moore stated, *inter alia*, that the 90-day extension resulted from Biopure's response "to a new set of questions" that were "well within the range of

---

[1]    Contrary to Moore's arguments, the Commission's allegations related to the FDA's imposition of a safety hold in April 2003, and its continuation in May and July 2003, are much broader than the simple fact that Moore failed to disclose the existence of a "Clinical Hold Letter".

other questions we've answered in the past" and simply part of the "continual process of providing information" which has involved "answering hundreds of questions in the review of the BLA." Moore knew, however, and failed to disclose that the extension came about because of the company's attempt to lift the safety hold on the Trauma IND, not because of data submitted during the normal BLA review process. (*See* Compl. ¶¶51, 52-55).

- In April, May, June, and July, Moore authorized Biopure, without disclosing material non-public information (e.g., the FDA's safety concerns and the FDA's continued safety hold on the Trauma IND), to sell stock in the public market, including more than $25 million of stock to approximately twenty-five investors in four registered direct transactions and $3.8 million of stock in six issuances of shares to the public market. (*See* Compl. ¶¶ 1, 4, 5, 105; Ex. A (Moore Tr. 11/7/06 at 69:21-71:13, 93:16-94:9; 142:12-19, 150:22-151:4, 167:19-170-9)).

- In Biopure's August 1, 2003 press release, Moore, intentionally or recklessly, put a misleading, positive spin on the FDA's July 30, 2003 Complete Response Letter, while failing to disclose the scope and magnitude of deficiencies in the letter; and he recklessly misrepresented the amount of time that the FDA would have to review any resubmission by the company (i.e., 30 days, not six months). (Compl. ¶ 79).

- On or about August 1, 2003, Moore, while knowing that the actual timeline for the resubmission was indeterminable, authorized Biopure's designated investor relations representative to tell the press and analysts that Biopure would make its resubmission to the FDA's July 30, 2003 Complete Response Letter in only one to two months. (Exhibit B hereto (Moore Tr. 12/12/03 at 218:24-221:3); Ex. A (Moore Tr. 11/7/06 at 206:4-207:1)).

- On August 5, 2003, Moore authorized the sale by Biopure of 300,000 shares of Biopure stock in the pubic market, netting the company $2.26 million, while he and the company were in possession of material non-public information (e.g., that the company was unsure of how long it would take to make its resubmission to the FDA's Complete Response Letter but that it was longer than the previously disclosed one to two months, and that the FDA had expressed serious concerns to the Company about the safety and efficacy of Hemopure). (*See* Compl. ¶¶ 1, 4, 5, 105; Ex. A (Moore Tr. 11/7/06 at 261:5-13));

- On August 21, 2003, Moore recklessly misrepresented the nature of the FDA's July 30, 2003 letter to Biopure, stating that the FDA had done the company a "big favor" by issuing a "hybrid letter" rather than a complete response letter and making a "commitment" to respond to any resubmission within 30 days rather

than the normal six months, and failing to disclose that the FDA had expressed serious concerns to the company about the safety and efficacy of Hemopure. (Compl. ¶¶ 1, 5, 83, 86).

- On August 22, 2003, Moore authorized the sale by Biopure of 300,000 shares of Biopure stock in the pubic market, which was sold between August 22 and 27 and netted the company $2.26 million, while he and the company were in possession of material non-public information (e.g., that the company had not been the recipient of any special "favor" by the FDA and rather than receiving a "hybrid letter" had received a common Compete Response Letter that would result in the FDA having six months to respond to any resubmission rather than the previously disclosed 30 days, and that the FDA had expressed serious concerns to the Company about the safety and efficacy of Hemopure). (*See* Compl. ¶¶ 1, 4, 5, 105; Ex. A (Moore Tr. 11/7/06 338:14-339:7));

- On August 26, 2003, Moore received confirmation from Biopure's outside special FDA counsel that senior officials at FDA had confirmed that the July 30, 2003 letter related to the BLA was a Complete Response Letter and that the FDA would have six months, not 30 days, to respond to any resubmission, but failed to make any disclosure prior to public market stock sales by Biopure. (Ex. A (Moore Tr. 11/7/2006 at 324:5-326:2));

- On September 2, 2003, Moore authorized the sale by Biopure of up to 202,500 shares of Biopure stock in the pubic market, which was sold between September 2 and 4 and netted the company $1.6 million, while he and the company were in possession of material non-public information (e.g., that the company had not been the recipient of any special "favor" by the FDA and rather than receiving a "hybrid letter" had received a common Compete Response Letter that would result in the FDA having six months to respond to any resubmission rather than the previously disclosed 30 days, and that the FDA had expressed serious concerns to the Company about the safety and efficacy of Hemopure). (Compl. ¶ 1, 4, 5, 105; Ex. A (Moore Tr. 11/7/2006 at 356:9-358:5); Exhibit C hereto (Richards Tr. 10/27/06 at 131:21-132:100));

- On September 12, 2003, Moore directed that the company amend a public filing related to the registration of Biopure stock and remove a reference to the fact that the FDA's July 30, 2003 letter was a "Complete Response Letter." (Compl. ¶ 93).

- On September 17 and 25, and October 21 and 27, 2003, Moore made pre-announced presentations at investor conferences, webcast on Biopure's website, in which he failed to disclose that the FDA had expressed serious concerns about the safety and efficacy of Hemopure. Moore also never disclosed, contrary to advice

from Biopure's special FDA counsel, that in light of the company's recognition "that FDA has substantial questions regarding the safety of [Hemopure] in setting where patients can otherwise receive red blood cells," Biopure was seeking to amend its BLA for approval to market Hemopure for use only where patients could not receive real human blood transfusions. (Ex. A (Moore Tr. 11/7/06 at 375:18-379:7, 380:1-381:4, 392:4-15, 394:7-17, 398:10-399:4)).

- On October 30, 2003 Moore authorized the issuance of a press release and participated in an analyst call in which he still failed to disclose that the FDA had expressed serious concerns about the safety and efficacy of Hemopure. Moore also ignored the advice of Biopure's special FDA counsel to disclose that Biopure was seeking to amend its BLA for approval to market Hemopure for use only when real human blood was not available. (Compl. ¶ 100; Ex. A. (Moore Tr. 11/7/06 at 392:4-15, 399:10-402:18)).

Because defendant's Motion does not address all (or even most) of the pending charges, even if his Motion were granted by this Court (and it should not be), the parties anticipate that in six weeks, they will begin a substantial and factually detailed trial. For this reason, defendant's Motion should be continued.

## II.    On Its Face, Defendant's Motion Raises Disputed Factual Questions Precluding Summary Judgment

As to the charges that defendant's Motion does address, defendant Moore would not be entitled to summary judgment because it is evident on the face of the Motion that the existence of genuine issues of material fact would preclude summary judgment. *See* Fed. R. Civ. P. 56. Specifically:

- Summary judgment would be precluded on defendant's claim that the safety clinical hold was immaterial because there is ample evidence showing that it was material;

- Summary judgment would be precluded on defendant's claim relating to the July 30, 2003 complete response letter because there is ample evidence showing that it was important for investors to know whether the letter was a complete response letter and that defendant Moore continued to misrepresent the nature of the letter

even after receiving legal advice confirming the letter was a complete response letter; and

• Summary judgment would be precluded on defendant Moore's contention that his statements of optimism are not actionable. First, the Commission does not charge defendant Moore simply with making optimistic statements. Rather, the Commission charges that defendant Moore made or approved specific misstatements that mislead investors about the scope of the deficiencies identified by the FDA, the amount of time it would take Biopure to respond to the FDA, the amount of time the FDA would have to review any resubmission, and nature of the FDA's letter. Second, there is ample evidence showing that Moore, intentionally or recklessly, knew that the specific statements he made or approved concerning the letter and Biopure's response were false.

For these reasons, a full response to defendant's Motion would show that there is no basis here for entry of summary judgment, and defendant's Motion would have to be denied.

## A. Summary Judgment Would Not Be Appropriate on Defendant's Materiality Contention

Defendant Moore claims that Biopure was not required to disclose the existence of the clinical hold imposed by the FDA -- and the reasons it was imposed -- because that information purportedly was not material to investors. Defendant's argument, however, is not susceptible to resolution on a motion for summary judgment motion.

It is well-established that questions of materiality under the federal securities laws should normally be decided by a jury, not by the Court on a motion for summary judgment. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 209-210 (1st Cir. 2005) (vacating entry of summary judgment for defendants on materiality issue because, in part, "the materiality of a false statement [is a] question[] for the jury."); *see also In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D. Mass. 1997) (Saris, J.) ("The determination of materiality 'is normally a jury question . . .'") (citation omitted). Courts decide questions of materiality only in the rare circumstance where the

8

moving party satisfies a high standard of showing that reasonable minds could not possibly differ about the materiality of the information in question. *Stone & Webster*, 414 F.3d at 209; *Biogen*, 179 F.R.D. at 35.

Here, there are ample -- undisputed -- facts demonstrating that the clinical hold itself, and the reasons it was imposed and continued several times, were material to investors. Specifically,

- Biopure's stock price dropped 13.83% on heavy trading volume after the safety hold was first disclosed in a December 24, 2003 press release, issued after the close of the markets on Christmas Eve (Exhibit D hereto (Chart of Stock Price Movement)).

- In Moore's presentations to investors during 2003, he mentioned trauma trials in multiple instances and even projected that trauma will generate over 5% of Biopure's future revenues, a greater percentage than the revenue projected from the orthopedic surgery indication that was the subject of the BLA. (Exhibit E hereto (Stamm Report at ¶ 33)).

- Equity analyst reports noted the importance of the trauma indication to investors, and, after Biopure disclosed the clinical hold, noted that the FDA's safety concerns for the Trauma IND and BLA "overlap." (Ex. E. (Stamm Report at ¶¶ 31-32)).

- After receiving a July 30, 2003 letter in which the FDA rejected Biopure's second attempt to lift the clinical hold, defendant Moore did not show the FDA's letter to Biopure's board of directors. When one director with FDA regulatory experience later saw the letter, he said that it was as if the FDA was "throwing the book at" Biopure. (Facts[2] ¶ 105.)

- Biopure's stock price reacted positively after the company issued several press releases in the few months immediately prior to submitting the Trauma IND, in which the company touted its development of trauma uses for Hemopure generally and referred specifically to the trial proposed in the Trauma IND (including naming the doctors and hospital that would have conducted it) (Ex. E. (Stamm Report at ¶¶ 23-25)).

---

[2]     Citations to "Facts" refer to the Commission's Local Rule 56.1 Statement of Facts, dated February 7, 2006, Docket No. 84.

- The FDA's clinical hold of the trauma IND was based on the same data Biopure submitted in support of its BLA and the FDA explicitly stated that the clinical hold was based on a preliminary assessment of the BLA. (Facts ¶ 44; Exhibit F hereto (Snyder Report at 4-5.))

Although defendant Moore may dispute the significance of these facts, this is exactly the type of dispute that should be decided by a jury.

**B.      Summary Judgment Would Not Be Appropriate on Defendant's Contention That The Label "Complete Response Letter" Was Immaterial Or That Defendant Moore Lacked Scienter**

A genuine issues of material fact would also preclude summary judgment on defendant's materiality contention relating to the failure to disclose that Biopure had received a "complete response letter." The FDA has guidelines establishing the time for review of a BLA and of any resubmission made after the FDA has provided a "complete response letter." (Facts ¶¶ 8-14.) The FDA's guidelines are public, and investors can use the information to gain an understanding of the timing for a final decision on a company's application. (*Id.*) Here, the timing of a final decision on approval of the BLA was critical to Biopure's investors because without approval, the company had no authority to sell Hemopure in the Unites States market. *See Walsingham v. Biocontrol Tech., Inc.* 66 F. Supp. 2d 699, 676 (W.D. Pa. 1998) (denying motion to dismiss based on allegations that defendants withheld information about status of FDA application review especially given that it related to the company's only product).

The Complete Response Letter designation was indisputably of central importance to Biopure. It was one of the first questions that defendant Richman asked the FDA on July 31, 2003, and he was told, yes, it was a complete response letter. (Facts ¶¶ 72, 73.) Upon reading the Complete Response Letter, a Biopure board member with experience in drug development,

told defendant Moore that the company "absolutely needed to know" whether the letter was a complete response letter and suggested that the company engage experienced FDA regulatory counsel on the matter. (*Id.* ¶¶ 68, 79.)

The formal designation of the letter was also obviously important to investors. The first question asked during the first investor call after the August 1 press release was whether the letter from the FDA was a "complete response letter." (*Id.* ¶ 103.) In September 2003, when the company "mistakenly" characterized the letter as a "complete response letter" in a public filing, Biopure's stock price declined 6.5% on heavy volume, and Biopure's director of investor relations attributed the decline to the "complete response letter" designation. (*Id.* ¶¶ 106-08.)

By omitting the familiar "complete response letter" designation, defendant Moore and others were able to create the false impression that the FDA would review a Biopure resubmission in 30 days rather than the actual six month review time. Even Biopure's CFO at the time concedes that the difference in time would have been important for investors to know. (Ex. C. (Richards Tr. 10/27/06 at 146:23-147:16)). Accordingly, there would be no basis for this Court to concluded -- as a matter of law -- that the complete response letter designation was not material to investors. *See Biogen*, 179 F.R.D. at 29, 32-33 (liability would exist for mislabeling a phase II clinical trial as a phase III or "pivotal" trial, thereby misleading investors into thinking that a product is closer to actual approval than it is).

Similarly, defendant Moore's contention that he lacked scienter -- as a matter of law -- lacks merit on its face. Even if a jury were to believe defendant Moore's contention that he did not think the letter was a complete response letter as of August 1, 2003 (despite that the letter

11

uses the FDA's boilerplate complete response letter language and that the FDA told Biopure that

it was a complete response letter), defendant Moore indisputably knew that the letter was a

complete response letter as of August 26, 2003.  On that date, Biopure's outside counsel

confirmed that the letter was a complete response letter and that the FDA would have 6 months,

not 30 days, to review any resubmission, which Moore then conveyed to his senior staff.  (Ex. A

(Moore Tr. 11/7/06 at 324:5-326:2, 340:8-341:13, 345:9-346:8)).  After being told definitively

that the letter was a complete response letter -- and that his prior, emphatic public statements to

the contrary were wrong -- defendant Moore nonetheless authorized Biopure to sell

approximately $2.1 million of stock without making any disclosure.  (Ex. A (Moore Tr. 11/7/06

at 338:14-339:7, 357:9 - 361:19)).  He also ordered that a reference to the letter as a complete

response letter be removed from an SEC filing and he failed to state that the letter was a

complete response letter in four investor presentations and in the company's October 30, 2003

press release.  (Compl. ¶¶ 93, 100; Ex. A (Moore Tr. 11/7/06 at 392:4-15, 399:10-402:18; Ex.

353)).

        For these reasons, there would be no basis to enter summary judgment on defendant

Moore's contention that he lacked scienter.

### C.      Summary Judgment Would Not Be Appropriate on Defendant's Contention That Statement of Optimism Are Not Actionable

        Lastly, genuine issues of material fact would also preclude entry of summary judgment on

defendant Moore's contention that statements of optimism are not.  The evidence shows that

defendant Moore made material misstatements that lacked any factual basis when he stated that

was "encouraged" by the FDA's review and that by completing its review 30 days early, the FDA

12

was "encouraging" Biopure to work with the FDA to complete the review process quickly.  *See In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 118-19 (D. Mass. 1999) (holding that defendants could be liable for securities fraud by stating, without any factual basis, that the FDA had concluded that their clinical data was so encouraging that randomization could be halted).

The FDA simply did not provide any encouragement that Biopure could gain quick approval of Hemopure.  Dr. Crout, an outside director at Biopure with drug development experience, told defendant Moore that the Complete Response letter should not be characterized as good news.  (Facts ¶81.)  Outside FDA regulatory counsel also told defendant Kober that the issuance of the complete response letter "30 days early in this context while true isn't great cause [for] optimism."  (*Id*. ¶ 83.)  The FDA never provided any reason to Biopure for the early letter and expressly told Biopure that they would <u>not</u> review a resubmission in 30 days.  (*Id.* ¶¶ 74-76.) Moreover, there is no factual basis for Moore's statement that the early issuance of the letter was done by the FDA to "encourage" Biopure to work towards a quick approval of the BLA.  The FDA did not see the Complete Response Letter as a positive development in the BLA approval process.  In fact, one of the letter's main authors, Dr. Landow, testified that if he had received the letter he would have been depressed, not encouraged.  (*Id.* ¶ 97.)

Contrary to defendant's arguments, the Commission's charges do not attack predictions or statements of future intent.  Moore expressed a present state of mind based on past events (i.e. Biopure's communications with the FDA).  These statements set an overall inappropriately positive tone for the entire release. As the court in *Amylin* commented:  "If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously

13

undermine the accuracy of its statement, the statement is actionable." *See In re Amylin Phara., Inc. Sec. Litig.*, No. 01cv1455, 2003 WL 21500525, at *8, n.3 (S.D. Cal. Aug. 9, 2001) (citing *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)).

### III.   In Light of The Current Trial Schedule, A Formal Response To Defendant's Motion Would Be A Waste Of Governmental and Judicial Resources

Trial is scheduled to begin in only six weeks, and the parties are vigorously engaged in trial preparations.  Now, on the eve of trial, defendant Moore has filed a Motion for Summary Judgment that does not address all of the Commission's charges and lacks merit on its face, but would require the Commission to consume considerable resources to respond at the same time it is preparing for trial.  In addition, defendant Moore has also filed four other motions.  Because (1) this Court has indicated that it would not consider a summary judgment submission this close to trial, (2) the Motion does not address all (or even most) of the charges in this case, (3) the Motion lacks merit on its face, and (4) preparing a formal response (including a Local Rule 56.1 Statement of Facts and, necessarily, voluminous evidentiary appendices) would consume considerable Commission resources during the trial preparation period, the Commission respectfully requests that it not be required to respond formally to the Motion.  To the extent that defendant's Motion raises any legal issues that need to be resolved by this Court rather than the jury, such issues may be resolved on *motions in limine* on jury instructions.

In the alternative, the Commission respectfully requests that this Court schedule a status hearing for the purpose of addressing a schedule for briefing the Motion and for trial.

### Conclusion

For the foregoing reasons, the Commission respectfully requests that defendant's Motion

for Summary Judgment be continued and the Commission not be required to submit a response.

In the alternative, the Commission requests that this Court schedule a status hearing for the

purpose of addressing a schedule for briefing defendant's Motion and for trial.

Dated: December 2, 2006
       Boston, Massachusetts                    Respectfully submitted,


                                         /s/ Ian D. Roffman
                                     Ian D. Roffman (BBO #637564)
                                     R. Daniel O'Connor (BBO# 634207)
                                     Ellen Bober Moynihan (BBO#  567598)
                                     33 Arch Street
                                     Boston, Massachusetts 02110-1424
                                     (617) 573-8987 (Roffman)
                                     Counsel for Plaintiff
                                     Securities and Exchange Commission

                          *Electronically Served by ECF*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------x
U.S. SECURITIES AND            :
EXCHANGE COMMISSION,           :
                               :
        Plaintiff,     :
                               :
        v.             : No. 05-11853-PBS
                       :
BIOPURE CORPORATION et al., :
                       :
                       :
        Defendants.    :
---------------------------x


Washington, D.C.

