## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05-11853-PBS |
| BIOPURE CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANT THOMAS A. MOORE'S OPPOSITION TO THE MOTION OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION FOR A CONTINUANCE OR STATUS CONFERENCE

In another effort to delay the trial and extract a litigation advantage over Mr. Moore, the SEC asserts that the Court should *ignore* Mr. Moore's summary judgment motion because it is: (1) filed too close to the trial date; and (2) too narrow and unmeritorious to warrant full briefing and decision. The SEC is wrong in both respects.

*First*, with six weeks remaining before trial, there is ample time for briefing and decision on Mr. Moore's summary judgment motion (*contra* SEC Br. at 3, 14). Further, contrary to the SEC's assertion (*id.* at 1), the motion is fully consistent with the Court's admonitions at the scheduling conference on March 16, 2006. Indeed, Mr. Moore filed his motion as promptly as he could – less than a month after the formal discovery deadline and a week after the final deposition – even though the SEC and FDA delayed, obstructed, and withheld discovery. For its own tactical reasons, the SEC decided to notice Mr. Moore's deposition for the very end of the discovery period and, rejecting several earlier dates that Mr. Moore offered, did not depose him until November 7. Further, the SEC requested a lengthy extension of time for its expert rebuttal

report, which it submitted on October 31 – the last day of the formal discovery period – and then refused to schedule this witness's deposition until the week of Thanksgiving. Mr. Moore filed his summary judgment motion *five business days later.* Similarly, the FDA has continued its refusal to produce relevant documents, and refused to schedule the depositions of its witnesses until late October. The SEC ignores the fact that *the Government was largely responsible* for the delay about which it now complains, and certainly should not be permitted to benefit from its own delays.[1]

*Second*, if granted, Mr. Moore's summary judgment motion would dispose of much of this case and greatly narrow the remaining issues for trial. The materiality of the clinical hold (Complaint ¶¶ 27, 30-33, 35-36, 39-40, 42-45, 50-66, 68, 71-72, 81-83, 88-89, 94-100), the "complete response letter" designation (*id.* ¶¶ 68, 76-79, 81-89, 93-100), and Mr. Moore's various optimistic statements (*id.* ¶¶ 26, 44-45, 50-51, 53-55, 76-79, 81-86, 99), along with his state of mind in connection with these matters, are fundamental to all or virtually all of the allegations made by the SEC. Indeed, the SEC's recitation of factual issues – many of which are encompassed by Mr. Moore's motion – demonstrates the need to pare down this case to make it manageable for trial. Further, the SEC's cursory, dismissive, and inaccurate analysis of the motion for summary judgment provides no basis for the Court to *ignore* the motion. The SEC's fear that the Court will give full consideration to the motion is not a ground for the Court to set it aside and give the SEC a "free pass."

---

[1]     The SEC did not seek Mr. Moore's consent for additional time to respond to the summary judgment motion, and we thus assume, if its request is denied, that it will adhere to the schedule set forth in the Local Rules.

## THE SUMMARY JUDGMENT MOTION

Mr. Moore's summary judgment motion first demonstrates that the clinical hold issued in April 2003 on Biopure's proposed protocol for a Phase IIA test of Hemopure on 50 in-hospital trauma patients was not material. *See* Moore SJ Br. at 9-11. Based on undisputed testimony of FDA witnesses, the motion shows that the hold was not material to the BLA because the "trauma study would be looking at a different endpoint [than the then-pending BLA for use of Hemopure in elective orthopedic surgery]. Trauma is not the same as surgery. It is medically different." Toby Silverman Tr. 88:14-19 (Ex. 1). *See also* Franklin Stephenson Tr. 140:21-141:7 (trauma protocol and orthopedic surgery BLA "are in different tracks.") (Ex. 2). The motion further shows that: (1) in-hospital trauma use was only one of numerous indications that Biopure had noted its desire to develop; (2) unlike the pending BLA for orthopedic surgery these other indications were likely 5 years or more away from commercialization even assuming all testing and regulatory review were positive; and (3) each such disclosure was accompanied by a disclaimer cautioning investors about the uncertainties inherent in testing, the FDA regulatory process, and commercialization. *See* Moore SJ Br. at 7-8. All of this indicated that the clinical hold on the in-hospital trauma protocol was not material. The motion further showed that Mr. Moore, like every other Biopure Board member and top executive, believed the hold was not disclosable. *Id.* at 12.

Second, with regard to the BLA letter issued by FDA on July 30, 2003, the motion demonstrated that the term "complete response letter" has no material significance. *Id.* at 14-16. Again, based on undisputed testimony from FDA reviewers, the motion showed that the term "carries no implication as to the ultimate approvability of the application." Silverman Tr. 93:16-17. *See also* Stephenson Tr. 75:22-76:9 ("it doesn't mean anything."). The motion further

showed that any time difference occasioned by calling the letter a "complete response letter" versus a "hybrid" letter was completely speculative, because: (1) the FDA timetable for review is just an unenforceable guideline; (2) the ten month guideline for review of BLAs produced an average time to approval of 30 months; and (3) in the context of an average FDA review period of 30 months the incremental difference in estimated time was not material. *See* Moore SJ Br. at 15. Finally, the motion showed that the July 30 BLA letter was extremely confusing to Mr. Moore, the rest of the Biopure Board, and other Biopure executives, the company and Mr. Moore did the best they could to be accurate, and as the situation clarified itself Mr. Moore made appropriate disclosures. *Id.* at 14, 16.

Finally, the motion showed that six statements by Mr. Moore that are attacked by the SEC were the sorts of "rosy affirmations" that courts have repeatedly found "immaterial as a matter of law." *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D. Mass. 1997). *See* Moore SJ Br. at 16 n.6, 17-20. Several of these statements are inaccurately reiterated in the SEC's current motion as statements that would survive a complete grant of the summary judgment motion.

## ARGUMENT

## I.     MR. MOORE'S MOTION IS NOT UNTIMELY, AND ANY DELAY IN FILING IT IS ATTRIBUTABLE TO THE SEC AND THE FDA.

The SEC asserts that Mr. Moore's motion was filed too close to the trial date to warrant consideration by the Court (SEC Br. at 1-2, 14), but this claim is belied by the facts and the SEC's own role in the delay. The six weeks remaining before trial are more than ample time for briefing and decision on the motion. Further, contrary to the SEC's contention, the Court did *not* state at the scheduling conference on March 16, 2006, that it "would not consider a summary judgment motion that was filed this close to trial." *Id.* at 1. In fact, the Court stated only that "if you want to file another motion for summary judgment, you *probably* will need to do that really

4

early on. Don't do it at the *last minute*." Mar. 16, 2006 Tr. at 24 (emphasis added) (Ex. 3). Mr.