Tuesday, November 7, 2006

Videotaped deposition of

THOMAS MOORE

a Defendant, called for examination by counsel for

Defendants pursuant to notice and agreement of

counsel, beginning at approximately 9:39 a.m. at the

offices of the U.S. Securities and Exchange

Commission, 100 F Street, NE, Washington, D.C.,

before Karen Young of Beta Court Reporting, notary

public in and for the District of Columbia, when

were present on behalf of the respective parties:

69

1      A    My understanding was that through

2    this agreement, the Bank of New York would

3    sell at the company's discretion shares into

4    the marketplace enabling the company to raise

5    money, not a lot of money, in the context of

6    the overall fund-raising activities, but a

7    little bit of money at a time in order to

8    help defray the aforementioned burn rate.

9      Q    Now, you said that the Bank of New

10   York would sell stock at the company's

11   discretion.  What do you mean by at the

12   company's discretion?

13     A    I mean the company would determine

14   when and how -- when, not how, but when the

15   Bank of New York would in fact sell the

16   company's stock.

17     Q    And what factors did the

18   company -- well, let me take a step backward.

19   Were you involved in the company's

20   decision-making process as to when the

21   company would ask Bank of New York to sell

22   stock?

70

1    A    Yes, I was.

2    Q    What was your role?

3    A    My CFO would come to me and say the

4    recommendation is that we would sell some

5    stock in the next few days, do you agree, and

6    I would say yes.

7    Q    And what factors did you employ in

8    making a determination as to when to sell

9    stock?

10    A    It was based entirely on the Bank

11    of New York's determination of their ability

12    to do so.

13    Q    I'm sorry.  I don't understand

14    that.

15    A    The Bank of New York would assess

16    the market in terms of what the rate of sales

17    in the stock would be, called the velocity --

18    I'm sure you're familiar with the term -- of

19    the stock, and would make a recommendation as

20    to how much stock they thought they could

21    sell without depressing the stock price in

22    the marketplace.

71

1    Q   I'm a little bit confused because I

2   thought you had said that Bank of New York

3   would sell stock at the company's discretion.

4    A   Well, they would come to us to say

5   we think we can sell some stock now, and we

6   would then say okay, go ahead and do that.

7   So it was an interaction between the two, but

8   the Bank of New York would advise us on what

9   they could sell without creating a problem

10   and how much they could sell.

11    Q   I see.  So was it your

12   understanding at the time that the process of

13   the transaction is that it would originate at

14   the Bank of New York, then come to Biopure,

15   and then come to you and you would approve or

16   disprove of it?

17    A   That was my perception of the

18   process.

19    MR. ROFFMAN:  Okay.  Could you mark

20   this please as Exhibit 335?  Thank you.

21        (Deposition Exhibit No. 335 was

22        marked for identification.)

93

1    overlooked saying that we also needed Jane

2    Kober's approval in order to do this as

3    general counsel of the company, and at the

4    time, we were all aware of initially the

5    phone call and then I guess as we get to the

6    later transactions, the letter in hand

7    concerning that hold.  And so we discussed

8    that the deal was going forward, we discussed

9    the fact the company received this letter.

10   We did not specifically discuss for each of

11   these transactions whether or not we should

12   disclose that letter and our belief that it

13   was not a material event.

14        BY MR. ROFFMAN:

15        Q    Did you specifically discuss with

16   Jane Kober prior to the April 16th, May 2nd

17   and May 6th transaction the topic of whether

18   to disclose the clinical hold on the trauma

19   indication?

20        A    I cannot specifically recall a

21   conversation.  I believe it's entirely

22   possible we did, but I cannot recall the

94

1   specific conversation.

2       Q   Do you know whether Ms. Kober was

3   aware of the clinical hold as of April 16th,

4   2003?

5       MR. BURCHFIELD:  Object to form.

6       THE WITNESS:  As of April 16th,

7   given that we'd received a phone call I guess

8   a few days before, I'm not -- I can't say for

9   sure that she was aware.  It was the

10  responsibility of our regulatory officer to

11  make sure she knew about it, and as far as I

12  knew, Howard did that, but I can't personally

13  say that I told her, so I can't personally

14  vouch whether or not she knew it back when.

15  I'm pretty certain that she knew as of the

16  point of the May transactions.

17      BY MR. ROFFMAN:

18      Q   And why is it that you're pretty

19  certain she knew as of the May transactions?

20      A   Because any written correspondence

21  we would have received from FDA would have

22  been circulated to her.

BETA  COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

133

1        BY MR. ROFFMAN:

2        Q    Okay, and those two times being

3    what?

4        A    On this occasion, and as I recall

5    from the exhibits you previously showed me,

6    on the occasion of the previous report.

7        Q    Do you recall generally speaking

8    the topics of conversation that

9    Ms. Srivastava was interested in prior to

10   filing her May 14th analyst report?

11       A    I really don't recall the topics.

12   I assume -- I don't -- I don't recall.

13       Q    Okay.  If I can ask you to look at

14   the report, which is marked as Exhibit 260 --

15       A    Uh-huh.

16       Q    Its headline is "Hemopure is not on

17   the June advisory committee, a positive in

18   our view."  Do you see that?

19       A    I do.

20       Q    Did you share with Ms. Srivastava

21   the view that it was positive for Biopure

22   that Hemopure was not on the June advisory

142

1   is that correct?

2       A    That's correct.

3       Q    And Exhibit 309 sets forth the

4   schedule of investors that you were at least

5   scheduled to speak with in connection with

6   that potential transaction; correct?

7       A    That's what I see.

8       Q    Okay.  And that's consistent with

9   your memory of what happened?

10      A    To a degree that a particular day

11  of road showing is memorable, yes.

12      Q    Okay.  The schedule states toward

13  the top of it that Sapna Srivastava will be

14  traveling with Biopure for the day.  Do you

15  see that?

16      A    I do.

17      Q    Why did Ms. Srivastava travel with

18  you for this road show?

19      A    Well, as an analyst, she had spent

20  more time thinking about and understanding

21  the company than anyone, or at least anyone

22  we knew of outside the company, and as an

150

1    designed to gradually increase the rate of

2    investment on marketing so that we would not

3    end up running out of all our funds before we

4    had a chance to benefit from the commercial

5    uptake on the product.

6        Q    And the time frame of two, maybe

7    three years -- was that dependent on

8    obtaining FDA approval at the end of the BLA

9    review cycle?

10       A    That was all based -- that was all

11   based from the point where we got approval.

12       Q    Okay, so it would have been two or

13   three years from the point of approval for

14   the company to become profitable?

15       A    That's right.

16       Q    And was there -- were there

17   questions from investors or prospective

18   investors about how long it would take to get

19   to the point of approval?

20       A    Always.

21       Q    And what did you say about that?

22       A    I'd say I didn't know because at

151

1  this point we didn't know what the FDA had to

2  say about the product, and I would remind

3  investors that even if the product was

4  approved, there would be an extensive period

5  generally in negotiation about things like

6  labeling and other matters.

7      Q   Could you turn on your calendar

8  please to page 47, and specifically Tuesday

9  May 20th, and there's a notation in there for

10  a ThinkEquity dinner.  Do you see that?

11     A   Yes.

12     Q   What does that refer to?

13     A   I don't exactly recall, but I think

14  we were having a meeting with ThinkEquity the

15  next day.  They were coming in the night

16  before and so they required entertainment.

17     Q   Okay.  What was the meeting the

18  next day?

19     A   I assume it was a discussion about

20  the status of the fund-raising, but I don't

21  recall the exact topic.

22     Q   Okay.  And do you know if Sapna

167

1   review cycle, I disclosed the reasons for

2   that extension.  I think those are the

3   principal things that were disclosed.

4       Q   When you say you disclosed the

5   reasons for that extension, did you say

6   anything to investors who participated in the

7   ThinkEquity transaction that were different

8   from the statements you made during the May

9   30 investor conference call?

10      A   Not that I recall.

11      Q   What reasons did you provide to

12  investors who participated in the ThinkEquity

13  transaction about the reasons for the

14  extension?

15      A   I said that there had been

16  additional analysis on some of the clinical

17  data which had been submitted to the BLA and

18  that the FDA had viewed that as a major

19  amendment and thereby invoked their right to

20  extend the review period by 90 days.

21      Q   Did you disclose to investors who

22  participated in the ThinkEquity transaction

168

1   that the information Biopure submitted to the

2   FDA was submitted for the purpose of lifting

3   a clinical hold that was in place?

4      A   No, I did not.

5      Q   I'd like to show you what's been

6   previously marked as Exhibit 284.

7   Exhibit 284 is a copy of the Rule 424(b)(5)

8   prospectus supplement filed by Biopure in

9   connection with the ThinkEquity transaction;

10   is that correct?

11      A   Yes, it is.

12      Q   What was your role with respect to

13   the preparation or filing of this document

14   with the SEC?

15      A   I reviewed the filing before it was

16   made with the SEC.

17      Q   Was your approval required prior to

18   filing the document with the SEC?

19      A   My approval, the approval of Jane

20   Kober, I'm sure the approval of ThinkEquity

21   counsel as well, but I believe all those

22   approvals were required, as well as probably

BETA  COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

169

1    that of Ron Richards before it actually could

2    be filed.

3        Q    If I could ask you to turn please

4    to page 5 of Exhibit 284, there's a section

5    titled "Recent Developments."  Do you see

6    that?

7        A    Yes.

8        Q    And did you review the narrative

9    under the heading "Recent Developments" prior

10   to the file with the SEC?

11       A    Yes, I did.

12       Q    If I could direct your attention to

13   the section that begins in the second

14   paragraph, and it begins with a heading "FDA

15   Approval Process."  Do you see that, sir?

16       A    I do see it.

17       Q    If I could ask you to read the

18   three paragraphs under the heading "FDA

19   Approval Process" and let me know when you're

20   done please?

21       A    Okay.  "FDA approval process."

22       Q    I don't mean read it out loud.  You

170

1  can read it to yourself.

2      A   Very well.

3      Q   I just want to make sure you have

4  an opportunity to review it --

5      A   Okay.

6      Q   Before I ask you a question.

7      A   Okay, I've read it.

8      Q   Do the three paragraphs under the

9  heading "FDA Approval Process" in this

10  prospectus supplement -- are they an accurate

11  disclosure of the FDA approval process for

12  Biopure's biologics license application as of

13  July 18, 2003?

14      A   They're accurate based on the

15  advice I received at the time.

16      Q   Do the three paragraphs describing

17  the FDA approval process -- are they

18  consistent with your understanding of the

19  process for Biopure's BLA as of July 18,

20  2003?

21      A   It does describe my understanding

22  of the process as of that time, yes.

206

1  consistent with the press release the company

2  had made.  I guess I didn't think that was an

3  unreasonable expectation.

4      Q    Well, had you had discussions with

5  Mr. Sayles prior to issuing the press release

6  about his view that he thought it was a good

7  idea to provide a timeline to the public?

8      A    He sent me an e-mail concerning

9  that, which occurred -- I guess the e-mail

10  was sent, would have been -- it would be late

11  on July the 31st, as I recall.

12      Q    And did you receive that e-mail

13  late on July 31st?

14      A    It went into my account.  I did not

15  read it until actually a day and a half

16  later.

17      Q    Did you have any discussions with

18  Mr. Sayles prior to issuing the press release

19  about his view that the company should

20  provide a timeline to the public?

21      MR. BURCHFIELD:  Objection.  I

22  think that's been asked a few times.

207

1   Mr. Moore, you may answer it again.

2        THE WITNESS:  We talked about what

3   the right time frame was.  We talked about

4   the succession of thinking that led us to say

5   as expeditiously as possible.

6        BY MR. ROFFMAN:

7     Q   Now, the discussion that you had

8   about the timeline, was the topic about

9   whether to provide a specific timeline to the

10   public, did that come up prior to issuing the

11   press release?

12     A   Yes, it did.

13     Q   And did you give instructions to

14   Mr. Sayles not to provide a timeline?

15     A   We agreed in the press release that

16   we would say as expeditiously as possible.

17     Q   Did you have discussions with

18   Mr. Sayles about providing a timeline in

19   conversations to -- with the media outside of

20   the press release?

21     A   Outside of the press release.  He

22   may have asked that question, but the press

261

1    on August 5th, 2003?

2        A   I did.

3        Q   The e-mail at the bottom, which is

4    the first in time, is an e-mail from

5    Ms. Kober to you and Howard Richman that

6    says, "Bob Dormer just phoned.  He's

7    astounded at the clinical data items."  Do

8    you see that?

9        A   I do.

10       Q   Did you have any discussion with

11   anybody about -- about Mr. Dormer being

12   astounded at the clinical data items?

13       A   Well, I think eventually it came up

14   for discussion with board members, but that's

15   not something that I shared, as I recall, in

16   any general way around the company.

17       Q   Did you have a conversation -- I

18   mean, it appears from this e-mail that

19   Ms. Kober was relaying on to you and

20   Dr. Richman about a phone conversation that

21   she had with Bob Dormer; correct?

22       A   Correct.

324

1    A    No.

2    Q    Why not?

3    A    Because these individuals they

4    talked to were not the people that actually

5    issued us the letter, and they clearly

6    represented to these lawyers that they didn't

7    in fact know specifically about the letter.

8    They were discussing what they -- what

9    they -- how they interpreted the letter based

10   on the description of it by the lawyers, but

11   I agreed with Josephine's recommendation that

12   somehow we ought to get the -- to try to get

13   clarification directly from the folks who in

14   fact were our reviewers.

15   Q    As of reviewing this e-mail, did it

16   call into question your prior statements

17   during the August 21st conference call that

18   the letter was a hybrid letter?

19   A    It certainly was a different point

20   of view about it, but again, it didn't come

21   from the people who actually sent us the

22   letter, nor -- and these people made it clear

325

1  that they hadn't talked to the people who

2  actually sent us the letter, and in point of

3  fact, in discussing it with Jane, I was told

4  that these discussions occurred on a tennis

5  court, and so I didn't feel a tennis court

6  discussion was a definitive message from the

7  FDA about what the status of the letter was.

8      I continued to believe, given that

9  we'd made these statements publicly, that the

10  FDA should be communicating with us about it,

11  and in point of fact, we had had several

12  discussions with them and I was not aware of

13  any communication as of that point where they

14  said no, this is a complete response letter

15  and we disagree with your interpretation of

16  what the letter means.

17  Q   As of reviewing this letter, this

18  e-mail, did it call into question your

19  statements on the August 21st conference call

20  that the FDA had made a commitment to get

21  back to Biopure within 30 days?

22  A   It was a different point of view.

326

1    It was not the point of view of the people

2    who would have made this commitment.

3        Q    Did you have any communications

4    yourself with the people who would have made

5    such a commitment?

6        A    No, not -- not as of this point.

7        Q    Had you reviewed any written

8    communications or written documents that

9    seemed to confirm to you any other

10    explanation for the July 30 letter?

11        A    No, I was unaware of any written

12    communication from the agency to us at that

13    time stating some different point of view.

14        Q    Had you reviewed any internal

15    Biopure telephone contact report that

16    confirmed any different perspective?

17        A    I saw that report that you and I

18    discussed earlier which talked about the CR

19    letter.  I asked Dr. Richman what the CR was

20    and he said that meant complete review.

21        Q    Had you seen any internal contact

22    reports that confirmed in your mind or

338

1  up periodically.  There was no particular

2  reason for the choice of this date.

3      Q   I'd like to show you what's been

4  previously marked as Exhibit 238.  Do you

5  recognize Exhibit 238 to be minutes from an

6  August 27th, 2003 BLA response committee

7  meeting?

8      A   I do.

9      Q   And that was a meeting that you

10  attended --

11      A   Uh-huh.

12      Q   And participated in?

13      A   Yes.

14      Q   I'd like to direct your attention

15  to the heading "FDA Interactions During the

16  Previous 72 Hours."  Do you see that?

17      A   Yes.

18      Q   And that describes some of the

19  communications that we've just been reviewing

20  with Hyman Phelps; correct?

21      A   Exactly.  I did not try to keep

22  them quiet.

339

1     Q    And so you discuss that Hyman

2    Phelps had provided advice that it was -- the

3    July 30 letter was an action letter and that

4    the response time would be not 30 days, but

5    either two months or six months depending on

6    the type of response; correct?

7     A    I relayed accurately what they had

8    told me.

9     Q    The third to last bullet in that

10   section says, "We are wording our letter to

11   say a complete review letter instead of a

12   complete response letter."  Do you see that?

13    A    I do.

14    Q    And that refers to a meeting

15   request you were making?

16    A    That's also true.

17    Q    Can you explain to me what was

18   stated on that topic at this meeting?

19    A    I'm not sure, Mr. Roffman, about

20   your question, but I do want to answer it.

21   Sorry.

22    Q    Okay.  What's the difference

340

1   between a compete review and a complete

2   response letter in your mind?

3       A   I guess in my mind, the complete

4   review says that they've completed the review

5   of our application and this a follow-up to

6   that complete review, and that's in fact what

7   the FDA said in their letter.

8       Q   By calling it a complete review

9   letter instead of a complete response letter,

10  were you taking a position that the company

11  did not believe the letter to have been a

12  complete response letter?

13      A   That's fundamentally true, albeit

14  this is of course in communications with the

15  FDA, not external.

16      Q   Did you receive any advice from

17  Hyman Phelps as to whether to refer to it as

18  a complete review letter as opposed to

19  complete response letter?

20      A   Not in the context of this letter.

21  At least not that I recall.

22      Q   Where did you come up with the

341

1   phrase "complete review letter" from?

2      A    That was the phrase the FDA used in

3   their letter to us.

4      Q    Did they refer to the letter as a

5   complete review letter?

6      A    They said that we've completed our

7   review, and Dr. Richman had told me that the

8   initials CR stood for complete review.

9      Q    Did you have a -- did you have a

10  view that the FDA's response time would be

11  any different if it was a complete review

12  letter as opposed to a complete response

13  letter?

14     A    At this point, I had -- I

15  didn't -- at this point all I'd said was what

16  I said in the press release and then repeated

17  it in our press conference about how I

18  interpreted the difference in the two

19  response times.

20     Q    I'm sorry.  I'm not sure I

21  understand what you answered.

22     A    You asked whether or not I

345

1   advising me of that.

2       Q    So as you sit here today, you're

3   not aware of any advice you received in

4   connection with the question of whether it

5   was a complete response letter.

6       A    Right.  I will say I'm quite sure

7   we didn't receive any advice that a public

8   announcement was in fact necessary.

9       Q    Well, I guess the question is

10  whether you received any advice on that topic

11  generally one way or the other.

12      A    I'm thinking for a moment.  I don't

13  recall receiving advice on that point one way

14  or another.

15      MR. ROFFMAN:  Why don't we take a

16  five-minute break.

17      THE WITNESS:  Sure.

18      VIDEOGRAPHER:  Going off the record

19  at 5:04 p.m., Tape 5.

20          (Recess)

21      VIDEOGRAPHER:  Going back on the

22  record at 5:26 p.m., Tape 6.

346

1       BY MR. ROFFMAN:

2       Q   Mr. Moore, I'm showing you what's

3    been previously marked Exhibit 241.