Moore submits that six weeks hardly constitutes "the last minute." In addition, nothing in the

Court's admonition suggests that it intended to grant the SEC a "free pass" on formally opposing

a summary judgment motion on the merits, whether or not the Court thereafter decided to rule on

the motion before trial.

More importantly, the SEC now ignores its own substantial role in causing Mr. Moore's

summary judgment motion to be filed when it was. The SEC unilaterally decided, for its own

tactical reasons, to notice Mr. Moore for deposition on October 30 – the day before the formal

close of discovery. Then, despite Mr. Moore's unavailability on the 30th, the SEC refused to

accept several earlier dates that Mr. Moore proposed.[2]  Finally, to avoid imposing on the Court,

Mr. Moore acquiesced in a deposition on November 7, a week *after* the discovery deadline, on

the explicit understanding that allowing the deposition on that date would *not* delay the

proceedings.

In addition, although Mr. Moore submitted an expert disclosure from a capital markets

expert on September 6, the SEC sought and obtained an extension of time to file a rebuttal expert

report nearly two months later, on October 31 – the last day of the formal discovery period.[3]

The SEC then refused Mr. Moore's request to make this witness available for deposition during

the week of November 13, and instead insisted that the deposition could occur no earlier than

---

[2]      On at least one alternative date proposed by Mr. Moore, the SEC's lead counsel refused to take
the deposition on the asserted ground that another deposition was scheduled for that day, but then counsel
failed to attend this deposition.

[3]      Although the SEC obtained an extension of time for its rebuttal expert disclosure on the ground
that it was "surprised" by Mr. Moore's expert disclosure of September 6, the SEC's rebuttal expert
witness testified at her deposition that she was retained by the SEC "in anticipation of" such disclosure –
and spent time familiarizing herself with this case – in *August, before* Mr. Moore's expert disclosure was
even submitted. *See* Laura Stamm Tr. at 46-47, 50-51 (Nov. 21, 2006) (Ex. 4).

Thanksgiving week. Mr. Moore filed his summary judgment motion *five business days later*, less than month after the formal close of discovery. Were it not for the SEC's conscious delaying tactics, the motion would have been filed significantly earlier.

Further, the FDA waited until late August before authorizing depositions of FDA staffers that Mr. Moore had requested in March, and the agency then refused to schedule these depositions until late October. In the meantime, as Mr. Moore explained at length in his recent motion for equitable relief, the FDA has, even today, failed to produce requested documents. As shown in that motion, the SEC did almost nothing to help Mr. Moore obtain discovery from the FDA, despite the Court's admonitions at the March 16 scheduling conference that: (1) the FDA was to comply "immediately" with discovery requests; and (2) the SEC was to help defendants obtain prompt discovery or its case "is going to suffer." *See* Mar. 16, 2006 Tr. at 7-10. In view of the SEC's acquiescence in the FDA's discovery delays, it would be wholly inappropriate for the SEC to win a "free pass" on the motion because it was filed too close to the trial date.

## II.   MR. MOORE'S MOTION, IF GRANTED, WOULD GREATLY NARROW THE ISSUES FOR TRIAL AND IS SUBSTANTIAL ENOUGH ON THE MERITS TO WARRANT, AT A MINIMUM, FULL BRIEFING AND DECISION.

### A.   The Motion Addresses the Bulk of the SEC's Allegations.

The SEC asserts that Mr. Moore's motion for summary judgment addresses "only a small portion of the Commission's charges in this matter" and is limited to "three specific incidents" (SEC Br. at 4). These statements are plainly incorrect. On its face, the motion addresses *all* of the SEC's allegations that Mr. Moore violated the securities laws by: (1) failing to disclose the clinical hold; (2) describing a July 30, 2003 letter from the FDA as something other than a "complete response letter"; and (3) making various optimistic – and allegedly false or misleading – statements about the FDA review process. These allegations form the core of the Complaint

6

against Mr. Moore (*see supra* page 2) and, if decided in his favor on summary judgment, would largely eviscerate the SEC's case. Moreover, in the absence of any requirement that a summary judgment motion must be entirely case-dispositive, the SEC's claim that Mr. Moore's motion is too narrow to warrant briefing and decision must fail.

Although the SEC professes to set forth various allegations that would be unaffected by Mr. Moore's motion for summary judgment, most of the examples selected prove the opposite. For example, the SEC's "basic charge" of a scheme among defendants to "misrepresent the status of its FDA applications" (SEC Br. at 4)[4] turns entirely on: (1) the materiality of the alleged misrepresentations; and (2) Mr. Moore's state of mind in connection with them. Mr. Moore's summary judgment brief addresses both issues at length, and thus goes to the purported heart of the SEC's Complaint. Further, the SEC's contentions regarding Mr. Moore's authorization of stock sales without the disclosure of "material non-public information" (*id.* at 5-6) also hinge upon the asserted "materiality" of the matters addressed on summary judgment. Likewise, Mr. Moore's "positive spin" on the July 30, 2003 letter from FDA and statement that the agency had done Biopure a "big favor" (*id.* at 5) are addressed in Mr. Moore's summary judgment brief as well, among other optimistic statements challenged by the SEC. Mr. Moore also provides an undisputed explanation for his evolving understanding of whether the July 30, 2003 BLA letter was a "complete response letter," taking into account the statements made by outside counsel upon which the SEC now relies. *Id.* at 6. Mr. Moore has addressed the bulk of the SEC's allegations against him, whether or not he has addressed them all.[5]

---

[4]    Importantly, there is no conspiracy claim in the Complaint.

[5]    The SEC also contends that Mr. Moore's motion for summary judgment fails to address claims pertaining to: (1) statements he made during investor conferences; and (2) statements made by Biopure's Director of Corporate Communications (SEC Br. at 5, 6-7), but these allegations are *not* pleaded in the

Courts, including the First Circuit, have specifically dismissed in part or entered summary judgment in securities cases on individual statements that were not material or known to be false when made. *See Milton v. Van Dorn*, 961 F.2d 965, 970 (1st Cir. 1992) (summary judgment on materiality); *Geffon v. Micron Corp.*, 249 F.3d 29, 30 (1st Cir. 2001) (same for scienter). For case management and equitable reasons, this approach is warranted here.

**B.    The Motion Is Meritorious and Warrants Full Briefing and Decision.**

The SEC also baldly asserts that summary judgment is inappropriate "on the face of the Motion" because "ample evidence" shows that material facts are disputed. *See* SEC Br. at 7-8. If this were true (and it is not), the SEC would encounter no difficulty in briefing the motion.