4    Exhibit 241 is a copy of the minutes from the

5    team responding to the BLA letter from

6    September 2nd, 2003; is that correct?

7       A   Yes, it is.

8       Q   I'd like to direct your attention

9    to the second page, and there's a section

10   entitled "Biopure Negotiating Strategy."  Do

11   you see that?

12      A   Yes.

13      Q   And it says that you presented a

14   goal of the -- presented the goal of the

15   negotiating strategy, which is to obtain

16   approval.  Do you see that?

17      A   Yes.

18      Q   What did you say at this meeting

19   about what Biopure's strategy was?

20      A   Well, I really just, as it says

21   here, presented the goal.  It says our aim is

22   to get approval here, and so let's talk about

356

1    Q    As of September 2nd, 2003, had your

2    understanding about whether the July 30

3    letter was a complete response letter or not

4    changed -- had that changed at all since

5    August -- the August 1 press release?

6    A    No.

7    Q    As of September 2nd, had your

8    understanding of whether the July 30 letter

9    was a complete response letter or not changed

10   at all since the August 21st conference call?

11   A    I was -- I was certainly

12   considering the advice I was getting from

13   various tennis courts around the Washington

14   area, but I had not decided that the status

15   of that letter had changed.

16   Q    Okay.  And when you say you were

17   considering advice you had gotten from

18   various tennis courts, you're referring to

19   advice that you had received from Hyman

20   Phelps --

21   A    Right.

22   Q    Based on their conversations with

357

1  FDA officials?

2      A   Uh-huh.

3      Q   Did you consult with Hyman Phelps

4  at all as to whether additional disclosures

5  would be necessary in connection with stock

6  sales on September 2nd?

7      A   I did not ask them that question.

8      Q   Did you consult with Jane Kober

9  about whether additional disclosures would be

10  required in light of the advice you received

11  from Hyman Phelps?

12      A   I did not ask her that question.

13      Q   Does the fact that you believe the

14  conversation between Hyman Phelps and the FDA

15  officials occurred on a tennis court affect

16  in your mind the validity of the information?

17      A   Well, I've worked with many

18  different law firms in my career in business.

19  I know the difference between an opinion and

20  a guess, and I interpreted what Hyman Phelps

21  said, which was not provided me in writing,

22  was not an opinion of the firm; it was their

358

1    guess based on these informal contacts they'd

2    had with FDA officials who were not directly

3    involved with the issuance of our letter.  I

4    respect their experience, but I didn't view

5    this as an opinion because they didn't

6    present it as an opinion.

7        Q    Would it have been important for

8    you to receive something in writing about

9    whether the letter was a complete response

10   letter or not?

11       A    Well, at least it would elevate it

12   to an opinion.  Nevertheless, I knew the

13   source of that opinion.

14       Q    Did you ask for a formal opinion as

15   to whether it was a complete response letter

16   or not?

17       A    I did not.

18       Q    Why not?

19       A    Because I understood the source of

20   it, and so I assumed that that letter without

21   that source meant that no such opinion letter

22   was forthcoming.

BETA  COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

359

1     Q    Well, did you consider whether it

2    would be appropriate to ask for such an

3    opinion letter?

4     A    I'm working back on my recollection

5    on this.  I considered that, but again, I

6    knew the origination of their -- their point

7    of view on this, and that -- so I assumed

8    that there was nothing more to be said, that

9    this was not so much a legal opinion as a

10    little bit of lobbying that they had done,

11    lobbying not to get the agency to do

12    anything, but lobbying to find out what the

13    agency was thinking, and that it had to be

14    treated in that context.

15     Q    Now, on September 12th, 2003, did

16    you become aware that the company had made a

17    public filing that referred to the July 30

18    letter as a complete response letter?

19     A    I did.

20     Q    Can you describe for me what you

21    found out and how you found that out?

22     A    I believe Ron Richards told me that

360

1   the company had made a filing which had

2   described the letter as a complete response

3   letter.

4       Q    When did he tell you that?

5       A    I can't recall.

6       Q    Did he tell you in person or over

7   the telephone?

8       A    I think it was over the telephone.

9       Q    And did he tell you -- I can tell

10   you and you can look at your calendar,

11   September 12th was a Friday.  It's on page 63

12   of your calendar.  Do you see that?

13       A    I do.

14       Q    And did he tell you on the evening

15   of September 12th?

16       A    It's possible.  I really don't

17   recall.

18       Q    How did you respond to Mr. Richards

19   telling you that this filing had been made?

20       A    I said that's inconsistent with our

21   position on what this letter is.  I think he

22   had already known that and already requested

361

1    that it be changed.

2       Q   Mr. Richards requested that it be

3    changed?

4       A   He did either shortly before or

5    shortly after our conversation.

6       Q   Okay.  Did you give Mr. Richards

7    any instructions with respect to whether the

8    prospectus should be changed?

9       A   I don't recall specifically, but

10   I'm reasonably certain I would have said we

11   need to have a consistent position on this so

12   I'd like the prospectus changed.

13      Q   And that was something that you

14   said to Mr. Richards?

15      A   That's what I recall.

16      Q   Did you have any conversations with

17   anyone else about this disclosure that the

18   company had made on September 12th, 2003?

19      A   I think I may have had a

20   conversation with Jane Kober about it.

21      Q   And was that conversation over the

22   phone or in person?

375

1   sessions held that we went -- after a

2   presentation, we would generally go to a

3   smaller room and be available for Q and A's.

4       Q   What was the purpose of

5   participating in this conference?

6       A   To keep the -- to familiarize

7   potential investors with the status of the

8   company, to keep the company in front of the

9   investment community.

10      Q   And why would you want to do that?

11      A   At some point in the future, we

12  would probably be interested in raising

13  money.

14      Q   And the slides that constitute this

15  PowerPoint presentation -- did you prepare

16  those?

17      A   I prepared most of them, and I

18  certainly approved all of them.

19      Q   Were these slides reviewed by

20  anyone else?

21      A   They're reviewed by -- I believe by

22  Jane Kober.

376

1    Q    Were they reviewed by anybody else?

2    A    Probably Ron Richards.

3    Q    Anyone else?

4    A    Doug Sayles.

5    Q    At the September -- anyone else?

6    I'm sorry.

7    A    Probably -- probably Howard

8    Richman.

9    Q    Anyone else?

10    A    I haven't said the right name yet.

11    Q    No, I'm not looking for a

12    particular name.  I'm just asking --

13    A    I think that represents the folks

14    who would have reviewed it.

15    Q    In connection with the September

16    17th, 2003 presentation that you made, did

17    you make any disclosure about safety concerns

18    raised by the FDA in connection with

19    Hemopure?

20    A    No, I did not.

21    Q    Did you make any disclosure about

22    the consideration of an alternate indication

377

1    in situations where blood is not available?

2        A    No, I did not.

3        Q    Did you have any discussions with

4    anyone about whether those disclosures would

5    be appropriate?

6        A    No.  There was -- as you know from

7    the dates, this occurred the day after this

8    conversation with FDA, and so there was

9    hardly any time to talk to anybody at that

10    point, though at that point I had already

11    talked to my chairman of the board, Charlie

12    Sanders.

13        MR. ROFFMAN:  Would you mark this

14    please as exhibit -- the next exhibit?

15            (Deposition Exhibit No. 349 was

16            marked for identification.)

17        BY MR. ROFFMAN:

18        Q    Mr. Moore, I've handed you what's

19    been marked as Exhibit 349.  Is Exhibit 349 a

20    copy of a press release announcing a

21    presentation at the UBS Global Life Sciences

22    Conference on September 25th, 2003, and

378

1   attached to that, a copy of the presentation

2   that you gave at that conference?

3       A   Yes.

4       Q   And you attended the conference?

5       A   I did.

6       Q   And you presented the presentation

7   that's marked as Exhibit 349?

8       A   I did.

9       Q   Did you attend any smaller group

10  sessions in addition?

11      A   As I recall, I think I did.

12      Q   In connection with the

13  September -- or at the September 25th

14  conference, did you make any disclosure about

15  safety concerns raised by the FDA about

16  Hemopure or the BLA?

17      A   Not to my recollection.

18      Q   Did you make any disclosure about

19  an alternate indication of Hemopure when

20  human blood is not available?

21      A   No, I did not.

22      Q   Why didn't you make a disclosure

379

1    about safety concerns that the FDA had

2    expressed?

3        A    Well, I found the conversation with

4    Dr. Silverman bizarre.  It was not a

5    scheduled conversation.  I just happened to

6    be in Richman's office when she called, and

7    that didn't seem to be the context in which

8    to deliver some authoritative viewpoint.

9    Two, in her discussions, she really wandered

10    back and forth between the discussion about

11    the trauma IND and the BLA and didn't really

12    present a very consistent story.

13        She was extremely emotional and so

14    it didn't -- and further, she brought in this

15    discussion about safety as an afterthought

16    after we had discussed the principal topic

17    about whether or not we could develop a

18    sampling approach to look at the sites.  So

19    it seemed to me -- I didn't know how to

20    evaluate that discussion because it was -- if

21    the agency intended to communicate to us

22    their opinion about the safety of the

380

1    product, normally it would be done in the

2    form of written correspondence.  Normally it

3    would be done as part of the so-called

4    complete response letter.

5          Now here it is a month and a half

6    later and suddenly not -- she didn't call up

7    to say I'd like to discuss what your status

8    is of your product with FDA.  We called up to

9    discuss strictly whether or not we could take

10   a sampling approach.  Suddenly at the end of

11   this she starts talking about these issues.

12          And so I regarded it as some kind

13   of highly personal communication which indeed

14   we had to address, but it reflected the fact

15   that they had questions which they had yet to

16   ask us which they expect -- would expect some

17   kind of response to, but it was not in my

18   opinion either the form or the format or the

19   forum in which to actually communicate

20   substantial agency concerns.  I saw that as

21   these are the kinds of questions you're going

22   to have to address.

381

1        And so in that context, I didn't

2    know how to report this.  I don't know how

3    you stand up in front of a group of people

4    and say I was talking with an agency official

5    about how we could do the sampling approach

6    and then suddenly she said I think you have

7    real safety concerns with this product,

8    concerns which we reflected to you in the

9    communication of the BLA.  I didn't know how

10   to do that and I didn't know how to evaluate

11   what that meant.

12       We had already established that we

13   were going to be considerably spaced out in

14   our response to those questions.  It was no

15   longer a question of whether or not we would

16   get back in three months or four months.

17   We'd already established it was going to be

18   longer than that, and so at that point my

19   belief was I had to understand more about

20   what these questions were and how they should

21   be responded before I could communicate with

22   anybody about what these FDA safety concerns

392

1          BY MR. ROFFMAN:

2      Q    Is Exhibit 350 a copy of a press

3    release announcing your presentation at a

4    Rodman & Renshaw Techvest Healthcare

5    Conference on October 21st attached to a copy

6    of the presentation you gave at that

7    conference?

8      A    Yes, it is.

9      Q    And this is a copy of a

10   presentation that you prepared and gave at

11   that conference?

12     A    Yes, it is.

13     Q    Now, in late October, is it fair to

14   say that the company made a decision about

15   reducing its work force while it responded to

16   the BLA letter?

17     A    Sure is.

18     Q    And that was a decision that was

19   made in conjunction with the board?

20     A    Yes, it was.

21     Q    And was the high cost of responding

22   to the July 30 letter a factor in determining

394

1  operating, so that was a factor.  In point of

2  fact, the company should not have been

3  spending all that money on a manufacturing

4  facility that's being underutilized from the

5  very start.

6        MR. ROFFMAN:  Would you mark this

7  please as Exhibit 351?

8        MR. BURCHFIELD:  351?  I've got, by

9  the way, about ten minutes.

10       MR. ROFFMAN:  I have a little more

11  than that but not much.

12       MR. BURCHFIELD:  I think you've had

13  plenty of time.

14       BY MR. ROFFMAN:

15    Q   I've handed you what's been marked

16  as Exhibit 351.  Do you have that in front of

17  you?

18    A   No.

19    Q   Oh, I'm sorry.

20           (Deposition Exhibit No. 351 was

21           marked for identification.)

22       MR. BURCHFIELD:  No, seriously, as

BETA  COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

398

1     Q    I agree.  Is that your signature on

2    the last page?

3     A    It is.

4     Q    And on the first page, you referred

5    to the letter as a complete response letter;

6    is that correct?

7     A    That's correct.

8     Q    And as of this time, it was

9    confirmed for you that the letter was a

10    complete response letter?

11     A    No, it was not.

12     Q    Why did you refer to it as a

13    complete response letter?

14     A    I gave up.  There was still no

15    indication that we'd stopped -- received any

16    confirmation on this, but at this point, to

17    call it anything other than a complete

18    response, given the fact the agency was

19    releasing all the other information, it

20    seemed at this point there was no need to

21    continue to call it something different, even

22    though in point of fact, the agency's own

399

1    actions had shown it was not a complete

2    response letter.

3        Q    Had you received any additional

4    information on the topic of whether it was a

5    complete response letter or not after the

6    August 26th, 27th, and 28th communications we

7    looked at earlier?

8        A    You mean the guess by Hyman Phelps

9    on those dates.

10       Q    I'm asking about whether you

11   received any further communications after

12   August 28th about whether it was a complete

13   response letter or not.

14       A    Not that I recollect.

15       Q    If you can turn to the second page

16   please --

17       A    Uh-huh.

18       Q    The second paragraph begins with a

19   sentence, "In discussions with the agency

20   around the time of the complete response

21   letter, Biopure recognized that FDA had

22   substantial questions regarding the safety of

400

1    HBOC-201 in settings where patients can

2    otherwise receive red blood cells."

3        Do you see that?

4    A   I do.

5    Q    Is that a true statement?

6    A    Well, the definition of "around"

7    reflects the conversation on September 16th,

8    so the definition of "around" is six to eight

9    weeks after receipt of the letter.

10   Q    And so the discussions you're

11   referring to is the discussion on September

12   16th?

13   A    That's correct.

14       MR. ROFFMAN:  Can you mark this as

15   Exhibit 354?

16           (Deposition Exhibit No. 354 was

17             marked for identification.)

18       BY MR. ROFFMAN:

19   Q    I'm showing you what's been marked

20   as Exhibit 354.  Is Exhibit 354 a copy of the

21   transcript of the investor conference call

22   that you participated in on October 30th,

BETA  COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

401

1    2003?

2        A   Yes.

3            MR. ROFFMAN:  Can you mark this as

4    Exhibit 355?

5                (Deposition Exhibit No. 355 was

6                marked for identification.)

7            BY MR. ROFFMAN:

8        Q   I'm showing you what's been marked

9    as Exhibit 355.  Exhibit 355 is an e-mail

10   which you are not a recipient on, but it

11   refers to some additional due diligence in

12   connection with the Bank of New York deal in

13   November of 2003.  Do you see that?

14       A   Not yet.

15           MR. BURCHFIELD:  While he's looking

16   for that, there's no Bates number on this.

17           MR. ROFFMAN:  That's correct.

18           MR. BURCHFIELD:  Has this -- has

19   this been produced in litigation?

20           MR. ROFFMAN:  It has.  It was part

21   of the materials that were produced to us

22   from the third-party productions, which you

402

1   received a copy of as well.

2         THE WITNESS:  Okay, I see this now.

3   As you pointed out, it was not sent to me, so

4   I'm not familiar with it.

5         BY MR. ROFFMAN:

6      Q   Well, my question is not about

7   specifically this note, but were you aware of

8   conversations between the company and Bank of

9   New York about doing a further financing in

10  the fall of 2003.

11     A   I guess I knew that Ron was

12  carrying on some discussions in that regard.

13     Q   Did you participate in any

14  discussions about doing an additional

15  financing with Bank of New York in the fall

16  of 2003?

17     A   I think Ron informed me he wanted

18  to have that discussion.

19     Q   Did you participate in any

20  discussions about due diligence that Bank of

21  New York or its representatives had requested

22  in connection with a potential transaction?

# EXHIBIT B

Page 1

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3  In the Matter of:            )

4                               )  File No.: B-01987-A

5  BIOPURE CORPORATION          )

6  WITNESS: THOMAS A. MOORE

7  PAGES:  1 through 250

8  PLACE:    Securities & Exchange Commission

9            Boston District Office

10           73 Tremont Street, Suite 600

11           Boston, Massachusetts

12  DATE:    Friday, December 12, 2003

13

14           The above-entitled matter came on for hearing at

15  10:22 a.m., pursuant to notice.

16

17

18

19

20

21

22

23

24           Diversified Reporting Services, Inc.

25               (202) 467-9200

Page 2

1  APPEARANCES:

2

3  On behalf of the Securities & Exchange Commission:

4    ELLEN BOBER, Senior Counsel

5    CELIA MOORE, Deputy Assistant District Administrator

6    Securities and Exchange Commission

7    73 Tremont Street, Suite 600

8    Boston, MA  02108

9    (617) 424-5900

10

11  On Behalf of the Witness:

12    ROBERT A. BUHLMAN, ESQ.

13    Bingham McCutchen

14    150 Federal Street

15    Boston, MA  02110

16    (617) 951-8717

17

18

19

20

21

22

23

24

25

331

EXHIBIT NO.____

KY  11/7/06

Page 3

C O N T E N T S

WITNESS                                            EXAMINATION

Thomas A. Moore    Examination by Ms. Bober              4

EXHIBITS  DESCRIPTION                              IDENTIFIED

#60  Subpoena                                          6

#61  Series of handwritten notes                     130

#62  Series of e-mails, first being 8/18             149

#12A Press release, 8/1/03                           202

#63  Note from Mr. Moore to Mr. Sayles               228

#64  Minutes of FDA response planning meeting        240

RECEIVED

DEC 3 0 2003

SECURITIES AND EXCHANGE COMMISSION
BOSTON DISTRICT OFFICE

Page 4

PROCEEDINGS

MS. BOBER:  We're on the record at 10:22 A.M. on Friday, December 12, 2003.  Sir, please raise your right hand.  Please state your name — your full name for the record.

THE WITNESS:  Thomas Andrew Moore.

Whereupon,

THOMAS ANDREW MOORE

the witness herein, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified under oath as follows:

EXAMINATION BY MS. BOBER:

Q  Please spell your name for the record.

A  My last name?

Q  Your whole name.

A  Thomas, T-h-o-m-a-s, Andrew, A-n-d-r-e-w, Moore, M-o-o-r-e.

Q  My name is Ellen Bober.  With me today is Celia Moore.  We are officers of the Commission for the purposes of today's proceeding.  While I will be asking the majority of questions, Ms. Moore may also ask you some questions.