In any event, the SEC's assertion of factual disputes is in error. *First*, the SEC asserts that "undisputed" facts show that the clinical hold was material to investors (*id.* at 9-10), but none of these items go to the heart of the materiality issues identified by Mr. Moore: namely, the extensive time lag before commercialization of the indication placed on clinical hold, the inherently risky process of seeking FDA approval, the relative unimportance of the indication to Biopure's business plans, and the omnipresent disclaimers in Biopure's press releases and filings. *See* Moore SJ Br. at 9-11. Further, the SEC's assertedly "undisputed" facts in support of its position are not *material* to the summary judgment motion. For example, Biopure's December 24, 2003 press release announced the SEC's "Wells Notice," and the stock-price drop thereafter cannot merely be attributed to its disclosure of the clinical hold. *See* SEC Br. at 9. Further, the SEC's cited presentations to investors, equity analyst reports, and Biopure press releases referencing "trauma" (*id.*) did not pertain to the in-hospital trauma indication placed on clinical hold, and in any event the case law is clear that the mere mention of a fact by an issuer

---

Complaint and Mr. Moore has moved in limine to exclude them from trial. The SEC's recitation of these

dies not make it material. *See In re Boston Tech* , 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("a duty to disclose arises only where both the statement made is material and the omitted fact is material to the statement in that it alters the meaning of the statement."). The SEC's sparse recitation pertaining to the clinical hold hardly justifies its request for a "free pass" on this issue.

*Second*, the SEC also contends that the "complete response letter" designation was "indisputably" material (SEC Br. at 10-11), but the SEC again ignores the core undisputed facts identified by Mr. Moore: namely, the unequivocal, unanimous testimony of FDA witnesses and experts that the designation does *not* convey information about the ultimate approvability of an application, and the undisputed fact that the FDA's overall review process is so protracted as to render inconsequential the question whether a re-submission would be reviewed in 30 days as opposed to six months. *See* Moore SJ Br. at 14-15. In addition, the SEC simply ignores Mr. Moore's undisputed explanation of his state of mind pertaining to the "complete response letter" issue, the undisputed concurrence in this view of Biopure's entire Board of Directors, its General Counsel, and its Senior Vice President for Regulatory Affairs, and the information that Mr. Moore was provided on this issue. *Id.* at 13-14, 16. As for the asserted "opinion" of outside counsel, which is at least third-level hearsay as to Mr. Moore (SEC Br. at 12), it: (1) came to Mr. Moore's attention *after* many of the challenged statements; and (2) does not alter the immateriality of the "complete response letter" label.

*Finally*, the SEC claims that Mr. Moore cannot obtain summary judgment with respect to optimistic statements that the SEC characterizes as materially false and misleading (*id.* at 12-14), but once again ignores the case law and undisputed material facts militating in favor of summary judgment for Mr. Moore. As explained at length in Mr. Moore's motion, the challenged

---

matters is notably devoid of citations to the Complaint. *Id.*

statements were accompanied by disclaimers that "bespoke caution" to investors, and thus were immaterial as a matter of law. *See* Moore SJ Br. at 7-8, 16 n.6, 18. Further, Mr. Moore had ample factual grounds for optimism when his challenged statements were made, based upon *encouragement* that Biopure had received from the FDA's Regulatory Program Manager, Mr. Franklin Stephenson, and the opinion of Biopure's Senior Vice President for Regulatory Affairs that the July 30, 2003 letter was "fundamentally positive." *Id.* at 19-20. Remarkably, the SEC relies upon the FDA's internal views of what the July 30, 2003 letter meant, which are irrelevant because Mr. Moore did not know, and could not have known, of these views. SEC Br. at 13.

*    *    *    *    *

For these reasons, it would be wholly unfair to penalize Mr. Moore, and reward the Government, by conferring a major litigation advantage on the SEC. It would be equally unfair to give the SEC a "free pass" on a motion of substance.

## CONCLUSION

For the foregoing reasons, the SEC's motion for a continuance should be denied, and Mr. Moore's motion for summary judgment should be briefed pursuant to the Local Rules and decided by the Court before trial.

Respectfully submitted,

/s/ Jason A. Levine
Edward P. Leibensperger (BBO # 292620)
McDermott Will & Emery LLP
28 State Street
Boston, MA  02109-1775
Tel.: (617) 535-4000

Bobby R. Burchfield (admitted *pro hac vice*)
Jason A. Levine (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, NW
Washington, D.C. 20005-3096
Tel.: (202) 756-8000

Date:   December 4, 2006                *Counsel for Defendant Thomas A. Moore*

# EXHIBIT 1

VIDEOTAPED DEPOSITION OF TOBY SILVERMAN, M.D.
CONDUCTED ON TUESDAY, OCTOBER 24, 2006

1 (Pages 1 to 4)

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3        -----------------------------x
 4        SECURITIES AND EXCHANGE       :
 5        COMMISSION,
 6            Plaintiff,                 :
 7            -vs-             : Case No. 05-11853-PBS
 8        BIOPURE CORPORATION, THOMAS  :
 9        MOORE, HOWARD RICHMAN AND     :
10        JANE KOBER,                   :
11            Defendants.               :
12        -----------------------------x
13
14
15          Videotaped Deposition of Toby Silverman, M.D.
16                    Rockville, Maryland
17                 Tuesday, October 24, 2006
18                      9:08 a.m.
19
20        Job No.: 1-88641
21        Pages 1 - 319
22        Reported by: Tammy S. Newton
```

```
 1          Deposition of Toby Silverman, M.D. held at the
 2      offices of:
 3          Food and Drug Administration
 4          1401 Rockville Pike
 5          Rockville, Maryland 20850
 6
 7
 8
 9      Pursuant to agreement, before Tammy S. Newton, a
10      Notary Public in and for the State of Maryland.
11
12
13
14
15
16
17
18
19
20
21
22
```

```
 1                  A P P E A R A N C E S
 2      ON BEHALF OF THE FOOD AND DRUG ADMINISTRATION:
 3          CLAIRE WHITAKER, ESQUIRE
 4          United States Attorney's Office
 5          555 Fourth Street, N.W.
 6          E-4204
 7          Washington, D.C. 20530
 8          (202) 514-7137
 9          and
10          MICHAEL SHANE, ESQUIRE
11          Office of the Chief Counsel
12          Food and Drug Administration
13          5600 Fishers Lane
14          Rockville, Maryland 20857
15          (301) 827-2802
16
17
18
19
20
21
22
```