This is an investigation by the United States Securities & Exchange Commission in the matter of Biopure Corporation to determine whether there have been any violations of certain provisions of the federal securities

Page 217

1 So as of the summer of 2003, we'd only been on the clock for
2 about a year.
3    Q   Are you saying it was Biopure's expectation that it
4 would not receive FDA approval before spring of 2004?
5    A   We didn't know what to expect.  We expected we
6 would be able to progress the application forward, and we
7 expected the FDA to answer by September 1st.
8    Q   Had you hired personnel in anticipation of FDA
9 approval?
10    A   We increased the staffing of our marketing
11 department and scientific exchange, and we had had -- but
12 that was something I felt we had to do anyway in order to do
13 market preparation and planning prior to a launch whether it
14 was going to occur in 2003 or 2004.
15    Q   Is it fair to say you wouldn't want to incur the
16 additional personnel costs for those individuals sooner than
17 it was necessary?
18    A   That's true, but in a normal pharmaceutical
19 environment, these individuals would have been hired two
20 years ago.  Things like publications and scientific exchange
21 needed to be set up well in advance.  And if you go to any
22 pharmaceutical firm, they'll have a brand manager on a
23 product while it's in Phase III trials, let alone an
24 application with FDA.  And the company had not retained
25 either of those individuals.  And those were the individuals

Page 218

1 I hired.  We didn't hire anybody else.
2    Q   When did you do those hirings?
3    A   I did the scientific exchange in January, I did the
4 senior brand manager in -- I guess it was February or March.
5    Q   You didn't do that when you first came to Biopure
6 in the summer of 2002?
7    A   Actually, I made the agreement with my -- the
8 scientific exchange person, I made that agreement in
9 September or October of 2002.  It took a couple of months for
10 her to end her then-employment arrangement.
11       The senior brand manager, we began the recruitment
12 process in October.  We just didn't get to a suitable
13 applicant until February, early March.
14    Q   Returning just for a moment back to the board
15 meeting that took place on July 31st, have you now described
16 all the discussion that took place at that board meeting?
17    A   All that I can recall.
18    Q   And have you now described all the discussions you
19 participated in or are aware of with respect to the August
20 1st press release drafts?
21    A   I believe I've described my discussions with Dick
22 Crout, the board discussions -- I believe I have.
23    EXAMINATION BY MS. BOBER:
24    Q   I'm showing you a document which has previously
25 been marked as Exhibit #15.  Do you recognize this document

Page 219

1 (indicating)?
2    A   (Looking at exhibit)  I do.
3    Q   What is it?
4    A   It's a list of talking points prepared by Doug
5 Sayles for his discussions with the press concerning the FDA
6 response.
7    Q   Did you instruct Mr. Sayles to draft these points?
8    A   I don't believe so.  I think he drafted them
9 himself based on a belief that it was important to have that
10 on paper.
11    Q   Did you receive these via e-mail?
12    A   Yes, I did.
13    Q   After receiving the e-mail, what did you do?
14    A   I looked at it quickly.  I think Doug then
15 subsequently contacted me to see if I agreed with them.
16    Q   Did you?
17    A   I did.
18    Q   The first one says, 'We feel a reasonable estimate
19 for our complete response is about one to two months.'  You
20 received this e-mail on August 1st, is that correct?
21    A   Yes.
22    Q   At that point in time, did you believe that was a
23 reasonable estimate?
24    A   I did, but I also felt it was a very rough estimate
25 because we were going to be evaluating the questions and

Page 220

1 assigning responsibilities.  In fact, that work really went
2 on mostly on August 4th and thereafter.
3    Q   If you believed it was a rough estimate, did you
4 consider whether it would have been preferable to not offer a
5 timeframe?
6    A   Yes.  In fact, I had a discussion with Doug
7 suggesting we shouldn't do that.  He insisted he felt that
8 was a -- something that he had to say, and I agreed to it.
9    EXAMINATION BY MS. MOORE:
10    Q   And the estimate at that point was based on your
11 assumption that all the data needed by the FDA was in-house?
12    A   That's correct.
13    Q   And you had not had any confirmation of that
14 assumption from anybody at that point?
15    A   There was still no time to get that confirmation
16 because the definition of in-house is with Quintiles or with
17 Red River Statistics, it was not what was physically under
18 our roof.
19    Q   In light of that, what was the reason that you
20 approved Mr. Sayles using that timeframe?
21    A   Doug insisted that we needed to give some sort of
22 timeframe, and I acceded to his request.
23    Q   He reports to you, right?
24    A   That is true.
25    Q   You make the decisions?

Page 221

1   A   As I say, I agreed to it. I'm not saying that he
did this without my agreement.
3   EXAMINATION BY MS. BOBER:
4   Q   I'm now handing you a document which has previously
5   been marked as Exhibit #17A. Do you recognize this document
6   (indicating)?
7   A   (Looking at exhibit)  I do.
8   Q   What is it?
9   A   It's a revised list of talking points that Doug
10  Sayles prepared and sent out on Monday morning.
11  Q   After receiving any version of the talking points,
12  did you participate in any meetings to discuss them?
13  A   Well, this was simultaneous with the meeting
14  previously described on August 4th where he brought the key
15  people involved in the response together. And based on that
16  preliminary input, it became clear that it was going to take
17  longer than -- it would take longer than the initial period
18  of time we thought to answer.
19      This was done before that meeting actually got
20  underway. And unless that's -- this was added in the belief
21  that we needed to better specify what the FDA letter was
22  about.
23  Q   Were you talking points subsequently amended after
the estimate of how long it was going to take was revised?
    A   I don't think we -- I don't know because Doug

Page 222

1   actually prepared the talking points and he used them -- I
2   didn't use them -- so I knew all this.
3   Q   Did he need your authorization before he was
4   allowed to comment on these matters to the press?
5   A   Doug can generally comment to the press directly
6   based on his understanding of what's going on. I don't
7   approve, in general, everything he says.
8   Q   Was this an issue on which your approval was
9   required?
10  A   It wasn't required, but he did share these talking
11  points with me.
12  Q   The first page of the exhibit says that, 'The
13  attached talking points have been revised per Howard's
14  input.' Did anyone else provide any input into the revised -
15  -
16  A   I don't believe so. I believe the only changes are
17  the discussion of the length of the FDA letter and the number
18  of questions.
19  Q   And is that the last bullet point, major bullet
20  point on the --
    A   Yes, it is.
22  Q   -- second page?
23  A   Yes, it is.
24  Q   Was that Howard's --
25  A   Yes, it is.

Page 223

1   Q   -- creation?
2   A   (No response)
3   Q   Did you have any discussions with Howard about
4   adding those points?
5   A   Only that I agreed that it was right for us to give
6   more specificity and underscore the length of the letter.
7   Q   Do you know what the basis of the statement that,
8   'It's typical in its breadth and content for a major new
9   product application' is?
10  A   That was based on Howard's assurances and
11  assessment.
12  Q   Did you take any steps to try to verify whether
13  that was a reasonable statement?
14  A   I did not.
15  Q   Did you have full confidence in Howard Richman at
16  that point in time?
17  A   As of this time, August 4, 2003, were you pleased
18  with Howard Richman's performance?
19  A   Howard Richman's performance, vis a vis FDA
20  communications, I was pleased with. He had other
21  responsibilities which he wasn't executing as well.
22  Q   What was he not executing as well?
23  A   His management of the manufacturing side where he
24  was -- he was perceived as dictatorial and not -- not
25  allowing as much team participation as the manufacturing team

Page 224

1   would like to have.
2   Q   Were there any other areas in which he was not
3   performing as well?
4   A   That was really the principal concern.
5   MS. MOORE:  Had you communicated your concern about
6   his performance to Mr. Richman at that point?
7   THE WITNESS:  Yes, I had.
8   MS. MOORE:  Did you do that in writing?
9   THE WITNESS:  No, I did that in a face-to-face
10  communication.
11  BY MS. BOBER:
12  Q   Did you prepare a written review --
13  A   No.
14  Q   -- of Mr. Richman?
15  A   (No response)
16  Q   Never?
17  A   Never.
18  Q   Did someone else?
19  A   No.
20  Q   At that time, did you feel that this was -- this
21  statement that, 'The letter is typical in breadth and content
22  for a new product application,' was a fair statement of what
23  was presented in the FDA letter?
24  A   I don't mean to -- well, I did, based on Howard's
25  assurances, yes.

# EXHIBIT C

```
 1        UNITED STATES DISTRICT COURT
 2         DISTRICT OF MASSACHUSETTS
 3              --oOo--
 4
 5  SECURITIES AND EXCHANGE COMMISSION,)
                                      )
 6                                    )
                                      )
        Plaintiff,        )
 7                        )
   vs.                    )  No. 05-11853-PBS
 8                        )
   BIOPURE CORPORATION, THOMAS MOORE, )
 9  HOWARD RICHMAN, and JANE KOBER,   )
                                      )
10      Defendants.       )
   _____)
11
12
13
14
15          Deposition of
16          RONALD RICHARDS
17          October 27, 2006
18
19
20  Reported by:
21  James Matthews, CSR 7916
22
23          TOOKER & ANTZ
       COURT REPORTING & VIDEO SERVICES
24       350 SANSOME STREET, SUITE 700
        SAN FRANCISCO, CALIFORNIA 94104
25            (415) 392-0650
```

Page 1

```
 1              I N D E X
 2             ---oOo---
 3
 4  Deposition of RONALD RICHARDS          Page
 5  Examination by Mr. O'Connor         8
 6  Examination by Mr. Huang           166
 7  Further Examination by Mr. O'Connor  179
 8  Further Examination by Mr. Huang     182
 9
10  Exhibits (RONALD RICHARDS)          Iden
11  295  3 documents concerning $34M Shelf Registration  22
12       Closing April 16, 2003 $3.1 M deal
13  296  Group of documents concerning Biopure Corporation  30
14       $34M Shelf Registration Closing May 2, 2003
15       $3.1M Deal
16  297  Two documents concerning Biopure Corporation $34M  38
17       Shelf Registration Closing May 6, 2003 $3.0M
18       Deal
19  298  Standby Equity Distribution Agreement  48
20  299  Exhibit A Issuance Notice with attached e-mails  50
21  300  2-27-03 e-mail from Richards to Strupp and  64
22       previous e-mails
23  301  3-14-03 e-mail from Richards to Srivastava and  65
24       previous e-mails
25  (continued)
```

Page 2

```
 1  Exhibits (RONALD RICHARDS)          Iden
 2  302  4-3-03 e-mail from Richards to Srivastava and  66
 3       previous e-mails
 4  303  4-3-03 e-mail from Srivastava to Richards and  68
 5       attachments
 6  304  4-4-04 e-mail from Sayles to Srivastava and  69
 7       original message
 8  305  4-4-03 e-mail from Richards to Srivastava  72
 9  306  4-14-03 e-mail from Srivastava to Srivastava with  74
10       attachments
11  307  5-13-03 e-mail from Richards to Srivastava and  77
12       prior e-mails
13  308  5-9-03 e-mail from Sayles to Strupp and Quazzo with  79
14       Powerpoint attachment
15  309  5-14-03 e-mail from Soffey to Sayles and others  79
16       and attachment
17  310  6-24-03 e-mail from Sayles to Strupp  84
18  311  6-24-03 e-mail from Richards to Strupp and prior  84
19       e-mails
20  312  6-26-03 e-mail from Kratus to Richards and others  88
21  313  7-8-03 e-mail from Soffey to Soffey and others  92
22       and attachments
23  314  Biopure Corp Prospectus Supplement to Prospectus  10
24       dated July 3, 2003
25  315  Copy of February to November calendar  106
```

Page

```
 1  Exhibits (RONALD RICHARDS)          Iden
 2  218  8-1-03 e-mail from Richards to Sayles (previously
 3       marked)
 4  316  Positive Review Letter from the FDA -- Great  111
 5       News for Biopure
 6  225  FDA Response Planning Meeting Meeting Minutes
 7       August 1, 2003 (previously marked)
 8  317  8-4-03 e-mail from Sayles to Moore and others  115
 9       and attachment
10  227  FDA Response Planning Meeting Meeting Minutes
11       August 4, 2003 (previously marked)
12  229  FDA Response Planning Meeting Meeting Minutes
13       August 8, 2003 (previously marked)
14  318  CCBN StreetEvents Conference Call Transcript  120
15  224  7-30-03 FDA letter from Golding to Richman
16  319  Documents summarizing sales of securities 8-5-03  130
17       through 8-11-03
18  320  Documents summarizing sales of securities 8-22-03  13
19       through 8-27-03
20  321  Documents summarizing sales of securities 9-2-03  133
21       through 9-4-03
22  322  Quarterly Report Pursuant to Section 13 or 15(d)  136
23       of the Securities Exchange Act of 1934 for the
24       quarterly period ended July 31, 2003
25  (continued)
```

Page

1  (Pages 1 to 4

1  is what this means.
2      Q. Okay. Now, what if any financial significance
3  would -- strike that.
4          What if any financial significance did the fact
5  that the FDA response time was supposed to be 30 days as
6  opposed to two months or six months as described in Exhibit
7  314? What was the significance of that from a financial
8  point of view?
9      A. Basically two things. One is it would affect how
10 to manage our cash flow during that period, and then also
11 that is a significant milestone in the market, so it would
12 signal when we might be able to do a raise if we needed to do
13 a raise, because once you get close to those events the
14 window basically shuts down on you because everybody just
15 wants to wait for the event.
16     Q. Okay. Now, when you talked earlier you mentioned
17 when you came in the company the burn rate was somewhere
18 above $4 million a month. In August of 2003, what if any
19 change had happened in the company's burn rate?
20     A. If anything it was going up.
21     Q. So more than $4 million a month?
22     A. Yeah. I'd have to go back and recalculate to give
23 the exact number, but the trend was up, because we had hired
24 people like Ketchum and other people to get the drug ready to
25 go to market.

Page 129

1      Q. So is one difference between a one-month response
2  time in the FDA and a six-month response time in the FDA just
3  five times $4 million, or about $20 million of cash the
4  company would be expending?
5      A. That might be a okay approximation tool, but also
6  partly what comes into account is the longer it is probably
7  suggests there's more work to do to respond. So I'm not sure
8  there's a direct correlation. I mean, it wouldn't be a bad
9  way to think about it. It's just, I think you have to take
10 into account if it's taking more time there's probably more
11 things that have to be done that also cost more money to do.
12     Q. So the burn rate could possibly be higher?
13     A. It could be higher, but we could possibly eliminate
14 some costs, too. I'm not trying to be evasive. It just,
15 knowing that, you obviously, we now when we're moving forward
16 quickly, you're trying to get out of the Ketchum contract and
17 try to reduce that burn. So they offset each other.
18 (Whereupon Exhibit 319 was marked for
19          identification.)
20     MR. O'CONNOR: Q. Right. I'm going to put in front
21 of you what I've marked as Exhibit 319. Exhibit 319's a
22 compilation of documents. --
23     A. Yes.
24     Q. -- that are Bates stamped BP SEC 2227 through 2237
25 sequentially.

Page 130

1          Starting with the page that has a Bates stamp on it
2  SEC 2237, the last page of this. Exhibit 319. Do you
3  recognize this document, sir?
4      A. 2237?
5      Q. Yes, sir, the last page?
6      A. Yes, I do.
7      Q. What is this?
8      A. This is an issuance notice issued by Biopure to the
9  Bank of New York requesting an issuance against standby
10 equity agreement.
11     Q. Okay. And when was this sent to Bank of New York,
12 sir?
13     A. Based upon the date on the top of the page, August
14 5th, 2003.
15     Q. And what are the essence of the instructions you're
16 conveying here to the Bank of New York?
17     A. This notice asks the Bank of New York to sell
18 300,000 shares into the market. The time period to sell over
19 is five days. And there is a floor price limitation of 6.50
20 per share.
21     Q. Now, you've described the process earlier when we
22 looked at one of these things from May. To what extent
23 did -- was Mr. Moore involved with approving or -- this
24 issuance here that we see in Exhibit 319?
25     A. I don't recall this specific one, but the procedure

Page 131

1  again would be to tell Tom that we need to raise some money
2  because of blank reason, and he would call the pricing
3  committee meeting, we'd get on a call and we would tell them
4  this is what we want to do, and they would give us direction
5  of what the minimum they're willing to accept.
6      Q. Were there any circumstances in which you issued an
7  issuance notice here to Bank of New York under the standby
8  equity agreement whereby you didn't have Mr. Moore's
9  authority to do so?
10     A. No.
11     Q. Okay. And then you look at the first page of this
12 document. Do you recognize that, sir?
13     A. Yes.
14     Q. And what is that?
15     A. It appears to be an -- a printout of an attachment
16 that the Bank of New York would send me after executing
17 trades. They would send me this full-color attachment to an
18 e-mail. That's what this looks like, even though it's in
19 black and white.
20     Q. Okay. And what's the significance of the row that
21 begins with 300,000 at the bottom there with respect to the
22 transaction that you've proposed to Bank of New York?
23     A. The 300,000 there is a total for the five days of
24 trading above. It just shows that they've executed and sold
25 300,000 shares on our behalf.

Page 132

33 (Pages 129 to 132)

1  was aware that issues like this were being discussed.
2      Q.  And how did you become aware of that, sir?
3      A.  At one point I remember Jane had suggested that
4  Frank Sasinowski could contact the FDA, and there was a
5  discussion about whether that was the right thing to do, to
6  go around Howard, because Howard had been asked to call the
7  FDA directly and seemed to not be doing that.
8      Q.  Okay.  But did you ever learn the results of that
9  contact, if it was undertaken at all?
10     A.  I never knew whether he actually called -- actually
11  called the FDA.  I didn't get closure on what actually
12  happened.  So no, I did not.
13     Q.  Okay.  Now, we saw earlier, sir, in Exhibit 318
14  that the company held a conference call with investors on the
15  21st of August, 2003.  And if you turn your attention to the
16  third page in of this.  There's a comment by Mr. Moore in
17  response to the very first question.  I'm sorry -- maybe it's
18  the fourth page.  Fourth page in.
19         It's on Bates page 6801.  Do you see the very first
20  question?
21     A.  Yes.
22     Q.  And the first question has to do with whether or
23  not that the letter was a complete response letter.  Do you
24  see that there, sir?
25     A.  Yes.