```
 1      ON BEHALF OF THE SECURITIES AND EXCHANGE
 2      COMMISSION:
 3          IAN D. ROFFMAN, ESQUIRE
 4          Securities and Exchange Commission
 5          Boston District Office
 6          33 Arch Street
 7          Boston, Massachusetts 02110-1424
 8          (617) 573-8987
 9
10      ON BEHALF OF DEFENDANT THOMAS MOORE:
11          BOBBY BURCHFIELD, ESQUIRE
12          HEATHER SIDWELL, ESQUIRE
13          McDermott, Will & Emery, LLP
14          600 Thirteenth Street, N.W.
15          Washington, D.C. 20005-3096
16          (202) 756-8021
17
18
19
20
21
22
```

VIDEOTAPED DEPOSITION OF TOBY SILVERMAN, M.D.
CONDUCTED ON TUESDAY, OCTOBER 24, 2006

22 (Pages 85 to 88)

85

1  trauma indication, it submitted that protocol under
2  the existing IND for orthopedic surgery?
3      A    As I recall, it did, yes.
4      Q    Submission of a subsequent study protocol
5  under an existing IND is not necessarily the wrong
6  thing to do, is it?
7      A    No, it is not necessarily the wrong thing
8  to do.
9      Q    And am I correct that FDA, CBER, made the
10  determination that the trauma indication was
11  sufficiently different from the orthopedic surgery
12  indication that a new IND number was assigned to the
13  trauma protocol?
14        MR. ROFFMAN: Objection.
15        MS. WHITAKER: You can answer.
16        THE WITNESS: Yes.
17  BY MR. BURCHFIELD:
18      Q    And the reason for that was because the
19  trauma IND was not sufficiently similar to the
20  orthopedic indication --
21        MS. WHITAKER: Objection
22  BY MR. BURCHFIELD:

86

1      Q    -- to proceed under the same IND name?
2        MS. WHITAKER: Objection.
3        MR. ROFFMAN: Objection.
4        MS. WHITAKER: To the form of the question.
5        THE WITNESS: It's an administrative
6  decision at FDA. Generally, it's easier
7  administratively to keep track of what's going on if
8  you have studies that are similar leading to a single
9  indication under one IND that allows a reviewer to
10  keep straight all of the studies related to a
11  particular indication. So it's an administrative
12  decision.
13  BY MR. BURCHFIELD:
14      Q    Were you involved in that decision?
15      A    Yes, I was.
16      Q    Who else was involved in that decision?
17      A    Well, I would make my recommendation again
18  through my management chain, and they would either
19  agree or disagree. In this case, I don't recall that
20  they -- there was any disagreement.
21      Q    When you say it's an administrative
22  decision, that is not the same as saying it's a

87

1  clerical issue, is it?
2      A    What do you mean by clerical?
3      Q    Well, at one extreme might be the mail room
4  where matters come in and they're sorted clerically by
5  zip code, and at another extreme would be having two
6  different protocols for clinical studies which have to
7  be evaluated by someone with substantial medical and
8  clinical experience to determine whether one is
9  sufficiently similar to the other.
10        MR. ROFFMAN: Object to form.
11        THE WITNESS: This is -- this is an
12  administrative decision. It's also for the purpose of
13  keeping straight those studies that are related to one
14  indication, keep them separate from those studies that
15  are related to another indication. It's not clerical.
16  It's not a clerical decision.
17  BY MR. BURCHFIELD:
18      Q    It sounds like it's a medical decision or a
19  clinical decision
20      A    In part, it's a medical decision, yes.
21      Q    And what part of it is medical?
22      A    Well, in this particular case, it would

88

1  have all been medical since nothing changed in terms
2  of the product characteristics. In other
3  circumstances where manufacturing changes have
4  occurred, it might very well be to keep straight what
5  you're dealing with in terms of a product. So in this
6  case, it would have been a medical decision. It's a
7  different indication. It's easier to keep the
8  studies -- instead of having to remember study
9  numbers, you can remember an IND number. It keeps it
10  separate in someone's mind.
11      Q    And can you -- can you describe the medical
12  reasons that the two studies were put under separate
13  IND numbers?
14      A    All of the studies up until that IND dealt
15  with surgical use with a particular clinical endpoint
16  of avoidance of transfusion. A trauma study would be
17  looking at a different endpoint. Trauma is not the
18  same as surgery. It's medically a different -- it's a
19  different situation.
20      Q    What was the endpoint for the trauma study,
21  if you recall?
22      A    It would have been survival, I believe.

VIDEOTAPED DEPOSITION OF TOBY SILVERMAN, M.D.
CONDUCTED ON TUESDAY, OCTOBER 24, 2006

24 (Pages 93 to 96)

93

1 approvable and not approvable letters?
2    A   **Right. In other words, as I understand it**
3 **under PDUFA 1, FDA would issue complete responses**
4 **under the first iteration of the law. A complete**
5 **response would carry a designation of either**
6 **approvable or not approvable. In subsequent**
7 **iterations of the law captured -- I haven't seen this**
8 **document before, captured here, memorialized here,**
9 **those two categories were merged, and the designation**
10 **of complete response letter was used, and the two**
11 **terms "approvable" and "not approvable" were dropped.**
12    Q   And would you -- as the term "complete
13 response letter" is used within CBER, does it also
14 carry, as stated here, no implication as to the
15 ultimate approvability of the application?
16    A   **That is correct. It carries no implication**
17 **as to the ultimate approvability of the application.**
18    MR. BURCHFIELD: Let me ask the reporter to
19 mark as Silverman Exhibit 13 a letter from Jeffrey
20 Riedler of the Securities and Exchange Commission to
21 Lana Ogram of FDA dated February 5, 2003.
22    (Deposition Exhibit No. 13 was marked for

94

1 identification and attached to the transcript.)
2 BY MR. BURCHFIELD:
3    Q   Dr. Silverman, do you have in front of you
4 Exhibit 13?
5    A   **I do.**
6    Q   Have you seen this letter before?
7    A   **I don't believe so.**
8    Q   Were you aware that in early 2003 the
9 Securities and Exchange Commission made an inquiry to
10 FDA about whether certain statements in Biopure's
11 public filings were accurate?
12    A   **I don't remember.**
13    Q   I would have thought, and correct me if I'm
14 wrong, I would have thought that as the person -- one
15 of the senior people involved in this review, you
16 might have -- you might have become aware of this
17 inquiry?
18    A   **I can't answer that, because I do not**
19 **remember this.**
20    Q   This document, you will see, contains the
21 first page -- this is the way it was produced to me --
22 contains the first page of a Form S-3, which is dated

95

1 January 29th, 2003 at the top. Do you see that? It's
2 the next to last page.
3    A   **I see.**
4    Q   Then it also contains the first page of a
5 Form 10-K, which appears to have been issued sometime
6 in January of 2003. Do you see that?
7    A   **I see that.**
8    Q   Let me, just for the record -- let's mark
9 the actual documents in light of the FDA's failure to
10 date to produce full versions of this letter.
11    MR. ROFFMAN: Objection.
12    MR. BURCHFIELD: Exhibit 13 will be the
13 Form S-3 dated January 29, 2003 and --
14    COURT REPORTER: Do you mean 14?
15    MR. BURCHFIELD: I'm sorry, Exhibit 14?
16 Exhibit 14 will be the Form S-3 dated January 29, 2003
17 and Silverman Exhibit 15 will be the 10-K referred to
18 in the letter.
19    (Deposition Exhibit No. 14 was marked for
20 identification and attached to the transcript.)
21    (Deposition Exhibit No. 15 was marked for
22 identification and attached to the transcript.)

96

1 BY MR. BURCHFIELD:
2    Q   Dr. Silverman, I don't mean to take your
3 time at this juncture to read these two documents,
4 although we may come back to them in a few minutes.
5 Just thumbing through them, do you recall ever looking
6 at documents of this nature from Biopure before?
7    MS. WHITAKER: Objection, beyond the scope.
8    THE WITNESS: The answer is no.
9 BY MR. BURCHFIELD:
10    Q   You can put those aside. Do you know Lana
11 Ogram?
12    A   **No, I do not.**
13    Q   Do you know Marianne Brill, Marianne Brill,
14 B-R-I-L-L?
15    A   **The name doesn't ring a bell.**
16    Q   Do you know Jerome C. Davis?
17    A   **Not to the best of my recollection. These**
18 **are not people I deal with.**
19    Q   Let me -- let's quickly run through the
20 chronology of the Biopure BLA, Dr. Silverman. Quickly
21 will be a relative term, I'm afraid. As Silverman
22 Exhibit 16, I ask the reporter to mark a letter dated

# EXHIBIT 2

VIDEOTAPED DEPOSITION OF FRANKLIN STEPHENSON
CONDUCTED ON MONDAY, OCTOBER 23, 2006

1 (Pages 1 to 4)

---

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF MASSACHUSETTS
 3
 4     - - - - - - - - - - - - - - - - - - *
 5   U.S. SECURITIES AND EXCHANGE       *
 6   COMMISSION,                        *
 7          Plaintiff,        *
 8        vs.               * Case Number
 9   BIOPURE CORPORATION, THOMAS MOORE, * 05-11853-PBS
10   HOWARD RICHMAN, and JANE KOBER,   *
11        Defendants.       *
12     - - - - - - - - - - - - - - - - - - *
13     Videotaped Deposition of FRANKLIN STEPHENSON
14     Rockville, Maryland
15     Monday, October 23, 2006
16        9:12 a.m.
17
18
19   Job No. 1-88635
20   Pages 1 - 242
21   Reported by: Karen Young
22   Videographer: Santiago Murillo
```