Page 145

1      Q.  Okay.  And do you see Mr. Moore's response refers
2  to this hybrid letter.  Do you see him use that phrase,
3  "hybrid letter?"
4      A.  Yes.
5      Q.  Is this the notion we talked about earlier, seemed
6  to be what Mr. Richman was talking about, the fact that the
7  letter, Exhibit 224, was not a complete response letter but
8  it was some kind of a hybrid letter, sir?
9      A.  Yes.
10     Q.  Okay.  Now, you had interacted with investors for
11  Biopure in a number of venues prior to August of 2003; isn't
12  that right?
13     A.  Yes.
14     Q.  You talked about many meetings that happened in
15  July, investor road show meetings; is that right?
16     A.  Yes.
17     Q.  Other than those road show meetings had you had
18  other meetings with investors to talk about what was going on
19  at Biopure and talk about how things were moving at the
20  company?
21     A.  Yes, there were other meetings.  When they were, I
22  couldn't tell you without some aid to look that up.
23     Q.  Okay.  Based on the interactions that you had with
24  the company's investors and in your role as the CFO of the
25  company, what if any understanding, sir, do you have as to

Page 146

1  whether investors would think it would be important to know
2  if the FDA was going to respond to any submission made by the
3  company in response to the July 30th letter within one month
4  versus six months?
5      A.  It would be important to them to know.
6      Q.  Based on your interactions with investors and your
7  role as the CFO of the company, why would the investors want
8  to know that?  What significance would it have for them?
9      A.  They would have built some sort of model or
10  investment thesis for the company, and as part of that they
11  would be examining when certain events would occur, because
12  those events impact when the drug might be approved, and also
13  impact how long the cash the company is likely to last.
14     Q.  Okay.  So it had importance from a financial impact
15  point of view.  Is that what your understanding would be?
16     A.  Yes.
17     Q.  Okay.  Based on your interaction with investors and
18  your role as the CFO of the company, what if any import do
19  you think that investors of the company would have had with
20  respect to knowing if the letter sent by the FDA at the end
21  of July was a typical complete response letter versus a
22  hybrid letter?  Do you have any opinion about that, sir?
23     A.  My only opinion -- a nonregulatory or FDA
24  regulatory opinion would be that they would really be more
25  concerned with the substance of what the letter says rather

Page 147

1  than what the letter is called.
2      Q.  I took from what you said earlier, based on the
3  conversations you had with Mr. Richman, that he conveyed to
4  you some substantive message or understanding of a
5  substantive message, based on the fact that the letter sent
6  on July 30th was a hybrid rather than a complete responses
7  letter.  Do you recall that testimony?
8      A.  Yes.
9      Q.  With respect to that issue, the notion that a
10  message is conveyed to the company as to whether it's a
11  hybrid letter as opposed to a complete response issue,
12  dealing with that issue, based on your interaction with
13  companies' investors, what if any significance do you believe
14  that the company's investors would have placed on knowing if
15  it was a complete responses letter or a hybrid letter with a
16  special message associated with it?
17     A.  I'm not sure if I completely understand the
18  question.  I apologize, can you repeat the question?
19     Q.  Yeah.  Look at Exhibit 318, the third page in.
20         I keep on doing that, don't I.  Sorry.
21         Third page in.  Okay.  Good.
22         And at the bottom of the first full paragraph
23  there's a sentence that begins in about the middle, "The
24  agency has done us a big favor by providing what amounts to a
25  complete detailed response and a set of questions."

Page 148

37  (Pages 145 to 148)

# EXHIBIT D

# Biopure Corporation
## (BPUR)
Historical Stock Prices
2003

| Date | Open | Close | Volume |
|---|---|---|---|
| 1/2/2003 | 3.73 | 3.8 | 72400 |
| 1/3/2003 | 3.99 | 3.83 | 34000 |
| 1/6/2003 | 3.92 | 3.75 | 43400 |
| 1/7/2003 | 3.7 | 3.6 | 98900 |
| 1/8/2003 | 3.78 | 3.59 | 107100 |
| 1/9/2003 | 3.59 | 3.37 | 195600 |
| 1/10/2003 | 3.38 | 3.36 | 193700 |
| 1/13/2003 | 3.48 | 3.29 | 130000 |
| 1/14/2003 | 3.2 | 3.4 | 89500 |
| 1/15/2003 | 3.5 | 3.21 | 216300 |
| 1/16/2003 | 3.31 | 3.31 | 63400 |
| 1/17/2003 | 3.41 | 3.47 | 154900 |
| 1/21/2003 | 3.44 | 3.22 | 156700 |
| 1/22/2003 | 3.25 | 3.33 | 151800 |
| 1/23/2003 | 3.35 | 3.35 | 93200 |
| 1/24/2003 | 3.5 | 3.22 | 79500 |
| 1/27/2003 | 3.2 | 2.75 | 215300 |
| 1/28/2003 | 2.75 | 2.27 | 471200 |
| 1/29/2003 | 2.29 | 2.23 | 277900 |
| 1/30/2003 | 2.4 | 2.59 | 445400 |
| 1/31/2003 | 2.79 | 3.27 | 349700 |
| 2/3/2003 | 3.61 | 3.51 | 414400 |
| 2/4/2003 | 3.61 | 3.38 | 133900 |
| 2/5/2003 | 3.38 | 3.65 | 158900 |
| 2/6/2003 | 3.7 | 3.61 | 89300 |
| 2/7/2003 | 3.64 | 3.35 | 69000 |
| 2/10/2003 | 3.45 | 3.39 | 88400 |
| 2/11/2003 | 3.25 | 3.43 | 72900 |
| 2/12/2003 | 3.7 | 3.37 | 58000 |
| 2/13/2003 | 3.8 | 3.94 | 1060500 |
| 2/14/2003 | 4.19 | 3.88 | 253700 |
| 2/18/2003 | 4.13 | 3.9 | 207000 |
| 2/19/2003 | 3.79 | 3.74 | 86500 |
| 2/20/2003 | 3.73 | 3.7 | 147100 |
| 2/21/2003 | 3.68 | 3.35 | 196600 |
| 2/24/2003 | 3.39 | 3.1 | 154400 |
| 2/25/2003 | 3.18 | 3.05 | 189200 |
| 2/26/2003 | 3.13 | 3.06 | 112600 |
| 2/27/2003 | 3.21 | 3.09 | 78700 |
| 2/28/2003 | 3.06 | 3.11 | 84900 |
| 3/3/2003 | 3.18 | 3.42 | 142100 |
| 3/4/2003 | 3.41 | 3.5 | 166400 |
| 3/5/2003 | 3.69 | 3.59 | 708800 |
| 3/6/2003 | 3.54 | 3.84 | 315800 |
| 3/7/2003 | 3.82 | 3.87 | 181500 |
| 3/10/2003 | 3.9 | 3.45 | 225700 |

| Date | Open | Close | Volume |
|------|------|-------|--------|
| 3/11/2003 | 3.46 | 3.71 | 132000 |
| 3/12/2003 | 3.72 | 3.86 | 109800 |
| 3/13/2003 | 3.94 | 3.9 | 141400 |
| 3/14/2003 | 3.85 | 3.71 | 193200 |
| 3/17/2003 | 3.71 | 3.6 | 210900 |
| 3/18/2003 | 3.56 | 3.61 | 176600 |
| 3/19/2003 | 3.62 | 3.5 | 78100 |
| 3/20/2003 | 3.4 | 3.66 | 214400 |
| 3/21/2003 | 3.44 | 3.35 | 253100 |
| 3/24/2003 | 3.29 | 3.03 | 531800 |
| 3/25/2003 | 2.96 | 2.45 | 2003700 |
| 3/26/2003 | 2.73 | 2.57 | 856900 |
| 3/27/2003 | 2.65 | 2.76 | 761600 |
| 3/28/2003 | 2.74 | 2.79 | 628900 |
| 3/31/2003 | 3 | 3.34 | 1006500 |
| 4/1/2003 | 3.35 | 3.13 | 353100 |
| 4/2/2003 | 3.2 | 3.21 | 243600 |
| 4/3/2003 | 3.15 | 3 | 401200 |
| 4/4/2003 | 3.05 | 3.06 | 277500 |
| 4/7/2003 | 3.2 | 3.15 | 293000 |
| 4/8/2003 | 3.15 | 3.2 | 260100 |
| 4/9/2003 | 3.2 | 3.1 | 183200 |
| 4/10/2003 | 3.06 | 3.01 | 149300 |
| 4/11/2003 | 3.19 | 3.13 | 92300 |
| 4/14/2003 | 3.15 | 3.19 | 96800 |
| 4/15/2003 | 3.2 | 3.34 | 296700 |
| 4/16/2003 | 3.44 | 3.45 | 333400 |
| 4/17/2003 | 3.52 | 3.45 | 163100 |
| 4/21/2003 | 3.56 | 3.48 | 267400 |
| 4/22/2003 | 3.5 | 3.51 | 223900 |
| 4/23/2003 | 3.7 | 3.61 | 234200 |
| 4/24/2003 | 3.61 | 3.57 | 484000 |
| 4/25/2003 | 3.6 | 3.59 | 306200 |
| 4/28/2003 | 3.68 | 3.59 | 325100 |
| 4/29/2003 | 3.66 | 3.56 | 330600 |
| 4/30/2003 | 3.5 | 3.5 | 190000 |
| 5/1/2003 | 3.48 | 3.6 | 297600 |
| 5/2/2003 | 3.65 | 3.75 | 1198400 |
| 5/5/2003 | 3.85 | 3.66 | 1226800 |
| 5/6/2003 | 3.72 | 3.48 | 831900 |
| 5/7/2003 | 3.55 | 3.5 | 335600 |
| 5/8/2003 | 3.5 | 3.61 | 269400 |
| 5/9/2003 | 3.64 | 3.67 | 325400 |
| 5/12/2003 | 3.67 | 3.75 | 369900 |
| 5/13/2003 | 3.82 | 4.2 | 644400 |
| 5/14/2003 | 4.53 | 4.48 | 1404300 |
| 5/15/2003 | 4.78 | 4.85 | 1005700 |
| 5/16/2003 | 5 | 4.96 | 1137100 |
| 5/19/2003 | 5.15 | 4.94 | 1106700 |
| 5/20/2003 | 5.15 | 4.7 | 634600 |
| 5/21/2003 | 5.07 | 4.61 | 400200 |

| Date | Open | Close | Volume |
|------|------|-------|--------|
| 5/22/2003 | 4.55 | 4.35 | 1532300 |
| 5/23/2003 | 4.4 | 4.93 | 1157100 |
| 5/27/2003 | 5.13 | 6 | 2008800 |
| 5/28/2003 | 6.05 | 5.77 | 2574000 |
| 5/29/2003 | 6.05 | 5.73 | 1703800 |
| 5/30/2003 | 5.91 | 6 | 4157300 |
| 6/2/2003 | 6.26 | 5.67 | 1344800 |
| 6/3/2003 | 5.85 | 5.33 | 842500 |
| 6/4/2003 | 5.33 | 5.56 | 766600 |
| 6/5/2003 | 5.66 | 6.3 | 2227000 |
| 6/6/2003 | 6.77 | 6.11 | 1185600 |
| 6/9/2003 | 6.75 | 6.5 | 864500 |
| 6/10/2003 | 6.43 | 6.4 | 627400 |
| 6/11/2003 | 6.45 | 6.32 | 430400 |
| 6/12/2003 | 6.58 | 6.23 | 577700 |
| 6/13/2003 | 6.23 | 5.9 | 833600 |
| 6/16/2003 | 5.96 | 6.33 | 680300 |
| 6/17/2003 | 6.37 | 6.1 | 454400 |
| 6/18/2003 | 6.22 | 6.2 | 466200 |
| 6/19/2003 | 6.07 | 5.84 | 486500 |
| 6/20/2003 | 5.76 | 5.61 | 612900 |
| 6/23/2003 | 5.66 | 5.56 | 448500 |
| 6/24/2003 | 5.78 | 5.73 | 486200 |
| 6/25/2003 | 5.75 | 5.7 | 328100 |
| 6/26/2003 | 6 | 5.9 | 189000 |
| 6/27/2003 | 5.99 | 6 | 688500 |
| 6/30/2003 | 6.04 | 6.04 | 973100 |
| 7/1/2003 | 6.15 | 6.23 | 489200 |
| 7/2/2003 | 6.2 | 6.08 | 701500 |
| 7/3/2003 | 6 | 6.01 | 378600 |
| 7/7/2003 | 5.89 | 6.07 | 356300 |
| 7/8/2003 | 5.97 | 6.8 | 1111100 |
| 7/9/2003 | 6.77 | 6.65 | 655200 |
| 7/10/2003 | 7.2 | 6.62 | 253500 |
| 7/11/2003 | 6.63 | 6.75 | 321000 |
| 7/14/2003 | 6.9 | 6.45 | 419600 |
| 7/15/2003 | 6.73 | 6.5 | 227400 |
| 7/16/2003 | 6.5 | 6.2 | 293000 |
| 7/17/2003 | 6.25 | 5.89 | 456900 |
| 7/18/2003 | 5.85 | 5.6 | 1003400 |
| 7/21/2003 | 5.6 | 5.5 | 549700 |
| 7/22/2003 | 5.7 | 5.57 | 411900 |
| 7/23/2003 | 5.56 | 5.62 | 466700 |
| 7/24/2003 | 5.65 | 5.6 | 318200 |
| 7/25/2003 | 5.65 | 5.55 | 212000 |
| 7/28/2003 | 5.55 | 5.5 | 563700 |
| 7/29/2003 | 5.6 | 5.65 | 536900 |
| 7/30/2003 | 5.85 | 5.72 | 343700 |
| 7/31/2003 | 5.8 | 5.97 | 559400 |
| 8/1/2003 | 8.33 | 7.3 | 6901700 |
| 8/4/2003 | 7.7 | 7.46 | 1856900 |

| Date | Open | Close | Volume |
|------|------|-------|--------|
| 8/5/2003 | 7.85 | 7.47 | 1189900 |
| 8/6/2003 | 7.55 | 6.92 | 1114000 |
| 8/7/2003 | 6.92 | 7.17 | 665300 |
| 8/8/2003 | 7.05 | 7.16 | 577800 |
| 8/11/2003 | 7.2 | 7.15 | 584200 |
| 8/12/2003 | 7.13 | 7.18 | 387200 |
| 8/13/2003 | 7.04 | 7.02 | 329300 |
| 8/14/2003 | 7.06 | 7.1 | 403900 |
| 8/15/2003 | 7.1 | 7.19 | 318400 |
| 8/18/2003 | 7.25 | 7.24 | 442100 |
| 8/19/2003 | 7.26 | 7.9 | 1264900 |
| 8/20/2003 | 7.98 | 8.12 | 1735900 |
| 8/21/2003 | 8.35 | 8.25 | 1178200 |
| 8/22/2003 | 8.14 | 7.43 | 1430400 |
| 8/25/2003 | 7.31 | 7.65 | 813600 |
| 8/26/2003 | 7.65 | 7.82 | 740500 |
| 8/27/2003 | 7.88 | 7.9 | 842700 |
| 8/28/2003 | 8.08 | 8.17 | 534900 |
| 8/29/2003 | 8.25 | 8.24 | 503400 |
| 9/2/2003 | 8.47 | 8.09 | 798900 |
| 9/3/2003 | 8 | 7.93 | 574400 |
| 9/4/2003 | 8.05 | 8.2 | 632200 |
| 9/5/2003 | 7.9 | 7.92 | 382500 |
| 9/8/2003 | 7.89 | 8.12 | 488300 |
| 9/9/2003 | 8 | 8.03 | 387200 |
| 9/10/2003 | 8.1 | 7.95 | 320200 |
| 9/11/2003 | 8.1 | 7.98 | 260000 |
| 9/12/2003 | 8.05 | 8 | 317500 |
| 9/15/2003 | 7.52 | 7.48 | 1769100 |
| 9/16/2003 | 7.49 | 7.62 | 498000 |
| 9/17/2003 | 7.59 | 7.7 | 384800 |
| 9/18/2003 | 7.65 | 7.7 | 290200 |
| 9/19/2003 | 7.71 | 7.46 | 434000 |
| 9/22/2003 | 7.4 | 7.33 | 782700 |
| 9/23/2003 | 7.33 | 7 | 1011400 |
| 9/24/2003 | 7.01 | 6.85 | 1204900 |
| 9/25/2003 | 6.75 | 6.28 | 1123800 |
| 9/26/2003 | 6.25 | 5.7 | 1410100 |
| 9/29/2003 | 5.79 | 5.98 | 812300 |
| 9/30/2003 | 5.99 | 6.47 | 744400 |
| 10/1/2003 | 6.45 | 6.29 | 497000 |
| 10/2/2003 | 6.29 | 6.13 | 346100 |
| 10/3/2003 | 6.28 | 5.7 | 939200 |
| 10/6/2003 | 5.8 | 6.01 | 403000 |
| 10/7/2003 | 6 | 6.15 | 285400 |
| 10/8/2003 | 6.15 | 6.1 | 332600 |
| 10/9/2003 | 6.14 | 6.16 | 371000 |
| 10/10/2003 | 6.16 | 6.06 | 226500 |
| 10/13/2003 | 6.05 | 6.13 | 220700 |
| 10/14/2003 | 6.15 | 6.36 | 391600 |
| 10/15/2003 | 6.44 | 6.45 | 402500 |

| Date | Open | Close | Volume |
|------|------|-------|--------|
| 10/16/2003 | 6.4 | 6.15 | 177600 |
| 10/17/2003 | 6.28 | 6.33 | 229800 |
| 10/20/2003 | 6.25 | 5.95 | 459100 |
| 10/21/2003 | 6 | 5.92 | 402300 |
| 10/22/2003 | 5.95 | 5.92 | 312100 |
| 10/23/2003 | 5.92 | 5.77 | 460800 |
| 10/24/2003 | 5.89 | 5.62 | 288100 |
| 10/27/2003 | 5.62 | 5.7 | 313100 |
| 10/28/2003 | 5.93 | 5.82 | 283900 |
| 10/29/2003 | 5.91 | 6.05 | 250000 |
| 10/30/2003 | 5 | 3.68 | 6910000 |
| 10/31/2003 | 3.55 | 3.46 | 2548300 |
| 11/3/2003 | 3.54 | 3.2 | 1780700 |
| 11/4/2003 | 3.09 | 3.45 | 1736300 |
| 11/5/2003 | 3.47 | 3.59 | 997800 |
| 11/6/2003 | 3.64 | 3.52 | 559400 |
| 11/7/2003 | 3.62 | 3.56 | 328600 |
| 11/10/2003 | 3.6 | 3.49 | 321000 |
| 11/11/2003 | 3.4 | 3.33 | 491000 |
| 11/12/2003 | 3.33 | 3.37 | 337100 |
| 11/13/2003 | 3.36 | 3.31 | 324400 |
| 11/14/2003 | 3.37 | 3.42 | 488700 |
| 11/17/2003 | 3.48 | 3.26 | 412300 |
| 11/18/2003 | 3.23 | 3.02 | 827700 |
| 11/19/2003 | 3.02 | 2.8 | 1117800 |
| 11/20/2003 | 2.76 | 2.72 | 972200 |
| 11/21/2003 | 2.83 | 2.55 | 711800 |
| 11/24/2003 | 2.9 | 3 | 937100 |
| 11/25/2003 | 3 | 2.91 | 651200 |
| 11/26/2003 | 3.1 | 3.05 | 400100 |
| 11/28/2003 | 3.16 | 3.19 | 171500 |
| 12/1/2003 | 3.25 | 3.32 | 558800 |
| 12/2/2003 | 3.36 | 3.28 | 359700 |
| 12/3/2003 | 3.5 | 3.32 | 366300 |
| 12/4/2003 | 3.46 | 3.2 | 508200 |
| 12/5/2003 | 3.18 | 3.06 | 344400 |
| 12/8/2003 | 2.98 | 2.83 | 619200 |
| 12/9/2003 | 3 | 2.75 | 457400 |
| 12/10/2003 | 2.75 | 2.75 | 491400 |
| 12/11/2003 | 2.67 | 2.89 | 411500 |
| 12/12/2003 | 2.52 | 2.6 | 1311300 |
| 12/15/2003 | 2.65 | 2.64 | 446800 |
| 12/16/2003 | 2.5 | 2.51 | 707200 |
| 12/17/2003 | 2.56 | 2.49 | 681500 |
| 12/18/2003 | 2.31 | 2.36 | 727600 |
| 12/19/2003 | 2.39 | 2.34 | 920300 |
| 12/22/2003 | 2.3 | 2.93 | 2836400 |
| 12/23/2003 | 3.05 | 2.73 | 2215200 |
| 12/24/2003 | 2.57 | 2.82 | 500500 |
| 12/26/2003 | 2.32 | 2.43 | 3140600 |
| 12/29/2003 | 2.27 | 2.33 | 3462700 |

| Date | Open | Close | Volume |
|------|------|-------|--------|
| 12/30/2003 | 2.32 | 2.61 | 3048900 |
| 12/31/2003 | 2.55 | 2.45 | 1477000 |

Source: Commodity Systems, Inc.