---

**Page 2**

```
 1        Videotaped Deposition of FRANKLIN
 2   STEPHENSON, held at the offices of:
 3      U.S. FOOD AND DRUG ADMINISTRATION
 4      1401 Rockville Pike, Room 402S
 5      Rockville, Maryland 20852
 6      (301) 827-7877
 7
 8
 9
10
11       Pursuant to notice, before Karen Young,
12   Notary Public in and for the State of Maryland.
13
14
15
16
17
18
19
20
21
22
```

---

**Page 3**

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF THE SECURITIES AND EXCHANGE
     COMMISSION:
 3
 4      IAN D. ROFFMAN, ESQUIRE
        U.S. SECURITIES AND EXCHANGE COMMISSION
        Division of Enforcement
 5      Boston District Office
        33 Arch Street
 6      Boston, Massachusetts 02110-1424
 7      (617) 573-8987
 8
     ON BEHALF OF THOMAS MOORE:
 9
        BOBBY R. BURCHFIELD, ESQUIRE
10      HEATHER L. SIDWELL, ESQUIRE
        McDERMOTT WILL & EMERY LLP
11      600 Thirteenth Street, Northwest
        Washington, D.C. 20005-3096
12      (202) 756-8003
13
14
     ON BEHALF OF THE U.S. FOOD AND DRUG
15   ADMINISTRATION:
16      CLAIRE WHITAKER, ESQUIRE
        U.S. ATTORNEY'S OFFICE
17      555 Fourth Street, Northwest, E-4204
        Washington, D.C. 20530
18      (202) 514-7137
19      MICHAEL SHANE, ESQUIRE
        DEPARTMENT OF HEALTH AND HUMAN SERVICES
20      Office of the Chief Counsel
        Food and Drug Administration
21      5600 Fishers Lane
        Rockville, Maryland 20857
22      (301) 827-2802
```

---

**Page 4**

```
 1   ON BEHALF OF BIOPURE CORPORATION:
 2      MICHAEL D. BLANCHARD, ESQUIRE
        BINGHAM McCUTCHEN LLP
 3      One State Street
        Hartford, Connecticut 06103-3178
 4
 5      (860) 240-2945
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

VIDEOTAPED DEPOSITION OF FRANKLIN STEPHENSON
CONDUCTED ON MONDAY, OCTOBER 23, 2006

19 (Pages 73 to 76)

73

1  FDA gets six months to review. I've never seen, well,
2  anything approved immediately. Usually we'll take the
3  time to review and then approve it.
4      Q.   Okay. How many -- how many products have
5  you been involved with as the regulatory product
6  manager that have been approved without issuance of a
7  complete response letter?
8      A.   Thirty or 40.
9      Q.   So in comparison to the products on which
10 complete response letters are issued, you're saying
11 that more products are approved without a complete
12 response letter --
13     A.   Yes.
14     Q.   -- than approved after a complete response
15 letter.
16     A.   Oh, no, products are approved after a CR
17 letter.
18     Q.   Right.
19     A.   And I've seen two CR letters or three CR
20 letters and then approval.
21     Q.   So complete response letters are not the end
22 of the line.

74

1      A.   No.
2      Q.   Okay. And my question simply here is as for
3  all the products that you have served as the
4  regulatory product manager, do more get approved prior
5  to receiving a complete response letter? In other
6  words, do more of them get approved with an approval
7  letter and no complete response letter, or do most of
8  them go through complete response letters, one or
9  more, before they ultimately get to approval?
10     MR. ROFFMAN: Object to form.
11     A.   Products are approved without a CR letter.
12 A CR letter doesn't need to be issued. CR letters are
13 only issued if the deficiencies are great or -- yeah.
14     Q.   Okay, well, let me try again. I understand
15 that -- I understand that products can be approved
16 without a complete response letter.
17     A.   Yes.
18     Q.   I also understand that products can be
19 approved if the sponsor has received a complete
20 response letter and then satisfied CBER that the --
21 that the deficiencies have been corrected or
22 sufficiently addressed. My question for you is as for

75

1  the products that are approved after receiving a
2  complete response letter and the deficiencies being
3  addressed, is that number greater or lesser than the
4  number of products in your experience that are
5  approved without an intervening complete response
6  letter?
7      MR. ROFFMAN: Object to form.
8      A.   I would say 25 to 30 percent are issued CR
9  letters.
10     Q.   And the other --
11     A.   All applications, and the other are
12 straight.
13     Q.   Okay, so to make sure I understand, of the
14 approvals, 75 percent or so --
15     A.   Or 70 percent are straight approvals.
16 Thirty percent have CR letters.
17     Q.   Okay. Now, if I were to tell you, just
18 speaking hypothetically, if I were to tell you that a
19 particular product had received a complete response
20 letter --
21     A.   Uh-huh.
22     Q.   Would that tell you, just that phrase,