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

**SECURITIES AND EXCHANGE COMMISSION**

      **Plaintiff,**


      **v.**


**BIOPURE CORPORATION, THOMAS MOORE,**
**HOWARD RICHMAN, AND JANE KOBER**

      **Defendants.**


_____

**EXPERT REPORT OF LAURA B. STAMM**

**OCTOBER 31, 2006**

_____

**I.     OVERVIEW**

    **A.     Assignment**

        1.     I have been retained by the Securities and Exchange Commission ("SEC") in connection with the above referenced matter. I was asked to review and respond to the expert report of Paul A. Gompers ("Gompers report"), an expert retained by the Defendant in this matter.

    **B.     Qualifications**

        2.     I am a Principal in the Boston office of Analysis Group. Analysis Group is a consulting firm specializing in microeconomic, financial and accounting

analysis.  I have managed numerous damage studies on a wide range of topics in a variety of industries.  I have a Master of Science degree in management with a concentration in finance from the Massachusetts Institute of Technology.  I am also a certified public accountant.  Prior to joining Analysis Group, I spent several years in the Business Investigation Services Group at Coopers & Lybrand.  A copy of my curriculum vitae, which includes publications, is attached as Appendix A.  Appendix B includes the list of testimony I have given in the past four years.

**C.       Scope of Analysis**

3.   I was asked to review and respond to the Gompers Report.  In completing this assignment, I reviewed documents produced by the parties and did independent research using publicly-available data. A complete list of documents and data I reviewed and relied upon is contained in Appendix C. In general, I reviewed the following types of materials:

- Legal filings;

- The Gompers report and supporting documents;

- Deposition testimony of Dr. Gompers;

- Stock trade data;

- News announcements;

- Investment analyst reports;

- Investor conference calls;

- Biopure presentations to investors.

4.   Analysis Group is compensated at the rate of $495 per hour for time I incur on this assignment.  Part of the work was performed by others under my direction.  Charges for staff members have been billed at our customary hourly rates.  Payment is not contingent on my findings or on the outcome of this case.

**D.    Summary of Conclusions**

5.  I have reviewed the report and deposition testimony of Dr. Gompers and the bases for his conclusions. Dr. Gompers purports to have demonstrated, primarily through the use of an event study that the information not disclosed was not material to investors.

6.  Dr. Gompers' report and conclusions are problematic in that he implies that event studies can demonstrate the absence of materiality. Event studies, when applied in a litigation context, are typically used to determine loss causation and the extent of investor harm. Although event studies in general are an accepted scientific methodology, their proper use is limited to answering the very narrow question of whether a stock price movement on a given day is statistically significant, or in other words, if it can be determined that the move was not as a result of random variation. The link between immateriality and statistically insignificant price changes is not an established scientific conclusion.

7.  To reach meaningful conclusions about the relationship between a piece of news and a statistically significant price increase, an event study requires that the news be announced on a day without confounding news. The days on which the SEC claims that partial corrective disclosures concerning the substance of the FDA complete response letter or clinical hold were made – namely, October 30, December 11, and December 24 – all contain confounding information according to Dr. Gompers.

8.  I disagree with Dr. Gompers' conclusion that the non-disclosure of the clinical hold imposed on the proposed trauma trials was not material for the following reasons:

- When the clinical hold was first disclosed on December 24, 2003, there was a significant price decline.

- Dr. Gompers discards most of his event study findings because of confounding information and instead relies on unscientific methods such as his interpretation of one analyst's reports.

- ■ I have used event study methodology to analyze the stock market reaction on days on which Biopure issued a press release focused on the trauma trial at issue in this matter. On these days, I find significant price changes and significant trading volume, indicating that information related to the trauma trials was material to investors.

9. Based on my reading of the complaint, Dr. Gompers misstates the nature of the SEC's claim relating to Biopure's failure to represent that the July 30 letter from the FDA was a complete response letter ("CRL") and the implications that had on i) whether the FDA sent a "hybrid" letter to Biopure as a "big favor" and ii) the timing of the FDA's review of any resubmission by Biopure. I disagree with Dr. Gompers' conclusion that omissions related to the "complete response letter" in the references to the July 30, 2003 FDA letter was not material to investors.

- ■ In my opinion, the market reaction to the September 12, 2003 disclosure of the complete response letter is consistent with the hypothesis that the news of Biopure's complete response letter was material to investors. Dr. Gompers reached the opposite conclusion, because he did not look at intraday trading evidence or correspondence from Biopure that contained additional information on when the information became known to investors.

- ■ Dr. Gompers' observations about disclosures of other CRLs are not a reasonable basis for reaching a conclusion about this issue because he did not establish that the facts and circumstances of the other CRL's were comparable.

10. In my opinion, the statistically significant price decline following the October 30, 2003 announcement is evidence of the materiality of the disclosures related to the complete response letter.

11. In my opinion, the statistically significant price decline following the December 24, 2003 announcement is evidence of the materiality of the disclosures related to the clinical hold.

Analysis Group, Inc.

12. Below, I discuss my detailed findings. I have organized my report into six sections that correspond to the six conclusions put forward by Dr. Gompers in his report.

## II.    DETAILED FINDINGS

### A.    Large fluctuations in the Biopure stock price

13. Dr. Gompers begins his report with a discussion of why large fluctuations in stock price are normal for a small company like Biopure. As Dr. Gompers points out, "[I]f Hemopure were to be approved in the US and used on a widespread basis, Biopure would enjoy a large stream of future cash flows."[1] He points out that much of the uncertainty around future cash flows results from the need to "cross several regulatory stages before being marketable."[2]

14. In my opinion, this discussion highlights why one would expect news related to interactions with the FDA concerning the regulatory review process to be material to investors. Biopure's only product besides Hemopure was Oxygolobin, a veterinary product not expected to have large sales or profits. The company's stock price movements are therefore heavily influenced by the probability that Hemopure will have significant future revenues. Any news regarding the drug's future is therefore likely to influence investor's opinion of the value of Biopure. As an example, ThinkEquity in its opening report on Biopure on April 14, 2003 wrote, "[A]ny regulatory delay or setback will have a significantly negative impact on the stock."[3]

### 1.    Event study methodology and materiality

15. An event study is a statistical method for assessing whether a stock price change is statistically significant. An event study answers the following question: Can one conclude, with a defined level of certainty,[4] that the stock

---

[1] Gompers Report, paragraph 15.

[2] Gompers Report, paragraph 5.

[3] ThinkEquity Partners Analyst Report, April 14, 2003, p 3. Gompers 00272.

[4] Three levels of certainty are frequently used, 99%, 95%, and 90% but there is no rule or generally

price change did not result from random variation? Or put differently: is the stock price change significantly different from the average change on days on which there is no news?

16. Event study methodology can be used to establish that news is material; news that causes a statistically significant change in the price of a stock can be said to have been material to investors because it caused a change in the market value of the company. However, event study methodology cannot be used to establish that news is immaterial. News that does not cause a statistically significant stock price change may also be material. There are two reasons for this relationship.

17. First, the threshold for statistical significance is different from that for materiality. As Dr. Gompers points out, the Biopure stock price is very volatile and, for that reason, price changes as large as 10% may not be statistically significant. However, a rational investor would likely consider information that results in a 10% change in his estimate of value to be material to his decision about buying or selling the stock.

18. Second, news may not be interpreted by all investors in the same way. For example, suppose a company announces a change in management. Some reasonable investors may view the news as positive because they believe that new management will be able to better realize potential value. Those investors will want to acquire the stock. Other reasonable investors may view the news as negative because they believe it is a signal of other trouble within the company that may not have been made public. Those investors will want to sell the stock. In such a case, one may see a statistically significant increase in trading volume without a statistically significant change in price.

19. Academic literature supports the idea that volume can be used to infer whether or not an event has material informational content. In general, the literature has shown theoretically and empirically that stock price changes reflect changes in the expectations of the market as a whole, but volume

accepted practice as to the proper cut-off.

changes may reflect the divergent opinions within the market about the informational content of the news.[5]

20. Because volume does provide additional information relevant to the question of materiality, in addition to looking at the statistical significance of stock price movements, I also analyzed the trading volume on each day relative to the market in order to assess whether or not volume was significant on the various days associated with partial corrective disclosures.  Exhibit 3 summarizes my regression results which are consistent with those of Dr. Gompers.  Exhibit 4 summarizes my volume analysis regression results. Exhibit 5 presents both the returns and volumes along with an indication of statistical significance for all days between January 2, 2003 and December 31, 2003.  Exhibit 6 summarizes the information for selected days mentioned in the Complaint.

**B.    The non-disclosure of the clinical hold imposed on the proposed in-hospital trauma trials**

21. Dr. Gompers reaches the opinion that the April 9, 2003 clinical hold on the in-hospital trauma IND was not material to Biopure's stock price.  Dr. Gompers states the following bases for his opinion:

- July 25, 2005 disclosure of a different clinical hold did not cause a significant price change;

- Analyst coverage emphasized that the basis of coverage was approval of the Hemopure BLA;

- Equity analysts did not quantify the amount of future revenues from trauma uses;

- Testimony by FDA officials indicates that clinical holds are common.

22. As I will discuss below, none of these four supporting arguments forms a scientific basis for an economic opinion about immateriality.  In Section II.C., I discuss the disclosure of the clinical hold on December 24, 2003 and why, in my opinion – and contrary to the opinion of Dr. Gompers – the

---

[5] Beaver 1968.  See also: Karpoff 1986, Kandel and Pearson  1995, Tkac 1999, Bamber and Cheon 1995, Bamber, Barron, and Stober 1999, Morse 1981, Richardson and Sefcik 1986, and Bamber 1986, 1987.

statistically significant price decline in Biopure stock that followed is evidence of the materiality of the clinical hold.

**1.    Statistical analysis of disclosures related to trauma trials**

23.    In Exhibit 8, I list dates during 2002 and 2003 on which Biopure issued press releases specifically relating to the Hemopure trauma trials at issue in this matter.  I do not include December 24, 2003 since I present my analysis of that announcement separately in the next section.  Exhibit 8 shows the adjusted stock price return and trading volume for the three days I analyzed. All three days have significant trading volume.  Two of the three days had significant price changes.

24.    On the only day that did not have a significant price change – March 5, 2003 – there were two distinct public announcements.  The news related to the trauma funding was announced prior to the opening of trading at 7:28 a.m.  I looked at intraday trading to isolate the effect of the pre-opening announcement that contained the news related to the trial funding.  Exhibit 10 shows the trading throughout the day on March 5, 2003.  The price increased almost 15% during the day, up until 3:46 p.m. when Biopure submitted a shelf registration to issue ten million new shares.  Following the filing for shelf registration, the trading volume spiked and the price declined back to its opening level.

25.    The news on the three days mentioned above discusses the trauma trial and are close in time to the imposition of the clinical hold.  The stock trading on these days is consistent with the news of the trial being material.  Dr. Gompers includes news from a different day as a basis for his opinion that the trauma trial clinical hold was not material.  He includes a discussion of the stock price decline following a July 12, 2005 announcement that a pre-hospital clinical trial of Hemopure run by the military, not Biopure, had been put on a clinical hold.  He concludes that because the stock price decline was not significant, the clinical hold was not viewed as material by investors.

26.    I note that news related to this trial is different from news related to the trauma trials at issue in this case.  This trial was announced almost two years

later than the period at issue in this matter.  For the same reason that Dr. Gompers favors using a control period for his event study that immediately precedes the complaint period, the effect of an event two years after the complaint period reflects the changing conditions of the company at issue. Dr. Gompers has not done any analysis to determine that the trials were comparable either in terms of the specifications of the trial or the importance of the trials to Biopure and its investors.  He simply basis his opinion on the inclusion of the words "trauma" and "clinical hold" in both releases.  More analytical rigor is required to reach a scientific conclusion.

27. To further analyze the effect of news related to this later trial, I looked at the stock price reaction on June 13, 2005, the date that the U.S. Naval Medical Research Center (NMRC) submitted the investigational new drug application to the FDA to conduct the pre-hospital clinical trials of Hemopure run by the military.  In fact, as Exhibit 9 shows, the return on June 13, 2005 was 19.55%.  Furthermore, before the announcement on June 13, 2005, Biopure's stock price closed at $1.33.  Following the announcement of the trials, it increased to $1.59, but after the announcement of the clinical hold, the stock closed at $1.39, close to the level at which it traded prior to the announcement of the trials.

28. In my opinion, the large stock price move associated with the announcement of the military trauma trials, and the return to previous levels after the announcement of the clinical hold is more consistent with the conclusion that news related to trauma trials was indeed material to investors.

**2. Analyst discussion of trauma trials**

29. Dr. Gompers' reliance on the analyst reports to conclude information is not material to a reasonable investor has no basis in scientific method.  First, Dr. Gompers himself admits that analyst coverage was sparse for this company. He has not established why the emphasis of a limited number of individual analysts can be extrapolated to all investors of Biopure.

30. The fact that analysts would emphasize the approval of the Hemopure BLA is logical since that was an important milestone regarding the near-term

Biopure revenues.  The fact that analysts did not quantify the amount of future revenues from trauma uses highlights the uncertainty surrounding those future revenues.  It does not imply that those future revenues are immaterial or that news concerning future applications is immaterial.  On the contrary, news of the clinical hold would serve to inform investors' expectations about these future revenues.

31.  The other problem with Dr. Gompers' interpretation of the analyst reports is that it ignores the interplay between the two applications.  I understand that the BLA and the trauma trial IND relied on the same clinical data.[6] ThinkEquity appears to have first made this connection in its December 26, 2003 report following Biopure's disclosure of the clinical hold.  The analyst writes, "… at least some questions regarding the FDA's concerns on safety for the IND appear to overlap with the BLA."[7]   Dr. Gompers does not consider the effect of news related to the trauma IND clinical hold on the BLA in reaching his conclusions.

32.  As Dr. Gompers admits, analyst reports do include discussion of the potential use in trauma and regulatory progress toward that goal.  For example, an analyst report states that "Success in trauma trials or a military contract could provide significant upside to our estimates."[8]   If this information was not material to investors, analysts would not bother to include it in their reports. I also note that the analysts' projections of revenue were generally short-term forecasts not exceeding a few years into the future.  Revenues from trauma applications would not have been expected by then, so it is not surprising that there is no inclusion of revenue projections specific to the trauma application.  However, Biopure's market value was clearly dependent on the growth projections well into the future, which depended upon Biopure obtaining approval for indications beyond orthopedic surgery.  One cannot conclude from the analyst reports that trauma indications did not figure into the analyst's conclusions regarding long-term growth.

---

[6] SEC Complaint vs. Biopure Corporation et. al., paragraph 28.  Gompers 00273.

[7] ThinkEquity Partners Analyst Report, December 26, 2003, p 1.  Gompers 000440.

[8] ThinkEquity Partners Analyst Report, April 14, 2003, p 4.  Gompers 00273.

33. The evidence also supports the conclusion that Biopure felt that the trauma applications were important to investors. In its presentations to potential investors in 2003, Biopure mentions trauma trials in multiple instances and even projects that trauma will generate over 5% of Biopure's revenues – a greater percentage than the revenues from orthopedic surgery applications.[9]

### 3. Relationship of materiality to commonness

34. Dr. Gompers cites as a basis of his opinion testimony of FDA officials that safety concerns are the most common reason for clinical holds, and that clinical holds were a typical procedure. Dr. Gompers does not indicate why such information is important to a conclusion with respect to materiality. In my opinion, it is not relevant. The existence of a clinical hold provides information that investors can use to form their own opinions about future revenues. Even if it is the case that many applications are eventually approved after a clinical hold, the existence of a clinical hold likely provides information beyond just the probability of approval. It also provides information about the costs to receive approval and the timing of that approval.

35. Furthermore, there is no theoretical basis for saying that an event that is common is not material. Many events that affect investors are both common and material. For example, announcements of Federal Reserve interest rate actions have become quite common over the past few years, and yet they are eagerly anticipated and analyzed by market participants.

### C. Negative stock price reaction to the December 24 press release

### 1. Significant stock price decline following the clinical hold disclosure

36. On December 24, 2003 Biopure issued a press release in which it first disclosed the clinical hold and gave an account of the events that are the subject of this lawsuit. On December 26, 2003 – the first trading day following the announcement – Biopure's stock price declined significantly.

---

[9] See for example, BP 06688-06754.

Analysis Group, Inc.

As I will discuss below, in my opinion, this stock price decline is evidence of the materiality of the disclosure.  The facts of the SEC investigation related to the clinical hold and complete response letter that were also included in the press release should be considered related information not confounding information.

37.  In contrast, Dr. Gompers, in reaching his conclusion about the materiality of the clinical hold, does not rely on his event study findings of a significant price decline following the December 24, 2003 announcement of the clinical hold.

38.  Dr. Gompers dismisses this result because he considers news released on that day related to the Wells Notices received by the SEC to be confounding. I find two problems with Dr. Gompers' analysis of this event.  First, it is not possible to separate the fact of the SEC investigations from the underlying conduct being investigated of the complaint. In my opinion, the news of the SEC investigation is not confounding, but, in fact, part of the curative disclosure.  Second, Dr. Gompers' citations to academic research of the effect of SEC and regulatory investigations are taken out of context.

**2.  Disclosure of the Wells Notices**

39.  Biopure's announcement that it had received a Wells Notice from the SEC contained an account of the events that are the subject of this lawsuit.  As such, it must be interpreted as a curative disclosure to the market.  Dr. Gompers cannot therefore contend that if the stock price drop is caused by the announcement of the SEC investigation it is not indicative of the materiality of disclosures.

**3.  Academic research on SEC investigations**

40.  In addition to my disagreement with Dr. Gompers' analysis on a conceptual basis, I also find problems with the particular academic research on which he relies to determine that the observed price decline is consistent with the decline attributable to other SEC investigations.

41. Dr. Gompers relies primarily on research showing that stock prices declined on average 8%-12% following the disclosure of an SEC investigation.[10]  Dr. Gompers testified in his deposition that the author of the paper is a law professor at NYU.[11]  In fact, this research is a student paper written as an independent project by a second year MBA student.  The paper was never published in a peer reviewed journal.

42. Dr. Gompers also cites other research that did appear in peer reviewed journals.  In paragraph 67, he cites research that concluded that, "[a]n announcement of the enforcement action negatively affects a target firm's stock value."[12]  In fact, this research looked at the effect of SEC insider trading enforcements.  Dr. Gompers has no basis for concluding that the reaction to insider trading actions is relevant to the allegations in this matter.