76

1  without knowing any more, would that phrase tell you
2  that that product is or is not likely to be approved
3  down the road?
4      A.   No.
5      Q.   It wouldn't tell you anything, would it?
6      A.   Exactly, unless you respond to the
7  deficiencies, you won't get approved, so it doesn't
8  mean anything. You have to respond to the
9  deficiencies in order for us to approve it.
10     Q.   But just using the term "complete response
11 letter" about a product doesn't tell you whether or
12 not the sponsor's going to be able to respond to those
13 deficiencies, right?
14     A.   I wouldn't know.
15     Q.   What does FDA do -- what does CBER do if it
16 is convinced that a product is so toxic, so unsafe and
17 so lacking in efficacy that it can never be approved?
18     MS. WHITAKER: Objection, beyond the scope,
19 but you can answer if you --
20     A.   That is a question that has to be given to
21 people that make more money than us. I have no idea.
22     Q.   Well, that's a fair response. Let me try it

VIDEOTAPED DEPOSITION OF FRANKLIN STEPHENSON
CONDUCTED ON MONDAY, OCTOBER 23, 2006

35 (Pages 137 to 140)

137

1   was being extended by 90 days.
2      A.   Yes, it is.
3      Q.   And the new date for completion of the
4   review as stated in this letter is August 29, 2003?
5      A.   Correct.
6      Q.   Now, do you recall having another telephone
7   call with Biopure on May 27?
8      A.   Besides this one?
9      Q.   Correct.
10     A.   I don't recall.
11         MR. BURCHFIELD: I ask the reporter to mark
12   as Stephenson Exhibit 28 another phone memorandum from
13   May 27, 2003.
14              - - -
15         (Deposition Exhibit Number 28 was marked for
16   identification.)
17              - - -
18         THE WITNESS: Yes.
19   BY MR. BURCHFIELD:
20     Q.   Have you read Stephenson Exhibit 28?
21     A.   I have.
22     Q.   Is there anything in this memorandum that

138

1   you believe to be inaccurate?
2         MR. ROFFMAN: Objection.
3      A.   The point about working on our letter. What
4   kind of letter? I would never say that, working on a
5   letter.
6      Q.   You're talking about the sentence that says,
7   "He also mentioned that he had been working on our
8   letter and he had even finalized it," quote unquote,
9   "four times, that they, the reviewers, keep adding,
10   subtracting and redrafting," quote, "You know the
11   government," unquote. Is that what you're referring
12   to?
13     A.   Yes. I didn't say that.
14     Q.   Okay. Do you recall earlier today we looked
15   at a draft -- a draft of the July -- of a letter that
16   was eventually issued on July 30, 2003 --
17     A.   In July, yes.
18     Q.   -- that had been circulated on May 19th?
19     A.   Uh-huh.
20     Q.   Correct?
21     A.   Yes.
22     Q.   And that is in your stack there. If you

139

1   want to refresh your recollection of that, that draft
2   is Stephenson Exhibit 24. Your recollection is that
3   you did not mention that you'd been working on such a
4   letter during this call with Biopure?
5      A.   Correct, I would not divulge the existence
6   of a letter or an approval or disapproval.
7      Q.   Well, is there anything else in here that
8   you find inaccurate?
9      A.   No.
10     Q.   In the last sentence of the first paragraph,
11   it says, "He," referring to you, "said that the FDA
12   really wants to approve this but mistakes needed to be
13   corrected, concerns with safety need to be addressed."
14   You see that?
15     A.   Yes.
16     Q.   And that accurately portrays something that
17   you had said during that call?
18     A.   Yes.
19     Q.   And then -- and then down in the second
20   paragraph, it says, "F. Stephenson stated that,"
21   quote, "they wanted to approve the product but they
22   would want to do it in the right way," unquote. Does

140

1   that accurately quote you in that sentence?
2      A.   I don't recall saying that precise sentence,
3   we want to do it in the right way. What is the right
4   way?
5      Q.   But you -- but the -- but you do recall the
6   first part of the sentence, they wanted to approve the
7   product?
8      A.   Yes, FDA had an open mind. We wanted to
9   approve the product.
10     Q.   Now, this -- this telephone conversation on
11   May 27, 2003 occurred after the clinical hold letter
12   had been issued, correct?
13     A.   I'm not sure.
14     Q.   Would you look back at Stephenson Exhibit --
15   Stephenson Exhibit 20, which is the April 25, 2003
16   letter announcing the clinical hold --
17     A.   Yes.
18     Q.   -- about a month before.
19     A.   You mean a month -- the letter was issued a
20   month before, yes.
21     Q.   Correct. So it was your judgment as of May
22   27, 2003 that even against the background of the

VIDEOTAPED DEPOSITION OF FRANKLIN STEPHENSON
CONDUCTED ON MONDAY, OCTOBER 23, 2006

36 (Pages 141 to 144)

141

1   clinical hold letter, FDA still had an open mind with
2   regard to the BLA.
3       A.   Of course. They are two different
4   submissions.
5       Q.   Okay.
6       A.   One is an IND. The other one is a BLA.
7   They're in different tracks.
8       Q.   And to your knowledge, at that point in
9   time, CBER had not made a decision to deny the BLA; is
10  that right?
11      A.   CBER had not made a decision --
12      Q.   At all.
13      A.   At all. We were still open to the review.
14  There was no decision made.
15      MR. BURCHFIELD: Let me ask the reporter to
16  mark as Stephenson Exhibit 29 a memorandum of a
17  telephone call on May 28, 2003 between Mr. Richman and
18  Mr. Stephenson.
19          - - -
20      (Deposition Exhibit Number 29 was marked for
21  identification.)
22          - - -

142

1       THE WITNESS: Yes.
2   BY MR. BURCHFIELD:
3       Q.   Have you had a chance to review the Exhibit
4   29?
5       A.   Yes.
6       Q.   Does that accurately recount a telephone
7   conversation you had with Dr. Richman on or about May
8   28, 2003?
9       MR. ROFFMAN: Objection.
10      A.   Not accurately.
11      Q.   What do you find inaccurate about this
12  report?
13      A.   About completing the review cycle by August
14  11.
15      Q.   And this sentence you're referring to is,
16  "H. Richman asked if FDA could shoot for completing
17  the review cycle by 11 August. That's 90 days from 13
18  May 2003. F. Stephenson said that he'll try for 13
19  August, but it may be as late as 28 August."
20      A.   How would I know how to complete a review if
21  I'm not a reviewer?
22      Q.   Well, wasn't the end of the review cycle as

143

1   set forth in the -- in the letter from Dr. Golding,
2   Stephenson Exhibit 27, stated to be August 29, 2003?
3       A.   Yes.
4       Q.   Do you recall Dr. Richman asking you if FDA
5   could speed up its review and complete the cycle by
6   August 11 or August 13?
7       A.   I don't recall. I can't be sure of that.
8       Q.   The next paragraph says, "H. Richman said he
9   assumed additional review would occur in the interim
10  and F. Stephenson agreed." Is that much true?
11      A.   Additional review was occurring, yes.
12      Q.   Okay.
13      A.   We were reviewing the BLA.
14      Q.   It continues, "He also said that the heard
15  management questions had gone from four to two." Is
16  that accurate?
17      MR. ROFFMAN: Objection.
18      A.   I don't think so because the heard
19  management questions are more than four.
20      Q.   Had Biopure provided information to the
21  heard management group in response to those questions?
22      A.   I'm not sure. Probably.