43. Next, Dr. Gompers cites a paper that concluded, "[t]he analysis revealed a negative market reaction to the announcement of investigations."[13]  In fact, the article discusses that the nature of the underlying conduct and the severity of the enforcement actions were significant variables for explaining the stock price response.  Finally, Dr. Gompers also cites a paper that concluded, "[o]n average, alleged or actual corporate fraud announcements of stakeholders or the government correspond to an economically and statistically significant loss in the accused firm's common stock market value."[14]  Again, a careful read of the paper suggests the findings are much more nuanced than Dr. Gompers suggests.   The paper defines fraud of stakeholders to occur when the firm cheats or is accused of cheating on implicit or explicit contracts with

---

[10] McDowell, John, "A Look at the Market's Reaction to the Announcements of SEC Investigations," The Leonard N. Stern School of Business, Glucksman Institute for Research in Securities Markets, April 1, 2005.  Gompers 00050-00065.

[11] Transcript of Paul A. Gompers's Deposition, October 11, 2006, pp 220-227.

[12] Persons, Obeua S., "SEC's Insider Trading Enforcements and Target Firms' Stock Values," Journal of Business Research 39, pp 187-194 (1997).  Gompers 00066-00073.

[13] Nourayi, Mahmoud N., "Stock Price Response to the SEC's Enforcement Actions," Journal of Accounting and Public Policy 13, pp 333-347 (1994).  Gompers 00074-00088.

[14] Karpoff, Jonathan M. and John R. Lott, Jr., "The Reputational Penalty Firms Bear From Committing Criminal Fraud," Journal of Law and Economics, vol. XXXVI (October 1993).  Gompers 00089-00134.

suppliers, employees, franchisees, or customers other than governments, none of which apply to the case at hand.

44. In conclusion, even if it were appropriate to separate the stock price response from the SEC investigation as apart from the substance of the disclosures contained in the announcement, I do not believe that Dr. Gompers has a basis for doing so.

45. Even if one accepts Dr. Gompers' claim that the entirety of Biopure's stock decline on December 26th was due to the announcement of an SEC investigation, in my opinion, such a claim confirms the materiality and significance of Biopure's false and misleading disclosures since the announcement should be considered a curative disclosure.

**D.    The omission of the Phrase "Complete Response Letter" in Disclosures**

46. Gompers bases his opinion on the following:

- There was no significant price reaction after the September 12, 2003 SEC filing.  The September 15 price decline was not significant and occurred after the company had removed the reference.

- Following the December 11, 2003 disclosure, the stock price change is not statistically significant.

- Disclosure of a CRL does not always lead to a negative stock price reaction.

47. As I discuss below, I disagree with Dr. Gompers' conclusions about the significance of the price declines following the September 12 and December 11 disclosures.  I also find that Dr. Gompers limited analysis of two particular CRL disclosures by other companies to be based on a bias and unscientific sample that simply does not provide information about the issue at hand.

1.  **Analysis of September 12 and September 15 news and trading**

48. On August 21, in a conference call with investors, Biopure explicitly
    represented to investors that the July 30 FDA letter was something other than
    a CRL. Thomas Moore of Biopure specifically refered to the letter as a
    "hybrid." He also stated that the FDA had "made a commitment" to Biopure
    to give them an action letter 30 days after they provide responses to the FDA
    questions. Moore noted that in taking this unusual action of sending a
    "hybrid" letter and making a "commitment" of a quick review, the FDA had
    done Biopure a "big favor."

49. On Friday September 12 at 11:02 am, Biopure filed a registration statement
    with the SEC to register shares that investors sought to purchase from
    Biopure through the exercise of warrants. In contrast to the August 21
    statements, the document included a reference to the FDA letter of July 30,
    2003 as a complete response letter. On Monday September 15, 2003 Biopure
    submitted a revised registration statement removing the "complete response
    letter" terminology.

50. Dr. Gompers concludes that the disclosure of the complete response letter
    was not material to investors because the market price did not change
    significantly. He concludes that the stock price reaction is inconsistent with
    the hypothesis that a complete response letter is negative.[15] I disagree. I
    have examined the intraday trading records for September 12 and September
    15 as well as correspondence between Biopure and the investing community.
    In my opinion, this evidence is consistent with the hypothesis that the market
    reacted negatively to the first disclosure and that the two disclosures together
    created confusion among investors.

51. Exhibit 11 shows the intraday trading volume and trade prices for September
    12 through September 16. The complete response disclosure was contained
    in a Form 424B3 filing that was made at [11:02am]. Focusing on September

---

[15] Transcript of Paul A. Gompers's Deposition, October 11, 2006, pp 176-178.

12, we see little activity either in volume or price movement following the filing.  However, at the opening of the market on Monday morning, September 15, there is a burst of trading activity and a drop in the price of nearly 10%.  As the day goes on, the price rebounds, closing to about 6% of the prior day closing price.  The trading volume on September 15 was statistically significant.  This pattern would be consistent with the interpretation that investors were slow to react to the Friday disclosure.  In fact, Biopure itself has put forward this interpretation.

52. Biopure believed that the trading volume and stock price decline on Monday morning was due to investors learning of the Friday disclosure of the complete response letter after trading hours.  In emails with investors, Doug Sayles wrote that he suspected that the trading and stock price decline on September 15, was as a result of investors having noticed the language late Friday or over the weekend.[16]  Sayles admits that a reporter called him on Friday evening, and that he knew that the reporter had called at least one institutional investor.  Sayles also believed that investors did not become aware of the correction until later in the day.

53. Biopure's interpretation of the events is consistent with the finance literature on efficient markets.  Dr. Gompers quotes a paper on efficient markets that concludes: "in an efficient market, stock prices react to news within minutes."[17]  There are two reasons why one would not expect stock price reactions to occur as quickly in this instance.

54. First, one must note that the subject of the paper referenced by Dr. Gompers is the stock market reaction to earnings and dividends announcement.  Earnings and dividends announcements are anticipated by the market, and therefore are likely to be noticed and read shortly after their publications.  In this instance, the public filing was a 424B3 that was not anticipated by the market.  It is not unreasonable to think that investors would not be instantly aware of it.  Also, because the purpose of the filing was to register shares,

[16] BP 05053-05056.

[17] Gompers Report, paragraph 57.

investors would not be looking for news announcements. Thus it is reasonable to assume that even an interested investor who was aware of the filing might not read it carefully within the first several hours of its availability. Consistent with that possibility, I note that the paper that Dr. Gompers cites also finds "significant returns are detected in the overnight period and at the opening of trading on the next day."[18]

55.  Second, Dr. Gompers himself admits that this company had very limited analyst coverage. The more visible the company is to the investing public, the quicker the stock price will be to react. For example, Burton Malkiel, a noted expert on efficient markets writes in his book, A Random Walk Down Wall Street, that "[e]ven if it can be argued that all relevant news for the major stocks followed by institutional investors is quickly reflected in their prices, it may well be that this is not the case for all the thousands of small companies that are not closely followed by the pros."[19]

56.  In my opinion, the stock price decline on the morning of September 15, 2003 can be attributed to the news contained in the 424B3 filed on September 12, 2003, which included the disclosure of the complete response letter, or to the confusion created by the two disclosures.

## 2.  Effect of December 11 Disclosure

57.  On December 11, 2003 after the market close, Biopure referred to the July 30, 2003 FDA letter of the complete response letter. The adjusted return on December 12, was -10.3%. That return is significant at an 89.6% level of confidence. In other words, there is an approximately one in ten chance that such a return was as a result of random variation rather than as a result of the December 11, 2003 announcement. Although the return does not reach the 95% level of significance, it is still unusually large. I also find that the

---

[18] Patell and Wolfson. "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," Journal of Financial Economics 13, pp 223-252 (1984).

[19] Malkiel, Burton. A Random Walk Down Wall Street, 1986, p 199. W. W. Norton & Company: 8th Edition, 2003.

trading volume on December 12, 2003 is statistically significant, further indicating that investors acted on the information disclosed.

58. Dr. Gompers concludes that any stock price change on this day should be attributable to the confounding news of an earnings miss and going concern modification. He does not provide any basis for that conclusion in his report but clarified his position at his deposition that the academic literature supports the conclusion that earnings misses are usually accompanied by significant stock price declines.[20] I disagree that the earnings news contained in the press release can be termed a "miss." A miss is typically defined as a deviation from expectations. In its report on December 12, 2003, ThinkEquity reported that the results were largely in line with their expectations.[21] I also compared the announced earnings to the consensus earnings estimates reported in the November 24, 2003 Weiss Ratings Inc. analyst report and found that the announced earnings were actually higher than the reported consensus estimate.[22]

59. The going concern modification is also not likely to have been a surprise to the market. Biopure's auditors included such a modification in the prior year's financial statements. Also, prior financial announcements during the year included discussions about cash position and funding needs that would have provided similar information to the market.[23]

60. Finally and most important, I note that the press release contained several statements pertaining to future revenues and expenses, and in particular, Biopure discloses the expectation of higher expenses related to the company's FDA response activities.

---

[20] Transcript of Paul A. Gompers's Deposition, October 11, 2006, pp 198-199.

[21] ThinkEquity Partners Analyst Report, December 12, 2003, p 1. Gompers 00432.

[22] Weiss Ratings Inc. Analyst Report, November 24, 2003, p 5. Gompers 00385.

[23] Biopure Corporate Press Releases 05/22/2003 and 08/21/2003.

### 3.  Event study related to CRL disclosures

61. Dr. Gompers' relies on an analysis he did for two companies other than Biopure who announced receipt of a complete response letter. In each of these two instances, the company's stock price reacted positively to the announcement.

62. I find several problems with drawing any inference from this analysis. First, one cannot draw any predictive conclusions from a sample of two that was selected in order to show a particular result. Dr. Gompers has not shown that the sample is representative of the broader population of CRL disclosures, or that these particular instances are comparable to the omissions at issue in this case. Dr. Gompers did no analysis of the context of these other CRL's in order to determine how the CRL news compared to investor expectations. It appears to me that the instances that Dr. Gompers reviewed are ones in which the complete response letter disclosure provided information about the timing and cost of obtaining future approval that was positive. Thus, I do not find any information of relevance to the issues in this case

63. Also, Dr. Gompers analysis depends on the assumption that the use of the phrase "complete response letter" is the only relevant determinant of the market reaction. I understand from Counsel that the SEC's allegations of non-disclosure are broader than just the omission of those words. The issues in this case include Biopure's portrayal of the FDA letter, for example, as a "hybrid" letter that was sent as a "big favor" by the FDA. The issues also include the misinformation conveyed to the market about the timing of the FDA review following resubmission by Biopure.

### E.  Negative Stock price reaction on October 30, 2003

64. On October 30, 2003, Biopure announced that it would not be able to complete its response to the FDA's questions on the BLA until June 30, 2004 and that in order to conserve cash it was laying off 30% of the workforce.

Analysis Group, Inc.

Biopure also announced that the FDA review of a resubmission would take longer than 30 days, and that the July 30 letter was not a "hybrid" letter.

65. Dr. Gompers' event study shows a significant price decline following the announcement on October 30, 2003.   However, Dr. Gompers concludes that the negative stock price reaction is caused by concerns about layoffs and cash position and not Biopure's corrective disclosure.

66. In my opinion, Dr. Gompers is using an interpretation of the allegations that is too narrow.  I understand that the SEC alleges that Biopure failed to disclose the "true scope and nature of the deficiencies with the BLA identified by the FDA."[24]  Therefore, the information disclosed related to the timing – namely that it would take Biopure eight more months to complete its response  – should be considered a partial corrective disclosure of information related to the scope of the deficiencies.

67. Similarly, the news of the layoffs and cash constraints is directly related to the delay caused by the FDA complete response letter, as is clear from the articles surrounding the news:

> … it will cut its staff by 30% to save money while it responds to questions the Food and Drug Administration has about its marketing application for an artificial-blood product.[25]

68. In my opinion, the stock market reaction to the October 30, 2003 announcement is a clear indication of the materiality of the disclosures at issue in this case.

## III.    CONCLUSIONS

69. I do not believe that Dr. Gompers has established a basis to conclude that the non-disclosure of the clinical hold imposed on the proposed trauma trials was not material.  He relies only on his interpretation of analyst comments and a non-event study analysis of the disclosure of news related to a different

---

[24] SEC Complaint vs. Biopure Corporation et. al., paragraph 5.

[25] The Wall Street Journal, 10/31/03.  Gompers Report, paragraph 44.

clinical hold. He ignores the fact that significant price changes and significant trading volume occurred on days when there was news related to the trauma trials.

70. I disagree with Dr. Gompers' conclusion that the omission of the phrase "complete response letter" in the references to the July 30, 2003 FDA letter was not material to investors. In my opinion, the market reaction to the September 12, 2003 disclosure of the complete response letter and the October 30 disclosure relating to the length of FDA review and the nature of the July 30 letter, is consistent with the hypothesis that the determination of whether Biopure received a complete response letter (as opposed to some other type of letter) is material, and provides evidence of the materiality of the disclosure. Dr. Gompers' observations about disclosures of other CRLs are not a reasonable basis for reaching a conclusion about this issue because he did not establish that the facts and circumstances of the CRL's were comparable. The statistically significant price decline following the October 30, 2003 announcement is also evidence of the materiality of the disclosures related to the complete response letter.

71. In my opinion, the statistically significant price decline following the December 24, 2003 announcement is evidence of the materiality of the disclosures related to the clinical hold.

Date: October 31, 2006                    Submitted by:

_____

Laura B. Stamm

-21-                                Analysis Group, Inc.

# EXHIBIT F

**Edward L. Snyder, MD**
**Yale School of Medicine**
**Yale-New Haven Hospital**
**Blood Bank  CB-459**
**20 York Street**
**New Haven, CT 06510**

February 23, 2006

Ian D. Roffman
R. Daniel O'Connor
Ellen Bober Moynihan
Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, MA  02108

**Securities and Exchange Commission  v.**
**Biopure Corp., Thomas Moore, Howard Richman and Jane Kober**
**Civ. A. No. 05-11853-PBS**

Dear Attorneys Roffman, O'Connor and Moynihan:

I am writing to provide my opinion in the above named legal action. I herein will provide my opinions and provide necessary justification. I am a Professor of Laboratory Medicine at Yale University School of Medicine and Director of the Blood Bank/Apheresis/Cell Processing Service at Yale New-Haven Hospital. I have for the last 28 years been a practicing physician in the field of Transfusion Medicine and also a site Principal Investigator on a number of clinical trials many of which have been submitted to the FDA for licensure of various transfusion medicine products.  The opinions offered represent solely my own and in no way represent opinions or comments of my employer Yale University, of Yale-New Haven Hospital, or any of either of their subsidiaries.

**I.      INTRODUCTION**

A.     I have formed my opinions based on:

- My review of selected materials, focusing on communications between the FDA and Biopure, which are categorized and appended as Attachment 1

- On my past 28 years of experience in my capacity as Director of a Blood Bank/Transfusion Service at an academic medical center

- On my experience as a Principal Investigator on a number of clinical trials

- On my other relevant professional experience as more fully described in my attached CV (Attachment II)

B.    I have agreed to receive compensation for my time and services at the rate of $200 per hour. This is per hour for expert consultation, deposition and/or testimony.

C.    I have retained a colleague to assist in my review. Her rate is $100/hour

D.    In the preceding four years, I have been deposed once. The case currently pending is:

**Beglin v. University Medical Center in Louisville Kentucky in the Jefferson Circuit court**

II.    **OPINIONS:**

**It is my overarching opinion, based on my experience and my review of the communications between the FDA and Biopure, including the FDA letters of July 30, 2003, that the FDA in its review of the BLA and Trauma IND was raising fundamental questions about the following:**

- **Design and conduct of the supporting trials**
- **Integrity of data**
- **Safety of the product**
- **Efficacy of the product**

**Responding completely and satisfactorily as required and requested by the FDA, to the two letters of July 30, 2003, would require in my opinion, that Biopure undertake extensive and even Herculean efforts, including the performance of new pre-clinical trials. Further, after successful and satisfactory response to the data issues raised in the letters of July 30, 2003, Biopure would likely have had to conduct new clinical trials. The concerns delineated in the above mentioned two letters show, in my opinion, the low impression the FDA held of the quality and integrity of the Biopure HBOC-201 pivotal clinical trial starting with safety and quality issues related to the extraction of starting material, i.e., bovine hemoglobin from the animals in the abbatoirs, to the labeling copy of the final product and almost every manufacturing step in between. It is obvious, in my opinion, from reading each of the FDA espoused concerns, that the FDA did not have confidence that Biopure had conducted the pivotal HBOC-201 clinical trial in a fashion consistent with a requisite level of investigational quality, and that the FDA had serious concerns regarding the clinical trial data integrity, quality, validity and veracity. FDA was also, in my opinion deeply concerned about product safety and whether the subjects in the HBOC-201 pivotal trial were enrolled and treated appropriately. FDA, in my opinion was also concerned, based on their comments in the two letters of July 30, 2003, as to whether infusion of the Hemopure product at the clinical sites was performed in a safe manner, following required subject inclusion and exclusion criteria, performed by well trained investigators, supported by quality and timely laboratory and ancillary clinical testing (e.g., plasma hemoglobins and ECGs, etc) that would ensure the subject in**

the trial was being monitored in the safest possible manner. Concerns regarding the efficacy of the HBC-201 compound are also raised. These concerns are in part attributable, as I read the FDA's July 30, 2003 comments, to the Agency's inability to judge product efficacy due to FDA's existing concerns regarding the validity and quality of the data Biopure submitted in support of the BLA.

In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency.

I do not believe, that one could read these two FDA opinions contained in the letters of July 30, 2003 and abstract a belief that the FDA was enthusiastic about the BLA submission, or viewed the BLA and IND submissions as acceptable and approvable, in any way.

A. An overall timeline for key events could be generally summarized as follows:

## TIMELINE

1. On or about **July 31, 2002** Biopure submitted a BLA to the FDA in support of the licensure of Hemopure, a blood substitute intended for use in human patients who were acutely anemic and undergoing elective orthopedic surgery.

2. During the **September 2002** timeframe, the FDA conveyed several times to Biopure, the Agency's concerns regarding the integrity of the data submitted in support of the HBOC-201 BLA, including, but not limited to, the concept of "soft-locking" and subsequent re-opening of the database.

3. On or about **March 7, 2003** Biopure, based on the pending BLA, applied for an IND approval for a clinical trial involving use of Hemopure in trauma victims.

4. On or about April **9, 2003** Dr. Landow of the FDA telephoned Howard Richman at Biopure to notify them that the FDA was placing Biopure IND 10962 (A multi-center study to evaluate the safety and tolerability of hemoglobin-based oxygen carrier –201 [HBOC-201] in trauma subjects) on Clinical Hold based on safety concerns determined during the FDA's ongoing review of the Biopure BLA submission. The Clinical Hold was placed due to the FDA's belief that subjects would be exposed to unreasonable and significant risk of injury [CFR 312.42(b)(1)(iv)].

5. On or about **April 25, 2003** the FDA sent a follow-up letter related to their placing the IND on Clinical Hold as discussed in the call of **April 9, 2003**.

6. On or about **May 12, 2003**, Biopure sent a letter to the FDA regarding the clinical hold on the Biopure IND. This was sent as a "Clinical Hold Complete Response" letter in response to the FDA's April 25, 2003 letter. Biopure also sent a second

letter stating that Biopure's response to the clinical hold was also being submitted in connection with (as an amendment to) Biopure's BLA.