144

1       Q.   In that event, might the number of
2   outstanding questions on the heard management
3   discipline have gone from four to two?
4       MR. ROFFMAN: Objection.
5       A.   Probably.
6       Q.   Okay. It then says, "F. Stephenson said
7   that the next two and a half months will be very busy,
8   as FDA will be sending Biopure requests for
9   information and questions." Is that accurate?
10      A.   Yes, that's accurate.
11      MR. BURCHFIELD: Ask the reporter to mark as
12  Stephenson Exhibit 30 a memo of a telephone call from
13  May 28, 2003 between Mr. Stephenson and Mr. Tubbs.
14          - - -
15      (Deposition Exhibit Number 30 was marked for
16  identification.)
17          - - -
18  BY MR. BURCHFIELD:
19      Q.   Have you had a chance to read Stephenson
20  Exhibit 30?
21      A.   Yes.
22      Q.   Is this -- this -- just to keep this in

# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,)
                                   )
              Plaintiff            )
                                   )
        -VS-                       ) CA No. 05-11853-PBS
                                   ) Pages 1 - 27
BIOPURE CORPORATION, et al,        )
                                   )
              Defendants           )


STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 16, 2006, 3:30 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 2

1    A P P E A R A N C E S:

2        IAN D. ROFFMAN, ESQ., R. DANIEL O'CONNOR, ESQ., and
     ELLEN E. BOBER MOYNIHAN, ESQ., Securities and Exchange
3    Commission MA, 33 Arch Street, 23rd Floor, Boston,
     Massachusetts, 02110-1424, for the Plaintiff.
4
         ROBERT A. BUHLMAN, ESQ. and DONALD J. SAVERY, ESQ.,
5    Bingham McCutchen, LLP, 150 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Biopure Corporation.
6
         BOBBY R. BURCHFIELD, ESQ. and EDWARD P. LEIBENSPERGER,
7    ESQ., McDermott, Will & Emery, 28 State Street, Boston,
     Massachusetts, 02109-1775, for the Defendant, Thomas Moore.
8
         CATHY A. FLEMING, ESQ. and MARY-PAT CORMIER, ESQ.,
9    Edwards Angell Palmer & Dodge, 101 Federal Street, Boston,
     Massachusetts, 02110, for the Defendant, Howard Richman.
10
         JUSTIN J. DANIELS, ESQ., Skadden, Arps, Slate, Meagher
11   & Flom, LLP, One Beacon Street, 31st Floor, Boston,
     Massachusetts, 02108, for the Defendant, Jane Kober.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1    the SEC is going to have a problem, okay.  But follow the

2    rule because without that, I'm going to deny any request for

3    a continuance.  The rule has been there from the beginning of

4    time.

5           Now, maybe you didn't know about it then, but you

6    sure know about it now, and I don't understand why you

7    haven't followed the rule.  That puts the laboring oar on

8    them to do it in a timely way by the time a federal judge has

9    scheduled the trial.

10          Let me ask you this:  Is there any principled

11   reason why the FDA hasn't complied other than this

12   regulation?  I mean, is there something like national

13   security, terrorism, something I'm not familiar with?

14          MR. ROFFMAN:  Your Honor, it's actually all of

15   them.  There's two separate issues.  One is documents, and

16   the other is depositions.  For depositions, it really is,

17   they just haven't followed the rule.  And as soon as they

18   submit the request, the FDA will process it, and I think that

19   they'll be able to get the depositions.

20          THE COURT:  Immediately, immediately, I mean,

21   because they can't -- you know, I know the federal

22   government, okay.  I used to be chief of civil in the U.S.

23   Attorney's office a million years ago, and also -- also --

24   I've been a judge now for twelve years here, twenty years all

25   together, okay?  So it can't be when the agency gets around

9f710079-b8d3-4592-a64a-0ab673502085

Page 8

1    to it.  It's got to be immediately.  But you have to cross

2    the T and dot the I.

3         MS. FLEMING:  Your Honor, we have.  We have

4    submitted the requests.  We have done the alternate paths.

5         THE COURT:  Well, when I got all that screaming and

6    yelling back and forth, that wasn't what was said in my

7    brief.

8         MS. FLEMING:  I think what we did is cited it down

9    in the footnotes, what steps we had taken as well to comply

10   with -- not only with doing it under the rules of discovery

11   in this court, but that we had taken steps to comply with the

12   Touhy regulations, that we were doing this --

13        THE COURT:  I wish somebody, instead of screaming

14   about the Constitution, it would have been a lot quicker to

15   have just told me you did the regulation and that they're

16   just slow in responding, instead of the volumes of briefs

17   that I got.  I didn't see the fine print in some footnote

18   somewhere.

19        All right, now, is it correct she's now followed

20   the regulations?

21        MR. ROFFMAN:  Your Honor, with respect to -- I

22   don't think they have with respect to depositions, but --

23        THE COURT:  Why?  What haven't they done it?

24        MR. ROFFMAN:  What they have to do is write a

25   letter that explains the reason why they need testimony

1    addressed to the Commissioner of the FDA.

2            THE COURT:  Would you help because your case is

3    going to suffer?

4            MR. ROFFMAN:  I will.  And if they've done it, I've

5    never seen it.

6            THE COURT:  Do you have the letter that you've

7    written?

8            MS. FLEMING:  I don't have the letter with me, your

9    Honor.  I have the footnote which refers to the steps --

10           THE COURT:  You know, the briefing was annoying

11   because it was talking -- it's a very -- it puts the thing in

12   a totally different setting when you're talking about due

13   process clause and you don't tell me you followed the

14   regulation.  So why don't you file with me exactly what you

15   did on the Touhy regulation, all right?

16           MS. FLEMING:  We will do it, your Honor.  We will

17   do it.

18           THE COURT:  So let's assume that they've done it.

19   What is the FDA telling you about how quickly they can get a

20   turnaround on it?

21           MR. ROFFMAN:  Well, can I just address the

22   documents for a second because I think that's a separate

23   issue.  The FDA really has an agencywide and, I think,

24   legitimate concern about documents because they get

25   subpoenas, Congressional requests, terrorism-related

Page 10

1   requests, and they have an enormous backlog.  But what we can

2   do to try and get through that is -- and I've spoken briefly

3   with Mr. Moore's counsel about this -- if the defendants can

4   have what's a reasonable narrowly tailored request, there is

5   a regulation which allows us as another federal agency to

6   request outside of the FOIA regulations, and we will make the

7   request for those documents.