7. On or about **May 30, 2003**, the FDA sent Biopure two letters. The first stated that the FDA would not lift the clinical hold on the Biopure IND regarding the use of Hemopure in a human Trauma Trial. The FDA also required that Biopure conduct a series of three pre-clinical (animal) studies in conscious swine. The second letter was a letter stating that the FDA deadline for the review of the Biopure BLA was being extended 90 days until **August 29, 2003**. This was being done inasmuch as the FDA viewed the new data analyses provided in the letter and new information regarding the SEEC (Data and Safety Monitoring) committee contained in the Biopure letter of **May 12, 2003** as constituting a major amendment and extended the deadline for a final decision on the Biopure BLA, by 90 days as noted above until August 29, 2003.

8. On or about **July 2, 2003** Biopure again contacted the FDA for a 2nd time, to request that the FDA lift the clinical hold on the Biopure IND regarding the use of Hemopure in a human Trauma Trial. The letter was in the form of a "Clinical Hold Complete Response" letter in response to the FDA's May 30, 2003 letter.

9. On or about **July 30, 2003**, the FDA sent Biopure a Complete Response Letter (FDA reference STN: 125066/0) which was a 34 page document outlining myriad concerns that the FDA had raised during their review of the Biopure BLA. The FDA stated that the letter was in regard the BLA for Hemoglobin Glutamer-250 (Bovine) also known as HBOC-201 submitted under section 351 of the PHSA. It stated that the FDA had completed its review of all submissions made relating to the BLA. Their review found that the information and data submitted were inadequate for final approval action at that time based on the deficiencies the FDA outlined in the disapproval letter. The letter suggested that Biopure could choose to discuss the matter in person or via telephone and referred Howard Richman to Franklin T. Stephenson in the Division of Blood Applications. Biopure was given four options in the letter:

      i.   amend the application
      ii.  notify FDA of intent to file an amendment or a new submission
      iii. withdraw the application
      iv. request an opportunity for a hearing regarding denying approval

In the absence of the above, CBER it stated, may initiate action to deny the application. Biopure was told that any amendment should respond to all deficiencies listed and that a partial reply would not be considered for review.

10. On or about July 30, 2003 the FDA sent a second letter to Biopure informing Biopure that the Trauma IND 10962 would remain on clinical hold because the FDA felt that human subject enrollees would be exposed to an unreasonable and significant risk of illness or injury.

**B. Opinion re: April 25, 2003 FDA letter related to their placing the Biopure IND 10962 on Clinical Hold as discussed in the call of April 9, 2003.**

**In my opinion, this letter shows that the FDA was deeply concerned about the safety of the HBOC-201 product, to such a degree that they were unwilling to permit the use of the product in humans. Further, it is my opinion that the SAEs alluded to in the FDA's statements were exactly those that were likely to encountered and to be of greatest concern since it is known that plasma free-hemoglobins, such as was HBOC-201, bind to nitric oxide (NO) and thus might predispose recipients to hypertension, cardiovascular and other life-threatening complications.**

This letter contained three major points and many subpoints.

- The first point stated that based on the review of the BLA and the pivotal trial HEM-0115 (n=693), the FDA concluded that compared to allogeneic blood the there was a higher incidence of life threatening SAEs. This was seen and statistics provided for the following SAEs:

  - Death
  - Cardiac arrest
  - Acute renal failure requiring dialysis
  - Congestive heat failure/pulmonary edema
  - Atrial fibrillation/flutter
  - Cerebrovascular accidents/TIA/RIND

- The second point was that systemic hypertension which can lead to increased blood loss as well as many of the SAEs listed in the bullet directly above, was observed much more frequently in HBOC-201 subjects than control (63 vs 21; p<0.0001). Since the IND 10962 was to be used in an in-hospital setting, enrolled subjects would be exposed to an unreasonable risk of injury.

- The third point was supported by the Biopure DMB (SEEC), and found that SAEs were statistically significantly greater in the HBOC-201 group vs. control. These SAEs were related to:

  - permanent disability
  - death or permanent disability
  - An increase in incidence of moderate to severe SAEs
  - SAEs related to CTM

Biopure was told that they "May not initiate clinical trials under the IND" -- until the deficiencies noted were satisfactorily address and accepted by the FDA.

C. **May 30, 2003 Letter: In my opinion, this letter demonstrates the FDA's continued significant concerns over the safety of the HBOC-201 product. The letter clearly states that the IND will remain on clinical hold due to safety concerns raised during communications between the FDA and Biopure in April, 2003. The FDA also stated that Biopure was required to resolve contradictory statements between the investigator database and the SEEC AE/SAE databases regarding safety endpoints for the HEM-0115 study. In addition, the FDA expressed concerns regarding the review of all**

AE's and SAE's by the SEEC.  Further, the FDA communicated concerns regarding the validity of Biopure's post hoc analysis in the HEM-0115 data. Lastly, the FDA stated that three additional studies in conscious swine would be required to address tissue perfusion and oxygenation issues regarding infusion of HBOC-201.  In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency.   A strong linkage exists between the BLA and the IND Clinical Hold Letter that derives from the fact that the data submitted for the IND was cross-referenced to the BLA.  Moreover, the nature of the concerns that led to the clinical hold clearly give rise to concerns regarding the approvability of the BLA.

D.  Opinion re: Letter dated on July 30, 2003 from FDA to Biopure regarding the FDA's responses to the BLA.  The FDA was raising fundamental questions about the following:

- **Design and conduct of the trials**
- **Integrity of data**
- **Safety of the product**
- **Efficacy of the product**

It is my opinion that to respond fully to the concerns raised in the letter of July 30, 2003 would take an extremely long period of time since the concerns were of such a fundamental nature so as to make a rapid response to the questions and a subsequent quick review by the FDA improbable. Having been a PI on many clinical trials, I was immediately struck upon reading this letter by the intensity, depth and breadth of the deficiencies and queries made in the letter from the FDA to Biopure, and the implications that this would have for the approvability of the BLA.   The issues raised were not a cause for optimism. Indeed, they should have been considered substantially negative comments and a major cause of concern. These comments do not imply, again, in my opinion, a message that the FDA is willing to work with Biopure to get the product approved and indicated that Biopure faced major hurdles in trying to obtain approval for the BLA.

1.  Bioresearch Monitoring Inspections: In my opinion, the FDA asked a series of fundamental questions that called into question the integrity of the data collected.  There were four major questions asked of Biopure with eleven subparts in total. These questions address deficiencies that should have not been an issue for the BLA submission; in my opinion, deficiencies of this nature should never have occurred.  The specific obligations and responsibilities of the CRO and the internal monitors are to ensure that the data submitted by Biopure would be valid and verifiable. Clinical trials rely on the integrity of the data submitted in support of a licensure application. Biopure had, as per the FDA letter, failed to satisfy the FDA in this regard. Given the number of sites and

patients, addressing and responding to the critique in the needed detail would have required a substantial amount of time and effort.

FDA questions to Biopure included concerns regarding documentation of:

    a.  time of monitoring inspections
    b.  obligations and responsibilities of the CRO
    c.  completion of procedures for making changes to the CRFs
    d.  handling of data clarification requests
    e.  reporting of SAEs and AEs
    f.  training of CRO or Biopure monitors as per Biopure's SOPs
    g.  knowledge of and proficiency in implementing Biopure's SOPs by external contract monitors
    h.  consistency of monitoring activities among the various monitors from Biopure, external CROs and private consultants
    i.  how the various monitors reported their results – separately, or integrated
    j.  why 8 of 10 pre-study monitoring reports covering six sites were not finalized and reviewed as per Biopure's SOPs
    k.  why 5 of 8 initiation monitoring reports covering six sites were not finalized
    l.  why there were still problems at the November 2002 FDA inspection of Bipure regarding timely submission of monitoring reports.
    m.  Why Biopure failed to take corrective action in regards to submission of monitoring reports as noted by the FDA in November 1999.

## 2. Clinical Investigator Issues:

**In my opinion, the issues raised in this section call the integrity of the entire clinical trial into question, not only because of their nature but also because of the presence of a pattern of inadequate data reporting. In my opinion, of serious concern is a statement by the FDA that they noted a "pattern of protocol violations" that continued unabated despite repeated monitoring visits that disclosed these on-going problems. For example, the FDA noted that pre-transfusion hematology and chemistry assessment were not drawn, or not consistently drawn, such that they question whether Biopure had the necessary data to draw conclusions about patient outcomes. In essence, the FDA impugned the integrity of the clinical study at all 14 sites that were inspected and potentially at the other 32 sites that were not, and questioned how Biopure could ensure that it met safety and efficacy endpoints.**

Specific concerns cited by the FDA related to:

a.  Failure to report many SAEs and AEs.
b.  Ineligible subjects enrolled including those with known excludable medical risks
c.  Lack of proper consent of all subjects
d.  Key protocol assessments not performed including key laboratory assays such as plasma hemoglobin, ECGs and physical examinations

e. Lack of information regarding training of all investigators at the clinical sites before enrolling subjects or before using the investigational product.

f. Missing source documents, incomplete CRFs, discrepancies with test product records among the CRFs, hospital records, and drug accountability records. This calls the integrity of the entire study into question.

g. Biopure's failure to initiate corrective action such as suspending enrollment at sites where deficiencies were noted.

3. **Study Conduct: This section again calls into question the integrity of the data used to support the BLA, and in particular, focuses on the presentation to and review of data by the SEEC. The FDA questioned whether the data was improperly changed during the review process. FDA asked Biopure, based on my reading of the July 30, 2003 letter, to document and show FDA that the sanctity, validity and veracity of the HBOC-201 pivotal clinical trial data used to support the BLA was maintained during and after the trials were completed and that the data was not tainted. The FDA noted that statements that Biopure made in several communications with the FDA regarding data handling "suggest that the data recorded may at best be incomplete and at worst not constitute an adequate basis upon which to make a determination of safety or efficacy."**

The FDA raised a series of issues including:

a. Concerns that the term "softlocking" of the database had no official regulatory meaning and appeared to denote a number of different data management actions, including Biopure's potentially inappropriate involvement in data management activities.

b. Whether the data review completed by the SEEC as related to their identification and characterization of adverse events was properly used to determine whether safety endpoints were met.

c. Concerns over the handling of source documents and blinding for patient identifiers.

4. **Clinical Trials: Queries related to HEM -115 (Efficacy): This section contains numerous concerns related to whether the quality of the conduct of the clinical trials was sufficient to allow for the evaluation of the efficacy of the product. As an example, the FDA asked Biopure to address the question of why the transfusion avoidance for Hem-0115 was driven by avoidance of allogeneic transfusion in the subjects who received the least amount (60-90g) of HBOC-21, while a larger number of those subjects who received higher doses of HBOC-201 received a larger number of allogeneic transfusions. This would seem counterintuitive to me. In my opinion, the FDA's concerns here were not only related to the efficacy of HBOC-201, but also to whether the clinical trial data were accurate, and verifiable. I base this conclusion on the FDA's stated concerns vis-a-vis study integrity as outlined in the section on Study Conduct. Also, the FDA states that given the**

information from the clinical trials, it is not possible to write adequate and safe dosing guidelines and notes that resolution of this issue will likely involve an adequately sized and powered phase 3 trial. After reading these statements, and based on my experience, it is my opinion that addressing these concerns would require that extensive new clinical data be provided. This requirement would, again in my opinion, likely take years to complete.

The importance of this section relates to the conduct of the clinical trial. Deficiencies noted include:

a.    The CRFs contain numerous discrepancies, cross outs, missing data, and deletions. The accuracy and integrity of the data are seriously in question. Reconciling these data represent a major task in light of the number of patients enrolled.

b.    Similar concerns are raised as to missing or incomplete data regarding the pre and post HBOC-201 infusion, total hemoglobin levels. This query is key since Hemopure is a free hemoglobin material and its level post-infusion is a major clinical outcome.

c.    Dosing recommendations provided by Biopure in their Table 1 of the proposed package insert are not supported by clinical data from Hem –0114 or Hem-0115. The FDA states that Biopure would need to perform new Phase II and/or Phase III clinical trials to provide evidence of product efficacy (the FDA again informed Biopure that it would need to conduct additional Phase II and Phase III clinical trials to address dosing issues in its discussion of pharmacokinetics later in the BLA letter). The FDA stated that adequate and safe dosing guidelines cannot be derived from the submitted clinical trial data.

5.    Clinical Trials: Queries related to HEM-115 (Safety): The FDA's comments in the letter of July 30, 2003, state that the Agency is concerned as to why the reports of SAEs between the SEEC and the FDA databases are different. In my opinion, this represents a substantial issue for Biopure to address. The FDA punctuates this concern, by requesting that Biopure provide the Agency with copies of all source documents supplied to the SEEC relating to AEs and SAEs. A response to this request, again in my opinion, would require a massive clerical effort. It is also my opinion that it is an important point to note that even if Biopure successfully completed this undertaking, the FDA stated that it still reserved the right to re-evaluate the safety data.

Deficiencies noted include:

a.    CRF AE pages contain numerous discrepancies, cross outs, missing data, markings entitled "re-monitored", and deletions. The accuracy and integrity of the data are seriously in question. Reconciling these data represent a major task considering the number of patients enrolled.

b. The incidence of acute MI is different between the SEEC and the FDA databases, the latter based on the CRFs submitted.

c. There are missing cardiac and renal laboratory data and discrepancies between the handwritten and data printouts for some patient data.

d. There are requests to evaluate the cross-reactivity of antibodies to bovine hemoglobin to human hemoglobin, and to provide analyses of drug-drug interactions between HBOC-201 with antihypertensives, vasodilators, diuretics, cardiac glycosides, etc.

6. **Hem-0114/Other Clinical Studies**: **In my opinion the FDA's comments, questions and requests for data as it relates to Other Clinical Studies (besides Hem-0115) shows that the FDA had similar concerns with respect to data integrity, efficacy and safety findings. Moreover as with requests relevant to Hem-0115, gathering the responsive materials would require a substantial undertaking.**

Sample queries for this section include:

a. Requests for myriad amounts of missing data and explanations for their absence.

b. Requests for anesthesia records on all surgical patients in all phase 2 studies.

c. Requests for all pertinent CRFs and copies of all source documents to substantiate reported AEs.

d. Requests for training records.

e. Requests for all CRFs and source documents for all phase 2 studies.

f. Requests for anesthesia records for all surgical patients in all phase 2 studies.

g. Requests for final study reports for all phase 2 studies.

7. **Statistics:** **In my opinion the essence of the FDA's statistical questions goes to the basic issue of whether HBOC-201 is safe. I believe the Agency is questioning the safety of HBOC-201 by pointing out that the SAEs in the HBOC-201 group were higher than those in the RBC group and then asking Biopure to justify the benefit of use of HBOC-201 if the group that received the compound sustained higher morbidity and mortality than was seen in the control (allogeneic RBC) group as per the HBOC-201 BLA data submission.**

8. **Clinical Laboratory Measurements:** **As in other sections, the FDA has once again raised multiple concerns related to the integrity, validity and veracity of the data submitted relative to the HBOC-201 BLA. To**

supply clear documentation for each clinical laboratory result from each site about what laboratory results have been submitted to the BLA is a monumental task that could involve documentation of hundreds of thousands of individual laboratory data points.

The FDA raised:

a. Concerns that the reference labs in Europe, South Africa and the US used different reference ranges and the FDA needed to have the results from these central laboratories reconciled since results from all three sites were combined for HEM-0115—again, integrity of the data is being called into question.

b. Concerns over data deletions and accordingly, requested explanations for the deleted data.

c. Concerns over lack of instrumentation training records and instrument validation records and requests for documentation.

d. Concerns over how some analytes can be measured due to varying degrees of interference of HBOC-201 with analyte measurements.

9. **Pharmacology/Toxicity:** In the May 30, 2003 letter from FDA to Biopure reaffirming the Clinical Hold status of the Trauma IND, the FDA raised concerns regarding the risk of vasoconstriction and resultant tissue hypoperfusion following administration of HBOC-201 as revealed in Biopure's BLA data. At that time, the FDA requested at least three additional studies in conscious swine to address issues of tissue perfusion, oxygenation and volume hemo-dynamics. In the July 30, 2003 BLA Complete Response Letter, the Agency again requests that Biopure provide evidence from a conscious large animal model that vasoconstriction will not adversely influence tissue oxygenation following infusion of clinically relevant volumes of HBOC-201. Additionally, serious issues raised by the FDA, with regard to patients with hepatic and renal impairment as well as issues related to the pharmacokinetics of repeated dosing of HBOC-201, in my opinion, will likely require additional new pre-clinical and/or clinical trials.

FDA has again requested information and data:

a. Numerous toxicological questions were raised.

b. There were requests for preclinical data from large animal studies.

c. FDA cited myriad incomplete pharmacokinetic analysis reports.

d. Labeling issues were cited re: teratogenicity studies and label copy for pregnant women.

10. <u>Herd Management Program</u>: In my opinion these questions relate to the very cleanliness and purity of the starting product for manufacture, which shows that in addition to questions as to the clinical trials that the FDA was concerned with the production of the product.

FDA cited issues regarding the need for:

a. verification that animal husbandry practices were acceptable

b. assessment of fallen stock management that assured exclusion of sick animals from the manufacturing process

c. details on blood collection and prevention of contamination of the blood product from brain matter following the captive bolt process.

d. responses to the nine listed queries from the FDA regarding process validation.

11. <u>Product characterization/Stability</u>: The FDA asked a series of questions regarding Biopure's understanding of the HBOC-201 product's quality and stability. These issues speak to the idea that the FDA is not yet satisfied with the HBOC-201 product characterization. Additional laboratory analyses will likely be needed including studies of degree of autoxidation, and analyses of the contributions of the various molecular weight species that comprise the HBOC-201 to overall oxygen affinity.

12. <u>Package Inserts</u>: In my opinion, the FDA's view of the BLA is that the data Biopure has submitted is so deficient that the Agency would not even begin to evaluate the label copy. These include claims for HBOC-201 relating to mechanism(s) of action, dosing, pharmacology, safety, efficacy and indications for use among many other issues.

13. <u>Preapproval Inspection</u>: FDA pointed out that inspection issues from February 3-7, 2003 and March 17-27, 2003 were not resolved.

E. <u>FDA Response to Biopure BB-IND 10962 (7/30/03)</u>

In this letter, also dated July 30, 2003, the FDA explicitly notified Biopure that the Agency was maintaining the Clinical Hold on the Trauma IND 10962 for safety reasons. In my opinion, the FDA's comments and concerns raised in the course of their communications in regard to the trauma IND Clinical Hold, including those in this letter, are relevant and informative as to the FDA's view of the myriad serious issues that needed to be satisfactorily addressed before approval of the BLA could be considered by the Agency. A strong linkage exists between the Complete Response Letter and the IND Clinical Hold Letter that derives from the fact that the data submitted for the IND was cross-referenced to the BLA.

13

Moreover, the nature of the data integrity and safety issues that led to the clinical hold clearly gave rise to concerns regarding the approveability of the BLA. Indeed, the IND Clinical Hold Letter sets forth many of the same deficiencies and concerns as the Complete Response Letter and led the FDA to maintain the IND Clinical Hold.

Respectfully,

*Edward L. Snyder, MD*     2/23/06

Edward L. Snyder, MD