8           THE COURT:  This isn't FOIA.  This is discovery.

9   We're not talking FOIA; we're talking discovery.  And so what

10  T does she have to cross and I to dot to get the documents,

11  the Touhy regulations again?

12          MR. ROFFMAN:  Again, it's the Touhy regulations.

13          THE COURT:  Has she done that?

14          MR. ROFFMAN:  With the Touhy regulations, the FDA

15  takes the position, as they're entitled to under the law,

16  that a document subpoena gets put in the FOIA cue.

17          THE COURT:  You know what?  I'll find them in

18  contempt.  They'll subpoena the stuff to court here.  That's

19  not acceptable.  Now, it has to be narrowly tailored.  I'll

20  be sympathetic if it's everything but the kitchen sink, but

21  if there's an ongoing trial which the government is pressing

22  forward with, they can't do that.

23          MR. ROFFMAN:  As long as it's narrowly tailored, we

24  can get the documents.

25          THE COURT:  Good.

Page 24

1    next week?

2              THE CLERK:  July 26 at 2:00 o'clock.

3              MS. FLEMING:  Great, thank you.

4              THE COURT:  Where is that going to take place?

5              MS. FLEMING:  New York City.  It's supposed to take

6    place at the ABA, but that's in Honolulu.

7              THE COURT:  And you're picking New York?

8              MS. FLEMING:  I did not, but the people who don't

9    have big firm support behind them thought it would be better

10   to do it in New York.  Unfortunately, our constitution

11   requires that I attend the ABA in Honolulu, so --

12             THE COURT:  So we'll do it the following week, the

13   26th.

14             MS. FLEMING:  Thank you.

15             THE CLERK:  And the trial is January 15 at 9:00,

16   final pretrial January 9 at 2:00 p.m.

17             THE COURT:  Okay?  One thing this does not provide

18   for -- let's be clear -- it doesn't set out a window for

19   additional motions for summary judgment.  So that

20   realistically, if someone files one, I will not get to it

21   because this is so tight following the close of discovery.

22   So if you want to file another motion for summary judgment,

23   you probably will need to do that really early on.  Don't do

24   it at the last minute.  The other issue it doesn't build in

25   for is expert discovery.

9f710079-b8d3-4592-a64a-0ab673502085

# EXHIBIT 4

nov21 rough draft.txt

1

THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

This realtime transcription has not been checked or

proofread.  It is the court reporter's uncorrected

steno translation, not the certified transcript

You may see untranslated keystrokes and

mistranslations, resulting in nonsensical word

combinations.

The transcript will be certified by me after it is

proofread and corrections made, title page and

appearances added.  Page and line numbers in the

certified transcript will therefore change, as well

as punctuation, proper name spellings, and

formatting.

This interactive realtime service is provided to you

solely for use in-house by you and other members of

your staff, associate counsel, paralegals, expert

consultants.  We agree to provide this service to

you ONLY on the explicit understanding that you will

in no way make it available, in whole or in part, in

any form, to anyone else.

nov21 rough draft.txt

2

THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL

RECORD WHICH MAY BE RELIED UPON FOR THE

VERBATIM CITATION OF TESTIMONY.  PLEASE DO NOT

QUOTE VERBATIM FROM THE DRAFT TRANSCRIPT!


The court reporting agency and the court reporter,

Alan H. Brock, are not responsible for the misuse of

this realtime draft transcript by anyone.

☐


3

November 21, 2006    8:34 a.m.

P R O C E E D I N G S

(Exhibits Stamm 1 and 2 marked for

identification.)

THE VIDEOGRAPHER:  We are now recording

and on the record.  My name is Thomas Laub.  I'm a

legal video specialist for National Video Reporters,

Boston, Massachusetts.  Today is November 21st,

2006, and the time on the video monitor is 8:34 a.m.

This is the deposition of Laura B. Stamm

in the matter of Securities and Exchange Commission,

Plaintiff, versus Biopure Corporation, et al.,

Defendant, in U.S. District Court, District of

Massachusetts, Case No. 05-11853-PBS.

This deposition is being taken at 28

Page 2

nov21 rough draft.txt

A. I have not.

Q. How is it, Ms. Stamm, that you were

retained in this matter?

    MR. ROFFMAN: Objection.

A. I'm not sure what you mean.

Q. Well, you are doing work for the SEC in

connection with this case; correct?

A. Yes.

Q. How is it that that came about, to your

knowledge?

A. Mr. Roffman was referred to me by a

colleague, we spoke, and he retained me.

Q. A colleague at the SEC or a colleague from

somewhere else?

A. A colleague at Analysis Group; one of my

colleagues.

Q. Who was that colleague?

A. Arthur Samuelson.

Q. When did that occur, to your knowledge?

A. August of this year.

Q. Were you retained in August of this year?

☐

47

A. Yes, I was.

Q. When did you begin performing work in this

case?

A. At the very end of August.

Page 44

nov21 rough draft.txt

Q. What work did you and others at Analysis

Group do in this matter prior to September 6, 2006?

A. I read the complaint. We downloaded the

stock-price data on Biopure, started out the stock

price, probably made a summary of -- summary chart

of the dates mentioned in the complaint, downloaded

a market index, investigated different industry

indexes that might be appropriate.

Q. Appropriate to what?

A. Appropriate industry comparables to

Biopure.

Q. Were these tasks that the SEC asked you to

perform prior to September 6th?

A. Well, I wouldn't quite characterize it that

way.

Q. Well, what was your understanding of the

scope of your engagement when you were first

retained by the SEC in this case?

□

50

A. The scope of my engagement was to review

and respond to any expert report filed on behalf of

the defendants.

Q. In any particular subject area?

A. Yes, the issue of materiality is what was

expected?

Q. So it was your understanding even before

Page 47

nov21 rough draft.txt

September 6th that the defendants may produce such

an expert report?

   A. Yes.

   Q. And did the scope of your engagement

contemplate a performance of work on materiality

even if no such report was produced by defendants?

   A. No. It was -- my understanding was if no

such report was produced by the defendants, I would

not be needed.

   Q. And you were retained in anticipation of an

expert report being provided by defendants on

materiality in late August?

   A. Yes.

         (Exhibits Stamm 3 and 4 marked for

identification.)

         (Discussion off the record.)

         MR. LEVINE:  The copy with the stamped

□

                    51

copies have the labels.

   Q. Ms. Stamm, I have provided you with what

have been marked as Stamm Exhibits 3 and 4.

         MR. LEVINE:  For the record, Exhibit 3

bears labels Stamm 00002 through 00004, and then

Exhibit 4 has Bates labeling Stamm 00005 through

00007.

   Q. Do you recognize these documents,

                    Page 48